Calendar No. 411

| 110TH CONGRESS | SENATE | REPORT |
|---|---|---|
| *1st Session* | | 110–191 |

## DECEPTIVE PRACTICES AND VOTER INTIMIDATION PREVENTION ACT OF 2007

---

OCTOBER 4, 2007.—Ordered to be printed

---

Mr. LEAHY, from the Committee on the Judiciary,
submitted the following

# R E P O R T

together with

## ADDITIONAL VIEWS

[To accompany S. 453]

The Committee on the Judiciary, to which was referred the bill (S. 453) to prohibit deceptive practices in Federal elections, having considered the same, reports favorably thereon with amendment and recommends that the bill do pass.

### CONTENTS

| | Page |
|---|---|
| I. Background and Purpose of the Deceptive Practices and Voter Intimidation Prevention Act of 2007 | 1 |
| II. History of the Bill and Committee Consideration | 3 |
| III. Section-by-Section Summary of the Bill | 8 |
| IV. Cost Estimate | 13 |
| V. Regulatory Impact Evaluation | 15 |
| VI. Conclusion | 15 |
| VII. Additional Views of Senators Kyl, Graham, Cornyn, and Brownback | 16 |
| VIII. Changes to Existing Law Made by the Bill, as Reported | 19 |

## I. BACKGROUND AND PURPOSE OF THE DECEPTIVE PRACTICES AND VOTER INTIMIDATION PREVENTION ACT OF 2007

The right to vote is a fundamental right accorded to United States citizens, and the unimpeded exercise of this right is essential to the functioning of our democracy.

It has been 137 years since the States ratified the Fifteenth Amendment to the United States Constitution in 1870, which pro-

69–010

2

vides that "the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race [or] color." The Amendment also gave Congress power to enforce the amendment by "appropriate legislation."

Tragically, African Americans still had to suffer through nearly another century of discrimination at the hands of discriminatory Jim Crow laws and regulations. During the Jim Crow era, it was difficult, if not impossible, for African Americans to register to vote and cast their votes due to grandfather clauses, literacy tests, poll taxes, property requirements, harassment, violence, and other significant barriers.

The 19th Amendment to the Constitution was ratified in 1920, prohibiting the denial of the right to vote on the basis of sex. In 1964, the 24th Amendment to the Constitution was ratified, prohibiting the use of a poll tax or any other tax to deny a citizen the right to vote. In 1965, Congress enacted the Voting Rights Act, which was designed to once and for all prohibit discrimination against voters on the basis of race or color. In 1971, the 26th amendment to the Constitution was ratified, prohibiting the denial of the right to vote to anyone 18 years or older simply because of their age. In 2006, Congress reauthorized the Voting Rights Act for another 25 years and rejected efforts to weaken this historic law.

Despite the constitutional and statutory protections provided, deceptive practices are still used today to keep citizens away from the polls. Deceptive practices generally focus on providing false information regarding the time or place of an election or voting eligibility requirements, in an effort to keep voters away from the ballot box or to prevent voters from voting for the candidate of their choice. These efforts are primarily targeted at racial minorities, new voters, the elderly, the disabled, low-income individuals, naturalized citizens, formerly-incarcerated voters, and other groups that are disadvantaged or have historically faced discrimination.

Deceptive practices have a long history, but have received greater attention in recent years. For example, shortly before the 1990 midterm elections, 125,000 voters in North Carolina received postcards providing false information about voter eligibility and a warning about criminal penalties for voter fraud. Ninety-seven percent of the voters who received a postcard were African American.

In 2002, fliers stating that voters could cast their ballots three days after the election "if the weather is bad" were distributed in New Orleans public housing complexes.

In the 2004 presidential election, voters in Milwaukee received fliers from the non-existent "Milwaukee Black Voters League," warning that voters risked imprisonment for voting and the loss of custody of their children if they were ever found guilty of any offense—even a traffic violation.

Also in the 2004 general election, voters in Franklin County, Ohio, received fliers stating that due to "confusion caused by unexpected heavy voter registrations" Republicans should vote on Tuesday and Democrats should vote on Wednesday. A similar deceptive flier was distributed that year in Allegheny County, Pennsylvania, asking Republicans to vote on Tuesday and Democrats to vote on Wednesday, and concluding by thanking voters for "cooperating with us in this endeavor to create a peaceful voting environment."

3

In the 2006 mid-term election, 14,000 Latino voters in Orange County, California received mailings from the California Coalition for Immigration Reform, warning them in Spanish that "if you are an immigrant, voting in a federal election is a crime that can result in incarceration". The letter also falsely stated that the U.S. Government was "installing a new computer system to verify the names of all new registered voters," and that "[a]nti-immigration organizations can ask for information from this new computer system."

Also in 2006, registered voters in Virginia received phone messages falsely warning them that the "Virginia Elections Commission" had determined that they were ineligible to vote. Similar misinformation campaigns were reported in jurisdictions across the country.

The same year, in Maryland, certain campaigns for Governor and United States Senator distributed fliers in predominantly African American neighborhoods falsely claiming that the candidates had been endorsed by prominent figures in the community, when in fact these prominent figures in the community had actually endorsed the opponents of the candidates.

Congress has a compelling interest in protecting the integrity of elections, safeguarding the right of all citizens to vote for the candidate of their choice, and preventing any attempts to keep voters from exercising their right to vote. The Deceptive Practices and Voter Intimidation Prevention Act of 2007 would prohibit and punish the practice of communicating false information regarding: the time, place or manner of the election; the qualifications for or restrictions on voter eligibility for such election; or the explicit endorsement by any person or organization of a candidate's election. The bill would prohibit and punish deceptive practices committed with the intent to prevent a citizen from exercising the right to vote. The bill would increase monetary and criminal penalties for deceptive practices and voter intimidation in Federal elections. The bill would also require the Attorney General to respond to deceptive practices by providing accurate information to affected voters regarding the time and place of elections and rules on voter eligibility, in an effort to counter the harm caused by deceptive practices.

