UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------- x

UNITED STATES OF AMERICA

     - v -                           Criminal Case No. 21-0080 (NGG)

DOUGLASS MACKEY,

                Defendant.

------------------------------------------------- x


MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
<u>DOUGLASS MACKEY'S MOTION TO DISMISS THE INDICTMENT</u>


Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*

*Attorney for Douglass Mackey*


June 24, 2022

Tables of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

I      THERE IS NO VENUE IN THIS DISTRICT
       FOR THIS PROSECUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

       A. Mr. Mackey did not commit any overt act in this District . . . . . . . .   8

       B. Mr. Mackey did not engage in any "essential conduct" in nor
          have substantial contact with this District . . . . . . . . . . . . . . . . . . .   9

       C. The circumstances of the government's selection of this District
          "leads to the appearance of abuses, if not abuses" . . . . . . . . . . . .   11

II     THE INDICTMENT VIOLATES DUE PROCESS BECAUSE IT
       IS NOT REASONABLE TO BELIEVE THAT SECTION 241
       BARS THE TWEETED MEMES . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

       A. Section 241 is not meant to expand criminal liability
          and has never been applied to non-threatening speech . . . . . . . . . . .   13

       B. The structure of Section 241 and its relationship to other
          laws suggest a limited definition of "injure" . . . . . . . . . . . . . . . . . .   14

       C. Section 241 does not prohibit merely inhibiting exercise of rights . .   16

       D. Section 241 must be read narrowly to ensure fair notice
          and prevent arbitrary enforcement . . . . . . . . . . . . . . . . . . . . . . . . . .   18

III    IF SECTION 241 CAN FAIRLY BE INTERPRETED TO COVER
       THE TWEETED MEMES IN THIS CASE, IT IS
       UNCONSTITUTIONALLY OVERBROAD AS APPLIED . . . . . . . . .   22

       A. The First Amendment generally protects "disinformation"
          in political campaigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

       B. The allegedly deceptive memes are protected as satirical speech . .   26

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------- x

UNITED STATES OF AMERICA

    - v -                Criminal Case No. 21-0080 (NGG)

DOUGLASS MACKEY,

        Defendant.

------------------------------------------------- x

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
<u>DOUGLASS MACKEY'S MOTION TO DISMISS THE INDICTMENT</u>

<u>Introduction</u>

On January 22, 2021, two days into the Biden Administration, the United States Department of Justice reached back to the election of President Biden's predecessor in 2016 and initiated a criminal prosecution of defendant Douglass Mackey [Docket No. 1 (complaint); Docket No. 8 (indictment)], which this motion seeks to dismiss.[1]  The government alleges that Mr. Mackey, using fictional major leaguer Ricky Vaughn in a MAGA cap as his avatar, conspired with politically like-minded others in Internet chat forums to injure, oppress, threaten and intimidate the free exercise of the constitutional right to vote, in purported violation of 18 U.S.C. § 241, by tweeting two memes.  The memes allegedly encouraged supporters of Hillary Clinton to

---

[1]  Mr. Mackey's motion for particulars is incorporated by reference herein.  Docket No. 31; Transcript of May 6, 2022 ("Tr") (oral argument on motion).

cast official ballots for President by sending a text to an unidentified recipient without (1) any attendant formality; (2) requiring the texters to provide their names or establish their status as registered voters; or (3) even providing their state of voter registration or home address. *See* Docket No. 1 (complaint); Docket No. 32 (government's opposition to particulars); Tr at 16-17. The government appears to concede that the memes did not prevent any registered voter in the Eastern District of New York (or anywhere else) from voting for President in 2016. Docket No. 39 (government's particulars on venue).

Mr. Mackey could not reasonably have understood that it was illegal to tweet a meme that registered voters could cast official ballots for President via anonymous text. Section 241 has never before been applied to allegedly deceptive speech, let alone a tweeted meme. In 2005, eleven years *before* the Presidential Election of 2016, then-Senator Barack Obama introduced the Deceptive Practices and Voter Intimidation Prevention Act (S. 1975, 109th Congress, First Session), permitting the Department of Justice to prosecute deceptive campaign practices imbued with indicia of ostensible reliability lacking in a tweeted meme. *See, e.g.*, S. 453 Report No. 110-191 (Oct. 4, 2007) at 2, 4-5 (described in Docket No. 31-1 at 7). The legislation has been repeatedly reintroduced since 2005 and never been enacted. Media reports suggest that the Department of Justice is itself uncertain that Section 241 embraces mere deception about

protocols for voting for President.[2]

The government's case is predicated exclusively on Mr. Mackey's alleged participation in online chat forums with politically like-minded others and the tweeted memes. *See* Dockets No. 1, 32; Tr at 5-7, 14-15.  This prosecution thereby attempts to thread a constitutional needle through the First Amendment's rights of speech and association.  The proposed legislation remains stalled at least in part because of congressional reluctance to risk piercing those rights by chilling consumers in the marketplace of ideas from congregating, commentating, provoking, and satirizing.  *See New York Times Co. v. Sullivan*, 376 U.S. 254, 271-72 (1964).  The government's attempt to address allegedly deceptive speech about voting by prosecuting Mr. Mackey is the equivalent of breaking open a kaleidoscope to cut out a particular shape or color:  the moment the kaleidoscope breaks open, it will never again work effectively. Stretching centuries old law to inapposite conduct can only forever damage free discourse.[3]

---

[2]  *See https://www.reuters.com/business/media-telecom/us-steps-up-pursuit-far-right-activists-2016-voter-suppression-probe-2021-05-26/*

