RTP:EDP/OO/WJG
F. #2018R02250

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

                                                      21 CR 80 (NGG)

DOUGLASS MACKEY,

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT'S RESPONSE IN OPPOSITION TO
<u>DEFENDANT'S MOTION TO DISMISS</u>

                                                    BREON PEACE
                                                    United States Attorney
                                                    Eastern District of New York
                                                    271 Cadman Plaza East
                                                  Brooklyn, New York 11201

                                                    COREY R. AMUNDSON
                                                    Chief
                                                    Criminal Division, Public Integrity Section
                                                    1301 New York Ave. NW, Tenth Floor
                                                    Washington, District of Columbia 20004

ERIK D. PAULSEN
OLATOKUNBO OLANIYAN
Assistant U.S. Attorneys
(Of Counsel)

WILLIAM J. GULLOTTA
Trial Attorney
(Of Counsel)

## Table of Contents

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ..............................................................................................................1

ARGUMENT ..................................................................................................................4

I.   STANDARD OF REVIEW ......................................................................................... 5

II.  THE INDICTMENT SATISFIES DUE PROCESS BECAUSE IT WAS WELL-
ESTABLISHED THAT SECTION 241 PROHIBITS CONSPIRACIES TO INJURE
THE RIGHT TO VOTE. ........................................................................................ 6

   A.   The Right to Vote is Secured by the Constitution and Section 241 Has Been Properly
Used to Prosecute Conspiracies to Injure That Right. ............................................... 7

   B.   Section 241 Criminalizes All Conspiracies to Injure the Right to Vote, Not Only
Those That Involve Threats or Physical Interference. ............................................... 8

   C.   The Defendant Had Fair Warning That His Conduct Violated Section 241. ............. 12

III.  The Use of Section 241, as Applied to the Defendant, Does Not Violate the First
Amendment. ..................................................................................................... 15

IV.  THE EASTERN DISTRICT OF NEW YORK IS A PROPER VENUE FOR THE
INSTANT PROSECUTION. ................................................................................... 22

   A.   Applicable Law................................................................................................. 22

   B.   Discussion....................................................................................................... 24

CONCLUSION............................................................................................................31

Table of Authorities

**Cases**

Anderson v. Celebrezze, 460 U.S. 780 (1983) ............................................................. 19

Anderson v. United States, 417 U.S. 211 (1974) .................................................. 7, 8, 10

Bl(a)ck Tea Society v. City of Boston, 378 F.3d 8 (1st Cir. 2004) ............................... 16

Burson v. Freeman, 504 U.S. 191 (1992) ............................................................... 19, 20

Chaplinsky v. State of New Hampshire, 315 U.S. 568 (1942) ...................................... 16

FEC v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431 (2001) ...................... 19

Heffron v. Int'l Soc'y for Krishna Consciousness, 452 U.S. 640 (1981)....................... 16

Hope v. Pelzer, 536 U.S. 730 (2002) ........................................................................... 12

In re R.M.J., 455 U.S. 191 (1982)................................................................................. 16

John Doe No. 1 v. Reed, 561 U.S. 186 (2010) ............................................................. 19

Marcavage v. City of New York, 689 F.3d 98 (2d Cir. 2012)........................................ 16

McIntyre v. Ohio Elections Comm'n, 564 U.S. 721 (2011)........................................... 19

Minnesota Majority v. Manksy, 62 F. Supp. 3d 870 (D. Minn. 2014) .......................... 21

Minnesota Majority v. Mansky, 849 F.3d 749 (8th Cir. 2017)...................................... 21

Minnesota Voters Alliance v. Mansky, 138 S.Ct. 1876 (2018)................... 6, 16, 17, 21

National Coalition on Black Civil Participation v. Wohl, 498 F. Supp. 3d 457 (S.D.N.Y. 2020)
............................................................................................................................. 21, 22

Nicopure Labs, LLC v. Food & Drug Administration, 944 F.3d 267 (D.C. Cir. 2019)............... 16

Pizzuto v. County of Nassau, 239 F. Supp. 2d 301 (E.D.N.Y. 2003)........................... 28

Preferred Properties, Inc. v. Indian River Estates, Inc., 276 F.3d 790 (6th Cir. 2002)................ 15

San Francisco Forty-Niners v. Nishioka 89 Cal. Rptr. 2d 388 ............................... 18, 19

Schenck v. United States, 249 U.S. 47 (1919)......................................................... 15

United States v. Ahmed, 94 F. Supp. 3d 394 (E.D.N.Y. 2015) ..................................... 5

United States v. Aleynikov, 676 F.3d 71 (2d Cir. 2012) ................................................. 5

United States v. Alfonso, 143 F.3d 772 (2d Cir. 1998) .................................................. 5

United States v. Beech–Nut Nutrition Corp., 871 F.2d 1181 (2d Cir. 1989) ............... 23

United States v. Benson 561 F. 3d 718 (7th Cir. 2009).............................................. 18

United States v. Bradfield, 2000 WL 103302 (6th Cir. July 18, 2000) ...................... 11

United States v. Brooks, No. 05-CR-550, 2009 WL 3644122 (E.D.N.Y. Oct. 27, 2009)............. 5

United States v. Brown, 293 F. App'x 826 (2d Cir. 2008).......................................... 25

United States v. Bufalino, 518 F. Supp. 1190 (S.D.N.Y. 1981) .................................. 28

United States v. Candella, 487 F.2d 1223 (2d Cir. 1973)...................................... 24, 26

United States v. Classic, 313 U.S. 299 (1941)................................................... 7, 12, 13

United States v. Crochiere, 129 F.3d 233 (1st Cir. 1997)............................................. 8

United States v. Dawkins, No. 17-CR-684, 2019 WL 2461722 (S.D.N.Y. May 23, 2019)........... 5

United States v. De La Pava, 268 F.3d 157 (2d Cir. 2001) ........................................... 5

United States v. DeLaurentis, 491 F.2d 208 (2d Cir. 1974) ......................................... 9

United States v. Grammatikos, 633 F.2d 1013 (2d Cir. 1980) .................................... 22

United States v. Greer, 939 F.2d 1076 (5th Cir. 1991)................................................ 28

United States v. Guest, 383 U.S. 745 (1966) .............................................................. 13

United States v. Halloran, 821 F.3d 321 (2d Cir. 2016) ........................................ 15
United States v. Haynes, 1992 WL 296782 (6th Cir. 1992) ..................................... 7
United States v. Kirk Tang Yuk, 885 F.3d 57 (2d Cir. 2018) .................................. 30
United States v. Lange, 834 F.3d 58 (2d Cir. 2016) ...................................... passim
United States v. Lanier, 520 U.S. 259 (1997) ..................................... 11, 13, 14
United States v. Lee, 6 F.3d 1297 (8th Cir. 1993) ................................................. 9
United States v. Lombardo, 241 U.S. 73 (1916) ................................................... 23
United States v. Magleby, 420 F.3d 1136 (10th Cir. 2005) ..................................... 9
United States v. Martinez-Mercado, 919 F.3d 91 (1st Cir. 2019) ......................... 28
United States v. Mavashev, No. 08-CR-902, 2009 WL 4746301, (E.D.N.Y. Dec. 7, 2009) ......... 5
United States v. Melendez, 2004 WL 162937 (E.D. Mich. Jan. 20, 2004) ............... 11
United States v. Mosley, 238 U.S. 383 (1915) .............................................. 7, 12
United States v. Ng, No. 18-CR-538 (MKB), Dkt. No. 84 (E.D.N.Y. Sept. 10, 2021).... 22, 25, 26
United States v. Perez, 575 F.3d 164 (2d Cir. 2009) ............................................ 25
United States v. Potamitis, 739 F.2d 784 (2d Cir. 1984) ...................................... 22
United States v. Price, 383 U.S. 787 (1966) ......................................................... 8
United States v. Ramirez, 420 F.3d 134 (2d Cir. 2005)......................... 23, 24, 26, 28
United States v. Reed, 773 F.2d 477 (2d Cir. 1985) ............................ 23, 24, 29, 30
United States v. Rodriguez-Moreno, 526 U.S. 275 (1999)............................... 23, 29
United States v. Rowe, 414 F.3d 271 (2d Cir. 2005) ........................................... 28
United States v. Royer, 549 F. 3d 886 (2d Cir. 2008) ............................ 24, 26, 28
United States v. Saavedra, 223 F.3d 85 (2d Cir. 2000) ................................... 24, 30
United States v. Sampson, 898 F.3d 270 (2d Cir. 1998) ...................................... 5, 6
United States v. Saylor, 322 U.S. 385 (1944) ................................................. 7, 13
United States v. Smith, 198 F.3d 377 (2d Cir. 1999)........................................... 23
United States v. Stone, 188 F. 836 (D. Md. 1911) ...................................... 7, 10, 12
United States v. Sutton, 13 F.3d 595 (2d Cir. 1994) ........................................... 22
United States v. Svoboda, 347 F.3d 471 (2d Cir. 2003) ................................. 24, 26
United States v. Tobin, 2005 WL 3199672, 04-CR-216, (D.N.H. Nov. 30, 2005) .......... 12, 13, 14
United States v. Townsley, 843 F.2d 1070 (8th Cir. 1988) ..................................... 7
United States v. Waddell, 112 U.S. 76 (1884) .................................................... 10
United States v. Weston, 417 F.2d 181 (4th Cir. 1969) .......................................... 8
United States v. Williams, 553 U.S. 285 (2008) ................................................. 15
Waffenschmidt v. McKay, 763 F.2d 711 (5th Cir. 1985).................................. 29, 30
Ward v. Rock Against Racism, 491 U.S. 781 (1989) .......................................... 16

