RCH:EDP/FTB/WJG
F. #2018R02250

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

DOUGLASS MACKEY,
   also known as "Ricky Vaughn,"

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.  21–CR-80 (NGG)

GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF MOTIONS *IN LIMINE*

BREON PEACE
United States Attorney
Eastern District of New York
271A Cadman Plaza East
Brooklyn, New York 11201

COREY R. AMUNDSON
Chief
Criminal Division, Public Integrity Section
1301 New York Ave. NW, Tenth Floor
Washington, D.C.  20004

Erik D. Paulsen
F. Turner Buford
Assistant U.S. Attorneys
    (Of Counsel)

William J. Gullotta
Trial Attorney
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

I. Relevant Factual Background ................................................................................... 1

II. Motions in Limine ................................................................................................... 3

   A. Motion to Admit Prior Statements of the Defendant and Co-Conspirators Concerning Similar Efforts to Create Viral Content ....................................... 3

      1. Applicable Law ............................................................................................ 3

         a. The Prior Statements of a Defendant are Admissible as the Statements of a Party Opponent ................................................................................... 3

         b. The Statements of Co-Conspirators are Admissible as Non-Hearsay .............. 4

         c. Evidence of Prior Acts is Admissible as Direct Evidence of the Conspiracy if it Helps to Explain the History of the Relationships Among Co-Conspirators or, in the Alternative, Pursuant to Federal Rule of Evidence 404(b) for the Same Reasons ................................................................................ 6

      2. Discussion .................................................................................................. 10

         a. The Defendant's Own Statements Are Admissible ......................................... 10

         b. The Statements of Co-Conspirators Are Admissible ..................................... 16

            i. The Warroom Group ................................................................................. 17

            ii. Micro Group ......................................................................................... 20

            iii. Madman Group ..................................................................................... 21

CONCLUSION.............................................................................................................. 25

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits these motions <u>in limine</u> in advance of the upcoming trial in this matter, which is currently scheduled to begin on March 16, 2023.  The defendant is charged in a one-count indictment with conspiring to "injure, oppress, threaten and intimidate one or more persons" in the free exercise of their right to vote, in violation of 18 U.S.C. § 241.  The charge arises from the defendant's participation in a conspiracy to distribute misinformation about the time, place, and manner of elections to prospective voters shortly before the 2016 Presidential Election (the "Election"), which occurred on November 8, 2016. For the reasons noted below, the government moves in limine to admit the defendant's own statements, the statements of co-conspirators, and additional communications that provide context for those statements.

I.      <u>RELEVANT FACTUAL BACKGROUND</u>

In or about and between September 2016 and November 2016, the defendant and others made coordinated use of social media to spread disinformation relevant to the Election.  In service of that end, the defendant distributed disinformation suggesting that individuals supporting then-Presidential candidate Hillary Clinton could cast votes in support of her candidacy in the Election by voting over social media or by text message.  The defendant effectuated this distribution principally by tweeting and retweeting memes making such claims (hereinafter categorically, the "Deceptive Images").

Throughout 2015 and 2016, in the time period both prior to the charged conspiracy and during the charged conspiracy, the defendant frequently used Twitter to communicate with others.  The defendant's communications on Twitter took various forms: he sent tweets, which are public statements that the defendant sent to his followers and others, and which were available for viewing by the general public; he engaged in Twitter direct messaging,

which consists of private one-on-one conversations with other individual Twitter users; and he participated in Twitter direct-message groups, which are non-public group conversations where large numbers of individuals were able to communicate with each other in a private forum that was accessible only by invitation.

During the charged conspiracy period, the defendant was a member of several direct-message groups, in which individuals discussed the creation, formulation and distribution of disinformation concerning how individuals could ineffectively cast a vote, including memes like the Deceptive Images, among other topics.  The participants in these groups included: individuals who expressly discussed the creation, formulation and distribution of the Deceptive Images; individuals who commented on this activity; and individuals who were present but did not specifically engage on the topic.  Some participants, like the defendant, were largely silent in conversations concerning the Deceptive Images, but then publicly distributed the materials that were the subject of those conversations.

In the time period prior to the defendant's public distribution of the Deceptive Images, including both prior to the charged conspiracy and during the charged conspiracy, the participants of these same Twitter direct-message groups engaged in numerous conversations concerning how to use Twitter to engage in political messaging.  In these conversations, the participants, including the defendant, discussed strategies for leveraging coordinated actions and their collective influence to ensure that their messaging received as wide an audience as possible. These conversations included tactical discussions about how to most effectively distribute specific pieces of information, including memes, as well as more general discussions of the participants' techniques, methodologies and ability to leverage their audiences.

The defendant's presence in these direct-message groups was periodically interrupted when his accounts were suspended from Twitter.  Such suspensions occurred on or about October 5, 2016, November 2, 2016, and November 16, 2016—the middle date marking his suspension after he distributed the Deceptive Images.  The defendant was generally able to evade these suspensions and rejoin some of the same direct-message groups at a later time by being reinvited under a newly established Twitter profile.  Following such suspensions, however, the defendant would lose access to these direct-message groups until he was able to rejoin under a new profile.

