UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------- x

UNITED STATES OF AMERICA

      - v -                        Criminal Case No. 21-0080 (NGG)

DOUGLASS MACKEY,

               Defendant.

------------------------------------------------- x


## MEMORANDUM OF LAW IN OPPOSITION TO GOVERNMENT'S MOTIONS *IN LIMINE*


Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*

*Attorney for Douglass Mackey*


February 24, 2023

Tables of Contents

Introduction . . . . . . . . . . . . . . . . . . .  3

Discussion   . . . . . . . . . . . . . . . . . .  4

A.    Mr. Mackey's Alleged Statements  . . . . . . . . . . .  7

      1.    Statements about political views . . . . . . . . . .  7

      2.    Statements creating false impressions of voter or celebrity allegiance  .  9

      3.    Statements about the importance of voter turnout  . . . . . . .  12

      4.    Statements establishing Mr. Mackey's identity  . . . . . . . .  14

B.    Statements of Purported Co-Conspirators  . . . . . . . . . .  14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------- x

UNITED STATES OF AMERICA

    - v -                              Criminal Case No. 21-0080 (NGG)

DOUGLASS MACKEY,

              Defendant.

------------------------------------------------- x

MEMORANDUM OF LAW IN OPPOSITION
<u>TO GOVERNMENT'S MOTIONS *IN LIMINE*</u>

<u>Introduction</u>

        The government's motion *in limine* seeks permission to prove its allegation that Douglass Mackey disseminated two deceptive memes via Twitter, in violation of Title 18, United States Code, Section 241, with conversations among politically like-minded strangers in Internet chats unrelated to the memes, including many in which Mr. Mackey did not participate.  While some of the government's proffered evidence may be fair game given the Court's decision to permit this case to proceed to trial [Docket No. 54], much of it is evidence of protected speech and association so attenuated from the government's theory of criminal liability as to have no true value beyond prejudicing and confusing the jury.  The government's use of such speech would risk chilling exercise of constitutional rights on top of other types of undue prejudice and confusion and would thereby offend Rule 403; too much of the government's proffer crosses constitutional lines and would damage too much crop to root out two purported weeds.  *See United States v. Ring*, 706 F.3d 460, 473 (D.C. Cir. 2013) ("injecting the First Amendment into

3

the Rule 403 balance in this way would resonate with First Amendment - - specific 'chilling'

concerns - - concerns that are especially powerful where political speech is involved.").

Discussion

While "[t]he First Amendment. . . does not prohibit the evidentiary use of speech

to establish the elements of a crime or to prove motive or intent" [*see Wisconsin v. Mitchell*, 508

U.S. 476, 489  (1993)], the government's proffered evidence includes expressions of political

views or controversial but protected speech.  This evidence risks undue prejudice and confusion

based precisely on the views and the words used to express them and does little if anything to

establish intent, motive, or the elements of the crime.  *See* Dan T. Coenen, "*Free Speech and the

Law of Evidence*," 68 Duke L.J. 639, 664 (2019) (the Supreme Court has "never suggested that

actual prosecutorial use in an actual case of politically or socially charged past-speech evidence

creates no risk whatsoever of generating problematic chilling effects.").  Even if the First

Amendment does not single-handedly forbid the introduction of evidence, these concerns "justify

placing a thumb on the prejudice and confusion side of the scale." *United States v. Ring*, 706 F.

3d at 473.

In opposing dismissal, the government contrasted this case to *McIntyre v. Ohio

Elections Comm'n*, 564 U.S. 721 (2011), which overturned a state law regulating false speech

about campaign candidates and issues.  Docket No. 45 at 19.  The Court ultimately agreed with

the government, "The instant application of Section 241 does not attempt to regulate speech

about the substance of what is on the ballot.  Instead, it attempts to protect access to the ballot."

Docket 54 at 49.  The government assured the Court that "the focus of this case is narrow and

specific:  the defendant's intentional spreading of false information calculated to mislead and

4

misinform voters about how, where and when to cast a vote in a federal election."  Docket No. 45 at 19.  The Court should hold the government to its promise.

