UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- x

UNITED STATES OF AMERICA

    - v -                                    Criminal Case No. 21-0080 (NGG)

DOUGLASS MACKEY,

           Defendant.

-------------------------------------------------- x

## MEMORANDUM IN OPPOSITION TO GOVERNMENT'S MOTION FOR CERTAIN PROTECTIVE MEASURES CONCERNING A COOPERATING WITNESS

Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
212-285-8000

Attorney for Douglass Mackey

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- x

UNITED STATES OF AMERICA

    - v -                                   Criminal Case No. 21-0080 (NGG)

DOUGLASS MACKEY,

           Defendant.

-------------------------------------------------- x


## MEMORANDUM IN OPPOSITION TO GOVERNMENT'S MOTION FOR CERTAIN PROTECTIVE MEASURES CONCERNING A COOPERATING WITNESS

By Memorandum dated February 24, 2023, the government moved under seal for permission for a witness to testify anonymously and to preclude questioning him about his current proactive work for the Federal Bureau of Investigation ("FBI"). Neither the witness's name nor the nature of his work is disclosed in the government's motion so it should not remain under seal; the public's right of access under the First Amendment is not outweighed by any information disclosed in the government's application. *See* Section IV herein.

Otherwise, the government's motion does not establish why an anonymous tweeter on the Internet should be permitted to be a witness at a criminal trial without identifying himself. As for the witness's proactive work for the government, the government has advised defense counsel that the witness is not being paid for his work; while disclosure of all the details of the witness's work may not be necessary, Mr. Mackey is entitled to explore the witness's credibility and bias arising from work with the FBI for which he appears to be volunteering, requiring that the general nature of his work and degree of his ongoing contact with the government be disclosed.

Introduction

In ruling on a motion to limit disclosures about a confidential witness ("CW"), courts should weigh "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense" and that such considerations "depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Roviaro v. United States* 353 U.S. 53, 63 (1957).[1]  While the government has not clarified whether it would seek to partially close the courtroom during the CW's testimony, the government cites authority on the "Waller Factors" for closed courtrooms to argue for anonymity [*see, e.g.*, *Ayala v. Speckard*, 131 F.3d 62, 72 (2d Cir. 1997); *United States v. Hernandez*, No. S1 12 CR 809 PKC, 2013 WL 3936185 (S.D.N.Y. July 29, 2013)], and many courts have applied these factors in evaluating whether witnesses may use pseudonyms.  *See, e.g. United States v. Schulte*, 436 F. Supp. 3d 698 (S.D.N.Y. 2020).

These so-called "Waller" factors are:

> (1) whether the closure advances an overriding interest that is likely to be prejudiced; (2) whether the closure is no broader than necessary to protect that interest; (3) whether the trial court has considered reasonable alternatives to the protective measure; and (4) whether the trial court has made "findings adequate to support the closure."

---

[1] While *Roviaro* involved whether a defendant was entitled to the identity of an informant, the government cites it to apply it to confidential witnesses, and courts in this District and out-of-circuit cases cited by the government apply this test to pseudonymous and confidential witnesses. *See, e.g., El-Mezain*, 664 F.3d at 491 (5th Cir. 2011); *United States v. Dan Zhong*, No. 16-CR-614 (DLI), 2018 WL 6173430, at *2 (E.D.N.Y. Nov. 26, 2018).

*United States v. Ledee*, 762 F.3d 224, 229 (2d Cir. 2014) (citing *Waller v. Georgia*, 467 U.S. 39,

48 (1984) (internal quotations omitted)).

Under both *Roviaro* and *Waller*, the court must balance the defendant's right to

confrontation under the Sixth Amendment and how pseudonymity may negatively affect his

defense with the government's interests and the necessity of the measure.  *See also United States*

*v. Gutierrez de Lopez*, 761 F.3d 1123, 1140 (10th Cir. 2014) ("[C]ourts evaluate Confrontation

Clause claims based on anonymous testimony by asking (i) whether the government has

demonstrated a threat and if so, (ii) whether anonymous testimony deprived the defendant of an

opportunity for effective cross-examination.").

