The Law Offices of
## ANDREW J. FRISCH, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
212-285-8000

April 19, 2023

The Honorable Ann M. Donnelly
United States District Judge
225 Cadman Plaza East
Brooklyn, New York 11201

*Re: United States v. Douglass Mackey, Criminal Docket No. 21-0080 (AMD)*

Dear Judge Donnelly:

This letter is submitted on behalf of Douglass Mackey in response to the Court's order of April 12, 2023, to show why his draft stipulation, dated March 27, 2023, and the government's reports of interviews of representatives of Hillary Clinton's campaign for President (the "Clinton Campaign") should be publicly filed as part of Mr. Mackey's post-verdict motions.

Mr. Mackey is preparing a motion to dismiss this case (and for alternative relief) based on the government's attempt to manufacture false inferences of conspiracy from insufficient evidence, bolstered by its untimely disclosure of evidence favorable to the defense. *See* Fed. R. Cr. P. 5(f): *Brady v. Maryland*, 373 U.S. 83 (1963): *United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012).  The government did so in principally two ways: (1) selective disclosure of statements made to the government by representatives of the Clinton Campaign; and (2) selective disclosure to Judge Garaufis of the government's relevant information about Mr. Microchip in seeking protective measures [*see* Docket No. 66] - - all of which served to mislead the Court and the jury about the true context of the memes and the government's purported evidence of conspiracy (to prove the charge and to admit evidence under Rule 801(d)(2)(E)).

In opening statement, Mr. Mackey's counsel told the jury that Mr. Mackey would testify, in sum, that (1) through his Twitter avatar Ricky Vaughn, he shared hundreds of tweets, messages and memes everyday in 2016 during the presidential campaign as part of "shitposting" - - constant provocative or off-topic postings meant in part to get under the skin of the Clinton Campaign and distract from the main political conversation [T 30-31, 33]; (2) was not present during chats in which alleged coconspirators discussed voting by text; and (3) shared vote-by-text memes different from those formulated by alleged coconspirators in those chats.  T 32-33.

The government's first witness, Robert McNees testified that, upon looking for postings by Vaughn on November 1, 2016, he found the memes and was concerned by their "virtually similar" replication of Clinton graphics.  He also testified that the use of the hashtag on the memes, "#imwithher," steered the memes to Clinton's supporters.  T 45-48, 50-53, 62.

The government's second witness was Jess Morales Rocketto.  On March 10, 2023, the Friday before the start of jury selection, the government first identified Ms. Rocketto as a witness.  Thereafter, during jury selection, the government disclosed a report of the

government's then-recent interview of Ms. Rocketto, without disclosing any of eighteen reports of the government's interviews of seventeen other representatives of the Clinton Campaign, conducted between March 2021 and January 2023.  Ms. Rocketto testified that she was the Clinton Campaign's digital organizing director; learned of vote-by-text memes using fake graphics during the final days of the campaign; found the memes' misappropriation of the Clinton Campaign's graphics and hashtag "#imwithher" to be such a "big deal" and so "jarring" that "you have to make a decision about what to do about something like this."  T 76, 78, 84-85, 90-92.  *See* T 86 (The Court:  "If you can avoid asking like terribly open-ended questions to this witness . . . . she has a lot to say, which is fine, but we're never going to finish.").  On defense counsel's subsequent cross-examination of Lloyd Cotler (a representative of the Clinton Campaign called principally to testify to steps to remediate the memes' reference to a short code), defense counsel confirmed an unelaborated statement in the government's report of Mr. Cotler's interview that a Clinton Campaign worker named Amy Karr monitored social media, including 4chan [T 103], on which Mr. Mackey had seen the memes that he then shared.

