605

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                        21-CR-80(AMD)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5           -versus-                    March 23, 2023
                                        9:30 a.m.
6   DOUGLASS MACKEY,

7           Defendant.

8   ------------------------------x

9           TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
              BEFORE THE HONORABLE ANN M. DONNELLY
10              UNITED STATES DISTRICT JUDGE
                       BEFORE A JURY

11

12  APPEARANCES

13  For the Government:      UNITED STATES ATTORNEY'S OFFICE
                             Eastern District of New York
14                           271 Cadman Plaza East
                             Brooklyn, New York 11201
15                           BY:  ERIK PAULSON, ESQ.
                                  TURNER BUFORD, ESQ.
16                                WILLIAM J. GULLOTTA, ESQ.
                             Assistant United States Attorneys

17

18
    For the Defendant:       BY:  ANDREW J. FRISCH, ESQ.
19                           40 Fulton Street
                             New York, New York 10030
20

21
    Court Reporter:          Rivka Teich, CSR, RPR, RMR, FCRR
22                           Phone:  718-613-2268
                             Email:  RivkaTeich@gmail.com
23
    Proceedings recorded by mechanical stenography.  Transcript
24  produced by computer-aided transcription.

25

PROCEEDINGS                                    606

1              (In open court.)

2          THE COURTROOM DEPUTY:  All Rise.

3          THE COURT:  Everyone can sit down.

4          What order do you want to take this in?  To me, it

5  makes the most sense to maybe have counsel clarify what

6  exactly your position is.  You made sort of a Brady motion for

7  a mistrial.  I think we took this extra period so you could

8  refine what the argument was.

9          MR. FRISCH:  Here is just the highlights, then I can

10  give you the big pieces, then I'll do the small pieces after

11  if it's necessary.

12          Number one, I don't think any prophylactic measure

13  with regard to the ongoing trial would work.

14          THE COURT:  But I think what would be easier for me

15  is, what is Brady?  What material do you think is Brady?

16          There are a number of 302s and what exculpatory

17  material is in there that -- and we are still on trial so that

18  if the jury were to here about it, it had the potential to

19  change the outcome of the trial?

20          MR. FRISCH:  Let me answer that.  Let me preface my

21  answer, to protect the record, which is that I don't want to

22  be in the position if there is a conviction and if there is no

23  remedy in district court of being accused on appeal of not,

24  under the circumstances and given the timing, that I'm not

25  adequately or that I left something out of my objection.  So

PROCEEDINGS                                    607

1   before I answer your question, I want to be sure that I say

2   that I do want to address this in writing so I make all my

3   arguments.

4           Having said that let me answer your question.

5           THE COURT:  Just taking that, do you have anything

6   prepared in writing?

7           MR. FRISCH:  I don't.  I read these after preparing

8   for Mr. Mackey today, this morning and last night, I read

9   everything for the first time comprehensively so I can

10  summarize my arguments why I think it's a Brady violation.

11          THE COURT:  What are you asking me to do then?  You

12  want to submit something in writing?

13          MR. FRISCH:  I think the only --

14          THE COURT:  Can you give it to me by tomorrow?

15          MR. FRISCH:  I just, I can try.  This is -- look --

16  this is not my fault.

17          THE COURT:  I'm just -- I'm a very simple person.

18  I'm just trying to get clarity on what you want.

19          MR. FRISCH:  Let me answer you.

20          THE COURT:  I want you to do it the way I want you

21  to do it so I understand it.

22          MR. FRISCH:  Let me --

23          THE COURT:  It is frequently the case in trials in

24  this courthouse, and in other courthouses, that a legal issue

25  comes up that is a complicated legal issue that lawyers handle

PROCEEDINGS                                    608

1    orally.  So let's try it that way first.  And if I feel that I

2    need to have something clarified, or that I need more argument

3    on it then I'll take it in writing.  But I'm not aware of any

4    requirement in the middle of a trial that requires a Court to

5    put a hold on everything while people do a full briefing on

6    something.  My mind is not closed to it.

7            But what I'm most interested now is an

8    identification of the 302s that were given to you, so I know

9    what to look at.  So if you can look at which witnesses you

10   believe have Brady material in the 302s, and what it is that

11   the material is that is exculpatory, and then we'll take it

12   from there.

13           There are a number of these 302s, which are the ones

14   that you assert contain Brady material?

15           MR. FRISCH:  So the short answer -- let me go

16   through it, let me go through it and tell you what I think is

17   Brady material.

18           I think the specific ones, I think all of is this

19   Brady material in substance, but the specific ones which is

20   the most concerning to me are Alexandria Witt, Ms. Karr, the

21   witness whose last name is Ayoubi, A-Y-O-U-B-I, Monett,

22   M-O-N-E-T-T, Mr. Or Ms. Ball.  I didn't make a list by

23   witness, so there may be more.  I'm doing the best I can.

24           If I can just I'll try to answer your question as to

25   what I think is the Brady and why this is a problem.  I think

PROCEEDINGS                                          609

1    that the problems include the following.  I think the

2    principle -- I think we start with Rocketto.  Rocketto is the

3    equivalent to calling a witness to identified the defendant

4    from a line up without giving the defendant the information

5    that others didn't.  So for example --

6              THE COURT:  So what is the information that would be

7    helpful?

8              MR. FRISCH:  Okay.  So Witt is one of the witnesses,

9    Karr is another, who basically say that they, that this was

10   not a big deal to the Clinton campaign.  That they didn't see

11   it as worth reporting to the Government.  That no one even

12   reported it to Twitter, at least initially.  That there were,

13   there was not just one person doing it, it was all over the

14   Internet.  That there was misuse of the Clinton logo

15   pervasively on the Internet.  That there were teams of people,

16   not just one person, Ms. Karr, but it turns out there were

17   teams of people, lots of them, not just monitoring the

18   Internet precisely for this sort of thing, but they were

19   making records of it.

20              There is a number of witnesses who talk about

21   creating, I think Mr. Ball if it's Mr. Ball, talked about

22   scraping content from 4chan into a slack channel.  There was

23   talk by Mr. Ball about a daily PowerPoint presentation about

24   trends in voter disruption.

25              THE COURT:  Let me stop you there.  I think I

PROCEEDINGS                                   610

1  understand what you're saying.

2              With respect to the issue -- the e-mail telling

3  people they could text to vote was not a big deal to the

4  Clinton campaign.  Why is that Brady material what their

5  opinion of it is?

6              MR. FRISCH:  Because they called Ms. Rocketto to

7  essentially testify how horrible this was.  How something had

8  to be done right away.  How she recognized this as a problem.

9  That it specifically, in her view, was either targeted to or

10 designed to affect or had the affect of effecting Latin

11 American and African American voters.  She was a terrific --

12 she's very charismatic and had a lot to say, that's fine --

13             THE COURT:  Why is someone --

14             MR. FRISCH:  But I couldn't cross-examine her with

15 this information.

16             THE COURT:  But you opened on it.

17             MR. FRISCH:  But I didn't know that the Clinton

18 campaign agreed with my defense.

19             THE COURT:  But who cares what their opinion is.

20 The Clinton campaign can't testify in court about what they

21 think about something, any more than they can come -- you

22 didn't object to it, she did say something was sneaky, I think

23 I stopped her at some point.  A particular person's opinion of

24 what the case is, I don't understand how that is Brady

25 material.

PROCEEDINGS                              611

1           MR. FRISCH:  If the Government had not called her, I

2      still think this is Brady material.  But she testified to a

3      view of the case essentially, and the Government put this in

4      issue, whether whatever word she used, I didn't have the

5      material with which to cross-examine her.  I didn't

6      cross-examine her at all.  I think I asked one question from

7      her, I can't remember what it was.

8               I would have had an extensive cross-examination of

9      her.  Not just that she represents one voice of the Clinton

10     campaign of which there were literally armies of people

11     monitoring social media who knew about this --

12          THE COURT:  Okay.

13          MR. FRISCH:  I'm sorry, go ahead.

14          THE COURT:  I think I understand the substance of

15     it.  I'm not rushing you because -- and I'm not dismissing

16     what you want to say, I want to get each thing that you think

17     is Brady.  Then I'll have the Government's response.  And then

18     the jury will come back.

19               The first thing is at least one or more of these

20     302s reflect that when the campaign workers tried to bring

21     these things to the attention of the higher ups in the Clinton

22     campaign, they were dismissed because they didn't think it was

23     important.

24          MR. FRISCH:  Yes.

25          THE COURT:  Okay.  So I that's number one.

PROCEEDINGS                                    612

1          What is the next thing?

2          MR. FRISCH:  Number two, this was so diffuse this

3    was so -- not diffuse, this was so pervasive on so many

4    different aspects of social media that it cuts against that

5    this was -- let me start from the beginning.

6          The fact that members of the Clinton campaign knew

7    how pervasive this was on the Internet shows that, helps the

8    defense show, that this was not, as Mr. Microchip put it, a

9    grand plan.  It wasn't a conspiracy.  It was everywhere

10   online.

11         While there is some evidence that I think I opened

12   at that certainly it was already viral, I didn't know that the

13   Clinton campaign not only knew that but they were monitoring

14   it.

15         THE COURT:  Why is that exculpatory?

16         MR. FRISCH:  It goes to whether or not this really

17   is as, it cuts against the inference that this is so obviously

18   a problem that it's obviously a deceptive image, that it's not

19   just more, to use the language which is again in these 302s

20   and I didn't even know they knew about it, stuff posting.

21   There is view of the world, I think in Ms. Karr's 302, that

22   she recognized that this was part of stuff posting.  It could

23   well have been in her view, that stuff posting can be serious.

24   But I'm entitled to probe that.

25         THE COURT:  Why couldn't we just recall the witness

PROCEEDINGS                                    613

1    that you want to cross?  What is wrong with that?  Have you

2    talked to the Government about trying to stipulate to any of

3    this before we go through the parade of horribles?  I

4    understand your position, but have you talked to them about

5    either calling a witness, calling the witness yourself, making

6    them available.  I take it there is a fair amount of stuff in

7    these 302s that you wouldn't want them to testify about.  A

8    lot of it is not --

9             MR. FRISCH:  That's one of the reasons why, Judge,

10   getting this --

11            THE COURT:  First just answer this question.

12            What about this could not be remedied by calling one

13   or more of these witnesses or having the Government call them

14   if you don't want to call them?

15            MR. FRISCH:  I've already opened.  This is a trial.

16   The law on --

17            THE COURT:  It is?

18            MR. FRISCH:  Let me make my argument.  You can

19   reject it, but let me make my record.

20            Brady violations become increasingly more serious if

21   the timing of disclosure is after you've opened and after the

22   trial has happened.  This is not a random putting stuff in

23   front of the jury.

24            Lawyers -- I know you know this, I'm just making a

25   record, let me just -- if I don't say this, on appeal I'll be

PROCEEDINGS                                614

1   criticized for not saying it --

2          THE COURT:  The only thing I'll tell you is, I mean

3   I'm sure that the record will reflect all the basic things

4   there are about trials.  I'm just trying to get you to

5   streamline it so I know what the argument is.

6          You're saying that you were hobbled in your ability

7   to open because you weren't aware of what some of these

8   Clinton campaign people thought.  So you're saying that the

9   point that you learned these things, that you were not in a

10  position -- you already opened and you were precluded from

11  raising these arguments in opening.  Correct?

12         MR. FRISCH:  Yes.

13         THE COURT:  Okay.  In your view, there is nothing to

14  do at this point that could remedy that.  The only solution to

15  it is a mistrial because of what these 302s say.  Do I have

16  that right?

17         MR. FRISCH:  Yes.

18         THE COURT:  Then in addition to the -- I just want

19  to make sure I understand every aspect of what your Brady

20  claim is -- that it wasn't a big deal to the Clinton campaign,

21  that these memes or it was so pervasive on the Internet and

22  that the Clinton campaign was monitoring it, that that is also

23  Brady material.  Correct so far?

24         MR. FRISCH:  Yes, with one gloss, but yes.

25         THE COURT:  Tell me.

PROCEEDINGS                           615

1     MR. FRISCH:  The gloss is, our defense is that

2   Mr. Mackey knew that he was well known and that his purpose in

3   putting this out was not to deceive any voters, was precisely

4   to get it picked up and unnerve the Clintons.  We now know

5   from the Clintons that they knew about this.  And it

6   supports -- they were pervasively monitoring social media and

7   that it supports his argument, it helps nullify the argument

8   that he did this in some sneaky way intending to trick voters.

9         They corroborate that there is this underbelly of

10  people fighting for messaging and fighting to carry the day.

11  That's what Mr. Mackey thought, that's what he thought he was

12  doing.  And we now know that's what the Clinton's understood

13  what was going on.  Another thing --

14        THE COURT:  Can you just clarify one thing for me?

15  I'm sure you've paid much more attention to these than I have,

16  but I thought that some of these 302s were, I think it's

17  Ms. Ayoubi Monett, one of them any way, talked about how

18  everybody was so young and everybody was trying to bring this

19  to the attention of the higher ups in the Clinton campaign,

20  and that they were essentially rejected.  That's the theme of

21  a lot of these.  I guess I'm having so much difficulty seeing

22  how that's exculpatory.

23        MR. FRISCH:  It's not important for the defense who

24  in the campaign who is sufficiently perspicacious to

25  understand what is going on in the social media.  It's in the

PROCEEDINGS                                              616

1    MIT report.  The fact they dropped the ball and missed this,

2    is not on Mackey.

3              THE COURT:  Why is it on anybody?

4              MR. FRISCH:  Our defense is made out by these 302s.

5    Our defense is made out, number one, it's pervasive on the

6    Internet.  The notion that you can cull out a handful of

7    people from the Internet and say it's a conspiracy when it's

8    all over the place, they realized that.  I could cross on

9    that.

10             They also realized that there is this back and forth

11   going on in social media, whether it's Ms. Karr or Mark Elias,

12   the Clinton campaign realizes that there is a struggle going

13   on inside social media to control the message and carry the

14   day.  That's our defense.  They corroborate that.

15             THE COURT:  Could you call anybody else to establish

16   that, that's less a matter of opinion rather than just looking

17   to see what is going on on the Internet?  Are there alternate

18   sources of that position that everybody was talking about?

19             MR. FRISCH:  It's in the MIT report, to some extent.

20   But these are the people, these are the Clintons saying it.

21   The people who are -- the people who are most directly

22   affected by the alleged crime here, both the voters and the

23   people voting for Hillary Clinton.  They know what is going on

24   and they are not doing anything about it.

25             Which also, I know you can make the argument that

PROCEEDINGS                                    617

1    it's irrelevant, but if the people who are victimized from

2    this, if they think it's not a big deal, whether it was or it

3    wasn't, if they think it is not a big deal and they are not

4    contacting Twitter, they don't think it's important to contact

5    the Government, I can't remember which of the 302s says that.

6              THE COURT:  I remember.

7              MR. FRISCH:  How is it fair with all of their

8    lawyers and election lawyers, all of their machinery, if they

9    don't think this is so important and they are looking at

10   4chan, Reddit, all of these social medias and Twitter, how is

11   it fair, how is it fair to put on Mr. Mackey criminal

12   liability and these kind of arguments that would put the whole

13   case in a different light had I had this information before we

14   opened.

15             THE COURT:  But the -- first of all, I thought the

16   victims in this case were -- well, it's a conspiracy, but the

17   intended victims were voters.  I did not understand the claim

18   to be that the Clinton campaign was a victim.  I don't think

19   that's what the Government has to prove in order to prove the

20   actual charged crime.  Clearly, I guess you could argue, they

21   were affected by it.

22             But I do think I understand your position that there

23   were people in the campaign that didn't think this was

24   important enough to do anything about.

25             Is there another theory that you have about why this

PROCEEDINGS                                    618

1    is exculpatory material?

2              MR. FRISCH:  Let me look at my notes.

3              THE COURT:  Sure.

4              MR. FRISCH:  This may be repetitive and forgive me.

5              THE COURT:  It's fine.

6              MR. FRISCH:  Just in answer to one of the things you

7    just said.  You may being right about the nature of the crime

8    and the fact that Clinton is irrelevant, but they put it into

9    evidence.  In retrospect, they called the witness, number one.

10             Number two, they said -- I think this is in Karr or

11   maybe Witt, I don't remember -- but I think someone says that

12   they perceived this as being organic, that it organically came

13   up in social media.  It wasn't so much, some people ganging up

14   at a ballot box in Brooklyn where they call the cops; it was

15   just organically from social media.  That also is part of our

16   defense.

17             THE COURT:  But that's their opinion.  Right?

18             MR. FRISCH:  Whether it's their opinion or whether

19   they have it in a book of science, I have a right to exam it

20   through the witness they called.  And had I had all this

21   information, you'd be darn sure I would have served a subpoena

22   on the appropriate people on the records they were keeping,

23   and the briefing they were having of just this stuff.

24             And it's not just that the voters are their

25   purported victims, but the Clinton campaign is looking to

PROCEEDINGS                                          619

1    protect those voters, that is one of the jobs that

2    Ms. Rocketto had.  To some extent they become the surrogates

3    for the voters.  You could be sure I would have subpoenaed all

4    of the various records to see what exists, what other types of

5    records existed.  This would have been a treasure trove to

6    hire an investigator, call these people, and find out what was

7    going on.

8           I didn't have an opportunity to do any of that

9    because I didn't know that the Clintons were approaching what

10   they are alleging what Mackey was doing with such thoroughness

11   and exhaustiveness, and not doing anything about it.  Whether

12   they should or shouldn't have, the fact is they weren't.

13          THE COURT:  Let me ask you about your opening

14   statement.  In the beginning of your opening statement you

15   said:  Memes like this were already going viral from days

16   before.  They were already going viral by the time Mr. Mackey

17   shared the memes.  The Clinton campaign had already begun

18   taking action about these kinds of memes.

19          Then there is a portion where you talk about how it

20   it was a news story, and this is later on in the opening:

21   About 99 percent of the approximate 4900 texts came after the

22   media began covering the memes.  And that Mr. Mackey had

23   nothing to do with the two memes, the two clicks.

24          And then there is the partial quotation of his,

25   something that he posted -- let me find it here -- it was the

PROCEEDINGS                                    620

1    haphazard posting.

2              It is certainly something that was raised in your

3    opening statement.  That's why I'm just, I just don't know why

4    we have to go right to 11 on a mistrial and why there are

5    not -- it's always the case that if there are less drastic

6    alternatives to a mistrial, the Court should consider them.

7              It seems to me, putting aside the question for the

8    moment of whether this truly is Brady material, and I must say

9    I have some serious questions about that, but the Government

10   hasn't rested.  We have told the jury that this is, they are

11   expecting to stay for a little while.  So the -- I'll hear

12   from the Government on this too -- there could be a

13   stipulation.  There could be the witness could be recalled to

14   be cross-examined about some of the things that you've raised.

15   Or either you or the Government could call one or more of

16   these witnesses.  I don't think that any of them, the ones

17   you're talking about, have essentially the same feature so you

18   wouldn't want to be cumulative about it.

19             Why haven't you considered that?  Is that something

20   you're willing to consider if you come in second on the

21   mistrial motion?

22             MR. FRISCH:  So I'm willing to consider and think

23   about options.  I've tried to do that.

24             THE COURT:  You propose some in your letter.

25             MR. FRISCH:  That's right.  And if your Honor --

PROCEEDINGS                          621

1          THE COURT:  You want to think about it?

2          MR. FRISCH:  Can I make one more substantive point?

3    Just bear with me.

4          THE COURT:  I am.  Go ahead.

5          MR. FRISCH:  A couple of things.

6          Number one, I've had these precise issues come up in

7    other cases where the Government's position is, you kind of

8    made that argument so why do you need this, it's cumulative,

9    or things along those lines.  And the Second Circuit has found

10   for the defense on precisely these kinds of issues.

11         Bear with me.  One of the things that I didn't

12   realize, or never even dawned on me until I read the reports.

13   What I thought happened was that McNees called these out and

14   he called out on his Twitter account that Twitter had said

15   we're not going to take Mackey down, we're not going to take

16   Vaughn down.  As a result, Buzzfeed wrote the first of a

17   number of articles.

18         It now appears, this is completely consistent with

19   our defense, this press:  Forbes, MSBNC, CNN and others, they

20   reported this because of the Clinton campaign.  I can't say

21   that for sure, but it certainly reads that way.

22         That's completely what Mackey, in a way that was

23   completely legal, was trying to do, was create a side story.

24   And it appears that's what happened.  Let me just --

25         THE COURT:  I want to make sure I understand.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

PROCEEDINGS                              622

1    You're saying a lot of things.  I don't want to miss anything.

2              So your position is that efforts that certain

3    members, it sounds like the younger people in the Clinton

4    campaign, were very concerned by this is something that

5    supports his claim that that's all he was trying to do, was to

6    rile up the Clinton campaign.  All right.  I get it.

7              MR. FRISCH:  The second thing is, what I believe

8    when I opened, was that based on the information I had, and

9    this is based on Omar Samiri's testimony, that this had

10   started going viral, as I believed it when I opened, two or

11   three days before November 1st, on October 29 when people

12   started texting the number, the short code.

13             In fact, according to Karr's one witness, it's not

14   clear whether it's three or four months before, these vote by

15   text things had been online three or four months.  That is

16   also consistent with a core part of Mr. Mackey's defense, that

17   this was, he didn't just -- he wasn't conspiring with the

18   likes of Microchip and BakedAlaska.

19             He just put -- it' completely, in my view, nullifies

20   the notion of a conspiracy.  Because it shows that this was

21   saturated online prior to October 29.  And I didn't know that

22   until I saw this.

23             Let me say that differently.  I didn't know that the

24   Clintons knew about it.  I think we know in social media

25   there's all kinds of stuff.  The fact that the Clinton

PROCEEDINGS                                      623

1     campaign knew about it, to me, tips the scales.

2               THE COURT:  That's the critical factor.  You clearly

3     were aware, because I think that's been your argument, that

4     other people were pushing out these memes.  So the critical

5     factor, in your view, is that the Clinton campaign was also

6     aware of it and either didn't react sufficiently or -- I know

7     there is one of the 302s said that these younger people in the

8     campaign were trying to urge senior members to use social

9     media and they reacted by sending out mailings.  But that's

10    not what you're talking about.

11              You just think that if you had much more information

12    about the inner workings of the Clinton campaign, it would

13    assist in your defense that this wasn't a conspiracy.

14              MR. FRISCH:  If I had any information about the

15    inner workings of the Clinton campaign, along anything,

16    anything.  There is literally an army of people -- this goes

17    right to our defense, in fact, it is establishes our

18    defense -- there is an army, all these different sub-groups

19    within the Clinton campaign whose responsibilities in whole or

20    in part is to look for what was going on online for months.

21              For reasons various reasons, the United States

22    Government has decided to pick this guy and make him the

23    poster boy for this and call it a criminal conspiracy with the

24    likes of Microchip, when this is pervasive online.

25              And the Clinton campaign is not just an innocent

PROCEEDINGS                                624

1    bystander in this.  They are essentially at this trial, and

2    maybe in reality, surrogates for their voters.  They are

3    representing the interests of their voters.  If the voters are

4    the alleged, or the prospective victims of the crime -- and

5    they are -- the Clintons are standing up for them.

6              That was one of the jobs of Rocketto.  That's one of

7    the reasons for all of this voter outreach and voter

8    protection that was going on in Clinton headquarters.

9              I didn't know that's what they were doing.  I didn't

10   know they were aware of this for months.

11             THE COURT:  I see.  Let me hear from the Government.

12             MR. PAULSEN:  Yes, your Honor.  First off, I think

13   your Honor has the factual chronology correct.

14             We called the 2 HFA employees, Ms. Rocketto and

15   Mr. Cotler, not to offer an opinion of what they thought of

16   this, it's because they were the two individuals who responded

17   to these particular memes and set the ball in motion such that

18   there would be a warning for them as people started seeing

19   them on the Internet.  This was in the days before the

20   defendant sent it out.  I think the record is clear about

21   that.

22             To the extent that they gave an opinion, it was not

23   because they were here to say this is bad, this is good.  This

24   was to explain why they took the actions they did.

25             If we offered various other members of the campaign,

PROCEEDINGS                                   625

1    who, it sounds like your Honor read the 302s, just to state

2    they thought this was terrible, it would have been objected

3    to.  It would be there just for opinion.  There are many

4    people in the world who have strong opinions in this case,

5    neither side could offer those people as witnesses.

6              THE COURT:  Let me ask you, though, to just respond

7    specifically to the first -- go through the things that

8    Mr. Frisch has raised.

9              Starting with this, I think I have this right, that

10   this was not a big deal to the Clinton campaign, that other

11   people were doing it, and that the Clinton campaign was

12   monitoring it.

13             MR. PAULSEN:  I think most of that comes from

14   Ms. Karr.  Ms. Karr was an intern on the campaign who had a

15   dexterity with the dark corners of the Internet.  She did spot

16   these things early.  I think her 302 reflects she was flagging

17   it.  She also says that she eventually got people in the

18   campaign to pay attention to it and do something about it,

19   which happens before the defendant does anything.

20             THE COURT:  But if you could just respond to that

21   argument that this is exculpatory material.

22             MR. PAULSEN:  Sure.  I don't know how what the

23   campaign was doing behind the scenes could possibly be

24   exculpatory to the defendant's intent to what he did later on.

25   I'm struggling to figure out a way to respond to that.

PROCEEDINGS                    626

1   Because whether the defendant had a specific intent in what he

2   did, he would have that irrespective of what the campaign was

3   doing behind the scenes before that happened.

4            I honestly don't understand how that is related.

5            THE COURT:  Let me ask you to address the second

6   basis for the application, which is that the 302s reflect that

7   this, I guess misinformation is the best way to put it, was so

8   diffuse and pervasive on the Internet -- that's the first part

9   of it, although I take it, I don't need a long answer on this,

10  I take it there are other ways to find that out.

11           It sounds like you did find them out; is that right,

12  Mr. Frisch?

13           MR. FRISCH:  From the Clinton campaign, no.

14           THE COURT:  Just the general idea, I think there has

15  been evidence about it, so I think the general idea that other

16  people were doing this is not something that you're focusing

17  on.  You're focusing on the Clinton campaign's knowledge of

18  it, and reaction to it at least in one regard.  Right?

19           MR. FRISCH:  Yes.

20           THE COURT:  So that's just the part I'm asking you

21  to respond to.

22           MR. PAULSEN:  Sure, your Honor.

23           I believe Ms. Karr says that she was aware that it

24  was things of this sort, not this exact thing but things of

25  this sort, were available as of the summer of 2016.  We made

PROCEEDINGS                                        627

1    that same representation in the first search warrant in this

2    case where we said the website knowyourmemes states these

3    first appeared in or round June 2016.  Our evidence, which we

4    presented through the summary witness yesterday, showed that

5    the groups that the defendant was part of were discussing

6    iterations of this scheme as early as September 26.

7              THE COURT:  I want to -- does anyone have a copy of

8    the search warrant application?

9              MR. PAULSEN:  We can pull it up and e-mail it to

10   your clerk.

11             THE COURT:  That's great.

12             MR. PAULSEN:  Our evidence shows that iterations of

13   this meme was starting to be developed as early as

14   September 26 in groups the defendant was in.  They had many,

15   many iterations which started in mid October, October 15 and

16   closer to election day.

17             The search warrant also noted that the one that the

18   defendant sent out was available on the Daily Stormer website,

19   the American Nazi newspaper, as early as October 29, which is

20   a couple days before the defendant did.

21             It is also true, however, that as Mr. Samiri said in

22   his direct testimony that the precise text code didn't start

23   registering clicks on this in any number until November 2 or

24   so, which is around the time the defendant did it, and around

25   the time it got picked up in the news.

PROCEEDINGS                                    628

1          I think it's a fair assumption the reason it got

2     picked up in the news is that these things, which were

3     pervasive in the dark corners Internet like 4chan, they were

4     not pervasive in the "land of normies" as the defendant would

5     call it.  What called attention to this scheme such that it

6     was covered by the Washington Post and CNN, was the break out

7     from places like 4chan, places like the Daily Stormer, and the

8     message group where the defendant was part of where these were

9     formulated, was people like the defendant sending it out who

10    had an enormous influence.

11         THE COURT:  I think the focus of Mr. Frisch is not

12    that these things were happening, it's that the Clinton

13    campaign knew about it.

