RCH:EDP/WJG/FTB
F. #2018R02250

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -                        Docket No. <u>21-CR-080 (AMD)</u>

DOUGLASS MACKEY,
    also known as "Ricky Vaughn,"

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
THE INDICTMENT OR, IN THE ALTERNATIVE, FOR A NEW TRIAL</u>

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

COREY R. AMUNDSON
Chief, Public Integrity Section
U.S. Department of Justice
1301 New York Ave. NW, Tenth Floor
Washington, D.C.  20004

Erik D. Paulsen
F. Turner Buford
Assistant U.S. Attorneys
     (Of Counsel)

William J. Gullotta
Trial Attorney
     (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

I.   THE GOVERNMENT'S DISCLOSURE OF CERTAIN INTERVIEW REPORTS
     CONTAINING INCULPATORY, OR AT BEST NEUTRAL, INFORMATION DOES
     NOT WARRANT A NEW TRIAL ............................................................................. 1

     A.  Factual and Procedural Background ............................................................. 2

         1.  The Government's Pretrial Disclosures ............................................... 2

         2.  Relevant Portions of the Trial ............................................................. 4

     B.  Applicable Law ............................................................................................ 8

     C.  Argument ..................................................................................................... 10

         1.  The Interview Reports are Not Exculpatory ........................................ 10

         2.  The Defendant Received the Interview Reports in Time to Make Use of Them at
             Trial .................................................................................................... 16

II.  NO NEW TRIAL IS WARRANTED BECAUSE THE GOVERNMENT PROVIDED
     THE COURT WITH ALL INFORMATION RELEVANT TO THE DETERMINATION
     OF WHETHER MICROCHIP SHOULD BE ALLOWED TO TESTIFY
     ANONYMOUSLY. .................................................................................................. 19

     A.  Factual and Procedural Background. ........................................................... 20

     B.  Applicable Law. ........................................................................................... 22

     C.  Argument. .................................................................................................... 23

         1.  The Government Provided the Court and the Defendant with All Relevant
             Information Concerning the Request to Shield Microchip's Identity .................. 23

         2.  None of the Information Cited by the Defense Is Relevant to the Confrontation
             Clause Analysis Regarding Microchip's Identity. ................................. 24

         3.  Microchip's February 2023 Tweets Similarly Had No Bearing on the
             Confrontation Clause Analysis. ........................................................... 26

III. THE TRIAL EVIDENCE WAS SUFFICIENT TO SUPPORT THE DEFENDANT'S
     CONVICTION ......................................................................................................... 28

     A.  Applicable Law ........................................................................................... 28

         1.  Federal Rule of Criminal Procedure 29 ............................................... 28

2.   Federal Rule of Criminal Procedure 33 .................................................................. 29

B.  Argument ............................................................................................................................. 30

IV. THE COURT SHOULD DECLINE THE DEFENDANT'S INVITATION TO REVISIT
JUDGE GARAUFIS'S RULING ON THE DEFENDANT'S PRETRIAL MOTION TO
DISMISS ................................................................................................................................... 34

V.  THE TRIAL EVIDENCE WAS SUFFICIENT TO PERMIT THE JURY TO FIND
VENUE FOR THE CHARGED CRIME IN THE EASTERN
DISTRICT ................................................................................................................................. 34

CONCLUSION ........................................................................................................................... 36

## TABLE OF AUTHORITIES

**Cases**

Delaware v. Fensterer,
   474 U.S. 15 (1985) ............................................................................................ 22

United States v. Crowley,
   318 F.3d 401 (2d Cir. 2003) ............................................................................ 22

United States v. Djibo,
   730 F. App'x 52 (2d Cir. 2018) ........................................................................ 9

United States v. Douglas,
   525 F.3d 225 (2d Cir. 2008) ............................................................................. 9

United States v. Guadagna,
   183 F.3d 122 (2d Cir. 1999) ...................................................................... 28, 34

United States v. Hunter,
   32 F.4th 22 (2d Cir. 2022) ................................................................................ 8

United States v. Klein,
   913 F.3d 73 (2d Cir. 2019) ........................................................................ 28, 29

United States v. Landesman,
   17 F.4th 298 (2d Cir. 2021) ....................................................................... 30, 31

United States v. Lorenzo,
   534 F.3d 153 (2d Cir. 2008) ........................................................................... 29

United States v. Mahaffy,
   693 F.3d 113 (2d Cir. 2012) ........................................................................... 13

United States v. Mangano,
   No. 16-CR-540 (JMA), 2022 WL 59697 (E.D.N.Y. Jan. 6, 2022) .................... 9

United States v. Martoma,
   894 F.3d 64 (2d Cir. 2017) ............................................................................. 28

United States v. McCourty,
   562 F.3d 458 (2d Cir. 2009) ........................................................................... 29

United States v. Monica,
   295 F.2d 400 (2d Cir. 1961) ........................................................................... 28

United States v. Mora,
   152 F.3d 921 (2d Cir. 1998) ........................................................................... 19

United States v. Naseer,
   No. 10 CR 19 (RJD), 2015 WL 13843166 (E.D.N.Y. Jan. 26, 2015) .............. 22

United States v. Payne,
   63 F.3d 1200 (2d Cir. 1995) ............................................................................. 8

United States v. Pugh,
   945 F.3d 9 (2d Cir. 2019) ............................................................................... 29

United States v. Rosa,
   17 F.3d 1531 (2d Cir. 1994) ........................................................................... 29

United States v. Saipov,
   17-CR-722 (VSB), 2023 WL 3495031 (S.D.N.Y. May 16, 2023) ............... 9, 18

United States v. Sanchez,
   969 F.2d 1409 (2d Cir. 1992) ......................................................................... 29

United States v. Temple,
   447 F.3d 130 (2d Cir. 2006) ............................................................... 29
United States v. White,
   7 F.4th 90 (2d Cir. 2021) ............................................................. 28, 33

**Rules**
Federal Rule of Criminal Procedure 29 ................................................. 28
Federal Rule of Criminal Procedure 33 ................................................. 29

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the defendant's motion to dismiss the indictment or, in the alternative, for a directed verdict or a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively.  (ECF Nos. 134, 135).  On March 31, 2023, the defendant was convicted on the sole count of the indictment in this case, which charged the defendant with conspiracy against rights, in violation of 18 U.S.C. § 241.  In his motion, the defendant principally argues that (1) the government made misrepresentations to the Court and failed to turn over Brady and Giglio material concerning the testimony of Microchip; (2) that, contrary to its Brady and Giglio obligations, the government failed to disclose in a timely fashion certain reports containing statements made to the government by former campaign staffers of Hillary Clinton; and (3) that the evidence was insufficient to support the jury's verdict in several respects.  For the reasons set forth in greater detail below, the defendant's motion should be denied in its entirety.

I.      THE GOVERNMENT'S DISCLOSURE OF CERTAIN INTERVIEW REPORTS CONTAINING INCULPATORY, OR AT BEST NEUTRAL, INFORMATION DOES NOT WARRANT A NEW TRIAL

The government's theory of the case presented at trial was that the defendant – acting in coordination with his co-conspirators – participated in the synchronized mass distribution of text-to-vote misinformation through Twitter with the intent to deprive citizens of their right to vote.  The defendant argues principally that information contained in interview reports that were disclosed by the government on the second day of trial is either inconsistent with that theory or tends to support the defendant's claim that he engaged in distribution of text-to-vote misinformation with the sole intent of confusing or distracting the campaign staff of then presidential candidate Hillary Clinton (and without any intent to deceive actual voters).  The relevant reports documented statements made by former campaign staffers of Hillary Clinton,

who generally expressed concern over the spread of text-to-vote misinformation across the Internet and described some of the campaign's internal deliberations in response.

As the Court correctly found during trial, the content of these reports is not exculpatory, but rather is consistent with the factual narrative at the core of the government's evidentiary presentation.  At a minimum, the information in the reports is not materially inconsistent with the government's case – especially in light of the undisputed chronology of events wherein the Clinton campaign undertook corrective action in response to the spread of text-to-vote misinformation prior to the defendant's dissemination of similar misinformation. Notably, after receiving these reports early in the trial, the defendant declined the opportunity either to call the witnesses himself or to re-open cross examination of any of the witnesses who had already testified despite being afforded ample opportunity to do either by the Court.  Instead, the parties negotiated a stipulation to certain facts deemed important by the defense that was presented to the jury as part of the defendant's case.  Under these circumstances, the Court did not err in denying the defendant's motion for a mistrial, a new trial is not warranted under Rule 33, and dismissal of the indictment is not appropriate.