## II. HISTORY OF THE BILL AND COMMITTEE CONSIDERATION

### A. INTRODUCTION OF THE BILL

Senator Barack Obama and Senator Charles E. Schumer introduced S. 453, the Deceptive Practices and Voter Intimidation Prevention Act of 2007, on January 31, 2007, joined by Senators Leahy, Cardin, Feingold, Kerry, Feinstein, Clinton, Boxer and Kennedy as original cosponsors. Since the bill's introduction, Senators Levin, Landrieu, Brown, Johnson, Whitehouse, McCaskill, Wyden, Durbin and Coburn have joined as cosponsors. The bill was referred to the Committee on the Judiciary.

The House of Representatives passed companion legislation, H.R. 1281, by voice vote on June 25, 2007.

4

B. HEARING ON JUNE 7, 2007

The Judiciary Committee held a hearing on June 7, 2007, chaired by Senator Benjamin L. Cardin and entitled, "Prevention of Deceptive Practices and Voter Intimidation in Federal Elections: S. 453." Senators Charles E. Schumer and Barack Obama testified on the first panel. Testifying on the second panel were Douglas F. Gansler, Attorney General for the State of Maryland, and Jack B. Johnson, County Executive for Prince George's County in the State of Maryland. Testifying on the third panel were Hilary O. Shelton, Director of the Washington Bureau of the National Association for the Advancement of Colored People (NAACP); John Trasviña, President and General Counsel of the Mexican American Legal Defense and Education Fund (MALDEF); Richard Briffault, Joseph Chamberlain Professor of Legislation at the Columbia Law School; William B. Canfield, Principal at Williams & Jensen, PLLC; and Peter N. Kirsanow, Commissioner of the United States Commission on Civil Rights (testifying in his personal capacity).

The hearing focused on the need for S. 453 to combat the decades-old practice of communicating intentionally false information in an effort to disenfranchise voters and to keep voters away from the polls. The hearing discussed some of the forms of deceptive practices that have been seen in recent elections. In detailing some of these newer tactics, Senator Cardin quoted, in part, a letter dated June 4, 2007, from former United States Senator Charles ("Mac") Mathias, Jr.:

> While the methods employed to deter voting differ today from those in vogue years ago, the deplorable objective remains the same: to help destroy the integrity of the election process by suppressing participation, especially by minorities. Because these more modern methods of coercion and intimidation do not fall neatly within the ambit of current law, legislation amending Section 1971(b) is needed. I believe S. 453 fills that gap admirably.

Douglas F. Gansler, Attorney General for the State of Maryland, strongly endorsed S. 453 and described deceptive fliers distributed during the 2002 and 2006 Federal elections in African American neighborhoods. In 2002, a flier showing the wrong election date and falsely stating that parking tickets must be paid before voting was distributed in predominantly African American areas in Baltimore City, in an apparent effort to lower voter turnout.

Jack B. Johnson, County Executive of Prince George's County in Maryland, testified in support of S. 453 and described how, on the date of the Federal election in 2006, fliers were distributed in his County that misleadingly suggested that Mr. Johnson had endorsed certain Republican candidates despite the fact that Mr. Johnson had, in fact, endorsed those candidates' opponents. These same fliers falsely listed certain candidates as part of a "Democratic Sample Ballot."

Hilary O. Shelton, Director of the Washington Bureau of the NAACP, testified in support of the bill. He testified that:

> Unfortunately, some people are still so desperate to win elections—elections that they fear they cannot rightfully win—that they resort to deceptive practices, misinformation and lies, to try to keep legitimate voters away from the polls or to support

5

candidates whom they might not otherwise vote for. It is even more unfortunate that these practices often target and exploit many of the same populations that have historically been excluded from the ballot box. Specifically, vulnerable populations, such as racial and ethnic minorities, the disabled and/or the poor and senior citizens are often targeted by those perpetuating these deceptive practices. . . Yet there are still people and organizations in our country who are so afraid of the outcome of our democratic process that they must stoop to lies, duplicitous behavior, and intimidation to try to keep certain segments of our population and communities away from the voting poll.

Mr. Shelton provided the following examples of deceptive tactics in recent elections:

In Ingham County, Michigan, a partisan poll challenger confronted every African American attempting to vote that day. There were no reports of any Caucasian voters even being questioned. In Orange County, California, 14,000 Latino voters got letters in Spanish saying it was a crime for immigrants to vote in a Federal election. It did not state or even clarify that immigrants who are citizens have the right to vote and indeed should. In Baltimore, Maryland, misleading fliers were placed on cars in predominantly African American neighborhoods giving the wrong date for the upcoming election day. In Virginia, registered voters received recorded (robotic) calls that falsely stated that the recipient of the call was registered in another State and would face criminal charges if they came to the polls to vote that day. It was also in Virginia that voters received phone calls stating that because they were such regular voters they could vote this time by telephone, by simply pressing a number at that time for the candidate of their choice. The call ended by repeating that they had now voted and did not need to go to the polls.

Mr. Shelton testified that these cases warranted a quick response by the Federal Government to expose the lies told to voters and to provide corrected information so voters could go to the polls in time to have their votes counted.