[3]  *See, e.g.*, Richard L. Hasen, *How to Keep the Rising Tide of Fake News From Drowning our Democracy*, N.Y. Times (Mar 7, 2022) (discussing this case in a larger essay about legal and political remedies to disinformation after January 6, 2021) (available at *http://nytimes.com/2022/03/07/opinion/cheap-speech-fake-news-democracy.html*

I

THERE IS NO VENUE IN THIS DISTRICT FOR THIS PROSECUTION

On May 13, 2022, this Court granted Mr. Mackey's motion for particulars on the government's basis for venue.  Docket No. 36 at 5-6.  On May 27, 2022, the government provided particulars, claiming that venue for this case lies in this District because (1) conspirators intended and/or foresaw injury of the free exercise of the right to vote in this District; and (2) even though no registered voter in this District (or apparently anywhere else) was actually prevented from voting, people in this District *viewed* the subject tweets, which traveled through this District.  The government's concessions establish that this case should be dismissed for lack of venue.  *See* Tr at 7-8 (the government conceding that its expansive theory of venue would apply to "every state and hamlet" in the country).

"[T]he government must prosecute an offense in a district where the offense was committed."  Fed. R. Cr. Pro. 18.  Rule 18 echoes the constitutional commands of (1) Article III, Section 2, clause 3, that "Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed;" and (2) the Sixth Amendment that trials shall be conducted "by an impartial jury of the State and district wherein the crime shall have been committed."  *United States v. Cabrales*, 524 U.S. 1, 6 (1998) ("Proper venue in criminal proceedings was a matter of concern to the Nation's founders.");  *United States v. Davis,* 689 F.3d 179, 185 (2d Cir. 2012)  ("a defendant's right to be tried in the state and district in which the charged crime shall have been

committed . . . derives from colonial grievances against the Crown" referenced as "a grievance in the Declaration of Independence.'").  Venue should be narrowly construed; it involves "matters that touch closely the fair administration of criminal justice and public confidence in it."  *United States v. Johnson*, 323 U.S. 273, 276 (1944).

The *locus delecti*, meaning the place where the crime was committed [Black's Law Dictionary 1025 (9th ed., 2009)], "must be determined from the nature of the crime alleged and the location of the act or acts constituting it."  *Cabrales,* 524 U.S. at 7; *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999).  "Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."  18 U.S.C. § 3237(a).  Thus, for example, venue for an offense requiring proof that the mails were used may be prosecuted in any district from, through, or into which the mail moved.  *Cabrales*, 524 U.S. at 9.  A prosecution requiring proof of interstate commerce, such as the Hobbs Act, may be prosecuted in any district where interstate commerce was affected.  *United States v. Reed*, 773 F.2d 477, 482 (2d Cir. 1985).  A prosecution requiring proof that pornography was distributed may be prosecuted where the pornography was advertised or made available.  *United States v. Rowe*, 414 F.3d 271, 279 (2d Cir. 2005); *United States v. Rogers*, 165 Fed App'x 873 (2d Cir. 2005).

*A.  Mr. Mackey did not commit any overt act in this District*

               The government in this case has effectively conceded [*see* Docket No. 39] that neither Mr. Mackey nor any co-conspirator committed any act in this District, prevented any registered voter in this District from voting, or even impaired any registered voter in this District from the free exercise of the constitutional right to vote.  To the contrary, the government alleged in its complaint in this case [Docket No. 1 at 7] and at oral argument on Mr. Mackey's motion for particulars [Tr at 8] that the locus of the conspiracy was the Southern District of New York, where Mr. Mackey resided at the time of the charged crime.  Nor did Mr. Mackey intend a specific act in this District:  he uploaded memes to Twitter accounts.  The *possibility* that memes could be (or were) viewed in this District is not an act in furtherance of the conspiracy, but a potential consequence of a *locus delecti* elsewhere.

               This Circuit has favored a "substantial contacts" test that considers the locus of the defendant's acts, the elements and nature of the crime, the locus of the effect of the crime, and the suitability of a district for accurate fact-finding.  *Reed*, 773 F.2d at 481; *Rowe*, 414 F.3d at 278. Venue for a charge of conspiracy is proper "in any district in which an overt act in furtherance of the conspiracy was committed."  *United States v. Kloszewski*, 760 F. App'x 12, 15 (2d Cir. 2019) (quoting *United States v. Lange*, 834 F.3d 58, 69 (2d Cir. 2016); *United States v. Royer*, 549 F.3d 886, 894 (2d Cir. 2008) (quoting *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003) ("venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in

furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such

an act would occur in the district of venue [and it does].") (brackets in original).

B. *Mr. Mackey did not engage in any "essential conduct" in nor have*
   *substantial contact with this District*

Even where a defendant is charged with a crime requiring proof of misuse of a

computer with access to the Internet, venue does not lie in "every state and hamlet" connected to

the world wide web.  In determining a crime's *locus delecti*, "we must be careful to separate

'essential conduct elements' from 'circumstance element[s].'" *United States v. Auernheimer*, 748

F.3d 525, 533 (3d Cir. 2014); *see also United States v. Ramirez*, 420 F.3d 134, 138 (2d Cir. 2005)

(emphasizing that venue must be found where the "essential conduct element" took place);

*United States v. Saavedra*, 223 F.3d 85, 92 (2d Cir. 2000) (holding that venue must lay where an

element "essential to the conduct the statute criminalizes" occurred).  The defendant in

*Auernheimer*, 748 F.3d at 525, was charged in Newark with violations of the Computer Fraud and

Abuse Act (18 U.S.C. § 1030(a)(2)© and (c)(2)(B)(ii)) and identity fraud (18 U.S.C.