**Statutes**

18 U.S.C. § 1001 ................................................................................................. 16
18 U.S.C. § 1343 ................................................................................................. 16
18 U.S.C. § 1621 ................................................................................................. 16
18 U.S.C. § 241 ............................................................................................ passim
18 U.S.C. § 242 ......................................................................... 8, 11, 12, 13
18 U.S.C. § 3237 .......................................................................................... 23, 26

42 U.S.C. § 1983 .................................................................................................................. 12

**Rules**

Federal Rule of Criminal Procedure 12 ........................................................................... 5

PRELIMINARY STATEMENT

Leading up to the November 8, 2016, election for the Office of the President of the United States, the defendant conspired with others to falsely inform the public that supporters of one candidate could and should vote through social media posts or text messages.  The defendant and his co-conspirators engaged in this conduct intending to deprive voters of their constitutional right to vote by tricking them into thinking that they could vote without casting a ballot.  The defendant's conduct is no different than had he conspired to destroy ballots or intimidate voters to keep them away from the polls—conduct that constitutes criminal infringement of the right to vote.  The law has long prohibited such conspiracies, and the defendant was squarely on notice that his conduct was illegal.  The defendant's conduct is also unprotected by the First Amendment.  As the Supreme Court has recognized, the First Amendment does not shield intentional efforts to deprive citizens of their right to vote through deception regarding the time, place, and manner of elections.  Finally, venue is proper in the Eastern District of New York as the misleading information was transmitted through the district and the criminal conduct aimed to impact potential voters in the district.  The defendant's motion should be denied in its entirety.

BACKGROUND

On or about February 10, 2021, a Grand Jury sitting in the Eastern District of New York returned an indictment charging the defendant with one count of Conspiracy Against Rights, in violation of 18 U.S.C. § 241 ("Section 241") (the "Indictment").  Specifically, the Indictment alleges:

> In or about and between September 2016 and November 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant DOUGLASS MACKEY, also known as "Ricky Vaughn," together with others, conspired to injure, oppress, threaten and intimidate one or more

1

persons in the free exercise and enjoyment of a right and privilege
secured to them by the Constitution and laws of the United States,
to wit: the right to vote.

ECF Docket Entry No. 8.  On January 26, 2021, approximately two weeks before the Indictment

was returned, the defendant was arrested on a complaint charging him with Conspiracy Against

Rights, in violation of Section 241 (the "Complaint").  The 24-page Complaint provides

substantial detail regarding the defendant's alleged conduct and how that conduct violated

Section 241.  Among other things, the Complaint alleges that the defendant:

formulated, created and disseminated information over social
media that claimed, among other things, that supporters of a
Presidential candidate from one of the two main political parties
("the Candidate") could and should vote for the Candidate by
posting a specific hashtag on Twitter or Facebook, or by texting
the Candidate's first name to a specific telephone text code (the
"Text Code").  MACKEY and his co-conspirators conspired to
design and distribute these messages with the intent that supporters
of the Candidate would believe the fraudulent information
contained therein, attempt to cast their votes via social media or
text message, and, as a result, fail to cast their votes in the Election
in a legally valid manner.

Complaint, ¶ 3.  ECF Docket Entry No. 1.  The Complaint describes in detail two occasions,

both occurring during the week prior to the 2016 Presidential Election, on which the defendant

used Twitter to distribute memes ("Deceptive Image(s)") encouraging citizens to cast their votes

by texting their vote to a specific Text Code:

On or about November 1, 2016, the day before he sent the tweet
suggesting the importance of limiting "black turnout," MACKEY
used MACKEY Account 2 to tweet a Deceptive Image.  The
picture featured an African American woman standing in front of
an "African Americans for [the Candidate]" sign.  The Deceptive
Image included the following text: "Avoid the Line.  Vote from
Home.  Text '[Candidate's first name]' to 59925[.]  Vote for [the
Candidate] and be a part of history."  The fine print at the bottom
of the Deceptive Image stated the following: "Must be 18 or older
to vote.  One vote per person.  Must be a legal citizen of the United
States.  Voting by text not available in Guam, Puerto Rico, Alaska
or Hawaii.  Paid for by [Candidate] for President 2016."

2

> The next day, MACKEY used MACKEY Account 2 to tweet another Deceptive Image. The image depicted a woman sitting at a conference table and using her telephone as if she was entering a text message. This Deceptive Image contained similar written messages to the one described above, using the same distinctive font employed by the campaign of the Candidate, although this Deceptive Image was written entirely in Spanish. In addition, this Deceptive Image included a copy of the logo of the Candidate's campaign, as well as a link to the Candidate's campaign website.

Complaint ¶¶ 32-33. The Complaint describes the Twitter group chats used by the defendant and his co-conspirators, quoting extensively from the messages sent and received. Further, the Complaint and subsequent discovery produced to the defendant show that the Deceptive Images distributed by the defendant were distributed in a manner that would reach a wide audience, including individuals located in the Eastern District of New York, among other places.

On May 27, 2022, in response to the defendant's motion for a bill of particulars, the government informed the defendant and the Court that it would establish the following facts by a preponderance of the evidence:[1]

> That in the lead up to the 2016 Federal Presidential Election, the members of the conspiracy distributed disinformation about the time, place and manner of voting with the intent to "injure, oppress, threaten and intimidate" voters, which would include voters located the Eastern District of New York;

> That given the method by which the members of the conspiracy distributed this aforementioned disinformation, including by the social media platform Twitter, it was foreseeable that the disinformation would be spread to and through the Eastern District of New York;

_____

[1] On May 13, 2022, the Court issued a Memorandum and Order directing the government to state and clarify the facts that the government intends to prove at trial to establish venue within the Eastern District of New York. The Court stated that it was "mindful that a bill of particulars should not 'foreclose the government from using proof it may develop as the trial approaches.' Accordingly, the government is granted leave to amend its theory of venue should that theory change during discovery, motion practice, or while pre-paring for trial. ECF Docket Entry No. 36, at *5.

That as a result of the acts by the members of the conspiracy, the aforementioned disinformation was viewed by Twitter users located in the Eastern District of New York; and

That communications sent to and from members of the conspiracy, including the communications sent by the Defendant on November 1, 2016 and November 2, 2016 containing the "Deceptive Images" described in paragraphs 32 and 33 of the Complaint, traveled through the territory of the Eastern District of New York due to the Defendant's use of the Twitter platform.