## II.   MOTIONS IN LIMINE

### A.   Motion to Admit Prior Statements of the Defendant and Co-Conspirators Concerning Similar Efforts to Create Viral Content

#### 1.   Applicable Law

##### a.   The Prior Statements of a Defendant are Admissible as the Statements of a Party Opponent

It is well-established under Second Circuit law that "a party's own statement, if offered against him, is not hearsay." United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982). Federal Rule of Evidence 801(d)(2) provides that a statement is not considered hearsay if the "statement is offered against a party and is . . . the party's own statement."  United States v. Gotti, 457 F. Supp. 2d 395, 397 (S.D.N.Y. 2006).  Statements made by a defendant are generally admissible "regardless of whether such statements were against his interest when made." Id.; see also United States v. Blake, 195 F. Supp. 3d 605, 609 (S.D.N.Y. 2016).  Furthermore, the defendant's statements need not have been made in furtherance of the conspiracy to be admissible.  See United States v. Gil, 792 F. App'x 11, 15 (2d Cir. 2019).

b.       The Statements of Co-Conspirators are Admissible as
         Non-Hearsay

Federal Rule of Evidence 801(d)(2)(E) provides that a statement offered against a defendant that was made by the defendant's co-conspirator during and in furtherance of a conspiracy is not hearsay.  It is well established that "in ruling on the admissibility of a coconspirator statement under Fed. R. Evid. 801(d)(2)(E)[,] a trial court must find by a preponderance of the evidence that a conspiracy existed and that both the declarant and the defendant were part of that conspiracy."  United States v. Rastelli, 870 F.2d 822, 837 (2d Cir. 1989).  "In making this determination, the court may consider the coconspirator's statement itself."  Id. at 838; see also Basciano v. United States, No. 12-CV-280 (NGG), 2014 WL 12978824, at *14 (E.D.N.Y. Dec. 17, 2014) (Garaufis, J.) ("The statement itself must be considered but does not by itself establish the existence of the conspiracy."); United States v. Giovanelli, 747 F. Supp. 897, 900 (S.D.N.Y. 1989) ("[T]he hearsay statements of co-conspirators that would be admissible against a defendant under Fed. R. Evid. 801(d)(2)(E) may also be used to show that defendant's participation in a conspiracy provided that the hearsay statements are sufficiently reliable in light of independent corroborating evidence.").

The Second Circuit has explained the rationale for the rule as follows:

> [W]hen two people enter into a joint venture of conspiratorial nature, the actions and utterances of either done in furtherance of that conspiracy are deemed authorized by the other. Where one is a defendant, the declarations of his co-conspirator done in furtherance of the conspiracy formed between them are deemed to be authorized by the defendant and are admissible against him. . . .  [T]he objective of the joint venture need not be the crime charged in the indictment (or the objective of the conspiracy charged in the indictment). . . .  Indeed, the objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all.

United States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002) (internal citations omitted); see also

United States v. Ray, No. 20-CR-110 (LJL), 2022 WL 842254, at *1 (S.D.N.Y. Mar. 20, 2022)

("[T]he conspiracy in furtherance of which the statement was made does not have to be the

conspiracy charged in the indictment."); United States v. Persico, No. 04-CR-911 (JS), 2007 WL

9759642, at *3 (E.D.N.Y. Nov. 6, 2007).

   With respect to whether a particular statement is "in furtherance" of a

conspiracy's purpose, the Second Circuit has found a variety of different types of statements to

further the purpose of conspiracies, including statements that provide reassurance, serve to

maintain trust and cohesiveness, or provide information concerning the current status of the

conspiracy and progress toward its ends.  See Rastelli, 870 F.2d at 837 (citing cases); see also

United States v. Pimentel, No. 99 CR 1104 (SJ), 2001 WL 185086, at *5 (E.D.N.Y. Jan. 22,

2001) ("Statements made during the course and in furtherance of a conspiracy can include those

which 'provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust

and cohesiveness, or inform each other as to the progress or status of the conspiracy.'" (quoting

United States v. Gigante, 166 F.3d 75, 82-83 (2d Cir. 2001))).  Notably, it is not necessary that

the defendant be present for the co-conspirator's statement (or otherwise be aware of it

contemporaneously) for it to be admissible.  See, e.g., United States v. Perez, No. 05 CR. 441

(PKL), 2005 WL 2709160, at *2 (S.D.N.Y. Oct. 20, 2005) (admitting statements of informant on

a recording of conversation where defendant did not participate on the grounds that

co-conspirator's statements were admissible pursuant to Fed. R. Evid. 801(d)(2)(E) and

informant's statements were not offered for the truth, but rather as context for co-conspirator's

statements).

      c.     <u>Evidence of Prior Acts is Admissible as Direct Evidence of the Conspiracy if it Helps to Explain the History of the Relationships Among Co-Conspirators or, in the Alternative, Pursuant to Federal Rule of Evidence 404(b) for the Same Reasons</u>

It is well-established under Second Circuit law that uncharged misconduct can be presented to the jury as direct evidence of a charged crime "'if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'"  <u>United States v. Fiumano</u>, No. S3 14 Cr. 518 (JFK), 2016 WL 1629356, at *3 (S.D.N.Y. Apr. 25, 2016) (quoting <u>United States v. Gonzalez</u>, 110 F.3d 936, 942 (2d Cir. 1997)). "In addition, where the Government must prove a conspiracy existed, evidence of acts committed in furtherance of the conspiracy is not Rule 404(b) 'other acts' evidence, but rather, it is direct evidence of the acts charged in the Indictment."  <u>United States v. Townsend</u>, No. S1 06 CR. 34 (FJK), 2007 WL 1288597, at *1 (S.D.N.Y. May 1, 2007).  Under this standard, courts have permitted the introduction of evidence tending to establish a relationship of trust among co-conspirators as direct evidence of a charged conspiracy.  <u>See, e.g.</u>, <u>United States v. Wedd</u>, S2 15 Cr. 616 (KBF), 2017 WL 11488608, at *5 (S.D.N.Y. Apr. 3, 2017) ("Completing the story of a crime may include background information in a conspiracy case – including how a scheme developed or how conspirators came to know and trust one another."); <u>United States v. Alston</u>, S3 15 CR 435, 2016 WL 5806790, at *2 (S.D.N.Y. Sep. 27, 2016) ("The Government will be permitted to introduce the proffered conspirator evidence as direct evidence of the charged conspiracy, because it shows the development of a relationship of trust between the participants.").