       If the Court does not exclude proffered evidence on purely First Amendment grounds, the risk of chilling speech favors preclusion under Rule 403.  In *Ring* the court rejected a First Amendment challenge to excluding evidence of lawful political speech, but found the "strongest" argument that "concerns about jury prejudice and confusion should carry more weight in the context of core First Amendment activity," and that courts " injecting the First Amendment into the Rule 403 balance in this way would resonate with First Amendment -  - specific 'chilling' concerns - - concerns that are especially powerful *where political speech is involved*."  *Ring*, 706 F.3d at 473.  The government is not permitted to use speech under "whatever label is given to the evidence presented" such as motive or intent.  *See Dawson v. Delaware*, 503 U.S. 159, 166-67 (1992).  Even if it is constitutionally permitted to introduce such evidence, "First Amendment concerns justify[ing] placing a thumb on the prejudice and confusion side of the scale" are "powerful."  *Ring,* 706 F.3d *at* 473.

       If the alleged memes fall into an unprotected category or a carve-out of sorts from protected speech, the following do not:  conversations on how to use Twitter for "political messaging," "strategies for leveraging coordinated actions [and] collective influence to ensure that . . .  messaging received as wide an audience as possible, or "general discussions of the participants' techniques, methodologies and ability to leverage their audiences."  Gov't Mem at 2.  If admission of these things or other line items on the government's wish list [*see* Gov't Memo 3-9] can be admitted in a typical case with appropriate predicates, their status as dialogue among Internet users assembled precisely because of a common political ideology changes the

5

calculus.  These people were not playing cards in someone's basement when conversation turned to robbing a bank; they were politically like-minded strangers in a chat room discussing an election.  The government's complaint establishes that the government does need these types of statements to prove its case;  the government is expected to argue that inferences of a concerted aim to deceive flows from the retweeting of deceptive memes.  But even if not, prosecutorial need is not a proper carve-out for protected speech.

"[P]olitical speech by its nature will sometimes have unpalatable consequences, and, in general, our society accords greater weight to the value of free speech than to the dangers of its misuse."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995).  *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)  ("permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes"); *see also Volokh v. James*, 1:22-cv-10195 (S.D.N.Y. Feb. 14, 2023) (Carter, U.S.D.J.), Docket No. 45 at 1 ("Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'") (quoting *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017)).

The government's memorandum does not purport to limit its offer of proof to just those statements identified therein. This memorandum can only endeavor to respond to the specific statements identified.  Mr. Mackey does not read the government's motion *in limine* as suggesting to the Court that he must now register objections by category of evidence as opposed to specifically proffered evidence at trial, and nor could it.  The government's proffer of a

6

particular piece of evidence will depend on the specific context within which it is offered and the dynamics of the trial at that time.  While typical protocol may obviate the need to do so, Mr. Mackey respectfully reserves objections for trial.

A.    Mr. Mackey's Alleged Statements

The government's proffers of Mr. Mackey's alleged statements fall into the following categories: (1) statements about political views; (2) statements creating false impressions of voter or celebrity allegiances; (3) statements about voter turnout; and (4) statements establishing Mr. Mackey's identity.

All of these specifically proffered statements appear to have been made well before the charged period of the conspiracy and the retweeting of the two subject memes. Temporal remoteness might not bar the government's use of the statements if their topic were deception about the precise subject matter that underscores the government's theory of criminal liability:  the manner of voting.  But the matters discussed in the government's proffered statements appear to be as distant from the charged crime as the intervening intervals of time.

1.  *Statements about political views*

The government claims that "[t]he defendant has made statements, both in public and in private, in which he expressed animosity toward certain political parties or certain groups of people."  Gov't Memo at 15.  The government argues,

> Given that the defendant is charged with distributing Deceptive Images depicting two women, one African-American and one Latina, which both suggested that votes for a specific candidate should be cast in an ineffective manner, the government submits that the defendant's own statements on matters such as whether women should vote are both admissible and highly relevant toward the defendant's intent in committing the acts charged in the indictment.

Gov't Memo at 15.  The government's theory has nothing to do with the defendant's alleged animus towards any group of people.  More, the undue prejudice from any inference of such animus from an alleged attempt to suppress turnout of Secretary Clinton's voters far outweighs any probative value.

Section 241 does not require proof of animus toward any group unless the underlying right or privilege requires a showing.  "[I]f the predominant purpose of the conspiracy is to impede or prevent the exercise of the right of interstate travel, or to oppress a person because of his exercise of that right, then, whether or not motivated by racial discrimination, the conspiracy becomes a proper object of the federal law under which the indictment in this case was brought." *United States v. Guest,* 383 U.S. 745, 760 (1966); *United States v. Martin*, 248 F.3d 1161 (7th Cir. 2000) 2000 U.S. App. LEXIS 34059 at *13 ("When there is "no link between the alleged racism and harm . . . the probative value of . . . accusations [of racism] was substantially outweighed by the danger of sidetracking the jury and misusing time on a mini-trial on racism.").