The government cites cases where pseudonymous witnesses and/or closed testimony was

permitted involved alleged terrorists [*United States v. Pugh*, No. 15-Cr-116 (NGG), slip op.,

ECF No 99 (E.D.N.Y. Feb 24, 2016); *El Mezzain*, 664 F.3d 467 (5th Cir. 2011); *United States v.*

*Abu Marzook*, 412, F. Supp. 2d 193, 916 (N.D. Il. 2016), *United States v. Naseer*, No. 10 CR 19

(S-4) (RJD), 2015 WL 13843166, at *1 (E.D.N.Y. Jan. 26, 2015)]; undercover officers in regular

contact with street criminals [*Ayala v, 131 F.3d 62*; U. S. ex rel. *Lloyd v. Vincent*, 520 F.2d 1272

(2d Cir. 1975); *Alvarado v. Burge*, No. 05 CIV. 1851 (AKH), 2006 WL 1840020 (S.D.N.Y. June

30, 2006)]; and murderous gangs [*United States v. Urena*, 8 F. Supp. 3d 568 (S.D.N.Y. 2014)].

The fact that these are the sorts of cases where these measures are taken reflects both

*Roviaro*'s factor to consider the type of crime, and the fact that these are when legitimate

concerns about the safety of witnesses and effectiveness of an undercover officer are implicated.

In the present case, there are no conceivable government interest in safety or a confidential

witness's continued effectiveness, and it seems more likely that the CW likely does not want to

face negative attention and harm to his reputation.  Moreover, the witness adds little or nothing

truly probative to the government's case: his contact with Mr. Mackey was exclusively through the online communications on which the case is predicated, and all he is qualified to say is what *he* intended, not what was intended by Mr. Mackey.

I. **Because the government has records of all of the CWs communications with the defendant, his testimony provides no value.**

As a preliminary matter, the CW's testimony provides no probative value. The government has not alleged that the CW and the defendant have ever met, spoken on the phone, or communicated in any form other than via the Twitter chats, of which the government has full transcript. The defense does not challenge the authenticity of these transcripts. If there is a circumstance where the CW's testimony would be the only avenue to overcome a hearsay objection, the defense would consider waiving those objections. With that, the only insight the CW has to offer is his own subjective thoughts and motivations. He has no ability to speak to the defendant's intent or the intent of any other co-conspirator.

II. **The government's justifications for allowing pseudonymous testimony are facially meritless.**

The government notes three justifications for allowing pseudonymous testimony: (A) concerns over the CW's effectiveness in ongoing and unrelated investigations for the FBI; (B) protecting him from physical threats; and (C) protecting him from online harassment. While safety and effectiveness are legitimate interests, they are not present in this case; the government's concern about protecting the defendant from online harassment really means protecting him from negative attention, which is not a legitimate interest.

A. **Because the CW's work for the government is done under a pseudonym, his effectiveness in further assisting the government does not require anonymity.**

The government cites *Ayala*, 131 F.3d at 72 for the proposition that "state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial

interest."  However, it does not demonstrate that the CW's "continued effectiveness" is

threatened.  "[A]n officer's undercover status will not in itself" establish this interest.  *Brown v.*

*Kuhlmann*, 142 F.3d 529, 538 (2d Cir. 1998).  With respect to the interest in effectiveness, the

state may satisfy its burden by demonstrating that the undercover officer would return to an area

of operation where the trial audience might reside, so long as that area is defined with geographic

particularity."  *Cadilla v. Johnson*, 119 F. Supp. 2d 366, 377 (S.D.N.Y. 2000); *see also*

*McCarthy v. Portuondo*, No. 98-CV-3726(JG), 2001 WL 826702, at *6 (E.D.N.Y. May 25,

2001), aff'd, 62 F. App'x 17 (2d Cir. 2003) (discussing how this test is applied in several cases).

While CW's "proactive investigations" are apparently involved in cyberspace, the

underlying motivation for the geographic limitation is to only find that it would "hinder" the

investigation if "people would recognize [the agent]."  *McCarthy*, 2001 WL 826702, at *2.