       The following morning, the government provided defense counsel with two reports of its interviews of Ms. Karr.  At the lunch break, defense counsel requested that the government provide reports of all the government's interviews of representatives of the Clinton Campaign.  Highlights of the reports, summarized in the draft stipulation, contradicted the testimony and inferences elicited by the government from Ms. Rocketto and Mr. McNees.  For example, Alexandria Witt, Senior Social Media Strategist, told the government that she referred vote-by-text memes to executive staff, but the general response was lackluster as though - - directly contradicting the very words used by Ms. Rocketto - - "this was no big deal."  Diana Al Ayoubi-Monett, another Senior Social Medical Strategist, said that she was mocked for taking "text-to-vote" memes seriously.  Timothy Lu Hu Ball, a senior security expert, said that senior officials of the Clinton Campaign did not take the vote-by-texts seriously.  Ms. Witt and Ms. Karr both were aware of and monitored "shit-posters" on social media supporting Clinton's opponent.  Memes containing misinformation about voting began to appear about three months before Election Day; there was no single influencer behind them; and senor staff, including campaign chair John Podesta, did not take concerns about the memes seriously.  According to Matthew Compton, Deputy Digital Director (possibly Ms. Rocketto's principal underling), the "#imwithher" hashtag had been somewhat commandeered with "unbelievable" amounts of irrelevant information, rendering it not "particularly useful."  Multiple witnesses told the government about records created by the campaign to track misinformation on social media (about which Mr. Mackey had been unaware and never attempted to subpoena or investigate).

       The Court responded to Mr. Mackey's complaints about the government's failure timely to produce all of this material by suggesting (as is relevant to this letter) that the parties discuss a stipulation as a remedy.  Mr. Mackey's draft stipulation was a response to the Court's suggestion, but the government rejected it.  Defense counsel emailed it to the Court (rather than electronically file it with a letter) when an issue unexpectedly arose early on the morning of the last day of trial about the government's timely receipt of the draft stipulation; exigencies of the imminent trial day made preparation and filing of a letter impractical.  But it would otherwise have been electronically filed to show that Mr. Mackey's attempt at a mid-trial remedy for the government's violation of Rule 5(f) and *Brady* had been rejected (though the government agreed to stipulate to a narrow portion thereof), thereby filling in the record and helping to show the consequent irreparable prejudice.

The suppressed material in *Mahaffy* was comprised of multiple investigative depositions conducted by the Securities and Exchange Commission, which were accepted for public filing - - without government objection - - precisely because they constituted the basis for Mahaffy's claim of suppressed exculpatory statements of undisclosed witnesses. *See United States v. Mahaffy, et al.*, 05-CR-613 (E.D.N.Y.) (Gleeson, U.S.D.J.), Docket Nos. 862 and 865. While Mr. Mackey will address the many parallels between this case and *Mahaffy* in his motion to dismiss, Judge Gleeson (another judge for whom undersigned counsel has unqualified respect) was hostile in substance and tenor during counsel's oral argument of Mahaffy's motion. The Circuit, however, reversed Judge Gleeson, resoundingly and comprehensively rejecting precisely the types of arguments advanced by the government here. Mr. Mackey's motion will demonstrate irreparable prejudice flowing from the violation and why any inference of mere prosecutorial negligence is rebutted by the government's similarly selective disclosures in moving for protective measures for Mr. Microchip - - not to mention the government's otherwise distinctly meticulous command of its evidence.

Mr. Mackey's claim of a violation of Rule 5(f) and *Brady*, with or without the context of the media's coverage of this case, is sufficient itself to underscore the presumption of public access favoring public filing of the draft stipulation and the government's reports of interviews. *See Gannett Media Corp. v. United States*, 2022 U.S. App. LEXIS 35099 (2d Cir. Dec. 20. 2022). Secretary Clinton has herself put her thumb on the scale in favor of public filing. On April 3, 2023, she sat for a videotaped interview hosted by Columbia University's School of International and Public Affairs,[1] volunteering the following remarks about this case (beginning at 1:12:15 of the videotape) at odds with the government's interviews of her staff:

> There was just a trial in Brooklyn where a guy who had been one of the . . . main people running memes against me in 2016. He went from what you could consider free speech . . . . to running a very deliberate effort to mislead people about where and how to vote so it went from speech to action meant to subvert the election because thousands of people who they targeted through their algorithms . . . . texted their vote [so] we already know this has real world consequences, but we're just at the tip of what can happen to us because we are either incapable, unwilling, or just confused about what to do to try to reign all of this in.

Notwithstanding errors of fact baked into Secretary Clinton's expressed view of this case, her observations help establish the public interest in the underlying (contradictory) statements of her campaign. Mr. Mackey should be permitted publicly to file the reports and the draft stipulation.

Respectfully submitted,

*/s/ Andrew J. Frisch*
Andrew J. Frisch

cc:  U.S. Attorney's Office

---

[1]  Available at *https://www.sipa.columbia.edu/news/pelosi-clinton-discuss-danger-taking-democracy-granted.*