14         Do you have a response to that?

15         MR. PAULSEN:  My reading of the 302s and the

16    interviews I sat in, was that this particular intern saw it

17    quite earlier than most people.  That people in the campaign

18    who were very busy obviously in the last two weeks of a

19    campaign, some took it more seriously than others, but

20    eventually the people in the campaign who handled text

21    codes -- that's what this scheme related to -- took it

22    seriously and acted in the days before the defendant acted.

23    So some people took it more seriously than others, but the

24    campaign did formally respond in late October.

25         THE COURT:  But I'm just wondering, do you have a

PROCEEDINGS                                    629

1    response about whether the campaign's view of this is

2    exculpatory?

3              MR. PAULSEN:  I had don't see how it could be, your

4    Honor.

5              THE COURT:  The third thing -- or one thing is that

6    counsel says that Mr. Mackey's goal was to rile up the Clinton

7    campaign, and these reactions are proof that the Clinton

8    campaign was riled up.

9              MR. PAULSEN:  Your Honor, part of the reason we

10   provided the 302s we did, is that we heard his opening

11   argument, at the same time everyone did, and he made something

12   like that argument.  We turned them over at that point because

13   it seemed like he was interested in that.

14             But if his secret agenda, or so he claims, was to

15   frustrate the Clinton campaign, that's still not relevant to

16   the charge he's facing here.  It doesn't change his intent in

17   terms of the Government's burden here.

18             I don't know how that -- whether the campaign did or

19   did not respond to his provocation would actually be

20   exculpatory to the -- if he meant to, did it for that reason,

21   it doesn't matter if the campaign responded.  If they

22   responded too aggressively and he didn't mean that, that

23   wouldn't matter either.  The response of the purported victim

24   is not going to be relevant to his intent, certainly not to a

25   degree that it's Brady material.

PROCEEDINGS                                    630

1          THE COURT:  Forgive me if I don't have this exactly

2     right.  I believe, although I'm not 100 percent certain, and

3     Mr. Frisch you can correct me, that your position is the

4     Clinton campaign is a victim, although not for purpose of the

5     statute, is either a victim or a surrogate for the voters who

6     are the victims.

7          MR. PAULSEN:  I don't believe we've taken that

8     position, your Honor.  The Clinton individuals were presented

9     here because they are the individuals who saw this, responded

10    to it, and set up the response such that when did people did

11    start texting the code they would get this warning sign.  They

12    are there as part of the four-person Rocketto to Cotler to

13    Chesley to Samiri group, that actually thwarted this, I would

14    say.  That's why they were offered.

15         I think you're correct that I guess because

16    candidate Clinton was running against candidate Trump and she

17    was affected by this, you can see her as a victim.  But for

18    the charge itself, the conspiracy against rights, is the

19    rights of voters not the rights of a campaign.

20         THE COURT:  All right.  Then to a practical

21    question.  I know, Mr. Frisch, you think there is nothing that

22    can cure this.  Although, I have to say, I don't find that

23    particularly persuasive.  Because the Government hasn't

24    rested, we have at least three options, four options that can

25    address what your concerns are, putting aside the question of

PROCEEDINGS                                            631

1    Brady, which I'll address in a minute.

2            The first option, as I said, is to have the

3    Government recall Ms. Rocketto for additional

4    cross-examination on these topics, or the other person that

5    testified.

6            The second option is to make one or more of these

7    witnesses available for Mr. Frisch to call on his direct case.

8            The third option is for the Government to call one

9    or more of these witnesses as part of their case.

10           And the final option is for the parties to attempt

11   to enter into some kind of a stipulation.  This seems to me to

12   be the most obvious solution.  Because if the claim is that

13   these different aspects or different members of the Clinton

14   campaign reacted in different ways, and they don't all seem to

15   have been united in their reaction, at least from my review of

16   the 302s, seems to me like it's not a huge deal to craft some

17   kind of a stipulation.

18           But there are these four options, even if I were to

19   conclude that this was Brady material.  Just to sort of put

20   this in, to frame this in terms of what the Government's

21   burden is under *Brady against Maryland*:  That the Government

22   has a duty to disclose all material evidence favorable to a

23   criminal defendant.  It includes not just exculpatory

24   information but also any information that could be used to

25   impeach Government witnesses.

PROCEEDINGS                          632

1          And the question is, the three elements are:

2    Whether the Government either willfully or inadvertently

3    suppressed material information.

4          The second is that the information is material

5    because it is exculpatory or because it is impeaching.  And as

6    a result, that the defendant suffers prejudice.

7          The first question is whether the information was

8    suppressed.  It's been turned over, and it was turned over

9    after openings, but I guess to the extent there is a

10   suppression argument, the claim is that it's because the

11   information was turned over after openings and after

12   Mr. Rocketto testified.

13         The second question is whether it's material.  If

14   there is a reasonable probability that if the evidence were

15   disclosed the result would be different.  This requires a

16   prediction of whether the information has the ability to alter

17   the outcome.

18         And related to the suppression issue, is the

19   question of the Court considering the timing of the disclosure

20   and whether the defense had a reasonable opportunity, either

21   to use the evidence in the trial or to use information to

22   obtain evidence for use in the trial.

23         So the first issue is whether this is material.  And

24   as Mr. Frisch has expressed it, it's material not because he

25   wasn't -- let's just take -- I think the materiality questions

PROCEEDINGS                                    633

1    all center around what various parts of the Clinton campaign,

2    either thought or didn't think, about these particular

3    postings, that's one aspect of it.  The second aspect of it is

4    that the Clinton campaign knew, or at least members of it,

5    knew that these memes were pervasive on Internet.

6                (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                                    634

1          THE COURT:  The third assertion is that since Mr.

2    Mackey is going to, it's his position that he only did this to

3    rile up the Clinton campaign, that evidence that it actually,

4    people were concerned about it, proves his point.

5          And then the other argument is that the reason why

6    the Clinton's reaction to this or the Clinton campaign's

7    reaction to this is because they, I think the argument is that

8    they stand in the shoes of the victims that were perspective

9    voters.  So it's the Court's view that it's not Brady material

10   because it amounts to really, the essence is what the Clinton

11   campaign thought about it, and that's just not relevant.  In

12   fact, their opinion of it is no more valid than their opinion

13   would be about whether Mr. Mackey is guilty or not.  That's

14   not relevant, to the extent that's the claim.

15         I do not find this issue that the Clinton campaign

16   is somehow a surrogate for voters makes a campaign employees

17   sense of what was happening Brady material.  And then as to

18   the question of whether Mr. Mackey riled up the Clinton

19   campaign, I don't think that's Brady material.  I think it

20   doesn't take a huge leap of common sense to figure that

21   something like that would rile up the Clinton campaign.  But

22   whether it did or didn't, whether it had that effect or not,

23   is not Brady material.  Beyond that, even if there were Brady

24   material, which I find that it was not, I've already outlined

25   the four options, and there may be more, that could be taken

*ToniAnn Lucatorto RPR, RMR, CRR*

PROCEEDINGS                                           635

1    to address Mr. Frisch's concerns.

2              As I said, we, the Government has not rested, the

3    defense obviously hasn't put on a case.  So those are the four

4    things that can be done if Mr. Frisch wants to take advantage

5    of them.  And I suggest we take a little recess to discuss

6    what those options are.  And if you, you know, if you can

7    agree on a stipulation that this was something that you know,

8    for example, the concern that people in the Clinton campaign

9    were concerned, some people were, that would answer the

10   question of whether Mr. Mackey succeeded in upsetting people

11   in the Clinton campaign or distracting them or whatever the

12   claim was.  The fact that people certain people in the Clinton

13   campaign were aware of it, to me, seems like something that

14   could very easily be part of the stipulation.  But

15   stipulations require both sides to agree.  And so if that's

16   not a possibility and the Government is able to call some of

17   these witnesses, or one or more of these witnesses, or recall

18   the witness for cross examination to the extent Mr. Frisch

19   feels that he was limited because he didn't have this

20   information, that's another option.  So we're going to take a

21   recess for about 20  minutes and then you'll let me know what

22   your conclusion is, okay?

23             MR. PAULSEN:  Thank you, your Honor.

24             (A recess was taken at this time.)

25             (In open court.)

*ToniAnn Lucatorto RPR, RMR, CRR*

PROCEEDINGS                              636

1          (JUDGE ANN DONNELLY enters the courtroom.)

2          COURTROOM DEPUTY:  All rise.

3          THE COURT:  Please be seated.

4          All right.  My courtroom deputy tells me that you've

5    finished your discussion.  What have we decided.

6          MR. PAULSEN:  Yes, your Honor.  I believe you laid

7    out four options.

8          THE COURT:  Yes.

9          MR. PAULSEN:  First, recalling Ms. Rocketto, the

10   defense does not want that.

11         THE COURT:  Okay.

12         MR. PAULSEN:  Option two, the defendant does not

13   want to call Ms. Rocketto.

14         THE COURT:

15         MR. PAULSEN:  And third, I don't believe defendant

16   wants to call any of the other witnesses either.  So we are

17   left with option four, the stipulation.

18         THE COURT:  Okay.

19         MR. PAULSEN:  I'm not optimistic we will find a

20   common ground on this, but we are certainly willing to try.

21   But I think we would need the afternoon because it sounds like

22   the defense does not want to narrow the stipulation down to

23   one factor, they want a number of things from various

24   different reports.  The Government is unwilling to do that

25   without proper context, so we're willing to try but I'm not, I

PROCEEDINGS                                637

1   think we may be asking to come back tomorrow morning on the

2   same spot.

3          THE COURT:   Well, I don't think the stipulation

4   needs to be done before we move on with the case because it's

5   a stipulation.  So it's both sides agreement.  So obviously  a

6   stipulation requires agreement by both sides, but I just would

7   encourage the parties to consider -- I mean, it was pretty

8   clear to me the topics that counsel wanted to include.  And

9   I'm must say, maybe it's just me, they don't strike me as

10  particularly controversial and there could be other context

11  that goes into that.  I mean, the reason I don't think they're

12  controversial is because I don't think it's  Brady material.

13  But I do think it's possible to craft a stipulation.

14          But let me just confirm with Mr. Frisch that you

15  don't wish to have the Government recall any witnesses; is

16  that correct?

17          MR. FRISCH:  Correct.

18          THE COURT:  And you don't wish to call these 302

19  witnesses on your own, right?

20          MR. FRISCH:   Correct.

21          THE COURT:  And then --

22          MR. PAULSEN:  It was reopen cross examination.

23          THE COURT:  You don't want to reopen the cross of

24  Rocketto.  And then, so you're going to work on a stipulation?

25          MR. PAULSEN:  Yes, your Honor.

PROCEEDINGS                                638

1          THE COURT:  Well, maybe it's a triumph of hope over

2   experience, but I think you can probably work something out.

3   All right.  How are we on jurors?

4          THE COURTROOM DEPUTY:  Judge, I'm going to have to

5   check.  They weren't all there.

6          THE COURT:  We were missing 1 or 2, so Ms. Greene is

7   going to check.  I think next steps you're resting, the

8   Government?

9          MR. PAULSEN:  Yes, your Honor.

10          THE COURT:  And then I think you said that what your

11   preference to do in terms of motions to dismiss at the end of

12   the case.  I can't remember what you said your intended

13   preference was.  It was to do them later or to do them in

14   writing?  I don't remember.

15          MR. FRISCH:  For now, to do a placeholder to make

16   the motion, to treat it as having been made, and then address

17   it or -- address it orally or brief it at a later time.

18          THE COURT:  Okay.  Is that something that you would

19   like to just put on the record now,  even though they haven't

20   formally rested in front of the jury?  That would just obviate

21   the need to come in and go out again.

22          MR. FRISCH:  I can do that.  And the other thing is

23   that yesterday your Honor inquired as to the defense reference

24    with regard to the striking of that exhibit.

25          THE COURT:  Right.

PROCEEDINGS                                639

1        MR. FRISCH:  And the instruction on anonymity, and I

2   would ask that you do that sooner as opposed -- you do it

3   today.

4        THE COURT:  Oh, to strike that --

5        MR. FRISCH:  Exhibit and to give the instruction on

6   anonymity.

7        THE COURT:  I thought that was what your wanted on

8   the final charge.

9        MR. PAULSEN:  That's for the jury charge.

10       THE COURT:  Yes.

11       MR. FRISCH:  I never answered.

12       THE COURT:  I never proposed that.  You want me to

13  give a freestanding anonymity charge?

14       MR. FRISCH:  Well, my first preference is to strike

15  it, tell the jury to strike it, and to give the freestanding

16  anonymity charge.  And if you don't want to do that, just

17  strike the exhibit for now and do the charge.

18       THE COURT:  I think that's the best way to do it.  I

19  apologize, I misunderstood what your were asking me to do, I

20  forgot they were connected.  So it's Mr. Feldman, right?

21       MR. FRISCH:  Right.

22       THE COURT:  And I'm sort of free styling here.

23  During his testimony, what's the exhibit number?

24       MR. PAULSEN:  712.

25       THE COURT:  Okay.  So Exhibit 712, which was a

PROCEEDINGS                                      640

1    photograph.  Do you want me to describe it?

2              MR. FRISCH:  Yes.

3              THE COURT:  Okay.  A photograph of Mr. Mackey's

4    profile.  How do you describe it?  In shadow or something.

5              MR. FRISCH:  The profile photograph.

6              MR. PAULSEN:  Silhouette.

7              THE COURT:  Silhouette.  So what I'm going to say is

8    during Mr. Feldman's testimony, Exhibit Number 712 came into

9    evidence and it's a photograph of Mr. Mackey's profile in

10   silhouette.  And that I am striking that from the record and

11   any testimony about that exhibit.  And so you won't be

12   considering it.  How's that?

13             MR. FRISCH:  Good.

14             THE COURT:  Good?  All right.  And then how do you

15   want to do this.  We have the jury ready.  Do you want to make

16   your motion?

17             MR. FRISCH:   I can just repeat what I said a moment

18   ago.  With the Government about to rest and to, for the jury

19   and the Court's convenience, in anticipation of the Government

20   about to rest, I make my Rule 29 motion for the Government's

21   failure to make its case and I ask permission to either orally

22   argue it or brief it within the near future at a date to be

23   decided.  Later on today or perhaps tomorrow.

24             THE COURT:   Okay.  Do you want to respond,

25   placeholder wise?

Mackey – Direct – Frisch                    641

1          MR. PAULSEN:  Just a placeholder response.  We

2    oppose the motion and will do it in writing.  If he presents a

3    motion in writing, we will respond.

4          THE COURT:  All right.  So at this point, the

5    motion is denied with leave to supplement.  And then I'll

6    consider it at a later date.

7          All right.  With that, I think we are ready for the

8    jury; is that right?

9          MR. FRISCH:  Correct.

10         MR. PAULSEN:  Your Honor, there  was one other

11   motion the defendant made yesterday that I think he postponed

12   until now as well regarding the admissibility  of the

13   coconspirator statements.  Do you want to handle that at a

14   different time?

15         THE COURT:  Oh.  Well, we might as well handle it

16   now.  What's your position?

17         MR. PAULSEN:  We believe that we have laid a proper

18   foundation linking the various statements to a common

19   conspiracy.  I'm happy to address it in detail.  I'm prepared

20   to do so if your Honor wishes.

21
     OFFICIAL COURT REPORTER
22

23         THE COURT:  Do you have more that you want to say at

24   this point or do you want to incorporate that in your motions.

25         MR. FRISCH:  The latter.

*TONIANN LUCATORTO, RPR, RMR, CRR*

Mackey - Direct - Frisch                    642

1          THE COURT:  Okay.  So the motion is denied at this

2    point, again, with leave to supplement at a later date.

3          All right, let's get the jury.

4          (Jury enters the courtroom.)

5          THE COURT:  All right, good afternoon everybody.

6    Nice to see you again.  We are ready to continue with the

7    trial.

8          Let me ask the Government.  Do you have any further

9    evidence to put on.

10          MR. PAULSEN:  We do not, your Honor.  The Government

11    rests.

12          THE COURT:  Mr. Frisch, do you wish to put on any

13    evidence?

14          MR. FRISCH:  I do, your Honor.  I call Mr. Mackey.

15          (Witness takes the witness stand.)

16    **DOUGLASS MACKEY**, called as a witness, having been first duly

17    sworn/affirmed, was examined and testified as follows:

18          THE COURT:  Okay.  Mr. Mackey, I know you heard me

19    give this instruction to other witnesses, but it's important

20    that you follow it, too.  Please don't speak too quickly so we

21    don't make it too difficult for the court reporter.

22          If there's a question that isn't clear or you want

23    to have repeated, let me know.  And just do your best to

24    answer only the question you're being asked, all right?

25          THE WITNESS:  Yes, your Honor.

*TONIANN LUCATORTO, RPR, RMR, CRR*

DOUGLASS MACKEY – DIRECT – MR. FRISCH          643

1          THE COURT:  All right.  Go ahead.

2    DIRECT EXAMINATION

3    BY MR. FRISCH:

4    Q     Mr. Mackey, good afternoon.

5    A     Good afternoon.

6    Q     On January 27, 2021, where were you living?

7    A     I was living in Florida.

8    Q     And as of January 27, 2021 for how long had you lived in

9    Florida?

10   A     Almost three years.

11   Q     With whom were you living in 2021 in January?

12   A     I was living with two roommates.

13          THE COURT:  Mr. Frisch, I'm so sorry.  I neglected

14   to give that instruction.  Can I do that at this point?  You

15   said you wanted it done.

16          MR. FRISCH:   Oh, I beg your pardon.  I forgot it

17   too.

18          THE COURT:  So sorry about this folks, this is my

19   fault.  There was a witness who testified, Mr. Loren Feldman,

20   and during his testimony, an exhibit, which was 712 it was a

21   photograph of Mr. Mackey's profile silhouette.  I'm striking

22   that exhibit so you won't, it won't be part of your

23   deliberations, okay?  So I'm sorry that I didn't do that

24   first.  Go ahead.

25          MR. FRISCH:  Thank you.

*TONIANN LUCATORTO, RPR, RMR, CRR*

DOUGLASS MACKEY – DIRECT – MR. FRISCH          644

1    Q    So as of January  2021, with whom were you living?

2    A    I was living with two roommates.

3    Q    And did you and your two roommates live in a house or an

4    apartment in Florida?

5    A    We lived in an apartment building.

6    Q    That morning at about 7: 00 a.m., what happened?

7    A    We received a knock at the door they said it was the FBI.

8    Q    Had you been sleeping or were you awake at that time?

9    A    I was asleep at the time.

10   Q    And did the FBI explain why they were there?

11   A    They said that they had an arrest warrant.

12   Q    For?

13   A    For me.

14   Q    In total, about how many law enforcement officers were at

15   your apartment that morning, approximately?

16   A    There was about 8 to 10.

17   Q    Did they say why they were there to arrest you?

18   A    They didn't say.  I asked what for and they didn't say.

19   Q    Before January 27, 2021, had you ever been arrested?

20   A    No.

21   Q    Have you before arrest since?

22   A    No, I haven't.

23   Q    After the agents and the officers arrested you, did they

24   take you someplace?

25   A    Yes, they did.

DOUGLASS MACKEY - DIRECT - MR. FRISCH                645

1   Q    Where to?

2   A    They took me to the federal courthouse in West Palm

3   Beach.

4   Q    Before you arrived at the courthouse before you appeared

5   before a judge, had anyone told you why you were under arrest?

6   A    No.

7   Q    During your trip  to the courthouse, did you think that

8   you were under arrest for sharing the memes about vote-to-text

9   that this jury  has seen?

10  A    No.  I had no idea why I was under arrest.

11  Q    Did it even enter your mind that you were arrested in

12  connection with the memes that the jury has seen?

13  A    No.

14  Q    Were there agents -- did the 8 to 10 law enforcement

15  officers include FBI agents from New York?

16  A    Yes, they did.

17  Q    And do you know the names of any of the agents that were

18  from New York who were there?

19  A    Just one of them.  Maegan Rees.

20  Q    Did you come later that day at or after the time you were

21  before the judge to see the criminal complaint underlying the

22  warrant for your arrest?

23  A    Yes.  It was after I saw the judge.

24  Q    And who swore out the complaint?

25  A    It was Maegan Rees.

DOUGLASS MACKEY – DIRECT – MR. FRISCH          646

1   Q    Were you online as Ricky Vaughn?

2   A    Yes.  I was.

3   Q    For what period of time, what total period of time, were

4   are you online as Ricky Vaughn?

5   A    About four years.

6   Q    Beginning when?

7   A    Beginning in the early part of 2014.

8   Q    Now, the Government, if I remember correctly, has shown

9   the jury or read into the jury a stipulation about the various

10  Twitter accounts that you had as Ricky Vaughn.  Do you recall

11  that?

12  A    Yes, I do.

13  Q    Is that stipulation accurate?

14  A    Yes, it is.

15  Q    Before yesterday, had you ever seen Microchip?

16  A    No, I hadn't.

17  Q    Had you ever met him?

18  A    No.

19  Q    Ever spoken to him by telephone?

20  A    No.

21  Q    Was the entirety of your contact with him online?

22  A    Yes it was.

23  Q    Back in 2016, did you believe you had anything in common

24  with him?

25  A    Just the fact that we both supported Donald Trump.

DOUGLASS MACKEY – DIRECT – MR. FRISCH          647

1   Q    Other than that, did you have any idea what was going on

2   in his head?

3   A    No, I had no idea.

4   Q    Regarding people alleged in this case as coconspirators,

5   did you ever meet any of them?

6   A    No, I never met any of them.

7   Q    Did you ever speak to any of them by telephone?

8   A    No.

9   Q    On the Government 's case it presented 2 memes suggesting

10  vote-to-text.  I believe it's Government Exhibit 720 and 721.

11          Where did you find those?

12  A    I found those memes or 4chan.

13  Q    What's 4chan?

14  A    It's an internet messaging board.

15  Q    At any one time back in 2016, how many users were on

16  4chan?

17  A    I don't know exactly how many.  Probably was thousands

18  tens of thousands.  I'm not really sure.

19  Q    Can you give us a sense of how does 4chan work?  When you

20  open the 4chan program, whatever the right word to use; open,

21  access it, activate it, what do you see?  What's there?

22  A    They have different boards that you can click on and

23  within each board, there 's different threads that you can

24  click on.  If you go under the thread, then people make posts

25  which consist of images and texts or both.

*TONIANN LUCATORTO, RPR, RMR, CRR*

DOUGLASS MACKEY – DIRECT – MR. FRISCH          648

1    Q    So when you say a board or a thread, is that by topic?

2    A    Yes.  It's organized by topic.

3    Q    Exhibit -- Government Exhibit  720 and 721, did you share

4    those two memes late on November 1 st or --

5         MR. FRISCH:  Withdrawn.

6    Q    On November 1st or late that night?

7    A    Yes, I did.

8    Q    Mr. Mackey, did you share those two memes intending to

9    trick anyone about voting?

10   A    No, I did not.

11   Q    The Government also showed the jury Government

12   Exhibit 722.  Do you recall seeing that on or about November

13    2, 2016?

14   A    Yes, I do.

15   Q    And how did you come to see it?

16   A    The Twitter user @nia4_Trump mentioned me.  So when you

17   get a mention, it shows up in your notifications.  So when I

18   saw it in my notifications, I retweeted it.

19   Q    Can you explain what you mean by the person mentioning

20   you?

21   A    They wrote out the handle, which is at, followed by my

22   handle.

23   Q    So if someone tweets on -- if someone tweets something

24   that has your handle it in, you automatically are notified of

25   it?

DOUGLASS MACKEY – DIRECT – MR. FRISCH          649

1    A    Yes.

2    Q    And upon being receiving that notification of 722, you

3    retweeted it?

4    A    Yes, I did.

5    Q    Did you share or --

6           MR. FRISCH:  Withdrawn.

7    Q    Did you retweet that meme with intent to trick anyone

8    about voting?

9    A    No, I did not.

10   Q    Now, I think yesterday, maybe it was the day before, I

11   think it was yesterday, the Government showed the jury chats

12   and messages among other people online discussing vote-by-text

13   memes in 2016.  Do you recall seeing those chats and messages

14   in this courtroom?

15   A    Yes.

16   Q    Before you shared or retweeted the three memes that we

17   just talked about, had you seen those chats and messages that

18   the Government showed the jury?

19   A    No, I had not.

20   Q    When was the first time you saw them?

21   A    The first time I saw them was when the Government

22   provided us with the evidence that they held.

23   Q    And that means after you were arrested and after this

24   prosecution began, correct?

25   A    Yes.

DOUGLASS MACKEY - DIRECT - MR. FRISCH                650

1    Q    And the Government has an obligation to provide the

2    defense with its evidence, and that's when you saw it?

3    A    Yes.

4    Q    Did you share any memes with intent to threaten anyone's

5    right to vote?

6    A    No, I did not.

7    Q    To intimidate anyone's right to vote?

8    A    No.

9    Q    To oppress anyone's right to vote?

10   A    No.

11   Q    To injure anyone's right to vote?

12   A    No.

13   Q    Have you ever been affiliated with any political

14   organization?

15   A    No, I have not.

16   Q    Did anyone ever employ you to be Ricky Vaughn on Twitter?

17   A    No.

18   Q    Did anyone ever pay you to be Ricky Vaughn on Twitter?

19   A    No.

20   Q    Mr. Mackey, where were you born?

21   A    I was born in Washington, D.C.

22   Q    How old are you now?

23   A    I'm 33 years old.

24   Q    What kind of work did your father do when you were born?

25   A    He was working for a senator in D.C.

DOUGLASS MACKEY – DIRECT – MR. FRISCH          651

1   Q    He was working for a United States senator  in

2   Washington, D.C.?

3   A    Yes.

4   Q    A senator from what state?

5   A    A senator from Vermont.

6   Q    What kind of work did you mother do?

7   A    She was an orthopedic tech.  She worked in hospitals.

8   Q    Did you attend college?

9   A    Yes, I did.

10  Q    In what state?

11  A    Vermont.

12  Q    Did you earn a degree?

13  A    Yes, I did.

14  Q    What degree did you earn?

15  A    I earned a bachelor of arts in economics.

16  Q    Upon graduation did you work?

17  A    Yes, I did.

18  Q    For whom did you work?

19  A    I worked for a small company called John Dunham.

20  Q    And for the court reporter, that's D-U-N-H-A-M; is that

21  right?

22  A    Yes.

23  Q    For what period of time did you work for Dunham?

24  A    From 2011 through about June of 2016.

25  Q    What kind of business was Dunham?

DOUGLASS MACKEY – DIRECT – MR. FRISCH          652

1   A     He was in the business of economics consulting.

2   Q     And in the office in which you worked, how many people

3   worked in the office where you were?

4   A     About ten.

5   Q     What was your job?

6   A     I was an economics  analyst.

7   Q     You said you worked there, you said June of 2016?

8   A     Yes.

9   Q     What happened then?

10  A     Basically I was let go.  We came to an agreement that

11  they would give me several months pay and we would part ways,

12  so I agreed to that.

13  Q     Where were Dunham's offices?

14  A     Over here on Court Street.

15  Q     In Brooklyn?

16  A     Yes.

17  Q     About -- and you said --

18        MR. FRISCH:  Withdrawn.

19  Q     So you left Dunham in the June of 2016 period?

20  A     Yes.

21  Q     That was before the period of the charged conspiracy in

22  this case; which is September to November 2016, correct?

23  A     Yes.

24  Q     During the period of the charged conspiracy in this case,

25  September to November 2016, did you work at Dunham?

DOUGLASS MACKEY – DIRECT – MR. FRISCH          653

1    A    No.

2    Q    Did you live in this district?

3    A    No, I did not.

4    Q    Where did you live?

5    A    I was living in Manhattan.

6    Q    During the period of the charged conspiracy  in this

7    case, did you post anything online from this district, the

8    Eastern District of New York?

9    A    No.

10   Q    When you started your Twitter account, did you say 2014 ?

11   A    Yes.

12   Q    How old were you?

13   A    I was about 24 years old.

14   Q    How did you choose  the name Ricky Vaughn?

15   A    I just chose it randomly because I enjoined the movie

16   Major League.

17   Q    And Ricky Vaughn was a fictional character in the movie?

18   A    Yes.  Played by Charlie Sheen.

19   Q    Did he have a nickname?

20   A    Yes.  His nickname was The Wild Thing.

21   Q    Did you have what they call a Twitter avatar?

22   A    Yes, I did.

23   Q    What was your avatar?

24   A    It was a picture of Charlie Sheen wearing a red MAGA cap.

25   Q    And I think we've seen this, I think the jury has seen

DOUGLASS MACKEY - DIRECT - MR. FRISCH          654

1    this, but your Twitter avatar  appeared in the upper left

2    corner of your tweets.  Essentially a photograph of Charlie

3    Sheen wearing a red MAGA cap; is that right?

4    A    Yes.

5    Q    Can you say exactly in total how many tweets and messages

6    you sent as Ricky Vaughn between 2014 and 2016?