     A.    <u>Factual and Procedural Background</u>

     1.    <u>The Government's Pretrial Disclosures</u>

On July 21, 2021, more than a year and a half before trial, the government produced certain discovery materials, including affidavits created by federal agents in support of search warrant applications.  These affidavits made clear that text-to-vote misinformation, including misinformation in the form of images designed to look like statements from the Clinton campaign, had surfaced on the Internet as early as June 2016 and that there had been a concerted public effort to push the misinformation by at least one anti-Clinton publication in late

October 2016.  See, e.g., GOV-MACKEY-00002924, ¶ 12 & n.4, attached herein as Ex. A.[1]

Accordingly, the government made no secret of the fact that text-to-vote misinformation had

been created and spread publicly by other individuals who were not part of the charged

conspiracy in the time leading up to the election and, in fact, disclosed this very information to

the defense.

As trial approached, the government made witness-specific disclosures, including

disclosures related to the Clinton campaign staffers it had elected to call as witnesses.  On

February 27, 2023, the government disclosed, among other things, Jencks Act material for

certain witnesses, including Lloyd Cotler, the SMS campaign manager for the Clinton campaign.

See 3500-LC-1, at 1, attached herein, as Ex. B.  The material for Cotler included an interview

report, which memorialized the substance of Cotler's statements that he believed he may have

learned about "text-to-vote" Internet content from another campaign staffer, ███████, who was

responsible for audience development.  Id. at 2.  According to the interview report, Cotler said

that ███ "spent a substantial amount of time monitoring 4[c]han and Reddit for content" and

may have brought the misinformation to Cotler's attention.  Id.  The report also memorialized the

substance of Cotler's statement that he was not responsible for social media monitoring and that

other campaign employees – specifically, ██████████, ██████████, and ███ – might have

more information concerning the chain of events.  Id. at 4.

On March 12, 2023, the government disclosed Jencks Act material for certain

additional witnesses, including Jess Morales-Rocketto, the Digital Organizing Director for the

---

[1]      As the search warrant affidavit remains under seal, the government if filing it
under seal here, along with other exhibits filed under seal pursuant to the Court's April 27,
2023 minute order.

Clinton campaign.[2]  See 3500-JMR-1-A, at 1, attached herein as Ex. C.  These materials

memorialized the substance of her statements that she had discussed the "text-to-vote" issue with

Cotler, ███████, ███ and the campaign's communications team.  Id. at 2.  It further

memorialized her statement that one of the decisions made by the campaign in response was to

"make the media aware of what was happening" and that she "[r]emembered the press part of it

most clearly."[3]  Id. at 2-3.

  2. Relevant Portions of the Trial

  Trial in this matter began on March 20, 2023.  The defense's opening statement

previewed certain positions the defendant intended to advance, including that prior to the

defendant's tweeting of the text-to-vote misinformation, "memes like these were already going

viral from days before" and that the "Clinton campaign had already begun taking action about

these types of memes."  Tr. 26.  The defense also took the position that the defendant was merely

a "shit poster," meaning that he posted "on social media deliberately provocative or off-topic

comments in order to distract from the main conversation, to get attention, to go viral" and to

"[p]ut [his] opponent off his game."  Id. at 30-31.  More specifically, the defendant claimed that

the evidence would show that the defendant tweeted the text-to-vote disinformation "to call

---

[2] Notwithstanding the suggestion by the defendant that the government did not timely disclose its intent to call Morales-Rocketto, the Jencks Act material reflects that the government had not met with Morales-Rocketto until March 10, 2023.  See 3500-JMR-1-A.  An initial production of Jencks Act material related to Morales-Rocketto was provided to the defense two days after that initial meeting.

[3] The Jencks Act material indicated that Morales-Rocketto had stated that "[w]hat was real and what was fake was just starting to get talked about, and they wanted [people] to know that this was fake, and you can't text to vote."  3500-JMR-1-A, at 2-3.  Morales-Rocketto remembered very clearly having a conversation with the communications team, Cotler, ███, and ██████ about how and why it was important to communicate with the public on the issue. Id.

attention to himself[,] [d]istract from the main conversation, get under the skin of the other side, [and] get the other side off message." Id. at 33.

Morales-Rocketto testified on the first day of trial. Morales-Rocketto described speaking with Cotler about the text-to-vote misinformation and bringing it to the attention of the Clinton campaign's communications team, which elected to alert the media about the misinformation. See Tr. 92-93. She testified that there had subsequently been "news coverage" of the misinformation spread. Id. On cross-examination, Morales-Rocketto testified that she could not recall the precise date when Cotler may have taken corrective action regarding the misinformation. See Tr. 95.

Cotler also testified on the first day of the trial that he first attempted to ascertain the company that controlled the short code featured on some of the phony text-to-vote images on October 29, 2016 – approximately three days before the defendant sent his first tweet containing text-to-vote misinformation on November 1, 2016. See Tr. 102; GX 720. This fact was later corroborated by the testimony of Mattias ("Ti") Chesley and Omer Samiri, who worked together to put in place an automated response to those attempting to vote by text by November 2, 2016.[4] See Tr. 109-110, 117, 119-20. Cotler also confirmed, consistent with his Jencks Act material, that ▮▮▮ was a Clinton campaign staffer whose responsibilities included monitoring social media websites, including Reddit and 4chan for the campaign. See Tr. 102-03.

At the start of the second day of trial, the government disclosed two interview reports of ▮▮▮ and advised defense counsel that the government was in possession of additional

---

[4]     Samiri also confirmed that he had seen news coverage of the text-to-vote misinformation in an online article published by Wired by at least November 2, 2023. See Tr. 133-34.

interview reports for other Clinton campaign personnel.  Defense counsel, upon review of the
interview reports, moved for a mistrial.  The Court, after hearing from the defendant and briefly
reviewing the interview reports, observed:

> [I]t does not strike me that this is Brady material.  Because at least
> from my quick perusal of these documents, this seems consistent
> with – it's not exculpatory material from my view, from what I'm
> looking at and from what you're telling me.  Much of what you
> were arguing before is pretty much what you argued in your
> opening statement. . . .  I'm denying the motion at this point, but I
> will consider additional arguments that you have to make about it.

Tr. 234-35.  In response to the defense's argument that the reports reflected statements of former
Clinton campaign staffers (whom the defendant characterized as one of the "purported victims")
and that Morales-Rocketto had testified that "these types of memes could particularly affect
African American and Hispanic voters and women, and yet the campaign was already on it," the
Court stated: "I just don't see how that is exculpatory. . . .  At least as I understand it, the concern
[Morales-Rocketto] expressed was that voters would believe this, and that sounds to me like
what the campaign's concern was."  Id. at 235-36.

   Over the lunch break, at the request of defense counsel, the government disclosed
additional interview reports of other Clinton campaign staffers that the government had offered
to provide earlier in the day.  The next day, the defendant filed a motion for, among other things,
a one-day continuance to permit the defendant additional time to review the interview reports.
ECF No. 106.  The Court granted the motion and also directed the government to provide the
Court with copies of the interview reports and to file them on the docket, which the government
did.  Tr. 599-600; Min. Or. dated Mar. 22, 2023, granting continuance; ECF No. 107.

   On March 23, 2023, the Court heard oral argument concerning the disclosure of
the interview reports.  The defendant argued that the reports contained Brady information

principally because they showed that members of the Clinton campaign were aware of

"pervasive" text-to-vote misinformation on the Internet before the defendant tweeted about it;

that some members of the Clinton campaign did not regard such misinformation as a "big deal"

and were slow to react; that the campaign was aware of the phenomenon of "shit posting"; and

that the campaign had an internal apparatus to monitor misinformation on the Internet, which,

counsel claimed, supported the defendant's argument that his intent in distributing the

misinformation was entirely to confuse or distract the campaign (and not to fool voters).[5]  Tr.