John Trasviña, President and General Counsel of MALDEF, testified in support of the bill because: "voter intimidation and deceptive practices present serious threats to the integrity of the American democratic system. . . . We have recently witnessed an increase in voter suppression, intimidation and deceptive practices aimed at Latino voters. When a community organizes and begins to make new political gains, it often becomes subject to deliberate attempts to halt its electoral advancement by any available means, including the use of deceptive practices and voter intimidation." Mr. Trasviña described a letter sent to approximately 14,000 Spanish-surname voters in Orange County, California, that provided false information to prospective voters, including the statement that immigrants who vote in Federal elections are committing a crime that can result in incarceration and possible deportation.

Richard Briffault, Joseph Chamberlain Professor of Legislation at the Columbia Law School, testified in support of the bill that "Congress plainly has the authority to adopt laws vindicating the integrity of federal elections and the rights of federal voters" such

6

as S. 453. Professor Briffault further testified that S. 453 "is entirely consistent with the First Amendment's protection of freedom of speech. Indeed, by protecting voters from false statements intended to deceive voters or prevent voters from voting, the bill actually promotes the values of political participation and personal autonomy that are at the heart of the First Amendment." He testified that:

> The only significant constitutional issue in the regulation of false election communications is the requirement that the law be narrowly tailored to avoid impinging on or chilling constitutionally protected speech. S. 453 clearly satisfies the narrow tailoring requirement. First, S. 453 is limited to the communication of falsehoods that the speaker knows to be false and which the speaker communicates in order to prevent another person from voting. This is actually significantly tighter than the constitutional test for the regulation of false statements adopted by the Supreme Court. . . . Innocent, negligent, and even reckless mistakes are not restricted.

> Second, S. 453 is limited to a very constrained set of false statements of fact—statements dealing with the time, place, or manner of voting; with eligibility to vote; and with explicit endorsements by persons or organizations. These involve simple statements of fact that do not remotely deal with matters of opinion, or the issues, ideas, or political views that make up an election campaign.

Professor Briffault's statement for the hearing record sets out legal arguments in support of the constitutionality of S. 453.

William B. Canfield, Principal at Williams & Jensen, PLLC, testified in opposition to the bill. Mr. Canfield stated his view that S. 453, as introduced, was overly broad and unnecessary. Mr. Canfield also objected to the bill's provision of a private right of action for aggrieved individuals.

Peter N. Kirsanow, a member of the United States Commission on Civil Rights and the National Labor Relations Board, testified in his personal capacity. Mr. Kirsanow suggested that the Committee should expand S. 453 to cover the issues of fraudulent registration, multiple registration, and compromised absentee ballots. During the course of the hearing, in response to a question from Senator Orrin G. Hatch, Professor Briffault clarified that fraudulent registration and fraudulent voting are already criminalized.

The People for the American Way and the People for the American Way Foundation submitted a statement for the record in support of the legislation. The statement elaborated on the need for the bill:

> Federal law may not currently criminalize all the deceptive practices we saw in the 2006 elections, including disinformation campaigns and harassing robocalls. Such practices try to deceive voters into changing their votes, or voting on the wrong day, or by sending them to the wrong polling place. Some schemes attempt to convince citizens that voting will be difficult or even dangerous, or simply annoy them so much that they stay home from the polls in disgust at the whole process. Americans deserve elections that are clean and fair. We may not be able to stop dirty tricks in campaigns, but we can make

7

it harder for them to succeed—and we can make the consequences very serious for those who carry them out.

Barbara Arnwine, Executive Director of the Lawyers' Committee for Civil Rights Under Law, submitted a statement for the record detailing the lengthy history of deceptive practices undermining our democracy's electoral integrity. Her testimony included specific examples of deceptive practices and stated that "across the country, primarily in traditionally disenfranchised communities, voters are deliberately misinformed about the mechanics of elections." Ms. Arnwine expressed her organization's support for the bill:

> "This crucial piece of legislation targets the necessary problems in the election system by striking a necessary balance between the rights of all Americans to cast an effective ballot and our core First Amendment constitutional rights." Ms. Arnwine noted that the Lawyers' Committee has joined with the NAACP, the National Bar Association, and the People for the American Way Foundation to form the Election Protection Coalition, which has systematically collected reports of deceptive practices or voter intimidation in Federal elections.

Patricia M. Roberts, President of Citizens Against Un-American Voter Intimidation, submitted a statement for the record detailing the use of deceptive practices and voter intimidation methods in Federal elections.

### C. COMMITTEE CONSIDERATION

The bill was considered by the Committee on the Judiciary on September 6, 2007. During Committee consideration, Senators Durbin and Coburn requested to be added as cosponsors of the measure.

Senator Schumer introduced an amendment in the nature of a substitute. In addition to minor changes intended to clarify the scope of the bill and the reporting requirements under the bill, the substitute amendment reflects numerous substantive changes proposed by members of the Committee, the Department of Justice, and civil rights advocates.

Specifically, whereas the original bill provided civil and criminal penalties for the communication of false information regarding political party affiliation, this type of false information is not covered in the substitute amendment. The substitute amendment also eliminates the original bill's private right of action for any aggrieved individual to enforce the bill. Instead, the substitute amendment grants aggrieved individuals the right to seek an order in Federal court requiring the Attorney General to take corrective action as provided in the bill, if the Attorney General fails to take such corrective action within 72 hours (or sooner if necessary to ensure timely corrective action before an election) after receiving information that gives reasonable cause to believe a violation has occurred.

Finally, the substitute amendment establishes several safeguards in the section of the bill requiring the Attorney General to counteract deceptive information by distributing corrective information. The provision of corrective information shall be strictly limited to the information necessary, shall occur only if the false information distributed could materially affect any individual's ability to vote,

8

and shall be limited to information regarding the time and place of an election or regarding voter eligibility rules.

The substitute amendment, offered by Senator Schumer, was accepted by a voice vote.

Senator Specter offered an amendment to expand the findings in the bill to include examples of voter fraud. This amendment was rejected on a roll call vote. The vote record is as follows:

Tally: 9 Yes, 10 No.