§ 1028(a)(7)) on the theory that the conspirators via computer illegally gained access to the email

addresses of about 4,500 New Jersey residents thereby affecting them in New Jersey.  *See*

*Auernheimer,* 748 F.3d at 531.  But the "essential conduct" of computer fraud is obtaining

information from unauthorized access to a computer, which had not happened in New Jersey.  The

"essential conduct" of identity fraud is transfer, possession, or use of a person's identification with

intent to commit another crime, neither of which happened in New Jersey even though email

addresses of 4,500 New Jersey residents were affected.   *Id.* at 534-36.

Though the Third Circuit has never formally adopted the Second Circuit's "substantial contacts" test, it applied it to *Auernheimer's* facts and found contacts with New Jersey to be insubstantial.  As the Third Circuit explained, "the test operates to limit venue, not to expand it;" it requires "more than some activity in the situs district; instead there must by 'substantial contacts' . . . . some sense of venue having been freely chosen by the defendants." *Id.* at 536-37 (quoting *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012) (some punctuation omitted).  While the location of a crime's effects can be relevant to venue, "those cases are reserved for situations where 'an essential conduct element is itself defined in terms of its effects,'" such as the effect on commerce caused by a violation of the Hobbs Act. *Id.* at 537 (quoting *United States v. Bowens*, 224 F.3d 302, 311 (4th Cir. 2000)).

By contrast, the essential conduct of Section 241 is a conspiracy to injure, oppress, threaten, or intimidate any person in the free exercise of a constitutional right; no proof of effect is defined as an element nor required.  The crime is complete upon the illicit agreement, which in Mr. Mackey's case had no connection to this District.  Even if the alleged tweets (or re-tweets) were *viewed* in this District as the government alleges [Docket No. 39], Section 241 does not define effect as essential conduct, which distinguishes this case, for example, from crimes defined as including an effect on commerce.  Even then, the government here particularizes no claim that any *registered voter* viewed the memes or that the alleged conspiracy actually injured, oppressed,

threatened, or intimidated any registered voter from casting a ballot for President in 2016.  Like the email addresses of New Jersey residents in *Auernheimer*, any viewing of the memes in this District was an incidental circumstance of the charged conspiracy, a distinctly *insubstantial* contact with this District, much like the tweets (or re-tweets) themselves which establish no "sense of venue having been freely chosen by the defendants."  *See Auernheimer,* 748 F.3d at 536-37.

C.  *The circumstances of the government's selection of this District "leads to the appearance of abuses, if not abuses"*

      *"Venue in criminal cases is more than a technicality."  See Auernheimer,* 748 F.3d at 529.  "[T]oo great leeway in the selection of a situs for trial 'leads to the appearance of abuses, if not abuses, in the selection of what may be deemed a tribunal favorable to the prosecution.'" *United States v. Fernandez*, 480 F.2d 726, 731 (2d Cir. 1973) (quoting *United States v. Johnson*, 323 U.S. at 275).  The Department of Justice charged Mr. Mackey two days into the Biden Administration, quoting Mr. Mackey less than a week before Election Day in 2016 as saying: "Obviously, we can win Pennsylvania.  The key is to drive up turnout with non-college whites, and limit black turnout."  Docket No. 1 at 21 (complaint).  The Department of Justice elected not to bring this case in Pennsylvania nor any other battleground state.  Instead, the Department of Justice chose solidly Democratic New York, which last voted for a Republican for President almost forty years ago in 1984.  The Department of Justice then elected not to bring this case in the Southern District of New York where the government alleged Mr. Mackey entered into the

11

alleged conspiracy [Docket No. 1 (complaint) at 7], but in the Eastern District of New York, with

which Mr. Mackey has no connection, and which is one of the most diverse Districts in the United

States:

> The Eastern District of New York is home to more than eight million people and houses
> major international air and seaports.  It is a place of extraordinary commercial and cultural
> activity and is characterized by a rich and vibrant diversity which is reflected in the
> staffing of the Office.

*See https://www.justice.gov/usao-edny*.

The government thus predicated this prosecution on memes purportedly targeting

African Americans and women [*see* Docket No. 1 at 13, 21-22], but bypassed districts in the

conspirators' purportedly targeted swing states and the district of Mr. Mackey's residence,  instead

charging him in the distinctively diverse Eastern District of New York known for landmark

decisions vindicating the civil rights of African Americans and women.[4]

Thus, even apart from this prosecution's constitutional infirmities, discussed

below, the government's choice of this District despite non-existent or insubstantial contacts with

the charged crime creates "the appearance of abuses, if not abuses, in the selection of what may be

deemed a tribunal favorable to the prosecution."  *See United States v. Fernandez*, 480 F.2d at 731

(quoting *Johnson*, 323 U.S. at 275).  For this reason alone, this case should be dismissed.

---

[4] *See https://nyed.uscourts.gov/news/united-states-district-court-eastern-district-new-
york-retrospective-1990-2014;  See also "A History of the United States Court for the Eastern
District of New York to Commemorate and to Celebrate a Centennium 1865-1965,"*
available at *https://img.nyed.uscourts.gov/files/local_rules/EDNY%20History %201865
-1965%20Centennium.pdf*.