## ARGUMENT

It is well-established that the First Amendment does not protect schemes to deprive American citizens of their right to vote. This case involves just such a scheme. The defendant and his co-conspirators engaged in a deliberate effort to deceive potential voters regarding the manner in which they could cast a valid ballot in the 2016 election, in an effort to cause those potential voters mistakenly to believe that they had voted, when in fact they had not. The Supreme Court has recognized that such messages intended to mislead voters about "voting requirements and procedures" may be prohibited. And properly so—were the broadcasting of intentional lies about voting procedures constitutionally protected, voters would be repeatedly subjected to an array of disinformation regarding the time, place, and manner of voting, and the resulting confusion would lead to the disenfranchisement of numerous potential voters. As set forth in further detail below, it has long been established that the First Amendment simply does not protect the intentional deception practiced by the defendant here. Furthermore, the defendant had fair notice that his conduct was against the law and subject to prosecution under Section 241. Finally, venue for this prosecution in proper in the Eastern District of New York. The defendant's motion should be denied.

4

I.      STANDARD OF REVIEW

Federal Rule of Criminal Procedure 12(b) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1).  United States v. Ahmed, 94 F. Supp. 3d 394, 404 (E.D.N.Y. 2015).  The sufficiency of an indictment and the interpretation of a federal statute are both matters of law reviewable on a motion to dismiss an indictment.  Id. at 404-05.  The defendant "must satisfy a high standard," see, e.g., United States v. Brooks, No. 05-CR-550, 2009 WL 3644122, at *2 (E.D.N.Y. Oct. 27, 2009), as "the dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." United States v. Dawkins, No. 17-CR-684, 2019 WL 2461722, at *1 (S.D.N.Y. May 23, 2019), aff'd, 999 F.3d 767 (2d Cir. 2021) (quoting United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted)).

Because a motion to dismiss is a legal remedy, "[t]he sufficiency of the evidence is not appropriately addressed" in such a motion.  Ahmed, 94 F. Supp. 3d at 404-05 (quoting United States v. Alfonso, 143 F.3d 772, 777–78 (2d Cir. 1998)); United States v. Sampson, 898 F.3d 270, 279 (2d Cir. 1998) (noting that when a motion to dismiss an indictment raises dispositive evidentiary questions, the motion must be deferred to after trial).  In other words, Rule 12 authorizes defendants to challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds.  Ahmed, 94 F. Supp. 3d at 404 (citing United States v. Aleynikov, 676 F.3d 71, 75–76 (2d Cir. 2012)).  At this posture, therefore, a court must "accept the facts alleged in the indictment as true and determine only whether the indictment is 'valid on its face.'" United States v. Mavashev, No. 08-CR-902, 2009 WL 4746301, at *2 (E.D.N.Y. Dec. 7, 2009) (quoting De Le Pava, 268 F.3d at 162 (alterations in original)); see Sampson, 898 F.3d

5

at 282-83 (noting that unless the government is construed to have made a "full proffer of the
evidence it intends to introduce at trial," a court cannot rule on the sufficiency of evidence, as it
would improperly convert the motion to the criminal equivalent of a summary judgment
motion).[2]

II.     THE INDICTMENT SATISFIES DUE PROCESS BECAUSE IT WAS WELL-
        ESTABLISHED THAT SECTION 241 PROHIBITS CONSPIRACIES TO INJURE
        THE RIGHT TO VOTE.

            The defendant's due process argument is largely rooted in his assertion that he
simply could not have understood that his alleged conduct was illegal.  This assertion is not
plausible.  There is ample caselaw stretching back over a hundred years that recognizes the
constitutional right to vote and authorizes the use of Section 241 to prosecute conspiracies to
injure that right.  Courts have been clear that the deployment of a new means by which to violate
a recognized constitutional right does not insulate a defendant from prosecution under Section
241.  Moreover, the Supreme Court has indicated that the myriad state laws that prohibit such
conduct, including the use of false information to deceive voters as to the time, place, and
manner of elections, pass constitutional muster.  Minnesota Voters Alliance v. Mansky, 138 S.
Ct. 1876, 1889 n.4 (2018) ("We do not doubt that the State may prohibit messages intended to
mislead voters about voting requirements and procedures.").  The defendant conspired to injure
the well-established constitutional right to vote, and he had fair notice that his conduct fits
squarely within the purview of Section 241.

---

[2] To the extent that the defendant argues that the Deceptive Images are satirical
speech, see Def. Mot. at 27, such arguments are properly addressed to the trier-of-fact at trial.

A.  <u>The Right to Vote is Secured by the Constitution and Section 241 Has Been Properly Used to Prosecute Conspiracies to Injure That Right.</u>

The defendant does not dispute that the Constitution protects the right to vote, and a conspiracy to injure the right to vote has long been held to violate Section 241.  The Indictment does not change the scope of criminal liability created by that statute.  It is beyond question that the right to vote may be injured by non-threatening means.  See e.g., <u>United States v. Saylor</u>, 322 U.S. 385 (1944) (ballot stuffing); <u>United States v. Classic</u>, 313 U.S. 299 (1941) (manipulating ballots and false certification); <u>United States v. Mosley</u>, 238 U.S. 383 (1915) (omitting ballots); <u>United States v. Haynes</u>, 1992 WL 296782 (6th Cir. 1992) (unpublished) (withholding ballots); <u>United States v. Stone</u>, 188 F. 836 (D. Md. 1911) (confusing ballots).  Because the defendant intended to injure the rights of certain voters, and the right to vote has been protected by the Constitution for well over a hundred years, he had reasonable notice that his conduct violated Section 241.

Courts have long recognized that the constitutional right to vote includes both the right to cast a vote and the right to have that vote counted.  See <u>Mosley</u>, 238 U.S. at 386 ("We regard it as equally unquestionable that the right to have one's vote counted is as open to protection by Congress as the right to put a ballot in a box."); <u>Classic</u>, 313 U.S. at 315 (explaining that the right to cast a ballot in a congressional election and have it counted is "secured against the action of individuals as well as of states") (citing <u>Ex Parte Yarbrough</u>, 110 U.S. 651 (1884)); <u>United States v. Townsley</u>, 843 F.2d 1070 (8th Cir. 1988) (upholding Section 241 conviction for unsealing and manipulating absentee ballots); <u>Anderson v. United States</u>, 417 U.S. 211 (1974) (upholding Section 241 conviction for deceiving voters regarding which candidate was selected on their ballot); <u>Haynes</u>, 1992 WL 296782, *2 (upholding Section 241 conviction for withholding certain voting cards).  Here, the defendant is charged with conspiring

7

to distribute false information about the time, place, and manner of an election; his conduct falls squarely within the protected right.

    B.   Section 241 Criminalizes All Conspiracies to Injure the Right to Vote, Not Only Those That Involve Threats or Physical Interference.

           Courts have consistently held that Section 241 should be construed broadly to protect the right to vote.  For example, in Anderson, the Supreme Court affirmed a Section 241 conviction because the defendant's casting of fictitious ballots "injure[d] the right of all voters in a federal election to express their choice of a candidate and to have their expressions of choice given full value and effect."  417 U.S. at 226; see also United States v. Weston, 417 F.2d 181, 183 (4th Cir. 1969) ("[I]t has been established in this circuit that the procurement of absentee ballots in violation of state election laws is indictable under 241.") (Internal citations omitted). Naturally, other courts have followed Anderson, noting the "Supreme Court cases that have emphasized the breadth of §§ 241 and 242, and the prosecutorial force that Congress intended to give them."  United States v. Crochiere, 129 F.3d 233, 238-39 (1st Cir. 1997) (recognizing that the Supreme Court's "discussion provides strong support for the proposition that the Reconstruction Era Congress did not intend Section 241 to have a narrow scope.") (citing United States v. Price, 383 U.S. 787, 803-05 (1966)).  The intentional use of deception to trick voters into casting inauthentic ballots indisputably interferes with the right to vote.  Thus, Section 241 squarely covers the conduct at issue in this case.

           Contrary to the defendant's argument, Section 241 has never been confined to violence and threats of violence or other physical acts.  Indeed, as described above, the Supreme Court has recognized that Section 241 prohibits the intentional deception of voters regarding the voting process.  See Anderson, 417 U.S. at 225 (affirming Section 241 convictions arising from scheme in which defendants, among other things, joined voters in the voting booth and deceived

8

the voters into believing that they had cast votes for one slate of candidates, when in fact they had cast votes for a different slate).  The cases cited by the defendant are inapposite and do not preclude the application of Section 241 under these circumstances.  See Def.'s Mem. At 13, citing United States v. DeLaurentis, 491 F.2d 208 (2d Cir. 1974) (involving the use of Section 241 to prosecute conduct involving labor disputes), United States v. Lee, 6 F.3d 1297 (8th Cir. 1993) (involving the use of Section 241 to prosecute a cross burning near a housing complex housing many African American residents); United States v. Magleby, 420 F.3d 1136 (10th Cir. 2005) (cross burning case).[3]  To be sure, many prior prosecutions under Section 241 involving a myriad of constitutional rights have involved the use of violence or threats.  However, the constitutional right to vote can be injured without the use of violence or physical conduct (e.g., ballot box stuffing or deliberately confusing ballots), and the application of Section 241 is not limited to such circumstances.