Even if "other acts" evidence does not constitute direct evidence, Federal Rule of Evidence 404(b) permits the introduction of such evidence to prove, among other things,

6

"motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack

of accident" – provided that the evidence is not being used "to prove a person's character . . . to

show that on a particular occasion the person acted in accordance with the character."  Courts in

the Second Circuit typically analyze the admissibility of evidence pursuant to Rule 404(b)

according to the following process:

> First, the district court must determine if the evidence is offered for
> a proper purpose, one other than to prove the defendant's bad
> character or criminal propensity.  If the evidence is offered for a
> proper purpose, the district court must next determine if the
> evidence is relevant to an issue in the case, and, if relevant,
> whether its probative value is substantially outweighed by the
> danger of unfair prejudice.  Finally, upon request, the district court
> must give an appropriate limiting instruction to the jury.

United States v. Pitre, 960 F. 2d 1112, 1119 (2d Cir. 1992).

"The Second Circuit has adopted an 'inclusive' approach to Rule 404(b)."  United

States v. Mesbahuddin, No. 10-CR-726 (NGG) (JO), 2011 WL 3841385, at *2 (E.D.N.Y. Aug.

26, 2011) (quoting United States v. Stevens, 83 F.3d 60, 68 (2d Cir. 1998)).  In practice, this

means that "other acts" evidence is properly admitted "for any purpose other than to show a

defendant's criminal propensity."  United States v. Serrano, No. 13 CR. 58 (KBF), 2014 WL

2696569, at *5 (S.D.N.Y. Jun. 10, 2014).  Among other purposes, "[p]rior act evidence may be

admitted to inform the jury of the background of the conspiracy charged, to complete the story of

the crimes charged, and to help explain to the jury how the illegal relationship between

participants in the crime developed."  Pitre, 960 F.2d at 1119; see also United States v. Morrison,

No. 04-CR-699 (DRH) (S-2), 2007 WL 1100447, at *4 (E.D.N.Y. Apr. 5, 2007) ("We have

repeatedly held that it is within the court's discretion to admit evidence of prior acts to inform

the jury of the background of the conspiracy charged, in order to help explain how the illegal

relationship between participants in this crime developed, or to explain the mutual trust that

7

existed between coconspirators."  (quoting United States v. Rosa, 11 F.3d 315, 334 (2d Cir.

1993))).  Evidence offered to show "how a criminal enterprise developed" can also be used to

assist the jury "in understanding the relationship of trust between the co-conspirators."  Serrano,

2014 WL 2696569, at *5.

> In addition, where the issue is contested by the defense, "other acts" evidence can

be offered – consistent with Rule 404(b) – to prove criminal intent.  See United States v.

Pascarella, 84 F.3d 61, 69 (2d Cir. 1996) ("Where a defendant claims that his conduct has an

innocent explanation, prior act evidence is generally admissible to prove that the defendant acted

with the state of mind necessary to commit the offense charged."); Pitre, 960 F.2d at 1119

("Where a defendant's intent or knowledge is clearly at issue, evidence of prior acts may be

admissible to prove intent or knowledge.").  "To be relevant, the other act must be sufficiently

similar to the conduct at issue to permit the jury reasonably to draw an inference from the act that

the state of mind of the actor is as the proponent of the evidence asserts."  Serrano, 2014 WL

2696569, at *6; see also Fiumano, 2016 WL 1629356, at *4 ("[W]hen the evidence is offered for

the purpose of establishing knowledge or intent, the Government must 'identify a similarity or

connection between the two acts that makes the prior act relevant to establishing knowledge of

the current act.'") (quoting United States v. Garcia, 291 F.3d 127, 137 (2d Cir. 2002)).  Although

temporal proximity between acts is one factor in assessing relevance, the fact that a prior act is

separated in time from the charged conduct does not automatically render a prior act irrelevant.

See Wedd, 2017 WL 11488608, at *4 ("While the duration of elapsed time between two events

can detract from the probative value of the prior event . . . , temporal remoteness of acts does not

preclude their relevancy."  (internal citations, alterations, and quotation marks omitted)).

With respect to evaluating whether the probative value of "other acts" evidence is "substantially outweighed by the danger of unfair prejudice," see Fed. R. Evid. 403, courts in this circuit have routinely concluded that evidence tending to show that the defendant engaged in prior conduct that was no more serious than that with which the defendant is charged should be admitted. See, e.g., Wedd, 2017 WL 11488608, at *6 ("Several courts have found that other-act evidence is not unfairly prejudicial where it is not 'any more sensational or disturbing than the crimes' with which the defendant has been charged.") (quoting United States v. Roldan-Zapata, 916 F. 3d 795, 804 (2d Cir. 1990)); Mesbahuddin, 2011 WL 3841385, at *4 ("The uncharged misconduct did not involve conduct more inflammatory or serious than the charged crime – indeed, since the uncharged conspiracies apparently failed, they were, if anything, less serious."). To the extent courts have found that the introduction of "other acts" evidence has created the risk of prejudice, they have generally concluded that the risk can be appropriately managed through the use of limiting instructions. See, e.g., United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000) ("[W]e find no undue prejudice under Rule 403; the evidence did not involve conduct more serious than the charged crime and the district court gave a proper limiting instruction."). Applying these principles, courts have regularly admitted prior acts evidence even where the evidence consists of serious, uncharged crimes, concluding that, on balance, the probative value is not substantially outweighed by the risk of undue prejudice. See, e.g,, United States v. Basciano, No. 03-CR-929 (NGG), 2006 WL 385325, at *10 (E.D.N.Y. Feb. 17, 2006) (Garaufis, J.) (admitting evidence of multiple uncharged murders as "their probative value in completing the story, establishing relationships of trust, and/or corroborating testimony of cooperating witnesses is not substantially outweighed by unfair prejudice").