The government in a footnote suggests that evidence of animus would be especially relevant "should the defendant suggest . . . that his acts were done in satire" [Gov't Memo at 15 n. 4], but the government mixes apples and oranges.  If Mr. Mackey were on trial for sending memes that threatened people based on race and claimed at trial that he had only been joking, prior statements truly evincing animus might be relevant.  But Mr. Mackey is charged with conspiring to deceive apparent voters of his preferred candidate's opponents about the correct manner of voting.  His thinking about any particular demographic has nothing to do with whether he intended to deceive voters.

8

Absent true probative value, it is widely accepted that speech expressing racist, sexist, or politically charged speech has an extremely prejudicial effect.  Jurors may be members of the groups about which the government claims that Mr. Mackey expressed animosity, or they may otherwise find such beliefs repugnant.  "It does not take much imagination to understand how such grossly biased comments would be viewed by the jury . . . for nearly all citizens find themselves repelled by such blatantly racist remarks and resentful of the person claimed to have uttered them."  *United States v. Hazelwood*, 979 F.3d 398, 412 (6th Cir. 2020).  "The government" cannot "introduce a defendant's speech simply to paint that defendant as 'morally reprehensible based on the views expressed."  *United States v. Herron*, No. 10-CR-0615 NGG, 2014 WL 1871909, at *7 (E.D.N.Y. May 8, 2014), *aff'd*, 762 F. App'x 25 (2d Cir. 2019) (internal citation omitted).  Nor may the government introduce such evidence on a theory so far afield from the government's theory of criminal liability and a possible defense.

On occasion, courts have held that racist and sexist statements may pass the balancing test of Rule 403, typically when relevant to claims of employment discrimination or bias.  Even in those case courts take great care to exclude all but the most probative comments due to their extremely prejudicial tendency.  *See, e.g., Phoenix v. Coatesville Area Sch. Dist.*, 683 F. App'x 117, 120 (3d Cir. 2017) (excluding evidence of "vile" and "racist" text messages in an employment termination lawsuit because such speech was "not directly relevant to [the plaintiff's] discharge" and would lead to "unfair prejudice and confusion of the issues.").

2. *Statements creating false impressions of voter or celebrity allegiance*

The government seeks to introduce statements that Mr. Mackey or others discussed disseminating false information about, for example, celebrity endorsements or voter

allegiances.  Gov't Memo at 11-12.  These statements are of an entirely different character than deceptions about the manner of voting.  If purported tricks intended to deceive voters about the manner of voting are off limits, other types of deceptions have been a staple of American politics as old as America.  Any evidence of chats about such deceptions at Mr. Mackey's trial, even if pressed as relevant context, "manner," or intent, or use of memes to influence turnout, has no true probative value and risks undue prejudice and confusion about legal speech to which jurors may be averse.

Benjamin Franklin in 1782, while still representing the United States in Paris, printed a fake edition of an actual Boston newspaper, The Independent Chronicle:

> Amid the fictitious ads and articles, Franklin inserted a made-up story about the massive slaughter of white settlers on the frontiers of New York. Native Americans, in the service of the British forces, had collected 700 scalps from men, women, children, and even infants, Franklin lied . . . . [W]hen the news reached America, it was reprinted in papers throughout New England. The story helped stiffen American resistance to the British, who were now seen as using Indians to terrorize settlers.

Jeff Nilsson, *"Ben Franklin Used Fake News, The term 'fake news' may be new, but the concept isn't. Politicians have long been the perpetrators — and the victims — of phony information,"* The Saturday Evening Post, Feb. 28, 2017[1] ("presidential campaigns have often been marked by fabricated stories and synthetic scandals. Even after the race, the slander often continued."). John Adams and others of his time proudly disseminated false and exaggerated stores to undermine the king.  Robert G. Parkinson, *"Fake News?  That's a very old story,"* The Washington Post, Nov. 26, 2016.[2]

---

[1] *https://www.saturdayeveningpost.com/2017/02/even-ben-franklin-used-fake-news/*

[2] *https://www.washingtonpost.com/opinions/fake-news-thats-a-very-old-story/2016/11/25/c8b1f3d4-b330-11e6-8616-52b15787add0_story.html*

The government takes great care not to offer these statements under Rule 404(b), apparently acknowledging that they do not constitute "other crimes, wrongs, or acts."  But its proffer of this category of statements has the same effect, forcing Mr. Mackey to defend protected speech, and turning the trial into a mini-trial civics lesson on the American tradition of relying on the marketplace of expression to find truth.  *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, dissenting)  ("I think that we should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required to save the country.")