However, the government has not made a plausible showing that the CW's effectiveness would

be compromised by testifying under his own name in open court.  As the government

acknowledges, the CW's unspecified work with the FBI is all being done behind a computer

while using pseudonyms.  *See* Gov't Memo at 2 ("The CW is presently involved in multiple,

ongoing investigations and other activities in which he or she is using assumed Internet names

and 'handles' that do not reveal his or her true identity.").  There is no plausible way that using

his own name in court would cause anyone to recognize him and hinder the effectiveness of any

other investigation.

Regardless, the CW is not an undercover officer in any meaningful sense.  While the

defense does not know the nature of his help, he is not a paid employee, and his work is entirely

behind the safety and anonymity of a computer screen.  *See United States v. Maxwell*, No. 20-

CR-330 (AJN), 2021 WL 5967913, at *3 (S.D.N.Y. Dec. 15, 2021) (noting the unique threats to

foreign intelligence agents and undercover officers do not apply to ordinary citizens who wish to testify anonymously.).

### B. The CW does not face legitimate threat to his safety if his identity is known.

"When the government seeks to withhold a witness's true name, address, or place of employment, it bears the burden of demonstrating that the threat to the witness is actual and not a result of conjecture." *United States v. Ramos–Cruz*, 667 F.3d 487, 500 (4th Cir. 2012). "A generalized statement about danger - - such as anyone who testifies against one of [a gang's] members faces danger from [that gang] - - would be insufficient to show that a threat against a witness was actual and not a result of conjecture." *Gutierrez de Lopez,* 761 F.3d at 1141 (10th Cir. 2014) (citing *id*. at 501, internal quotations omitted). "[T]he mere invocation of officer safety does not justify the closing of a courtroom" and the government "must show facts that tend to support his fear." *Brown v. Artuz*, 283 F.3d 492, 501 (2d Cir. 2002).

Examples in which the government has established danger have included situations such as showing "Hamas and other terrorist organizations seek out the true identities of [Israeli Security Agency] agents and their families and publish descriptions of ISA officers on websites so that they can be targeted," *El–Mezain*, 664 F.3d at 492; or providing evidence that the Columbian narco-terrorist organization FARC had "killed people suspected of helping arrest [the defendant] and had threatened to kill cooperating witnesses." *United States v. Celis*, 608 F.3d 818, 833 (D.C.Cir.2010).

Suffice to say none of these concerns are present with the defendant and the CW. The prosecution has never alleged that the defendant has a reputation for violence, ever engaged in violence, or even threatened anyone's safety. Cf, *Vidal v. Williams*, 31 F.3d 67, 69 (2d Cir. 1994) (rejecting an undercover's officer's safety as a substantial interest when the government

failed to show the people they wished to protect his anonymity from "were inclined to harm a police officer.").

The government has instead vaguely claimed that members of the so called "alt-right" - - a nebulous ideology rather than an actual group or gang - - are upset about Mr. Mackey's prosecution and potentially wish to engage in violence against those involved without citing a single example of any concrete threat or action - - beyond an unwelcome phone call to an FBI agent after Mr. Mackey's arrest, which the government acknowledges was not a serious threat. Gov't Memo at 7.  Cf. *Ramos-Cruz* 667 F.3d at 501 (acknowledging a statement that "anyone who testifies against one of its members faces danger from MS-13" would be insufficient to justify pseudonymity); *Gutierrez de Lopez,* 761 F.3d at 1145 (rejecting pseudonymous witness when the government only argued simply because the defendant had "cartel connections" and the witness's testimony may "ultimately make it back to the cartel").

### C. The government's concerns over "harassment" are actually aimed at preventing unwelcome publicity, criticism, and attention, which are not substantial interests.

Without any real threat to the CW's physical safety, the government alleges that Mr. Mackey's alleged past online "trolling" is now a threat to witnesses via "online harassment." The government does not allege that Mr. Mackey nor anyone else engaged in "harassment" which crossed the line into criminal harassment or violent threats.