7    A    No, not exactly.

8    Q    Can you approximate it?

9    A    It would have to be hundreds of thousands.  I'm not

10   exactly sure how many.

11   Q    What's a chat group on Twitter?

12   A    A chat group is a private message group between three or

13   more Twitter users.

14   Q    How many people could be -- so three or more is the

15   minimum.  How many could be in a chat group?

16   A    I think it was up to 50 or so.

17   Q    Did you join chat groups on Twitter?

18   A    Yes.

19   Q    About how many?

20   A    Dozens.  I'm not sure exactly how many.

21   Q    Did you post memes on Twitter?

22   A    Yes.

23   Q    In 2015  and 2016, how often did you use Twitter?

24   A    I used Twitter every day.

25   Q    How often did you tweet or retweet or share memes?

*TONIANN LUCATORTO, RPR, RMR, CRR*

DOUGLASS MACKEY – DIRECT – MR. FRISCH                    655

1    A      Every day.

2    Q      How many times a day?

3    A      Typically hundreds of times per day.

4    Q      Did you use your real name on your Ricky Vaughn account?

5    A      No.

6    Q      Did you remain anonymous with regard to your name?

7    A      Yes, I did.

8    Q      Was there a reason for that?

9    A      Just because it's online.  And I think when it's a First

10   Amendment issue, sometimes anonymity might be better.

11   Q      Now, the Government showed the jury things from Twitter,

12   correct?  You saw the things that were shown, correct?

13   A      Yes.

14   Q      Was Twitter the only place that content about the

15   presidential election appeared in 2016?

16   A      No.

17   Q      What are some of the other places where it appeared?

18   A      Everywhere online.  It would be Facebook, Reddit, 4chan.

19   Mainstream media sources, everywhere.

20   Q      So you told us about 4chan.  What's Reddit?  And that's

21   R-E -D-D-I- T.  What's Reddit?

22   A      That's –– it 's like a text discussion board, mostly

23   with, like, they have a lot of threads where people can write

24   messages and respond back and forth.

25            THE COURT:   Can I just –– I just wanted to clarify.

DOUGLASS MACKEY - DIRECT - MR. FRISCH          656

1    Were you on these?  Is that how you know that the, that this

2    was the topic of discussion because you were on these various

3    sites?

4              THE WITNESS:  I was not really on Reddit.  I did use

5    it, I did have an account there at one point.  They didn't ask

6    me anything but I wasn't really a big user of Reddit.

7              THE COURT:  So I think probably just best to confine

8    yourself to things -- but did you actually see on Reddit this

9    was a topic on discussion?

10             THE WITNESS:  That what was?

11             MR. FRISCH:   The presidential election.

12             THE COURT:  The presidential election.

13             THE WITNESS:  Yes.

14             THE COURT:  So you knew that from reading?

15             THE WITNESS:  Yes.

16             THE COURT:  Sorry.  Go ahead.

17   Q    How many people -- can you say how many people were

18   posting content on these various social media, as far as you

19   can tell, about the presidential election of 2016?

20   A    I don't know.  Millions maybe.

21   Q    Did you consider Twitter to be a reliable source of

22   information?

23   A    No.

24   Q    Why not?

25   A    Well, I think there was all kinds of stuff on Twitter.

DOUGLASS MACKEY – DIRECT – MR. FRISCH          657

1  I think anyone using it would know that you can't believe

2  everything you see on Twitter.

3  Q    From your perspective  and from your experience and

4  understanding, was it common knowledge that you shouldn't

5  believe things that you saw on Twitter ?

6  A    Yeah.  You would have to check it out before you believed

7  anything you saw there.

8              MR. FRISCH:  I want to show you what I've marked for

9  identification as Defense C.  And if I can show it to the

10  witness first so he can identify it.

11             THE COURT:  Does the Government have a copy of it?

12             MR. FRISCH:  No.  I'm giving it to them now.

13             MR. PAULSEN:  Your Honor, I think we need a sidebar.

14             THE COURT:  Okay.  Let's go to the side with the

15  court reporter.

16             (Continued on the next page.)

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    658

1          (Sidebar conference.)

2          THE COURT:  What's your objection?

3          MR. PAULSEN:  So shortly after the defendant was

4    arrested, one of the things that popped up was people went

5    around and looked for other examples of people like this, and

6    they found  this woman that did something comparable on the

7    other side trying to promote.  And it was /TKPWEPBL it's

8    because this woman didn't get arrest, why exactly did Mr.

9    Mackey get arrested, I'm assuming that's where is he going.

10         MR. FRISCH:  That is incorrect.  We found this on

11   Twitter within the last month, it's still up.  And it, that's

12   reason enough to put it on about Twitter's, all the testimony

13   about how serious this is and Twitter has taken it off and now

14   you've got -- this kind of stuff is all over Twitter and I

15   think this goes, this undermines the Government's  argument,

16   the Government's theory of prosecution in a number of ways.

17         THE COURT:  All right.  Well, I mean, if we were

18   talking about a bank robbery and there was -- the defendant

19   was on trial for bank robbery, I know we wouldn't permit other

20   examples of bank  robberies to show that other people were

21   doing this.  That's not your intent, correct?

22         MR. FRISCH:  That is right.

23         THE COURT:  But forgive me for being dense, but the

24   fact that it was on the internet, it's unrelated to him.  Why

25   is it relevant and it's November 8th.

SIDEBAR CONFERENCE                    659

1          MR. FRISCH:  No, it's March 2, 2023, that's when it

2     was posted.  It's still up.  It was posted on Election Day and

3     it' s sill still up.  That's the argument.

4          THE COURT:  I see.  I guess that's an argument you

5     can rebut.  I guess the argument then is, you know, Twitter is

6     not, the police aren't working well enough, they aren't

7     solving other --

8          MR. FRISCH:  That's his argument and my argument --

9          MR. PAULSEN:  Your Honor, he can't just decide to

10    pluck other things and say you arrested  my guy.

11         MR. FRISCH:  That's not my argument.

12         THE COURT:  He's not going to say that and I'm not

13    going to permit that.  One of the arguments  this morning was

14    this is all over the place and that's what you opened on.  But

15    I know you're not going to make an argument about why didn't

16    they arrest this person.  And if you want to make an argument

17    that Twitter didn't go a good job of policing, you can

18    respond, okay?

19         MR. FRISCH:  Thank you, your Honor.

20         (Continued on the next page.)

21

22

23

24

25

*TONIANN LUCATORTO, RPR, RMR, CRR*

SIDEBAR CONFERENCE                                    660

1               (Sidebar Conference.)

2               THE COURT:  I think if these things are going to

3     come in -- is it Judge Garaufis that offered it or did I?

4               THE LAW CLERK:  Judge Garaufis.

5               THE COURT:  That a specific instruction about

6     Twitter being a private company and their actions, they are

7     not relevant.  So I will give that instruction.

8               As long as you're fine with it.

9               (End of sidebar conference.)

10              (Continued on the next page.)

D. MACKEY - DIRECT - MR. FRISCH                661

1              (In open court.)

2              THE COURT:  The objection is overruled go ahead.

3    BY MR. FRISCH:

4    Q    I'm going to put this on just for the witness to look at

5    and see if he can identify it.

6              Mr. Mackey, can you identify that?

7    A    Yes, I can.

8    Q    What is it?

9    A    It's a tweet from a democratic comedian named

10   Ms. Christina Wong.  She says --

11   Q    Before you testify, we have to get it into evidence

12   first.

13   A    Got it.  Yes, I recognize it.

14   Q    Did you see this on Twitter?

15   A    Yes.

16   Q    When did you see it on Twitter most recently?

17   A    March 2.

18             THE COURT:  Of this year?

19   Q    Of 2023?

20   A    March 2 of 2023.

21             MR. FRISCH:  I offer it.

22             MR. PAULSEN:  Your Honor, subject to the

23   Government's previous objection.

24             THE COURT:  It's in evidence.

25             (Defense Exhibit C, was received in evidence.)

D. MACKEY - DIRECT - MR. FRISCH                    662

1    BY MR. FRISCH:

2    Q    Again, I think on the upper part of this, I'm not sure

3    the jury can see it but, you see the date March 2, 2023, when

4    you saw this on Twitter, correct?

5    A    Yes.

6    Q    It shows on the bottom that it was posted November 8,

7    2016.  Do you see that?

8    A    Yes, I do.

9    Q    Thank you.  One of the things in evidence, and I believe

10   it's a Government Exhibit, the MIT research report about which

11   Dr. Chu and Mr. Powers testified.  Do you recall that?

12   A    Yes.

13   Q    Did you see the MIT study at the time when it came out on

14   February 23, 2016?

15   A    I don't think it was right away, but I saw it shortly

16   thereafter.

17   Q    In February or March 2016; is that fair?

18   A    Yes.

19   Q    Ms. Parshad, I don't remember the exhibit number, if you

20   could call it up.  Thank you.  If you could enlarge the bottom

21   part of the first page.

22           Your Honor, with the Court's permission this will be

23   the only exhibit I'm going to do this, I'm going to ask

24   Mr. Mackey to read aloud two very short portions of this.

25           THE COURT:  That's fine.

D. MACKEY - DIRECT - MR. FRISCH          663

1  Q    Could you read, if you can see it, I'm going to ask you

2  to read the short amount of text on the bottom.

3  A    Sure:  With super Tuesday just around the corner we know

4  one thing about this election, the most riveting in years.

5  But why?

6              I can't read that.

7              Why is this election different from everything that

8  came before.

9  Q    Ms. Parshad, if you could go to the top of the next page.

10  The top paragraph, Mr. Mackey, can you see that okay?

11  A    Yes.

12  Q    Read that top paragraph.

13  A    The obvious answer is the surprising lineup of final

14  contenders.  A year ago the idea that a Donald Trump or a

15  Bernie Sanders could have a serious shot at the White House

16  was unthinkable, especially to the quote "experts" working off

17  20th Century playbooks.  Now here we are and the real question

18  is how the dynamics of public opinion, and influence in

19  particular, have changed to make this new kind of politics

20  possible.

21  Q    Finally, if you could go, Ms. Parshad, the very bottom of

22  that page.

23              If you could just read that?

24  A    In short, the old influence hierarchy has been shattered,

25  replaced by a new mosaic of influence in which social media

D. MACKEY - DIRECT - MR. FRISCH                 664

1    play a growing role.

2    Q    Ms. Parshad, if you could go to page four of that

3    document.  If could you highlight the bottom right corner.

4          You see number 107 of the 150 top influencers Ricky

5    Vaughn?

6    A    Yes.

7    Q    You're right below Senator Elizabeth Warren of

8    Massachusetts?

9    A    Yes.

10   Q    If you go a little bit higher -- sorry lower.  I think at

11   101 is Cher?

12   A    Yes.

13   Q    If you go to page six at the very top.  There is a

14   picture of two people on this list, Vladimir Putin and Cher,

15   correct?

16   A    Yes.

17   Q    Thank you, Ms. Parshad.

18          Was there media coverage about Ricky Vaughn well in

19   advance of the presidential election of November 2016?

20   A    Yes.

21   Q    There is media coverage about you therefore, correct?

22   A    Yes.

23   Q    Using your avatar Ricky Vaughn, correct?

24   A    Yes.

25   Q    Do you recall the names at least of some the publications

D. MACKEY - DIRECT - MR. FRISCH                          665

1    that wrote articles about you in 2016 before the election?

2    A     From what I recall: Washington Post, Vice, Magazine,

3    Tablet Magazine.  There might have been others.

4    Q     Did you ever hear the term the deplorable free speech

5    activist?

6    A     Yes.

7    Q     What does that mean to you?

8    A     A term that I used, ironically, in my biography of my

9    Twitter account.

10   Q     If anyone looked at your Twitter bio, that's what they

11   would see?

12   A     Yes.

13   Q     Do you recall in 2016 whether any celebrities or

14   well-known people retweeted you?

15   A     Yes.

16   Q     Can you give some examples that you recall?

17   A     I recall Lou Dobbs and Rosanne Barr.  Those are the ones

18   I remember.

19   Q     Who is Lou Dobbs?

20   A     He's used to be a television personality.

21   Q     Did you consider yourself -- I think there was a chat to

22   this affect -- did you consider yourself, as a result of all

23   of this, a leader of sorts?

24   A     Yes, I did.

25   Q     I want to ask you, change the subject, I want to ask you

D. MACKEY – DIRECT – MR. FRISCH                    666

1    a question about what I said in opening statement, something

2    we call stuff posting.  I'm going to continue to call it that

3    so it's not to unnecessarily use offensive language.  Fair to

4    say you used language and said things as Rickey Vaughn that

5    were profane or were profanity?

6    A    Yes.

7    Q    Fair to say you used language and said things online that

8    were offensive.

9    A    Yes.

10   Q    In bad taste?

11   A    Yes.

12   Q    And sometimes crossed the lines of decency?

13   A    Yes.

14   Q    You don't dispute any of that, correct?

15   A    No, I don't dispute that.

16   Q    This term stuff posting, did you create the term?

17   A    No.

18        THE COURT:  Just to be clear, that's not what it's

19   called, right?  You're trying to be polite.

20        MR. FRISCH:  Yes.

21   Q    You did not create this term?

22   A    No.

23   Q    Was it essentially a Twitter term of art?

24   A    Yes.

25   Q    And what is your understanding of what that means?

D. MACKEY - DIRECT - MR. FRISCH                    667

1   A    To me it just meant posting a lot of stuff, just kind of

2   distract or get the conversation going, that kind of thing.

3   Q    In 2016, were you the only person stuff posting on the

4   Internet?

5   A    No.

6   Q    Any idea how many other people were the doing the same

7   thing?

8   A    Thousands, millions, I don't know how many exactly.

9   Q    Was there a lot of content online from people stuff

10  posting?

11  A    Yes, there was.

12  Q    Was there other content online about voting by text?

13  A    Yes.

14  Q    We saw in discovery -- rather, the jury saw on the chats,

15  some other terms of art I want to talk to you about those, see

16  if you know what they are.

17          I'm being polite, is there a term of art stuff Lord?

18  A    Yes.

19  Q    And is that a term that you coined?

20  A    No, it's not.

21  Q    Is it essentially an Internet term of art or was it an

22  Internet term of art?

23  A    Yes.

24  Q    What do you understand that it means, stuff Lord?

25  A    Just someone who is stuff posts I suppose.

D. MACKEY - DIRECT - MR. FRISCH                    668

1   Q    So essentially you would have been a stuff Lord, correct?

2   A    Yes.

3   Q    Were you the only stuff Lord in 2016?

4   A    No.

5   Q    You were one of many, many people doing that sort of

6   stuff, correct?

7   A    Correct.

8   Q    Another term that was in the Government's evidence was

9   stuff lib, I'm being polite.  Did you coin that term?

10  A    No, I didn't.

11  Q    Was that also a term that was used on the Internet?

12  A    Yes.

13  Q    What is your understanding of what that term meant?

14  A    A derogatory term for a liberal.

15  Q    Was there also online derogatory terms for conservatives?

16  A    Yes.

17  Q    I think yesterday, the day before, we saw a reference to

18  the word normie, is that a term that you coined?

19  A    No.

20  Q    Was it also a term of art or at least an Internet term of

21  art?

22  A    Yes.

23  Q    Was is a normie?

24  A    I think it's just someone who isn't really up to speed on

25  Internet lingo, doesn't spend a lot of time on social media,

D. MACKEY - DIRECT - MR. FRISCH                    669

1   that kind of thing.

2   Q    From your own knowledge and experience, were you familiar

3   in 2016 with any history in the United States about political

4   campaigns and how they are typically run?

5   A    Yes.

6   Q    Explain.

7   A    For as long as it's been around, it's been very ruckus, I

8   suppose.  They are always lying about each other.

9   Q    What do you mean by that?

10  A    The politicians are always lying about their opposition.

11  Q    And the campaigns?

12  A    Yes, I think so.

13  Q    So this didn't start, this kind of back and forth, didn't

14  start with the presidential election campaign in 2016,

15  correct?

16  A    No, it didn't.

17  Q    What was different was that it was on social media?

18  A    Yes, I think so.

19  Q    I want to talk about chat rooms.  When Agent Cunder was

20  testifying, Mr. Paulsen asked a number of questions about

21  whether you were in various groups or chat rooms at various

22  times.  Do you recall that testimony?

23  A    Yes.

24  Q    I want to focus on use of the word "in" in those

25  questions.

D. MACKEY - DIRECT - MR. FRISCH                    670

1              How many different groups or chat rooms were you a

2    member in 2016?

3    A    I don't recall exactly, but it was a lot.  It was dozens

4    or more than that, I'm not sure exactly.

5    Q    In every group or chat room of which you were a member,

6    did you read every chat and every message of those rooms and

7    groups of which you were a member?

8    A    No.  I think I would have been doing that all day if I

9    read every message.

10   Q    If you were in such a room; that is, if you were a member

11   or sometimes participated, did you have knowledge of

12   everything that other participants were saying?

13   A    No.

14   Q    Did you ever photoshop anything by yourself or do it

15   yourself?

16   A    No.

17   Q    Did you sometimes ask others to photoshop for you?

18   A    Yes, from time to time.

19   Q    Even if you did not ask people to photoshop things for --

20   even if you asked people to photoshop things for you, did you

21   share things online that had been photoshopped by other

22   people?

23   A    That other people had photoshopped?

24   Q    Correct.

25   A    Yes, I did share stuff that other people had

D. MACKEY – DIRECT – MR. FRISCH                671

1    photoshopped.

2    Q    For example, did you share any of the photoshopped pop

3    stars wearing read MAGA caps?

4    A    Yes, I did.

5    Q    Has it ever been your understanding, ever, that it was

6    illegal to share photoshopped pop stars wearing red MAGA caps?

7              MR. PAULSEN:  Objection.

8              THE COURT:  Sustained as to form.

9    Q    What was your understanding with regard to sharing those

10   photoshopped --

11             THE COURT:  In terms of his opinion about whether

12   something is legal, that's not a permissible question.

13             MR. FRISCH:  Fair enough, Judge.

14   BY MR. FRISCH:

15   Q    Did you share any of the photoshopped memes regarding

16   DraftOurDaughters?

17   A    Yes, I did.

18   Q    By the way, in the Government's complaint -- withdrawn.

19             What was your -- I think I just asked you, I just

20   lost my train of thought.  So you shared photoshopped

21   DraftOurDaughters memes, correct?

22   A    Yes.

23   Q    What was your intent?

24   A    Well, Hillary Clinton, she came out with a position that

25   women should register for the draft.  So I disagree with that

D. MACKEY - DIRECT - MR. FRISCH                                   672

1    politically.

2    Q    And, therefore, so what was your intent in sharing these

3    memes?

4    A    To call attention to her position, which is that she

5    wants or wanted to draft women into the draft, therefore,

6    maybe she would send them overseas to fight.

7    Q    What was your intent in sharing photoshopped pop stars

8    wearing MAGA Karrs?

9    A    A stuff post.  It was something to distract, might rile

10   up Twitter, might rile up who knows, the Hillary Clinton

11   campaign or supporters, something like that.

12   Q    When you were Ricky Vaughn on Twitter, did you sometimes

13   use terms of art that you understood were used by the

14   campaigns themselves?

15   A    Yes.

16   Q    So one of them was "turnout," you talked about voter

17   turnout, correct?

18   A    Yes.

19   Q    What is your understanding of turnout in connection with

20   presidential elections?

21   A    So my understanding is that turnout is one of the most

22   important things for the campaigns.  If their voters don't

23   turnout or their voters turnout a lot, it determines whether

24   they win or lose.

25   Q    Is that unusual for political campaigns to be concerned

D. MACKEY – DIRECT – MR. FRISCH                 673

1   about turnout?

2   A    No.  I think that's one of the things that they usually

3   spend time talking about.

4   Q    That's both getting their own voters to turnout, and

5   discouraging the voters of the other side from turning out; is

6   that correct?

7   A    Yes.

8   Q    Increasing the turnout of your voters, correct?

9   A    Yes.

10  Q    Was it unusual, in your experience and from your

11  knowledge and your understanding, to take steps to demoralize

12  the opponent's voters?

13  A    Yes.

14  Q    It's not unusual, correct?

15  A    It's not unusual.

16  Q    Both sides do it, correct?

17  A    I've seen both sides doing it, yes.

18  Q    In one of the posts that we saw, one of the chats or

19  messages that we saw, you made a reference to low information

20  voters.  Do you recall that?

21  A    Yes.

22  Q    Before I ask you what that means, and what you meant by

23  it, do you recall when in the calendar year of 2016 you used

24  that phrase?

25  A    I don't remember exactly, but it might have been the

D. MACKEY - DIRECT - MR. FRISCH                    674

1    first half of the year.

2    Q    In any event, the exhibit is in evidence and we can look

3    at it.  What did you mean by low information voters?

4    A    A term is thrown around on the media, people not paying

5    close attention to politics, they don't know a lot about the

6    candidates, the issues, et cetera.

7    Q    That's both sides of the political spectrum?

8    A    Yes.

9    Q    I should say all sides of the political spectrum,

10   correct?

11   A    Yes.

12   Q    Low information voters across the political ideological

13   range, correct?

14          THE COURT:  Mr. Frisch, could you please not lead

15   your witness.

16          MR. FRISCH:  Of course.

17   Q    What did you mean by it?

18   A    I believe that there are low information voters across

19   the political spectrum.

20   Q    Thank you.  You also talked about, I think on a number of

21   occasions, the election being on a knife's edge.  Do you

22   recall that?

23   A    Yes, I do.

24   Q    What did you mean by that?

25   A    Well, I think it was close in the electoral college.  And

D. MACKEY - DIRECT - MR. FRISCH                    675

1   a lot of my followers were Trump supports were very anxious.

2   I would tell them the election was close because I believed

3   it, and so they would go vote.

4           MR. FRISCH:  Give me one second, Judge.

5           THE COURT:  Sure.

6   BY MR. FRISCH:

7   Q    I want to show you what is -- Ms. Parshad, could you call

8   up 200-123.

9           Do you see that on the screen?

10  A    I see.

11  Q    Can you explain what this is?

12  A    This is a retweet of Microchip and it's saying -- you

13  want me to read it?

14  Q    With the Court's permission, yes.

15          THE COURT:  All right.

16  A    Heard from Hillary they have so many voters out there

17  that if you plan on voting for Hillary just stay home, you're

18  not needed #ElectionDay.

19  Q    What was your intent on retweeting this?

20  A    It's a stuff post.  To me this is, I wouldn't think

21  anyone would take this seriously.  I thougt it was funny.

22  Q    When you retweeted it, did you retweet it with the name

23  Ricky Vaughn at the top?

24  A    Yes.

25  Q    So anyone who would see this retweet would have seen your

1   name Ricky Vaughn at the top, correct?

2   A     Yes.

3   Q     And the red MAGA cap on the figure on the upper left?

4   A     Yes.

5   Q     By the way, the Government showed Agent Cunder a meme of

6   someone named I think Aziz Ansari holding a sign about voting

7   by text.  Do you remember seeing that?

8   A     I don't recall seeing that.

9   Q     Do you recall seeing it two days ago?

10  A     Yes.

11  Q     Did you see it at the time?

12  A     I don't recall.

13  Q     Who is Aziz Ansari?

14  A     A stand-up comedian.

15  Q     Did you have any reaction upon -- or don't recall if you

16  saw it in 2016, correct?

17  Q     You saw in discovery in this case, correct?

18  A     Yes.

19  Q     Did you have any reaction upon seeing it?

20  A     It looks silly to me.

21  Q     Now, let me ask Ms. Parshad to call up, if you could call

22  up 200-73 and 200-74.  We'll do each at a time, start with

23  200-73.

24          MR. FRISCH:  One moment, your Honor, apparently they

25  are in evidence under a different number.

D. MACKEY - DIRECT - MR. FRISCH                677

1          THE COURT:  Sure.

2          MR. PAULSEN:  Your Honor, he has an older version

3     we're just trying to match it up.

4          THE COURT:  It's all right.

5          MR. FRISCH:  I'm going to move on to something else;

6     apparently these didn't come into evidence.

7          THE COURT:  Okay.

8     BY MR. FRISCH:

9     Q    Can we turn to 410-11.  While Ms. Parshad is looking for

10    that, did the sharing of the memes on November 1st into

11    November 2, 2016 cause publicity, result in publicity?

12    A    The two memes?

13    Q    Yes.

14    A    Yes.

15    Q    So now I want to go back to October 30, 2016.  You posted

16    your first one on November 1st, 2016, correct?

17    A    Yes.

18    Q    So the chat that's on the screen, which is 410-11, did

19    you see, do you recall seeing this at the time?

20    A    This chat?

21    Q    Correct.

22    A    No.

23    Q    You're familiar, however, as you've testified, with the

24    DraftOurDaughters type memes, correct?

25    A    Yes.

D. MACKEY - DIRECT - MR. FRISCH                    678

1   Q    So if you look at the line underneath it, it says:  And

2   Buzzfeed took the bait.  LOLOLOL.  Do you see that?

3   A    I do.

4   Q    LOL, essentially laugh out loud, correct?

5   A    Yes.

6   Q    In the context of this world with which you were

7   familiar, what does that mean:  Buzzfeed took the bait

8   LOLOLOL?

9            MR. PAULSEN:  Objection, your Honor.

10           THE COURT:  Sustained.

11  Q    Was one of the purposes of sharing the memes to get

12  publicity?

13  A    Yes.

14  Q    Do you recall the publications that published stories

15  about the memes on November 2 and thereafter?

16  A    Are you referring to the DraftOurDaughters memes or the

17  later memes?

18  Q    Later memes.

19  A    Mashable, Buzzfeed, Wired, CNN.  I think there were

20  others.

21  Q    If we could turn to 410-20.  If you highlight the top

22  portion.  Do you see that reference there to CTR?

23  A    Yes.

24  Q    Do you know what that stands for?

25  A    I do, yes.

D. MACKEY - DIRECT - MR. FRISCH                    679

1   Q     What does it stand for?

2   A     Correct The Record.

3   Q     In the context of this meme, do you know what CTR means,

4   or what Correct The Record is?

5   A     Yes, I do.

6   Q     Explain?

7   A     Correct The Record was a Hillary Clinton super pack that

8   was essentially her online troll army.  They would go around

9   commenting on posts, replying to posts, that kind of thing.

10  Q     Do you recall the testimony of Omar Samiri on the

11  Government's case?

12  A     Yes, I do.

13  Q     Do you recall the spreadsheets that the Government

14  introduced into evidence through him?

15  A     Yes.

16  Q     And what was your understanding or what is your

17  understanding of those spreadsheets; that is, generally

18  speaking, what do those spreadsheets show?

19  A     They showed that people started texting the number on

20  October 29, that it was less than 100 people texted the people

21  before I posted the two memes.  After I posted the two memes,

22  roughly about 100 more people texted the number.  And then the

23  story was picked up by Robert McNees and later Buzzfeed, Wired

24  Mashable, et cetera, at which point about 4,800 more people

25  texted the number.

D. MACKEY - DIRECT - MR. FRISCH                    680

1    Q    Your testimony is based on your review of the

2    spreadsheets about which Mr. Samiri testified about, correct?

3    A    Yes.

4              THE COURT:  Let's not lead the witness.

5    Q    What was your -- I don't mean to.

6              So the record is clear, the testimony you just gave,

7    what is it based on?

8    A    Based on the spreadsheet that the Government provided to

9    us that were created by Omar Samiri.

10   Q    Thank you, Mr. Mackey.

11             Ms. Parshad would you call up 400-41.

12             Did you participate in this chat?

13   A    Yes, I did.

14   Q    Do you see the bottom where it says:  Return of RV.  And

15   above:  The return of RV?

16   A    Yes.

17   Q    That's you?

18   A    Yes.

19   Q    Do you see where it says:  Voter misinformation LOL?

20   A    Yes.

21   Q    Then the next one says:  Ricky?

22   A    Yes.

23   Q    Next one says:  Ha ha ha so awesome?

24   A    Yes.

25   Q    Then you say:  LOLOLOL, correct?

D. MACKEY - DIRECT - MR. FRISCH                681

1   A    Yes.

2   Q    Can you explain this and why you wrote what you did?

3   A    Yes.  So we were discussing that the media had picked up

4   the story and they were calling it voter misinformation.  And

5   I said LOL, because I thought it was funny that the media

6   thought that this was an attempt to deceive voters, not just a

7   ridiculous post that no one would possibly believe that you

8   could text by vote.