606-24.  After hearing from the government, the Court concluded:

> So it's the Court's view that it's not Brady material because it
> amounts to really, the essence is what the Clinton campaign
> thought about it, and that's just not relevant.  In fact, their opinion
> of it is no more valid than their opinion would be about whether
> Mr. Mackey is guilty or not.  That's not relevant, to the extent
> that's the claim.  I do not find this issue that the Clinton campaign
> is somehow a surrogate for voters makes a campaign employee's
> sense of what was happening Brady material.  And then as to the
> question of whether Mr. Mackey riled up the Clinton campaign, I
> don't think that's Brady material.  I think it doesn't take a huge
> leap of common sense to figure that something like that would rile
> up the Clinton campaign.  But whether it did not didn't, whether it
> had that effect or not, is not Brady material.

Tr. 634.

The Court directed the parties to consider whether they could agree on one or

more of the following proposed alternatives: (1) recalling Morales-Rocketto and/or Cotler to

---

[5]      At trial, defense counsel claimed that all of the disclosed interview reports
contained Brady material but identified specifically the reports of interviews with the following
staffers as being particularly important: ███, ██████████, ████, and ██████████
███.  Tr. 608.  Defense counsel later asked the government to stipulate to certain information
the defendant had selected from the interview reports of those individuals, plus three others:
██████████, ████, and ██████████.  See Ex. D to May 12, 2023 Def. Mot. to
Dismiss the Indictment, ECF No. 135.  The government declined.  Ultimately, the parties agreed
to the stipulation introduced as Defense Exhibit BB.

permit additional cross-examination; (2) requiring the government to call certain of the persons identified in the interview reports as witnesses; (3) permitting the defendant to call certain of the persons identified in the interview reports as witnesses; or (4) entering into a stipulation as to certain facts. The defendant rejected the first three options. <u>See</u> Tr. 631, 636-37. The parties ultimately agreed to a stipulation that was read into the record as part of the defense case. Tr. 825. The stipulation (marked as DX BB) stated that:

> In the months prior to the 2016 presidential election, [memes] containing misinformation concerning how to vote were posted and shared online on political messaging boards such as 4Chan. At least one member of the Clinton campaign staff observed these [memes] and brought them to the attention of other staff members after she observed them.

Tr. 825.

B.   <u>Applicable Law</u>

"In order to establish a <u>Brady</u> violation, a defendant must show, <u>inter alia</u>, (1) that the government failed to disclose favorable evidence, and (2) that the evidence it 'suppressed' was material." <u>United States v. Payne</u>, 63 F.3d 1200, 1208 (2d Cir. 1995); <u>see also</u> <u>United States v. Hunter</u>, 32 F.4th 22, 31 (2d Cir. 2022). Evidence is considered "favorable" to the defendant if it is either exculpatory or if it is "impeaching." <u>See</u> <u>Hunter</u>, 32 F.4th at 30-31. "The government's <u>Brady</u> obligation to disclose extends only to favorable evidence that is material." <u>Payne</u>, 63 F.3d at 1209. "Undisclosed evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Id.</u> (internal quotations omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the case." <u>Id.</u>

> This standard does not mean that a defendant is required to show that the undisclosed evidence would have rendered the evidence as a whole insufficient to support a conviction . . . or that if timely disclosure had been made, acquittal would have been certain. But

8

> the defendant is required to show more than just that the error was
> not harmless beyond a reasonable doubt.

Id. (internal citations omitted).

"Although there is no precise deadline for when the government is required to disclose Brady and Giglio material, . . . Brady requires disclosure in time for its effective use at trial." United States v. Djibo, 730 F. App'x 52, 56 (2d Cir. 2018) (internal quotations and citations omitted). "Even if evidence is exculpatory and material . . . , the Government is not required to disclose if the defendant knows or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." United States v. Saipov, 17-CR-722 (VSB), 2023 WL 3495031, at *4 (S.D.N.Y. May 16, 2023) (internal quotation marks and citations omitted). Whether to grant a new trial on the basis of an alleged Brady violation is committed to the discretion of the district court. See, e.g., United States v. Douglas, 525 F.3d 225, 245 (2d Cir. 2008).

With respect to the defendant's request for an order dismissing the indictment as a sanction for the alleged Brady violation,

> [d]ismissal of an indictment due to prosecutorial misconduct is
> appropriate only in very limited and extreme circumstances in
> which there is a need either to eliminate prejudice to a defendant in
> a criminal prosecution, where it is impossible to do so by
> imposition of lesser sanctions, or to deter a pattern of demonstrated
> and widespread or continuous official misconduct . . . .  The
> standard remedy for a Brady violation is vacatur of the judgment
> of conviction and a new trial in which the defendant will have the
> Brady material available to him. . . .

United States v. Mangano, No. 16-CR-540 (JMA), 2022 WL 59697, at *2-3 (E.D.N.Y. Jan. 6, 2022) (internal quotation marks, alterations, and citations omitted).

C.      Argument

1.      The Interview Reports are Not Exculpatory

As the government previously argued to the district court, the information in the reports is generally inculpatory and consistent with the government's factual narrative.  To the extent the defendant claims that the information in the reports establishes certain points, those points were either not in dispute, irrelevant, or cumulative of (or ascertainable from) other information disclosed by the government pretrial.  None of the interviewees had any direct communication with the defendant or any of the alleged members of the conspiracy, and, as such, none of the interviewees had any personal knowledge as to the defendant's motive or intent for disseminating text-to-vote misinformation – the critical issue in dispute at the trial.  Similarly, none of the interviewees personally considered text-to-vote misinformation to be unimportant, innocuous, or an obvious joke in the context of the campaign; nor do any of the interview reports contain statements suggesting that Morales-Rocketto or Cotler specifically did not view text-to-vote misinformation as being of concern to the campaign.

The contents of the reports do suggest that there may have been differences of opinion within the campaign as to how to approach the spread of misinformation on the Internet generally and how great a danger such misinformation posed.  The reports also reflect internal deliberations about how best to respond to misinformation without inadvertently expanding its reach.  It is difficult to see how these points, even if they could be established, have any material bearing on the issues that were before the jury– especially when the campaign indisputably did take action specifically to address the spread of text-to-vote misinformation in late October 2016 prior to the defendant's dissemination.

The defendant argues that the reports indicate that the Clinton campaign was aware of "pervasive" text-to-vote misinformation before the defendant attempted to spread it

10

through Twitter but failed to act because senior campaign officials did not view the issue as a serious threat.  This characterization both oversimplifies the reports' contents and is inaccurate since the campaign did take action to combat the misinformation.  The testimony of Morales-Rocketto and Cotler specifically demonstrated this latter point: that the Clinton campaign saw the misinformation and then attempted to minimize its harmful effect.

████'s interview reports reflect that she saw memes containing misinformation designed to suppress the vote about three months before Election Day in 2016; she did not recall the specific date when the text-to-vote misinformation campaign started.  ECF 107, Ex. 17, at 1-2; ECF 107, Ex. 18, at 3-4.  The interview report for ██████, a ████████████████ ████  for the Clinton campaign, reflects that ████ thought voting disinformation memes started appearing online in late September.  Id., Ex. 5, at 2.  This information is consistent with the information disclosed by the government in the search warrant affidavit described above, as well as other publicly available information, concerning the basic chronology of when text-to-vote misinformation began to appear and where it originated on the Internet.  The evidence introduced at trial by the government (and disclosed to the defense well in advance of trial) showed online discussion of text-to-vote (and similar) misinformation as early as September 26, 2016 (GX 430, at 43) and continuing throughout October 2016 (GX 430, at 48-53, 56-63; GX 400, at 31).

████'s interview report memorializes her observation that the political board of 4chan featured a high volume of misinformation.  ECF 107, Ex. 18, at 2.  This too is consistent with the evidence presented by the government at trial, which, among other things, featured testimony from Microchip describing how he would lift content from the 4chan political board and from Reddit for distribution over Twitter.  See Tr. 497-98.  The testimony of Special Agent

Cunder featured multiple examples of the defendant's co-conspirators discussing the harvesting of election-related misinformation from 4chan in the run-up to the election.  See Tr. 376-77; 418.