Yeas (9): Specter (R–PA), Hatch (R–UT), Grassley (R–IA), Kyl (R–AZ), Sessions (R–AL), Graham (R–SC), Cornyn (R–TX), Brownback (R–KS), Coburn (R–OK).

Nays (10): Leahy (D–VT), Kennedy (D–MA), Biden (D–DE), Kohl (D–WI), Feinstein (D–CA), Feingold (D–WI), Schumer (D–NY), Durbin (D–IL), Cardin (D–MD), Whitehouse (D–RI).

Senator Hatch offered an amendment to provide a definition for the term "right to vote." This amendment was rejected on a roll call vote. The vote record is as follows:

Tally: 9 Yes, 10 No.

Yeas (9): Specter (R–PA), Hatch (R–UT), Grassley (R–IA), Kyl (R–AZ), Sessions (R–AL), Graham (R–SC), Cornyn (R–TX), Brownback (R–KS), Coburn (R–OK).

Nays (10): Leahy (D–VT), Kennedy (D–MA), Biden (D–DE), Kohl (D–WI), Feinstein (D–CA), Feingold (D–WI), Schumer (D–NY), Durbin (D–IL), Cardin (D–MD), Whitehouse (D–RI).

Senator Hatch offered an amendment to expand the bill to include the communication of false information with the intent to facilitate voting by a person who is ineligible to vote. This amendment was rejected on a roll call vote. The vote record is as follows:

Tally: 9 Yes, 10 No.

Yeas (9): Specter (R–PA), Hatch (R–UT), Grassley (R–IA), Kyl (R–AZ), Sessions (R–AL), Graham (R–SC), Cornyn (R–TX), Brownback (R–KS), Coburn (R–OK).

Nays (10): Leahy (D–VT), Kennedy (D–MA), Biden (D–DE), Kohl (D–WI), Feinstein (D–CA), Feingold (D–WI), Schumer (D–NY), Durbin (D–IL), Cardin (D–MD), Whitehouse (D–RI).

The Committee then voted to report the Deceptive Practices and Voter Intimidation Prevention Act of 2007, with an amendment in the nature of a substitute, favorably to the Senate. The Committee proceeded by voice vote.

### III. SECTION-BY-SECTION SUMMARY OF THE BILL, AS REPORTED

*Section 1. Short title*

Title: "Deceptive Practices and Voter Intimidation Prevention Act of 2007".

*Section 2. Findings*

This section has 14 findings related to the fundamental right to vote; historical efforts to suppress votes, including deceptive practices and intimidation; the Federal Government's interest in protecting the right to vote; and First Amendment jurisprudence recognizing that false statements do not necessarily enjoy constitutional protection.

9

*Section 3. Prohibition on deceptive practices in federal elections*

This section provides a civil penalty for persons who, with the intent to prevent another person from exercising the right to vote or from voting for the candidate of the voter's choice, knowingly communicate within 60 days of a Federal election information which they know to be false regarding: (1) the time, place or manner of the election; (2) the qualifications for or restrictions on voter eligibility for such election, including criminal penalties associated with voting or a voter's registration status or eligibility; or (3) the explicit endorsement by any person or organization of a candidate for an upcoming election.

The Committee contemplates that a suspect or defendant's voluntary and timely communication of correct information to voters affected by an initial communication of false information may be a relevant factor in determining whether the suspect or defendant acted with the intent to prevent another person from exercising the right to vote or from voting for the candidate of the voter's choice.

The Committee contemplates that enforcement by the Department of Justice of the sections prohibiting false explicit endorsements be focused on false explicit endorsements purporting to be from public officials, community leaders, organizations, or persons well known in the voting precinct in which the deceptive communications occur.

This section also includes criminal penalties for the provision of false information as described above.

The deceptive practices provision applies to any general, primary, run-off, or special election held solely or in part for the purposes of electing the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Delegate or Commissioner from a territory or possession.

This section provides penalties of not more than a $100,000 fine or five years imprisonment, or both.

This section includes an attempt provision.

This section amends the current voter intimidation statute so that it clearly applies in any general, primary, run-off, or special election held solely or in part for the purposes of electing the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Delegate or Commissioner from a territory or possession.

This section increases the criminal penalty for voter intimidation from one year to five years. The Committee believes that the existing penalty for voter intimidation does not adequately reflect the seriousness of this crime. Noting that voter intimidation and deceptive practices are different means of attempting to keep voters from reaching the polls and casting ballots for the candidate of their choice, the Committee is of the view that voter intimidation and deceptive election practices are crimes of equal seriousness.

This section also requires the United States Sentencing Commission to review and, if necessary, amend the Federal Sentencing Guidelines for persons convicted under this section.

*Section 4. Reporting of false election information*

Section 4(a) provides that individuals who have received or have knowledge of deceptive practices prohibited by Section 3 can report such information to the Attorney General.

10

Section 4(b) states that if a report provides a reasonable basis to find a violation of the law, the Attorney General shall pursue "any appropriate" criminal prosecution or civil action.[1] This section preserves the Attorney General's discretion in assessing whether to undertake a criminal or civil response to a possible legal violation as well as what response is appropriate.

Section 4(b) also specifies that the Attorney General shall refer to the Civil Rights Division only those matters that would otherwise fall under the Civil Rights Division's jurisdiction.[2] Thus, the Committee intends that the Attorney General will assign enforcement of this legislation in a way that does not substantially add to the workload of the Civil Rights Division and does not limit that Division's resources available for enforcing other important voting rights laws, such as the Voting Rights Act. Rather, the Committee expects that the legislation would primarily be enforced by other Divisions of the Department of Justice. The Attorney General's role in defining the jurisdiction of the Divisions of the Department of Justice is preserved under this bill, because a referral to the Civil Rights Division under this bill is determined by how that Division's jurisdiction is otherwise defined, either by a preexisting statute or by the Attorney General.