<u>II</u>

THE INDICTMENT VIOLATES DUE PROCESS BECAUSE IT IS NOT
<u>REASONABLE TO BELIEVE THAT SECTION 241 BARS THE TWEETED MEMES</u>

Section 241 was enacted as part of the Enforcement Act of 1870 to address the Ku

Klux Klan's violence against and intimidation of African Americans.  *See United States v.*

*Cruikshank*, 92 U.S. 542, 544 (1875); *Ex parte Yarbrough*, 110 U.S. 651 (1884) (prosecution of

Klansman for violence and intimidation); *United States v. Price*, 383 U.S. 787, 800 (1966) ("the

source of this section in the doings of the Ku Klux and the like is obvious, and acts of violence

obviously were in the mind of Congress.") (quoting *United States v. Mosley*, 238 U.S. 383, 387

(1915)); *see also* Michael T. Morley, *The Enforcement Act of 1870, Federal Jurisdiction over*

*Election Contests, and the Political Question Doctrine*, 72 Fla. L. Rev. 1153, 1159-1161 (2020).

While Mr. Mackey is charged with violating Section 241's first clause (making it a crime to

conspire to injure, oppress, threaten, or intimidate the free exercise of a constitutional right), its

second clause makes it a crime for two or more people to "go in disguise [a reference to the

Klan's white hoods] on the highway, or on the premises of another, with intent to prevent or

hinder" the free exercise of a constitutional right.

*A.  Section 241 is not meant to expand criminal liability*
*    and has never been applied to non-threatening speech*

While the statute has long been interpreted to cover a more "general scope" now

that "the Ku Klux have passed away," *United States v. Mosley*, 238 U.S. at 388, it remains limited

by its own language and basic canons of statutory construction.  It is not meant to create a "huge

expansion of federal criminal liability," *United States v. DeLaurentis*, 491 F.2d 208, 214 (2d Cir.

1974), and cannot be read "too broad" so as to "criminalize a great deal of conduct, some of it

13

pure speech*."* *United States v. Lee*, 6 F.3d 1297, 1301 (8th Cir. 1993) (concurrence) (internal

quotations and citations omitted).

Section 241 has uniformly been applied to conspiracies to use language to threaten

or intimidate [*see, e.g.*, *United States v. Robinson*, 813 F.3d 251 (6th Cir. 2016) (extortion); *United*

*States v. Butler*, 1 Hughes 457 (1887) (intimidation)], or to commit physical acts of interference

such as stuffing, destroying, or altering or falsely counting ballots [*United States v. Saylor*, 322

U.S. 385 (1944); *United States v. Mosley*, 238 U.S. 383 (1915); *United States v. Classic*, 313 U.S.

299 (1941); *Anderson v. United States*, 417 U.S. 211 (1974); *see also United States v. Stone*, 188

F. 836 (D. Md. 1911) (conspiracy to make it harder for illiterate African Americans to vote by

making ballots difficult to understand).  By contrast, a conspiracy to bribe voters is not covered.

*See United States v. Bathgate*, 246 U.S. 220, 226 (1918) (extending the law to bribes would

improperly extend the statute  "in respect of almost any act reprehensible in itself, or forbidden by

state statutes, and supposed injuriously to affect freedom, honesty, or integrity of an election.").

There appears to be no case ever prosecuted in this Circuit (or at least no case

found by counsel in this Circuit or anywhere else) where a violation of Section 241 has been

found absent independent wrongful conduct comprised of a physical act or, if speech, threat or

intimidation.  A compendium of these cases is appended hereto as Exhibit A.

*B.  The structure of Section 241 and its relationship to other*
   *laws suggest a limited definition of "injure"*

Another statute, Section 245(b)(1)(A), makes it a crime to use force or the threat

of force to interfere with the right to vote.  While Section 241 and its general reference to

constitutional rights has been applied to the right to vote despite Section 245's specific reference

to the right to vote [*see, e.g., United States v. Tobin*, 480 F.3d 53, 54-55 (1st Cir 2007) (defendant

acquitted of violating Section 241 by disruptive use of telephones on Election Day)], neither statute has ever been applied to speech alleged to constitute mere deception.  The Second Circuit appears to have interpreted Section 241 to exclude deception.  In *United States v. Pacelli*, 491 F.2d 1108 (2d Cir. 1974), *cert. denied*, 419 U.S. 826 (1974), *app. after remand*, 521 F.2d 135 (2d Cir. 1975) (emphasis added), the Circuit rejected Pacelli's argument that Congress had repealed Section 241 by implication when it enacted Section 245.  The Circuit explained that Congress enacted Section 245 "to remove any doubt as to the protection that would be extended against private interference with certain specific rights enumerated in § 245."  The Circuit described the prohibited interference as "forcible:"

> [Proposed Section 245] provides an effective means of deterring and punishing *forcible* interference with the exercise of Federal rights.  The clear language of the bill would avoid unnecessary litigation concerning coverage and would provide unmistakable warning to lawless elements not to *interfere* with any of these activities.

*Id.* at 1114 (quoting the Senate Report on the legislation which became Section 245).  While the violent act at issue in *Pacelli* (violating a witness's right to testify by killing her) made it unnecessary to address Section 241's application to threats and intimidation, the Circuit's use of the word "forcible" to describe the type of injury covered by the statute is consistent with the use of the statute in this Circuit as set forth in Exhibit A.