---

[3] The question for the Second Circuit in DeLaurentis was whether Section 241 could be used to prosecute defendants who may have interfered with the right not to engage in organized labor activity.  Indeed, it was about whether that *right* is properly within the scope of Section 241, not the *method* by which that right was injured.  By drawing attention to the particular methods of unlawful interference, rather than the right that was injured, the defendant hopes to distract the Court by arguing that the defendant's use of the Internet to interfere with Constitutional rights is a new method of injuring the exercise of that right, and that its novelty shields the conduct from prosecution.  It does not.

Moreover, Lee and Magleby are equally inapposite.  In those cross-burning cases, the courts held that, as an initial matter, cross burning was expressive conduct and therefore merited some First Amendment protections, though those protections would be lost if the cross burning constituted a true threat.  So, the question addressed in those cases was whether there was a true threat.  Alternatively, the Deceptive Images contained fraudulent words, not potentially threatening expressive conduct.  As such, the Government does not submit that the Deceptive Images fall outside the scope of the First Amendment because they constituted a true threat.  Instead, for reasons discussed below, the Deceptive Images fall outside the scope of the First Amendment because of their fraudulent nature.  As such, cases distinguishing between protected speech and true threats are irrelevant to the present case.

9

Consistent with the Supreme Court's holding in <u>Anderson</u>, courts have long held that Section 241 prohibits deceptive or misleading behavior intended to deprive voters of their constitutional right to vote.  In <u>Stone</u>, the court found that a conspiracy to print misleading or confusing ballots that made it easier for a person of limited literacy to vote for a Democrat than a Republican violated a predecessor of Section 241.  188 F. at 839-40.  According to the court, "[t]he ballot as described was so peculiar as to suggest that those who directed its preparation must have had some other purpose in mind than to facilitate the qualified and registered voters of the county in voting for the candidates of their choice." <u>Id</u>. at 838-39.  In their attempts to have the indictment dismissed, the defendants—like the defendant in the instant case—urged the court to adopt a narrow definition of "injure" that required a showing of intent to cause bodily harm. <u>Id</u>. at 839 ("It is contended that the statute is not violated unless the thing which is purposed to be done is in the nature of a threat, an injury, an oppression, or an intimidation.").  The court rejected that argument.  "In this case the government does not ask that the word 'injure' shall be given any other construction than that which it usually has.  Unlawfully to deprive a citizen of the United States of his right to vote at a congressional election is to injure him in any ordinary use of the word 'injure.'" <u>Id</u>. at 840.  In reaching its decision, the court underscored the broad purpose and application of the statute. <u>Id.</u> ("The Supreme Court has said of this statute that it covers any conspiracy to prevent the exercise of any of the rights protected by it, or to throw obstruction in the way of exercising such right, or for the purpose or with intent to prevent its exercise.") (citing <u>United States v. Waddell</u>, 112 U.S. 76 (1884)).  A deliberately misleading ballot is not substantively different than deliberately misleading information on how to cast a ballot.  The intended conspiratorial aim is the same—to injure the right to cast a valid vote in an election.  As <u>Stone</u> demonstrates, it has been the case for over 100 years that Section 241 is a

10

proper vehicle to charge non-violent, deceptive conspiracies to injure constitutional rights, including the right to vote.

The defendant's assertion that Section 241 "has [n]ever been applied to speech alleged to constitute mere deception" is not correct.  See Def.'s Memo. at 15.  Indeed, deception that injures other constitutional rights has also been found to violate Section 241.  For example, courts have approved the use of Sections 241 and 242 to prosecute police officers who violate the Fourth Amendment by making false statements in search warrant affidavits, conduct that, like the defendant's, includes misleading words.  See United States v. Melendez, 2004 WL 162937 (E.D. Mich. Jan. 20, 2004) (denying motion to dismiss in Section 241 case).  Melendez and a Sixth Circuit case, United States v. Bradfield, 2000 WL 1033022 (6th Cir. July 18, 2000), involve, among other things, "falsified police reports" that injured the right under the Fourth Amendment to be free from unreasonable searches.  Melendez, 2004 WL 162937, at *8.  The Melendez court held that, "[b]ased on these cases, the conduct alleged in the indictment is unlawful according to pre-existing law and satisfies the fair warning concern of Lanier," and it denied the defendants' motion to dismiss.  Id., (citing United States v. Lanier, 520 U.S. 259 (1997)).

The prosecution of the defendant for his use of Twitter to mislead voters does not represent a "huge expansion of federal criminal liability."  See Def. Mem. at 13.  It merely holds him responsible for a new *means* of using deception to commit a crime that the government has prosecuted for decades.  The defendant asserts, "Nothing about the inherent violence of a face-to-face confrontation with a white-hooded Klansman is anything like viewing an allegedly deceptive tweeted meme on the Internet."  Id. at 16.  That may in fact be true; however, ballot-stuffing, creating misleading ballots, and making false statements in search warrant affidavits are

also unlike confronting a mob of Klansmen, and courts have routinely held that Section 241 covers that very non-violent and non-threatening deceptive conduct.  See, e.g., Classic, 313 U.S. 299 (involving altered ballots); United States v. Tobin, 2005 WL 3199672, 04-CR-216 (D.N.H. Nov. 30, 2005) (disruption of phone lines on election day); Stone, 188 F. 836 (preparation of confusing ballots); Mosley, 238 U.S. 383 (omission of certain returns from the tally of votes). The defendant cites no case limiting Section 241 to violence, threats of violence, or other physical acts.  Indeed, there is no case that holds that Section 241 cannot be used to prosecute conduct that injures the well-established right to vote merely because the means by which the defendant injured the right involved the use of deceptive or misleading statements.[4]

C. The Defendant Had Fair Warning That His Conduct Violated Section 241.

Fair warning does not require that a prior case involved either fundamentally similar or materially similar facts; a defendant "can still be on notice that their conduct violates established law even in novel factual circumstances."  Hope v. Pelzer, 536 U.S. 730, 741 (2002).[5]

In Classic, a case involving the alteration and false counting and certification of ballots, the Supreme Court held that "a conspiracy to prevent the citizen from voting or to prevent the official count of his ballot when cast is a conspiracy to injure and oppress the citizen in the free exercise of a right secured by the Constitution within the meaning of [Section 241]."

---

[4] The defendant's assertion that an entirely different statute, 18 U.S.C. § 245, may require "forcible" conduct does not cast any useful light on the interpretation of Section 241. See Def.'s Memo. at 15 (citing United States v. Pacelli, 491 F.2d 1108 (2d Cir. 1974)).

[5] Although Hope v. Pelzer addressed this issue in the context of whether certain officers were entitled to qualified immunity in a suit under 42 U.S.C. § 1983, the standard for such qualified immunity is the same as the standard for fair notice under § 241 and § 242. See Hope v. Pelzer, 536 U.S. at 739.

Classic, 313 U.S. at 321.  The Supreme Court has emphasized that, in order to provide fair warning regarding the scope of Section 241, it does not "demand[] precedents that applied the right at issue to a factual situation that is fundamentally similar at the level of specificity meant by the Sixth Circuit in using that phrase.  To the contrary, we have upheld convictions under [Section] 241 or [Section] 242 despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."  Lanier, 520 U.S. at 269-70.  The Court has found such "reasonable warning" in a variety of contexts in which the conduct at issue differed from that presented in prior cases.  See United States v. Guest, 383 U.S. 745, 759 n.17 (1966) (prior cases established right of interstate travel, but later case was the first to address the deprivation of this right by private persons); Saylor, 322 U.S. 385 (prior cases established right to have legitimate vote counted, whereas later case involved dilution of legitimate votes through casting of fraudulent ballots); Classic, 313 U.S. at 321–324 (prior cases established right to have vote counted in general election, whereas later case involved primary election).