2.    <u>Discussion</u>

The defendant, his co-conspirators, and his associate Twitter direct-message group members used Twitter's various communication methods—tweets, direct messages, and group direct messages—in various ways relevant to the instant prosecution.

a.    <u>The Defendant's Own Statements Are Admissible</u>

As alleged in the Complaint, the defendant communicated with his co-conspirators and others online on social media platforms, including Twitter.  The government intends to present evidence of the defendant's own statements—including Tweets and direct messages—that the defendant made before, during and after the charged time period of the conspiracy.  These statements constitute direct evidence of the offense alleged in the Indictment, are admissible pursuant to Federal Rule of Evidence 801(d)(2)(A) and would be relevant to prove, among other things, his intent in distributing the Deceptive Images and his identity.

The following are a series of examples of such statements, including statements made outside the charged time period of the conspiracy.[1]  The government submits that these statements, and those of a similar character, are all admissible as opposing party admissions and are relevant for showing the defendant's intent and background of the conspiracy, among other uses.  <u>See, e.g.</u>, <u>Wedd</u>, 2017 WL 11488608, at *5 (background information in a conspiracy case, including "how a scheme developed or how conspirators came to know and trust one another" is

---

[1] Many of the statements by the defendant and his associates are not of a criminal nature, but rather reveal the background, history and nature of collaborative work in which they engaged during the lead up to the 2016 Election.  The relevance of such statements was recognized by the Court in its January 23, 2023 Opinion.  <u>United States v. Mackey</u>, 12-CR-80, ECF Dkt. 54 at pg. 49 n.20 ("[T]he Court understands the complaint to be providing the exchanges in question (those referring to Democrats as "shitlibs," or emphasizing the importance of limiting the number of Black voters) as background and context for the conversational environment in which the Deceptive Tweets were ultimately conspired about and formulated, rather than as acts to be regulated in of themselves." (internal citations omitted)).

admissible); cf. Fiumano, 2016 WL 1629356, at *4 (prior similar acts relevant to defendant's intent, if the issue is contested).

On or about December 22, 2015, the defendant communicated with others in a Twitter direct-message group about sharing memes that would suggest certain voters were hiding their desire to vote for the defendant's preferred Presidential candidate.  The defendant stated, "it's actually a great meme to spread, make all these shitlibs think they're [sic] friends are secretly voting for Trump."  Several weeks later, on or about January 9, 2016, the defendant and another Twitter user discussed their Twitter methodologies.  After the defendant stated that "Images work better than words," the user stated "we should collaboratively work on a guide / like, step by step, each major aspect of the ideological disruption toolkit . . .  ricky you could outline your methods of commentary / we could churn out a book like this, divide profits / and hand people a fucking manual for psychological loldongs terrorism."  The defendant responded "Yes… I think that would be good / I could do another chapter on methodologies from the ads industry-- shit like my twitter ads stuff was very much the result of careful targeting, nobody's managed to replicate it properly since."  Shortly thereafter, the Twitter user stated, "honestly at this point i've hand [sic] converted so many shitlibs that like, i am absolutely sure we can get anyone to do or believe anything as long as we come up with the right rhetorical formula and have people actually try to apply it consistently."  The defendant responded, "I think you're right."[2]  These statements, and those like them, are admissible and relevant to show, among other things, that the defendant's intent in spreading memes was to influence people.

---

[2] These statements are from the Twitter direct message group labeled the "Fed Free Hate Chat," discussed below.

In a later conversation in April 2016, the defendant messaged with others about spreading memes that falsely depicted certain celebrities as supporters of Trump. Others in the group discussed a strategy in which they would focus on spreading memes featuring one particular celebrity until that meme lost its traction online, and then pivot to another meme falsely depicting a different celebrity as supporting Trump. They expressed their belief that this would be more effective than spreading multiple fake celebrity memes simultaneously. In response to this suggested strategy, the defendant said, "I really like this idea" and that they should "outmeme" their opponents. Following this conversation, the defendant retweeted one of the memes they discussed featuring a celebrity who purportedly supported Trump. About a week later, the defendant posted a new meme falsely depicting a different celebrity as a Trump supporter. Statements of this character, which occurred prior to the charged period of the conspiracy, are relevant to the government's case and admissible in that they show the manner in which the defendant and the other members of the Twitter direct-message groups organized and orchestrated their collective activities.

The defendant also spoke about his belief that the 2016 Election would be close and that, if turnout among Clinton voters were high, then Trump would lose the election. For example, the defendant tweeted, "Don't be overconfident. Reality is, if HRC gets turnout, and if electorate really is heavily Democratic, we will lose in a landslide." He also tweeted his concern that if turnout were high among Democrats, Clinton would win, but if turnout from Democrats were low, Trump would win. These statements of the defendant are relevant to prove his intent, plan, and motive in spreading false information online, including by posting the Deceptive Images that constitute the charged Section 241 violation. His intent was to influence the election by affecting election turnout. The defendant's statements are admissible to prove not only that

he intended to post the Deceptive Images, but also that he hoped they would reduce turnout among Democrats – a goal he believed was important to further the chances of his preferred candidate.