The primary effect of including this evidence is to create the impression that Mr. Mackey's spreading of false but lawful information makes it more likely that Mr. Mackey spread false and unlawful information.  As the government itself notes, it seeks to argue that Mr. Mackey "*pivoted* from spreading information about candidates" to "false information about the time, place, and manner of the election."  Gov't Memo at 13.   The pivot is fatal to the government's analysis.

Even 404(b) is not "a carte blanche to admit prejudicial extrinsic act evidence when . . . it is offered to prove propensity." *United States v. Garcia*, 291 F.3d 127, 136 (2d Cir. 2002).  Application of 404(b)'s standard here is especially incongruous because, unlike a prior conviction for fraud or something analogous, Mr. Mackey's statements were fully lawful and constitutionally-protected;  ill intent to spread false and unlawful information does not flow from false but lawful speech.  Evidence of false but lawful speech risks an improper inference of propensity and has no true purpose other than to cause undue prejudice and confuse the jury.

11

While generally lawful, Americans have a very low opinion of misinformation. According to a Pearson Institute/AP-NORC Poll, 91% of Americans find misinformation a problem, and 74% believe it is a major problem.  Americans are particularly "worried about the impact on democracy including the ways misinformation fuel hate crimes and extreme political beliefs."[3]  It is one thing to indict Mr. Mackey for deceiving voters about the manner of voting, but another thing entirely to prejudice him unduly and confuse the issue by introducing his legal if controversial statements.

3.   *Statements about the importance of voter turnout*

If Mr. Mackey testifies at trial and says that he acted other than to deceive Secretary Clinton's voters to suppress their turnout, the government should be permitted to cross-examine him about the proffered statements that she would win if turnout of her voters were high, and President Trump would win if turnout of her voters were low.  But the statements otherwise risk undue prejudice and confusion.

As the polarization of the American electorate has become more stark, presidential elections have increasingly turned on voter turnout.  *See "What Would It Take To Turn Blue States Red? Change the settings below to see how shifts in party preference and turnout by different demographic groups would affect the 2016 presidential election,"* The 538 Project, Oct. 5, 2016.[4]  The proffered statements are not politically neutral.  *See* Gov't Memo at 12  ("Don't be overconfident.  Reality is, if HRC gets turnout, and if electorate really is heavily

---

[3]  Many believe misinformation is increasing extreme political views and behavior, AP NORC (Oct. 2022), *https://apnorc.org/wp-content/uploads/2022/10/Pearson-Institute-AP-NORC-Poll-Report-on-Misinformation.pdf.*

[4]  *https://projects.fivethirtyeight.com/2016-swing-the-election/*

Democratic, we lose in a landslide,").  The government should not be permitted to reply on a pro-Trump view of voter turnout to justify an inference of fraud against Mr. Mackey unless and until he testifies that suppressing turnout of voters presumably sympathetic to Secretary Clinton was not his intent.

The government alleges the conspiracy sought to prevent Democratic voters through deception for the purpose of helping elect Donald Trump and defeat Secretary Clinton by limiting the Democratic vote.  As the Court has noted, the government alleges that the defendant "intended to suppress *Democratic* voters."  Docket No. 54 at 2 (emphasis added).  Any discussion of turnout of specific groups, such as discussion of turnout of African Americans [*see* Gov't Memo at 10 n. 1] was related to the goal of helping elect President Trump and defeat Secretary Clinton. The Complaint claims Mackey wrote, "Obviously, we can win Pennsylvania. The key is to drive up turnout with non-college whites, and limit black turnout." Compl. at ¶ 31. Mr. Mackey's "We" undoubtedly referred to Trump supporters, not the white race.