Instead, it points to unwanted scrutiny from members of the public about Megan Rees, the FBI agent case whose name appeared on the complaint.  Critics of this prosecution speculated on her political motivations and dug into her background.  The government claims that a "purported" journalist managed to track down her personal phone number and contact her to ask questions about this.  The government does not allege this was done in a threatening manner and the FBI did not believe it to be a threat to her safety.  Gov't Memo at 7.

Mr. Mackey, on the other hand, has never alleged that Agent Rees was motivated by political bias or was part of a "liberal conspiracy," and he has had no involvement in any of the online articles and social media posts referred to by the government.  Nonetheless, what the government decries as harassment and threats is private citizens searching publicly available information and using it to speculate about the biases of a law enforcement official involved in this case.  Whether or not this speculation is well founded, even the government is not asking the court to police this activity.  *See, e.g., Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 555 n. 4 (1976) (invalidating restrictions on what the press could write in a "sensationalistic" trial, while noting some of it ended up being "false").

This court has rejected allowing anonymous letters in sentencing even if the "authors of supportive letters may face retribution if their identities are publicly known, given the public attention that has been paid to this case" and worried they "will be targeted if their identities are publicly known."  *United States v. Rainiere*, No. 18-CR-204, 2021 WL 4522298, at *4 (E.D.N.Y. Oct. 4, 2021) (Garaufis, J.).  The Southern District applied this analysis to pseudonymous witnesses and rejected the argument that "witness anonymity is necessary to protect its witnesses from *scrutiny and harassment* because of [] significant publicity" because "these generalized concerns are present in *every high-profile criminal case*." *Maxwell*, 2021 WL 5967913, at *2 (emphasis added).

The sole case the government cites where a court gave credence to concerns about "harassment" is *United States v. Bundy,* No. 2:16-CR-46-GMN-PAL, 2017 WL 888311 (D. Nev. Mar. 6, 2017).  The government had alleged Bundy had recently violated a protective order, *id.* at 3, in a prosecution where he was charged with recruiting "hundreds" of followers to engage in a "massive armed assault against federal law enforcement officers to threaten, intimidate, and

extort the officers." *United States v. Payne*, No. 216CR00046GMNPAL, 2016 WL 7380744, at

*3 (D. Nev. Dec. 20, 2016).[1]  Supporters of the Bundys' cause had already killed two law

enforcement officers in retaliation against the government's prosecution of him.  Ian Lovett,

*Anti-government Obsession Preceded Las Vegas Shootings*, The New York Times (Jun. 9, 2014).

With this background, it is incredibly unlikely the court in *Bundy* was contemplating

unpleasant social media posts and calls from purported journalists when it discussed concerns

about witness "harassment" and "safety."  Indeed, if the government's claim of threat were so

serious, then the jurors and every single prosecution witness in this case would be entitled to

anonymity.

**D. The CW likely seeks anonymity to protect his reputation.**

With no plausible concerns about ongoing investigations or safety, Occam's razor

suggests a more obvious motivation.  The CW is assisting the government in its case against Mr.

Mackey, and the government is incentivized to make the CW's life more pleasant.  The CW pled

guilty to a felony and, according to the government, was a leader in the controversial "alt right"

movement, and was engaged in spreading disinformation, and leading online harassment

campaigns.  He has guarded his anonymity for years not because he is afraid for his safety or his

ability to work with the FBI, but because it would harm his reputation.

The defense is aware of no case where protecting a witness's reputation is viewed as a

factor in favor against a witness anonymity.  Indeed, the concerns about harassment, which were

rejected in *Rainiere* and *Maxwell* discussed above, apply concerns about reputation as well. See

---

[1] The case was ultimately dismissed due to prosecutorial misconduct.  *"Charges Against Bundys in Ranch Standoff Case Are Dismissed,"* The New York Times (Jan. 8, 2018) https://www.nytimes.com/2018/01/08/us/bundy-ranch-standoff-case-charges-dismissed.html

*Rainiere*, 2021 WL 4522298, at \*4 (noting that a desire for "remaining out of the public eye"

does not justify anonymity).