9   Q    Thank you, Ms. Parshad.

10         Do you recall, are you able to say approximately

11  what dates and times that you shared the two memes that are

12  Government Exhibit 720 and 721?

13  A    Yes.

14  Q    Tell us.

15  A    The first one was on November 1st approximately five or

16  5:30 p.m.  The second one was on November 2, just after

17  midnight around 12:30 a.m. eastern time.

18  Q    From the time that you -- where did you see these memes?

19  A    I saw these memes on the messaging board 4chan.

20  Q    From the time that you saw these two memes on 4chan until

21  the time that you shared them, how long did that take?

22  A    It was a split second.  I just copied and pasted it from

23  4chan over to Twitter.

24  Q    Did you deliberate about doing so before you did it?

25  A    No, I didn't.

D. MACKEY - DIRECT - MR. FRISCH                    682

1    Q    Discuss it with anyone before sharing them?

2    A    No, I did not.

3    Q    Were you posting other things about the same time,

4    posting or sharing or messaging around the same time?

5    A    Yes.

6    Q    About how much other stuff?

7    A    That day it was about 300 between retweets and tweets.

8    Q    Looking back at that moment, do you recall exactly what

9    you were thinking or what you are thinking?

10   A    I don't recall exactly what I was thinking.  But it was

11   sort of a shit post, like let me post these on Twitter, see

12   what happens, see if anyone picks it up, see if it goes viral.

13   Maybe even the media will pick it up, the Clinton campaign,

14   and then it rile them up, get under their skin, get them off

15   their message that they wanted to push.

16   Q    Before you shared these two memes, how many memes like

17   this or similar to this did you see online?

18   A    I saw quite a few.

19   Q    Did you have any particular reason to believe when you

20   saw and shared these particular memes that they had been put

21   thereby Microchip?

22   A    No, I had no idea.

23   Q    Did you share these two memes with any of the groups of

24   which you were a member?

25   A    No.

D. MACKEY - DIRECT - MR. FRISCH                683

1    Q    Had you ever shared any memes with groups of which you

2    were a member?

3    A    Yes.

4    Q    How often?

5    A    Quite often I think.

6    Q    I want to show you -- can I use your charts?

7         Let me start by showing you 721, I'll do it from

8    here.

9    A    I can see it.

10   Q    This is one of the two that you saw and shared?

11   A    Yes.

12   Q    Is this the one that you shared at about five or so in

13   the afternoon or after midnight on November 2?

14   A    After midnight.

15   Q    So it would have been -- withdrawn.

16        Do you see down here, I know it's in Spanish but it

17   says November 8, do you see that?

18   A    Yes.

19   Q    There is a stipulation of what the English language

20   translation is, do you remember seeing that?

21   A    Yes.

22   Q    Essentially, I'm paraphrasing, it says you can vote by

23   text on November 8.  Do you I have that essentially right?

24   A    Yes.

25   Q    If you had been trying to trick anyone, would you have

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

D. MACKEY - DIRECT - MR. FRISCH                    684

1    shared on November 1 telling people they could text on

2    November 8?

3              THE COURT:  Please don't lead the witness.

4              MR. FRISCH:  Yes, your Honor.

5    Q    Fair to say you were not intending to trick any voters by

6    sharing that meme; is that right?

7    A    Yes.

8    Q    Let me show you what is 720.  This is the other one that

9    you saw and shared?

10   A    Yes.

11   Q    When you saw and shared it, did it have this avatar and

12   this language in the upper left?

13   A    Yes, it did.

14   Q    So tell us about that avatar, what is that?

15   A    That's Charlie Sheen playing the Ricky Vaughn character

16   except it's photoshopped to have a Make American Great Again

17   hat on, and a mask from the character Bane from Batman.

18   Q    Who is Bane?

19   A    Bane was one of the villains in Batman.

20   Q    Why did you put the Bane mask on, or post this with the

21   Bane mask?

22   A    Sort of a meme.  If you're suspended, your account was

23   suspended, you would come back the next one with a Bane mask

24   on.

25   Q    The words Publius Gaius, what does that mean?

D. MACKEY - DIRECT - MR. FRISCH                685

1   A    That doesn't mean anything, it's just random Latin words.

2   Q    You posted that, correct?

3   A    Yes.

4   Q    When you shared these, what would the affect have been if

5   sharing it with the avatar of the Bane mask with the MAGA cap?

6   A    Well, I don't see how anyone could possibly take that

7   seriously as voting --

8            MR. PAULSEN:  Objection, your Honor.

9            THE COURT:  Sustained.

10  BY MR. FRISCH:

11  Q    When you retweeted or shared this, did you anticipate

12  that the recipients would see the avatar?

13  A    Yes.

14  Q    Is it possible that they could not have seen the avatar?

15  A    No.

16  Q    Would there have been a way for this to be disseminated

17  further on the Internet or on Twitter without the avatar?

18  A    Someone would have to screenshot it, taking out the

19  avatar, or copy and paste it and post it elsewhere.

20  Q    At the time did you think that's would happen?

21  A    No.

22  Q    What about the hashtags on these two.  The one that says

23  #ImWithHer and #GoHillary, were they there when you saw them?

24  A    Were they there when I saw?

25  Q    When you saw these memes on 4chan with the hashtag, did

D. MACKEY - DIRECT - MR. FRISCH                    686

1    you put them on?

2    A    I put them on.

3    Q    Why?

4    A    The Hillary Clinton campaign is constantly monitoring

5    their hashtag.  If I put the hashtags on, then maybe they

6    would freak out about it, or they would have to spend time

7    dealing with it rather than focus on their campaign.

8    Q    The third one, you testified about this earlier.

9    A    Yes.

10   Q    Do you recall when you retweeted this one?

11   A    November 2.

12   Q    And this is different from the other two in the way that

13   you transmitted them; is that correct?

14   A    Yes, it was retweet.

15   Q    Do you see in the upper left it says: @TheRickyVaughn

16   thanks for spreading the word?

17   A    Yes, that's a mention.

18   Q    So explain again what you mean by, it's a mention?

19   A    It says @TheRickyVaughn, that's a mention.  So you get a

20   notification from Twitter that somebody has mentioned you in a

21   tweet.  And so you can do what you like once you see the

22   tweet.

23   Q    That's how you came to receive it, correct?

24   A    Yes.

25   Q    That is when you retweeted it, correct?

D. MACKEY - DIRECT - MR. FRISCH                    687

1    A    Correct.

2    Q    There were chats that the Government introduced where the

3    terms fam and team were used.  Do you recall those?

4    A    Yes, I do.

5    Q    Do you recall using those terms?

6    A    Yes.

7    Q    Why did you use those terms?

8    A    Those are just terms of endearment essentially.

9    Q    Did you believe you had any kind of silent agreement with

10   Microchip?

11   A    No.

12   Q    Of any sort?

13   A    No.

14   Q    When did you first move to Florida?

15   A    April of 2018.

16   Q    Why did you move to Florida?

17   A    I had been doxed in the media.  I needed to make a

18   change, and so that's what I did.

19   Q    What happened?  Why Florida?

20   A    Florida had a program that I wanted to enter into, like

21   an intensive, like psychotherapy program so I could try to

22   turn my life around basically.

23   Q    Was it in-patient or out-patient?

24   A    It was in-patient.

25   Q    For how long were you in the in-patient psychotherapy

D. MACKEY - DIRECT - MR. FRISCH                    688

1    program?

2    A    Two months.

3    Q    When the two months of in-patient ended, did the

4    psychotherapy end?

5    A    No, it didn't.

6    Q    What happened then?

7    A    Then there is out-patient psycho therapy after that.

8    Q    Did you continue to live in Florida?

9    A    Yes, I did.

10   Q    How were things going for you in January 2021 before your

11   arrest?

12   A    I think things were going pretty well.  I had met a nice

13   women that I wanted to marry.  I had put a lot of things from

14   my past away.  I was trying to change my life, do the right

15   thing.  And I was in the process of making amends for some of

16   the things I had done wrong in the past.

17   Q    What happened in January 2023?

18   A    That's when I got married.

19   Q    You and your wife have any children?

20   A    No, we do not; but we have one on the way.

21   Q    On January 27, 2021, after the agents took you to the

22   judge in Florida in the West Palm Beach courthouse, how did

23   you plead to the charge against you?

24   A    I pled not guilty.

25            MR. FRISCH:  Your Honor, I have nothing else.  Thank

PROCEEDINGS                                    689

1    you.

2              THE COURT:  Ladies and gentlemen we'll take a few

3    minutes so you can stretch your legs.  Do not talk about the

4    case at all.  Don't let anybody approach you about the case

5    don't look anything up.  We'll see you in 15 minutes.

6              (Jury exits the courtroom.)

7              THE COURT:  The witness can step down.

8              (Whereupon, the witness steps down.)

9              Everyone can have a seat.

10             THE COURT:  Anything before we break?

11             MR. PAULSEN:  Yes, your Honor.  Yesterday we

12   discussed some communications with Amy Stephen.  And I have

13   some, I was going to share with your Honor and defense counsel

14   beforehand.  We will be showing the defendant a number of his

15   own statements which fit within the parameters of what has

16   been permitted already.  These are new, I wanted to share them

17   ahead of time.

18             THE COURT:  Does Mr. Frisch have them already?

19             MR. PAULSEN:  We're going to give it.

20             THE COURT:  Why don't you give him those.  I may

21   have seen some of these, but I'm not positive.

22             MR. PAULSEN:  Some of them were the materials that

23   Judge Garaufis had.

24             THE COURT:  I have those.  All right I think it

25   makes sense to take -- I know you've seen these before.  Do

PROCEEDINGS                                    690

1    you want to take a minute?

2              MR. FRISCH:  I do, yes, thank you.

3              MR. PAULSEN:  Your Honor, the red things were things

4    we're proposing to redact, but we wanted your Honor to see

5    what was there.

6              MR. FRISCH:  I will have objections to these, your

7    Honor.

8              THE COURT:  All right.  We can take them one at a

9    time it seems to me.

10             Can I just, I want to make sure I understand,

11   because I think some of this happened before Judge Garaufis

12   but I think there is voluminous material that the Government

13   has agreed not to use that is quite incendiary.  And I just

14   think probably this conversation has to take place in the

15   context of all of the materials that are not being used.  I've

16   done a review of some of it, but there is a lot of it.  I'm

17   keeping that in mind.

18             Why don't we start with this first page, which is

19   1004.  The first page of 1004.

20

21             (Continued on next page.)

22

23

24

25

PROCEEDINGS                              691

1          THE COURT:  Any objection to that?

2          MR. FRISCH:  I do.

3          THE COURT:  What's the objection?

4          MR. FRISCH:  First is the language in red

5    highlighted.  I have to see what the questioning is.  I mean,

6    I didn't I didn't go into Amy Stephens at all on my direct, so

7    I have to see what the question is.

8          THE COURT:  I think, if I recall correctly, this is

9    meant to be responsive to the questions you asked

10   Ms. Stephens, which included whether he was respectful,

11   polite, and a good kid.

12         MR. FRISCH:  Well, the good kid I think you struck.

13   You sustained it and took it out.

14         THE COURT:   That may be, but you did ask the

15   question.  Go ahead.

16         MR. FRISCH:   And the others have to do with the

17   context of his statement and her perception of him.  I think

18   this is not about, it doesn't, this does not contradict what

19   her perception is of him.  The fact that he may have had this

20   conversation about her our outside of her earshot or outside

21   of her ability to observe seems, to me, does not really prove

22   very much in her presence.  He was respectful, insightful, and

23   thoughtful.

24         THE COURT:  And this is just talking about her

25   behind her back basically, right?

PROCEEDINGS                              692

1          MR. FRISCH:  That's how I read it.

2          MR. PAULSEN:  Your Honor, there's that, but also on

3   direct, defense counsel elicited the fact that the defendant's

4   MAGA hat was visible on some of his tweets.  Part of this

5   discussion is they essentially recruited Amy Stephens with the

6   positive objective that, essentially, that their message would

7   be laundered through  her because she was followed a large

8   crowd of people that were unlike the defendant.  They discuss

9   it in detail.  I think he says I underestimated how important

10  her conversions was.  10,000 followers  were white people.

11  They essentially seduce her and use her to push their messages

12  further.  The fact they were also unkind to her behind her

13  back I think is relevant to other questions.  But frankly, I

14  think it's all relevant, your Honor.

15          THE COURT:  On the first page, there's something

16  that you've agreed to take out, which should be taken out.

17  There's -- I'm now looking at -- this will be the fourth

18  page, the top I think.

19          MR. FRISCH:  I'm sorry, Judge, I lost you.

20          THE COURT:  It's four, page four of the exhibit.

21  There's a three helpfully placed next to it, but I don't think

22  that's it.  So I'm just going to say that at the top, there is

23  an obscenity to describe black people, which you've taken out.

24  And then it says I think she is now Muslim and you've taken

25  out death.  But there's also, and I'm not going to say the

PROCEEDINGS                                    693

1    word, that shouldn't be there.

2              MR. PAULSEN:  Yes, your Honor.  That was an

3    oversight, that will be gone too.

4              MR. FRISCH:  Your Honor, if we can go back to page 2

5    and 3.

6              THE COURT:  Sure.

7              MR. FRISCH:  So Mr. Ricky Vaughn is not on page two

8    and the dates is -- the first page is December 9th, the second

9    page is December 13th , and the third page is January 5th.

10   I'm not sure why that's in there, other than it has obvious

11   incendiary effect.

12             THE COURT:  I think that can probably come out.

13             MR. PAULSEN:  Page two?

14             THE COURT:  Yes.

15             MR. PAULSEN:  Yes, your Honor.  They are talking

16   about Ms. Stephens.

17             THE COURT:  If he's not on it though, it's not

18   really responsive to the concern.

19             MR. PAULSEN:  He doesn't respond.  But yes, your

20   Honor, I understand.

21             MR. FRISCH:  Then on page four, the last one has to

22   do with a notorious publication with horrible connections and

23   there's nothing from Mr. Vaughn after 416 and this is 641.

24   It's just incendiary , it doesn't appear to have any

25   relevance.

PROCEEDINGS                        694

1        THE COURT:  I don't know if anyone knows what that

2  publication is, but they may.  Did you need that?

3        MR. PAULSEN:  Your Honor, we can take the last

4  comment out.

5        THE COURT:  I think that's probably fine.

6        MR. FRISCH:  Again, the next one, January 8th it was

7  just a post.  I understand the Government's argument about  if

8  it's in there, he saw it, or he's constructively aware of it.

9  But on this kind of thing, I think there needs to be more than

10 general membership in a group.

11       THE COURT:  I think what follows and I'm

12 specifically referring to page eight, shows that he knows what

13 they're talking about and this is admiration.  Let's see, I'm

14 looking at --

15       MR. PAULSEN:  Your Honor, to be clear, those two

16 pages are not in group chats.  They're both private messages

17 with the defendant.

18       THE COURT:  I see.  And then the one on page 7 I

19 think is Ms. Stephens?

20       MR. PAULSEN:  Yes.  Ms. Stephens, that's her

21 talking.

22       THE COURT:  All right.

23       MR. FRISCH:  Just to clarify, Judge, if you go

24 back.  So if you look at page seven --  I'm sorry, 1004-8, it

25 talks about a character -- give me one moment.

PROCEEDINGS                                    695

1          THE COURT:  This is the defendant, right, in the

2    blue?

3          MR. FRISCH:   That's correct.  I'm not sure that I

4    see any connection between --

5          MR. PAULSEN:  So your Honor --

6          MR. FRISCH:  Let me just finish.  Before the

7    reference to weaves race method, again, other than it being

8    incendiary, and it doesn't seem to be connected -- it doesn't

9    seem to be connected to what comes before or what that's a

10   reference to, other than that the word race is there.

11         MR. PAULSEN:  Your Honor, for some context.  This a

12   conversation with The Good Doctor, that is Doctor illusion,

13   the host of the podcast that we played in this trial already.

14   They are discussing how the defendant converted her prior to

15   this and she appears on the podcast and then essentially

16   agrees with him that women shouldn't be voting.

17         THE COURT:  Let me say something generally about

18   this.  First of all, I'm going to permit those -- it is page

19   eight.

20         MR. PAULSEN:  Yes, your Honor.

21         THE COURT:  First of all, it's his words.  I mean

22   we've sanitized this a little bit to, I mean, quite a bit to

23   prevent undue prejudice.  But I don't think he's entitled to

24   have his entire history sanitized.  And in this context, I

25   think it's relevant.  Because clearly the people that are

PROCEEDINGS                          696

1    participating in this see him as a leader, and he's bragging

2    about converting somebody who was, formerly didn't agree with

3    him.

4              MR. FRISCH:  So let me, if I can state the objection

5    this way and I also want to call your Honor's attention to

6    page ten of this series.  He's charged with tricking voters

7    into voting by text and he's a leader of a point of view

8    online.  There's a certain amount of cross examination

9    directly relevant to that which might be incendiary, which I

10   think is fair game.  This is collateral about his relationship

11   with someone.  This has to do with a separate thread of his

12   political positions that is tremendously far afield from

13   challenging his credibility today or establishing any lack --

14   any lack of credibility of what he's testified to about the

15   charged crime.  It's so collateral and so inflammatory that I

16   think it needs to be precluded under 403.  There's a certain

17   amount of this that perhaps they can go into to show that

18   while he was respectful in person, he wasn't necessarily

19   respectful in trying to convert her away from her point of

20   view to his point of view.  But at the same time, these

21   particular ways of doing it are inflammatory.  It seems to me

22   the questions can be asked about what he did, but it seems to

23   me that to put this kind of language and to put her personal

24   life into this is over the line.  I think there 's a way to do

25   this without this unduly and prejudicial and inflammatory

PROCEEDINGS                                              697

1    statements.

2              THE COURT:  I would perhaps be more open to that

3    argument if you hadn't brought out from him, I did sustain the

4    good kid objection, although the jury did hear it.  But you

5    also brought out that she thought he was respectful,

6    insightful, and thoughtful.  And I think that merits a

7    response.  And so I think the Government is entitled to

8    demonstrate that those character traits are not consistent

9    with other behavior.

10             So you have an exception to my ruling, but I permit

11   it.  Be very careful about making sure those are redacted.

12   Anything else before we break?

13             MR. PAULSEN:  No, your Honor.   Everything else is

14   the defendant's tweets.

15             MR. FRISCH:  On page 1004-4.  The third blue line,

16   the last three words of the blue -- the third blue line, the

17   last three  words, I would ask that the Court preclude that

18   under 403.

19             THE COURT:  What's your response?

20             MR. PAULSEN:  Your Honor, it wouldn't have any

21   context.  If he wants a different word that summarizes the

22   same thought, I don't have a -- I'm not married to the word

23   cuck but.

24             THE COURT:  You want to just take it out?

25             MR. PAULSEN:   Otherwise it just says -- white

PROCEEDINGS                              698

1   people.

2            THE COURT:   I don't even know what -- I mean, it's

3   a stupid word.   I don't know that anyone knows that it means.

4            MR. FRISCH:   My objection is --

5            THE COURT:   That it's a stupid word?

6            MR. FRISCH:   10,000 people follow her, the rest of

7   it is just inflammatory and unnecessarily brings in precisely

8   the issues that we discussed with Judge Garaufis that said

9   that there are occasions that this kind of thing needs to be

10  considered when trial comes.   So I think that, you know, if

11  you want to let it in, I understand that.   10,000 follow her ,

12  period, and the rest of us takes this trial to a different

13  place.

14           THE COURT:  I don't think that's accurate.   At least

15  in the context of this because the whole -- first of all, I

16  don't think it's -- as I said, I think it's a stupid phrase.

17  I don't think a lot of people know what it means,  maybe they

18  do.   But there's nothing -- it's not, aside from whatever that

19  word is, it's just referring to white people.   And it's not

20  like the other, you know, the other really vial references

21  that I'm protecting him from himself on.   So I'm permitting

22  what I permitted and you have an exception to the ruling.   So

23  let's take a few minutes to be on a break.

24           MR. PAULSEN:   Thank you your Honor.

25           (A recess was taken at this time.)

PROCEEDINGS                                    699

1              (In open court.)

2              (JUDGE ANN DONNELLY enters the courtroom.)

3              COURTROOM DEPUTY:  All rise.

4              THE COURT:  Please be seated.

5              MR. FRISCH:  Can I put something on the record,

6      unrelated to our prior conference.  I intended at the close of

7      the Government's place to put a placeholder.  But because of

8      the way it worked, the jury was here, I couldn't do it.  I

9      have been concerned as the trial has gone on that no case

10     agent has testified.  Maegan Rees didn't testify, my friend

11     Agent Granberg didn't testify, and ultimately Agent Dvorsky

12     did not testify.  At one time or another.  The key agent I'm

13     concerned with is Agent Rees.

14             THE COURT:  I'm having trouble hearing you.

15             MR. FRISCH:  I'll sit down.

16             THE COURT:  You're mostly concerned  about Agent

17     Rees?

18             MR. FRISCH:  I'm mostly concerned about why no case

19     agent testified and specifically whether there's a reason, a

20     bad reason, why Agent Rees's 3500 has not been provided,

21     obviously apart from when she attended Microchip interviews

22     and things like that.  I just wanted to put a placeholder,

23     I'll discuss it with the Government, I don't want to hold

24     things up.  I wanted to register an objection at my earliest

25     opportunity so if I can come back to it, if necessary.

Mackey – Cross – Paulsen                   700

1          THE COURT:  That they're not calling her?

2          MR. FRISCH:  Correct.

3          THE COURT:  Do you want to call her?

4          MR. FRISCH:  I don't know what she has, I don't know

5    what she said, I don't know what's in the reports.  It's just

6    in my experience, it's highly unusual that a trial happens

7    without the case agent testifying, without any case agent

8    testifying.  So I just want to --

9          THE COURT:  I've had kind of the opposite

10   experience.  But I don't think it's necessary to discuss it

11   now.  But if there's some particular thing that you feel that

12   you want to bring out from her that is irrelevant, you know,

13   you can discuss it with the Government and, you know, if

14   somebody wants to call her, they can call her.  But I'll give

15   you some more time later to expand upon your thoughts.

16          Okay, let's have the defendant back on the stand and

17   let's get the jury.

18          (Witness takes the witness stand.)

19

20

21          (Jury enters the courtroom.)

22          THE COURTROOM DEPUTY:  You may be seated.

23          THE COURT:  All right.  Ladies and gentlemen, we're

24   ready to resume with the cross.

25          THE COURTROOM DEPUTY:   Witness is reminded he's

 1    still under oath.

 2    CROSS-EXAMINATION

 3    BY MR. PAULSEN:

 4    Q    Good afternoon, Mr. Mackey?

 5    A    Good afternoon.

 6    Q    So I'd like to start by asking you again about this one,

 7    Government Exhibit 720.  You said you got that on 4chan,

 8    right?

 9    A    Yes.

10    Q    You said you off the pol board; is that right?

11    A    Yes.

12             THE COURT:  What board?  I'm sorry.

13             MR. PAULSEN:  P-O-L with hashtags on each side.

14    Q    You thought about it for a split second; is that right?

15    A    Yes.

16    Q    Did you think about it for a split second or did you

17    think about some effort to confuse the Clinton campaign?  I

18    think you said both?

19    A    Yes, did I say both.

20    Q    So which one is it?

21    A    Well, that's always what I was trying to do when I

22    posted.

23    Q    Okay.

24             Why did you choose this one.

25    A    I just saw it and I posted it.

CROSS – CROSS – MR. PAULSEN                    702

1   Q    So you said there was a number of ones like this on

2   4chan; is that right?

3   A    Yes.  I believe so.

4   Q    Why did you choose the one with the black woman?

5   A    No reason.

6   Q    Random choice?

7   A    Yes.

8   Q    You thought that black voters were a very important group

9   in the upcoming election; is that right?

10  A    Yes, they were.

11        MR. PAULSEN:  Can I show you Government Exhibit 200.

12  It's the 98th page in the big one.  It's in evidence, your

13  Honor.

14        THE COURT:  Yes.

15  Q    You wrote, and this is redacted.  The only thing standing

16  in Trump's path is the black voters.

17  A    I did say is that.

18  Q    You wrote that?

19  A    Yes.

20  Q    Is that what you believed?

21  A    Yes.

22        MR. PAULSEN:  Can you show 105.

23        (The above-referenced exhibit was published to the

24  jury.)

25  Q    You wrote; Obviously we can win Pennsylvania, the key is

CROSS - CROSS - MR. PAULSEN                703

1    to drive up turn out with non-college whites and limit black

2    turnout.

3              Limiting black turnout, you wrote that, right?

4    A    I said that.

5    Q    That's the day you sent these memes?

6    A    Yes.

7    Q    Now, wouldn't tricking some number of black people out of

8    voting, wouldn't that have served your aims overall?

9    A    I suppose so.

10   Q    So why not do it?

11   A    Well, I don't think that meme could actually trick anyone

12   into not voting.

13   Q    We'll get to that, about whether you would have felt

14   that.

15              But you agree that it actually would have served

16   your interest, right?

17   A    Hypothetically.

18   Q    You thought the election was very close; didn't you?

19   A    I did, yes.

20   Q    I know you saw during the trial that you tweeted a number

21   of times that the election was on a knifes edge, right?

22   A    I did.

23   Q    You said that many, many, many times?

24   A    Yes.

25   Q    Too close to call, you said things like that?

1  A    Yes, I said that.

2  Q    Do you remember you tweeted some statements some memes

3  that said hashtag never vote?

4  A    Yes, I did.

5  Q    What was hashtag never vote?

6  A    It was just saying if you don't like the candidates,

7  don't vote.

8  Q    But which people were those aimed at?

9  A    Those were aimed at black people.

10        MR. PAULSEN:  Can you show me 110?  I mean,

11  Ms. Parshad, sorry.

12        (The above-referenced exhibit was published to the

13  jury.)

14  Q    So you wrote this.  Idea create hashtag woke, hashtag

15  black Twitter, hashtag never vote memes.  Seed them in black

16  social spaces.

17        MR. PAULSEN:  Can you show me the next one,

18  Ms. Parshad, 111.

19        (The above-referenced exhibit was published to the

20  jury.)

21  Q    Vote for Hillary just means four more years of Hillary

22  Clinton taking black votes for granted.  Send her a message

23  fam, hashtag never vote.

24        You sent those, right?

25  A    Yes.

Mackey - Cross - Paulsen                    705

1    Q    The idea, if I get this right,  was you wanted some

2    number of black people to chose not to vote, right?

3    A    Yes.

4    Q    And you sent other things like that; is that fair?

5    A    I think so.

6    Q    You know that the presentation the Government did was a

7    small sample of some of the stuff you did; is that right?

8    A    Yes, that's accurate.

9    Q    Okay.  But you didn't want to trick  black people out of

10   voting later; is that your testimony?

11   A    Yes, it is.

12   Q    So you agree it that black vote is important in the

13   election?  You said that a moment ago.

14          MR. PAULSEN:  Can you bring me L5?  200-L-5.

15          (The above-referenced exhibit was published to the

16   jury.)

17          MR. PAULSEN:  So we just looked at this a moment

18   ago.  I'd like to show another one, your Honor.  This is the

19   first of defendant's tweets we have not put in evidence.  They

20   have all been authenticated through the stipulation, they are

21   all of the defendants statements.  Would you like me to show

22   it to the parties and the Court first before I show it to the

23   jury?

24

25

*TONIANN LUCATORTO, RPR, RMR, CRR*

Mackey – Cross – Paulsen                706

1          THE COURT:  I think it's probably preferable to show
2    it to defense counsel.
3          MR. PAULSEN:   Okay.  So it's 1005-10.  We also
4    created a chart of just the text that we can give to him as
5    well.
6          THE COURT:  Okay.  Is it your plan to introduce them
7    in a group?
8          MR. PAULSEN:  No, I have a number of them, but I can
9    show it to him on the screen first.  It's 1005-10.
10          THE COURT:  That's the first one?
11          MR. PAULSEN:  Yes, your Honor.  So Mr. Frisch they
12    will pop up on the screen one by one.
13          MR. FRISCH:   Can I just a moment?  Can I have a
14    moment to take a look at it?  Thank you.
15          MR. PAULSEN:  It's not necessarily in the order I'm
16    doing them though.
17          MR. FRISCH:  I'll use this, that's fine.  Your
18    Honor, can we approach on this?
19          (Continued on the next page.)
20
21
22
23
24
25

SIDEBAR CONFERENCE                    707

1          (Sidebar conference outside the hearing of the

2     jury.)