According to the reports, ▮ flagged the text-to-vote meme campaign as a critical issue after she discovered it, but that it was not seen as a critical issue by more senior campaign officials.  ECF 107, Ex. 17, at 1-2; ECF 107, Ex. 18, at 2-3.  ▮'s interview reports reflect that she shared the text-to-vote memes with, among others, members of the Digital Team, but her impression was that "no one knew what to do."  Id., Ex. 18, at 3.  The Digital Team was led by Morales-Rocketto, who as described above, testified at trial the campaign's response to the text-to-vote misinformation, including her discussions with the campaign's communications team concerning bringing media attention to the issue.[6]

The interview report for ▮ reflects that he did not believe the Clinton campaign had an "active response" to text-to-vote misinformation and that no one in the campaign cared to report the issue to Twitter.  ECF 107, Ex.5, at 5.  ▮ also said that his impression was that some people within the campaign took this sort of voter disinformation seriously, but that individuals at senior levels of the campaign did not because no one knew what to do with the information.  Id. at 6.  The report for ▮▮▮, a ▮▮▮▮ for the Clinton campaign, reflects that she recalled text-to-vote memes were brought to the attention of the campaign's headquarters by state campaign offices after seeing text-to-vote misinformation "on the ground," but that the general approach taken by more senior campaign staff was "lackluster," as though this was "no big deal."  Id., Ex. 12, at 1-2.  ▮ identified Morales-Rocketto as the

---

[6]      The interview report for ▮▮▮, a ▮▮▮▮ to the Clinton campign, memorializes that she would have notified Morales-Rocketto and members of the campaign's Digital Team, if she encountered a misinformation issue that she felt should be pushed up the management chain.  ECF 107, Ex. 1, at 3-4.

Director of the Digital Team, who saw all social media content and was in charge of the campaign's text-message communications.  Id. at 2.

There is also an interview report for ██, an ███████████████████████████ to the Clinton campaign.  The interview report for ██ reflects his statements that social media disinformation was "a big topic at the time" and that problematic things found on Twitter were brought to his attention.  ECF 107, Ex. 9, at 1.  According to the report, ██ recalled bringing misinformation to the attention of Facebook and Twitter and working with Twitter to try to remove misinformation.  Id. at 1-2.  Morales-Rocketto testified that she discussed the text-to-vote misinformation she observed with, among others, "██," whom she characterized as her "boss," and that together they came up with a "game plan" to respond that included "alert[ing] the media."  See Tr. 91-93.

Taken together, the statements from the various campaign staffers reflect – at worst – some internal differences of opinion within the campaign as to the pace and effectiveness of the campaign's response to misinformation generally and the text-to-vote misinformation specifically.  As the Court correctly found during the trial, these internal campaign deliberations are wholly irrelevant to the question of the defendant's intent.[7]  Given that senior campaign

---

[7]     This distinguishes this case from the facts of United States v. Mahaffy, 693 F.3d 113 (2d Cir. 2012), on which the defendant relies heavily.  In Mahaffy, the Second Circuit found that information suppressed by the government went directly to a core element of the charged crime: namely, whether specific information was "confidential" and therefore qualified as "property" of a business under the government's fraud theory.  See Mahaffy, 693 F.3d at 119, 121, 127-28.  Here, the internal discussions among Clinton campaign staffers (to which the defendant was indisputably not privy in real time) do not bear on the defendant's intent, as the Court found at the trial.  See Tr. 634.  As the government explained at trial, Morales-Rocketto testified as to her assessment of the images tweeted by the defendant not to offer a freestanding conclusion as to the images' capacity to deceive voters, but rather to explain the specific actions she took in response to seeing similar images prior to the defendant's tweets.  See Tr. 624-25.

officials did respond to the spread of text-to-vote misinformation, the fact (if true) that some campaign staffers may have wished that the campaign had reacted more quickly or with greater vigor is of no moment.  To the extent the defendant's defense is that text-to-vote misinformation was "shit posting" that forced the Clinton campaign to respond, the facts adduced at trial (and disclosed pretrial) supported the argument; and the defendant was free to (and did) make it.  To the extent the defendant's defense is that the Clinton campaign did not take the spread of misinformation seriously enough to respond, that claim is squarely inconsistent with the undisputed facts and is irrelevant as a matter of law.[8]

The defendant also argues that the fact that some Clinton campaign staffers were familiar with the concept of "shit posting" is exculpatory.  If anything, the opposite is true: if the campaign were familiar with the strategy of "shit posting" as a diversionary tactic,[9] then the fact that the campaign elected to respond to the spread of text-to-vote misinformation and bring it to the attention of the media suggests that the campaign concluded that this was not merely "shit posting," but rather a credible threat to the integrity of the voting process.  Under those circumstances, the campaign's decision to "take the bait" underscores the importance attached to

---

[8]     The defendant's arguments as to the significance of the alleged Brady material are inconsistent: On the one hand, the defendant claims that the Clinton campaign did not take the text-to-vote misinformation seriously, thus buttressing the defendant's claim that his tweets were intended as jokes.  On the other hand, the defendant claims that the campaign took it too seriously and wasted its time trying to debunk it – all in keeping with the defendant's "shit posting" agenda to distract and mislead.

[9]     The interview report for ▮▮▮▮▮▮, a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for the Clinton campaign, reflects that he recalled discussions with the Audience Development Team (of which ▮▮▮ was a member) about content observed on 4chan, Reddit, and other similar online spaces and specific discussions concerning how to address misinformation without amplifying it.  ECF 107, Ex. 4, at 2.

the issue by the campaign – a conclusion that is consistent with the testimony of

Morales-Rocketto.

   The defendant contends that the contents of the interview reports undermine the

conspiracy charge against the defendant because they tend to show different actors pushing

text-to-vote misinformation in multiple different venues.  This is simply not accurate.  Insofar as

the reports memorialize the perceptions of campaign staffers about the online spread of text-to-

vote misinformation, the reports are, as the government argued, "wildly inculpatory."  Tr. 233.

What follows are some of the reports' statements that are relevant to this issue:



   ■■. ■■ observed that information from groups of people on 4chan were just
"pumped out" with "clear distribution efforts."  ECF 107, Ex. 18, at 3.  According to the reports,
"[t]hese groups began to employ bot networks and artificial intelligence to increase their
messaging."  Id. ■■ observed "many online groups getting smart, making strategy, and
working together" and that the "individuals in these groups felt that they could actually change
the political game through pushing high-volume, low-quality content."  Id. at 2. ■■ believed
that the text-to-vote memes were not orchestrated by just one person or group, but by multiple
layers of individuals, which included those who created the content and those who distributed
them through avenues like fake Hillary Clinton websites.  ECF 107, Ex. 17, at 3. ■■ concluded
that the spread of text-to-vote misinformation was coordinated, sophisticated, and confused
voters and that online groups came up with creative ways to impede voters, while also targeting
apathetic voters.  Id.; ECF 107, Ex. 18, at 4.

   ■■■■■■. ■■■■■■ observed that the images in the
defendant's tweets targeted women and people of color and recalled that the campaign talked
more about the Spanish misinformation because Spanish-speaking voters were one of the most
difficult groups to reach with organic social media.  ECF 107, Ex. 1, at 3-4.  According to ■■
■■■■■, the campaign focused on Twitter due to its propensity to make things, including
misinformation, go viral quickly.  Id. at 3.

   ■■. ■■ stated that, from his observations of 4chan, Reddit, and other websites,
his impression was that individuals were "gathering people" to spread disinformation around
voter registration and how to vote.  ECF 107, Ex. 5, at 2.  His conclusion was that the goal was to
disrupt the Clinton campaign's Get Out The Vote efforts.  Id.

   ■■. ■■ believed that there was a direct, concerted effort to coordinate the
push of disinformation and that the individuals doing it were all paying attention to each other
and using one another as a megaphone.  ECF 107, Ex. 9, at 3.

These and other observations from Clinton campaign staffers reflected in the reports underscore the core theory of the prosecution: that the defendant and others participated in the coordinated dissemination of misinformation with the goal of affecting the outcome of the 2016 presidential election by fooling voters into believing that they could vote by text. The contents of the reports leave little doubt that the relevant staffers believed that members of certain online groups were working together to amplify agreed-upon messaging to expand the reach of misinformation into the mainstream political discussion. This perception by the Clinton campaign of coordinated distribution of misinformation overlaps precisely with the charges brought against the defendant. In this regard, as in others, the interview reports support the government's theory of the case.