This section specifies that no investigation or legal action may begin until after the election, unless the Attorney General reasonably decides that investigation or legal action before an election will not inhibit voting and is necessary because delaying investigation until after the election will substantially harm the government's ability to enforce the bill (or, as provided by Section 5, is necessary to determine the need for or scope of corrective action). Due to the sensitive nature of any investigation or punitive action under the criminal or civil provisions of the bill, the Committee intends to clarify that the Attorney General's actions under the bill should be guided by a presumption that any investigation or action prior to an election is discouraged.

---

[1] Contrary to the claims made in the Additional Views of Senators Kyl, Graham, Cornyn, and Brownback, Section 4(b) of the bill requires the Attorney General to pursue only any "appropriate" action if a citizen's report of false election information provides a "reasonable basis" to find a violation of law. The determination of what, if anything, constitutes an "appropriate criminal prosecution or civil action" remains within the Attorney General's discretion. To the extent that this bill affects prosecutorial choices, the Committee notes that Congress has frequently legislated in ways that affect prosecutorial discretion. See 28 U.S.C. §530(B) (2000) (restricting Federal prosecutors' discretion by subjecting them to state ethical rules); Pub. L. No. 105–119, §617, 111 Stat. 2440, 2519 (1997) (penalizing certain prosecutorial actions by allowing courts to award attorneys' fees to victims of vexatious, frivolous or bad faith prosecutions); 18 U.S.C. §6002 (2000) (limiting the extent to which congressional testimony can be used by prosecutors against the witness in a criminal case); Pub. L. No. 95–521, 92 Stat. 1824 (1978) (limiting prosecutorial discretion to not bring charges by requiring that the Attorney General conduct a preliminary investigation of persons covered by the statute); 28 U.S.C. §591 (Supp. IV, 2001–2005) (requiring the Attorney General to conduct an investigation whenever he has received "sufficient information" that a high-ranking US official may have violated certain Federal criminal laws).

[2] Senators Kyl, Graham, Cornyn, and Brownback mischaracterize the effect of Section 4(b) in their Additional Views. Section 4(b) does not require that all matters under this bill be referred to the Civil Rights Division. On the contrary, the bill limits the referrals to the Civil Rights Division only to cases that are otherwise under that Division's jurisdiction, such as cases that involve discrimination or intimidation on the basis of race. In this way, the bill provides for the preservation of the existing arrangement within the Department of Justice, under which the Criminal Division handles most criminal matters related to voting, and seeks to ensure that the Civil Rights Division will continue to maintain its primary focus on voting matters involving unlawful discrimination.

11

*Section 5. Corrective action*

Whereas earlier sections of the bill provide for civil and criminal enforcement against violators, Section 5 creates a mechanism for affirmatively correcting false information in order to assist affected voters in exercising their right to vote.[3] Section 5(a) requires the Attorney General to determine whether false information has been disseminated in violation of Section 3.

Under Section 5(a), if the Attorney General determines that the information communicated reasonably falls within the parameters of the prohibited information, the Attorney General shall undertake all necessary efforts to provide correct information to all voters who have been affected by the false information.[4] The corrective action requirement in this section of the bill poses no threat to prosecutorial discretion because the required action under this section does not involve prosecution and is limited to correcting false information in order to enable the effective exercise of the fundamental right to vote. The term "all effective measures" is intended to encompass any means of communication effective in reaching voters who were affected by a prior communication of false information. In many instances, the Department of Justice therefore may find it most effective to communicate corrective information to voters in the same format and to the same extent as false information was communicated. Moreover, because the goal of this section is to aid voters in overcoming any effects of false information, the Committee intends that the Attorney General should take corrective action under this section even if the perpetrator or suspected perpetrator has already made a voluntary effort to provide correct information following the initial communication of false information.

Section 5(a) further provides that the Attorney General's corrective action shall only address matters of time of voting, place of voting, qualifications for voter eligibility, or restrictions on voter eligibility. This list of topics for corrective communications is intended to be exhaustive. The Committee recognizes that the bill excludes certain false information from the corrective action section that falls within the criminal and civil prohibitions in the bill. The Committee thereby seeks to minimize both the burden on the Department of Justice and the risk that corrective action may influence the outcome of an election (beyond the impact of counteracting the false information that was communicated). The Committee intends that the requirement to distribute corrective information regarding "time and place" shall include issues such as absentee voting, vote-by-mail, and telephonic voting. Information on voter eligibility shall, at a minimum, be interpreted to include information on the kinds of identification that must be presented in order to vote or register to vote, information on the use and availability of absentee ballots, and information on whether and to what extent a per-

---

[3] It is not unusual for Congress to require the Department of Justice to perform a wide range of non-prosecutorial functions, including election monitoring to ensure voting rights are protected, mediation and conflict resolution through the Community Relations Service of the Civil Rights Division, the collection and analysis of data to track and inform public policy choices, and compliance with ethics and employment laws, among others.

[4] Contrary to the misconceptions advanced in the Additional Views, Section 5 does not require any civil or criminal action but rather directs the Attorney General to take non-prosecutorial corrective action in a limited set of cases. Providing the public with correct information so that a fundamental right can be exercised is clearly distinct from the traditional prosecutorial duties of charging and prosecuting a crime.

12

son's criminal history or immigration status affects his or her eligibility to vote.