The two clauses of Section 241 read together help show that mere deception is not covered.  While the clause of Section 241 with which Mr. Mackey is charged makes it a crime to conspire to injure, oppress, threaten, or intimidate, the second clause permits a prosecution if the defendant intends to prevent or hinder, meaning "to make slow or difficult the progress of" or "to

15

hold back,"[5] a consequence less harmful than Section 241's injury.  Section 241's hinder only

applies, however, if the defendant is "in disguise on the highway, or on the premises of another,"

language aimed at the Ku Klux Klan.  The use of "hinder" in the sentence after the one discussing

"injure, oppress, intimidate, or threaten" suggests that its omission from the first sentence was

intentional.  *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (the "expressio unius

est exclusio alterius" canon has force "when the items expressed are members of an 'associated

group or series', justifying the inference that items not mentioned were excluded by deliberate

choice, not inadvertence.").  Nothing about the inherent violence of a face-to-face confrontation

with a white-hooded Klansman is anything like viewing an allegedly deceptive tweeted meme on

the Internet.  Nothing about Section 241 provides fair notice that the alleged conduct in this case

is covered or that the statue could be so interpreted.  *See United States v. Kantor*, 78 F.2d 710,

712 (2d Cir. 1935) (reversing a Section 241 conviction because the government provided "no

evidence that any qualified voter, who did not vote because of alleged interference, intended to

vote for a candidate for federal office" and thus there is "no injury to qualified voters.").

*C.  Section 241 does not prohibit merely inhibiting exercise of rights*

Two circuits have held that Section 241 cannot be read to cover speech that merely

inhibits or makes it more difficult to exercise a constitutional right.  In the Eighth Circuit's  *United*

*States v. Lee*, the defendant had conspired to burn a cross adjacent to an apartment complex housing

many African American residents.  The district court instructed the jury that the "words 'threaten' or

'intimidate' are not used in any technical sense, but may cover a variety of conduct intended to harm,

frighten, punish or inhibit the free action of other persons" and "does not require a threat of physical

---

[5]  *See https://www.merriam-webster.com/dictionary/hinder*

force or the intimidation of physical fear." A panel of the Eighth Circuit initially upheld this instruction. *United States v. Lee*, 935 F.2d 952, 957 (8th Cir. 1991), opinion vacated in part (Aug. 14, 1991), on reh'g in part, 6 F.3d 1297 (8th Cir. 1993).

In a dissenting opinion, Chief Judge Arnold explained that this definition "is much too broad, because it would criminalize a great deal of conduct, some of it pure speech, which does no more than forcefully state a view that others find revolting or appalling." *Id.* at 959 (Arnold, J., dissenting). He found language that the defendant "inhibit[ed] the free action of other persons" problematic because a "great deal of speech is sufficiently forceful or offensive to inhibit the free action of persons against whom it is directed" without being unlawful. *Id.* Chief Judge Arnold was troubled that the jury acquitted the defendant of "interference with housing rights in violation of 42 U.S.C. § 3631(a)," suggesting that it would be wrong to create liability under 241 when the defendant was not guilty of the underlying crime's more serious elements. *Id.*

The Eight Circuit *en banc* reversed the conviction and remanded per curium. *United States v. Lee*, 6 F.3d 1297 (8th Cir. 1993). The *per curia* opinion endorsed a plurality concurrence, which in turn endorsed Chief Judge Arnold's dissent. *Id.* at 1297 (per curium) (remanding in "accordance with the concurring opinion of Judge John R. Gibson); *Id* at 1301 (Gibson, J., concurring) ("As Chief Judge Arnold stated in his dissent to the panel opinion in this case, the definition contained in the instructions 'is much too broad, because it would criminalize a great deal of conduct, some of it pure speech, which does no more than forcefully state a view that others find revolting or appalling.'"). The concurrence elaborated that while the "statute as written is broad, but as targeted toward Lee, it relies on the subjective reactions of residents who witnessed the cross burning and upon the perception of the viewer as an inherent aspect of the prosecution. The jury

17

instructions outlining the scope of section 241 extend substantially beyond the plain unvarnished wording of the statute." *Id.*

In a similar case also involving a cross burning, the Tenth Circuit also endorsed Judge Arnold's dissent in *United States v. Magleby*, 420 F.3d 1136, 1143 (10th Cir. 2005).  In *Magleby*, the jury instructions stated, "The words 'oppress,' 'threaten' or 'intimidate' are not used in any technical sense; they are to be understood in their ordinary meaning to cover a variety of conduct intended to threaten or frighten other persons or to prevent or punish the free action of other persons.  To oppress, threaten or intimidate does not require the possibility of physical force or of physical harm." *Id.*  Citing Chief Judge Arnold's dissent in *Lee*, the court held "that these instructions are flawed" because they "never define threat as requiring a threat of force; to the contrary, they assert that oppress, threaten, and intimidate are used in their everyday sense." *Id.*  *Magleby* and *Lee* clearly stand for the proposition that the means by which the criminal conspiracy to deprive others of their rights cannot be taken as merely preventing or inhibiting the right.

D.  *Section 241 must be read narrowly to ensure fair notice and prevent arbitrary enforcement*

Even if this court is not certain that Mr. Mackey's alleged conduct was not injurious within the meaning of Section 241, "[a]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."  *Cleveland v. United States*, 531 U.S. 12, 25 (2000).  The rule of lenity applies most forcefully in cases where the conduct is not otherwise prohibited and there are concerns about arbitrary enforcement, notice, and fair warning as here. "The canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered."  *United States v. Lanier*, 520 U.S. 259, 266 (1997).  Courts "must construe criminal statutes narrowly so

18

that Congress will not unintentionally turn ordinary citizens into criminals." *United States v. Valle*, 807 F.3d 508, 528 (2d Cir. 2015) (internal citations and quotations omitted).