In Tobin, the defendant was charged with conspiring to injure the right to vote by deliberately jamming the telephone lines of organizations that offered rides to the polls for people who could not get there on their own.  2005 WL 3199672, at *1.  Tobin made many of the same arguments that the defendant makes in this case, namely that he deployed a new method to injure the right to vote and did not have "fair warning" that his conduct was illegal.  Id. at *1-2.  The district court rejected that argument, making clear that the particular *means* by which a well-established constitutional right is injured is unimportant.  Id. at *4.  What matters is the particular *right* that was injured.  Specifically, the court said:

> In gauging whether prior decisions give reasonable warning that
> the charged conduct violates constitutional rights, it is not

13

> necessary, as defendant seems to suggest, to identify prior decisions that "applied the right at issue to a factual situation that is fundamentally similar." Rather, it is sufficient if earlier decisions give reasonable warning that the charged conduct would violate specific constitutional rights. In that regard, "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful."

Id. at *2 (citing Lanier, 520 U.S. at 269, 271). As the court explained, the "specific means" by which a defendant attempts to interfere with the Constitutional right to vote is not significant in the fair warning context, nor is it a defense that a similar case had not been decided. Id. at *3. "It is not the novelty of the means employed, or the originality of the scheme devised, that 'fair notice' speaks to, but the purpose of the conspiracy or the object of the conduct. Here, the alleged purpose of the charged conspiracy was to injure or oppress any person in the free exercise of the right to vote. Such conduct is plainly prohibited by Section 241." Id. at *4.

In other words, simply because a defendant might use a new means to injure the constitutional rights of others to vote in an election does not mean that his conduct is beyond the reach of Section 241. The right to vote is unambiguously protected by the Constitution and the Indictment alleges that the defendant deliberately joined a conspiracy with the specific intent to impede or prevent voters from exercising that right by deceiving them with false information about the time, place, and manner of the election. It may be a reflection of the times that the defendant used the internet in furtherance of the conspiracy, but he had fair notice that his conduct violated Section 241.[6]

---

[6] The defendant cites a variety of deceptive conduct, discussed in congressional hearings, that he believes would not violate Section 241. See Def.'s Memo. at 20-21 (describing telephone calls and paper fliers containing false information about the time, place, and manner of upcoming elections). In those scenarios, to the extent the government could meet the other

14

III.     THE USE OF SECTION 241, AS APPLIED TO THE DEFENDANT, DOES NOT
         VIOLATE THE FIRST AMENDMENT.

      Even if the conduct in question violates Section 241, the defendant argues that the

First Amendment prohibits the application of Section 241 to his specific conduct—the

distribution of memes containing false information about the time, place or manner of the 2016

election.  This is incorrect.

      As a threshold matter, illegal conduct is not protected by the First Amendment

merely because it is carried out by language.  Here, the Deceptive Images do not enjoy First

Amendment protection because the language used is akin to verbal acts rather than protected

First Amendment speech.  The verbal acts doctrine "applies where 'legal consequences flow

from the fact that words were said, e.g., the words of offer and acceptance which create a

contract.'"  Preferred Properties, Inc. v. Indian River Estates, Inc., 276 F.3d 790, 798 n.5 (6th

Cir. 2002) (citing Black's Law Dictionary (6th ed. 1990)).  Similarly, here, the Deceptive Images

were simply a means to the end of infringing on individuals' right to vote.  Courts have held that

speech falls outside the scope of the First Amendment when the speech is simply a vehicle to

accomplish an unlawful act.  See United States v. Williams, 553 U.S. 285, 297 (2008) ("Offers to

engage in illegal transactions are categorically excluded from First Amendment protection.")

(citations omitted); United States v. Halloran, 821 F.3d 321, 340 (2d Cir. 2016) (rejecting the

defendant's argument that the First Amendment protects bribery when the bribery was

accomplished through arguably protected speech – specifically, political donations); Schenck v.

United States, 249 U.S. 47, 52 (1919) (explaining that whether words are protected by the First

Amendment "depends on the circumstances" in which they are spoken and that "[t]he most

---

elements of a Section 241 violation, such conduct would, indeed, violate Section 241, just as the
defendant's does.

stringent protection of free speech would not protect a man in falsely shouting fire in a theatre");

Chaplinsky v. State of New Hampshire, 315 U.S. 568, 572 (1942) (explaining that "fighting

words" can be prohibited without violating the First Amendment and upholding a statute

prohibiting public use of "words likely to cause a breach of the peace").[7]

       The First Amendment does not guarantee a person's right to express their views at

any time, in any manner, and in any place of their choosing.  Heffron v. Int'l Soc'y for Krishna

Consciousness, 452 U.S. 640, 647 (1981) (citations omitted).  Indeed, even the use of public

forums for speech, which is traditionally the most protected venue for undertaking First

Amendment activities, is not absolute.  See Ward v. Rock Against Racism, 491 U.S. 781, 791

(1989) ("Our cases make clear, however, that even in a public forum the government may

impose reasonable restrictions on the time, place, or manner of protected speech….");

Marcavage v. City of New York, 689 F.3d 98, 109 (2d Cir. 2012); Bl(a)ck Tea Society v. City of

Boston, 378 F.3d 8, 12 (1st Cir. 2004).

       Approximately four years ago, in a case commenting on state regulations of

election-related speech, the Supreme Court noted that "[w]e do not doubt that the State may

prohibit messages intended to mislead voters about voting requirements and procedures."

Mansky, 138 S. Ct. at 1889 n.4.  Although the issue of disinformation meant to mislead voters

---

[7] Similarly, the First Amendment does not preclude prosecution for the use of false or misleading words in the context of schemes to defraud individuals and organizations (18 U.S.C. § 1343), lying to the FBI (18 U.S.C. § 1001), or perjury (18 U.S.C. § 1621, *et seq*.).  The government may also prohibit deceptive speech in other contexts, in favor of encouraging the "flow of accurate and reliable information relevant to public and private decision-making." See also Nicopure Labs, LLC v. Food & Drug Administration, 944 F.3d 267, 287 (D.C. Cir. 2019) ("[E]limination of false and deceptive [advertising] claims serves to promote the one facet of commercial price and product advertising that warrants First Amendment protection – its contribution to the flow of accurate and reliable information relevant to public and private decision-making."); In re R.M.J., 455 U.S. 191, 203 (1982) ("Misleading advertising may be prohibited entirely.") (citations omitted).

about the time, place, and manner of elections was not squarely presented in <u>Mansky</u>, the Court

emphasized that the prohibition of such conduct is within the purview of government regulation.

<u>Id.</u> (stating messages meant to confuse voters about whether they needed photo identification or

other messages similarly meant to mislead voters about the procedures for casting a valid vote in

an election are within the scope of government regulation.).

       The Court's decision in <u>Mansky</u> was issued in the context of our federalist

structure, in which numerous state laws have prohibited efforts to mislead voters about voting

requirements and procedures.  For example, New York law makes illegal "[a]ny acts intended to

hinder or prevent any eligible person from registering to vote, enrolling to vote or voting."  N.Y.