   The defendant has also described his affinity and preference for using memes (as opposed to words alone) because memes were, in the defendant's view, more impactful ("Images work better than words").  Statements like these are relevant to explain to the jury that the defendant's intent in posting memes and comments online was to influence voters.  While these earlier efforts to spread false information were not unlawful, the defendant's intent in spreading the Deceptive Images and non-criminal memes was the same – to influence voters (first, by changing their minds; later, during the time period of the conspiracy, by trying to deprive them of their right to make a choice at the polls).  By offering the defendant's statements concerning the online distribution of information, the government will prove to the jury that when the defendant pivoted from spreading information about candidates and their purported supporters to false information about the time, place, and manner of the election, his goal was still to affect the election, this time by tricking voters into casting an invalid vote.

   Mackey's statements are also relevant to prove his identity as the user of the relevant Twitter accounts (specifically, @Ricky_Vaughn99, @TheRickyVaughn, @ReturnofRV, and @VRichard1776).  For example, using the account @VRichard1776, the defendant sent a message stating that he had just recently been "doxed"[3] by a particular podcast host, naming that host in his message.  This was a direct reference to an April 3, 2018, podcast interview during

---

   [3] To "Dox" is "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge."  Dox, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/dox.

which a congressional candidate for whom Mackey had previously worked revealed that the

defendant was the person who went by the name "Ricky Vaughn" online.  In the subsequent

Twitter message, the defendant complained to another person that he had been doxed,

confirming that the defendant was indeed the person who went by the name "Ricky Vaughn"

online.  In another message, sent using the account @RickyVaughn99, the defendant stated, "I'm

gonna be in [a particular filmmaker's] documentary."  That filmmaker later was shown a photo

of the defendant and confirmed that the defendant was the person the filmmaker met in person

for the documentary and that he identified himself as Ricky Vaughn.  The defendant has also

made statements online identifying where he lives (e.g., "NYC," "the big apple," and "the upper

east"), his place of origin (e.g., "I'm a Vermonter shhhhhh don't tell anyone"), and the college he

attended (e.g., "Middlebury," "an elite school").[4]  Statements like these are admissible because

they are statements of an opposing party, and therefore not hearsay, and they are highly relevant

given the defendant's anonymity during the acts in question.

Statements like the above were, in each case, made in conversation with others

via Twitter's direct message function.  The statements of others in conversation with the

defendant are also admissible to provide context for the defendant's statements.  United States v.

Dupre, 462 F.3d 131, 137 (2d Cir. 2006) (admitting emails that included statements of

non-testifying third parties because "[a]lthough the authors of the 'Project 9' messages did not

testify at trial, the messages were not hearsay because they were not offered in evidence to prove

the truth of the matters asserted.  The prosecution offered the Project 9 messages to provide

context for defendants' messages sent in response to them, messages whose admissibility is not

---

[4] Each of these statements were made by the defendant in one-on-one Twitter direct
message conversations between May 2015 and May 2016.

contested."); <u>Funk v. Belneftekhim</u>, No. 14-CV-0376 (BMC), 2019 WL 3035124, at *6 (E.D.N.Y. July 11, 2019) (statements of opposing party admissible and statements of others admissible to provide context for opposing party's statements but not for their truth – unless they are otherwise admissible, <u>e.g.</u>, as statements in furtherance of a conspiracy); <u>United States v. Walker</u>, No. 99 CR. 379 (BSJ), 1999 WL 777885, at *4 (S.D.N.Y. Sep. 29, 1999) (allowing admission of voice recording of defendant's conversation with another and noting that the statements of the other participant were admissible not for their truth but as context for the defendant's statements).

Finally, on various occasions the defendant has expressed personal or political beliefs relevant to his intent in spreading the Deceptive Images.  For example, the defendant has made statements, both in public and in private, in which he expressed animosity toward certain political parties or certain groups of people.  In one such statement, the defendant was interviewed on a podcast and suggested that women should not be permitted to vote.  Given that the defendant is charged with distributing Deceptive Images depicting two women, one African-American and one Latina, which both suggested that votes for a specific candidate should be cast in an ineffective manner, the government submits that the defendant's own statements on matters such as whether women should vote are both admissible and highly relevant toward the defendant's intent in committing the acts charged in the indictment.[5]

---

[5] Although the government submits that such statements are relevant to prove the defendant's intent irrespective of how he may defend against the charges, should the defendant suggest, as he has in prior submissions, that his acts were done in satire, the government submits that such statements would be all the more relevant.

b.      The Statements of Co-Conspirators Are Admissible

The government seeks the admission into evidence of messages sent and received by co-conspirators of the defendant, as well as surrounding communications as necessary context for those statements.  See Perez, 2005 WL 2709160 at *2.

As is referenced in the Complaint and other discovery materials, on or about November 1, 2016 and November 2, 2016, the defendant—who was anonymous at the time— tweeted Deceptive Images from his @TheRickyVaughn Twitter account.  The defendant's account was suspended from Twitter shortly thereafter, and the then-CEO of Twitter, Jack Dorsey, commented publicly about the defendant's actions.  Both the defendant's acts, and Twitter's response, were covered by television and print media, including CNN, the Washington Post and other outlets.

In the subsequent investigation into the defendant's activities during the lead up to the Election, the government discovered that the defendant had been a member of three separate Twitter direct-message groups that discussed the creation, formulation and distribution of disinformation like the Deceptive Images.[6]  In each case, the defendant had been a member of

---

[6] In addition to the groups discussed below, the defendant participated in additional direct message groups—such as the Memeteam (Twitter Group ID 759537415384076288) and Fed Free Hate Chat (Twitter Group ID 663795692784193536) groups—in which the members engaged in relevant discussions of, among other things, strategies and methodologies for distributing materials over Twitter, but did not specifically discuss or strategize the distribution of Deceptive Images, some of which is referenced above.  Portions of these conversations, like similar conversations had in the Warroom, Micro and Madman groups discussed below, are relevant insofar as they reveal the methods and means by which the defendant and his associates used Twitter.  The government submits that such statements are admissible as statements of the defendant with necessary context, and relevant as background for the charged conspiracy or as Rule 404(b) evidence.