African Americans, as well as women, political liberals, and Hispanics, tend to vote for Democrats, and indeed did so for Hillary Clinton, at a higher rate than the general population.[5]  It is common for political partisans on both sides of the aisle to seek to limit the turnout of different demographic groups depending on who they tend to vote for without any animus and through undeniably lawful means.[6]  Not all ways of discouraging demographic

---

[5]  *See, e.g.*, An examination of the 2016 electorate, based on validated voters [*https://www.pewresearch.org/politics/2018/08/09/an-examination-of-the-2016-electorate-based-on-validated-voters*/], showing that, 54% of women, 66% of Hispanics, and 91% of African Americans voted for Secretary Clinton compared to 48% of the general population.

[6]  *See, e.g.* Alan I. Abramowitz, "*Barack Obama's Electoral Legacy: In a Polarized Era, Democrats Poised for Success in 2016 and Beyond in Debating the Obama Presidency*," p. 90

13

groups from voting may be lawful, but any animus towards any group has no relevance to this

case.[7]  Meanwhile, the government will be able easily to show that Mr. Mackey was a partisan of

then Candidate Trump and used social media for the purpose of helping elect him.  Animus

towards any group of people has no relevance to the intent to deceive voters.

>    *4.    Statements establishing Mr. Mackey's identity*

If Mr. Mackey concedes before trial that he was Ricky Vaughn, none of the

government's proffered statements to prove identity should be admitted.  If not, Mr. Mackey has

no objection to the statements proffered by the government for that purpose.

**B.    Statements of Purported Co-Conspirators**

Mr. Mackey has moved *in limine* [Docket No. 55] to preclude chats of

participants in chat rooms on the Internet for which Mr. Mackey was not present.  Mr. Mackey

had no direct or indirect contact with any of the participants outside of the chat rooms, which

were neither created nor hosted by Mr. Mackey.  Mr. Mackey argues that use of Rule

801(d)(2)(E) to admit chats from chat rooms on the Internet under these circumstances extends

the rule beyond its intended scope, is otherwise inapplicable, and runs afoul of Rules 401 and

403.

The government's motion *in limine* underscores Mr. Mackey's point.  According

to the government's proffer, the extent of Mr. Mackey's exchanges within three chat groups

---

(Steven E. Schier, ed., 2016) (arguing that in the 2016 election "Republicans will probably have
to hope for low turnout among nonwhites and young voters in order to take back the White
House."); Christopher Stout  &  Keith Baker, *"The Super-Predator Effect: How Negative
Targeted Messages Demobilize Black Voters*," 52 Brit. J. Pol. Sci. 1099 (2022) (arguing that
Republicans use "negative targeted messages" to "decrease[] Blacks' enthusiasm to vote.").

identified by the government appears to be that in August 2016 he "weighed in" with advice
about how to manipulate hashtags - - a statement which the government characterizes but
declines to quote [Gov't Memo at 17]; and an exchange after Mr. Mackey allegedly posted the
deceptive memes, in which he replied "lollolol" when another participant said "Voter
misinformation LOL."  Gov't Memo at 19.  Mr. Mackey cannot take a position on his purported
advice about the hashtags without knowing what he is alleged to have said and has no objection
to his "lollolol" in response to "Voter misinformation LOL."

       Otherwise, Mr. Mackey objects to the statements under Rules 801(d)(2)(E), 401,
and 403.  The government alleges at least a dozen exchanges, many apparently embracing
multiple statements within them [Gov't Memo at 17-25], and Mr. Mackey appears to have been
present for none or virtually none of them.  The government seeks to hold Mr. Mackey
vicariously liable for the statements of others when there is no evidence that he knew what or the
substance of what they were saying or was in agreement therewith; the government works
backwards from the memes and relies on the commonality of political kinship to press an
inference of Mr. Mackey's conspiratorial agreement.

       The government's theory of admission is constitutionally offensive, stretches Rule
801(d)(2)(E) beyond its intended purpose, and otherwise runs afoul of Rules 401 and 403.
Separately, there is no evidence independent of the proffered statements that any of these people
participated with Mr. Mackey in a conspiracy.  Mr. Mackey's sharing of the memes does not

establish his participation in a particular conspiracy about which others spoke apparently

completely in his absence.  Before the government may be permitted to thread such statements

together to warrant admission of the chats as co-conspirator statements under Rule 80(d)(2)(E), it

must do more than show that Mr. Mackey was connected with others with common political

allegiances, discussed lawful political strategies, and shared the same political views.

Dated: February 24, 2023

/s/ Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
afrisch@andrewfrisch.com
Attorney for Douglass Mackey