**III.    The Defense must be able to cross-examine the CW's current activities with the FBI and elements of his personal life in order to effectively place him in the proper setting and test its credibility**

Because the government has not articulated a credible safety or effectiveness justification

for allowing the witness to testify anonymously, the analysis may end there.  However, even if

there was any marginal justification for anonymity, it is outweighed by the limitations it poses on

the defense's ability to have an "opportunity to place the witness in his proper setting and put the

weight of his testimony and his credibility to a test." *Smith*, 390 U.S. at 132.  "The very starting

point in exposing falsehood and bringing out the truth through cross-examination must

necessarily be to ask the witness who he is and where he lives." *Id.* at 131 (internal citations

omitted).

In *El-Meazin*, for example, the court allowed anonymous testimony from a covert Israeli

agent due to extraordinary safety concerns and still allowed the defense to probe the witness's

"background, his training and experience with the [Israeli Security Agency], his legal education,

and his potential bias in favor of Israelis in the West Bank."  664 F.3d at 492.   In the instant

case, despite the lack of legitimate safety concerns, the government seeks to prevent the defense

from inquiring on the CW's background and experience with the FBI.

Furthermore, the private lives of covert intelligence agents and undercover police officers

who make up the bulk of the caselaw on anonymous witnesses are far less necessary for cross

examination than the CW.  The government claims that the CW was living a double life of sorts,

where he engaged in politically incendiary (and in its view, illegal) behavior online, while not

revealing this facet of his life to the bulk of his family, friends, colleagues, and acquaintances. He now is apparently living a triple life with his anonymous assistance to the FBI.

While the defendant and CW never met, they were both political conservatives, and the CW is now at odds against him.  If the CW's political views have changed significantly, it is relevant to understand his community and biases.  If it turns out his work for the FBI is targeting other right-wing adherents, the defense needs to know so for the purpose of cross-examination. If his political views have changed, the defense may wish to probe as to whether he has a political bias against the defendant.  If his views have not changed, it is relevant to probe his motivations.

How the CW presents himself in his day-to-day life in contrast with his past internet trolling and present assistance with the FBI gets to the core of his biases, honesty, and motivations.  Asking such questions of him at trial are not meant to intimidate, harass, confuse, embarrass, or jeopardize his safety, but are necessary to place him in the proper setting to judge the validity of his testimony.  These concerns are heightened by the fact that his testimony would likely heavily discuss his own subjective views about how he viewed the goals of the group chats and his own motivations and intent.

**IV      There is no basis for the government's motion to be maintained under seal**

"It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597–98 (1978).  "The common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).  *See also United States v. Caicedo Velandia*, No. 10-CR-00288-01, 2019 WL 6913524, at *1–2 (E.D.N.Y. Dec. 19, 2019) ("The law of sealing

and unsealing is extensive and largely well-settled. Succinctly stated: the public has a qualified right to access judicial documents under the common law and the First Amendment.")

The Second Circuit has "recognized the law enforcement privilege as an interest worthy of protection." *United States v. Amodeo*, 44 F.3d 141, 147 (2d Cir. 1995).  It's purpose is "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *Id.* (Quoting *In re Dep't of Investigation*, 856 F.2d 481, 484 (2d Cir.1988)).  However, this is merely an interest which is considered as part of "the balancing test required to determine whether access should be allowed or denied."  *Id.*

The government's sealed motion does not list the name of the CW, it does not mention any discussion of his current work with law enforcement, and thus having it public cannot conceivably endanger his safety, or compromise any ongoing investigation.  The fact that the government is willing to unseal the motion after the CW's testimony [Gov't Memo at 10] suggests that the government does not believe there to be any true threat; sealing and the relief sought by the government's motion can only serve to impede the defense's ability to effectively confront him.

Dated:  March 2, 2023

> /s/ Andrew J. Frisch
> Andrew J. Frisch
> The Law Offices of Andrew J. Frisch, PLLC
> 40 Fulton Street, 17th Floor
> New York, New York 10038
> 212-285-8000
>
> Attorney for Douglass Mackey