3          THE COURT:  Let me just -- because I think these are

4     all things that you gotten in discovery, it's not something

5     you've never seen before.

6          MR. PAULSEN:  Yes.

7          MR. FRISCH:  I have not seen these before.  I'm not

8     saying I didn't have available.  The discover is voluminous.

9     I haven't seen everything, it's impossible.

10          THE COURT:  I would assume you probably read all of

11     his tweets though.  Is that what these are?

12          MR. PAULSEN:  He has a lot of tweets as he said.  He

13     has hundreds of thousands.

14          MR. FRISCH:  So there's a lot of things in here that

15     are -- first of all, they're saturated.  I understand the

16     propriety of doing some of this.  But you go from one, to the

17     other, to the other.  I haven't looked at all of them.

18          MR. PAULSEN:  Your Honor, I can add some

19     clarification.  This is the entire thing in the packet.  Some

20     are things I'm not offering at the moment because I think

21     they're fairly incendiary things that depends on what he says.

22          THE COURT:  Those are things that depending -- why

23     don't we start with what you actually are going offer and I'll

24     take a look.

25          MR. PAULSEN:  Sure.  We have documents on black

SIDEBAR CONFERENCE                     708

1   turnout, which are similar to ones we've done before.

2           MR. FRISCH:  Go slow.  It's easy for me to read

3   these.  Thank you.  It's just not necessary.

4           THE COURT:  This is one thing I do remember about

5   the election was that everybody was saying she had Parkinsons

6   Disease or something like that, or that she was coughing.

7   That's my recollection, but whatever.

8           MR. PAULSEN:  It came in the -- that one we already

9   put in, that's in.

10          MR. FRISCH:  You already put that one in; is that

11  what you're saying?

12          MR. PAULSEN:  We put in the redacted version.  It's

13  already in trial.

14          THE COURT:  Please bear in mind we have the court

15  reporter.

16          MR. PAULSEN:  So this is the one I'm offering right

17  now just saying write off the black vote.  There's a number of

18  them that are about where he talked about women shouldn't the

19  vote.

20          MR. FRISCH:  I get it, fit in something about the

21  19th Amendment, but I object to this.

22          THE COURT:  Okay.  That objection is overruled.

23  Next one.

24          MR. PAULSEN:  Why women shouldn't vote, reason

25  number 4 million.

SIDEBAR CONFERENCE                    709

1          THE COURT:  I don't think we need a million of

2     those.  I think -- pick one of those.

3          MR. FRISCH:  There's another one.

4          MR. PAULSEN:  Your Honor, if I may be heard on this.

5     He took the stand and said he did not mean to fool anybody.

6     He has a long, established history of believing that black

7     people are confused and stupid, and things of that sort and

8     that women shouldn't vote.  He says it constantly over again

9     and I think we're entitled to  show this was not something he

10    said in a podcast, but this was one of his clear positions.

11         THE COURT:  I don't have any problem with bringing

12    out, and I know you don't like it, but it 's definitely

13    relevant to the scheme that's alleged.  But what I will permit

14    you to do is pick a few of them and you can say that he

15    expressed similar sentiments in other tweets.  You don't have

16    a problem with that, do you?

17         MR. FRISCH:  I hope he doesn't pick the most

18    incendiary  ones, but in theory, no.

19         MR. PAULSEN:  If he doesn't acknowledge that he has

20    said that many times --

21         THE COURT:  Then you can go through it.  Part of

22    this is contingent on any cross on what the defendant says.

23    All I'm saying is that a few of these make the point because

24    he clearly has a very -- it's not like a maybe people

25    shouldn't be able to vote.  He feels quite strongly about it.

*TONIANN LUCATORTO, RPR, RMR, CRR*

1    I'm not going to limit  you to the ones that you pick because

2    I think they're all relevant.  I'm to just going through them.

3    It's just his opinion that women -- it's impossible to have a

4    functioning government when single women and single mothers

5    vote.  It's unbelievable that we allow unmarried women to

6    vote.  I mean, that's kind of the same thing so I don't know

7    why you would need both of those.

8            MR. PAULSEN:  Well, I can pick one if you want.

9            THE COURT:  You don't have to pick one.  I'm just

10   saying I can't count.  I mean right now I've counted.

11           MR. PAULSEN:  I think you finished the end of the

12   women section.

13           THE COURT:  1, 2, 3, 4, 5, 6, 7 --

14           MR. PAULSEN:  There's nine.

15           THE COURT:  8, 9, 1011, 12, 13.  So if he's to say I

16   never said that, go to town.  But I would say of these you may

17   pick five and then I know you object basically to that.  So I

18   think we've covered that aspect of it.

19           Let's go through the rest of it, shall we.

20           MR. PAULSEN:  The next category, your Honor, is

21   black people will agree to anything they read on Twitter and

22   we let them vote.  Why.

23           THE COURT:  That is relevant because he said he did

24   not think that black people were gullible.

25           MR. FRISCH:  For the record, this is a year before.

1          MR. PAULSEN:  Your Honor, this is -- I'm sorry.

2          THE COURT:  It's what he believes and in the context

3    of this case unless there's evidence that he changed his

4    opinion, this is relevant.

5          MR. PAULSEN:  It's absolutely relevant, your Honor.

6          THE COURT:  Let me just look at what else is there.

7          MR. PAULSEN:  This the only one like that, the

8    other one --

9          THE COURT:  Stop.

10          MR. PAULSEN:  Sorry.  I'm a little punchy today.

11          THE COURT:  It's okay.

12          MR. PAULSEN:  That is a proposed redaction.

13          THE COURT:  These are right before the election.

14    This is --

15          MR. PAULSEN:  Your Honor, so if I can preface these.

16    There's two where he also then says that he thinks that

17    immigrants shouldn't vote either.  Given that he pushed out a

18    Spanish language one, there's two of those, we think those

19    should be relevant as well.

20          THE COURT:  All right, here's my ruling.  I have

21    looked at these and I agree that they are relevant.

22          MR. PAULSEN:  The last few are the incendiary ones I

23    don't know he opened the door.

24          THE COURT:  I don't think so either.  So just for

25    the record, just for the record, the last is this one in.  All

SIDEBAR CONFERENCE                    712

1  right.

2          MR. PAULSEN:  No, but Judge Garaufis said that he

3  believed if the defendant took the stand because he's

4  commenting on this --

5          THE COURT:  That's what I remember, I think, because

6  I didn't see this before.

7          MR. FRISCH:  I don't recall that's what he said.  I

8  don't know if we ever teed that up with Judge Garaufis.

9          THE COURT:  Well, it's Judge Donnelly now.  So I'll

10 take a look at it.

11         So here's the point.  I don't want to pause the

12 cross -examination.  You can; on each of these topics, women,

13 black people, minorities , and immigrants pick a select few.

14 But you can, and I'm not going to just let you pick them

15 without us checking.  If you put up one that is really really,

16 bad I may not let you do it.  But let's do a representative

17 sample, and you can object or if it's something that you want

18 that's based on a prior discussion, you can do that too.  But

19 so that's how we'll do each one.

20         MR. PAULSEN:  My only further request is when it

21 comes to turnout,  we selected there was four similar ones

22 that were all the day he sent these, and I wanted to draw out

23 that this was on your mind the day you did it.

24         THE COURT:  That's fine.

25         (End of sidebar conference.)

*TONIANN LUCATORTO, RPR, RMR, CRR*

D. MACKEY - CROSS - MR. PAULSEN          713

1          (In open court.)

2          THE COURT:  All right.  Next question.

3          MR. PAULSEN:  So, your Honor.  I think this

4    Document 105-10 was the one I wanted to present to the

5    witness.

6          THE COURT:  All right.  I can't remember if you laid

7    the foundation for it.

8          MR. PAULSEN:  Your Honor, I'm not sure if foundation

9    is necessary.  It's the defendant's statement.

10         THE COURT:  Do you have any objection to this one.

11         MR. FRISCH:  I do not.

12         THE COURT:  Okay.

13         MR. PAULSEN:  All right.

14   Q    So Mr. Mackey,  a moment ago, you had said that the black

15   vote was an important vote for -- in the election; is that

16   right?

17   A    Yes.

18   Q    And you wrote this, did you not.  Trump should write off

19   the black vote and just focus on depressing their town out and

20   go all-out on winning whites, Hispanics, and Indian.

21         Did you tweet that?

22   A    Yes, I tweeted that.

23   Q    So write off that means stop trying to persuade them; is

24   that right?

25   A    Stop trying to persuade them to vote for Trump.

D. MACKEY - CROSS - MR. PAULSEN                    714

1    Q    Yes.

2    A    Yes.

3    Q    You don't want the votes anymore, you've moving on; is

4    that right?

5    A    Yes.

6    Q    Do you remember Special Agent Cunder had a chart where he

7    had looked at hashtags that were dropped into the group you

8    were  in and he looked to see if you acted on them?

9    A    Well, I don't know if he looked to see I acted on them.

10   They were hashtags that were trending at the time.  I don't

11   think I necessarily acted on them from seeing them in the

12   group, considering they were widely trending and everybody

13   that was following was using those hashtags.

14   Q    Do you remember there was one hashtag that you didn't

15   use?  It was only one zero?

16   A    I don't recall.

17   Q    Okay.  Would it surprise you it was blacks for Trump?

18   A    Yes, it would surprise me.

19   Q    Now, you talked a lot of black turnout; is that right?

20   A    Yes.

21   Q    It was important for your political opponents at the time

22   or the side you didn't root for?

23   A    Yes.  Black turnout was important.

24   Q    We showed a number of those documents with Special Agent

25   Cunder; is that right?

*TONIANN LUCATORTO, RPR, RMR, CRR*

D. MACKEY - CROSS - MR. PAULSEN                715

1   A    Yes.

2          MR. PAULSEN:  I'd like to show you a few more.  Show

3   Government Exhibit 1005-7.

4   Q    Do you remember sending this?  Great question, the reason

5   is if Hillary does worse than 90 percent of blacks, she

6   probably  won't win the election?

7          THE COURT:  Slow down a little bit.

8          MR. PAULSEN:  Sorry about that.

9   A    Yes.

10  Q    You sent that?

11  A    Yes, I sent that.

12         MR. PAULSEN:  1005-5 please, Ms. Parshad.

13  Q    Did you write; While sick Hillary will get the

14  churchgoing black vote like always, it's the marginal and

15  young black voters where she hemorrhages support.  Did you

16  write that?

17  A    Yes.

18  Q    Do you remember Ms. Rocketto when she testified, she said

19  that it was younger voters that tend to respond to texts?

20  A    I do recall she testified that.

21  Q    Now, you sent this document and the others on the 1st and

22  the 2nd; do you recall that?

23  A    Yes, I do.

24  Q    Is it fair to say you were fairly preoccupied with the

25  turnout of black voters s on that topic, the day you sent

D. MACKEY – CROSS – MR. PAULSEN                716

1    these out?

2    A      Something that I commented on.

3              (Continued on the next page.)

D. MACKEY – CROSS – MR. PAULSEN                    717

1    BY MR. PAULSEN:

2    Q    Can I show you Government's Exhibit 1005-3 I'd like to

3    show you a few things you sent that day:  Trump will out

4    perform his poll number in minorities because his voters are

5    guaranteed the vote.

6              Did you send that?

7    A    Yes, I sent that.

8    Q    1005-2:  Black voter turnout so far is not good for

9    Hillary Clinton.

10             You sent that out?

11   A    Yes.  Appears to be a link to a news article.

12             THE COURT:  Could I just see the parties at the side

13   for a moment of clarification, and I think we should have the

14   court reporter.

15             (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    718

1          (Sidebar conference.)

2          THE COURT:  Nothing bad has happened so far.  I

3     thought he was going to get the opportunity to object to some

4     of them, and then you showed them on the screen.

5          MR. FRISCH:  That's what I thought.

6          THE COURT:  There is nothing that's been, I don't

7     think, objectionable so far.  But I think the way we ought to

8     do this is not just put it up on the screen.  I think my

9     thought was the best way to proceed was to show each one and

10    ask him if he recognized it and give counsel an opportunity to

11    object.

12         MR. PAULSEN:  Sure, that's fine.  This is the tight

13    series of four in the same day, which I thought were okay.

14         THE COURT:  You don't have any problem.

15         MR. FRISCH:  The ones we've seen so far, I don't.

16         MR. PAULSEN:  After these, we'll do that process.

17         THE COURT:  That's good.

18         (End of sidebar conference.)

19         (Continued on the next page.)

20

21

22

23

24

25

1          (In open court.)

2     BY MR. PAULSEN:

3     Q    I think we were at 1005-01.  Mr. Mackey, did you write:

4     Your problem is going to be low black turnout and high white

5     working-class turnout.

6          Did you send that?

7     A    Yes.  It appears to be a reply tweet.

8     Q    One more, number four please, Ms. Parshad.

9          Very slight changes in the electorate will lead to a

10    Trump landslide, small increase in white non-college voters,

11    small decrease in blacks.

12         Did you send that?

13    A    Yes.

14    Q    This is all the day that you sent these memes; is that

15    fair to say?

16    A    Yes, it appears so.

17    Q    This was on your mind, a small decrease in black turnout

18    might matter?

19    A    Yes, that was on my mind.

20    Q    Isn't it true, Mr. Mackey, that you thought that the

21    group of people we're discussing, the race of the individual

22    in this ad, that you thought that they were, would have fallen

23    for this?

24    A    Can you repeat the question please?

25    Q    Isn't it fair to say, Mr. Mackey, that you thought that

D. MACKEY - CROSS - MR. PAULSEN                720

1   black people would have fallen for a trick like this?

2   A    I don't know anyone would fall for this kind of a post.

3   Q    Isn't it true that you thought black people were

4   particularly gullible?

5   A    I did say that in the past, yes.

6   Q    Did you not believe it?

7   A    No.

8   Q    You didn't?

9   A    No, I didn't.

10  Q    You thought black people were as credulous as anyone

11  else?

12  A    I don't know, probably.

13  Q    Did you think black people were as smart as everyone

14  else?

15  A    I don't know.

16  Q    There was a lot of black people on Twitter I imagine,

17  right?

18  A    Yes.

19  Q    You talked about black Twitter before as like a thing?

20  A    Yes, I have.

21  Q    Twitter has a lot of info, right?

22  A    A lot of info?

23  Q    Info, information.

24  A    I would say so.

25  Q    You could use Twitter and things comes fast at you; is

D. MACKEY - CROSS - MR. PAULSEN                721

1   that right?

2   A     Yes, it comes very fast.

3   Q     You could scroll by, see lots of tweets in a short period

4   of time, that's a correct characterization?

5   A     Yes, it is.

6   Q     Is that a bad place for gullible people?

7   A     A bad place for gullible people?

8              MR. FRISCH:  Objection.

9              THE COURT:  Sustained as to form.  You can rephrase.

10  Q     Did you feel that gullible people would be easily tricked

11  on Twitter?

12  A     No.

13  Q     I'd like to show for the judge and for the defense

14  counsel Government's Exhibit 1005-23.

15             THE COURT:  And for the witness too, I suppose.

16             MR. PAULSEN:  For the witness as well.

17  Q     Did you send that, Mr. Mackey?

18  A     Yes, it appears so.

19             MR. PAULSEN:  May we publish?

20             THE COURT:  Any objection?

21             MR. FRISCH:  Only as discussed.

22             THE COURT:  That will be in evidence, go ahead.

23             (Government Exhibit 1005-23, was received in

24  evidence.)

25  Q     You wrote:  Black people will believe anything they read,

D. MACKEY - CROSS - MR. PAULSEN                722

1    okay Twitter.  And we let them vote why?

2    A    Yes, I wrote that.

3    Q    What did you mean by that?

4    A    It reads like a disparaging comment about African

5    Americans.

6    Q    Why did you say that?  Why shouldn't black people vote?

7    A    Why shouldn't they vote?

8    Q    I'm asking you what meant when you wrote that.

9    A    When I wrote that, it says because they believe anything

10   they read on Twitter.

11   Q    But you said a moment ago nobody would be fooled by this.

12   A    I don't think anything would be fooled by this.

13   Q    You just said black people, they believe everything they

14   read on Twitter and they shouldn't vote for that reason.

15   A    That's clearly a hyperbolic statement.

16   Q    So you think that's not something you meant?

17   A    I think it's an exaggeration.

18   Q    Do you think that's the only time you said something like

19   that?

20   A    No, I don't think so.

21          MR. PAULSEN:  Your Honor, I'd like latitude to show

22   the rest of them.

23          THE COURT:  One by one.

24   BY MR. PAULSEN:

25   Q    Can I show Government's Exhibit 1005-25.  Did you write:

D. MACKEY - CROSS - MR. PAULSEN            723

1    LOL blacks literally believe everything they see on CNN --

2              MR. FRISCH:  Your Honor.

3              MR. PAULSEN:  Sorry.

4              THE COURT:  It's the procedure we discussed at the

5    side.

6              MR. PAULSEN:  I apologize.

7              THE COURT:  Do you object to this?

8              MR. FRISCH:  I do.

9              THE COURT:  The objection is overruled.  But please

10   follow that protocol.

11             (Government Exhibit 1005-25, was received in

12   evidence.)

13             MR. PAULSEN:  Ms. Parshad, everything that I'm going

14   to show we're going to show to the parties first.  I

15   apologize.

16   BY MR. PAULSEN:

17   Q    Please publish this.  Did you write:  LOL blacks

18   literally believe everything they see on CNN, believe that the

19   border line of Brooklyn lies the KKK.

20   A    I did say that.

21   Q    Did you believe that?

22   A    That's another exaggerated statement.  I don't think

23   that's literally true.

24   Q    What about 1005-26, only to the parties and the witness.

25             May I publish?

D. MACKEY - CROSS - MR. PAULSEN                724

1            THE COURT:  Not yet, ask if he sent it.

2    Q    Mr. Mackey, did you send this tweet?

3    A    Yes.

4            THE COURT:  Do you have any objection?

5            MR. FRISCH:  I don't.

6            THE COURT:  That will be in evidence.

7            (Government Exhibit 1005-26, was received in

8    evidence.)

9    Q    Mr. Mackey you, wrote:  LMAO check out a Twitter person

10   trolling the shit out of black people.  So gullible.

11           Again, do you think black people are particularly

12   gullible?

13   A    I don't know that they are more gullible than anyone

14   else.  There are a lot of gullible people on Twitter.

15           MR. PAULSEN:  I'd like to show to the parties

16   1005-27, with the proposed redaction.

17           THE COURT:  But it's not redacted.

18           MR. PAULSEN:  Asking that we'll redact that before

19   showing.

20           THE COURT:  Can you do that?

21           MR. PAULSEN:  Assuming that, your Honor, believes --

22           THE COURT:  Can I see the parties at the side with

23   the court reporter.

24           (Continued on the next page.)

25

SIDEBAR CONFERENCE                    725

1              (Sidebar conference.)

2              THE COURT:  I am technically challenged.  What I'm

3    seeing on the screen includes the word that I said to be

4    redacted and it's in red.  Is it going to show up as redacted

5    when we put it in?

6              MR. PAULSEN:  She can get a quick box around it.  We

7    just didn't get your permission.

8              THE COURT:  Yes, I don't want it to come in in that

9    fashion.

10             MR. PAULSEN:  It will not.

11             THE COURT:  If that is redacted, do you have any

12   objection?

13             MR. FRISCH:  One second.

14             MR. PAULSEN:  I wasn't sure it was even necessary to

15   redact that, but in an abundance of caution.

16             MR. FRISCH:  With the redaction discussed, I do not

17   object.

18             (End of sidebar conference.)

19             (Continued on the next page.)

20

21

22

23

24

25

D. MACKEY - CROSS - MR. PAULSEN                726

1          (In open court.)

2          THE COURT:  There is no objection as we discussed at

3    the sidebar.  Go ahead and display it.

4          (Government Exhibit 1005-27, was received in

5    evidence.)

6    Q    Mr. Mackey, writing to Amy Stephen, who we saw at trial,

7    did you write:  No, you're dead wrong.  Decent people are fed

8    up with black people because they will believe anything.

9          Did you write that?

10   A    Yes.

11   Q    Was that also an exaggeration?

12   A    I think the last part is, yes.

13   Q    Which part isn't?

14   A    I think the whole thing is an exaggeration.

15   Q    These are all exaggerations so far?

16   A    I exaggerate a lot on Twitter.

17   Q    Your Honor, I'd like to show the parties what is marked

18   as Government's Exhibit 1005-28.

19          Mr. Mackey, do you recognize that?

20   A    I don't recall it, but --

21   Q    Is that your Twitter account?

22   A    Yes.

23          THE COURT:  Any objection?

24          MR. FRISCH:  I have none.

25          THE COURT:  You can display it.

D. MACKEY - CROSS - MR. PAULSEN                    727

1          (Government Exhibit 1005-28, was received in

2     evidence.)

3     Q    Mr. Mackey, did you write:  It is now officially

4     impossible to argue that blacks will not on the whole believe

5     anything they are told.

6     A    Yes, I posted that.

7     Q    Did you believe that?

8     A    No.

9     Q    You don't?

10    A    No.

11    Q    Do you recall the statement that we showed with Special

12    Agent Cunder was a private statement that you were having with

13    Ms. Stephen, do you recall?

14    A    Yes, I do recall.

15    Q    When you said you thought black people were the most

16    gullible people ever, that was I private DM?

17    A    Yes.

18    Q    That was also an exaggeration?

19    A    Yes, it was.

20    Q    Can we show the parties Government's Exhibit 1005-29?

21               THE COURT:  Is that something that you wrote?

22               THE WITNESS:  Yes.

23               MR. PAULSEN:  Thank you, your Honor.

24               THE COURT:  Do you have any objection to that coming

25    in?

D. MACKEY - CROSS - MR. PAULSEN                728

1          MR. FRISCH:  I don't want to take the time --

2          THE COURT:  I understand.

3          MR. FRISCH:  You understand the objection that I

4   have based on our conversation and what your Honor said at the

5   sidebar.

6          THE COURT:  Yes.  The objection is overruled.

7          (Government Exhibit 1005-29, was received in

8   evidence.)

9   Q    Mr. Mackey, did you write:  Black people will believe

10  literally anything and that is the source of racial tensions

11  in America.

12  A    Yes.

13  Q    Also an exaggeration?

14  A    Yes.

15  Q    Did you say anything sincere about black people on

16  Twitter?

17  A    I assume so.

18  Q    But these are all tongue in cheek.  None of this is --

19  A    I'm not saying tongue and cheek, I'm saying exaggeration,

20  hyperbole.

21  Q    Sitting here today, you didn't believe black people were

22  especially gullible?

23  A    At the time I don't know that they were more gullible

24  than anyone else.

25  Q    Would it surprise you that they are the group that you

1   tend to say these things about?

2            MR. FRISCH:  Objection.

3            THE COURT:  Rephrase.

4   Q    Did you in fact say these things about black people?

5   A    Yes.

6   Q    Do you think there is a difference between gullible and

7   stupid?

8   A    Yes, I do.

9   Q    Do you think black people are stupid?

10  A    Are you asking me if I believe that today?

11  Q    Sure.

12  A    No.

13  Q    Did you believe it back in 2016 and 2015?

14  A    Yes.

15  Q    You did.

16            Ms. Parshad, can I show 1005-24.  You can show that

17  to the parties.

18            Did you send that tweet?

19  A    Yes.

20            MR. PAULSEN:  May I publish, your Honor?

21            MR. FRISCH:  I object.

22            THE COURT:  Overruled.

23            (Government Exhibit 1005-24, was received in

24  evidence.)

25  Q    Did you write, Mr. Mackey, that:  Meanwhile blacks have

D. MACKEY - CROSS - MR. PAULSEN                    730

1   an average IQ of 85?

2   A     Yes, I did.

3   Q     You said a moment ago that's actually what you did

4   believe; is that right?

5   A     That's actually what I did believe at the time?

6   Q     Yes.

7   A     Yes.

8   Q     So that was your belief.  So if you believed that black

9   people were particularly stupid, why wouldn't they fall for

10  this?

11             MR. FRISCH:  Objection.

12             THE COURT:  Overruled.

13  A     Because I don't think that anyone -- at the time I didn't

14  believe that anybody could fall for that.  It doesn't matter

15  if you're gullible, you're stupid, I don't think anyone could

16  believe that you could text your vote anonymously.  Especially

17  when it's coming from a Twitter account with a MAGA hat,

18  wearing a Bane mask.  I don't think it matters whether you're

19  smart, stupid, gullible, or not gullible.  I don't think that

20  anyone would fall for that.

21  Q     You can give speeches when the defense --

22             MR. FRISCH:  Objection.

23             THE COURT:  Sustained.

24             Do you want to put a question to the witness please?

25  Q     You didn't want this to work then; is that correct?

1  A    It's not that I didn't want it to work, it wasn't my

2  intention that anyone would be deceived.

3  Q    It was a yes or no question.

4  A    Repeat it?

5  Q    You didn't want it to work, did you?

6  A    I don't understand the question.  I didn't want it to

7  work?  I didn't think it would work.  I wasn't trying to get

8  it to work, that wasn't the purpose.

9  Q    Okay.  So you picked this one randomly, you sent that

10 meme?

11 A    I saw it on 4chan.

12 Q    You typed these things in though, right?

13 A    I typed in the hashtags, is that what you mean?

14 Q    Yes.

15 A    Yes, I did.

16 Q    You typed in the #ImWithHer?

17 A    Yes, I did.

18 Q    You've talked at various points, we've seen evidence of

19 you hijacking hashtags?

20 A    Yes, that's right.

21 Q    Let's show 200-B-6 in evidence.  You said you could

22 hijack hashtags with memes?

23 A    Yes, I did.

24         THE COURT:  Slowly please.

25 Q    Was this an example of that?

1    A     Was this an example of that?

2    Q     Yes?

3    A     Yes, I would say so.

4    Q     But you said you didn't want anyone to fall for it?

5    A     Well, hijacking a hashtag is not about tricking people or

6    deceiving people.

7    Q     But it is, am I correct, though, that if you're using the

8    #ImWithHer hashtag, it's because you want this to be seen by

9    the sort of person who is searching for #ImWithHer; is that

10   right?

11   A     Yes.

12   Q     The people who were searching with #ImWithHer are the

13   people who are presumably supporters of former presidential

14   candidate Clinton?

15   A     Yes, especially the ones working for her.

16   Q     So your testimony is that you only wanted to bother the

17   campaign; is that right?

18   A     The campaign, the media, anyone who saw this would know

19   that you can't vote from home.  So if they were a Hillary

20   Clinton supporter they would become upset by it, whether it's

21   a supporter, campaign worker, et cetera.  That had the

22   potential to become a news story that would hijack their

23   narrative that she likes to push rather than -- she would have

24   to discuss this, or maybe this would upset her, knock her off

25   her game rather than the message that she wanted to push that

D. MACKEY - CROSS - MR. PAULSEN                733

1    day, whether it was jobs, economy, it doesn't matter.  This

2    was about knocking her off her message by creating a fire

3    storm.

4              MR. PAULSEN:  Your Honor, may I have a sidebar?

5              THE COURT:  Sure.

6              (Continued on the next page.)

SIDEBAR CONFERENCE                    734

1              (Sidebar conference.)

2              MR. PAULSEN:  I would ask for a bit of advice on how

3    would you like to me to handle when I ask a yes or no answer

4    and he gives a speech.

5              THE COURT:  I'm not going to give you advice.  But

6    if you have an objection to him saying that, you can make it.

7    Or you can let him speak and then you can ask him some other

8    questions.

9              MR. PAULSEN:  I didn't know if there is a mechanism

10   you prefer to ask him not give speeches.

11             THE COURT:  Here is what I don't want you to do.  I

12   suspected that you were starting to point out that he

13   basically gave yes or no answers on direct and now he's being

14   more expressive, and you can certainly argue that in summation

15   if you wish.  But if you want to nicely suggest to him to do

16   his best to answer the question that asked, you can do that.

17             Mr. Frisch?

18             MR. PAULSEN:  My recollection is our witness

19   answered his questions.

20             THE COURT:  I think he's asked several times for

21   people to answer something yes or no.  You can do that.