Finally, the defendant fails to address the key question posed by the Court in denying the mistrial motion – namely, why the opinions of third parties, like the Clinton campaign staffers, could have <u>any</u> conceivable salience for a <u>Brady</u> argument. The government offered the testimony of Morales-Rocketto and Cotler for a concrete purpose: to explain the sequence of events that led to the installation of the warning label on the commandeered text code. Their opinions about the co-conspirators' actions – like the opinions of any third party not involved in the criminal conspiracy – would not have been otherwise relevant or admissible. The defendant's does not show – and quite simply, cannot show – that the opinions and actions of campaign staffers, all of which were done outside the defendant's knowledge and awareness, somehow cast light on his subjective intent. <u>See</u> Tr. 625-26, 628-30, 634.

2.  <u>The Defendant Received the Interview Reports in Time to Make Use of Them at Trial</u>

Even if the interview reports contained material favorable to the defendant, the record is clear that the defendant had the relevant information in time to make use of it at trial.

As discussed above, the contents of the reports are consistent with the factual chronology laid out in the government's pretrial disclosures (and publicly available information) that the Clinton campaign took action to address the spread-of-text to vote misinformation prior to the defendant's tweets.  The fact that the Clinton campaign had staff monitoring 4chan and Reddit during the run-up to the election had also been disclosed to the defense in the Jencks Act material for Cotler, which explicitly identified ███, ███, and ███████ as campaign staffers who were involved in the response to text-to-vote misinformation.  As such, the subsequent disclosure of the interview reports did not require wholesale revisions to the defense strategy – a fact the Court observed during the trial.  See Tr. 234 ("Because at least from my quick perusal of these documents, this seems consistent with – it's not exculpatory material from my view, from what I'm looking at and from what you're telling me.  Much of what you were arguing before is pretty much what you argued in your opening statement.").

At trial, the defendant argued that the fact that the Clinton campaign had contributed to the news media's reporting on text-to-vote misinformation was both new information and exculpatory, citing a Buzzfeed article published on November 2, 2016 as being particularly important.  See Tr. 228, 231.  But the Jencks Act material for Morales-Rocketto reflected the campaign's strategy to bring text-to-vote misinformation to the attention of the media.  In addition, the government disclosed Jencks Act material for Professor Robert McNees on February 27, 2023.  That material included an interview report reflecting that after Professor McNees had tweeted his observations of the text-to-vote misinformation spread by the defendant and Twitter's response, Professor McNees communicated with news reporters from the Intercept and Buzzfeed on or about November 2, 2016 and that both publications issued news stories about the tweets and Twitter's response within 24 hours of those communications.  See 3500-RM-1, at

2, attached herein as Ex. D.  On March 6, 2023, the government disclosed Professor McNees's

communications with Charlie Warzel, the Buzzfeed reporter who subsequently published the

aforementioned article cited by the defense.  See 3500-RM-9-C, attached herein as Ex. E.

There can be little doubt that the Buzzfeed article was in fact written in response

to Professor McNees's tweets.  See Charlie Warzel, Twitter Finally Blocks Attempt to

Disenfranchise Voters, BUZZFEED NEWS, November 2, 2016, available at

https://www.buzzfeednews.com/article/charliewarzel/twitter-doesnt-think-this-attempt-to-

disenfranchise-voters-v (last visited June 18, 2023).  Notably, the article reported that "[t]hese

kinds of fake voter ads have appeared on Twitter from numerous Trump-supporting accounts

during the campaign; just last month [October 2016], the Democratic National Committee

condemned a similar fake voter ad tweet sent out by Trump adviser Roger Stone."  Id.  To the

extent that the spread of text-to-vote misinformation prior to the defendant's tweets and the

knowledge of that spread by officials within the Clinton campaign and the Democratic party was

central to his defense, the record shows that the defendant was on notice of the essential facts

giving rise to such a defense by virtue of the government's pretrial disclosures and publicly

available information.  See Saipov, 2023 WL 3495031, at *4 ("[T]he Government is under no

obligation to disclose its investigative files simply because they contain information which could

assist the defendant . . . [but] is required, however, to disclose sufficient information to the

defendant to ensure that the defendant will not be denied access to exculpatory evidence known

only to the Government."  (internal citations omitted)).  In any event, the government stipulated

to both of these facts in DX BB, which was introduced into evidence.

The defendant also declined to accept the Court's offer to force the government to

recall either Cotler or Morales-Rocketto to permit additional cross-examination on the basis of

the interview reports.  The defendant further elected not to accept the Court's offer to have the government call any of the witnesses identified in the reports as part of the government's case; and the defendant chose not to call any of the witnesses himself.  The Court made clear that it would have permitted the defendant time, including potentially an additional continuance, to pursue any of these avenues; but the defendant elected to forgo any of these approaches.  See United States v. Mora, 152 F.3d 921, at *2 (2d Cir. 1998) ("The fact that defendants failed to make use of much of the evidence in question once it was disclosed by the government – by, among other things, failing to recall government witnesses whose cross-examination by defendants was allegedly hampered by the belated disclosures – only reinforces our conclusions that new trials are not warranted, and belies defendants' claims regarding the importance of this evidence.").  Under these circumstances, a new trial is not warranted.

II.    **NO NEW TRIAL IS WARRANTED BECAUSE THE GOVERNMENT PROVIDED THE COURT WITH ALL INFORMATION RELEVANT TO THE DETERMINATION OF WHETHER MICROCHIP SHOULD BE ALLOWED TO TESTIFY ANONYMOUSLY.**

The defendant also alleges that the government violated its obligations under Brady, because it should have provided the Court with alleged impeachment information concerning Microchip before it granted the government's motion to shield Microchip's true identity.  This is incorrect.  The defendant did not, and cannot, articulate how any of the information he cites relates to the Confrontation Clause analysis that the Court conducted before permitting Microchip to testify anonymously.  The information cited by the defense essentially amounts to impeachment material – e.g., statements concerning Microchip's drug use decades ago, debts he owes to the IRS, and his concern about his current employment – which is not relevant to the three-step test that courts perform to decide whether to shield certain information from public disclosure at a trial.  The government did, however, provide this information to the

defense in advance of trial, and the defense used it to impeach the witness.  The defendant's

argument that it should have been provided to the Court in connection with the motion to shield

Microchip's true identity is meritless.

       At various places in the defendant's argument concerning Microchip's anonymity,

he conflates his Confrontation Clause analysis with <u>Brady</u> arguments.  <u>See</u> Def.'s Mot. at 8, 9,

11, 13, and 15.  But compliance with <u>Brady</u> and its progeny is an obligation – one the

government satisfied – separate from the government's duty to provide the Court with the

information relevant to its request that Microchip be allowed to testify anonymously (an

obligation the government also clearly met).  <u>Brady</u> material must be disclosed in time for its

effective use, but none of the information cited by the defense in its motion for a new trial relates

to the Confrontation Clause analysis performed by this Court.  The government provided the

Court with all of the information in its possession that was relevant to the Confrontation Clause

analysis, and the government likewise provided all potential <u>Brady</u> material to the defense in a

timely fashion prior to trial.  Indeed, the defense spent most of its cross-examination of

Microchip presenting the vey impeachment information it now cites in its motion for a new trial.

As such, no new trial is warranted, and the defendant's motion should be denied.

    A.   <u>Factual and Procedural Background</u>.

       Approximately one month prior to the start of jury selection, the government

disclosed to the defense that it intended to call a cooperating witness at trial (the "CW") and

disclosed to the defense the Internet moniker of the CW, Microchip, in order to permit the

defense sufficient time to review the various Twitter materials that had been produced in

discovery related to Microchip.  Those materials included numerous statements by Microchip

across multiple Twitter accounts, including many statements that were neither marked as exhibits

at trial nor introduced into evidence.