This section specifies, and the Committee intends, that the correct information distributed by the Attorney General should be limited to the information necessary to counteract the false information that was communicated. The overbroad or unnecessary distribution of information by the Department of Justice would create the appearance that the Department is unduly involved in political matters and presents a risk of inadvertently discouraging voting or otherwise influencing the outcome of an election. Thus, it is the Committee's view that corrective action should be limited to information enumerated in this section and be tailored as narrowly as possible in order to respond to the nature and scope of the original distribution of false information. In particular, information distributed by the Attorney General pursuant to this section should not include the suspected perpetrator's identity, or any other information that might influence the outcome of an election (beyond the impact of counteracting the false information that was communicated).

This section includes a materiality requirement so that the Attorney General need only take corrective action if there is reasonable basis to believe that false information as described in the bill has been communicated and such communication might materially hinder any citizen's meaningful exercise of the right to vote. False information materially hinders the meaningful exercise of the right to vote if there is a significant likelihood that such information will negatively affect voters' opportunity to vote for the candidates of their choice or to access to the polls at the required place and time, cast their votes, and have their votes counted in a Federal election or primary.

The Attorney General may not undertake any investigation related to a report of false information before the election to which the false information pertains, unless the Attorney General reasonably believes that such investigation will not inhibit voting and is necessary to determine the need for or scope of corrective action (or, as provided by Section 4, is necessary because delaying investigation until after the election will substantially harm the government's ability to enforce the bill). As in the civil and criminal sections of the bill, due to the sensitive nature of any such investigation, the Committee intends to clarify that the Attorney General's actions under the bill should be guided by a presumption that any investigation or action prior to an election is discouraged.

Section 5(b) states that if an individual has provided the Attorney General with information showing reasonable cause to believe a violation of this law has occurred, and the Attorney General fails to take corrective action within 72 hours (or sooner if necessary to ensure timely corrective action before an election), this section provides the individual with the right to apply to a U.S. District Court for an order requiring the Attorney General to take timely corrective action. The Committee believes that the time limit in this section is appropriate given that the right to vote is fundamental and that deceptive practices are frequently perpetrated in the days and hours immediately preceding an election. The Committee notes that Congress has elsewhere empowered citizens to seek judicial review of unreasonable executive inaction. For example, Congress

may provide for "citizen suits" against administrative or other officials who fail to enforce laws, and the Administrative Procedure Act permits a person aggrieved by agency action to request that a reviewing court "compel agency action unlawfully withheld or unreasonably delayed."[5]

The Attorney General must also provide the relevant committees of Congress with a report regarding the procedures and standards intended to be used to provide the corrective action required by this section by January 1 of each year in which there is a Federal election. If the Attorney General makes any changes to these procedures and standards, the Attorney General must promptly notify the relevant committees of Congress of such changes.

The Attorney General should consult with the Election Assistance Commission, civil rights organizations, voting rights groups, and State and local election officials in developing these procedures and standards.

This section requires the Attorney General to work with the Federal Communications Commission and the Election Assistance Commission to study the feasibility of using public service announcements, the emergency alert system or other forms of public broadcast to provide the corrective information required by this section. This feasibility report should be completed within 90 days of enactment.

This section authorizes such sums as may be necessary to carry out this section.

### Section 6. Reports to Congress

This section requires the Attorney General to report to Congress not later than 90 days after each Federal general election the allegations of false information received pursuant to this section, as well as detailed information on the types of reports received and the corrective actions taken, if any. The report must provide information regarding any primary or run-off election that has occurred since the prior report to Congress. The Attorney General may withhold from the report any non-public information that the Attorney General reasonably determines would infringe on the rights of a criminal suspect or defendant or would compromise an on-going investigation or prosecution.

### Section 7. Severability

This section provides that if any provision of this Act is found unconstitutional, the remainder of the Act remains in force.

### IV. Congressional Budget Office Cost Estimate

The Committee sets forth, with respect to the bill, S. 453, the following estimate prepared by the Director of the Congressional Budget Office under section 402 of the Congressional Budget Act of 1974:

---

[5] 5 U.S.C. § 706(1) (2007). The U.S. Supreme Court in Heckler v. Chaney, 470 U.S. 821 (1985), held that an agency's decision not to enforce a statute is presumptively unreviewable but stated that Congress may overcome this presumption if it supplies guidelines that circumscribe an agency's discretion in exercising its enforcement powers. Consistent with the principles set out in Heckler, this bill provides for expedited judicial review to determine whether a Department of Justice decision not to take corrective action accords with the standards provided in Section 5(b) of the bill.

14

September 21, 2007.

Hon. PATRICK J. LEAHY,
*Chairman, Committee on the Judiciary,*
*U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the enclosed cost estimate for S. 453, the Deceptive Practices and Voter Intimidation Prevention Act of 2007.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is Mark Grabowicz.

Sincerely,

PETER R. ORSZAG.

Enclosure.

*S. 453—Deceptive Practice and Voter Intimidation Prevention Act of 2007*

CBO estimates that implementing S. 453 would cost less than $500,000 annually from appropriated funds. Enacting the bill could affect direct spending and revenues, but CBO estimates that any such effects would not be significant.

Section 4 of the Unfunded Mandates Reform Act excludes from the application of that act any legislative provisions that enforce the Constitutional rights of individuals. CBO has determined that S. 453 would fall within that exclusion because it would protect voting rights. Therefore, CBO has not reviewed the bill for mandates.

S. 453 would establish a new crime for attempting to deceive voters in Federal elections and would require the Department of Justice to prepare reports relating to implementation of the bill's provisions. Because the legislation would establish a new offense, the government would be able to pursue cases that it otherwise would not be able to prosecute. CBO expects that S. 453 would apply to a relatively small number of offenders, however, so any increase in costs for law enforcement, court proceedings, or prison operations would not be significant. We estimate that it would cost less than $500,000 annually to implement this legislation, including costs to prepare the reports required by the bill. Any such costs would be subject to the availability of appropriated funds.