The government does not allege that posting purportedly deceptive memes about voting practices would be a crime under any other statute.  The "Court's traditional restraint in assessing federal criminal statutes' reach . . . is particularly appropriate here, where the act underlying the conviction. . .is by itself innocuous." *Arthur Andersen LLP v. United* States, 544 U.S. 696, 696 (2005).  *See generally* Einer Elhauge, *Preference-Eliciting Statutory Default Rules*, 102 Colum. L. Rev. 2162, 2201 (2002) ("The rule of lenity is strongest in mala prohibita cases.").

"The rule of lenity ensures that criminal statutes will provide fair warning of what constitutes criminal conduct, minimizes the risk of selective or arbitrary enforcement, and strikes the appropriate balance between the legislature and the court in defining criminal liability." *United States v. Valle*, 807 F.3d 508, 523 (2d Cir. 2015).  "The rule of lenity not only ensures that citizens will have fair notice of the criminal laws, but also that Congress will have fair notice of what conduct its laws criminalize." *United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012). *See also United States v. Valle*, 807 F.3d 508 at 528 (2d Cir. 2015) (endorsing this holding). A statute may be unconstitutional as applied if it fails to provide adequate notice that the alleged conduct is covered by the statute.  *Copeland v. Vance,* 893 F.3d 101, 110 (2d Cir. 2018) (citing *Dickerson v. Napolitano*, 604 F.3d 732, 745 (2d Cir. 2010), and *United States v. Nadi*, 996 F.2d 548 (2d Cir. 1993).  A statute is unconstitutionally vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" (fair notice) or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999).

19

These concerns apply with special force to the government's prosecution of Mr. Mackey.  Congress itself apparently does not believe the charged conduct is criminal.  As Mr. Mackey demonstrated in his motion for particulars [Docket No. 31], then-Senator Obama in 2005 introduced the Deceptive Practices and Voter Intimidation Prevention Act (S. 1975, 109th Congress, First Session), which has since been repeatedly reintroduced.  *See e.g.,* S. 4069, 109th Congress, Second Session; S. 453, 110th Congress, First Session; S. 1840, 117th Congress).  These bills *propose* to make it a crime for any person, within 60 days before a presidential election, to communicate or cause to be communicated knowingly false information about the time, place, or manner of a presidential election if such person acts with "intent *to prevent* another person from exercising the right to vote or from voting for the candidate of such other person's choice" in a presidential election.  *See e.g.* S. 453, Report No. 110-191 (Oct. 4, 2007) at 19 (emphasis added).  *See* Docket No. 31-3.

Whether or not any such law could pass constitutional muster, Mr. Mackey is not alleged to have prevented anything, but is alleged to have tweeted two memes that supporters of Secretary Clinton could text their vote without any attendant formality, without establishing themselves as registered voters, or even providing their names.  The allegedly deceptive memes lack indicia of ostensible reliability like the examples of campaign deception cited in the supporting report of the Committee on the Judiciary, which themselves are apparently not believed by Congress to be covered by current law:

- telephone calls to registered voters in Virginia advising that they could vote by pressing a number on their telephone keypad corresponding to their candidate of choice, and ending by advising them that their votes had been received, obviating any need to vote on Election Day [Docket No. 31-3 at 5];

- fliers circulated in Ohio's Franklin County (Columbus) in 2004 stating that, due to

20

''confusion caused by unexpected heavy voter registrations,'' Republicans should vote on Tuesday, and Democrats should vote on Wednesday [Docket No. 31-3 at 2];

• fliers circulated in predominantly African-American areas in Baltimore in 2002 showing the wrong election date and falsely stating that parking tickets must be paid before voting [Docket No. 31-3 at 4];

•  fliers circulated in public housing communities in New Orleans in 2002 stating that voters could cast their ballots three days after the election ''if the weather is bad" [Docket No. 31-3 at 2]; and

•  recorded calls to registered voters in Virginia that falsely told the recipients of the calls that they were registered in another state and would face criminal charges if they voted locally [Docket No. 31-3 at 5].

*See* Docket No. 31-1 (identifying public interest groups which believe that current Section 241 does not cover even these types of examples of deception).

As Mr. Mackey explained in his motion for particulars, the Election Crimes Branch of the United States Department of Justice's Public Integrity Section cites no application of Section 241 to prosecutions based on mere deception in its 281-page publicly-available "Federal Prosecution of Election Offenses, Eighth Edition" issued in December 2017[6] despite congressional awareness of "the decades-old practice of communicating intentionally false information in an effort to disenfranchise voters and to keep voters away from the polls."  Docket No. 31-3 at 4.  Nor did the United States Attorneys for the Eastern and Southern Districts of New York identify deception abut time, place, and manner of voting in advising their constituents of the scope of criminal voting-related law.  *See* Docket No. 31-1.[7]

_____

[6]  Available at *https://www.justice.gov/criminal/file/1029066/download*

[7]  *See also* Press Release, "*United States Attorneys Available To Receive Election Complaints,*" U.S. Department of Justice, SDNY, (June 22, 2020), available at *https://www.justice.gov/usao-edny/pr/united-states-attorneys-available-receive-election-complaints*-2

The Election Crimes Branch did not miss something in its compendium in failing to identify mere deception as within the scope of Section 241, let alone a tweeted meme. The history of Section 241, its language, and its purpose all show that Mr. Mackey was not on fair notice that his alleged conduct was a crime.