Elec. Law App 6201.1(d) (McKinney).  Numerous other states criminalize misleading messages

regarding the time, place, and manner of elections.[8]  State courts that have commented on such

---

[8] <u>See</u>, <u>e.g.</u>,  Conn. Gen. Stat. Ann. § 9-363 (West) ("Any person who, with intent
to defraud any elector of his or her vote or cause any elector to lose his or her vote or any part
thereof, gives in any way, or prints, writes or circulates, or causes to be written, printed or
circulated, any improper, false, misleading or incorrect instructions or advice or suggestions as to
the manner of voting on any tabulator, the following of which or any part of which would cause
any elector to lose his or her vote or any part thereof, or would cause any elector to fail in whole
or in part to register or record the same on the tabulator for the candidates of his or her choice,
shall be guilty of a class D felony."); Haw. Rev. Stat. Ann. § 19.3(12) (prohibiting
"communicat[ing]…false information about the time, date, place, or means of voting" in
Hawaii); Minn. Stat. Ann. § 204C.035 (prohibiting "knowingly deceiv[ing] another person
regarding the time, place, or manner of conducting an election" in Minnesota); Tenn. Code. Ann.
§ 2-19-133(a) (prohibiting "provid[ing] or publish[ing] false or misleading information
regarding…polling dates, times, and locations" in Tennessee); Va. Code Ann. § 24.2-1005.1
(prohibiting "communicat[ing]..false information…about the date, time, and place of the
election" in Virginia); Cal. Elec. Code § 18543 (prohibiting, among other things, "fraudulently
advis[ing] any person that he or she is not eligible to vote or is not registered to vote when in fact
that person is eligible or is registered" in California); Md. Elec. Law § 16-101(a)(8) (prohibiting,
among other things, "misrepresent[ing] any fact relating to registration" in Maryland); Okla.
Stat. Ann. § 16-109 (prohibiting "knowingly attempt[ing] to prevent a qualified elector from
becoming registered, or a registered voter from voting" in Oklahoma); Mo. Ann. Stat. §
115.631(26) (prohibiting "knowingly providing false information about election procedures for
the purpose of preventing any person from going to the polls" in Missouri); Mont. Code Ann. §
13-35-235(1) (prohibiting "knowingly or purposely disseminat[ing]…information about election

regulations have followed the general proclamation later expressed in Mansky.  In San Francisco Forty-Niners v. Nishioka, for example, a California court upheld a writ of mandate issued against a ballot petition because the petition contained "undisputed, objective untruths calculated to mislead and misinform a reasonable voter."  89 Cal. Rptr. 2d 388, 397–98 (Ct. App. 1999).  The court distinguished the untruths at issue in the case from "the typical hyperbole and opinionated comments common to political debate."  Id.  Indeed, the Supreme Court's statement in Mansky that the government "may prohibit messages intended to mislead voters about voting requirements and procedures" would make little sense if the government did not have latitude in preventing misinformation and disinformation aimed at the right to vote.  Mansky, 138 S. Ct. at 1889 n.4.

Courts have also drawn a distinction between prohibiting a speaker's political message and prohibiting misleading language on which others might rely—disallowing the former prohibitions but upholding the latter.  In United States v. Benson, the Seventh Circuit upheld an injunction prohibiting a seller from advertising that his product would free potential customers from taxation.  561 F.3d 718, 725–26 (7th Cir. 2009).  The court distinguished the prohibition on the false speech on which potential customers would rely—that the seller's product would prevent taxation—from the ability of the seller to spread elsewhere his political opinion that the Sixteenth Amendment was not ratified.  Id.  Likewise, the Section 241 prosecution at issue here does not criminalize spreading a political message.  Indeed, the disinformation in the Deceptive Images are not false statements, exaggerations or vilifications of

---

procedures that is incorrect or misleading" in Montana); N.M. Stat. Ann. § 1-20-9(A) (prohibiting "…distributing…false or misleading instructions pertaining to voting or the conduct of the election" in New Mexico); R.I. Gen. Laws Ann. § 17-19-46 (prohibiting "giv[ing] in any way…improper, false, misleading, or incorrect instructions or advice or suggestions of how to vote…" in Rhode Island).

a political candidate, party or ballot measure.  Nor is this Section 241 prosecution based on the defendant's political endorsement, viewpoint or advocacy.  See McIntyre v. Ohio Elections Comm'n, 564 U.S. 721 (2011) (discussing political speech in the form of debate over public issues and qualifications of candidates); FEC v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 440 (2001) (political contributions are considered political speech subject to First Amendment protection.).  Rather, the focus of this case is narrow and specific: the defendant's intentional spreading of false information calculated to mislead and misinform voters about how, where and when to cast a vote in a federal election—untruths that do not enjoy the same First Amendment protections that apply to other types of speech.  Cf. Nishioka, 89 Cal. Rptr. 2d at 397-98.

Even if the Deceptive Images contained political content as understood under First Amendment jurisprudence—which the government submits they do not—the Supreme Court has permitted the government to impose "generally-applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself."  Anderson v. Celebrezze, 460 U.S. 780, 788 n. 9 (1983) (compiling cases that upheld restrictions on speech to protect electoral integrity); see also Burson v. Freeman, 504 U.S. 191, 199 (1992) (upholding statute restricting political speech near polling places to prevent voter intimidation and election fraud); John Doe No. 1 v. Reed, 561 U.S. 186, 197 (2010) (petitioners' First Amendment rights may give way to State's interest in preserving the integrity of the electoral process, particularly as it relates to efforts to root out fraud).

In Burson, the Supreme Court upheld a Tennessee statute establishing a "campaign-free zone" surrounding polling places, in which campaign materials and solicitations of votes were prohibited.  504 U.S. at 193-94 (plurality opinion).  The Supreme Court noted that

the Tennessee statute banned political speech in public forums, was not content-neutral, and therefore was subject to strict scrutiny requiring the state to show that the regulation was "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." Id. at 197–98 (internal quotations omitted).  Nevertheless, the Court upheld the constitutionality of the statute and found that the restriction on speech served two compelling state interests—protecting voters from confusion and undue influence and preserving the integrity of the election process. Id. at 199 (internal quotations and citations omitted).  The Court noted that "an examination of the history of election regulation in this country reveals a persistent battle against two evils: voter intimidation and election fraud." Id. at 206.  The Court reasoned that the Tennessee statute was necessary to serve the State's compelling interests in counteracting those two evils.  Id.

Here, use of Section 241 to prosecute disinformation protects the same interests that were present in Burson: shielding voters from confusion and undue influence and preserving the integrity of the election process. Id. at 199.  In fact, there is an arguably greater need in the "persistent battle" against voter intimidation and election fraud to prevent the spread of disinformation about the time, place, and manner of voting, as such information prevents voters from accessing the type of restricted zone that was upheld in Burson—a place that should be "as free from interference as possible." Id. at 206 & 210.  Distributing fraudulent information about voting procedures is similar to engaging in the type of speech that the courts have held may be restricted when undertaking time, place, and manner analyses.  Publicizing false information with the intent that others will be denied the opportunity to vote both inhibits the political process and inhibits the functioning of an orderly society.  As such, the First Amendment does not preclude restrictions on such speech.

Similar considerations motivated the Court's decision in Mansky.  In Mansky, several advocacy groups raised a First Amendment challenge to a Minnesota statute that prohibited individuals from wearing political insignia inside a polling place on election day.  138 S. Ct. at 1882.  Because a polling place is a nonpublic forum, the case hinged on whether the ban on political apparel was viewpoint neutral and "reasonable in light of the purpose served by the forum."  Id. at 1886 (citations omitted).  The District Court found that "prohibiting the Plaintiffs from wearing [buttons with misleading information about identification requirements] to the polls is rationally related to the state's legitimate interests in protecting voters from confusion and undue influence, ensuring order and decorum at the polls, and safeguarding the integrity of the voting process."  Minnesota Majority v. Manksy, 62 F. Supp. 3d 870, 877 (D. Minn. 2014).  The Eighth Circuit affirmed.  Minnesota Majority v. Mansky, 849 F.3d 749, 753 (8th Cir. 2017).

In addressing a facial challenge to the statute, the Supreme Court found the statute's ban was unreasonably broad, holding that the use of the term "political" in the statute and the State's subsequent interpretation of that term did not provide a reasonable distinction as to what apparel was banned from the polling place and what was not.  Mansky, 138 S. Ct. at 1889-90.  In so holding, however, the Court endorsed the constitutional rationale expressed by the lower courts—namely, that the state has an interest in prohibiting misleading messages regarding voting procedures.  Mansky, 138 S. Ct. at 1889 n.4.

Finally, although the Supreme Court has not yet had occasion to determine whether false statements that discourage people from exercising the right to vote are categorically excluded from First Amendment protection, see National Coalition on Black Civil Participation v. Wohl, 498 F. Supp. 3d 457, 478 (S.D.N.Y. 2020), lower courts have not been blind to the grave risks offered by conduct like that of the defendant.  In Wohl, a factually

21

distinguishable Section 241 case involving automatic "robocalls" that conveyed threatening

information meant to intimidate voters from exercising their rights in an upcoming election, the

Southern District of New York characterized the defendant's position in the following way:

> Defendants do not contest that they originated the robocalls
> …. Instead, as a legal ground for their action, Defendants advance
> a sinister and pernicious theory.  They contend that the expression
> their robocalls communicated constitutes speech protected by the
> First Amendment.  Defendants' theory implicates a fundamental
> threat to democracy.  This Court thus rejects it as justification for
> Defendants' baneful conduct.  The First Amendment cannot confer
> on anyone a license to inflict purposeful harm on democratic
> society or offer refuge for wrongdoers seeking to undermine
> bedrock constitutional principles.  Nor can it serve as a weapon
> they wield to bring about our democracy's self-destruction.