In addition, members of the Fed Free Hate Chat did discuss the defendant's removals and subsequent reentrys on Twitter.  On or about October 5, 2016, when the defendant was first

the message groups in the time period prior to the charged conspiracy period, and the conversation among the co-conspirators about the Deceptive Images followed and occurred alongside separate discussions concerning the use of Twitter for non-criminal ends. The defendant's involvement in these relevant groups will be addressed separately.

i.   The Warroom Group

The defendant had been a member of the group labeled "Warroom" since approximately August 1, 2016, when the group appears to have been created.[7]  The user who started the group announced that the group would be used, among other things, to "hijack" hashtags and "attack Hillary about anything and everything," adding later that they should "keep this room free of tweets… just strategy."  The defendant weighed in on that first day with some advice re: how to "manipulate" negative hashtags into positive messages.

On or about October 29, 2016, a few days before the defendant publicly distributed the Deceptive Images, members of the Warroom began distributing disinformation about voting.  Although the defendant had been suspended from Twitter on or about October 5, 2016, he had reentered the Warroom under his new Twitter name, @TheRickyVaughn, and was

_____

[7] suspended from Twitter, a member of the group stated "ricky says he's gonna get on discord. you can also follow him on facebook," indicating that Twitter was only one method the group had for contacting the defendant.  On or about November 3, 2016, after the defendant was suspended for spreading the Deceptive Images, the defendant reentered the group using the @ReturnofRV user ID.  The day prior to his re-entry, a group member wrote "Looks like they got Ricky again" and "They are worried niggers would fall for these memes."  Another user responded, "they suspended Ricky FUCK" and distributed a link to a Twitter discussion of @TheRickyVaughn's removal.  Shortly thereafter, the defendant reentered the group and posted a message stating "hello team."  Twitter users in the group responded "Hey Ricky lol. I wonder if Jack will lighten the hell up after Tuesday. Wtf" and "Welcome back Ricky."

[7] The names of Twitter direct message groups were not permanent and could be changed by the membership.  Each group had a Twitter identification number that did not change, which is reflected in the discovery materials.  The identification number for the Warroom is 759914939335208960.

present in the Warroom at that time.  Relevant communications within the Warroom include the

following:

- On or about October 29, 2016, the user @Halleybordercol, posted a Deceptive Image to the group.  The image depicted a photo of Hillary Clinton and the following text: "Vote for her.  Post Hillary using #PresidentialElection On November 8th tweet and post the word Hillary using the hashtag "#PresidentialElection" on Facebook or Twitter between 7am and 9pm EST to cast your vote for Hillary.  Stronger together."  The image also included the logo of Hillary Clinton's campaign.  Earlier that month, on or about October 13, 2016, the individual who sent the meme, @Halleybordercol, had suggested that she would share materials to other groups ("ok, telling other rooms now! Let's get it trending!!!")

- Less than a minute later, @Halleybordercol posted another Deceptive Image to the War Room.  The image depicted a photo of  Hillary Clinton and the following text: "Vote Early Text 'Hillary' to 59925 Today Paid for by Hillary for President  Must be 18 years or older to vote.  Must be a legal citizen of the United States.  Vote by Text Not Available in Guam, Puerto Rico, Alaska or Hawaii."  The image also included the logo of Hillary Clinton's presidential campaign.  As is described in the complaint and discovery materials, "59925" is the same Text Code included in Deceptive Images later distributed by the defendant.

- On or about October 30, 2016, the user @WDFx2EU7 tweeted the following: "Remember @HillaryClinton voters, on Nov 8th, you can vote from home by #Tweeting \"#Hillary\", this is only set up for @HillaryClinton voters."  This tweet was retweeted 151 times.  @WDFx2EU7 then sent a screenshot of his tweet to the Warroom.

- Another participant in the Warroom, @Unityactivist, stated that he "liked the idea" but stated "what if we make it more believable acting like it's unfair that they can text and vote and we can't."  @WDFx2EU7 responded, "yeah, true, [], I'm working on it, let me see what I can come up with."

- Shortly thereafter, @WDFx2EU7 posted to the Warroom a screen shot of an apparent supporter of then Candidate Donald Trump who read the tweet and appeared to believe that voting by tweet was possible.  @WDFx2EU7 stated "here's what I worried about Greg, people on Trump side thinking this is legit and they stay home.  I'm plotting, will have something soon." @UnityActivist responded, "Micro, what about if we say something about its too late b/c we didn't register for it [and] we'll have to do it next election or some shit."  @WDFx2EU7 responded, "Yep, I think so."

The defendant distributed the Deceptive Images a few days after the above communications, on or about November 1, 2016 and November 2, 2016.  On or about November 3, 2016, the defendant returned to Warroom using a new account, @TheReturnofRV.  Various participants of the War Room greeted the defendant upon his return, writing (among other sentiments), "OMG. Ricky, you know-this kicks my twitter-love for you in the orbit," "Voter misinformation LOL" and "hahahaha so awesome."  The defendant replied, "lollolol."

A few days later, on Election Day, another member of the Warroom, @Nia_4Trump, messaged the group "I got suspended Micro for posing a text vote meme…"  Prior to that suspension, the defendant had retweeted a Deceptive Image distributed by @Nia4_Trump that included a picture of Hillary Clinton and the following text: "Save Time Avoid the Line Vote from home. Text "Hillary" to 59925 and we'll make history together This November 8th."  @Nia4_Trump's tweet of the Deceptive Image included specific "Thanks" to the defendant's twitter name, @TheRickyVaughn, for "spreading the word."