22             I'm not going to give advice on what I think is a

23   good cross-examination tactic.

24             MR. PAULSEN:  I was trying to find out what was

25   acceptable to you.  I didn't want to shut down the witness.

SIDEBAR CONFERENCE                    735

1          (End of sidebar conference.)

2          (Continued on the next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D. MACKEY - CROSS - MR. PAULSEN                    736

1           (In open court.)

2           THE COURT:  Next question.

3           MR. PAULSEN:  Thank you, your Honor.

4   BY MR. PAULSEN:

5   Q    Mr. Mackey, when Special Agent Cunder testified he walked

6   you through some the groups that you were in.  Do you recall

7   that?

8   A    Yes.

9   Q    Before we get to that, I think you testified on direct

10  that you stopped working shortly before the 2016 election?

11  A    Six months before, five months, something like that.

12  Q    Did you have another job during that time?

13  A    No, I did not.

14  Q    So you had free time to do Internet things, I imagine; is

15  that fair?

16  A    Yes, that's fair.

17  Q    I'd like to start with the War Room.  You were a member

18  of that group from the beginning; is that right?

19  A    I think so.

20  Q    Can we put up 400-01?  If we can zoom in on the front

21  first DM.  This is the one that began with a statement of

22  purpose.  Would you agree, that's what that was?

23  A    I think this is the first time I've seen it; but I guess,

24  yes.

25  Q    You were in the room.  You respond that day; isn't that

1    fair?

2    A    I don't recall responding that day; but if you say I did,

3    then I probably did.

4    Q    This says we have to work together like a unit so let's

5    keep this group open and use it like our strategy War Room.

6         Do you see that?

7    A    Yes.

8    Q    That's how it worked, right?

9    A    In the beginning that's how it did work, yes.

10   Q    This was a group of prominent individuals on Twitter?

11   A    A lot of them were prominent.

12   Q    A number of people who had big followings, things of that

13   sort.

14   A    Yes.

15   Q    This was to be generally kept free of tweets; is that

16   right?

17   A    It was in the beginning; but it became completely filled

18   with tweets towards the end.  It was basically unreadable.

19   Q    It was a place for coordination; is that fair?

20   A    That was the intention when it was started up on

21   August 1st, yes.

22   Q    Do you recall that Special Agent Cunder showed that chart

23   500, do you recall that?

24   A    Are you referring to the chart with the hashtags?

25   Q    That's the one.

D. MACKEY - CROSS - MR. PAULSEN                738

1   A     I do recall.

2   Q     Do you recall how the chart shows when a hashtag appeared

3   on these groups you tended to react --

4   A     I wouldn't say that --

5          THE COURT:  You have to --

6   A     -- no.

7          THE COURT:  Just a minute.

8          THE WITNESS:  I apologize.

9          THE COURT:  You have to let him finish the question

10  first before you start talking, because then the court

11  reporter can't make a record.

12         Do you want to finish your question, then wait until

13  he's finished, then answer.  Go ahead.

14  BY MR. PAULSEN:

15  Q     Mr. Mackey, do you recall that your retweets on Twitter,

16  or your activity on Twitter, tended to match what the group

17  was doing?

18  A     Yes, that's because --

19         THE COURT:  Next question.  You'll get an

20  opportunity to explain, but it works it's easier if you just

21  listen to the question.

22         THE WITNESS:  Yes, your Honor.  Apologies.

23  BY MR. PAULSEN:

24  Q     When you got in the War Room -- when you logged into

25  Twitter, you looked at the War Room?

1    A    When I logged in I looked at War Room?

2    Q    Yes.

3    A    In general?  Every day?  What are you referring to?

4    Q    Whenever you logged into Twitter.

5    A    No, I didn't look at War Room every time I logged into

6    Twitter.

7    Q    You weren't paying attention?

8    A    I had the group on mute so I wouldn't get the

9    notifications because there were so many messages coming in

10   every day.

11   Q    You didn't want to act in a coordinated way with all

12   these people?

13   A    I didn't need to look at the War Room to coordinate with

14   everyone else.  What they were tweeting was public.  I would

15   see it in my feed because I followed many of them.  Then it

16   would go viral and it would trend on the trending topics on

17   the left.

18            So when I see the trend on the topic and it's

19   trending, then I'll tweet about it.  Or I just see my friends

20   are talking about, so I'll talk about it.  I don't have to

21   look in the War Room to know that.

22   Q    It's a coincidence that your activity always matched what

23   the War Room is doing?

24   A    It's not a coincidence.  What the War Room was doing was

25   making the hashtags go public, widely available, and trend

D. MACKEY - CROSS - MR. PAULSEN                740

1    them.  So of course, if they were talking about something in

2    the War Room, I would see it go viral, I would see it trend, I

3    would see my friends talking about it.  When my friends are

4    tweeting about a hashtag and I liked the hashtag, then I will

5    join in.  It's sort of a natural thing.

6    Q    Lots of things are trending at any given moment; isn't

7    that fair?

8    A    Yes, but not all about politics, things I'm interested

9    in.

10   Q    But always the ones that the War Room is talking about,

11   that you're doing?

12   A    Of course because that's the top trends, the top trends

13   are on the left when you log into Twitter, that's the first

14   thing you see.  Why wouldn't I tweet about something that was

15   in the top trends.  If I was interested in the topic, of

16   course I would tweet about it.

17   Q    I'd like to ask you about some of people in that room.

18   A    Okay.

19   Q    Who is HalleyBorderCol?

20   A    That's someone I just know as HalleyBorderCol.  I don't

21   know anything more about that person.

22   Q    Nothing more?

23   A    Yes.

24   Q    What about Mia4trump?

25   A    Same thing.  I know the handle, familiar with the handle.

1   Q    What about NeilTurner?

2   A    I do recall the handle.

3   Q    Didn't know any of these people otherwise?

4   A    That's correct.

5   Q    Fair to say you had been communicating with them for

6   months and months and months in 2016; is that right?

7   A    Yes.

8   Q    I'd like to show you in the War Room page 400-27.

9          THE COURT:  Is this in evidence?

10          MR. PAULSEN:  It is, your Honor.

11  BY THE COURT:

12  Q    You if you zoom in on the top, please.

13          Mr. Mackey, do you remember this page?

14  A    Yes.

15  Q    HalleyBorderCol says:  Let's did depress illegal voter

16  turnout with a nice hoax.

17  A    Yes.

18  Q    POTUSTrump says:  I like that idea Haley, but I think we

19  should wait for the day before or the day of, that way they

20  don't have time to debunk the rumor.  Needs to be earlier than

21  that.

22          THE COURT:  When you're reading be mindful of not

23  being a fast talker.

24          MR. PAULSEN:  Yes, your Honor.

25  Q    Next line:  People vote early and we need time for our

D. MACKEY - CROSS - MR. PAULSEN                    742

1    rumor to spread.

2              Do you remember that?

3    A    I remember when Agent Cunder read it, yes.

4    Q    So this is another example of something you didn't see?

5    A    Yes.

6    Q    HalleyBorderCol writes:  People aren't rational.  A

7    significant portion of people who hear a rumor will not hear

8    the rumor has been debunked.  Even so, they might not trust

9    it.  A big risk to take.

10             Do you agree with those sentiments?

11   A    Yes, I do.

12   Q    You do.  So if you're your going to spread something, you

13   don't want to spread it the day of, you want to spread it the

14   week before, right?

15   A    If that's your intention.

16   Q    The last line is Microchip; is that right?

17   A    Yes.

18   Q    There is a whole series of 4chan tactical nuke memes like

19   this and gives a link.

20   A    Yes.

21   Q    We saw a few references to 4chan here?

22   A    Yes.

23   Q    Do you recall Microchip saying that the War Room was a

24   strategy group?

25   A    I do.  I think that was Gerald Wine.

D. MACKEY - CROSS - MR. PAULSEN                743

1   Q    You're right, Gerald Wine wrote it.

2   A    Yes, you showed me that.

3   Q    I meant, when Microchip testified do you recall him

4   saying the same thing?

5   A    Yes, I do.

6   Q    He had said that it was expected that you would grab

7   things from 4chan or other places in response to the War

8   Room's ideas?

9   A    He said that it was expected?  I don't recall him saying

10  that.  If he said it, then sure.

11  Q    Do you recall him stating that -- let me rephrase.

12         Do you recall him saying that he would get things

13  from 4chan if he thought it kind of fit the narrative they

14  were pushing?

15  A    He testified to that?

16  Q    Do you recall him testifying to that?

17  A    I don't.  But I believe he probably testified to that.

18  Q    Now I'd like to go to 400-31.

19         Do you recall seeing these memes in the War Room?

20  A    I recall seeing them when they were introduced into

21  evidence or when we were reviewing the discovery with my

22  attorney.

23  Q    That's another example of something you didn't see in the

24  War Room?

25  A    Again, there were over 600 messages coming in per day in

D. MACKEY - CROSS - MR. PAULSEN                744

1   the War Room, and that's just one Twitter group.  So no, I

2   don't recall.

3            THE COURT:  Is it you don't remember or you didn't

4   see?

5            THE WITNESS:  I don't recall seeing these.  I don't

6   recall seeing it the all.

7   Q    You could have seen it?

8   A    I don't remember seeing the text to vote memes in the War

9   Room at all.  The first time I remember seeing them is on

10  4chan.

11  Q    Okay.

12  A    I'm not sure about all the other stuff that came prior.

13  For example, the obviously the photoshop MAGA hat, I do recall

14  seeing those in the groups.  As far as these memes, I don't

15  recall seeing them.

16  Q    What about the DraftOurDaughters stuff that was

17  distributed around the same time.  Do you remember those?

18  A    I do remember those.

19  Q    Do you recall that the Government showed that in

20  particular you were retweeting other members of the War Room?

21  A    Yes.

22  Q    You were retweeting HalleyBorderCol?

23  A    Yes.

24  Q    That's the person who shared those --

25  A    The person I was following.

D. MACKEY - CROSS - MR. PAULSEN                    745

1          THE COURT:  Let him finish.

2          THE WITNESS:  Apologies.

3   Q    Correct, that HalleyBorderCol is the one who shared the

4   two vote by text and vote by hashtag memes to the War Room?

5   A    I remember seeing this one because I retweeted it.  I

6   don't know about the other one.  You'll have to refresh me.

7   Q    You going back to DraftOurDaughters, though, you

8   retweeted Mia4trump?

9   A    I assume so.

10  Q    You rewetted Microchip?

11  A    I retweeted those people all the time.  I followed them,

12  most of them.

13  Q    HalleyBorderCol as well?

14  A    I think so.

15  Q    So all these individuals, so I understand this right, are

16  with you in the War Room; is that right?

17  A    Yes.

18  Q    There is a discussion of DraftOurDaughters; is that

19  right?

20  A    Yes.

21  Q    They all retweet DraftOurDaughters, so do you; is that

22  right?

23  A    Yes, that's right.

24  Q    But you're not paying attention to any of this?

25  A    Well, DraftOurDaughters was one of the biggest hashtags

D. MACKEY - CROSS - MR. PAULSEN                746

1    of all of them, that one was everywhere, everyone was tweeting

2    that and it made the news.  I was all over, that hashtag.  I

3    was tweeting it.

4              And you're talking about some of the biggest

5    accounts on Twitter.  Twitter has an algorithm.  I believe

6    they had an algorithm at the time.  When the big accounts are

7    tweeting, it will show up in your algorithm or feed and you're

8    going to see it.  And I can click on the hashtag and look at

9    DraftOurDaughters --

10             MR. PAULSEN:  Your Honor.

11             THE COURT:  I think it's so much easier if you just

12   answer the question that is being asked.  I know your lawyer,

13   if he wants to bring out some of this on redirect, he can do

14   that.  But just do your best just to answer the question that

15   you're being asked without -- let's try that.

16             THE WITNESS:  Yes, your Honor.

17             THE COURT:  Next question.

18   BY MR. PAULSEN:

19   Q    Most of my questions are yes or no questions.  I asked

20   some open-ended questions, but most are yes or no.

21   A    My apologies, Mr. Paulsen.

22   Q    No worries at all.

23             Ms. Parshad, could you jump to the next page.

24             Do you recall seeing this page discussed during the

25   trial?

D. MACKEY - CROSS - MR. PAULSEN                747

1   A      Yes.

2   Q      The top had Microchip sending back to the group a tweet

3   that he had sent out; is that right?

4   A      Yes.

5   Q      Micro then engages in a discussion with UnityActivists

6   and a few others about it; is that right?

7   A      Yes.

8   Q      They discussed making it more believable; is that

9   correct?

10  A      Yes.

11  Q      And some ideas are thrown out in ways to make it more

12  believable; is that right?

13  A      Yes.

14  Q      You heard Microchip testify that he meant to trick

15  people; is that right?

16  A      I did hear him testify that.

17  Q      You didn't share those thoughts, is that your testimony?

18  A      That's right.

19  Q      Can we skip to the next page.

20         Do you remember this page?

21  A      Yes.

22         (Continued on next page.)

23

24

25

D. MACKEY - CROSS - MR. PAULSEN                748

1    Q    So here, Microchip got a message from somebody; is that

2    right?

3    A    Yes.

4    Q    An individual named Lauren Nann?

5    A    Yes.

6    Q    Wrote him and was upset that Donald Trump didn't have

7    this as well; is that right?

8    A    It appears that's what he said, yes.

9    Q    You must have been surprised to see this, right?

10   A    When I saw it in the discovery?

11   Q    You didn't see it back then?

12   A    No.

13   Q    But so -- all right.

14        So when you first saw it then, you must have been

15   surprised, right?

16   A    Yes, I was surprised.

17   Q    Because you said nobody would fall for this, right?

18   A    Yes.

19   Q    Is this is it fair to say that Microchip sent this out

20   and a Trump voter fell for it?

21   A    I'm not sure what he means we should do our own.  Like we

22   should do our own memes or what, but it's possible a Trump

23   fell for it based on this tweet.

24   Q    Microchip wrote; Here's what I'm worried about.  Greg.

25   People on Trump's side thinking this is legit and they stay

1    home.  I'm plotting, will have something soon.

2              That's what it says?

3    A    Yes.

4    Q    And then Unity Activist has some more suggestions about

5    how to tweak it, right?

6    A    Yes.

7    Q    You sent your memes, I guess it's two days later; is that

8    right?

9    A    Yes.

10   Q    And you're saying you didn't watch any of this?

11   A    Yes.  I am.

12   Q    Now, you sent your first on November 1st; is that right?

13   A    Yes.

14   Q    And about seven hours later, you sent another?

15   A    Yes; that is right.

16   Q    And you retweeted one from nia4_Trump; is that right?

17   A    Yes.

18   Q    You said that one was on November 2nd?

19   A    Yes.

20   Q    How do you remember the exact time?

21   A    Because I saw it in the discovery.

22   Q    It doesn't have a date on it, though?

23   A    Because it would have come after I sent the second one.

24   And my account was suspended on the 2nd, therefore, I would

25   have to retweet it on the 2nd.

D. MACKEY - CROSS - MR. PAULSEN                    750

1    Q    Okay.  So you assume it's in that time period in between?

2    A    I assume based on those facts that it would have had to

3    be on the 2nd, because my account was suspended that day.  I

4    could be wrong, it could have been on the 1st.

5    Q    She thanked you when she sent out the tweet; is that

6    right?

7    A    Yes.

8    Q    Now, she was a member of the war room; is that right?

9    A    I think so, yes.

10   Q    Now, that tweet, the nia4_Trump one, this one

11   (indicating.)

12         Do you recall seeing that in another part of this

13   trial?

14   A    Yes, I just saw it.

15   Q    No, I mean --

16         MR. PAULSEN:  Let me rephrase.

17   Q    Do you recall seeing that photo in the --

18   A    Yes.  You just showed it to me.

19         THE COURT:  First of all, you must let him finish

20   the question.  Please put question again.

21         MR. PAULSEN:  I'll ask it differently.

22   Q    Do you recall seeing that photo in one of your -- the

23   different groups you were a member of; the Mad Men group?

24   A    No.

25         MR. PAULSEN:  Ms. Parshad, can you put up Government

1    Exhibit 430-63.  Can you zoom in, Ms. Parshad?

2    Q    Is that the same photo?

3    A    Yes.

4    Q    And that's also the same date?

5    A    Yes.

6    Q    Who's Jeffyt ?

7    A    I don't know.  It's a username.

8    Q    You don't know who it is?

9    A    No.

10   Q    You two were  in the group together for a long time;

11   isn't that right?

12   A    Yes.

13   Q    Do you know anything else about him?

14   A    Jeffyt?

15   Q    Yeah.

16   A    No, I don't.

17        MR. PAULSEN:  Can you show 420 -- 430-7, also in

18   evidence.  Sorry, that's is wrong one.  We can move on.

19   Q    Besides these three, did you send any others?

20   A    Not that I recall.

21   Q    Could you have sent more?

22   A    I don't think so.  It's possible.

23   Q    Do you recall the technical employee from Twitter,

24   Michael Anderson that testified?  Do you remember him?

25   A    Yes, I do.

D. MACKEY - CROSS - MR. PAULSEN                    752

1    Q    Do you remember that he said if something deleted a tweet

2    that you later retweeted, it would sort of vanish from

3    Twitter.  Do you recall him saying that?

4    A    I do.

5    Q    I think he called it an orphan retweet or something like

6    that.  Does that sound familiar?

7    A    Yes.

8    Q    Do you recall in the Warm Room, nia4_Trump said she

9    deleted some of the things she did?

10   A    I don't recall seeing that.

11   Q    Well --

12            MR. PAULSEN:  Let me rephrase.

13   Q    You pushed forward  the nia4_Trump one ; is that right?

14   A    I retweeted it, yes.

15   Q    Did you retweet anybody else's?

16   A    I don't recall retweeting anyone else's.

17   Q    Mr. Mackey, you had a loyalty army on Twitter?

18   A    Yes, I did.

19   Q    You talked a lot about this, right?

20   A    Yes.

21   Q    So what would happen if you tweeted something to your

22   army?

23   A    They would retweet it, they would comment on it, they

24   would like it.

25   Q    So you should have had every expectation that when you

1   tweeted these things that loyal army would do the same, right?

2   A    I don't know what they would do.  Usually they just

3   retweet.  You mean they would tweet messages?

4   Q    What I just said.

5   A    It didn't cross my mind.

6   Q    It didn't cross your mind?

7   A    It didn't cross my mind that they would take it

8   elsewhere, but it's certainly possible.

9   Q    Didn't you talk extensively about how your full awareness

10  that when you did something people responded?

11  A    Yes.  They did.

12  Q    Okay.  But for this one, you didn't expect that?

13  A    No, that's not what I'm saying.  I did expect they

14  respond.  I thought you meant that they would do other things

15  with it.  I had no idea what they were going to do.  I

16  expected they would retweet it, they would like it, they would

17  quote tweet it, they would respond to it.

18  Q    You expected when you would push something out, others

19  would push it further; is that fair?

20  A    Yes, yes.

21  Q    Now, you called yourself a leader of sorts; didn't you?

22  A    Yes, I did.

23  Q    Were you?

24  A    Yes, I would say so.

25  Q    Is that part of the reason your followers responded to

1    you?

2    A    Yes.  I think so.

3    Q    You understood the weight that your words carried with

4    the people in your group?

5    A    Yes.

6              MR. PAULSEN:  Can I show Government Exhibit 200D-19

7    .  The bottom part.

8    Q    So someone whose name is redacted wrote; You don't

9    realize the weight your words carry.  Your account is much

10   larger than the follower account would lead one to believe.

11             You understood that, right?

12   A    Yes.

13   Q    Did you understand it when you tweeted something, you

14   should expect it to move?

15   A    Yes.

16   Q    The MIT study, do you recall the witnesses about that?

17   A    Yes, I do.

18   Q    You were very proud of that rank, right?

19   A    I was surprised by it.  I was proud of it, yes.

20   Q    It was talked about a lot in the groups, right?

21   A    Yes, it was.

22   Q    Is it fair to say it seemed to you that the other people

23   in the groups were rather impressed by that?

24   A    Yes.

25   Q    That was your particular power, right?  Your ability to

D. MACKEY – CROSS – MR. PAULSEN                    755

1    kind of get things to get retweeted further?

2    A    Yes.

3    Q    Now, you communicated with members outside of these

4    groups, outside of Twitter as well as well; isn't that right?

5    A    Some of them, yes.

6    Q    How did you normally do that?

7    A    It would have been on -- I was a member of Slack.  I

8    could communicate with people on the phone.

9         MR. PAULSEN:  I'd like to show you Government

10   Exhibit 410-A.

11   Q    Do you recall this Mr. Mackey?

12   A    Yes.

13   Q    This is -- it's fair to say this is the micro chat?

14   A    Yes, it is.

15   Q    And this is around about the time you got kicked out of

16   Twitter the first time?

17   A    Yes.

18   Q    It says; Anyone hear from Ricky?  Someone wrote he's

19   still in this chat but not in this other.  Someone else writes

20   he's been active on Facebook.  Is that all right?

21   A    Yes, that's right.

22   Q    Vendetta92429 says he replied to a message from me on

23   there.  I was showing him some of the fan art in the memes.

24        Who is Vendetta92429?

25   A    I just knew him as Vendetta.

1    Q     It's a guy, it's a girl?

2    A     I think it's a guy.

3    Q     Don't know his real name?

4    A     No.  I don't think so.

5    Q     Now, in some of these group chats after you left, there

6    was a discussion about when the vote by text memes should be

7    released.  Do you remember seeing them?

8    A     Are you referring to the Mad Man groups?

9    Q     Mad Man and others?

10   A     Yes.

11   Q     Do you recall that there was a discussion that it should

12   be a week before the election?

13   A     Yes.

14         MR. PAULSEN:  Can I show Government Exhibit 430-49?

15   49, I misspoke.  I apologize your Honor.

16   Q     Do you remember this page?

17   A     Yes, I saw it during the trial.

18         MR. PAULSEN:  Zoom in the middle, please, Ms.

19   Parshad.

20   Q     It says don't post it though a week or less before the

21   election.  Do you recall that?

22   A     Yes.

23   Q     What was a week before the election in 2016?

24   A     It would have been November 1st.

25   Q     Is that the day you did it?

D. MACKEY - CROSS - MR. PAULSEN                757

1    A    Yes.

2    Q    Is that a coincidence?

3    A    Yes.  I wasn't even a member of this group.

4    Q    Do you remember 1080P in this group?

5    A    Yes, I do.

6    Q    What do you know about 1080P?

7    A    Nothing besides his name is 1080P.

8    Q    No facts about him?

9    A    No.  I don't recall anything about 1080P.

10   Q    Is it fair to say he appeared to be the one that made a

11   lot of things?

12   A    Based on the discovery that we reviewed, yes.

13   Q    He's also the one that shared a group, an article, right

14   after you were suspended from Twitter?

15   A    I don't recall that, but if you're saying it I'll take

16   your word for it.

17        MR. PAULSEN:  Can we show Government Exhibit 430-64.

18   Q    Do you remember this slide?

19   A    Yes.

20        MR. FRISCH:  I'm sorry, I object.  I think.

21        THE COURT:  Is it in evidence?

22        MR. FRISCH:  I don't object to the document.  I

23   object to the questioning.  It's not worth a sidebar, I'll

24   withdraw the objection.

25        THE COURT:  Go ahead.

1    Q    Do you recall, Mr. Mackey, seeing a private discussion

2    with 1080P about these vote by text memes?

3    A    Yes.

4              MR. PAULSEN:  Can you show Government

5    Exhibit 200-Q-2.

6    Q    Do you remember this one, Mr. Mackey?

7    A    Yes.

8    Q    One of these --

9              MR. FRISCH:  I'm sorry, I think I have to object.  I

10   don't want to necessarily do it in open court, I apologize.

11             THE COURT:  Are you asking for a sidebar?

12             MR. FRISCH:  I am.

13             (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                              759

1                (Sidebar conference.)

2                MR. FRISCH:  I just don't want to say this in open

3      court, but if, when did he see it, did it see it in discovery

4      or did he see it at the time?

5                THE COURT:  Well, he seems quite capable of

6      volunteering.  You can ask him on redirect.  I mean, I don't

7      think there's anything wrong with the way the question is

8      being asked, and if you want to clarify  it, you can do it on

9      redirect.

10               MR. FRISCH:  That was my objection.

11               (Sidebar concluded.)

12               (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

D. MACKEY - CROSS - MR. PAULSEN                760

1          (In open court.)

2          THE COURT:  The objection is overruled.

3    Q    Do you remember this, Mr. Mackey?

4    A    This is a private conversation between 1080P and

5    Ms. Rachel --

6    Q    That's right.  Do you remember seeing it?

7    A    I remember seeing it during, reviewing of discovery and

8    during the trial.

9    Q    So here 1080P says; When did you think we should start

10   posting these and the response is November; 1st is that right?

11   A    Yes, I see that.

12   Q    That's the day you did yours?

13   A    Yes it is.

14   Q    Also coincidence?

15   A    Yes.

16   Q    Would you agree, Mr. Mackey, that several of the other

17   members of these groups appeared to want people to fall for

18   these?

19   A    Yes, I do.

20   Q    We already heard from Microchip.  He said that's what he

21   wanted, right?

22   A    Yes.

23          MR. PAULSEN:  Can we pull up 410-22.

24   Q    Who is Mr. Charlie Coker?

25   A    That's one with an avatar, or username Mr. Charlie Coker.

1  Q    Did you know him?

2  A    No.

3  Q    You were in groups with him?

4  A    Okay.  There were 50 people in the group.  I don't

5  remember every single avatar.  I mean, some I just recognize

6  the same, some I don't remember the name.

7  Q    He said that he hoped some stoners would fall for it,

8  especially in Colorado; is that right?

9  A    Yes he did.

10 Q    You didn't want that.  Is that your  testimony?

11 A    No.  I don't think I tweeted that meme, so.

12 Q    No, but in general.  You didn't want some people in

13 Colorado to fall for this?

14 A    No.

15        MR. FRISCH:  I object to the question.

16 A    I never saw this.

17        THE COURT:  Overruled.

18 A    No.

19        MR. PAULSEN:  Now, if I can pull up Mad Men 430-43.

20 Q    Mr. Mackey, do you remember this?

21 A    From the discovery.  Yes.

22 Q    You were in the room at this time?

23 A    I was in the room.  Yes.  It was before I was suspended

24 out of the room.

25 Q    That's right.  What did you think of this when it was

1    sent on February 26, 2016?

2    A    I don't recall that it was sent on February 26th.  What

3    did I think of if?  I don't know what you mean.

4    Q    Do you remember seeing this on September -- did I say

5    February, I'm sorry.  September  26, 2016?

6    A    No.

7    Q    You didn't see it?

8    A    No, I didn't see it.

9    Q    It appears to be individuals in your group saying we

10   should do something like what this did in Brexit, right?

11   A    Yes.

12   Q    Somebody says let's fake something like this for Hillary?

13   A    Yes.

14   Q    Then the bottom somebody says typical that all of the

15   dopey minorities fell for it?

16   A    Yes, they did.

17   Q    Was it surprising to you to, again?

18   A    I don't recall seeing this.  I mean, the Brexit thing I

19   don't know when Brexit  was, but yes, I was surprised to this.

20   Q    You didn't think anybody would fall for these things?

21   A    Yes, I didn't think so.

22   Q    When you saw this, that must have been surprising, right?

23   A    I don't know what's going on in their heads.  I don't

24   think I'm surprised that other people might have thought that.

25   Q    You didn't think that maybe they were gullible?

D. MACKEY - CROSS - MR. PAULSEN                763

1              MR. FRISCH:  Objection.

2    Q    Maybe they had low IQ?

3    A    Who?

4    Q    The people that fell for it.

5    A    I have no idea.  I'm not sure that anyone fell for it.

6    Just because they tweeted it, doesn't mean they fell for it.

7    They could have been expressing support for her, I have no

8    idea what these tweets are.

9    Q    But either way, you're saying that you didn't want anyone

10   to fall for this?

11   A    Right.  I didn't expect anyone to fall for it.

12   Q    Are you the only one in your group that didn't think

13   that?

14   A    I don't know.  I don't know what's in their heads.

15             MR. PAULSEN:   I'd like to see Mad Man 430-57.

16   Q    Do you remember this?

17   A    Yes.

18   Q    Who is Gabe?

19   A    Gabe?

20   Q    Yeah.

21   A    I don't know.

22   Q    What about Grand Torino DSA?

23   A    Yeah, I recognize that handle.

24   Q    So Grand Torino DSA says; Dopey shitlibs will fall for

25   that too?