On February 24, 2023, the government moved for certain protective measures designed to safeguard the identity of Microchip during his anticipated trial testimony.  In its motion and reply briefs, the government informed the Court that, among other things, the government intended to call a CW, Microchip, at trial, that the CW participated in the dissemination of misinformation prior to the 2016 presidential election, and that the CW was a co-conspirator of the defendant.  See ECF 66 at 1.  The government told the Court that it expected the evidence would show that Microchip communicated with the defendant and others on Twitter, including about the creation and dissemination of deceptive images concerning the time, place, and manner by which voters could vote in the 2016 presidential election ("Deceptive Images").  Id. at 2.  Indeed, Microchip participated in messaging groups that included the defendant and others.  Id.  Notably, in all instances, Microchip used his online moniker and did not reveal his true identity to the defendant or the other group participants.  Id.

The government also reported to the Court that Microchip was engaged in proactive investigations with the FBI and could engage in future investigations.  Id.  While Microchip has used various online handles and personas, the government advised the Court that it was not aware of any public association between his true identity and the Microchip handles.  Id.  The government further disclosed that Microchip had pleaded guilty pursuant to a cooperation agreement to a violation of 18 U.S.C. § 241, the same violation charged against the defendant.  Id. at 2.

In his opposition brief, the defendant argued that the Confrontation Clause required that the defendant be permitted to reveal Microchip's true identity during the trial.  On March 8, 2023, the Court granted the motion, allowing Microchip to testify anonymously.  ECF 82.  On March 10, 2023, approximately ten days prior to trial, the government began producing

21

Jencks Act material pertaining to Microchip.  In accordance with the Court's order, Microchip's true name was redacted from the Jencks Act material.[10]

    B.    <u>Applicable Law</u>.

        A person accused of a crime is guaranteed the right to confront the witnesses against him, however that right of confrontation is not absolute.  <u>See</u> <u>United States v. Naseer</u>, No. 10 CR 19 (RJD), 2015 WL 13843166 (E.D.N.Y. Jan. 26, 2015).  "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defendant might wish."  <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20 (1985).  As Judge Garaufis noted, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." ECF 82 at 3 (citing <u>United States v. Crowley</u>, 318 F.3d 401, 417 (2d Cir. 2003)).  "When considering whether to permit a witness to testify under a pseudonym, courts in this circuit have considered factors such as the witness's safety, their ability to continue assisting the government if their identity is disclosed, and whether knowledge of the witness's real name would go to the witness's credibility or knowledge regarding the subject of their testimony."  <u>Id.</u> at 4.

        Judge Garaufis "adopted the three-step test put forth by the New York Court of Appeals for determining whether the government should be permitted to shield a witness's

---

    [10]    Subsequently, defense counsel advised the government that he already knew Microchip's true name.  Counsel asked the government not to provide him with the true name, and then said Microchip's true name during the call, confirming he had the correct true name. When asked, counsel declined to explain why he withheld from the government and the Court during the pendency of the government's motion that he already knew Microchip's true name.

identity, address, or occupation." Id. at 6-7 (internal quotation marks and citations omitted).

Pursuant to this three-part test, the party seeking to shield a witness's identity must first make a

showing of why the witness should be permitted to testify anonymously, including by showing

the potential for harassment, annoyance, humiliation, or endangerment of the witness. Id. at 6.

Second, the burden then shifts to the other party to demonstrate the materiality of the witness's

true identity to the issue of guilt or innocence. Id. Finally, the Court uses its discretion to weigh

the various interests involved and determine whether the witness's identity is sufficiently

material to the question of guilt or innocence to overcome the interest in his anonymity. Id.

      C.    <u>Argument</u>.

          The defendant argues that the government should have provided the Court with

impeachment material related to Microchip that could have persuaded Judge Garaufis to deny the

government's motion to shield Microchip's identity. The defendant is incorrect. The

Confrontation Clause analysis is about the risks posed to the witness by revealing his identity,

balanced by the materiality of the witness's true identity to the defendant's guilt or innocence. It

is not about the perceived quality of the witness's testimony, which the defense suggests was

diminished by the impeachment information despite the jury having apparently credited his

testimony after learning of such impeachment information. The impeachment material

referenced by the defendant is irrelevant the Confrontation Clause analysis and therefore need

not have been submitted to the Court and would not have affected the Court's ruling.

      1.    <u>The Government Provided the Court and the Defendant with All Relevant<br>Information Concerning the Request to Shield Microchip's Identity</u>

          As described above, the government provided the Court with all relevant

information known to it at the time to enable the Court to determine whether Microchip's

identity should be protected. The Court weighed the facts and arguments presented by both

parties and reached the correct decision, namely that the government had met its burden to demonstrate the potential for harassment of, or danger to, Microchip, and that the defense had not met its burden to demonstrate the materiality of Microchip's true identity.  First, Judge Garaufis found that "the Government ha[d] adequately shown that requiring the CW to reveal their identity in open court would create the likelihood that third parties would 'harass' or 'endanger' the witness."  Id. at 7.  The Court agreed that Microchip's prominent position within the online alt-right community would potentially "attract intense scrutiny from members of that group that are already following this case," which would likely develop into "at a minimum, online harassment."  Id.  As such, the Court found "that there is real, non-speculative, concern that revealing the CW's identity could lead to online or physical harassment or danger."  Id. at 8.

Next, the Court found that "the Defense ha[d] failed to prove that testimony regarding the CW's identity is material to the question of guilt or innocence."  Id.  As the defense acknowledged, "the relevant exchanges and interactions all took place over the Internet, where the CW was known by online monikers (under which he would be testifying at trial) rather than by his legal name or personal background."  Id.  Per the government's proposal, the defense would be provided Microchip's true name on an attorney's-eyes-only basis so that counsel could perform any due diligence it believed necessary to prepare for cross-examination of the witness. "When weighing the interests and considering the Defendant's ability to test veracity, the court [found] that this test weighs in favor of granting the Government's requests."  Id. at 9.

2.     None of the Information Cited by the Defense Is Relevant to the Confrontation Clause Analysis Regarding Microchip's Identity.

The defendant insists that the government should have made additional disclosures during the Court's consideration of the motion for protective measures regarding Microchip's identity, specifically that Microchip (1) used drugs approximately twenty years ago;

(2) had debts owed to the IRS; (3) feared that his employment would be jeopardized if his true identity were associated with the Microchip handle; and (4) offered to help the FBI prior to being charged with a crime.  See ECF 135 at 9.  The defendant also cherry-picked statements from Microchip's interview reports relating to the substance of his involvement in the crimes charged in this case, including whether there was a "grand plan" to stop people from voting, the level of organization in the relevant chat rooms, and efforts among the members of the chat rooms to push out content.

The defendant fails to explain how any of this information relates to the three-step test described above used to decide whether the Confrontation Clause requires a witness's identity to be revealed.  For example, none of the information referenced by the defendant would have affected the first step of determining whether Microchip would face potential harassment or endangerment.  Likewise, none of the information would have impacted the second step of determining the materiality of Microchip's true identity to the determination of guilt or innocence.  The reality is that Microchip did not use his real name during any of the conduct relating to this case, and none of the information referenced by the defendant changes that fact.

As noted above, the government advised the defendant of the vast majority of Microchip's Jencks Act statements more than a month prior to trial.  The government then supplemented those early disclosures with the notes and reports of its meetings with Microchip. From this material, the defendant was able to effectively impeach Microchip during his testimony at trial.  All of this, however, is analytically distinct from whether Microchip faced a risk of harassment or endangerment by testifying in this case, or whether his true identity had any material impact on the determination of the defendant's guilt or innocence, and the

25

defendant fails in the instant motion to offer a coherent explanation of its relevance to the

Confrontation Clause analysis.[11]

3.      <u>Microchip's February 2023 Tweets Similarly Had No Bearing on the Confrontation Clause Analysis.</u>

Finally, in an apparent effort to create the appearance of government misconduct,

the defense argues that the government should have made the Court aware of Microchip's more

recent tweeting in February 2023 in advance of the Court's order allowing him to testify

anonymously.  The defense lists several tweets published under the Microchip handle.[12]  Among

the examples listed by the defense are tweets in which Microchip says that he is going to stop

---

[11]     It is notable that the defendant did not seek reconsideration of the Court's decision following his receipt of the interview reports of Microchip.

[12]     Although the defendant was in possession of a significant volume of Microchip's statements from the relevant conspiracy time period, the defense instead focused its impeachment on tweets made by Microchip more than six years later, via his Twitter account, @wdfx2eu9000, which Microchip was using in the months prior to trial.  That account was started in 2015 and is still active and available today.