Because those prosecuted and convicted under S. 453 could be subject to criminal fines, the Federal Government might collect additional fines if the legislation is enacted. Criminal fines are recorded as revenues, then deposited in the Crime Victims Fund and later spent. CBO expects that any additional revenues and direct spending would not be significant because of the small number of cases likely to be affected.

On April 11, 2007, CBO transmitted a cost estimate for H.R. 1281, the Deceptive Practices and Voter Intimidation Prevention Act of 2007, as ordered reported by the House Committee on the Judiciary on March 29, 2007. The bills are similar and the cost estimates are identical.

The CBO staff contact for this estimate is Mark Grabowicz. This estimate was approved by Peter H. Fontaine, Assistant Director for Budget Analysis.

15

## V. Regulatory Impact Evaluation

In compliance with rule XXVI of the Standing Rules of the Senate, the Committee finds that no significant regulatory impact will result from the enactment of S. 453.

## VI. Conclusion

Enactment of the Deceptive Practices and Voter Intimidation Prevention Act of 2007, S. 453, addresses the compelling national interest in ensuring the integrity of Federal elections by protecting voting rights of vulnerable members of the electorate, including citizens residing in minority and low-income communities. The legislation provides for civil and criminal penalties against persons who attempt to deceive citizens in order to prevent them from exercising the right to vote or from voting for the candidate of their choice. Deceptive communications found materially to hinder any citizen's right to vote require that the Attorney General undertake effective corrective action to counteract the false information that was communicated.

## VII. ADDITIONAL VIEWS OF SENATORS KYL, GRAHAM, CORNYN, AND BROWNBACK

It is our understanding that the Justice Department, though it has not yet issued an official Views Letter for this bill, will eventually endorse its overall purpose of proscribing certain election-related deceptive conduct. Although much of the conduct prohibited by this bill already arguably is proscribed by current statutes such as 18 U.S.C. § 241, this bill will provide clear and specific authority to prosecute efforts to deceive voters about the time and place and qualifications for voting. We, too, support the overall purpose of this bill.

We also expect, however, that the Justice Department will vigorously object to several provisions of this bill, and we do not need to read the Department's forthcoming Views Letter to know why. Several of the bill's restrictions on prosecutorial or other executive discretion are utterly unprecedented and would be a clear violation of the separation of powers. Congress simply cannot command the executive (or authorize the courts to command the executive) to carry out functions that are plainly within the realm of discretionary executive decisionmaking authority. The tasks that this bill commands the Justice Department to carry out are not ministerial in nature. These tasks are in the heartland of those decisions that are made on the basis of factors that only the executive can evaluate, such as the availability of enforcement resources and the prioritization of the use of those resources. Congress has never before ordered the executive branch bring an enforcement action in every single case that falls within a statute's proscriptions, or authorized the federal courts to issue such orders. It should not begin doing so in this bill.

The offending provisions of this bill are sections 4 and 5, which would require the Attorney General to refer cases for prosecution and take "corrective action" to rebut false voting information that has been disseminated to voters. Section 4(b) requires the Attorney General to refer a case to the Civil Rights Division for prosecution if he finds that there is a "reasonable basis" for concluding that the law has been broken. Section 5(b) authorizes private litigants to bring an action in federal court seeking an order that the Attorney General take "corrective action" rebutting false election information if the Attorney General does not act on a complaint within 72 hours after it is submitted to the Justice Department.

Both of these "enforcement" provisions are severe intrusions on prosecutorial discretion. The first strips from the Attorney General the authority to decide for himself whether a case is worth pursuing—if he concludes that there is a "reasonable basis" for a complaint, he must refer the case to the Civil Rights Division. The second provision effectively delegates to a federal district judge the de-

17

cision whether a citizen complaint about allegedly false voting information merits "corrective action" by the Attorney General.

Typically when committee reports such as this one are first circulated as a draft in the committee, Senators are given a few extra days to submit additional or minority views. After those additional views are submitted, proponents of the bill usually will amend the committee report—often through the addition of footnotes—to respond to those additional views. In this case, we are curious to see whether the proponents of this bill will be able to identify *any precedent whatsoever* for the intrusions on executive discretion in sections 4(b) and 5(b) of this bill. We doubt that the final committee report will be able to identify *even one statute* in which Congress has ordered the Justice Department to bring an enforcement action in every single case that falls within the statute's proscriptions, or in which it has delegated enforcement decisionmaking authority to the federal courts.

The executive branch needs to be allowed to decide whether a particular infraction of a statute merits enforcement action. Consider the practical implications of restricting such discretion in the context of this bill. The Civil Rights Division has a limited number of lawyers, and those lawyers are charged with enforcing a large number of other statutes. If a clear but minor violation of this bill's proscriptions has occurred—for example, incorrect information about poll-opening times has been issued, but did not reach many voters—should a Department attorney necessarily abandon every other case that he is assigned to in order to prosecute that incident? What if the facts of the case are not so clear, and the attorney is not certain that he will obtain a conviction? Should the attorney nevertheless be forced to prosecute the case? And should a judge be allowed to decide on the Justice Department's behalf whether "corrective action" should be taken?

Advocates of these provisions might also consider what precedent they are setting in the event that sections 4 and 5 of this bill are enacted into law and are upheld by the courts. How do they feel about a bill that would require the Justice Department to prosecute every single child-pornography case that is brought to its attention? Or every illegal-entry immigration case? What about cases of providing material support to terrorism?

The impossibility of extending such mandates across the criminal statutes should be apparent to everyone. Congress does not decide how enforcement resources are used. It is the President, his appointees, and career executive employees who make those decisions.