III

IF SECTION 241 CAN FAIRLY BE INTERPRETED TO COVER THE TWEETED MEMES <u>IN THIS CASE, IT IS UNCONSTITUTIONALLY OVERBROAD AS APPLIED</u>

"Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *United States v. Alvarez*, 567 U.S. 709, 723 (2012). "[T]he First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office.'" *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (quoting *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). "[P]olitical speech by its nature will sometimes have unpalatable consequences, and, in general, our society accords greater weight to the value of free speech than to the dangers of its misuse." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995). *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes"); *see also Nat'l Coalition on Black Civil Participation v. Wohl*, 498 F. Supp. 3d 457, 478 (S.D.N.Y. 2020) ("Although false statements that discourage people from exercising the right to vote could conceivably be exempted from First Amendment protection altogether, the Supreme Court has not crafted such an exception.").

Even as the digital age has made more information more instantly available,

22

Twitter is a no-holds-barred free-for-all.  "If the Internet is akin to the Wild West, as many have suggested, Twitter is, perhaps, the shooting gallery, where verbal gunslingers engage in prolonged hyperbolic crossfire." *Ganske v. Mensch*, 480 F. Supp. 3d 542, 545 (S.D.N.Y. 2020) (Abrams, U.S.D.J.) (dismissing claim of defamation based on tweets); citing *Brahms v. Carver*, 33 F. Supp. 39 192, 199 (E.D.N.Y. 2014) (Vitaliano, U.S.D.J.) (questioning reasonable reliance on statements "made on an internet forum where people typically solicit and express opinions, generally using pseudonyms"); *and Sandals Resorts Int'l Ltd. v. Google, Inc.*, 66 A.D.3d 32, 44 (1ˢᵗ Dep't 2011) ("The culture of Internet communications, as distinct from that of print media such as newspapers and magazines, has been characterized as encouraging a 'freewheeling, anything-goes writing style.'").  "[T]o some, truth itself has been lost in the cacophony of online and Twitter verbiage to such a degree that it seems to roll off the national consciousness like water off a duck's back." *Jacobus v. Trump*, 55 Misc. 3d 470, 484-85 (N.Y. Sup. Ct.), *aff'd*, 156 A.D.3d 452 (2017) ("I find that it is fairly concluded that a reasonable reader would recognize defendants' statements as opinion, even if some of the statements, viewed in isolation, could be found to convey facts.").

The hyperbole of Twitter contrasts sharply with the formalities attendant voting. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021) ("every voting rule imposes a burden of some sort.  Voting takes time and, for almost everyone, some travel, even if only to a nearby mailbox.  Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules.").  In the age of Twitter, Tiktok, Saturday Night Live, The Onion, and other forms of commentary, satire and ridicule, the use of criminal process to protect a hypothetical registered voter from concluding from a tweeted meme that a vote for President could be texted anonymously does not justify the consequent harm

to the First Amendment.  If Section 241 can fairly be interpreted to authorize the government's

theory, it chills freedom of speech and is unconstitutionally overbroad as applied.

A.  *The First Amendment generally protects "disinformation" in political campaigns*

Purported disinformation in a political campaign, including intentional falsehoods,

is generally protected by the First Amendment.  *See Susan B. Anthony List v. Driehaus*, 573 U.S.

149, 161 (2014) (holding that a Ohio statute criminalizing intentionally false statements about

candidates during political campaigns risked chilling freedom of speech); *Cantwell v. State of

Connecticut*, 310 U.S. 296, 310 (1940) ("To persuade others to his own point of view, the pleader,

as we know, at times, resorts to exaggeration, to vilification of men who have been, or are,

prominent in church or state, and even to false statement.  But the people of this nation have

ordained in the light of history, that, in spite of the probability of excesses and abuses, these

liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the

citizens of a democracy."); *281 Care Comm. v. Arneson*, 766 F.3d 774, 796 (8th Cir. 2014)  ("The

citizenry, not the government, should be the monitor of falseness in the political arena."); *Com. v.

Lucas*, 472 Mass. 387, 399 (2015) (laws "broadly suppressing false statements about candidates or

ballot questions cannot withstand" First Amendment scrutiny). *See generally*, Joshua S. Sellers,

*Legislating Against Lying in Campaigns and Elections*, 71 Okla. L. Rev. 141, 153–54 (2018)

("Considering *Alvarez*, *281 Care Committee*, and *Lucas* collectively, it is evident that laws

prohibiting intentionally false campaign or election speech are presumptively unconstitutional.

Concerns about chilling political speech are too serious to permit doctrinal carve outs that might

be perceived as gag orders.").

The government in this case attempts to tether its theory of criminal liability to

concerns about the time, place, or manner of voting, seizing on snippets of conversations among politically like-minded participants in chat forums to infer a conspiracy to injure the right to vote. The government infers a criminal conspiracy from, among other things, chats among politically like-minded participants about psychological warfare ("psyops") targeting the opposing campaign [Docket No. 1 at 12]; making "all these shitlibs think they're [sic] friends are secretly voting" for the opposition candidate [Docket No. 1 at 11]; "alter[ing] images of various celebrities in a manner that falsely suggested that the celebrities were supporting" the opposition candidate [Docket No. 1 at 12]; and promoting a "Draft Our Daughters" meme, suggesting that "the Candidate would provoke armed conflict and draft women to fight the resulting wars."  Docket No. 1 at 13.