498 F. Supp. 3d at 464.  This Court, too, should decline the defendant's invitation to

improperly stretch the protections of the First Amendment to cover his similarly

"baneful" conduct.

IV.   THE EASTERN DISTRICT OF NEW YORK IS A PROPER VENUE FOR THE
      INSTANT PROSECUTION.

   A.  Applicable Law

           At trial, the Government bears the burden of proving venue by a preponderance of

the evidence.  United States v. Lange, 834 F.3d 58, 69 (2d Cir. 2016).  Venue may be proved by

circumstantial evidence.  Id. (citing United States v. Potamitis, 739 F.2d 784, 791 (2d Cir.

1984)).  If the issue of venue is "squarely interposed" by the defense, the question must be

submitted to a jury.  United States v. Sutton, 13 F.3d 595, 598 (2d Cir. 1994) (quoting United

States v. Grammatikos, 633 F.2d 1013, 1022 (2d Cir. 1980)).  Courts in the Second Circuit

typically defer until trial a ruling on the propriety of the prosecution's choice of venue.  United

States v. Ng, No. 18-CR-538 (MKB), Dkt. No. 84 at *42-43 (E.D.N.Y. Sept. 10, 2021) (citing

cases) (hereinafter "Ng Order and Opinion").

When a federal statute defining an offense does not specify how to determine the location where the crime was committed, "[t]he locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it." United States v. Ramirez, 420 F.3d 134, 138 (2d Cir. 2005) (citing United States v. Rodriguez-Moreno, 526 U.S. 275 (1999)). To carry out that task, a court must "initially identify the conduct constituting the offense," and then "discern the location of the commission of the criminal acts." Ramirez, 420 F.3d at 138 (citing Rodriguez–Moreno, 526 U.S. at 279 (noting that it is helpful to identify the "verbs" of a statute)). Venue is proper only where the acts constituting the offense—the crime's "essential conduct elements"—took place. Id.; see also United States v. Smith, 198 F.3d 377, 384 (2d Cir. 1999).

If a crime consists of a single, non-continuing act, the proper venue is clear: the crime "is 'committed' in the district where the act is performed." Ramirez, 420 F.3d at 139 (citing United States v. Beech–Nut Nutrition Corp., 871 F.2d 1181, 1188 (2d Cir. 1989)). In other cases, however, the Constitution does not command a single exclusive venue for prosecution. United States v. Reed, 773 F.2d 477, 480 (2d Cir. 1985). Thus, where "the acts constituting the crime and the nature of the crime charged implicate more than one location," id., venue is properly laid in any of the districts where an essential element of the crime took place. See Rodriguez–Moreno, 526 U.S. at 281 ("[W]here a crime consists of distinct parts which have different localities [,] the whole may be tried where any part can be proved to have been done.") (quoting United States v. Lombardo, 241 U.S. 73, 77 (1916)). As noted in Ramirez, Congress has codified the rule that continuing offenses may be prosecuted wherever a proscribed act occurs in the first paragraph of 18 U.S.C. § 3237(a):

> Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and

> completed in another, or committed in more than one district, may
> be . . . prosecuted in any district in which such offense was begun,
> continued, or completed.

Ramirez, 420 F.3d at 139.  Where an offense is continuing, venue is properly laid in "'the whole area through which force propelled by an offender operates.'"  Id. at 147 n.11 (quoting United States v. Candella, 487 F.2d 1223, 1228 (2d Cir. 1973)).  In other words, venue is proper both "in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue."  United States v. Svoboda, 347 F.3d 471, 482–84 (2d Cir. 2003).  An act in furtherance may be "any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy. . . . This includes not just acts by co-conspirators but also acts that the conspirators caused others to take that materially furthered the ends of the conspiracy."  Lange, 834 F.3d at 70 (citing United States v. Royer, 549 F. 3d 886, 896 (2d Cir. 2008)).

Where venue may properly lie in more than one district under a continuing offense theory, the court is further tasked with asking "whether the criminal acts in question bear 'substantial contacts' with any given venue."  United States v. Saavedra, 223 F.3d 85, 93 (2d Cir. 2000) (quoting Reed, 773 F.2d at 477).  The substantial contacts test "takes into account four main factors: (1) the site of the crime, (2) its elements and nature, (3) the place where the effect of the criminal conduct occurs, and (4) suitability of the venue chosen for accurate factfinding."  Id.

B.  Discussion

The core of the government's assertion of venue in this case is its allegations concerning the means by which the conspiracy aimed to spread and did in fact spread this disinformation.  As the government asserts in its various charging documents and related

24

discovery, the defendant and his co-conspirators spread this disinformation using social media, in

particular Twitter.[9]  The government asserts that the co-conspirators, including the defendant,

understood how Twitter operates, and spread this disinformation via Twitter deliberately to

maximize the impact of their criminal scheme.

> The distribution of the Deceptive Images—acts in furtherance of the charged

conspiracy—implicates venue in a number of ways, any one of which would be sufficient to

defeat the defendant's argument that venue is improper in the Eastern District of New York.

> First, the government will establish that the Deceptive Images passed through the

Eastern District of New York as they were electronically sent from Manhattan to Twitter's

servers and beyond.  Courts in this circuit have consistently found that venue "is appropriate in

any district through which electronic communications are routed."  Ng Order and Opinion at

*44-45 (citing numerous cases); United States v. Brown, 293 F. App'x 826, 829 (2d Cir. 2008)

(affirming venue as appropriate in the Southern District of New York where a wire transfer was

automatically routed through a bank's Manhattan branch, even though it was not processed in

Manhattan).  Here, the electronic communications that were routed through the Eastern District

were not ancillary to the conspiracy; rather, they were specific acts by which the conspiracy

hoped to further its aims.  This is sufficient on its own to justify venue in the Eastern District.

> Second, the government will establish that the Deceptive Images were viewed by

Twitter users in the Eastern District following their distribution, rendering venue appropriate in

this district.  "Venue is proper in any district where electronic communications are sent or

---

[9] For the purpose of this motion, the Court is tasked with analyzing the validity of
the charge, not the sufficiency of the evidence.  United States v. Perez, 575 F.3d 164, 166–67 (2d
Cir. 2009) ("Unless the government has made what can fairly be described as a full proffer of the
evidence it intends to present at trial . . . the sufficiency of the evidence is not appropriately
addressed on a pretrial motion to dismiss the indictment.").

received." Ng Order and Opinion at 44 (citing cases); Lange, 834 F.3d at 70; Royer, 549 F.3d at 895. The cases predicating venue on electronic communications were themselves extensions of earlier cases predicating venue on receipt of telephonic and other analog communications. See, e.g., Ng Order and Opinion at 45, Lange, 834 F.3d at 70. The principle in these cases is the same: the use of a method of communication in furtherance of a criminal conspiracy or criminal act exposes the coconspirators to prosecution both where the communication was made and where it was received.

To the extent that the Deceptive Images were subsequently viewed in the Eastern District because they were wittingly or unwittingly retweeted into the District, venue in this district would also be appropriate, as such acts were both foreseeable to and intended by the coconspirators, and would thus be acts in furtherance of the charged scheme. 18 U.S.C. § 3237 (noting that venue is proper where an offense was "begun, continued, or completed"); Lange, 834 F.3d at 70 (noting that acts in furtherance of a conspiracy can include innocent acts that the co-conspirators caused others to take that materially furthered the ends of the conspiracy); Svoboda, 347 F.3d at 483 (noting that in a case where all the defendant's acts took place in the Eastern District, prosecution was proper in the Southern District because the defendant was a "savvy investor" and "could reasonably foresee" that his acts in the Eastern District would lead to acts by his victims in the Southern District); Ramirez, 420 F.3d at 147 n.11 (noting that this Circuit has held that a defendant should be expected to be prosecuted in "'the whole area through which force propelled by an offender operates.'" (quoting Candella, 487 F.2d at 1228); Candella, 487 F.2d at 1227-28 (noting that where a false statement made in Brooklyn was conveyed by the receiving agency to Manhattan, venue was proper in Manhattan).