Here, the users @Halleybordercol, @WDFx2EU7, @UnityActivist and @Nia4_Trump all either posted, shared or strategized over how to optimize the Deceptive Images and/or the messages therein.  The government submits that their statements and those of a similar character should be admissible as co-conspirator statements.  See, e.g., Pimentel, 2001 WL 185086, at *5 (co-conspirator statements admissible for, among other purposes, seeking to induce a coconspirator's assistance, fostering trust and cohesiveness, and advising as to progress toward conspiracy's goals).  Further, the government submits that the communications of others in the group who are not necessarily co-conspirators relating to these co-conspirator statements, as well as statements concerning the defendant's return to the group, are admissible as necessary

context for those co-conspirator statements and party admissions.  See, e.g., Perez, 2005 WL 2709160, at *2.

In addition to the Warroom, the defendant participated in additional private direct-message groups in which individuals engaged in comparable discussions concerning Deceptive Images and related messaging.  In two of these groups, described below, much of the discussions about the Deceptive Images took place after the defendant was suspended from Twitter, and included messages that the defendant did not receive.  In each case, however, the linkages between the groups—including common materials, membership and even discussions about the defendant—provide sufficient evidence to show by a preponderance of the evidence that a conspiracy existed and the defendant and the declarants of the proffered statements were participants in it.  See Rastelli, 870 F.2d at 837.

ii.   Micro Group

In the first of these two additional groups,[8] the "Micro" group, which the defendant entered at least by June 26, 2016 and was removed from on or about October 5, 2016 following his first suspension, several overlapping members of the earlier-described Warroom engaged in similar conversation—and distributed similar materials—as they did in the Warroom. On October 29, 2016, @Halleybordercol shared with the Micro group one of the same Deceptive Images that she had shared with the Warroom group, which contained the same Text Code as the Deceptive Image later distributed by the Defendant.  On November 2, 2016, the same day the defendant was removed from Twitter following his distribution of the Deceptive Images, a member of this group messaged about the defendant, stating "I know why Ricky was suspended"

---

[8] The name of this group is less certain; its Twitter ID was 744342789375332352. For the purposes of this motion, the government will label it as the "Micro" group.

and "He was posting this shit and people freaked out."  That member then sent a copy of one of the Deceptive Images the defendant tweeted on November 2, 2016.

On the morning of Election Day, November 8, 2016, @WDFx2EU7—who was also a member of the Warroom—shared another Deceptive Image to the Micro group, which consisted of a meme of the comic Aziz Ansari and the text "Save Time. Avoid the Line.  Vote from Home.  Tweet ClintonKaine with the hashtag #Presidential Election on November 8th, 2016 between 8AM and 6PM to cast your vote."  A member of the group responded, "I hope some stoners fall for it.  Especially somewhere like Colorado."  That same day, @WDFx2EU7 publicly tweeted the Aziz Ansari Deceptive Image that he had just shared to the group.

Here, as in the Warroom group, the statements of users @Halleybordercol and @WDFx2EU7 are admissible as co-conspirators statements, along with the surrounding contextual communications.  See Rastelli, 870 F.2d at 837.

### iii.    Madman Group

The second of these additional groups, titled the "Madman" group,[9] contained even more significant discussion and distribution of materials relating to the Deceptive Images. The defendant was a member of the Madman group starting from approximately April 4, 2016, and also belonged to a predecessor group, also labeled Madman.[10]

Upon the defendant's entry into the Madman group, the defendant noted that he was "honored to be in this group fam," and would periodically comment on the memes being created by other members ("hey spectator I like the first graphic," "I would say for maximum propaganda effect kill the top half," "I would do two memes, one where you just lay out the

---

[9] The Madman group corresponds to Twitter ID 715616206250639360.
[10] The predecessor Madman group corresponds to Twitter ID 705325968617918465.

numbers . . . ," "are you gonna post that meme?") or discuss their collective efforts ("we are running twitter right now;" "okay, I have a new hashtag we should push").

Starting on or around late September 2016, the group—which included both the defendant and @bakedalaska, both members of the Warroom group, as well as additional overlapping members with the Micro group—began discussing efforts that would develop into the Deceptive Images.  On or about September 26, 2016, user @Urpochan sent a message to the Madman Group that included a Deceptive Image from Facebook related to the June 2016 United Kingdom Brexit vote.  The image stated that voters wishing to remain in the European Union could now vote by Facebook or Twitter: "Save Yourself a Trip  You can now vote online via social media  Simply post 'Vote Remain' on your Facebook or Twitter account with the following Hashtag #EUReferendum on the 23rd June between 7am and 10pm  Vote remain 23 June."  The image included the logo of the British Labour Party and included screenshots of six individuals who appeared to have attempted to vote in such a manner.  Along with the image, @Uropchan wrote: "Can we [m]ake[11] something like this for Hillary?  Nov 8."  Approximately five minutes later, User @GranTorinoDSA responded, "Typical that all the dopey minorities fell for it."

Shortly thereafter, on or about October 5, 2016, Twitter suspended the defendant, removing him from the Madman group.  The members of the Madman group, however, continued to develop ideas based on @Urpochan's earlier suggestion.  One member in particular, @1080p, a longstanding member of the group, appeared to be behind the creation of numerous Deceptive Images, while others contributed ideas on how they should be presented:

---

[11] The user wrote "fake" rather than "make" but subsequently corrected the message.