*ToniAnn Lucatorto RPR, RMR, CRR*

D. MACKEY - CROSS - MR. PAULSEN                    764

1    A    Yes, I see that.

2    Q    You didn't think that would happen?

3    A    No.  I wasn't in this group either.

4    Q    I'm just asking you what you would have thought?

5    A    No.

6    Q    So everyone seems this will work but you?

7    A    Everyone ?  I've seen a couple people say it.  I didn't

8    see what everyone else said.

9    Q    Mr. Mackey, one of the accounts you used, the one you

10   used for this is was called the Ricky Vaughn, right?

11   A    Yes.

12   Q    Who gave you that account?

13   A    I don't recall.  Whether it was Amy Stephen or someone

14   else.

15   Q    You don't recall?

16   A    No.

17   Q    You got it from -- would you be surprised if there was

18   documents in evidence indicating that it was Amy Stephen?

19   A    No, I wouldn't be.  I know someone gave it to me.

20   Q    So who is Amy Stephen?

21   A    Amy Stephen is a woman on Twitter.  She uses the handle

22   Amy Stephen.

23   Q    You found her very useful, didn't you?

24   A    Useful?  Yes, I think so.

25   Q    Why was she useful?

1    A    Well, because she was a democrat and we convinced her to

2    -- she went from the left to the right.  So any time someone

3    changes their mind then I mean that's useful if you want to

4    change other people's minds.

5    Q    You converted her, right?

6    A    Yes; that is right.

7    Q    So when she would retweet your stuff, it got to a whole

8    different crowd of people?

9    A    Right.

10   Q    It was sort of an objective of Twitter, right?  To get

11   things out of your group?

12   A    I don't know that's the objective of Twitter.  But yes.

13   I think getting things to go viral is definitely  an objective

14   of Twitter.

15   Q    Did you ask her to create this account for you?

16   A    I don't recall.  I might have.

17   Q    Do you remember how you got it from her?

18   A    No.  I don't remember exactly how I got it from her.

19        MR. PAULSEN:  I'd like to show you some documents

20   that we've shared with you.  It's Government Exhibit 1004.

21   It's not in evidence yet, your Honor.  This is the documents

22   that we shared earlier.

23        THE COURT:  Okay.

24        MR. PAULSEN:  Ms. Parshad do they have the

25   redactions we discussed?

D. MACKEY - CROSS - MR. PAULSEN                766

1   Q     Mr. Mackey, do you remember this conversation?

2   A     Yes.  I do.

3   Q     You write, wow, I have to tell you --

4           THE COURT:  You haven't offered it in evidence yet.

5   Any objection.

6           MR. FRISCH:  Just as we discussed.

7           THE COURT:  Okay.  So I guess this is not part of

8   that other conversation we had?  Okay, so this is in evidence.

9           MR. PAULSEN:  Yes, your Honor.  Thank you.

10          THE COURT:  I was confused.

11          MR. PAULSEN:  This is Government Exhibit 104.

12          (Government Exhibit 104, was received in evidence.)

13  Q     Mr. Mackey, did you write; Wow, I have to tell you.

14  Taking -- was the best thing I ever did.  Even shit libs now

15  love me?

16  A     Yes.

17  Q     Ms. Stephen was somewhat taken with you; is that right?

18  A     Yes, she was.

19  Q     Now, you talked in one of the groups about how important

20  her conversion was, right?

21  A     Yes.

22  Q     What did that allow you to do?

23  A     What did that allow me to do?  She had an audience that

24  we could reach.

25  Q     You talked about how you said that if you sent things,

D. MACKEY - CROSS - MR. PAULSEN                   767

1   your avatar hat would be there, right?

2   A    Yes.

3   Q    It was important to convert people who could push your

4   message further, correct?

5   A    It's important to go viral, to convert people.  It's

6   politics.

7   Q    Do you remember she said some nice words about you?

8   A    Yes she did.

9   Q    Were you guys always kind to her?

10  A    No, we weren't.

11  Q    Why was that?

12  A    I don't know.  That's kind of how we talked.  We were

13  very vulgar and rude.

14  Q    Why with her, though?

15  A    Why with her?  I think that's basically, unfortunately,

16  back then I was very vulgar and rude.  And we would joke and

17  say things that weren't nice about other people.  That's just

18  the reality of it.

19  Q    Do you recall that --

20        MR. PAULSEN:  I'd like to show Government

21  Exhibit 1004-0009.

22  Q    Ms. Stephen wrote I love Ricky Vaughn.  If only he were

23  30 years older.

24  A    Yes.

25  Q    Do you recall that?

D. MACKEY - CROSS - MR. PAULSEN                768

1   A    Yes.

2   Q    When you got the account from her, you started mocking

3   her divorce; is that right?

4   A    Yes, I did.

5   Q    She got divorced in part because of you converting her;

6   is that right?

7   A    Unfortunately, yes.

8   Q    Were you kind about that?

9   A    I was not.

10  Q    Why not?

11  A    I just -- I don't think I was very kind back then at all.

12  Q    You wrote that, and I quote; I really did a number on

13  her.  JFC.

14  A    Yes, I did.

15  Q    Why did you say that?

16  A    Because I was shocked.  I was shocked that first of all

17  she would flip, and then it would be so much of a drastic

18  change that she would actually divorce her husband.

19  Q    Did you then, kind of, taunt her divorce in a group

20  message?

21  A    I did, yes.

22  Q    He cuck by an anon Major League avatar.  What does that

23  mean?

24  A    It means basically well, the Major League avatar is Ricky

25  Vaughn.  Anon is, means anonymous.  And he cuck just means.  I

 1    don't know.  It's kind of a vulgar saying but, you know, it's

 2    kind of vulgar.

 3            THE COURT:  What does JFC mean.

 4            THE WITNESS:  That means Jesus --

 5            THE COURT:  Oh, I see.  I get it.

 6    Q    Who gave you the run of RV account after you got kicked

 7    off the second time?

 8    A    I don't recall.  That might have been Amy Stephen, but I

 9    don't recall.

10    Q    Who is JBurtonXP?

11    A    That's someone I know as JBurtonXP.

12    Q    Isn't it true he's the one that gave you that account?

13    A    I guess it was.  I don't recall exactly who gave it to

14    me.

15    Q    Who is he?

16    A    A Twitter user going by JBurtonXP.

17    Q    You don't know his name either?

18    A    No.

19    Q    Why did he give you the account?

20    A    I don't know why he gave me the account.  He likes my

21    tweets.

22            THE COURT:  Just to clarify.  Why were people giving

23    you accounts at this point?

24            THE WITNESS:  Because they wanted me back on

25    Twitter.

1      THE COURT:  Oh, you had been banned at this point?

2      THE WITNESS:   I had been banned at this point.

3      THE COURT:  I see.  Sorry about that.  Go ahead.

4  Q    Mr. Mackey, I'd like to ask you about the second tweet,

5  this one.  This one has a Hispanic woman and it's in Spanish,

6  right?

7  A    Yes.

8  Q    Do you recall sending that?

9  A    Yes, I did.

10 Q    Why did you pick that one?

11 A    I saw it on 4chan.

12 Q    Why that one of any of them?

13 A    I just picked a random image on 4chan and shared it on

14 Twitter.

15 Q    You had a lot of choices, right?

16 A    From those threads, there were just those two images.

17 Q    You had a sense of what groups were the important voters

18 for democrats, right?

19 A    Yes, I did.

20 Q    What were those groups?

21 A    I think that the African American vote was her most

22 important constituency.  There were others.

23 Q    What about women  voters?

24 A    Women voters are an important constituency.

25      MR. PAULSEN:  If I can show just for the parties

D. MACKEY - CROSS - MR. PAULSEN                    771

1    Government Exhibit 1005-30 .  If Ms. Parshad, if you can

2    redact  that as discussed.

3    Q    Mr. Mackey, did you send that tweet?

4    A    Yes, I did.

5              THE COURT:  Any objection?

6              MR. FRISCH:  For the reasons stated.

7              THE COURT:  Okay, you can publish it.

8    Q    Mr. Mackey wrote; If the democrats have their  way, they

9    will form a permanent majority of unmarried white women and

10   minorities.

11             Women and minorities ; those were the two that you

12   focused on; is that right.

13   A    That I focused on?

14   Q    Yeah.  As the --

15   A    In this tweet.

16   Q    As the important groups on your side; is that right?

17   A    I think those were the most important for democrats, yes.

18   Q    Why unmarried white women?

19   A    Just because they voted for democrats in higher numbers

20   than married white women.

21             (Continued on the next page.)

22

23

24

25

D. MACKEY - CROSS - MR. PAULSEN                    772

1   BY MR. PAULSEN:

2   Q    Other than those two groups -- let me rephrase.

3        Do you recall during the trial you heard a recording

4   in which you said you didn't think women should vote?

5   A    Yes, I do.

6   Q    Do you remember doing that podcast?

7   A    Yes.

8   Q    Were there any other groups, other than women, that you

9   thought shouldn't vote?

10       MR. FRISCH:  Your Honor, I beg your parden, but I do

11  object to the question.

12       THE COURT:  Overruled.

13  A    At the time?

14  Q    Yes, at the time.

15  A    I don't recall what I said at the time.

16  Q    Do you think that were other groups that you thought

17  shouldn't be voting?

18  A    Probably, yes.

19  Q    Did you want people who spoke Spanish as their first

20  language to vote?

21  A    I don't recall.

22  Q    What about immigrants, did you think immigrants should

23  vote?

24  A    As long as they are legal.

25  Q    I mean legal immigrants.

1    A    Yes.

2    Q    I'm going to show 1005-33, Just to the parties and the

3    Court.

4             Mr. Mackey, did you send that tweet?

5    A    Yes, I did.

6             THE COURT:  Any objection other than what we

7    discussed?

8             MR. FRISCH:  No.

9             THE COURT:  Okay, you can show it.

10            (Government Exhibit 1005-33, was received in

11   evidence.)

12   Q    Mr. Mackey, did you write:  Trump won natural born

13   citizens 50 percent to 45 percent, naturalized citizens should

14   not get the vote.

15   A    Yes, I did.

16   Q    Did you believe that?

17   A    At the time I believed it.

18   Q    Do you still believe it?

19   A    No.

20   Q    1005-34, just for the parties.

21            Mr. Mackey, did you send that tweet?

22   A    Yes, I did.

23            THE COURT:  Do you have an objection other than what

24   we discussed?

25            MR. FRISCH:  That's right.

D. MACKEY - CROSS - MR. PAULSEN                774

1          THE COURT:  You can show it.

2          (Government Exhibit 1005-34, was received in

3    evidence.)

4    Q     Mr. Mackey, did you write:  Immigrants, the children of

5    immigrants, et cetera, cannot be trusted to vote in the

6    interests of their new country.

7    A     Yes, I did say that.

8    Q     Why did you say that?

9    A     Because I believed it at the time.

10   Q     This is the time when you were sending around memes that

11   if followed literally would trick people out of voting?

12   A     Yes.

13   Q     Including ones in Spanish?

14   A     Yes, one in Spanish.

15   Q     Mr. Mackey, we mentioned this a moment ago, but you

16   actually didn't think women should vote; is that right?

17   A     At the time that's what I believed.

18   Q     Did you change your opinion on that?

19   A     I have, yes.

20   Q     You obviously listened to the recording I mentioned a

21   moment ago, right?

22   A     Yes.

23   Q     That was a serious recording?

24   A     Yes, it was.

25   Q     You were speaking sincerely?

D. MACKEY - CROSS - MR. PAULSEN                775

1    A    Yes.

2    Q    That was a pretty consistent position of yours around

3    that time; is that right?

4    A    Yes, it was.

5    Q    So you would be unsurprised to learn that you said it on

6    a number of occasions?

7    A    Yes.

8    Q    Why didn't you think women should vote?

9    A    Mostly just because they tended to vote for Democrats; I

10   was a Republican at the time.

11   Q    The hashtag #RepealThe19th, do you recall using that?

12   A    Yes.

13   Q    What is the 19th Amendment?

14   A    The amendment which gives women the right to vote.

15   Q    You thought that should be repealed?

16   A    At the time I did, yes.

17   Q    I'd like to show you some of these which I will show your

18   counsel first.  If I could show you Government's Exhibit

19   1005-19.

20            Did you send that, Mr. Mackey?

21   A    Yes, I did.

22            MR. PAULSEN:  May I publish?

23            THE COURT:  Anything else to say about this?

24            MR. FRISCH:  I have no objection to it.

25            THE COURT:  You can publish it.

D. MACKEY - CROSS - MR. PAULSEN                776

1              (Government Exhibit 1005-19, was received in

2     evidence.)

3     Q    Mr. Mackey, did you write:  Women are children with the

4     right to vote.

5     A    Yes, I did.

6              THE COURT:  What does that hashtag mean?

7              THE WITNESS:  It's just an inside reference.

8              THE COURT:  Does it mean anything?

9              THE WITNESS:  No, not really.

10             MR. PAULSEN:  Your Honor, I think it's a misspelling

11    of Logic Trap.

12             THE COURT:  Is that right?

13             THE WITNESS:  Yes, that's right.

14    Q    Did you believe at the time that women were children with

15    the right to vote?

16    A    Yes, I did.

17    Q    Let me show you what is marked, to show the witness and

18    the parties, 1005-20.

19             Did you send that, Mr. Mackey?

20    A    Yes, I did.

21             MR. PAULSEN:  May I publish, your Honor?

22             MR. FRISCH:  I have an objection, I wish to shall

23    heard.

24             THE COURT:  Yes.  Sidebar with the court reporter.

25             (Continued on the next page.)

SIDEBAR CONFERENCE                    777

1          (Sidebar conference.)

2          MR. FRISCH:  Here's my concern, I've had this

3    concern from the beginning, which is that this cannot, this

4    trial cannot be a referendum on his political views.  There is

5    a point to which enough is enough.  We reached the tipping

6    now.  A referendum on views that he had, some of these were a

7    year before the election.  The Government has made its point.

8    I have my own view of this prosecution.

9          THE COURT:  I sensed that.

10          MR. FRISCH:  But I think that at this point we have

11   reached the tipping point.

12          He made the point of racism, the point about

13   misogyny, the point of the 19th Amendment.  This is piling on.

14   We reached the point; they should move on to something else.

15          MR. PAULSEN:  Only my second tweet on the women

16   issue.

17          THE COURT:  The only thing I'll say about this, you

18   don't have to show him every single one.  And I think that one

19   more is all that is necessary.  I will say, his responses to

20   the questions initially was he didn't think women should vote

21   because they vote for Democrats.  And those weren't what he

22   expressed in those tweets.  So I think, I don't think he

23   should be able to say that and not challenge it.  I think that

24   part is fine.

25          I'll let you do one more.

SIDEBAR CONFERENCE                778

1          The only other question I had was to the extent to

2    which timing is important on any of these.  So for example, if

3    some of these are tweeted or whatever close in time to when he

4    also tweeted this, that has relevance.  That is separate and

5    apart from his general attitude.

6          MR. PAULSEN:  I'll focus on the ones that are closer

7    in time.

8          MR. FRISCH:  The one.

9          THE COURT:  If there is more than one that is close

10   in time.  Remind me of the date of this one.

11         MR. PAULSEN:  I don't have it off the top of my

12   head.

13         THE COURT:  Let's not do this one.  You have made

14   the point about it.  Plus there is the podcast.

15         I think it's relevant, but I think the relevance of

16   additional ones relate to the placement of them in connection

17   with what is sent out.  How many are there?

18         MR. PAULSEN:  Quite a few.  I think you said I could

19   do five.  I've only done one.

20         THE COURT:  Okay, but in terms of -- there are

21   different ways to do it.  If he acknowledges it that he sent

22   it close in time, then you can say:  Have you sent other

23   similarly phrased ones.

24         Is that fine?

25         MR. FRISCH:  You know I think -- yes, it's fine.

SIDEBAR CONFERENCE                                779

1    Thank you.

2              (End of sidebar conference.)

3              (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D. MACKEY - CROSS - MR. PAULSEN                780

1                (In open court.)

2                THE COURT:  Did you want to select a different

3     exhibit?

4                MR. PAULSEN:  Yes, your Honor, I'll do that.

5     Q    Mr. Mackey do you recall when I played that recording of

6     the podcast in which you said you didn't think women should

7     vote?

8     A    Yes.

9     Q    Do you recall that I believe your defense counsel asked

10    around when the time was, do you remember that?

11    A    Did he ask that?

12               THE COURT:  Do you remember when the time was?

13               THE WITNESS:  No, I don't.

14    Q    Do you recall that the podcast was done around

15    March 2016?

16    A    Yes.

17    Q    Fair to say that your feelings about whether women should

18    vote were not localized around March 2016; is that right?

19    A    That's right.

20    Q    So is it correct to say on the eve of the election,

21    during the election, you didn't believe women should vote?

22    A    Yes, it is.

23    Q    Would it surprise you at all if there were a number of

24    tweets from in your account stating that fact?

25    A    No, it wouldn't.

1    Q    Similarly, would it surprise you that there were a number

2    of specific tweets in which you said that unmarried women

3    specifically shouldn't be voting?

4    A    I would not be surprised.

5    Q    Why unmarried women?

6    A    Because unmarried women tended to voted more for

7    Democrats than for Republicans.

8    Q    That's the only reason?

9    A    That's the only reason that I remember.

10   Q    Why not just say Democrat women shouldn't vote?

11   A    I don't know.

12   Q    I'd like to show you one more, your Honor?

13        THE COURT:  All right.

14   Q    Government's Exhibit 1005-21.  Showing just to the

15   parties.

16        Do you remember sending that, Mr. Mackey?

17   A    Yes.

18        MR. PAULSEN:  Your Honor, may I publish?

19        MR. FRISCH:  For the reasons stated.

20        THE COURT:  Yes, you may.

21        (Government Exhibit 1005-21, was received in

22   evidence.)

23   Q    Did you write, Mr. Mackey, that:  It's impossible to have

24   a functioning Government when single women and single mothers

25   vote.

D. MACKEY - CROSS - MR. PAULSEN                    782

1   A     I did retweet it; I didn't write it.

2   Q     You just thought it was a good idea?

3   A     Yes.  I retweeted it.

4   Q     Would you surprise you that there is similar tweets that

5   you wrote?

6   A     No, it wouldn't surprise me, no.

7   Q     So a good idea is a good idea, right?

8             MR. FRISCH:  Objection.

9             THE COURT:  You can rephrase.

10  Q     Fair to say that you both tweeted that women shouldn't

11  vote and you retweeted that women shouldn't vote?

12  A     Yes, it is.

13  Q     That was an idea worth giving out both ways, right?

14  A     I'm not denying that I believed it.  I was just being

15  specific that I retweeted, it not tweeted.  I'm not denying

16  it.

17  Q     Okay.  Just to sum up, you don't think women should vote?

18  A     I used to.

19            MR. FRISCH:  Objection.

20            THE COURT:  Sustained to form.  I think he said he

21  didn't think so at the time.

22  A     I didn't think so at the time.

23  Q     In 2016 you didn't think women should vote?

24  A     That's right.

25  Q     In 2016 you didn't think immigrants should vote?

D. MACKEY - REDIRECT - MR. FRISCH          783

1    A     That's right.

2    Q     In 2016 you thought black people were gullible?

3    A     Yes.

4    Q     In 2016 you thought black people believed everything they

5    read on Twitter?

6    A     That was an exaggeration, but yes.

7    Q     In 2016 you thought black people had low IQ?

8    A     I did say that.

9    Q     You had lots and lots of followers who pushed forward

10   whatever you did?

11   A     Yes.

12   Q     You were in multiple groups in which people were trying

13   to trick people out of voting?

14   A     Yes, I was.

15   Q     But you didn't mean it.

16   A     That's correct.

17           MR. PAULSEN:  No further questions, your Honor.

18           MR. FRISCH:  May I?

19           THE COURT:  Yes, go ahead.

20   REDIRECT EXAMINATION

21   BY MR. FRISCH:

22   Q    Mr. Mackey, you testified there is a chart in evidence, I

23   think through Agent Cunder, it was for the record it's 500,

24   but it's the one that lists I think some Twitter handles and

25   the number of hashtags.  Do you remember what I'm talking

D. MACKEY - REDIRECT - MR. FRISCH                784

1    about?

2    A    Yes, the hashtags.

3    Q    Could you explain, you started to answer Mr. Paulsen's

4    question about that, could you give that answer now?

5    A    Yes.  Those were hashtags that I tweeted that were also

6    discussed in the chat groups.  But those, I'm saying, those

7    tweets, those hashtags, were widely popular.  They were

8    trending at the time.  And all my followers were tweeting

9    them.  That's kind of what we did.

10        We acted as if -- if all my followers are tweeting

11   something that's trending, I'm always tweeting about the

12   trending hashtags; that's sort of what you do on Twitter,

13   especially if everyone is talking about it.

14   Q    Mr. Mackey, have you ever apologized to anyone, generally

15   speaking, for the things you said as Ricky Vaughn?

16   A    Yes, I have.

17   Q    To whom have you apologized?

18   A    To my family.

19   Q    Why did you apologize?

20   A    Because it was in bad taste.  It was wrong.  It was

21   offensive.

22   Q    Do you remember tweeting that feeling when you

23   haphazardly posted a meme and it winds up on cable television?

24   Did you remember that one?

25   A    Yes.

D. MACKEY – REDIRECT – MR. FRISCH                785

1   Q     What did you mean by that?

2   A     I meant that I was really shocked that I tweeted

3   something without putting any thought into it, haphazardly,

4   and that there it was on CNN.  I was pretty surprised by that.

5   I found it amusing at the time.

6             MR. FRISCH:  I have nothing else, your Honor.  Thank

7   you.

8             THE COURT:  Any recross?

9             MR. PAULSEN:  No, your Honor.

10            THE COURT:  You can step down.

11            (Whereupon, the witness was excused.)

12            THE COURT:  I want to check about scheduling at

13   sidebar.

14            (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    786

1              (Sidebar conference.)

2              THE COURT:  At least as far as the jury is concerned

3    are you planning on calling -- first of all, are you planning

4    on calling any other witnesses?

5              MR. FRISCH:  No.

6              THE COURT:  Are you planning on calling any rebuttal

7    witnesses?

8              MR. PAULSEN:  No, your Honor.

9              THE COURT:  I'm going to excuse them until Monday.

10   But I would like to have a charge conference tomorrow when

11   everybody's brains are --

12             MR. FRISCH:  I have no hot water in my home; so I

13   would like to now.

14             THE COURT:  That's fine.

15             MR. FRISCH:  I'll accommodate, whatever you want.

16             THE COURT:  You've got to fix your hot water.  I'm

17   happy to do it.

18             I want to mostly make sure when to tell the jurors

19   to come back.

20             (End of sidebar conference.)

21             (Continued on the next page.)

22

23

24

25

PROCEEDINGS                    787

1              (In open court.)

2              THE COURT:  I'm trying to get a sense from the

3    lawyers where we are next.  It looks like I'm going to give

4    you tomorrow off, so we can talk about certain matters.  I

5    don't think it would be the best use of your time.

6              Let me ask, which I neglected to do.

7              Do you plan on calling any additional witnesses?

8              MR. FRISCH:  I don't.  Except for the one matter

9    that we talked about before the jury came in.

10             THE COURT:  I see.  We'll wait on this.

11             My anticipation is that on Monday you'll hear the

12   parties' summations and my charge on the law.  I hope it

13   doesn't bother anybody that you have tomorrow off.

14             Because we aren't going to be together for a little

15   bit, I want to remind you in the most, in the strongest

16   possible terms, the importance of staying away from any

17   coverage of this case whatsoever, in any way shape or form.

18   Don't talk about it with anybody at home, or obviously amongst

19   yourselves.  Surely, don't permit anybody to contact you about

20   it.

21             Even though we won't be meeting tomorrow, you know

22   how to reach Ms. Greene.  I'm going to excuse you for now.

23             Please have a great three-day weekend.  And I'll see

24   Monday morning at 9:30.  Thank you so much.

25             (Jury exits the courtroom.)

PROCEEDINGS                            788

1           THE COURT:  Everybody can have a seat.  I forgot to

2      bring my charge with me so my law clerk is getting it.  I want

3      to address this question of the co-conspirator statements.

4      This is with the proviso if there is further briefing on it,

5      but I think, so the record is clear, I think Judge Garaufis

6      said before the case was reassigned to me that he was going to

7      follow the protocol that's described in *United States vs.*

8      *Geaney.*

9           Pursuant to that protocol, statements offered as

10     co-conspirator statements may be admitted into evidence on a

11     conditional basis subject to the Government meeting its burden

12     of proof to show that the defendant and the declarant or

13     declarants were members.  And that the statements were made

14     during the course of and in furtherance of the conspiracy.

15          After hearing the evidence at the trial, including

16     the proffered statements of the alleged co-conspirators, I

17     find that all of the statements offered in evidence, including

18     those of -- these are all they are Twitter names --

19     @HalleyBorderCol, @WDFXTEU7, @UnitedActivist, @Mia4trump,

20     @1080P, @BakedAlaska, @Jakekass, @nJeffytee, @ncurveme,

21     Twitter user 79421334054533604, @urpochan, @WDFXTEU8,

22     @MrCharlieCoker, @DonnyJBismarck, @Unspectateur, and Twitter

23     user 250628884, as well as other identified and unidentified

24     individuals who communicated with the defendant or with those

25     individuals in relation to the charged conspiracy on Twitter,

PROCEEDINGS                                789

1   4chan, or other messaging platforms.

2          Those are admissible under Federal Rule of Evidence

3   801(d)(2)(E) as an exception to the rule of hearsay.  In

4   particular I find that the Government has shown by a

5   preponderance of the evidence, One, there was a conspiracy to

6   injure, oppress, threaten and intimidate one or more people in

7   the free exercise and enjoinment of the right to vote.

8          Two, that it's members included the defendant and

9   the identified and unidentified individuals listed above or

10  that I just listed.

11         And three, that the statements were made during the

12  course of and in furtherance of the conspiracy.

13         As I said, I know that Mr. Frisch wanted to amplify

14  this objection and others, but I think for purposes of a

15  ruling on the record that's my ruling.

16         Let's turn to the charge.  My law clerk sent out the

17  last version of the charge.  And I'm just going to start party

18  by party.  And we'll start with the defense, whether you have

19  any objections to the charge.

20         MR. FRISCH:  Yes.

21         THE COURT:  Okay.

22         THE COURT:  Tell me the first one.

23         MR. FRISCH:  My pages are not numbered, but this

24  looks like paragraph eight, uncharged acts considered for a

25  limited purpose.

CHARGE CONFERENCE                                    790

1          THE COURT:  Your pages aren't numbered?

2          MR. FRISCH:  They are not numbered.  Also, I live

3    like in a tech-free place where nothing works, including my

4    plumbing, but in any event.

5          THE COURT:  I don't see --

6          MR. FRISCH:  But I have section eight, uncharged

7    acts considered for a limited purpose.

8          THE COURT:  That's actually three.  I don't know if

9    you're working from the same version.

10         MR. FRISCH:  I believe this is -- unless I made a

11   mistake, I printed out the most recent one.  If your Honor has

12   a copy of --

13         THE COURT:  Could we print it out because the

14   numbering is different?  There is not a whole lot that changed

15   in it, but it will make things easier for you if you have the

16   same one.  Let's take a minute while we're printing it out.

17         MR. BUFORD:  If you could print one for us too, that

18   would be great.

19         THE COURT:  We'll print it in chambers.

20         The one that I have is uncharged acts considered for

21   a limited purpose.  Maybe we can get started on what your

22   objection to this is.  I'm not sure how much it applies, I

23   have to say, after --

24         MR. FRISCH:  I'm not sure I understand why any of

25   this, this is not that kind of case.  There is no other -- I

CHARGE CONFERENCE                       791

1    don't get why this is in here at all.

2              THE COURT:  I think we, in an effort to be prepared,

3    did it before he testified.  I don't think I was aware of what

4    was going to be requested, so I think the whole thing can come

5    out, unless you have any objection.

6              MR. BUFORD:  No, your Honor.  I think we originally

7    included it to serve the purpose of what I think is now in the

8    charge as the inflammatory statements charge.

9              THE COURT:  I think that's right.  So that's out.

10             There may be other things like that too because we

11   were trying to predict.

12             MR. FRISCH:  The section under cooperating witness

13   testimony.  It looks like the second paragraph of that applies

14   to when the defense makes an issue of proffer agreements.  I

15   don't think it applies here, or otherwise it doesn't apply

16   here.