The defense asserts that "*not one* of these tweets was *ever* disclosed by the government to Mr. Mackey, even as part of compliance with the Jencks Act."  ECF 135 at 11 (emphasis in original).  However, the government did indeed direct the defense to this account in materials that were disclosed on or about March 10, 2023.  Among the Jencks Act materials provided by the government on that date was an interview report, as well as the notes from that interview, which both state that Microchip had been using this particular Twitter account since July 2015.

Upon re-review of these materials, it appears that the interview report erroneously omitted a digit from the name of the Twitter account: while the notes of the interview correctly listed the account as @wdfx2eu9000, the interview report listed the account as @wdfxeu9000, omitting the "2."  This was a typographical error.  As was clear in the discovery and trial testimony, Microchip used numerous accounts named using some variation of "@wdfx2eu."  All of Microchip's relevant communications introduced at trial used the @wdfx2eu7 or @wdfx2eu8 accounts, and defense counsel was provided with documents relating to numerous other Microchip accounts using that same naming convention.  Given the government's overall efforts to provide the defendant with early notice of statements made by Microchip, the government rejects the accusation and implication that it somehow engaged in efforts to hide from the defense the materials contained in this account.

26

tweeting, he is "insane," "on pills," doesn't shower, "can barely take care of [him]self," and is using Adderall.  ECF 135 at 10.

For the reasons noted above, none of these tweets would have been relevant to the three-step test to determine whether the Confrontation Clause requires Microchip's true identity to be revealed at trial.  Microchip did not reveal his true identity in any of these tweets.  None of the tweets contradicted the government's concerns about the potential for harassment or endangerment were Microchip to testify under his real name or buttressed the defendant's failed argument that his true identity was somehow material to the issue of the defendant's guilt or innocence.  The defendant was provided with Microchip's historical Twitter account handles prior to trial, and the highlighted tweets—which were made more than six years after the charged conspiracy—were all publicly available.  While the defendant was entitled to use the tweets to try to impeach Microchip at trial, the tweets were surely not relevant to the Court's decision to allow Microchip to testify under his online moniker.

Finally, as Microchip testified at trial, he would have testified regardless of whether he was permitted to testify anonymously, as his cooperation agreement required.  See Tr. 597 (Q. "… if the Court denied the request for you to testify anonymously, you would still have to testify here today and you planned to do that?"  A.  "Oh, yes, yes.").  Accordingly, the defendant's implication that the government hid information from the Court because it was desperate to win its motion for Microchip's anonymity and thereby assure his availability as a witness is utterly baseless.  Microchip was going to testify whether he was anonymous or not; his anonymity was granted to ensure his safety, not his presence at trial.

27

III.   THE TRIAL EVIDENCE WAS SUFFICIENT TO SUPPORT THE DEFENDANT'S CONVICTION

A.   Applicable Law

1.   Federal Rule of Criminal Procedure 29

Under Federal Rule of Criminal Procedure 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. "[T]he court may set aside the verdict . . . only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." United States v. White, 7 F.4th 90, 98 (2d Cir. 2021) (internal quotation marks omitted). "A conviction must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," and the evidence must be viewed "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." Id. (internal quotation marks omitted) (emphasis in original). "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted).

Thus, a defendant challenging a jury's guilty verdict "bears a heavy burden." United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017) (internal quotation marks omitted). A reviewing court must consider the evidence as a whole, not in isolation. United States v. Klein, 913 F.3d 73, 78 (2d Cir. 2019). This is so because "each fact may gain color from others." Guadagna, 183 F.3d at 130 (citing United States v. Monica, 295 F.2d 400, 401 (2d Cir. 1961)).

In addition to resolving any issue regarding witness credibility in the government's favor, the Court must leave to the jury the task of choosing among permissible competing inferences that can be drawn from the evidence.  See United States v. Pugh, 945 F.3d 9, 19 (2d Cir. 2019).  In deciding which inferences to draw, the jury is entitled to use its common sense, Klein, 913 F.3d at 79, and "[t]he fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences not drawn were not available or were not reasonable," United States v. Rosa, 17 F.3d 1531, 1542 (2d Cir. 1994). Furthermore, "[d]irect evidence is not required; [i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt."  United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quotations omitted).

Even if the Court concludes that the jury could have acquitted the defendant, the Court may not disturb the jury's verdict on that ground, because, "[w]here a court concludes after a full analysis of the evidence in connection with a Rule 29 motion that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter."  United States v. Temple, 447 F.3d 130, 137 (2d Cir. 2006).

### 2.    Federal Rule of Criminal Procedure 33

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  A trial court's discretion to grant a new trial must be "exercised sparingly," and "only with great caution and in the most extraordinary circumstances."  United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992). "The defendant bears the burden of proving that he is entitled to a new trial," United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009), and the crucial question for the court is whether "it would be a manifest injustice to let the guilty verdict stand."  Sanchez, 969 F.2d at 1414.  A

29

"manifest injustice" occurs where a trial court cannot be satisfied that "competent, satisfactory

and sufficient evidence" supports the jury's finding of guilt beyond a reasonable doubt, and

where a "real concern" exists "that an innocent person may have been convicted."  Id.

> The Second Circuit recently provided guidance on the "extraordinary

circumstances" that could warrant the grant of a motion for a new trial:

> A district court may not grant a Rule 33 motion based on the
> weight of the evidence alone unless the evidence preponderates
> heavily against the verdict to such an extent that it would be a
> manifest injustice to let the verdict stand. . . . Under the
> preponderates heavily standard, . . . a district court may not
> reweigh the evidence and set aside the verdict simply because it
> feels some other result would be more reasonable. . . . To the
> contrary, absent a situation in which, for example, the evidence
> was patently incredible or defied physical realities[,] where an
> evidentiary or instructional error compromised the reliability of the
> verdict, or where the government's case depends upon strained
> inferences drawn from uncorroborated testimony, a district court
> must defer to the jury's resolution of conflicting evidence. . . .
> Moreover, in applying the "preponderates heavily" standard, a
> district court must be careful to consider any reliable trial evidence
> as a whole, rather than on a piecemeal basis.

United States v. Landesman, 17 F.4th 298, 331-32 (2d Cir. 2021) (internal quotations omitted).

B.    Argument

> The defendant argues that the government's evidence was legally insufficient.

Based on the evidence offered at trial, the government submits that there should be no serious

dispute that a criminal conspiracy existed, or that the purpose of that conspiracy was to injure the

rights of voters.  Evidence of the conspiracy and its aims were patent in the documents presented

at trial and were echoed by the government's cooperating witness, whose own Twitter statements

clearly demonstrated collaboration with others to deceive voters.  GX 400-0033 (Microchip

stating "here's what I worried about, Greg, people on Trump side thinking this is legit and they

stay home" after an apparent Trump supporter read his misinformation and believed it to be

true).  The defendant's contention, rather, was that the defendant did not join or otherwise share the aims of this conspiracy and that any actions he took in a similar direction were done "haphazardly" and without thought.  The defendant is wrong, and government clearly met its burden to show that the defendant had knowingly joined the charged conspiracy.

As an initial matter, the Second Circuit has recently explained that the "high degree of deference" given to the jury's verdict in the context of Rule 29 motions "is especially important when reviewing a conviction of conspiracy." Landesman, 17 F.4th at 320.  "This is so because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." Id. (quotations omitted).  "The 'agreement to participate in the conspiracy may be inferred from the facts and circumstances of the case,' and 'both the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence.'" Id. (quotations omitted).

The evidence presented by the government included, but was not limited to, the following, described in sum and substance:

- Throughout 2016, the defendant was an active member of three separate, invitation-only Twitter direct message groups—the Warroom, the Madman Group and the Microchat—that were used by its members to share and coordinate political messaging.  The groups had overlapping membership.  The defendant was one of the more prominent members of the groups, and an object of interest and attention by the others.  See, e.g., Tr. 434, 441, 445; GX 200-D, 400, 410, 420, 430.

- Discussions within these groups often focused on efforts to make messages "trend," and therefore get the widest possible spread.  At times, the defendant discussed the formulation and distribution of such messages with members of the group, and then acted in a manner to help those messages spread.  At numerous other times, however, when defendant did not speak up or otherwise comment on the group activities, he still acted on—and distributed—the messages the members of group hoped to trend.  This evidence showed the members of the groups, including the defendant, consistently acting in a coordinated way, even

31

when they did not expressly articulate their plans to do so.  See, e.g., GX 500; Tr.
441-442, 446.