Several other provisions of this bill are problematic as well. The requirement that the Justice Department prosecute false candidate endorsements is destined to embroil the Department in political controversies and to subject it to accusations of political favoritism. Campaign speech and campaign tactics have traditionally remained outside the purview of the criminal laws. Nor would a campaign to punish "false" statements about candidates be a limited venture: we doubt that there are very many members of the Senate or House who do not believe that during some election someone said something about them that is false. We think that it is unlikely

18

that the Department will be enthusiastic about this committee's invitation to jump down this rabbit hole.

We are also curious to see what the lawyers who will be charged with enforcing this bill think about some of the language that it employs. It is unclear to us, for example, how those lawyers are supposed to prove that a defendant intended to prevent a voter "from voting for the candidate of such person's choice." It is one thing to prove what a defendant did and intended. It is another to prove what the victim of the offense (who likely will exist only as a hypothetical voter) *would* have intended to do absent the deceiving information. How is a federal prosecutor (or judge or jury) supposed to know who is the real candidate of that voter's choice? Does the jury employ a Marxian analysis and subtract the voter's false consciousness to determine who the voter *really* wanted to vote for? How can a court ever say that a voter's choice was anyone other than the candidate for whom the voter actually voted? None of us would want to be the first lawyer to prosecute one of these cases, and we hope that the Justice Department will suggest a more elegant way of defining this offense.

Again, we note that we support the overall purpose of this bill to expressly prohibit particular deceptive election-related practices. However, some of the parts of this bill clearly require adjustment, and we think that it is inevitable that the bill would benefit from the views of the Justice Department attorneys who practice in this field.

JON KYL.
LINDSEY GRAHAM.
JOHN CORNYN.
SAM BROWNBACK.

19

VIII. CHANGES TO EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with paragraph 12 of rule XXVI of the Standing Rules of the Senate, changes in existing law made by S. 453, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, and existing law in which no change is proposed is shown in roman):

# TITLE 18, UNITED STATES CODE

\*     \*     \*     \*     \*     \*     \*

## CHAPTER 29—ELECTIONS AND POLITICAL ACTIVITIES

\*     \*     \*     \*     \*     \*     \*

### § 594. Intimidation of Voters

〖Whoever〗 *(a) INTIMIDATION.—Whoever* intimidates, threatens, coerces, or attempts to intimidate, threaten, or coerce, any other person *by any means, including by means of written, electronic or telephonic communications,* for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, 〖at any election held solely or in part for the purpose of electing such candidate〗 *at any general, primary, run-off or special election held solely or in part for the purpose of electing such a candidate,* shall be fined under this title or imprisoned not more than 〖one year〗 *5 years,* or both.

*(b) DECEPTIVE ACTS.—*

*(1) PROHIBITION.—*

*(A) IN GENERAL.—It shall be unlawful for any person, within 60 days before an election described in subparagraph (B), to communicate or cause to be communicated information described in subparagraph (C), or produce information described in subparagraph (C) with the intent that such information be communicated, if such person—*

*"(i) knows such information to be false; and*

*"(ii) has the intent to prevent another person from exercising the right to vote or from voting for the candidate of such other person's choice in an election described in subparagraph (B).*

*(B) ELECTION DESCRIBED.—An election described in this subparagraph is any general, primary, run-off, or special election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Delegate or Commissioner from a territory or possession.*

*(C) INFORMATION DESCRIBED.—Information is described in this subparagraph if such information is regarding—*

*(i) the time, place, or manner of any election described in subparagraph (B);*

20

*(ii) the qualifications for or restrictions on voter eligibility for any such election, including—*

*(I) any criminal penalties associated with voting in any such election; or*

*(II) information regarding a voter's registration status or eligibility; or*

*(iii) the explicit endorsement by any person or organization for the upcoming election of a candidate to any office described in subparagraph (B).*

*(2) PENALTY.—Any person who violates paragraph (1) shall be fined not more than $100,000, imprisoned not more than 5 years, or both.*

*(c) ATTEMPT.—*

*(1) ATTEMPT.—Any person who attempts to commit any offense described in subsection (a) or (b) shall be subject to the same penalties as those prescribed for the offense that the person attempted to commit.*

## TITLE 42, UNITED STATES CODE

\* \* \* \* \* \* \*

### CHAPTER 20—ELECTIVE FRANCHISE

\* \* \* \* \* \* \*

### § 1971. Voting Rights

(a) \* \* \*

\* \* \* \* \* \* \*

(b) INTIMIDATION, THREATS, OR COERCION.—

【No person】 *(1) No person,* whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, presidential elector, Member of the Senate, or Member of the House of Representatives, Delegates or Commissioners from the Territories or possessions, at any general, special, or primary election held solely or in part for the purpose of selecting or electing any such candidate.

*(2)(A) No person, whether acting under color of law or otherwise, shall, within 60 days before an election described in subparagraph (B), communicate or cause to be communicated information described in subparagraph (C), or produce information described in subparagraph (C) with the intent that such information be communicated, if such person—*

*(i) knows such information to be false; and*

*(ii) has the intent to prevent another person from exercising the right to vote or from voting for the candidate of such other person's choice in an election described in subparagraph (B).*

*(B) An election described in this subparagraph is any general, primary, run-off, or special election held solely or in part for the*

21

*purpose of electing a candidate for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Delegate or Commissioner from a territory or possession.*

*(C) Information is described in this subparagraph if such information is regarding—*

*(i) the time, place, or manner of any election described in subparagraph (B);*

*(ii) the qualifications for or restrictions on voter eligibility for any such election, including—*

*(I) any criminal penalties associated with voting in any such election; or*

*(II) information regarding a voter's registration status or eligibility; or*

*(iii) the explicit endorsement by any person or organization for the upcoming election of a candidate to any office described in subparagraph (B).*

○