          Speech of this sort may or may not offend depending on the listener's sensibilities, but it is constitutionally protected as part of the "vehement, caustic, and sometimes unpleasantly sharp" speech which the First Amendment protects to promote "uninhibited, robust, and wide-open" debate about public issues.  Speech protected by the First Amendment "may not be curtailed simply because the speaker's message may be offensive to his audience." *Hill v. Colorado*, 530 U.S. 703, 716 (2000); *Thornhill v. Alabama*, 310 U.S. 88 (1940).  *See New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  Even false statements about political endorsements are protected.  *See, e.g. Winter v. Wolnitzek*, 834 F.3d 681, 689 (6th Cir. 2016) (holding that a prohibition on falsehoods "suggesting to the voters that the candidate is the endorsed nominee of a political party" is unconstitutionally vague).  Even a narrowly tailored new law covering the type of speech at issue in this case might run afoul of the First Amendment.  *See Coalition on Black Civil Participation v. Wohl*, 498 F. Supp. 3d 457, 478 (S.D.N.Y. 2020)

("Although false statements that discourage people from exercising the right to vote could conceivably be exempted from First Amendment protection altogether, the Supreme Court has not crafted such an exception.")].

  While the state may have an "interest in protecting the political process from distortions caused by untrue and inaccurate speech," . . . . the "chilling effect of such absolute accountability for factual misstatements in the course of political debate is incompatible with the atmosphere of free discussion contemplated by the First Amendment in the context of political campaigns." *Brown v. Hartlage,* 456 U.S. 45, 61 (1982); *Clingman v. Beaver*, 544 U.S. 581, 586 (2005) ("We have held that the First Amendment, among other things, protects the right of citizens 'to band together in promoting among the electorate candidates who espouse their political views.'  Regulations that impose severe burdens on associational rights must be narrowly tailored to serve a compelling state interest.") (quoting *California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000)).

*B.  The allegedly deceptive memes are protected as satirical speech*

  It is highly unlikely that a registered voter was misled by a tweeted meme inviting an anonymous text as an official ballot for President; in fact, the government's investigation in this case apparently failed to find one.  Any risk that a registered voter would be mislead, however, is far outweighed by the chilling of the marketplace of ideas where consumers can assess the value of political expression as provocation, satire, commentary, or otherwise, and, just as importantly, how its targets respond.  *See New York Times Co. v. Sullivan*, 376 U.S. 254, 271-72 (1964) ("To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state,

and even to false statement.  But the people of this nation have ordained in the light of history,

that, in spite of the probability of excesses and abuses, these liberties are, in the long view,

essential to enlightened opinion and right conduct on the part of the citizens of a democracy . . . .

[E]rroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of

expression are to have the breathing space that they need to survive."); *Farah v. Esquire Mag.,*

*736 F.3d 528, 536–37 (D.C. Cir. 2013)* ("But it is the nature of satire that not everyone 'gets it'

immediately.  For example, when Daniel Defoe first published The Shortest Way with the

Dissenters, an anonymous satirical pamphlet against religious persecution, it was initially

welcomed by the church establishment Defoe sought to ridicule.  See James Sutherland, English

Satire 83-84 (1958). Similarly, Benjamin Franklin's 'Speech of Miss Polly Baker,' a fictitious

news story mocking New England's harsh treatment of unwed mothers, was widely republished in

both England and the United States as actual news."); *Cliffs Notes, Inc. v. Bantam Doubleday Dell*

*Pub. Grp., Inc.*, 886 F.2d 490, 494 (2d Cir. 1989) ("the keystone of parody is imitation.  It is hard

to imagine, for example, a successful parody of Time magazine that did not reproduce Time's

trademarked red border."); *see also Falwell v. Flynt*, 805 F.2d 484, 487 (4th Cir. 1986)

(Wilkinson, J., dissenting), *rev'd sub nom. Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, (1988)

("Satire is particularly relevant to political debate because it tears down facades, deflates stuffed

shirts, and unmasks hypocrisy.  By cutting through the constraints imposed by pomp and

ceremony, it is a form of irreverence as welcome as fresh air.")

　　　　The First Amendment does not permit the government to decide which speech

qualifies as satire and which is deception, especially without clear legislative command, especially

on Twitter among "verbal gunslingers engaged in prolonged hyperbolic crossfire."  *See Ganske*,

480 F. Supp. 3d at 542.  Perhaps the Department of Justice on January 22, 2021, two days into the

Biden Administration when it filed its Complaint against Mr. Mackey [Docket No. 1], believed its

cause to be righteous, but the precedent that could be set here could animate different applications

of Section 241 based on the whims of whomever is in power.

      "Were this law to be sustained, there could be an endless list of subjects the

National Government or the States could single out.") (plurality opinion); *Alvarez, 567 U.S. at*

*718*  ("This comports with the common understanding that some false statements are inevitable if

there is to be an open and vigorous expression of views in public and private conversation,

expression the First Amendment seeks to guarantee.").  If Section 241 can be interpreted as

covering the allegedly deceptive speech here, it is unconstitutional as applied.

<u>Conclusion</u>

      For these reasons, the indictment in this case should be dismissed.

Dated: June 24, 2022

> */s/ Andrew J. Frisch*
> Andrew J. Frisch
> The Law Offices of Andrew J. Frisch, PLLC
> 40 Fulton Street, 17th Floor
> New York, New York 10038
> (212) 285-8000
> *afrisch@andrewfrisch.com*
>
> *Attorney for Douglass Mackey*