Within this conspiracy, the chosen method of electronic communication was Twitter, which permitted the distribution of the Deceptive Images far more broadly than could have been done with conventional physical means (such as hand delivery or mailing) or targeted electronic means (such as email or text). The defendant appears to concede that the distribution of the Deceptive Images constituted an act in furtherance of the alleged conspiracy (at least as charged by the government), but he then argues that the near immediate receipt of the Deceptive Images in many places at once was but an "incidental circumstance of the charged conspiracy" (Def. Br. at 11). This is incorrect; the acts at play here are directly comparable to the telephonic and electronic communications that have served as the basis of venue for numerous other cases.[10] This argument is also troubling at another level, as it suggests that precisely because the defendant aimed his harms broadly, he should only be held accountable where he was physically located. Said another way, the defendant appears to argue that despite (and, in fact, because) he and the conspiracy used a means of communication to send the Deceptive Images to lots of places all at once, the Court should geographically restrict his exposure to prosecution. This is not, and cannot be, the law. The government submits, to the contrary, that a conspiracy that intentionally—and foreseeably—seeks to commit a crime in a large number of locations should expect to be held accountable in a large number of locations, befitting the intended breath of the conspiracy's criminal ambition. A contrary position would perversely reward defendants who

---

[10] This legal principle—that venue is appropriate both where a communication is sent and where it is received—is arguably even more important in the internet age. Much criminal activity on the internet is conducted in a manner that shields both the identity and the location of the perpetrators. Investigators of internet-activity are much more likely to know the venue of the victims of crime than the venue of the perpetrators—who may be located in a distant district, or perhaps in another country. The facts in this case present the same concerns: the defendant acted anonymously for years—shielding his identity with aliases and his location by the use of virtual private networks (VPNs).

avail themselves of means of communication that foreseeably risks widespread harm.  This was

noted by the Circuit in <u>Royer</u>, a case in which venue in the Eastern District of New York was

found to be properly placed based on the defendants' criminal outreach to a great many districts,

including the Eastern District of New York:

> [W]here, as here, the use of modern communications facilities to
> execute a sophisticated criminal scheme inherently contemplates
> activities throughout many parts of the country. . . Indeed, the
> defendants, having concocted a scheme that . . .  defrauded
> investors throughout the country, can hardly complain that their
> very modus operandi subjected them to prosecution in numerous
> districts, including the Eastern District of New York.

<u>Royer</u>, 549 F.3d at 893 & 895; <u>see</u> <u>United States v. Rowe</u>, 414 F.3d 271, 279 (2d Cir. 2005)

(finding venue in the Southern District of New York appropriate where defendant hosted child

pornography in Kentucky but made it accessible everywhere, noting that "this crime occurred in

any district in which the advertisement appeared; that is to say, anywhere where the Internet chat

room was accessible and was actually accessed by anybody").

Finally, in addition to venue based on the wires, receipts and retweets discussed

above, the government submits that venue should also be deemed appropriate based on the

location of object of the conspiracy: the location of intended victims of the misinformation.  In

assessing venue, a Court is tasked to be cognizant of "the nature of the crime alleged and the

location of the act or acts constituting it."  <u>Ramirez</u>, 420 F.3d at 139.  Here, the crime was the

agreement to injure individuals in their right to vote, and the statute in question requires no overt

act upon which venue would typically be based.  <u>See</u>, <u>e.g.</u>, <u>United States v. Martinez-Mercado</u>,

919 F.3d 91, 104 (1st Cir. 2019); <u>Pizzuto v. County of Nassau</u>, 239 F. Supp. 2d 301, 309

(E.D.N.Y. 2003); <u>United States v. Bufalino</u>, 518 F. Supp. 1190, 1196 (S.D.N.Y. 1981); <u>but see</u>

<u>United States v. Greer</u>, 939 F.2d 1076, 1099 (5th Cir. 1991) (discussing overt acts in a Section

241 prosecution without elaboration and relying upon earlier cases discussing statutes which do require an overt act).  The "verbs" at issue in Section 241 suggest that venue should be proper, at, among other places, the locations relating to the agreement to conspire, as well as the location of the planned-for injuries, oppression, threats or intimidation.

 The government is unaware of any examples in which Courts have either permitted or denied venue in the context of a Section 241 prosecution on such a theory.  Cf. Rodriguez-Moreno, 526 U.S. at 279 n.2 (1999) ("The Government argues that venue also may permissibly be based upon the effects of a defendant's conduct in a district other than the one in which the defendant performs the acts constituting the offense.  Because this case only concerns the locus delicti, we express no opinion as to whether the Government's assertion is correct.").  However, in other contexts, courts have permitted venue based on planned effects without specific acts being taken within the venue of prosecution.  In United States v. Reed, the Second Circuit found that obstructive acts could be venued in the location of the proceeding sought to be obstructed—in other words, where the obstructive acts would have effect—regardless of the fact that the acts in question did not happen within the same district as the proceeding and prosecution.  773 F.2d at 486.  The court analogized the conduct to, among other examples, the power of a court to enforce the violation of its orders even where the violative acts happened out of district.  Id. (citing Waffendschmidt v. McKay, 763 F.2d 711, 714 (5th Cir. 1985)).  In so holding, the Court noted the existence of an official process that would be interfered, noted that "the places that suffer the effects of crime are entitled to consideration for venue purposes."  Id. at 481–82.  The kind the crime alleged in this case—that individuals in place A may use modern communications to conspire to create harms in place B—justify the same considerations

suggested in <u>Reed</u>.[11]   Accordingly, in addition to the venue arguments laid out above, the government submits that venue in a "conspiracy against rights" prosecution should properly lay, among other places, where the harm was meant to be felt.

   As a final consideration, courts have offered various additional factors that should be assessed in the propriety of possible locations for prosecution.  <u>Saavedra</u>, 223 F.3d at 93 (noting that the substantial contacts test "takes into account four main factors: (1) the site of the crime, (2) its elements and nature, (3) the place where the effect of the criminal conduct occurs, and (4) suitability of the venue chosen for accurate factfinding.").  Although assessment of these factors is likely not required on these facts,[12] they surely counsel in favor of a finding of venue. The defendant lived in New York City at the time of the conspiracy; as a result, venue in the Eastern District of New York is both convenient to certain potential witnesses, and close in proximity to the area freely chosen by the defendant as his residence at the time of the offense. The broad ambition of the conspiracy—the infliction of injury to voters who might receive, be persuaded by, or otherwise pass along the disinformation—would render any number of districts, including the Eastern District of New York, appropriate as "the site of the crime" and the "place where the effect of the criminal conduct occurs," and thus not be "any less suitable for accurate factfinding than any other district involved in the scheme's implementation."  <u>Lange</u>, 834 F.3d.

---

[11] Both <u>Reed</u> and <u>Waffenschmidt</u> lean on the interruption of an official judicial proceeding.  The instant conspiracy sought to interrupt voters participating in a comparably weighty official proceeding—a federal election.

[12] "When an overt act in furtherance of a criminal conspiracy has been committed in the district, however, this supplemental inquiry has no relevance.  A defendant who is participating in a conspiracy that is being conducted, in part, in the district of prosecution necessarily has sufficient "substantial contacts" to justify a finding of venue that is otherwise proper."  <u>United States v. Kirk Tang Yuk</u>, 885 F.3d 57, 70 (2d Cir. 2018).

at 75.  These considerations demonstrate the sort of substantial contacts that would militate

toward finding that venue is proper in the Eastern District of New York.

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that the

defendant's motion to dismiss should be denied in its entirety.

Dated: Brooklyn, New York
      August 5, 2022

                  Respectfully submitted,

                  BREON PEACE
                  United States Attorney
                  Eastern District of New York

                  COREY R. AMUNDSON
                  Chief
                  Criminal Division, Public Integrity Section


                    /s/
                  Erik D. Paulsen
                  Olatokunbo Olaniyan
                  Assistant U.S. Attorneys
                  (718) 254-7000

                  William J. Gullotta
                  Trial Attorney
                  (202) 514-0047


Cc:    Clerk of the Court (NGG)
        Andrew J. Frisch, Esq. (By ECF)