- On or about October 16, 2016, user @1080p posted a Deceptive Image to the group. The Deceptive Image included a photo of the Hillary Clinton with the following text: "Your vote matters. And now, it's easier than ever to cast your vote. Simply post ClintonKaine with the hashtag #PresidentialElection on your Facebook or Twitter account between 6:00 AM EST and 8:00 PM EST on November 8th, 2016. Together we can defeat Donald Trump and elect Hillary." @1080p then added, "How's this?"

- Within minutes, members of the Madman Group discussed ways to make the Deceptive Image more effective. A member of the group, @Unspectateur, responded, "Don't post it yet though, a week or less before the election… I'm making a version myself." @1080p responded, "make sure to use the latest color schemes they have." User @Jeffytee responded, "I would get rid of the \"and elect Hillary\" part at the bottom though. Together we can defeat Donald Trump is more assertive." That same day, @bakedalaska—also a member of the Warroom with the defendant—stated, "@gabe u need to make a text message version of that too," to which @1080p responded, "@bakedalaska hold on."

- Shortly thereafter, @1080p posted three additional Deceptive Images to the Madman Group. Each of these Deceptive Images depicted images of Hillary Clinton and included the line: "Simply post #ClintonKaine with the hashtag #PresidentialElection on your Facebook or Twitter account between 6:00 AM EST and 8:00 PM EST on November 8th, 2016."

- On or about October 17, 2016, @1080p sent another Deceptive Image to the Madman Group. The Deceptive Image featured a photograph of Hillary Clinton Candidate and the following text: "We are proud to announce a new partnership between Facebook and Twitter, and the United States State Department. Now, you won't even have to leave your bedroom in order to vote. Simply post #ClintonKaine with the hashtag #PresidentialElection on your Facebook or Twitter account between 6:00 AM EST and 8:00 PM EST on November 8th, 2016."

- On or about October 20, 2016, @1080p sent another Deceptive Image to the Madman Group. The Deceptive Image featured a silhouette of a map of the United States and the following text: "Voting just became easier. Post ClintonKaine on your Facebook or Twitter account on November 8th, 2016 to cast your vote. That's it."

- On or about October 28, 2016, @1080p posted another copy of a Deceptive Image and the word "heh." Three minutes later, @GranTorinoDSA responded, "Dopey shitlibs will fall for it too." Seven minutes later, @1080p posted another Deceptive Image.

- That same day, @Jakekass sent another Deceptive Image to the group with the label "hehehe." The image included a photograph of Hillary Clinton and the

23

following text:  "We are proud to announce our new partnership with Facebook and Twitter.  Now, you won't even have to leave your bedroom to vote.  Simply post ClintonKaine with the hashtag #Election to vote on November 8th, 2016.  Hillaryclinton.com.  Approved by Hillary Clinton, Paid for by Hillary for America."

- On or about November 2, 2016, @1080p shared with the Madman group the same Aziz Ansari Deceptive Image that @WDFx2EU7 later shared with the Warroom and tweeted on Election Day.  Approximately three hours later, group member @CurveMe showed a screenshot in which he had shared the Aziz Ansari meme with another Twitter user.  In the screenshot, the user asked "wait is this a real thing?" to which the @Curveme responded, "yes."

Prior to the defendant's suspension from Twitter on October 5, 2016, members of the Madman group often referenced the defendant ("Rickyyyyyy," "Ricky is the man," "Ricky is the best nerve center for seditious info") or suggested he see specific items ("Someone who is more in with the alt-right (Vaughn, Ricky) needs to post this video," "Ricky needs to see this lmao").  The defendant's initial October 5, 2016 suspension was noted by the Madman group ("Twitter gassed Ricky Vaughn," "Damn, I loved reading Ricky," "#FreeRicky," "Someone add Ricky back in here").  On November 2, 2016, the day the defendant was suspended a second time following the distribution of the Deceptive Images, @1080p, the apparent creator of many of the Deceptive Images, forwarded a Buzzfeed article about the defendant's suspension to the Madman group ("Twitter Finally Blocks Attempt to Disenfranchise Voters"), further commenting "hhahahah."   Others responded similarly ("Lol Ricky") and Twitter user 794213340545433604, another member of the group, conceded that he believed he had also received a suspension for "posting that \"vote for Hillary in the comfort of your home\" shit HahahaHa."  The defendant was able to return to the Madman group, using his third Twitter account, @ReturnofRV, on or around November 9, 2016.

As with the Warroom and Micro group users, members of the Madman group, including @1080p, @bakedalaska, @jakekass, @jeffytee, @curveme and Twitter user

794213340545433604, all either posted, shared or strategized over how to optimize the Deceptive Images and/or the messages therein like those that were tweeted by the defendant and other members of the various groups.  Although the defendant was removed from the Madman group in the month prior to the Election, he was a significant member of the group prior to his removal, and he was present when the scheme to develop the Deceptive Images began.  These factors, combined with the apparent sharing of ideas, materials and membership between this group and the defendant's other groups, all supports the inference that the defendant's act were done with a common purpose with the co-conspirators within the Madman group.  See Rastelli, 870 F.2d at 837-38.  Accordingly, the government submits that their statements and those of a similar character should be admissible as co-conspirator statements, and that other statements made within the group should be admissible as necessary context for those co-conspirator statements and party admissions.

<u>CONCLUSION</u>

For the reasons stated above, the government respectfully request that the Court grant these motions in limine.

Dated:  Brooklyn, New York
January 30, 2023

Respectfully submitted,

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York

COREY R. AMUNDSON
Chief
Criminal Division, Public Integrity Section

25

By:      /s/
        Erik D. Paulsen
        F. Turner Buford
        Assistant United States Attorneys
        (718) 254-7000

        William J. Gullotta
        Trial Attorney
        (202) 514-0047


cc:     Clerk of the Court (NGG)
        Andrew J. Frisch, Esq. (by E-Mail and ECF)