17             THE COURT:  I thought he was questioned on this.  I

18   thought the agreement came in.

19             MR. FRISCH:  I'm going to read:  As part of the

20   cooperation Microchip agreed to testify and the Government

21   agreed that it would not use his testimony against him in any

22   subsequent proceeding.  But that's proffer agreement language.

23   I didn't go into the proffer agreements.

24             THE COURT:  Do you want that out?

25             MR. FRISCH:  I think that should come out.  It's not

CHARGE CONFERENCE                               792

1    applicable to the case.  The last sentence probably is fair.

2              THE COURT:  That's what I think.  We'll take out

3    that first -- I think it's a sentence -- it begins with "as

4    part," it ends with "testimony."

5              Then the next language would be, I think -- the

6    point is for this second sentence about this is not something

7    the Court engaged in, I think that is part of the explanation

8    that the agreement was arranged directly between the witness

9    and the Government and not with the Court.

10             Any objection to that?

11             MR. BUFORD:  No objection, your Honor.

12             I apologize, I don't think I received the latest

13    version of the instructions.

14             THE COURT:  That's your fault.  I'm kidding.

15             MR. BUFORD:  I wasn't seeing this in the last

16    version.

17             THE COURT:  I think this is Judge Dearie's charge.

18    We'll give you a chance to see it.

19             MR. BUFORD:  It sounds like we have no objection.

20             THE COURT:  Next thing, Mr. Frisch.

21             MR. FRISCH:  Next thing is, if we turn to the venue

22    section, I have a number of objections to it.  I think that

23    the first and second paragraphs I have no objection to.  The

24    third paragraph --

25             THE COURT:  Okay.

CHARGE CONFERENCE                    793

1          MR. FRISCH:  So I think as a general matter, these

2    options need to be stated with different introductory

3    language, along the lines of, you may consider whether venue

4    is established if, or something like that.  Or venue may be

5    conferred.  For example, you may -- I think the first way is

6    better, you may consider, in determining whether venue is

7    proven you may consider XYZ.

8          THE COURT:  The intro, the first sentence of that

9    paragraph, instructs the jury that it may consider a number of

10   things.

11         MR. FRISCH:  But then the language comes from an

12   invitation to consider, to language which I read as being

13   more, this is venue.  I think the venue --

14         THE COURT:  I think that's correct, though.  Is it

15   not correct that venue can be conferred based on physical

16   presence or conduct?

17         MR. FRISCH:  Yes.  But however, I think the language

18   should be -- I'm speaking too quickly, thank you.

19         You may consider a number of things.  For example,

20   you can consider if venue -- it just reads as if you're

21   directing a ruling on venue.

22         THE COURT:  I think if you read it again -- I'm

23   perfectly happy to consider amendments to it, but I think

24   these are just statements of the law, and so an explanation of

25   how venue can be considered.  In much the same way as how a

1   jury determines intent or how a jury determines anything.

2   These are just the ways in which venue can be established.

3          I'm just thinking if there -- these are all ways

4   that venue can be established.  I don't know how else to

5   phrase it.

6          MR. FRISCH:  If I can?  One suggestion, reading it

7   again, maybe I read it too quickly the first time, didn't read

8   it in the context of the first sentence.  If you go to the

9   fourth sentence of the paragraph, you can say, they still have

10  to make a finding that the communications and the impulses, or

11  whatever, they still have to find that --

12         THE COURT:  Why don't I insert a sentence that says

13  that at the end.

14         MR. FRISCH:  You can do that, in addition to you

15  could say, venue may lie in any district where electronic

16  venue may be proper, where -- that kind of thing, gives them

17  an opportunity to find it as opposed to otherwise.

18         THE COURT:  Something you want to say about that?

19         MR. BUFORD:  I think the instruction as written is

20  an accurate statement of the law.  I think the instruction

21  overall makes clear the jury has to find it.  I don't object

22  to the phrasing in each of the sentences that precedes this

23  one, as venue can be, can be, can be; and this is one venue

24  lies in any district.  We don't object to venue can be.

25         THE COURT:  Okay.  So venue can be.  I think that

CHARGE CONFERENCE                                    795

1    addresses your concern.  And then maybe you want to change,

2    the venue is proper.  So venue can also -- or maybe you can

3    say there can also be venue.

4              (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CHARGE CONFERENCE                                    796

1          MR. PAULSEN:  Your Honor, if I may.  I think the

2   concern there is if you say venue can be in any district, that

3   suggests that even if we prove that, that venue is only, it

4   can be, that is isn't quite literally established, which is

5   what the law is.

6          THE COURT:  So I will just say this is only my

7   opinion, that the odds of the jury focusing on this, the can

8   be versus may be versus will, I think are slim to none.  And

9   slim just left town.  But it's not -- but I think these are

10  accurate statements of the law.  What I will do because we do

11  have some time, I'll see if there's another way we can phrase

12  it.  But I do take the point that I'm instructing them on the

13  law, and this is what the law is.  I think the way to fix it

14  or to address the concern that you have is to emphasize that

15  determining whether any of these things exist is for the jury

16  to determine.  The law is X, Y, and Z.  Is it up to you to

17  determine whether the Government has proved those things.  I

18  think that will fix what you're, what you've, what you're

19  concerned about.

20         MR. PAULSEN:  Your Honor, I would only add there was

21  a motion to dismiss in this case based on venue, which I think

22  your Honor knows.  There was an argument frankly during Mr.

23  Mackey's testimony.  They're pushing this issue, so...

24         THE COURT:  That does not surprise me.  They said

25  it, yeah.  I know .  That's why he wants the instruction to be

1    accurate.  I mean --

2            MR. PAULSEN:  Yes, your Honor.

3            THE COURT:   I don't think he's trying to trick me,

4    are you?

5            MR. FRISCH:  Not now.

6            THE COURT:  So we'll add another sentence in there

7    that I think will address this.

8            What's next?

9            MR. FRISCH:  The next is the next paragraph.  I

10   think the paragraph that we just discussed; does the venue

11   trick, so to speak, I don't think we need the next paragraph.

12           THE COURT:  Well, I think it has to be clear that --

13   oh, it has to be clear that it doesn't have to be the

14   defendant who  is here, because you did make a point of that

15   in your examination and your opening that he wasn't here.  But

16   I think it has to be clarified that what would be sufficient.

17   So I don't, I don't think that should be taken out.

18           MR. FRISCH:  Well, you already say that.  I agree

19   with that you just said that concept needs to be explained,

20   but that's in the end of the second paragraph.

21           THE COURT:  Well, I think you have to make it clear

22   that it' s any of these people that can do it.  You know, the

23   other I mean, the other issue is that you at one point had

24   asserted that the Clinton campaign was a victim, and I don't

25   think that's the Government's position.  And, you know, I

1    think which have to be specific about that because the Clinton

2    campaign was headquartered in Brooklyn.  And I think that

3    could be something that could be, I mean, could be confusing

4    in a way that's detrimental to your argument.

5              MR. FRISCH:  Well, there' s two different issues

6    here.  Just for the record.  There's the issue of venue,

7    whether there's venue in the Eastern District of New York for

8    this charge, and a separate issue is the argument that we had

9    earlier today which is not a venue argument.  It's a question

10   of whether the 302s are material and exculpatory .  I think

11   those are two different.

12             THE COURT:   I understand that, but I'm not charging

13   myself, so -- well, I'm concerned is what the jury might think

14   because the Clinton campaign is headquartered here that that

15   could be a basis for venue.  It's not unreasonable to a lay

16   person and that's why I think it has to be explicit what we're

17   talk about.  So that's the reason why we're doing that.  I'll

18   take a look and see if there's something else that, you know,

19   that can be added, but I'm not I'm not going to take those

20   things out.

21             All right.  What's the next one.

22             MR. FRISCH:  The next one is, one moment.  This is

23   -- so this is a proposed language -- I'm sorry.  Acts and

24   statements of coconspirators at the end.  I propose adding

25   language along the following lines.  Before considering such

CHARGE CONFERENCE                              799

1    statements, however, you first must find that the particular

2    person at issue was part of the charged conspiracy and had the

3    same intent as the defendant.

4              THE COURT:  I think that's in the last paragraph.

5    And I actually don't think that's the law, that they have to

6    share the same intent.  Just general conspiracy.  I could be

7    wrong about that.  But I don't know that every member of the

8    conspiracy has to share -- I mean, people can be unwitting

9    parts of the conspiracy.  I'm not sure that's applicable here.

10   But I don't think it's the law that every conspiracy has to

11   share the same intent.

12             MR. FRISCH:  I think that's true in some cases.

13             THE COURT:  I read it in a Supreme Court opinion.

14             MR. FRISCH:  I'm not saying it's not the law, but

15   it doesn't apply to this case.  There's only one, there's only

16   one bucket of criminal -- bucket is the wrong word.  But

17   there's only one thing of criminal intent, it's this

18   conspiracy.  It's not like there's some other conspiracy and

19   it 's admitted under 801 as sufficiently reliable under

20   another conspiracy here.  There's just this conspiracy.

21             THE COURT:  But it doesn't change the fact that the

22   rule of conspiracies, whether it is that not every member, I

23   believe, has to share the intent.  And I think we go on to

24   discuss this, correct me if I'm wrong, isn't this in the next

25   section, elements of the existence of the conspiracy?  So the

1    membership and this is, just when we're talking about the

2    elements of the crime.  There's a long and detailed discussion

3    about each element.  And I'm quite certain that it takes into

4    account what your concerns are.  And so there's a whole

5    section about mere presence or mere association or even

6    knowledge or acquiescence that all of those things are not

7    sufficient.  And so I think it's pretty detailed about what

8    the jury has to find.  And, in fact, that we say the

9    conspirators do not have to agree on every detail of their

10   venture, but they must agree on the essential nature of their

11   plan to achieve a specified, unlawful act.  That's a correct

12   statement of the law and I think it covers what you want to

13   cover.

14           MR. FRISCH:  Ready for the next?

15           THE COURT:  Yes.

16           MR. FRISCH:  So under the second element defendant's

17   membership, fifth paragraph.  I think the language here needs

18   to be tweaked a little to reflect this case.

19           THE COURT:  Okay.

20           MR. FRISCH:  So, for example, I want to caution you

21   --

22           THE COURT:  You're going to read it much more

23   slowly.

24           MR. FRISCH:   I want to caution you, however, that

25   the defendant's mere presence at the scene of activities.  I

CHARGE CONFERENCE                    801

1    mean, it's not clear that any of this is criminal activities,

2    or at locations frequented by alleged coconspirators  does

3    not, by itself, make him or her a member of the conspiracy.

4              THE COURT:  Do you have an objection to that?   I

5    mean, this is a standard conspiracy charge language, but we

6    can change it to -- I sort of like to think through before I

7    tweek language that is a standard conspiracy charge.  So the

8    Government is charging that this is a criminal activity.  And

9    so I think, again, I think it's in your interest too, to have

10   the jury's attention focused to the conduct that is the

11   alleged crime.  You may disagree that it's a crime, but it's

12   what's charged.  So I think you have to specify that it's a

13   criminal activity because you, I suppose you can conspire to

14   do all kinds of things, but I think that's the reason for the

15   language.

16             MR. FRISCH:  What about mere presence at the scene

17   of alleged criminal activities?  And I reason I'm concerned

18   about this paragraph, there's more language down at the bottom

19   is that while this a standard charge, the standard application

20   is drug dealing and armed robbery and whatever else.

21             THE COURT:  I just gave it in a completely different

22   case.  I've given it in several.  It's not just those.  I gave

23   it in the R Kelly case.  It's not any of those, so this is the

24   standard --

25             MR. FRISCH:  But that was a -- I don't know that's a

CHARGE CONFERENCE                                    802

1    crime.  It's obvious what happened in this case is a crime.

2            THE COURT:  Not to them.

3            MR. FRISCH:  Because it almost assumes that there's

4    some criminal activity here.  I mean, another option here is

5    the alleged criminal activity to make it more case specific.

6            THE COURT:  The only reason I'm just quibbling with

7    you here is because this is what the law is .  And so the law

8    -- and it's, and it's specific to direct the jury to the

9    activity at issue.  I'm not sure what adding alleged mean.  I

10   mean, do you have an opinion about that?

11           MR. BUFORD:  Your Honor, I think the scenario that's

12   contemplated  here is the jury concludes there's criminal

13   activity, and then the caution is just because there is

14   criminal activity and the defendant is present, doesn't mean

15   he joined in the conspiracy.  So I think that's the reason the

16   language is there and that's why the instruction is written

17   the way it is.

18           THE COURT:  I don't -- you know, I guess everybody

19   has their own interpretation of things, but this is not

20   designed to be, and is not in my view, a harmful instruction

21   to Mr. Mackey.  Because it's, even if you can say alleged but

22   let's say it really is a criminal activity and they believe

23   that, but he's just merely present at that, they can't find

24   him guilty.  So I don't, I'm always weary about tinkering with

25   these things because I think that's to his benefit.  I'm

CHARGE CONFERENCE                              803

1    inclined to leave it that way, unless you have strong feelings

2    about it and there's some other charge that you've seen that

3    you think works better.  But I think this is the purpose of

4    this is really to protect Mr. Mackey.

5              Anything else.

6              MR. FRISCH:  Yes.  So in the paragraph, the

7    paragraph that begins the indictment alleges that the

8    objective of the charged conspiracy was to injure.

9              THE COURT:  Right.

10             MR. FRISCH:  So there's two things.  Let me do the

11   more maybe the -- let me do both of them.  So section 241 has

12   two separate sentences.  One sentence has the four verbs;

13   injure  oppress, threaten, and intimidate.  And the next

14   sentence which covers a different class of conduct has the

15   language hinder and prevent.

16             THE COURT:  I think it's actually or.  I think this

17   is the language of the indictment but I think the statute says

18   or, doesn't it?

19             MR. FRISCH:   Whatever I wasn't focusing on that.  I

20   was -- the statute and the crime is injure, oppress, threaten,

21   and whether it's and or intimidate.  However, there's a second

22   sentence, a completely separate clause of the statute  which

23   defines a different crime and that crime uses language of

24   hinder or prevent.  And the history of the statute, as I

25   understand it, which is the Klu Klux Klan act of the 1800s is

CHARGE CONFERENCE                                  804

1    that the language of hinder and prevent -- I don't have the

2    statute in front of me, is precisely so that white hooded

3    folks literally did not stop African Americans from walking on

4    the highway.  And so, you know.

5           THE COURT:  What are you asking me to do?

6           MR. FRISCH:  Take out hinder and prevent because it

7    applies to a different section of the statute which is not

8    charged.

9           THE COURT:  Is this the language of the indictment?

10          MR. FRISCH:  No.  Hinder and prevent is not in the

11   indictment.

12          THE COURT:  Oh, so we should take it out then.  No,

13   wait.  Is this language -- I'm trying to find what the

14   indictment says.  So the statute says if two or more persons

15   conspire to injure, oppress, threaten or intimidate any person

16   in the free exercise or enjoyment of any right privilege

17   secured to him by the Constitution of the laws of the United

18   States, or because of him having exercised the same, they

19   shall be punished.  And the indictment charges that he

20   conspired to injure, oppress, threaten and intimidate one or

21   more persons in the free exercise and enjoyment. Oh, it's not

22   in the indictment.

23          MR. PAULSEN:  No, your Honor.  So the indictment

24   merely tracks the statute.  There's, there are jury

25   instructions on 241 charges that elaborate what those words

CHARGE CONFERENCE                    805

1    mean, and Judge Garaufis had an extensive discussion of this

2    in his opinion about what operative words one could use to

3    characterize what could constitute an injury.  That's where

4    what language comes from.  There have been, you know, a

5    hundred years of 241 cases in which the words have been

6    characterized.

7              So injury in this case which is what  we are relying

8    upon, has been construed in Judge Garaufis' opinion to include

9    things like prevent and hinder.

10             MR. FRISCH:  So --

11             THE COURT:  Wait.  Oh, oh, I see what you're saying.

12             MR. BUFORD:  They're defining --

13             THE COURT:  I thought you were complaining about the

14   first sentence, that's why I'm confused.  So your complaint is

15   the definitely of injure.  That the Government has alleged

16   that it was to injure one or more people in the free exercise

17   and enjoyment of their  right to vote.  I instruct you that

18   the statute covers conduct intended to hinder, prevent,

19   frustrate, make difficult, or indirectly rather than directly

20   assault free exercise of the right.

21             So these are the definitions of injure.  And you

22   object to that?

23             MR. FRISCH:  I object in two  respects, but the more

24   -- let me put both of them.  I believe that to include

25   language of prevent or hinder in a jury charge under the first

CHARGE CONFERENCE                                806

1    sentence of this section, would inappropriately inject into

2    the first sentence what congress did not intend to be there.

3    That is, prevent -- there's two different types of things

4    going on in this statute.

5             The second thing is if two or more persons go in

6    disguise on the highway, that's means Klu Klux Klan people on

7    the highway or on the premises of another with intent to

8    prevent or hinder.  That's a different harm.

9             THE COURT:  And this is what you argued in the

10   motion to dismiss?

11            MR. PAULSEN:  Yes, your Honor.

12            THE COURT:  My recollection is that you --

13            MR. FRISCH:  It's moot --

14            THE COURT:  You didn't win.

15            MR. FRISCH:  I don't have Judge Garaufis' opinion in

16   front of me.  But now I'm in front of Judge Donnelly.

17            THE COURT:  But I'm not revisiting what Judge

18   Garaufis did.

19            MR. FRISCH:  You may decide to do that, but my view

20   is that if this jury is charged that they can find Mr. Mackey

21   guilty based on preventing or hindering, that inoperative verb

22   is not applicable to the charged crime are being incorporated

23   into the jury charge in this case.  If that's what Judge

24   Garaufis said or that's what he meant, I believe, with due

25   respect, Judge Garaufis is wrong.

*ToniAnn Lucatorto RPR, RMR, CRR*

CHARGE CONFERENCE                               807

1     THE COURT:  I think he probably knows that.  I think

2     he probably knows what your opinion is.  But my only point in

3     referencing to that was I think this argument was rejected on

4     the motion to dismiss.  Obviously, the motion to dismiss,

5     should there be a conviction, will be a subject of an appeal.

6     But I think for purposes of the jury charge, that this is,

7     these definitions are appropriate.  And I think they are based

8     on other 241 cases, aren't they?

9     MR. BUFORD:  Yes, your Honor.

10     MR. FRISCH:  Here's the other problem with, the

11     other objection I have to this, which is related to what we're

12     talking about.  The indictment alleges all four verbs that are

13     in the first sentence of the, of this statute.

14     THE COURT:  Right.

15     MR. FRISCH:  Our view is that all four of them,

16     while the Government may choose injury as the one it likes

17     best, the context of the four verbs informs the jury's

18     consideration of what the injury is.  In other words; congress

19     had a respect intent and target in drafting this language

20     using injure, oppress, threaten or intimidate.  There is a

21     threat of commonality  among those four words.

22     THE COURT:  But if they're in the alternative, and

23     so they wouldn't just be, you know, at the same adjective.

24     MR. FRISCH:  I take that point and if your Honor

25     were to take out -- just hear me out.  If your Honor -- what

CHARGE CONFERENCE                        808

1   makes it a problem  is the use of the word prevent or hinder .

2   I mean, if you take out the other three verbs; oppress,

3   threaten, or intimidate, and I understand it's in the

4   conjunctive, and then you put in prevent or hindre, as a

5   definition of injure, you 're just rewriting the statute or

6   Judge  Garaufis is rewriting the statute , with due respect.

7          THE COURT:  I mean, my recollection of Judge

8   Garaufis' conclusion, and now I'm looking at it, is that he

9   cited at least three decisions as the reason for his

10  conclusion.  And I mean, I take your point that you 're not

11  asking me to re-- to revisit his decision, because I'm a judge

12  of coordinate jurisdiction, so I don't even think I have the

13  power to do that anyway.  But I mean, perhaps I do, that's not

14  the reason I'm not revisiting it.  But --

15         MR. FRISCH:  One other point to make and this is --

16  it just happens to be the case whether the Government's right

17  about this or not, that this statute has never been applied to

18  the kind of conduct in this case.  Maybe that's just the way

19  it is and we're there now.  But the language or prior jury

20  charges, I don't think the judges in those cases, the judges

21  in those cases, we know did not have disinformation on the

22  internet in mind when they drafted this charge.  And I think

23  that should put us, puts us in a different  place than just to

24  follow other charges or other cases where the nature of the

25  action is different than it is here.

CHARGE CONFERENCE                                   809

1          THE COURT:  All right.  I think -- do you have

2    anything else you want to say about this?

3          MR. BUFORD:  I would just say, your Honor, that

4    rightly or wrongly Judge Garaufis has concluded at page 33 and

5    34 of his opinion that this is the law with respect to Section

6    241, and our position would be it would be strange  for the

7    parties and the Court to know the law, but the jury  that has

8    to apply it to the facts to not have the benefit of that.

9          THE COURT:  Well, I mean, as I say, these are two

10   slightly different things.  I suppose a judge could, you know.

11   The new judge coming in can have a different  view.  I don't

12   happen to have a different view under, at this point.  So I

13   agree with Judge Garaufis.  And of course, that decision, his

14   decision and I guess my agreement with it is something that

15   the Circuit can set us straight on if they think we're wrong,

16   if there's a conviction.  But I'm going to leave the

17   instructions for the way they are.  I mean, it's certainly

18   true that, that nobody in those cases envisioned what -- I

19   mean what happened in this case or the way that the internet

20   changed the way people interact with one  another, the way

21   information gets spread.  But I mean even since 2016 , things

22   are quite different.  I mean, some of this we're looking at

23   through a 2023 lens that people probably weren't thinking

24   about in 2016.  But I think that's, you know, laws are

25   designed to be applied to all kinds of cases and whether, you

1   know, whether this one is appropriately applied to this

2   factual scenario is something that that courts will eventually

3   resolve.  We've resolved it this way and if we're wrong about

4   that, the Second Circuit will tell us.

5              Anything else in this section?

6              MR. FRISCH:  I think that is all I have.

7              THE COURT:  What about the Government?   Anything

8   that you want to bring to my attention?

9              MR. BUFORD:  Your Honor, if you can bear with me one

10  second.

11             THE COURT:  Sure.

12             MR. BUFORD:  Your Honor, it's a small point, but on

13  page 13 I think we only had testimony from one law enforcement

14  agent.

15             THE COURT:  Okay, yeah.  On page 13 you said?

16             MR. BUFORD:  It was on page 13, subsection C.

17             THE COURT:  Law enforcement witness.  Well let's

18  see, is that right?  I guess that is right.  We just had the

19  one guy.  Okay.

20             MR. BUFORD:  I take it back, your Honor.  Joel

21  DeCapua.  He's an expert, so I guess he's in a different

22  category.

23             THE COURT:  He's law enforcement though, right?  So

24  let's leave it the way it is.  All right.  Did you want me to

25  say what their expertise was?  I don't know if I said that.

1          MR. BUFORD:   Glad to have it if the Court will say

2    it.

3          THE COURT:  Oh, we didn't put Dr. Cho in here, did

4    we?  Was he an expert?

5          MR. PAULSEN:  Your Honor, he was not an expert.

6          THE COURT:  I don't think he was qualified.

7          MR. PAULSEN:   He wasn't, your Honor.  Because he

8    had specialized knowledge, we wanted to do a disclosure in an

9    abundance of caution.  He just testified what he did as a

10   fact.

11         THE COURT:  We don't have to include him.

12         MR. PAULSEN:  We don't, your Honor.

13         THE COURT:  We have Agent DeCapua.

14         Okay, anything else?   The other thing we still have

15   to discuss is the verdict sheet.

16              (Continued on the next page.)

17

18

19

20

21

22

23

24

25

1          MR. BUFORD:  With respect to, on the bottom of page

2     15, in subsection H, there is an uncalled witnesses equally

3     available, that instructs the jury that they shouldn't draw

4     any inferences or conclusions what people would have testified

5     to had they been called as a witness.

6          THE COURT:  Right.

7          MR. BUFORD:  Then in the next section, seven, in the

8     second paragraph, there is an instruction that both sides have

9     subpoena power, but if either side could have called a witness

10    and didn't, it says that the jury can draw an adverse

11    inference against that party.  I think the law is usually that

12    you sort of pick one or the other of these instructions.

13          THE COURT:  I don't think we need this.  Let's be

14    clear, all witnesses -- I think you're right about that.

15          MR. BUFORD:  Our preference would be to have

16    subsection H, the uncalled witnesses equally available.

17          THE COURT:  I think that's right.  I think this is

18    not correct for this case.

19          Do you have any problem with that Mr. Frisch?,

20          MR. FRISCH:  I don't.

21          THE COURT:  Next one.

22          MR. BUFORD:  Page 21, subsection D, intent, in the

23    second paragraph there is language about how the defendant

24    doesn't have to be aware of the specific law, but must know

25    that they act with a specific intent to do what the law

1    forbids.  In Section 241 cases, the specific intent is often

2    defined that the defendant know that there is a protected

3    right, and then specifically set out to interfere with it.

4    And if the Government establishes that, it has established the

5    specific intent such that the defendant has necessarily acted

6    with the requisite knowledge of interfering with the protected

7    right.

8              THE COURT:  So we should take this out?

9              MR. BUFORD:  Our recommendation is to take it out,

10   or refer the jury to the section of substantive instruction

11   where the Court instructs what you have to find to have the

12   person be a member of the conspiracy.

13             THE COURT:  I think that's right, don't you,

14   Mr. Frisch?

15             MR. FRISCH:  Can I think about this?  We don't have

16   to do it right now.  I'm uncomfortable taking out that

17   language and replacing it with something.  Incorporating the

18   other concept into here makes more sense to me, maybe I need

19   to think about it.

20             THE COURT:  Maybe what you could do is propose

21   language to me that would fit in there.  If you could let me

22   know, that would be great.

23             Anything else.

24             MR. BUFORD:  Bear with me for one second, your

25   Honor.  I think that's it.  That's all from us.

CHARGE CONFERENCE                                    814

1          THE COURT:  The only dispute about the verdict

2    sheet, I can't remember what I've done in these cases before,

3    is whether there is a separate question for venue.  I don't

4    think it's required or just how do you find the defendant.  I

5    think I've instructed the jury that they have to find venue so

6    you could just have the question.

7          But what is your objection to it?

8          MR. BUFORD:  We do object just because we've looked

9    at other cases and haven't found any examples where the jury

10   has been asked separately on the venue form -- on the verdict

11   form, to find venue, including recent cases like the Ng case,

12   MDB and Barrack case, which was hotly contested.  I think the

13   Court instructs they have to find venue.  We haven't seen it

14   on a verdict form.  I don't know that it's necessary to call

15   it out necessarily.

16         THE COURT:  Do you have case law on the subject or

17   just something you wanted to draw their attention to?

18         MR. FRISCH:  I want to draw their attention to.  I

19   can't remember, I don't have case law on my fingertips.

20         THE COURT:  If there is some and you can provide me

21   with it, I'll take a look at it.  My recollection, when venue

22   is more than a passing issue, I did not do a separate question

23   on it.  But if there is something out there that I'm missing,

24   just alert me to it.  I'll let you know that one on Monday.

25         Anything else?

CHARGE CONFERENCE                               815

1          MR. BUFORD:  No, your Honor.  We looked at the

2    aqueduct robbery verdict form, but I suspect venue is not an

3    issue there.

4          THE COURT:  The aqueduct is in the Eastern District

5    of New York.

6          Anything else, you know where to find me.

7          Everybody have a good weekend.  I'll see you on

8    Monday.

9          (Proceedings adjourned to resume on March 27, 2023.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

816

1                        I N D E X

2   WITNESS                               PAGE

3   **DOUGLASS MACKEY**

4   DIRECT EXAMINATION     BY MR. FRISCH     643

5   CROSS-EXAMINATION      BY MR. PAULSEN    701

6   REDIRECT EXAMINATION   BY MR. FRISCH     783

7

8                      E X H I B I T S

9   DEFENSE                               PAGE

10  C                                      661

11  GOVERNMENT                            PAGE

12  1005-23                                721

13  1005-25                                723

14  1005-26                                724

15  1005-27                                726

16  1005-28                                727

17  1005-29                                728

18  1005-24                                729

19  104                                    766

20  1005-33                                773

21  1005-34                                774

22  1005-19                                776

23  1005-21                                781

24

25