- As the 2016 election approached, members of all three groups turned their
attention toward the distribution of Deceptive Images to deceive voters about how
to cast valid votes.  These co-conspirators commented on, among other things, the
design of the Deceptive Images, the timing of when they should be distributed and
the effect they were having.  See, e.g., GX 400, pg. 27-33; Tr. 511-13.

- On or about November 1 and 2, 2016, at or around the time that the Deceptive
Images were being discussed in the three groups, the defendant tweeted out two
Deceptive Images similar to the materials that had been shared in the three
groups.  Both Deceptive Images featured women, one black and one Hispanic,
and included the hashtag "#Imwithher," which was used by the Clinton campaign.
See GX 720 and GX 721.

- At the time that the defendant sent both Deceptive Images, the defendant was a
member of the Warroom.  Cooperating witness "Microchip" described the
Warroom as a "strategy room" where ideas meant for distribution were shared.
See Tr. 498.  The defendant was a member of the Warroom when co-conspirators,
like Microchip, discussed distributing messaging meant to undermine the right to
vote, as well as ways to make it more effective.  See, e.g., Tr. 386-388; GX 400
pg. 32-33.

- Shortly after distributing the two Deceptive Images, the defendant retweeted a
third Deceptive Image tweeted by co-conspirator Nia_4Trump, who also
participated in the Warroom.  Nia_4Trump's tweet stated "@TheRickyVaughn
thanks for spreading the word! #MAGA #ImWithHer #Vote Hillary from home!
Save time & Avoid the line!"  See GX 722.

- After his removal from Twitter because of these acts, the defendant returned to
the Warroom and was cheered on by fellow group members for his actions.   He
also returned to the Madman group, where many Deceptive Images were created.
See, e.g., GX 400, pg. 37-41.

In addition to the evidence summarized above which showed the defendant's

involvement and coordination with the individuals who organized the conceptualization, creation

and distribution of the Deceptive Images, the government admitted numerous statements of the

defendant in which he evinced his relevant intent.  These statements expressed, among other

things: his preoccupation with the election, see, e.g., GX 200-K, GX 200-L; his intense

partisanship in the outcome, see, e.g., GX 200-M; his preference for using memes to accomplish

his political aims, see, e.g., GX 200-A, 200-B; 200-M; his understanding of his reach, see, e.g., GX 200-D, GX 200-E; and his awareness of his audience's willingness and desire to retweet and redistribute the materials he spread, see, e.g., GX 200-C.  Further, the government admitted numerous statements in which the defendant subjectively identified his political opponents—focusing primarily on black and women voters, matching the imagery of the two Deceptive Images—and stated his preoccupation with the closeness of the election, voter turnout, and the importance of small numbers of votes.  See, e.g., GX 200-K, 200-L, 1005.  Finally, the government admitted statement after statement where the defendant expressed the sincere belief—which he largely acknowledged on cross examination—that he thought black people were stupid and easily tricked, and that women and immigrants (and the children of immigrants) should not be permitted to vote at all.  See, e.g., GX 1005; Tr. 729, 772-773.

Pursuant to Second Circuit law, the evidence admitted at trial must be viewed "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  White, 7 F.4th at 98.  The government submits that the evidence offered at trial—which married the defendant's proven acts and demonstrated intent with the coordinated subterranean actions of he and his fellow group members—more than satisfied the government's burden of proof to establish the defendant's participation in the conspiracy.  This evidence also served to undermine the defendant's implausible assertion that his distribution of the Deceptive Images at the exact same time as his longtime fellow group members was somehow just a coincidence, and that in taking those actions—unlike nearly all other occasions during the long lead up to the election—he was now acting alone, uninterested in coordination, and without a political agenda or animus.  The government submits that the

33

members of the jury drew the correct conclusions from the evidence presented to them.  In the

posture of this motion, where the reviewing court must draw every inference in favor of the

government, the Court must reach the same result and deny the defendant's invitation to second

guess the judgment of the jury.  Guadagna, 183 F.3d at 130 ("In other words, the court may enter

a judgment of acquittal only if the evidence that the defendant committed the crime alleged is

nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."

(internal quotation marks omitted)).

IV.   THE COURT SHOULD DECLINE THE DEFENDANT'S INVITATION TO REVISIT
      JUDGE GARAUFIS'S RULING ON THE DEFENDANT'S PRETRIAL MOTION TO
      DISMISS

         The Court should deny the defendant's request that the Court reconsider Judge

Garaufis's January 23, 2023 Opinion ("the Opinion") denying the defendant's previous motion

to dismiss.  The defendant asks the Court to enter a judgment of acquittal or in the alternative

hold a new trial with radically different jury instructions on the grounds that the Opinion was

wrongly decided.  In so asking, the defendant rehashes the same legal arguments—focusing on

fair notice and First Amendment considerations—that were previously considered and rejected

by the trial court, and invites this Court to reject jury instructions based on the specific language

outlined in the Opinion.  The government believes that the Opinion was correctly decided and

sees no basis—particularly viewed through the highly deferential standard of review required by

Rule 29 and 33 analyses—to disturb its holdings.   The defendant's legal challenges should be

reserved for appeal.

V.    THE TRIAL EVIDENCE WAS SUFFICIENT TO PERMIT THE JURY TO FIND
      VENUE FOR THE CHARGED CRIME IN THE EASTERN DISTRICT

         Finally, the defendant argues that the Court should dismiss the charges based on

venue.  Here, as with the defendant's arguments concerning fair notice and the First Amendment,

the defendant is effectively asking for the Court to reconsider and reverse the legal

determinations rendered by Judge Garaufis in the Opinion.  The government submits that the

Court's interpretation of the law was correct and that any legal challenge to the Court's decisions

on venue is best reserved for appeal.

   In terms of the sufficiency of the evidence, the government submits that the

evidence it offered at trial, viewed in the light most favorable to the government, was more than

sufficient to meet the government's burden.  The government demonstrated that the defendant

was a resident of New York City throughout the charged conspiracy.  The defendant sent the

Deceptive Images from his apartment in Manhattan, using means of communication that

necessarily routed those images through the Eastern District of New York.  The government

proved this beyond a preponderance of the evidence in the following manner.

- Michael Anderson, an engineer from Twitter, testified that the defendant sent the Deceptive Images using both a Twitter desktop application and a Twitter mobile device application, and that both tweets had to travel to Atlanta, Georgia and Sacramento, California, for processing.  Tr. 138-44;

- The defendant's roommate, Marc Bertucci, testified that the defendant used Comcast for his Internet access.  Tr. 146-49;

- Joel Hendrickson, an engineer from Comcast, testified that any Internet transmissions sent from Manhattan to Atlanta or Sacramento (the locations of the Twitter servers) over the Comcast network must necessarily have passed through the Eastern District of New York.  Tr. 248-52; and

- Joel DeCapua of the Federal Bureau of Investigation provided expert opinion that signals sent from Manhattan to Atlanta or Sacramento over a mobile network would necessarily have passed through the Eastern District of New York.  Tr. 193-97.

   This evidence clearly demonstrated that essential acts in furtherance of the

conspiracy—namely, the defendant's distribution of the Deceptive Images—were sent through

the Eastern District of New York.  Accordingly, the defendant's motion—insofar as it challenges

the sufficiency of the evidence—should be denied.

CONCLUSION

For the reasons stated above, the defendant's motion should be denied.

Dated:      Brooklyn, New York
            June 21, 2023

                                    Respectfully submitted,

                                    BREON PEACE
                                    United States Attorney
                                    Eastern District of New York

                                    COREY R. AMUNDSON
                                    Chief, Public Integrity Section
                                    U.S. Department of Justice


                         By:        /s/
                                    _____
                                    Erik D. Paulsen
                                    F. Turner Buford
                                    Assistant United States Attorneys
                                    (718) 254-7000

                                    William J. Gullotta
                                    Trial Attorney
                                    (202) 514-0047


cc:     Clerk of the Court (NGG)
        Andrew J. Frisch, Esq. (by E-Mail and ECF)


36