412

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF          :   21-CR-80(RER)
AMERICA,                  :
                          :
                          :
                          :
                          :   United States Courthouse
                          :   Brooklyn, New York
     -against-            :
                          :
                          :
                          :
                          :   Wednesday, March 15, 2023
                          :   9:00 A.M.
DOUGLASS MACKEY,          :
                          :
        Defendant.        :
                          :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF JURY SELECTION
BEFORE THE HONORABLE JUDGE RAMON REYES

A P P E A R A N C E S:

For the Government:    UNITED STATES ATTORNEY'S OFFICE
                       Eastern District of New York
                       271 Cadman Plaza East
                       Brooklyn, New York 11201
                       BY: ERIK PAULSEN, ESQ.
                           F. TURNER BUFORD, ESQ.
                           Assistant United States Attorneys

For the Defendant:     LAW OFFICE OF ANDREW J. FRISCH
                       Attorney for the Defendant -
                       DOUGLASS MACKEY
                       40 Fulton Street
                       23rd Floor
                       New York, New York 10038
                       BY: ANDREW J. FRISCH, ESQ.


Official Court Reporter:   ToniAnn Lucatorto, RPR, RMR, CRR
                           Telephone: (718) 613-2601
                           E-mail: ToniAnnLucatorto@gmail.com

Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

Jury Selection                             413

1              (In open court.)

2              THE COURT:  Anything before we call in -- actually

3     yes.  Juror Number 56, Michael Signora, has told us that he

4     has a work trip to Arizona scheduled to begin next Friday.

5              Any objection to excusing him?

6              MR. BUFORD: No your Honor . I think we excused a

7     juror with a similar commitment for next Friday, yesterday.

8              THE COURT:  Mr. Frisch?

9              MR. FRISCH:  No.

10             THE COURT:  Juror Number 56 is excused.

11             Juror number 60, Leonard Shostak has a 4 o'clock

12    appointment today.  And I propose that we wait to see if we

13    get to him before then, Which we may, and he has a lot of

14    affirmative responses.  As the day progresses, if it looks

15    like we will not get to him before 4 o'clock, I suggest we

16    excuse him.

17             Anything else that we need to talk about before --

18             MR. BUFORD: Not from the Government, your Honor.

19             THE COURT:  All right.

20             (Prospective juror enters.)

21             Good morning, Mr. Gilreath.  Charles Gilreath,

22    Juror Number 46.

23             Mr.  Gilreath, this case has received some degree

24    of media attention.  Have you read, heard, or seen anything

25    in the media, on the internet, or on social media about this

1   case or about the defendant, Douglass Mackey, a/k/a Ricky

2   Vaughn before today?

3           THE PROSPECTIVE JUROR: No.

4           THE COURT:  This case involves various

5   individuals, including the defendant, Douglass Mackey, who

6   had strong political preferences during the 2016

7   presidential election campaign, including individuals who

8   supported President Donald Trump and individuals who

9   supported presidential candidate Hillary Clinton.

10          Do you have strong feelings or opinions related to

11  the 2016 presidential election campaign or to the two

12  candidates in that campaign such that it would overcome your

13  duty to judge this case fairly and impartially?

14          THE PROSPECTIVE JUROR:  No.

15          THE COURT:  Do you have any experience with what

16  you perceive to be deliberately false or misleading

17  information on the internet or on social media?

18          THE PROSPECTIVE JUROR:  Explaint that again.

19          THE COURT:  Sure.

20          Do you have any experience with what you perceived

21  to be false or misleading information on the internet or

22  social media?

23          THE PROSPECTIVE JUROR:  No.

24          THE COURT:  T trial, you may hear some language

25  that you may find to be offensive.  You should not assess

1    that evidence based on whether you find it to be offensive

2    or not, but rather on whether that evidence tends to prove

3    or disprove the elements of the crime.

4            If you found some evidence offensive, would you be

5    able to set aside those feelings or opinions and objectively

6    hear and consider that evidence and follow the Court's

7    instructions on the law?

8            THE PROSPECTIVE JUROR:  Yes.

9            THE COURT:  I know you raised your number in the

10   big room to the question of prior jury service.

11           THE PROSPECTIVE JUROR:  Correct.

12           THE COURT:  Tell me about that.  When, where, what

13   kind of case, and whether you deliberated to a verdict or

14   not.

15           THE PROSPECTIVE JUROR:  I don't remember when.

16   Probably years back maybe at least six, seven years, at

17   least.  It was an extortion case.  And I did sit on the jury

18   and we did deliberate.

19           THE COURT:  And you rendered a verdict?

20           THE PROSPECTIVE JUROR:  Yes.

21           THE COURT:  Okay.

22           But when you say it was an extortion case, do you

23   mean it was a criminal case?

24           THE PROSPECTIVE JUROR:  Criminal.

25           THE COURT:  Okay.  As I told you folks yesterday,

Jury Selection                                    416

1    the trial has been moved to March 20th, Monday, through

2    March 31st, at the very latest, but it's more likely that it

3    will end sooner than that.  Is there any reason this would

4    cause you a genuine hardship if you were selected to serve

5    on this jury?

6                THE PROSPECTIVE JUROR:  I might be trying to go to

7    Germany to see my first grandson.

8                THE COURT:  Do you have confirmed plans already?

9                THE PROSPECTIVE JUROR:  Not yet.

10               THE COURT:  Have you, a family member, or close

11   friend ever been charged with a crime, convicted of a crime,

12   been the subject of a criminal investigation, been a witness

13   to a crime, been a witness in a grand jury investigation, or

14   been questioned in any matter by law enforcement officers,

15   or been the victim of a crime?  In other words, have you, a

16   family member, or close friend ever been involved in the

17   criminal justice system?

18               THE PROSPECTIVE JUROR:  Yes, I have my brothers.

19               THE COURT:  You brothers?

20               THE PROSPECTIVE JUROR:  Yes.

21               THE COURT:  Can you tell me about that?

22               THE PROSPECTIVE JUROR:  A lot of drug crimes, you

23   know, possession, things like that.  And, over time, they

24   end up getting time.

25               THE COURT:  So there were -- some of your brothers

1    had been convicted of drug crimes and did some time in

2    prison?

3              THE PROSPECTIVE JUROR:  Correct.

4              THE COURT:  Is there anything about that that

5    would affect your ability to be fair and impartial in this

6    case?

7              THE PROSPECTIVE JUROR:  No.

8              THE COURT:  Have you, a family member, or a close

9    friend ever been a party to a legal action against or had a

10   dispute with the United States or any of its agencies or

11   employees?

12             THE PROSPECTIVE JUROR:  No.

13             THE COURT:  You live in Roosevelt?

14             THE PROSPECTIVE JUROR:  Correct.

15             THE COURT:  How long have you lived there?

16             THE PROSPECTIVE JUROR:  All my life.

17             THE COURT:  Do you own or do you rent your home?

18             THE PROSPECTIVE JUROR:  I own.

19             THE COURT:  Do you live with anyone?

20             THE PROSPECTIVE JUROR:  My wife and two of my

21   children.

22             THE COURT:  What does your wife do for a living?

23             THE PROSPECTIVE JUROR:  She works for Citibank,

24   information security.

25             THE COURT:  And your children that live with you,

1   are they working, or are they school-aged?

2          THE PROSPECTIVE JUROR:  No, they're working.

3          THE COURT:  What do they do for a living?

4          THE PROSPECTIVE JUROR:  My daughter is a nurse's

5   assistant, and my son is pursuing his music career right

6   now.

7          THE COURT:  Are you working?

8          THE PROSPECTIVE JUROR:  Yes, I am.

9          THE COURT:  What do you do for a living?

10         THE PROSPECTIVE JUROR:  I'm a high school phys ed

11  teacher and track coach.

12         THE COURT:  What is the highest level of education

13  that you've completed?

14         THE PROSPECTIVE JUROR:  I have a master's plus 45

15  credits.

16         THE COURT:  Have you ever served in the military?

17         THE PROSPECTIVE JUROR:  No.

18         THE COURT:  Where do you get your news from?

19  Newspapers, radio, TV, internet, social media, podcasts?

20  What?

21         THE PROSPECTIVE JUROR:  A little bit of

22  everything; newspaper, internet.

23         THE COURT:  Are there any particular networks that

24  you get your news from or internet sources that you can tell

25  us about?

1        THE PROSPECTIVE JUROR:  Mostly, if I really watch
2   news, it's usually CNN.
3        THE COURT:  And on the internet and social media,
4   is there anything in particular that you get it from, the
5   new?
6        THE PROSPECTIVE JUROR:  I just scan.  Whatever
7   catches my eye.
8        THE COURT:  Okay.  Do you -- other than getting
9   news from the internet, do you use the internet and social
10  media for anything else?   If so, what platforms do you use?
11       THE PROSPECTIVE JUROR:  I use Instagram, Facebook.
12       THE COURT:  How frequently do you use them?
13       THE PROSPECTIVE JUROR:  Once or twice a week.
14       THE COURT:  Okay.  Have you ever been involved in
15  voter education, or voter registration, or get-out-the-vote
16  efforts?
17       THE PROSPECTIVE JUROR:  No.
18       THE COURT:  What are your hobbies?  How do you
19  spend your leisure time?
20       THE PROSPECTIVE JUROR:  Coaching track, and
21  spending -- vacation with the family.
22       THE COURT:  Are there any television shows or
23  radio programs that you regularly watch or listen to?
24       THE PROSPECTIVE JUROR:  *Survivor*.
25       THE COURT:  *Survivor*?  Okay.

Jury Selection                          420

1          Is there any reason why you cannot be fair and

2    impartial in this case?

3          THE PROSPECTIVE JUROR:  I thought about that over

4    the past couple days.  If it has anything to do with

5    suppression of voters, I don't think I can be partial to

6    that, if it has something to do with suppressing votes.

7          THE COURT:  How so?  Tell me a little bit more

8    about that.

9          THE PROSPECTIVE JUROR:  I have certain feelings

10   toward anybody that I might feel that tried to suppress some

11   type of voting being.  Being an African American and things

12   that we went through, it's kind of a soft spot for me to

13   feel that somebody would oppress other people to get out and

14   vote.

15         THE COURT:  Would those feelings that you have

16   overcome your duty to weigh the evidence and consider it

17   impartially and fairly?  Meaning, if the Government would

18   fail to meet its burden of proof to prove by beyond a

19   reasonable doubt that the defendant committed this crime and

20   the crime was -- had something to do with voting, if the

21   Government would fail to meet its burden of proof, would you

22   have any hesitance in rendering a verdict of not guilty?

23         THE PROSPECTIVE JUROR:  No.

24         THE COURT:  Flip side.

25         If the Government would meet its burden of

Jury Selection                    421

1   proof -- it proved beyond a reasonable doubt all of the

2   elements of the crime, would you have any hesitance in

3   finding the defendant guilty?

4            THE PROSPECTIVE JUROR:  No.

5            THE COURT:  Okay.

6            So, in other words, you have these -- you do have

7   feelings about voter suppression, let's call it.

8            THE PROSPECTIVE JUROR:  Right.

9            THE COURT:  But if -- would these feelings

10  overcome your duty to be fair and impartial?  And I just

11  asked you if the Government would fail to meet its burden of

12  proof, would you hesitate to find the defendant not guilty?

13  So it seems to me that your feeling would not overcome your

14  duty to be fair and impartial.

15           THE PROSPECTIVE JUROR:  That's correct.

16           THE COURT:  Is there anything about this case that

17  would cause you to favor one side over the other?

18           THE PROSPECTIVE JUROR:  No.  I think I can sit and

19  listen practically to both sides.

20           THE COURT:  Will you be able to set aside any

21  sympathies or biases you may have for any of the parties in

22  this case and render an impartial verdict based solely on

23  the evidence presented in the court and the law as given to

24  you by Judge Garaufis?

25           THE PROSPECTIVE JUROR:  Yes.

```
                          Sidebar                        422

 1          THE COURT:  Are there any follow-up questions for
 2   Mr.  Gilreath?
 3          MR. BUFORD:  None for the Government, Your Honor.
 4          MR. FRISCH:  Your Honor, I have two.  One of
 5   them -- can I say it in open court?  I won't be
 6   controversial?
 7          THE COURT:  Sure.
 8          MR. FRISCH:  Can you inquire from Mr. Gilreath
 9   about -- I take it there's a grandson on -- a grandchild on
10   his or her way and what he meant by a possible trip to
11   Germany?
12          THE COURT:  Sure.
13          Is your grandson born?
14          THE PROSPECTIVE JUROR:  No.  He's going to be born
15   -- my son is in the military.
16          THE COURT:  When is your daughter in law's due
17   date?
18          THE PROSPECTIVE JUROR:  End of March, just trying
19   to figure out if we're going to go.
20          MR. FRISCH:  I'm sorry.
21          THE COURT:  Go ahead.
22          MR. FRISCH:  And the other I should ask at
23   sidebar.
24          THE COURT:  Okay.
25          (Sidebar.)
```

Sidebar                                       423

1        MR. FRISCH:  I challenge Mr. Gilreath because, and

2   I don't mean this to be in any way disrespectful because I

3   know what you're trying to do, we're trying to get a jury to

4   move on with our lives, and I appreciate that.  At the same

5   time, when I question -- I cannot relate adequately to the

6   African American experience.  We all have our life

7   experience, and some types are unfortunate, but I can't

8   relate to the historical oppression of black people in this

9   country.  I have empathy, but I don't understand it.  I

10  don't think it's something that someone who is obviously a

11  thoughtful and good man like this can put aside when he

12  specifically says that he would have difficulty dealing with

13  a case which deals with voter suppression of African

14  Americans, which is precisely what this case is about.  I

15  think when someone like him; a thoughtful man, saying

16  something like that, he should be struck, he should be

17  excused.  Now, the Government will say, well, he's

18  thoughtful he said, but this is right to the core of the

19  case.  And I think that expression for someone that has his

20  life experience, he's not the right juror for this case,

21  given how he expressed it and what he said.

22        Just one last thing so I can make a record.  He

23  said I have a number of days to think about this.  And he's

24  had a lifetime to think about that.  That, I don't

25  appreciate.  That, I can't fully appreciate given that I'm

1   not black.  And I think he should just be struck, given the

2   nature of this case.

3         I might also add just, so your Honor knows one of

4   the issues that is subdued to say before Judge Garaufis,

5   the Government has expressed its view very strongly using

6   the words we feel very strongly about this, and I have taken

7   the opposite view, very strongly, and other some people in

8   chance have used racial epithets, and have said things that

9   are very vile.  And whether or not they're there because

10  it's for the shock value or something else, the Government's

11  view, and they have been very expressed about this, is that

12  my client's racial animus is significant and has probative

13  value in proving their allegation of deception.  That's

14  another reason why, as  much as I respect Mr. Gilreath, he's

15  not the right juror for this case.

16        MR. BUFORD: Judge, I don't know that that that's

17  giving the juror enough credit.  He said that he has had a

18  couple days to think about it.  The question is whether he

19  can put aside his biases and anything that he may bring to

20  the Court outside of the courtroom and focus on the

21  evidence.  Your Honor squarely put the question to him, and

22  I think he answered truthfully.

23        THE COURT:  I'll overrule the objection to the

24  change.  Mr. Gilreath will sit.

25        (Sidebar ends.)

1            THE COURT:  Okay, Mr. Gilreath.  How do you

2      pronounce it?

3            THE PROSPECTIVE JUROR:  You said it right.

4            THE COURT:  They will take you into the other room

5      and we'll continue with our process.  You will get to the

6      next phase, which will hopefully happen at the end the day.

7            THE PROSPECTIVE JUROR:  Okay, thank you.

8            (Prospective juror exits.)

9            THE COURT:  We were just informed that Jurors 47

10     and 48 have not yet arrived.  But we have 49 and 50 ready to

11     get.  So let's -- if they're not here, we can't take them.

12     I'm not going to excuse them yet, but we just need to

13     continue.

14           MR. BUFORD:  Okay, your Honor.

15           MR. FRISCH:  While we're waiting, can I just

16     articulate one more thing for the record?

17           THE COURT:  Yes.

18           MR. FRISCH:  And if you don't mind, I don't want

19     to be disrespectful by sitting.

20           THE COURT:  That's fine.

21           MR. FRISCH:  One other thing about Mr. Gilreath

22     that strikes me is that if his -- if the jury is

23     deliberating when his grandson is born, notwithstanding --

24     I'll finish after this juror?

25           THE COURT:  Yes.

1            (The prospective juror enters.)

2            THE COURT:  This is Juror Number 49.  James

3    Latopolski.

4            THE PROSPECTIVE JUROR:  That's correct.  I'm just

5    going to...

6            THE COURT:  No, that's fine, that's fine.  You're

7    okay.

8            Good morning, Mr. Latopolski.  This case has

9    received some degree of media attention.  Have you read,

10   heard, or seen anything in the media, on the internet, or on

11   social media about this case or about the defendant,

12   Douglass Mackey, otherwise known as Ricky Vaughn, before

13   today?

14           THE PROSPECTIVE JUROR:  No.

15           THE COURT:  This case involved various

16   individuals, including the defendant, Douglass Mackey, who

17   had strong political preferences during the 2016

18   presidential election campaign.  Including individuals who

19   supported President Donald Trump and individuals that

20   supported presidential candidate Hillary Clinton.

21           Do you have strong feelings or opinions related to

22   the 2016 presidential election campaign or to the two

23   candidates in that campaign, such that it would overcome

24   your duty to judge this case fair and impartially?

25           THE PROSPECTIVE JUROR:  I cannot say anything of

1   the sort.

2          THE COURT:  Do you have any experience with what

3   you perceive to be deliberately false or misleading

4   information on the internet or on social media?

5          THE PROSPECTIVE JUROR:  I have seen misleading

6   posts of various topics.  Not necessarily politicians

7   exclusively, but I haven't posted them myself.  I've only

8   seen them.

9          THE COURT:  The fact that you've seen these things

10  that are, you perceive to be misleading, will that affect

11  your ability to be a fair and impartial juror in in case?

12         THE PROSPECTIVE JUROR:  I do not anticipate that

13  to be the case.

14         THE COURT:  At trial, you may hear some language

15  that you may find to be offensive.  You should not assess

16  that evidence based on whether you find it to be offensive

17  or not.  But rather, based on whether it tends to prove or

18  disprove the elements of the crime.  If you found some of

19  the evidence offensive, would you be able to set aside those

20  feelings or opinions and consider it fairly and impartially?

21         THE PROSPECTIVE JUROR:  Yes.  Or at least make a

22  sincere attempt.

23         THE COURT:  You raised your Juror Number to a

24  number of questions in the big room, ceremonial courtroom;

25  do you have any close friends or relatives who are lawyers,

Jury Selection                               428

1  work for lawyers or a judge, family members or close friends

2  ever worked for law enforcement, close friends, family

3  members who are members of law enforcement, and whether you

4  have beliefs concerning law enforcement, whether positive or

5  negative, that would prevent you from being fair and

6  impartial in this case.

7            So please tell me about, first your relationships

8  or your family members relationships with lawyers, law

9  enforcement and the like.

10           THE PROSPECTIVE JUROR:  I have friends who are

11  attorneys of various natures.  I'm not sure if it's

12  exclusive to criminal defense, but I do have friends of

13  various natures within alumni groups and other financial

14  groups that I do partake in outside of this.

15           My sister was a former police academy candidate

16  and she was engaged to a police officer who has since

17  passed.  Not in the line of duty, but in general.  And I

18  have been heavily pro- police in other unrelated

19  developments.  Not necessarily -- not exclusively the areas

20  of this case, but in general, I have been in favor of law

21  enforcement in other unrelated concerns.  But not in an

22  official, like, jury capacity.  Just conversations or

23  musings when I read the paper.

24           THE COURT:  A few things about that.  Your pro-

25  police beliefs and feelings.  Would they overcome your duty

Jury Selection                                    429

1    to be fair and impartial in this case?  And in other words,

2    would you be more inclined to vote for conviction,

3    regardless of what the evidence showed just because there

4    might be some law enforcement involvement in the case?

5            THE PROSPECTIVE JUROR:  I'll make a sincere

6    attempt to overcome that basis.

7            THE COURT:  Can you be successful in that attempt

8    and put aside your pro-police beliefs and -- if the

9    Government presents evidence that fails to convince you

10   beyond a reasonable doubt that Mr. Mackey is guilty, would

11   you have any hesitance in rendering a verdict of not guilty?

12           THE COURT:  Would you repeat that question,

13   please?

14           THE COURT:  Sure.

15           If the Government would fail to meet its burden of

16   proof through the evidence to prove by a beyond a reasonable

17   doubt that Mr. Mackey is guilty of the crime, the Government

18   doesn't meet its burden of proof, would your pro-police

19   beliefs overcome that government's failure and you would

20   still vote to convict Mr. Mackey?

21           THE PROSPECTIVE JUROR:  I would still render a

22   fair verdict under those circumstances.

23           THE COURT:  That's all we ask jurors to do is, if

24   they have beliefs, opinions, put them aside and be fair and

25   impartial and judge the evidence that's presented in court

1   fairly and impartially without their preconceived notions

2   and bias.  You can do that?

3            THE PROSPECTIVE JUROR:  Yes.

4            THE COURT:  You may have learned things about the

5   law from people that you know that, or lawyers, or, in law

6   enforcement.  Can you put aside whatever you may have

7   learned from them and judge this case based on the law that

8   Judge Garaufis tells you applies?

9            THE PROSPECTIVE JUROR:  Yes.

10           THE COURT:  So the trial is going to last from

11  March 20th to March 31st.  Is there any reason why this

12  would cause you a genuine hardship if you were selected to

13  serve on this jury?

14           THE PROSPECTIVE JUROR:  I would say minor work

15  issues, but I don't have anything like doctor appointments

16  or vacations.  Like minor.

17           THE COURT:  Have you, a family member, or a close

18  friend ever been charged with a crime, convicted of a crime,

19  or been the subject of a criminal investigation?  Been a

20  witness to a crime, witness in a grand jury investigation,

21  or been questioned in any matter by law enforcement

22  officers, or been a victim of any crime?  In other words;

23  have you, a family member, or close friend ever been

24  involved in the criminal justice system?

25           THE PROSPECTIVE JUROR:  Yes.

Jury Selection                    431

1      THE COURT:  Tell me about that, please.

2      THE PROSPECTIVE JUROR:  My mother was convicted of

3  shoplifting later in life, and my sister was the victim of

4  sexual assault.

5      THE COURT:  Is there anything about those

6  experiences that would affect your ability to be fair and

7  impartial in this case?

8      THE PROSPECTIVE JUROR:  I would say, yes, if

9  anything involved something of a graphic or, you know, of a

10  graphic or sexual nature.  I mean, it has riled me up in the

11  past.

12      THE COURT:  I can assure you that there's not --

13  well, I don't believe this case involves graphic sexual

14  content.  So --

15      THE PROSPECTIVE JUROR:  I, I, in that particular,

16  then no.  I don't anticipate any effects.

17      THE COURT:  Have you, a family member, or close

18  friend ever been a party to a legal action against or had a

19  dispute with the United States or any of its agencies or

20  employees?

21      THE PROSPECTIVE JUROR:  Not federal agencies, but

22  certain state agencies involving housing.

23      THE COURT:  You've had some claims or some housing

24  issues with the state government?

25      THE PROSPECTIVE JUROR:  My father.  I don't

1   remember the details.

2          THE COURT:  Is that going to affect your ability

3   to be fair and impartial in this case?

4          THE PROSPECTIVE JUROR:  No, I don't think.

5          THE COURT:  Mr. Latopolski, you live in Floral

6   Park, correct?

7          THE PROSPECTIVE JUROR:  That's right.

8          THE COURT:  How long have you lived there?.

9          THE PROSPECTIVE JUROR:  My entire life.

10          THE COURT:  Do you own, rent?

11          THE PROSPECTIVE JUROR:  I live with my family, so

12   none of the above.

13          THE COURT:  What do your parents do for a living?

14          THE PROSPECTIVE JUROR:  My mother is disabled, my

15   father is retired.

16          THE COURT:  What is your father retired from?

17          THE PROSPECTIVE JUROR:  New York City Transit.

18   He's been there for nearly four decades.

19          THE COURT:  Anyone else live with you?

20          THE PROSPECTIVE JUROR:  Yes, my sister.

21          THE COURT:  Is this the one that was in the police

22   academy?

23          THE PROSPECTIVE JUROR:  That's right.

24          THE COURT:  What does she do for a living?

25          THE PROSPECTIVE JUROR:  Social worker.

Jury Selection                433

1          THE COURT:  What do you do for a living?

2          THE PROSPECTIVE JUROR:  I work for the New York

3    city comptroller's office.

4          THE COURT:  In what capacity.

5          THE PROSPECTIVE JUROR:  Technically, it's within

6    the bureau of asset management.  They are the financial

7    division of the elected official.

8          THE COURT:  What is your highest level of

9    education completed?

10         THE PROSPECTIVE JUROR:  Graduate school.  I'm in

11   economics.

12         THE COURT:  Have you ever served in the military?

13         THE PROSPECTIVE JUROR:  No.

14         THE COURT:  Where do you get your news from?

15         THE PROSPECTIVE JUROR:  Mostly *The Wall Street*

16   *Journal.*  I read it on an app on my phone, but it's

17   essentially the paper itself.

18         THE COURT:  Do you ever get your news through TV,

19   social media, podcasts, newspapers, other than *The Wall*

20   *Street Journal*?

21         THE PROSPECTIVE JUROR:  I watch the Nightly News,

22   both the local nature -- either channel -- either ABC or

23   NBC, or the national news that's on after that.  Like the

24   one with Lester Holt, or something newer on ABC.  And I do

25   stumble on things here and there on social media, but I

Jury Selection                                    434

1   can't say I've read that as in depth as I would, what I see

2   on TV or *The Wall Street Journal*.

3           THE COURT:  What social media or internet

4   platforms do you use?

5           THE PROSPECTIVE JUROR:  Mostly Facebook and

6   Instagram.  I mean, I wouldn't say anything outrageously

7   different than the typical online consumer.

8           THE COURT:  Are you concerned at all about the

9   reliability of the information that you find on the internet

10  or on social media?

11          THE PROSPECTIVE JUROR:  I'd say somewhat.  I mean,

12  there is a lot of misinformation online, but that was well

13  before the rise of social media.  But, yes, I'm concerned

14  that anybody can post anything about anything.

15          THE COURT:  Will your concerns about the

16  reliability of information on social media or the internet

17  affect your ability to be fair and impartial in this case?

18  In other words, would you look beyond the evidence that's

19  presented in determining what your verdict would be and rely

20  on your concerns about the reliability of social media.

21          THE PROSPECTIVE JUROR: I would make a sincere

22  attempt to overcome those concerns.

23          THE COURT:  We have to be sure that jurors --

24          THE PROSPECTIVE JUROR:  I mean, it would depend

25  entirely on what I've heard.  I really can't anticipate

1    anything.

2             THE COURT:  So your decision, your verdict would

3    depend upon the evidence presented; is that fair?

4             THE PROSPECTIVE JUROR:  Right.

5             THE COURT:  Have you ever been involved in voter

6    education, or voter registration, or any get-out-the-vote

7    efforts?

8             THE PROSPECTIVE JUROR:  I handed out pamphlets

9    when I was a teenager.  I can't think of anything past that.

10            THE COURT:  Pamphlets for a particular candidate

11   or --

12            THE PROSPECTIVE JUROR:  No, no.  Just voting in

13   general.  Again, this is well over -- well over 20 years

14   ago.

15            THE COURT:  What are your hobbies?  How do you

16   spend your leisure time?

17            THE PROSPECTIVE JUROR:  I mostly watch the news; I

18   sightsee; I used to do fencing, and I am trying to get back

19   into it; and travel.

20            THE COURT:  Are there any television shows or

21   radio programs that you regularly read, or watch, or listen

22   to?

23            THE PROSPECTIVE JUROR:  I'd say -- I would

24   definitely say *New York Live* is something of -- *New York*

25   *Live* and travel-type shows, and occasionally action movies,

Sidebar                                      436

1   and certain game shows like *Wipe Out* or *The Chase*.

2          THE COURT:  No radio?

3          THE PROSPECTIVE JUROR:  I listen to CBS FM mostly

4   in the morning.  I do like their morning shows.  Sometimes I

5   listen to Sirius XM, mostly rock and metal stations.

6          THE COURT:  Is there any reason why you can not be

7   fair and impartial in this case?

8          THE PROSPECTIVE JUROR:  I'd say that inflammatory

9   comments can -- I'd say certain inflammatory or subject

10  materials can get to anybody, and this is -- and this

11  doesn't necessarily have to be anything preconceived,

12  just -- it's easy to get anybody to believe a certain thing

13  even if they are not aware of it beforehand.

14         THE COURT:  Would that belief that you have

15  overcome your ability to judge the evidence fairly and

16  impartially?  Meaning, if the evidence does not support a

17  verdict, you will not render that verdict?

18         THE PROSPECTIVE JUROR:  I would definitely make a

19  sincere attempt to consider the evidence, but, I mean, no

20  one knows, like, anything in advance.  I can't...

21         THE COURT:  Okay.  Is there anything about this

22  case that would cause you to favor one side over the other?

23         THE PROSPECTIVE JUROR:  Not based on what I've

24  initially heard.

25         THE COURT:  Do you think you will be able to set

Sidebar                          437

1   aside your sympathies and biases, any that you may have, for

2   any of the parties in this case and render an impartial

3   verdict based solely on the evidence presented and the laws

4   given to you by Judge Garaufis?

5              THE PROSPECTIVE JUROR:  I think I'd able to,

6   but...

7              THE COURT:  You think you are?

8              THE PROSPECTIVE JUROR:  Yeah, I think so.

9              THE COURT:  Any follow-up questions for

10  Mr. Latopolski?

11             MR.  BUFORD:  Not from the Government, your Honor.

12             MR. FRISCH:  I have one.  May we approach?

13             THE COURT:  Sure.

14             (Sidebar.)

15             MR. FRISCH:  So I appreciate what this prospective

16  juror is saying about his sincere efforts, but he's also

17  saying he has basis and he's also concerned about things

18  that are inflammatory.  And the very nature of this case is

19  inflammatory.  So it seems, to me, under these circumstances

20  while I don't -- while he is speaking about making a sincere

21  effort, we should have somebody who has promised the Court

22  that number one; that they don't have the bias to begin

23  with.  And number two; we want more than a sincere effort.

24  We want someone who is unbasised to begin with.  That's the

25  purpose of this exercise.  That's number one.  Number two,

Sidebar                                          438

1   just so I can finish this while we're here, with regard to

2   the prior juror, Mr. Gilreath, who I wanted to add was the

3   interplay between his expressed concerns about the nature of

4   the case generally, and the birth of his grandson.  His

5   grandson could come, for example, towards end of the case

6   and during deliberation.  And if the juror is struggling and

7   he knows his grandson is waiting to meet him, that might be

8   a bad moment, difficult moment, for him and he could tip the

9   scales toward convicting so he can get to meet his grandson.

10  So for that reason, I renew my motion for cause my challenge

11  for cause, and I also challenge this juror for cause because

12  I think we should be looking for jurors who don't have that

13  basis and can tell us that they're going to make a sincere

14  effort and not that they can't predict the future but that

15  they don't come with a basis.

16          MR.  BUFORD:  So, your Honor, unlike Mr. Gilreath,

17  the answers here have been more equivocal because a sincere

18  effort, I think at minimum, the Court should insist upon a

19  firm answer that he will overcome those basis.  In the

20  absence of anything else, we don't object.

21          THE COURT:  The answer is we have no objection to

22  dismissing him.  Let's -- we're going to be here tomorrow.

23  The way this is going, we're going to be here tomorrow.  And

24  might not be able to get done with that.  So let's get

25  doing.  All right, he's dismissed.  Mr. Gilreath is going to

1    stay.

2              (Sidebar ends.)

3              THE COURT:  Thank you, Mr. Lotopolski.  I'm going

4    to excuse you from serving on this jury.  You can go to the

5    central jury room.  They will give the further instructions,

6    okay?

7              THE PROSPECTIVE JUROR:  Thank you very much.

8              (Prospective juror excused.)

9              THE COURT:  Do we have 47 and 48 yet?  Number 50,

10   Steven Vaccaro, who did not raise his number to any

11   questions.

12             THE COURTROOM DEPUTY:  Judge, we do have 47 and 48

13   ready.

14             THE COURT:  Okay.  Number 47, Rajiv Krishnaswamy.

15             (Prospective juror enters.)

16             THE PROSPECTIVE JUROR:  Good morning.

17             THE COURT:  Good morning, Mr. Krishnaswamy.

18             This case has received some degree of media

19   attention.

20             Have you read, heard, or seen anything in the

21   media, on the internet, or on social media about this case

22   or about the defendant, Douglass Mackey, otherwise known as

23   Ricky Vaughn, before today?

24             THE PROSPECTIVE JUROR:  Not on social media or

25   anything, but I've been hearing rumors while waiting in the

1    past two days about people who claimed to have opinions on

2    the knowledge of the case, so I have heard some of that

3    chatter and, yes, all honestly.

4              THE COURT:  From other jurors?

5              THE PROSPECTIVE JUROR:  Yes.  Unintentionally I

6    was just part of groups and people talked.  I personally

7    haven't read about the case.

8              THE COURT:  Have you formed any ideas, opinions,

9    or conclusions about the facts of this case or about

10   Mr. Mackey, based on the things you overheard other jurors

11   talking about?

12             THE PROSPECTIVE JUROR:  I don't think so.  I

13   had -- when I read the indictment, I had some thoughts on

14   it, but not from what I heard from the jurors.

15             THE COURT:  When did you read the indictment?

16             THE PROSPECTIVE JUROR:  When you read it to us in

17   the -- on the first day.

18             THE COURT:  Okay.  You understand that the

19   indictment is not evidence, it is just the document that the

20   Government uses to bring charges against someone.

21             THE PROSPECTIVE JUROR:  I think I understand that.

22             THE COURT:  Can you set aside anything that you

23   may have heard from other jurors or any thoughts you may

24   have had -- may have developed based on me explaining the

25   case to you and objectively hear -- listen and hear to the

Jury Selection                                    441

1   evidence that's presented in court and --

2          THE PROSPECTIVE JUROR:  I think I can.

3          THE COURT:  All right.

4          This case involves various individuals, including

5   the defendant, Douglass Mackey, who had strong political

6   preferences during the 2016 presidential election campaign,

7   including individuals who supported President Donald Trump

8   and individuals who supported president candidate Hillary

9   Clinton.

10         Do you have strong feelings or opinions related to

11  the 2016 presidential election campaign or to the two

12  candidates in that campaign such that it would overcome your

13  duty to judge this case fairly and impartially?

14         THE PROSPECTIVE JUROR:  I -- I would be lying if I

15  said I don't have strong feelings on the 2016 election, but

16  I still think I can judge a case impartially.

17         THE COURT:  Do you have any experience with what

18  you perceive to be deliberately false or misleading

19  information on the internet or on social media?

20         THE PROSPECTIVE JUROR:  A lot.  Especially me

21  trying to convince my family members regarding from

22  elections to Covid and all of that.  So, yes, I have seen

23  that being passed around in, like, my family, WhatsApp

24  groups, and things like that, and I have tried to, like,

25  give my opinion on that.

Jury Selection                                              442

1        THE COURT:  Would your experiences with such

2   information affect your ability to be fair and impartial in

3   this case?

4        THE PROSPECTIVE JUROR:  Again, I don't think so.

5   I believe I can try to be fair and impartial.

6        THE COURT:  At trial, you may hear some language

7   that you may find to be offensive.  You should not assess

8   that evidence based on whether you find it to be offensive

9   or not, but rather on whether that evidence tends to prove

10  or disprove the elements of the crime.  If you found some

11  evidence to be offensive, would you be able to set aside

12  your feelings about its offensiveness and objectively hear

13  and consider the evidence presented and follow the Court's

14  instructions on the law?

15       THE PROSPECTIVE JUROR:  Yes.  No problem on that

16  front.

17       THE COURT:  Do you have any close friends or

18  relatives who are lawyers, or work for lawyers, work for a

19  judge, or in a courthouse?  You raised your --

20       THE PROSPECTIVE JUROR:  Yes, I have friends who

21  are lawyers, not criminal law.  They -- you know, they were,

22  like -- some of them were classmates from engineering -- I

23  did engineering -- and they went to do, like, IP law,

24  working on that front.  So I don't know any criminal or, you

25  know, prosecutors for criminal law.  But for lawyers who did

1   IP and things like that, I know some people.

2          THE COURT:  I don't think this case is going to

3   involve any intellectual property law, so you should be

4   good.  But you have to take the law from Judge Garaufis.  He

5   will tell you what law applies, and you have to apply that

6   law.  You can you do that?

7          THE PROSPECTIVE JUROR:  Yes.

8          THE COURT:  The trial is going to start on

9   March 20th and go until March 31st at the latest.

10          Is there any reason, if you were picked to be a

11   juror in this case, that that would cause you a genuine

12   hardship?

13          THE PROSPECTIVE JUROR:  Just personal -- not

14   genuine hardship.  So, no, I think I can do it.

15          THE COURT:  Have you, a family member, or close

16   friend ever been charged with a crime, convicted of a crime,

17   or been the subject of a criminal investigation, been a

18   witness to crime, been a witness in a grand jury

19   investigation, or been questioned in any manner by law

20   enforcement officers, or been a victim of a crime?  In other

21   words, have you been involved in the criminal justice

22   system?

23          THE PROSPECTIVE JUROR:  I have.  So I was the

24   victim of a crime.  This was -- it's been a while now,

25   closing in on ten years.  What happened was, you know, I

1    live in a two-family home with my wife's grandmother and

2    in-laws living on the ground floor, and me and my wife

3    having, like, the top floor.  It so happened one morning, I

4    was actually at home because I was recovering from an

5    accident, my arm was in a sling, and my wife's 90-year-old

6    -- 80-something-year-old grandma, she was on the porch in

7    the morning, as she usually does.  Couple of people took

8    that opportunity to come into the house because they knew --

9    they just shoved her aside.  And I didn't know it, I was

10   upstairs, until I started hearing sounds like -- they were

11   basically ransacking the ground floor.

12           So I come down and I see -- I see two people.  I

13   pretend like:  Hey, like, what's it going?

14           Because I was in a sling.  I didn't want to get

15   them angry or anything.  They said we're just contractors,

16   you know, and they walked out with a lot of money.  I did --

17   so I did report that, and then I was questioned by the

18   police several times.  I was called in to try to identify.

19   So, yeah, that was definitely something that I had to go

20   through.

21           THE COURT:  Would that experience affect your

22   ability to be fair and impartial in this case?

23           THE PROSPECTIVE JUROR:  It has made me feel a

24   little stronger about criminals in general.  But, like I

25   said earlier, I think I can try to be fair.  This case does

Jury Selection                                    445

1     seem different.

2               THE COURT:  Very different.

3               THE PROSPECTIVE JUROR:  Yes.

4               THE COURT:  Okay.  Have you, a family member, or

5     close friend, ever been a party to a legal action against,

6     or had a dispute with the United States or any of its

7     agencies or employees?

8               THE PROSPECTIVE JUROR:  No.

9               (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2            THE COURT:  You live in Elmhurst?

3            THE PROSPECTIVE JUROR:  Yes, Elmhurst, Queens.

4            THE COURT:  How long have you lived there?

5            THE PROSPECTIVE JUROR:  Since 2012 when I moved in

6    with my now wife.

7            THE COURT:  And you still live in that -- upstairs

8    of the house that your --

9            THE PROSPECTIVE JUROR:  Yes.

10           THE COURT:  -- wife's grandparents own?

11           THE PROSPECTIVE JUROR:  We own the house.  We

12   actually bought it from her family, but when I moved in that

13   time --

14           THE COURT:  Gotcha.

15           What does your wife do for a living?

16           THE PROSPECTIVE JUROR:  She is a financial risk

17   manager at a bank.

18           THE COURT:  You are an engineer?

19           THE PROSPECTIVE JUROR:  Yes, I'm a software

20   engineer.

21           THE COURT:  Okay.  Any children?

22           THE PROSPECTIVE JUROR:  No.  No children.

23           THE COURT:  And you have -- what's the highest level

24   of education you've completed?

25           THE PROSPECTIVE JUROR:  I have a master's degree.

1          THE COURT:  Have you ever served in the military?

2          THE PROSPECTIVE JUROR:  No.

3          THE COURT:  Where do you get your news from?

4   Newspapers, radio, television, internet, social media,

5   podcasts?

6          THE PROSPECTIVE JUROR:  Mostly like -- like

7   newspapers, subscriptions online.

8          THE COURT:  What newspapers do you --

9          THE PROSPECTIVE JUROR:  Like New York Times, most

10  commonly, but I do read other stuff, like *The Wall Street*

11  *Journal* and *Washington Post*, stuff like that.

12         THE COURT:  Okay.  Do you use the internet and

13  social media?  If so, what platforms and how frequently and

14  how do use it?

15         THE PROSPECTIVE JUROR:  Not -- so I use -- I do use

16  the internet.  I use social media, like, WhatsApp is my -- I

17  would say my primary one, but I do use the others less so

18  nowadays than I used to when -- like ten years ago, like when

19  I was much more active on Facebook and Instagram and all of

20  that.  Now I'm like mostly on WhatsApp with family and

21  friends, WhatsApp groups.  Kind of started in the pandemic and

22  continued that.

23         THE COURT:  Are you concerned about the reliability

24  of information that you find on the internet and social media?

25         THE PROSPECTIVE JUROR:  Wearily.  I don't trust in

1    in general.  I prefer mainstream news sources.  I mainly

2    because I mentioned earlier.  I had seen the kind of crap that

3    gets sent around, including my own family members, then I have

4    to argue with them, so yes.

5              THE COURT:  Will your concern about the reliability

6    of information on the internet and social media affect your

7    ability to be fair and impartial in this case?

8              THE PROSPECTIVE JUROR:  Again, I'm saying I think I

9    can set aside that and try to be impartial.

10             THE COURT:  Have you ever been involved in voter

11   education or voter registration or any get-out-the-vote

12   efforts?

13             THE PROSPECTIVE JUROR:  I convinced my wife to get

14   registered, but that was about it.

15             THE COURT:  What are your hobbies?  How do you spend

16   your leisure time?

17             THE PROSPECTIVE JUROR:  I'm sorry?

18             THE COURT:  What are your hobbies?  How do you spend

19   your free time?

20             THE PROSPECTIVE JUROR:  My favorite activity is

21   hiking, going out, like -- try to get out into the woods, in

22   the hills, as often as I can.

23             THE COURT:  Are there any television shows or radio

24   programs that you regularly watch or listen to?

25             THE PROSPECTIVE JUROR:  I listen to some podcasts

1  currently, mostly related to things like the Ukraine war, but

2  otherwise it's reality TV like Survivor or something like

3  that.

4              THE COURT:  Is there any reason why you cannot be

5  fair and impartial in this case?

6              THE PROSPECTIVE JUROR:  I -- other than the points

7  you asked me and I mentioned, I believe I can try to be fair

8  and impartial.

9              THE COURT:  Is there anything about this case that

10  would cause you to favor one side over the other?

11              THE PROSPECTIVE JUROR:  No, I think I can try to be

12  fair.

13              THE COURT:  Will you be able to set aside any

14  sympathies or biases you may have for any of the parties in

15  this case and render an impartial verdict based solely on the

16  evidence presented in court and the law as given to you by

17  Judge Garaufis?

18              THE PROSPECTIVE JUROR:  Yes.

19              THE COURT:  Is there any follow-up for

20  Mr. Krishnaswamy?

21              MR. BUFORD:  No, Your Honor.

22              MR. FRISCH:  Not for this prospective juror, but

23  after this prospective juror leaves, if I can have a moment to

24  make a record about something unrelated.

25              THE COURT:  Sure.

1              Okay.  Mr. Krishnaswamy, they will take you into the

2      other courtroom, you've survived this round and we will get to

3      you later in the day.

4              Thank you.

5              (The prospective juror exits.)

6              MR. FRISCH:  May I, Judge?

7              THE COURT:  Yes.

8              MR. FRISCH:  I'm concerned that apparently according

9      to Mr. -- to Juror Number 47 that there are jurors in the

10     ceremonial courtroom or otherwise who have been talking about

11     the case.  That's a concern.  I wonder if, as a -- at least a

12     partial remedy, Your Honor asks the next folks coming in if

13     they've heard discussion in the jury room about the case and

14     make an inquiry.  And I would also, in addition to that, next

15     time you speak to the group for scheduling purposes or

16     otherwise, to admonish them not to be talking about the case.

17             MR. BUFORD:  Agree on both fronts, Your Honor.

18             THE COURT:  I think it makes sense to do that now so

19     I'm going to go talk to them very briefly.

20             Before I go in there, make sure everyone goes and

21     sits down in the main room.

22             THE LAW CLERK:  Okay.  Do you want the people

23     outside --

24             THE COURT:  No.  I will deal with them individually.

25             THE LAW CLERK:  Okay.

1          THE COURT:  You can be seated.

2          (The following took place in the central jury room.)

3          THE COURT:  Good morning, ladies and gentlemen.

4          ALL:  Good morning.

5          THE COURT:  We are continuing our process this

6    morning, I've already spoken with a couple of your colleagues

7    individually, and we're going to continue that process

8    throughout today.  Hopefully shortly get to the requisite

9    number of potential jurors that we need for our panel.  But a

10   couple of people have told me at some point they overheard --

11   so a couple people have already informed me that they've

12   overheard other jurors talking about the case.  I want to

13   reiterate to my admonition yesterday that you are not to talk

14   about the case at all.  You don't know anything about the case

15   really.  All you know is the allegations in the indictment

16   that the Government has made.  That is not evidence.  You are

17   not to start to consider whether Mr. Mackey is guilty based

18   solely upon the indictment or discuss the case with each

19   other.  Don't do that, okay?  I just want to reiterate that.

20          When we do the individual questioning process I'm

21   going to be asking each of you if you've overheard other

22   jurors discussing the case.  I'm not going to ask you to

23   identify who those people are, but I'm going to ask you if you

24   overhearing those discussions will affect your ability to be

25   fair and impartial in this case.

1           So, please, don't talk about the case, and hopefully

2    we'll get through this process very quickly, okay?  Thank you.

3           (The following took place in Courtroom 2E.)

4           THE LAW CLERK:  You ready?

5           (The prospective juror enters.)

6           THE COURT:  Yes, Ms. Natalie Leder, number 48, has

7    only responded to Question 10, which is --

8           Good morning, Ms. Leder.

9           THE PROSPECTIVE JUROR:  Good morning.

10          THE COURT:  You indicated that you have prepaid

11   vacation plans or confirmed medical appointments that cannot

12   be moved over the next two weeks?

13          THE PROSPECTIVE JUROR:  I have to take my son back

14   up to school.

15          THE COURT:  When?

16          THE PROSPECTIVE JUROR:  College.

17          Probably the weekends.  I panicked.  I didn't know

18   the schedule of things.

19          THE COURT:  Okay.

20          THE PROSPECTIVE JUROR:  So --

21          THE COURT:  Which weekend?

22          THE PROSPECTIVE JUROR:  This weekends.

23          THE COURT:  This weekends coming up?

24          THE PROSPECTIVE JUROR:  Yes.

25          THE COURT:  You will be back by Monday?

1           THE PROSPECTIVE JUROR:  I would like to believe I

2      will be.  It's -- it's a distance, so that's why -- it's

3      upstate, so you never know.

4           THE COURT:  And you're driving it?

5           THE PROSPECTIVE JUROR:  Yes.

6           THE COURT:  Okay.  I think that should be fine.

7           Have you heard any discussions in the jury room --

8      overheard any discussions in the jury room from the other

9      jurors about this case?

10          THE PROSPECTIVE JUROR:  No.

11          THE COURT:  Now, the case has received some degree

12     of media attention.  Have you read, heard, or seen anything in

13     the media, on the internet, or on social media about this case

14     or about the defendant, Douglass Mackey, otherwise known as

15     Ricky Vaughn, before today?

16          THE PROSPECTIVE JUROR:  No.

17          THE COURT:  This case involves various individuals

18     including the defendant, Douglass Mackey, who had strong

19     political preferences during the 2016 presidential candidate

20     campaign, including individuals who supported President Donald

21     Trump and individuals who supported presidential candidate

22     Hillary Clinton.

23          Do you have strong feelings or opinions related to

24     the 2016 presidential election campaign or to those two

25     candidates such that it would overcome your duty to judge this

1  case fairly and impartially?

2        THE PROSPECTIVE JUROR:  No.

3        THE COURT:  Do you have any experience with what you

4  perceived to be deliberately false or misleading information

5  on the internet or social media?

6        THE PROSPECTIVE JUROR:  Say that again.

7        THE COURT:  Sure.

8        THE PROSPECTIVE JUROR:  I'm sorry.

9        THE COURT:  Do you have any experience with what you

10  perceive to be deliberately false or misleading information on

11  the internet or social media?

12        THE PROSPECTIVE JUROR:  No.

13        THE COURT:  At trial, you may hear some language

14  that you may find to be offensive.  You should not assess the

15  evidence you hear based on whether you find that evidence to

16  be offensive, but rather, on whether the evidence tends to

17  prove or disprove the elements of the crime.  If you found

18  some of the evidence to be offensive, would you be able to set

19  aside those feelings about its offensiveness and objectively

20  consider it and follow the Court's instructions on the law?

21        THE PROSPECTIVE JUROR:  Yes.

22        THE COURT:  The trial is going to start Monday,

23  March 20th, and go to the 31st of March, at the latest.  Is

24  there any reason this would cause you a genuine hardship if

25  you were asked to serve on this jury?

1                THE PROSPECTIVE JUROR:  No.

2                THE COURT:  Have you, a family member, or a close

3    friend ever been involved in the criminal justice system; for

4    example, been charged with a crime, convicted of a crime, been

5    the subject of a criminal investigation, been a witness to a

6    crime, a witness in a grand jury investigation, questioned by

7    police, or been the victim of a crime?

8                THE PROSPECTIVE JUROR:  Yes.

9                THE COURT:  Tell me about that.

10                THE PROSPECTIVE JUROR:  Witness to a crime.  I mean,

11    I -- I was -- I was burglarized.

12                THE COURT:  You were -- your house?

13                THE PROSPECTIVE JUROR:  Yeah.

14                THE COURT:  How long ago was that?

15                THE PROSPECTIVE JUROR:  Oh, it's got to be about 20

16    -- almost 20 years ago.  It was a long time ago.

17                THE COURT:  Is there anything about that experience

18    that would affect your ability to be fair and impartial in

19    this case?

20                THE PROSPECTIVE JUROR:  No.

21                THE COURT:  Have you, a family member, or close

22    friend ever been a party to a legal action against or had a

23    dispute with the United States of America or any of its

24    agencies or employees?

25                THE PROSPECTIVE JUROR:  No.

```
 1              THE COURT:  You live in Brooklyn?

 2              THE PROSPECTIVE JUROR:  Yes.

 3              THE COURT:  How long?

 4              THE PROSPECTIVE JUROR:  How long have I --

 5              THE COURT:  Yes.

 6              THE PROSPECTIVE JUROR:  Oh, 20 years.

 7              THE COURT:  Do you own or do you rent your home?

 8              THE PROSPECTIVE JUROR:  Own it.

 9              THE COURT:  Do you live with anyone?  I take it your

10    son at least?

11              THE PROSPECTIVE JUROR:  My family.

12              THE COURT:  Do you have a spouse?

13              THE PROSPECTIVE JUROR:  Spouse, three kids.

14              THE COURT:  Okay.  And what does your spouse do for

15    a living?

16              THE PROSPECTIVE JUROR:  He's disabled.

17              THE COURT:  And your kids are -- any of them of

18    working age?  Like, out of school and working?

19              THE PROSPECTIVE JUROR:  No.

20              THE COURT:  Okay.  Are you working?

21              THE PROSPECTIVE JUROR:  Part time.

22              THE COURT:  What do you do for a living?

23              THE PROSPECTIVE JUROR:  Real estate.

24              THE COURT:  What's your highest level of education

25    completed?
```

1            THE PROSPECTIVE JUROR:  College.

2            THE COURT:  Do you have a Bachelor's?

3            THE PROSPECTIVE JUROR:  Bachelor's.

4            THE COURT:  Did you ever serve in the military?

5            THE PROSPECTIVE JUROR:  No.

6            THE COURT:  Where do you get your news from?

7    Newspapers, radio, TV, internet, social media, podcasts,

8    carrier pigeon?

9            THE PROSPECTIVE JUROR:  Everywhere.  Social media,

10   of course, *Daily News*, The Post, *Washington Post*.

11           THE COURT:  Do you get news from TV?

12           THE PROSPECTIVE JUROR:  No.

13           THE COURT:  Okay.  You mentioned social media.

14           How do you use the internet and social media?  Like,

15   what platforms do you use?

16           THE PROSPECTIVE JUROR:  Just social.  I mean, like

17   -- you know, just scrolling.

18           THE COURT:  But --

19           THE PROSPECTIVE JUROR:  Pass time.

20           THE COURT:  Facebook, Twitter, Instagram, Snapchat?

21           THE PROSPECTIVE JUROR:  Yeah, Instagram, some

22   Facebook.  Friends, mostly.

23           THE COURT:  How frequently do you use social media?

24           THE PROSPECTIVE JUROR:  A few times a week.

25           THE COURT:  Do you have any concerns about the

1   reliability of the information that you find on the internet

2   and social media?

3                THE PROSPECTIVE JUROR:  At times.

4                THE COURT:  Would that affect your ability to be

5   fair and impartial in this case?

6                THE PROSPECTIVE JUROR:  No.

7                THE COURT:  Have you ever been involved in voter

8   education, voter registration or any get-out-the-vote efforts?

9                THE PROSPECTIVE JUROR:  No.

10               THE COURT:  Do you have any hobbies?  How do you

11  spend your free time, if you have any?

12               THE PROSPECTIVE JUROR:  I write.  I like to write.

13               THE COURT:  Okay.

14               Are there any TV shows or radio programs that you

15  regularly watch or listen to?

16               THE PROSPECTIVE JUROR:  You mean like just

17  television -- like --

18               THE COURT:  Do you have any shows -- I like -- I

19  watch every Star Trek --

20               THE PROSPECTIVE JUROR:  Oh, okay.

21               THE COURT:  -- thing.  That's my thing.  What are

22  yours, if you have any?

23               THE PROSPECTIVE JUROR:  Like, you know, just, like,

24  streaming -- I watch The Bear recently.  I liked it.  It was

25  good.  You know, Succession.

1          THE COURT:  That's fine.

2          Can you be fair and impartial in this case?

3          THE PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Is there anything about this case that

5    would cause you to favor one side over the other?

6          THE PROSPECTIVE JUROR:  No.

7          THE COURT:  Will you be able to set aside any

8    sympathies or biases you may have for any of the parties in

9    this case and render an impartial verdict based solely on the

10   evidence presented and the law as given to you by Judge

11   Garaufis?

12         THE PROSPECTIVE JUROR:  Yes.

13         THE COURT:  All right.

14         Any follow-up questions for Ms. Leder?

15         MR. BUFORD:  Not from the Government, Your Honor.

16         MR. FRISCH:  No, Your Honor, thank you.

17         THE COURT:  Thank you, Ms. Leder, you are going to

18   be escorted to the next courtroom.  We are going to continue

19   our process with your colleagues and we will get back to you

20   later in the day, okay?  Thanks?

21         THE PROSPECTIVE JUROR:  Thank you.

22         (The prospective juror exits.)

23         THE COURT:  Before you do that, is everyone -- oh,

24   no, that's right we told them to come back at two o'clock.

25         THE LAW CLERK:  Yes.

1          THE COURT:  Sorry.  My count is -- I just want to

2    make sure I'm right -- 25.

3          MR. PAULSEN:  Yes.

4          MR. BUFORD:  I have 25, Judge.

5          THE COURT:  Okay.  Great.  Next one, please.

6          Twenty-eight gives us the main jury because it's 12

7    plus 16 total peremptories.

8          MR. BUFORD:  Your Honor -- I will wait.

9          (The prospective juror enters.)

10         THE COURT:  Good morning, Mr. Vaccaro.

11         THE PROSPECTIVE JUROR:  Good morning.

12         THE COURT:  Steven Vaccaro, Juror Number 50.

13         THE PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Mr. Vaccaro, have you heard any -- heard

15   or overheard any discussions in the jury room about this case?

16   About the substance of this case or the facts or anything?

17         THE PROSPECTIVE JUROR:  No, no.

18         THE COURT:  This case has received some degree of

19   media attention.

20         Have you read, heard, or seen anything in the media,

21   on the internet, or on social media about this case or about

22   the defendant, Douglass Mackey, otherwise known as Ricky

23   Vaughn before today?

24         THE PROSPECTIVE JUROR:  No.

25         THE COURT:  Now, the case involves various

 1  individuals, including the defendant, Douglass Mackey who had

 2  strong political preferences during the 2016 president

 3  campaign, including individuals who supported President Donald

 4  Trump and individuals who supported presidential candidate

 5  Hillary Clinton.

 6          Do you have strong feelings or opinions related to

 7  the 2016 presidential election campaign or to those two

 8  candidates such that it would overcome your duty to judge this

 9  case fairly and impartially?

10          THE PROSPECTIVE JUROR:  No, I don't believe so.

11          THE COURT:  Do you have any experience with what you

12  perceived to be deliberately false or misleading information

13  on the internet or on social media?

14          THE PROSPECTIVE JUROR:  I'm sorry, can you repeat

15  the question?

16          THE COURT:  Everyone asks me to repeat that

17  question.  That's okay.

18          Do you have any experience with what you perceived

19  to be deliberately false or misleading information on the

20  internet or on social media?

21          THE PROSPECTIVE JUROR:  Experience with

22  deliberate --

23          THE COURT:  Deliberately false -- you saw something

24  on the internet or on social media and you said to yourself:

25  That's false or misleading, and deliberately so.  They're

1    trying to mislead me.

2            THE PROSPECTIVE JUROR:  Oh, I've had opinions, but

3    nothing concrete, nothing that I knew was false.

4            THE COURT:  Would you be able to put aside any of

5    your experiences about what you thought might be misleading

6    and that you've seen elsewhere outside of this case and judge

7    this case based solely on the evidence in court and the

8    judge's instructions on the law?

9            THE PROSPECTIVE JUROR:  Yeah.

10           THE COURT:  At trial, you may hear some language

11   that you find to be offensive.  You shouldn't assess that

12   evidence based on whether you find it to be offensive or not,

13   but rather whether that evidence tends to prove or disprove

14   the elements of the crime.

15           Can you -- if you did find some of the evidence

16   offensive, would you be able to put aside your feelings about

17   its offensiveness and objectively consider it fairly and

18   impartially?

19           THE PROSPECTIVE JUROR:  I believe so.

20           THE COURT:  Trial is going to start on Monday,

21   March 20th and last until March 31st at the very latest.

22           Is there any reason this would cause you a genuine

23   hardship if you were selected to serve on this jury?

24           THE PROSPECTIVE JUROR:  I believe so.

25           THE COURT:  It would cause you a hardship?

1           THE PROSPECTIVE JUROR:  Yes, sir.

2           THE COURT:  In what way?

3           THE PROSPECTIVE JUROR:  I have a three-year-old

4    daughter an hour away in New Jersey.  She has autism.  I -- I

5    have visitation every other weekends.  I'm not even sure what

6    I'm going to do this Friday to get down there.  I'm supposed

7    to be down there by 7:00 and that's just one portion of it.

8           The other part is I am working nights to make up for

9    the time that I am here and working until 3:00 a.m. with

10   software, just to have her in the car alone with me and to

11   stay with her on the weekend, she doesn't sleep well and she

12   might be unsafe in I fall asleep.  That's my concern.

13          THE COURT:  So you have her every other weekends?

14          THE PROSPECTIVE JUROR:  Yes, sir.

15          THE COURT:  When is the next weekend -- is this

16   weekends coming up?

17          THE PROSPECTIVE JUROR:  This weekend coming up I

18   have her, yes.

19          THE COURT:  Any objection to excusing Mr. Vaccaro

20   from serving on this jury?

21          MR. BUFORD:  No, Your Honor.

22          MR. FRISCH:  No.

23          THE COURT:  Mr. Vaccaro, I will excuse you.  You can

24   go to the central jury room and they will give you further

25   instructions?

1            THE PROSPECTIVE JUROR:  Thank you all for your

2    consideration.

3            Thank you.

4            (The prospective juror exits.)

5            MR. FRISCH:  Before the voir dire is over, can we

6    just confirm exactly who drafted that question on the other

7    side of the room?

8            THE COURT:  Oh, yes.  That's a good idea.  That's --

9    do you want to tinker with it now?

10           MR. FRISCH:  No, it's too late.

11           MR. PAULSEN:  We could.

12           MR. FRISCH:  I was being facetious, Judge.

13           MR. BUFORD:  Your Honor, the one point I was going

14   to make at the risk of jinxing ourselves, when we do arrive at

15   the right number, I think it might be worth, in an abundance

16   of caution, asking the ones who have already been qualified if

17   they have overheard any discussions in the jury room.  Just to

18   make sure that's squared off.

19           MR. FRISCH:  I join in that.

20           THE COURT:  Okay.

21           When we hit 28, do you want to do peremptories on

22   the 28 and get your jury of 12 and then move on to the -- I've

23   done it that way before, and -- it doesn't matter to me.

24           MR. FRISCH:  I think you need -- I would rather have

25   everyone assembled before we strike.  I would rather have the

1  36 or 40 or whatever number we're using, because then you know

2  -- you have a better picture of what's going on.

3        MR. PAULSEN:  Your Honor, also we can do strikes

4  after hours whereas the jury is -- I think we have to pick

5  them while they're here.

6        THE COURT:  Sure.  But we would have to keep the 40

7  or the 36 after hours.

8        MR. PAULSEN:  Sure, but better --

9        THE COURT:  -- than 180 or however many we have.

10       All right.

11       THE LAW CLERK:  Fifty-one?

12       (The prospective juror approaches.)

13       THE COURT:  Good morning.

14       THE PROSPECTIVE JUROR:  Good afternoon.

15       THE COURT:  Maureen McGovern-Walsh, Juror Number 51.

16       Ms. McGovern-Walsh, let me ask you a few questions.

17       Have you heard or overheard any discussions in the

18  jury room about this case -- other jurors talking about it and

19  the allegations or anything?

20       THE PROSPECTIVE JUROR:  No.

21       THE COURT:  Okay.

22       This case has received some degree of media

23  attention.

24       Have you read, heard, or seen anything in the media,

25  on the internet, or on social media about this case or about

1   the defendant, Douglass Mackey, who is otherwise known as

2   Ricky Vaughn, before today?

3           THE PROSPECTIVE JUROR:  No.  I did have the news on

4   last night but switched the channel.

5           THE COURT:  But you don't remember hearing anything

6   about it.

7           THE PROSPECTIVE JUROR:  No -- yeah -- I mean, I

8   heard them begin to -- it sounded like the next story up was

9   about this case and I changed the channel.

10          THE COURT:  All right.

11          Do you remember which network that was on?

12          THE PROSPECTIVE JUROR:  It was -- it was actually

13  Tucker Carlson.  It was, like, 8:45, something like that.

14          THE COURT:  Okay.

15          Thank you.

16          THE COURT:  I'm going to move to -- well, this case

17  involves various individuals, including the defendant,

18  Douglass Mackey, who had strong political preferences during

19  the 2016 presidential election campaign, including individuals

20  who it supported President Donald Trump, and individuals who

21  supported presidential candidate Hillary Clinton.

22          Do you have strong feelings or opinions related to

23  the 2016 presidential election campaign or to those two

24  candidates, such that it would overcome your duty to judge

25  this case fairly and impartially?

1              THE PROSPECTIVE JUROR:  No.

2              THE COURT:  Do you have any experience with what you

3      perceive to be deliberately false or misleading information on

4      the internet or on social media?

5              THE PROSPECTIVE JUROR:  Can you repeat that?  I'm

6      sorry.

7              THE COURT:  I smile because almost every person has

8      asked me to repeat that question.  It's not drafted the best

9      it could be, I think.

10             Do you have any experience in what you perceived to

11     be deliberately false or misleading information on the

12     internet or on social media?

13             THE PROSPECTIVE JUROR:  I'm not certain, yeah.

14             THE COURT:  You don't think -- you're uncertain if

15     you have been or --

16             THE PROSPECTIVE JUROR:  If I read any --

17             THE COURT:  Yes.  Have you read anything on the

18     internet or social media that you thought to yourself:  Oh,

19     yeah, that's deliberately false?

20             THE PROSPECTIVE JUROR:  Yes.

21             THE COURT:   -- or misleading?

22             You have?

23             THE PROSPECTIVE JUROR:  Yeah.

24             THE COURT:  This case has to be judged on the

25     evidence based in court and not on things that have happened

1   outside the courtroom, right.

2            THE PROSPECTIVE JUROR:  (No verbal response.)

3            THE COURT:  Would your experience seeing what you

4   perceive to be deliberately false or misleading information on

5   the internet or social media affect your ability to be fair

6   and impartial here in this case?

7            THE PROSPECTIVE JUROR:  No.

8            THE COURT:  At trial, you may hear some language

9   that you find to be offensive.  Now, you shouldn't assess that

10  evidence based on whether you find it to be offensive or not,

11  but based on whether it tends to prove or disprove the

12  elements of the crime.  If you did find some of the evidence

13  offensive, would you be able to set aside your feelings about

14  its offensiveness and objectively hear it and consider it

15  impartially and fairly?

16           THE PROSPECTIVE JUROR:  Yes.

17           THE COURT:  You raised your Juror Number to a number

18  of questions.  I want to go through those right now, if you

19  will give me a moment.

20           You served on a jury before?

21           THE PROSPECTIVE JUROR:  Yes.

22           THE COURT:  Tell me about that.  When?  Where was

23  it?  What kinds of case and did you render a verdict?

24           THE PROSPECTIVE JUROR:  Yes, it was -- I'm 60 now,

25  so it was about 40 years ago, and it was Kings County Criminal

1   Court and it was a robbery of a gentleman on the street by

2   three people and I believe there was a gun involved.

3            THE COURT:  And you rendered a verdict in that case?

4            THE PROSPECTIVE JUROR:  Yes.

5            THE COURT:  That's the only time you served?

6            THE PROSPECTIVE JUROR:  Yes, yeah.

7            THE COURT:  All right.  You have a background or

8   have taken courses in the law?

9            THE PROSPECTIVE JUROR:  Yes, I'm currently a

10  paralegal with the New York City Law Department.

11           THE COURT:  In what unit do you serve?

12           THE PROSPECTIVE JUROR:  Brooklyn division -- or tort

13  law.

14           THE COURT:  Okay.

15           THE PROSPECTIVE JUROR:  I also, years back, from

16  1987 to 1989, I was a paralegal for the Kings County district

17  attorney.

18           THE COURT:  Couple questions about that.

19           You may have learned back then when you were a

20  paralegal with the DA about criminal law or, I guess, with the

21  law department.  Not so much criminal law, but other areas of

22  law.  In this case, you have to judge the -- you have to apply

23  the law that Judge Garaufis instructs you.

24           THE PROSPECTIVE JUROR:  Okay.

25           THE COURT:  He will tell you what the law is for

1  this case.  You have to apply that law, whether you agree with

2  it or not, or whether you learned something different about

3  that law years ago or yesterday.

4              THE PROSPECTIVE JUROR:  Okay.

5              THE COURT:  Can you apply the law that Judge

6  Garaufis instructs you?

7              THE PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Okay.  Is there anything about your

9  background in the law, your experiences or your job that would

10  affect your ability to be fair and impartial in this case?

11             THE PROSPECTIVE JUROR:  Since I'm a paralegal for

12  the City of New York and the -- the nature of the work that I

13  do, I'm not sure I would be a hundred percent impartial.

14             THE COURT:  We need to be sure that our jurors will

15  be impartial.  We need to be sure that they are sure that they

16  will be impartial.  And if you are telling me you can't ensure

17  your impartiality, that means you would be inclined to favor

18  the Government in this case, regardless of what the evidence

19  showed, then I don't know that you can -- that you're the

20  right juror for this case.

21             THE PROSPECTIVE JUROR:  Right.

22             THE COURT:  So, in other words, if the Government

23  would fail to meet its burden of proof, it didn't produce

24  evidence that would convince you beyond a reasonable doubt

25  that Mr. Mackey is guilty, that you would still vote to

1    convict him.

2            THE PROSPECTIVE JUROR:  No.

3            THE COURT:  You wouldn't do that?

4            THE PROSPECTIVE JUROR:  (No verbal response.)

5            THE COURT:  On the other hand, if the Government did

6    produce evidence that proved beyond a reasonable doubt that he

7    was guilty, would you vote to convict him?

8            THE PROSPECTIVE JUROR:  Yes.

9            THE COURT:  All right.  So you would rely on the

10   evidence and the Government's burden of proof and --

11           THE PROSPECTIVE JUROR:  I would rely on the

12   evidence.

13           THE COURT:  Okay.  And would you rely on your

14   experience or your -- the fact that you are an employee of the

15   City of New York in rendering your verdict?

16           THE PROSPECTIVE JUROR:  I would just be interested

17   in the facts, that's it.  Just the facts of the case.

18           THE COURT:  Okay.  You've indicated also that you

19   worked -- well, you worked -- you told us about your job

20   already -- 17, 18, close friends, relatives who are lawyers or

21   worked for lawyers worked in a courthouse family members or

22   close friends who worked for law enforcement.  And so -- is it

23   beyond anything you've already told us already about your job

24   as a paralegal with the City and with the DA?  And the fact

25   that, of course, you know lawyers through your job.  Anything

1   more along those lines?

2          THE PROSPECTIVE JUROR:  I'm not sure.  Meaning any

3   other personal relationships or anything --

4          THE COURT:  Yes.

5          THE PROSPECTIVE JUROR:  Yeah, I'm not certain, yeah.

6          THE COURT:  Okay.

7          You indicated that you have strong beliefs

8   concerning law enforcement, whether positive or negative, that

9   would prevent you from being fair and impartial in this case.

10          Can you tell me about that?

11          THE PROSPECTIVE JUROR:  Can you please repeat that?

12          THE COURT:  You indicated that you have strong

13   beliefs concerning law enforcement that would prevent you from

14   being fair and impartial in this case.

15          THE PROSPECTIVE JUROR:  It goes both ways, actually.

16   I really -- I do look -- my job as a paralegal, it's -- I just

17   deal with not with who is going to win the case, who is

18   winning -- even though I'm working for the City, it's the

19   facts.  Getting the documents and whatever -- however way it

20   goes.

21          THE COURT:  Okay.

22          THE PROSPECTIVE JUROR:  But as far as -- it's --

23   it's a range.  I have a range of -- of opinions having worked

24   in criminal law and also in civil law, and...

25          THE COURT:  The -- I guess the bottom line is that

1    the question, can you be fair and impartial in this case,

2    meaning you judge the case based on the evidence he presented,

3    the Government's burden of proof, and the law that applies,

4    and not on any sympathies or bias you have, or any beliefs you

5    have about law enforcement, whether good or bad.

6              Can you be guided bid evidence, the Government's

7    burden of proof, and the law --

8              THE PROSPECTIVE JUROR:  Yeah.

9              THE COURT:  -- and nothing else?

10             THE PROSPECTIVE JUROR:  Yes.

11             THE COURT:  The trial is going to be on March 20th

12   and last until March 31st.

13             Will that present a genuine hardship for you if you

14   were selected to serve on this jury?

15             THE PROSPECTIVE JUROR:  May -- we are short-staffed

16   at work, and so --

17             THE COURT:  Okay.  So it would present a problem for

18   the law department because they're short staffed.

19             THE PROSPECTIVE JUROR:  Right.

20             THE COURT:  Have you, a family member, or close

21   friend ever been involved in the criminal justice system; it

22   for example, been charged with a crime, convicted of a crime,

23   been the subject of a criminal investigation, witness to a

24   crime, witness in a grand jury investigation, been questioned

25   by law enforcement officers, or the victim of a crime?

1          THE PROSPECTIVE JUROR:  Yes.  All of the above,

2    yeah.

3          THE COURT:  Tell me about that, please.

4          THE PROSPECTIVE JUROR:  Just over the years people

5    have -- I have personally been a victim of crime, but --

6    different family members or different friends have been robbed

7    or what have you, that type of victim of a crime.  And I know

8    family members who -- extended family, maybe arrested for pot

9    possession, things like that.  Yeah, and then a friend who --

10   since you're asking -- he's a friend of a friend but a friend

11   of the family who was a -- an assistant district attorney in

12   Suffolk County who -- who was convicted and is prison.

13         THE COURT:  Is there anything about those

14   relationships or those experiences that would affect your

15   ability to be fair and impartial in this case?

16         THE PROSPECTIVE JUROR:  No.

17         THE COURT:  Have you, a family member, or close

18   friend ever been a party to a legal action against or had a

19   dispute with the United States of America or any of its

20   agencies or employees?

21         THE PROSPECTIVE JUROR:  No.

22         THE COURT:  You live in Rockaway Park?

23         THE PROSPECTIVE JUROR:  Yes.

24         THE COURT:  How long have you lived there?

25         THE PROSPECTIVE JUROR:  Since 2009.  About 12 years,

1    yeah.

2              THE COURT:  Do you own or rent your home?

3              THE PROSPECTIVE JUROR:  Own.

4              THE COURT:  Do you live with anyone?

5              THE PROSPECTIVE JUROR:  My husband and daughter.

6              THE COURT:  What does your husband do for a living?

7              THE PROSPECTIVE JUROR:  He's a retired New York City

8    high school teacher -- social studies teacher.

9              THE COURT:  And is your daughter of working age

10   or --

11             THE PROSPECTIVE JUROR:  She's in college.

12             THE COURT:  I guess that's working age, but --

13             THE PROSPECTIVE JUROR:  Yes, I'm sorry, working age,

14   yeah.

15             THE COURT:  Working age is what?  Sixteen, fifteen

16   maybe?

17             THE PROSPECTIVE JUROR:  Eighteen.

18             THE COURT:  You told us how you're employed.  What

19   is your highest level of education completed?

20             THE PROSPECTIVE JUROR:  A master's degree in

21   teaching.

22             THE COURT:  Have you ever served in the military?

23             THE PROSPECTIVE JUROR:  No.

24             THE COURT:  Where do you get your news from?

25   Newspapers, radio, television, internet, social media,

1    podcasts, what?

2              THE PROSPECTIVE JUROR:  Combination of a lot of

3    online newspapers and some on TV.

4              THE COURT:  Okay.  Any online newspapers in

5    particular that you look at on a regular basis?

6              THE PROSPECTIVE JUROR:  Like *The New York Times*

7    and -- I'm thinking offhand, just something that comes up in

8    my news feed.

9              THE COURT:  Okay.  Stuff that comes up in your news

10   feed, *The New York Times*.

11             THE PROSPECTIVE JUROR:  Yeah.

12             THE COURT:  You did mention that you, the other day,

13   had on Fox, I take it, and the *Tucker Carlson Show* was coming

14   up?

15             THE PROSPECTIVE JUROR:  My husband had that program

16   on, yeah.

17             THE COURT:  Any other TV networks that you get your

18   news from?

19             THE PROSPECTIVE JUROR:  Generally just the networks,

20   yeah.  Like CBS, NBC.  The networks; 2, 4, 7.  I don't really

21   watch the cable.

22             THE COURT:  Do you use the internet and social

23   media?  And, if so, what platforms do you use?  And how often

24   and how do you use them?

25             THE PROSPECTIVE JUROR:  I'm actually -- Instagram

1   and Facebook I'll go on, yeah.

2            THE COURT:  Okay.  And are you on them daily,

3   weekly?  What?

4            THE PROSPECTIVE JUROR:  Every day I'm checking.  Too

5   much, but, yeah.

6            THE COURT:  Daily?

7            THE PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Okay.

9            Are you concerned at all about the reliability of

10  the information that you find on the internet and social

11  media?

12           THE PROSPECTIVE JUROR:  Yes.

13           THE COURT:  Will that affect your ability to be fair

14  and impartial in this case?

15           THE PROSPECTIVE JUROR:  No.

16           THE COURT:  Have you ever been involved in voter

17  education, voter registration or any get-out-the-vote efforts?

18           THE PROSPECTIVE JUROR:  No.

19           THE COURT:  Do you have any hobbies?  How do you

20  spend your free time?

21           THE PROSPECTIVE JUROR:  In the nice weather,

22  gardening.  We live by the beach, so hiking, you know,

23  walking.  We go up to the country, so outdoor activities.

24           THE COURT:  Do you have any television shows or

25  radio programs that you watch or listen to on a regular basis?

1            THE PROSPECTIVE JUROR:  Just -- I'm just laughing

2    because I watch it on Thursday night.  I watch *So Help Me*

3    *Todd*.  I'm addicted to that show, but I guess because it's a

4    law show, that's about it.  It's a little comic relief.

5

6            (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Can you be fair and impartial in this

2    case?

3           THE PROSPECTIVE JUROR:  Yes.

4           THE COURT:  Anything about this case that would

5    cause you to favor one side or the other?

6           THE PROSPECTIVE JUROR:  No.

7           THE COURT:  Will you be able to set aside any

8    sympathies or biases you may have for any of the parties in

9    this case and render an impartial verdict based solely on

10   the evidence in court and the law given to you by Judge

11   Garaufis?

12          THE PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Any follow-up for Ms. McGovern-Walsh.

14          MR. BUFORD:  Your Honor, may we approach briefly?

15          THE COURT:  Sure.

16          (Sidebar held outside the presence of the

17   potential juror.)

18          MR. BUFORD:  Your Honor, I hesitate to raise it

19   because if she hasn't recognized it yet it might inject an

20   element that wouldn't be there otherwise.  But

21   Special Agent Granberg's husband, I just found out, is an

22   employee of the New York City Law Department and works

23   Torts.  His name is Shane Granberg.

24           I, on the one hand, I'm hesitant to inject it into

25   the discussion.  On the other hand, I would hate for it to

*Jury Selection*                    480

1    come out at trial since Special Agent Granberg will be

2    counsel table the whole time.  I don't know if she realizes

3    she works with Shane Granberg, that might create a bias.

4                MR. FRISCH:  Two things.

5                First of all, your Honor has already read the list

6    of names which includes Agent Granberg.  And Agent Granberg

7    is not on the witness list.  Unless I'm wrong about that, I

8    don't think she will be testifying.

9                MR. BUFORD:  She will be introduced as somebody at

10   counsel table.

11               MR. FRISCH:  She was also introduced in jury

12   selection.

13               MR. BUFORD:  I just want it to be on the record.

14               THE COURT:  Her husband works for the Law

15   Department in Torts?

16               MR. BUFORD:  In Torts.

17               THE COURT:  In what capacity?

18               MR. BUFORD:  He's an attorney, I think.  I can

19   found out.

20               MR. PAULSEN:  He's an attorney.  They're likely

21   colleagues in some capacity, although the Law Department is

22   a rather big.

23               MR. FRISCH:  It's huge.

24               MR. PAULSEN:  One of the biggest.

25               THE COURT:  One of the biggest law firms in the

1   City, right?

2              MR. PAULSEN:  Right.

3              THE COURT:  I mean, it's a tangential

4   relationship, if any, and I don't know if it's sufficient.

5   If anything, I mean, that would enure to the Government's

6   benefit, right, you have no problem?

7              MR. FRISCH:  I have no problem.

8              MR. BUFORD:  I just want it to be on the record.

9              THE COURT:  I'm going to leave it alone.

10             Any objection?

11             MR. FRISCH:  No objection.

12             (Sidebar discussion concludes.)

13             (In open court.)

14             THE COURT:  Ms. McGovern-Walsh, you've made it

15  through this far, you're going to continue.  They'll escort

16  you into the next courtroom and we will continue our

17  procedure with your colleagues and get back to you

18  hopefully, certainly, later today.

19             All right?

20             THE PROSPECTIVE JUROR:  Thank you.

21             THE COURT:  Thank you.

22             (The prospective juror exits from the courtroom.)

23             MR. PAULSEN:  Your Honor, before we bring the next

24  juror in, if I could just add something for the record.

25             THE COURT:  Sure.

*Jury Selection*                                        482

1           MR. PAULSEN:  It sounds like this juror did the

2    right thing, and when she saw a bit on Tucker Carlson, she

3    turned away.  She did exactly the right thing.

4           I do want to add, I guess, there was a portion on

5    this case on Tucker Carlson last night.  Tucker Carlson

6    called the case "the greatest assault on free speech in

7    human rights in our country's history."

8           So to the extent there is any sort of question of

9    people looking at that show last night, it was a fairly

10   polemic bit of coverage of our case.

11          THE COURT:  Okay.  Well, if anyone indicates that

12   they watched that, we'll inquire about it.

13          MR. PAULSEN:  That's why I ask.

14          THE COURT:  All right.

15          MR. PAULSEN:  Thank you, your Honor.

16          COURTROOM DEPUTY:  52.

17          THE COURT:  Yes, please.  Shirlwin Hedley, Juror

18   No. 52.  Questions 12 and 25.

19          (Prospective Juror No. 52 enters the courtroom.)

20          THE COURT:  Good morning, Mr. Hedley.

21          THE PROSPECTIVE JUROR:  Good morning, sir.

22          THE COURT:  Mr. Hedley, have you heard or

23   overheard any discussions in the main jury room, other

24   jurors talking about this case or the facts or anything

25   during lunchtime?

*Jury Selection*                                              483

1        THE PROSPECTIVE JUROR:  No, not that I can

2   remember.

3        THE COURT:  Okay.  Now, this case has received

4   some degree of media attention.  Have you read, heard, or

5   seen anything in the media, on the internet or on social

6   media about this case or about the defendant Douglas Mackey,

7   otherwise knows as Ricky Vaughan, before today.

8        THE PROSPECTIVE JUROR:  No.

9        THE COURT:  This case involves various individuals

10  including Mr. Mackey who had strong political preferences

11  during the 2016 presidential election campaign including

12  individuals who supported President Donald Trump and

13  individuals who supported presidential candidate Hillary

14  Clinton.

15       Do you have any strong feelings or opinions

16  related to the 2016 presidential election campaign, or to

17  the two candidates in that campaign such that it would

18  overcome your duty to judge this case fairly and

19  impartially?

20       THE PROSPECTIVE JUROR:  Yes.

21       THE COURT:  Tell me what are your feelings.

22       THE PROSPECTIVE JUROR:  Well, I just don't, your

23  Honor.

24       THE COURT:  You don't what?

25       THE PROSPECTIVE JUROR:  I just don't think -- I

*Jury Selection*                                              484

1   don't really know.

2            THE COURT:  You really don't know?

3            THE PROSPECTIVE JUROR:  No.

4            THE COURT:  Okay.  You served on a jury before,

5   Mr. Hedley?

6            THE PROSPECTIVE JUROR:  No, no.  Never.

7            THE COURT:  Can I have a sidebar please?

8            (Sidebar held outside the presence of the

9   potential juror.)

10           THE COURT:  Mr. Hedley responded to question 12

11  which was prior jury service, we looked at his number.  He

12  also responded to that prior question in a somewhat

13  confusing way.  I don't think he wants to be here.

14           MR. FRISCH:  It certainly seems that way.  I

15  agree.

16           THE COURT:  Any objection to dismissing him?

17           MR. PAULSEN:  No objection.

18           THE COURT:  I'm going to dismiss him.

19           (Sidebar discussion concludes.)

20           (In open court.)

21           THE COURT:  Mr. Hedley, I'm going to excuse you

22  from serving on the jury.  So you can go to the Central Jury

23  Room and let them know and they'll gave you further

24  instructions, okay?

25           THE PROSPECTIVE JUROR:  Okay.

*Jury Selection*                                           485

1          MR. FRISCH:  Can your Honor accommodate a

2    five-minute bathroom break?

3          THE COURT:  Yes, please.

4          (The prospective juror exits from the courtroom.)

5          (A recess in the proceedings was taken.)

6          THE COURT:  Juror No. 53 Cleopatra Ruiz.

7          (Prospective Juror No. 53 enters the courtroom.)

8          THE COURT:  Good morning, Ms. Ruiz.

9          THE PROSPECTIVE JUROR:  Good morning.

10         THE COURT:  Have you overheard any of your fellow

11   jurors in either in the Central Jury Room, the

12   Ceremonial Courtroom where we were the first day, or during

13   lunch talking about the facts of this case or anything

14   related to this case?

15         THE PROSPECTIVE JUROR:  No.

16         THE COURT:  Okay.  Now, the case has received some

17   degree of media attention.  Have you read, heard, or seen

18   anything in the media, on the internet, or on social media

19   before today about this case or about the defendant Douglas

20   Mackey, otherwise known as Ricky Vaughn.

21         THE PROSPECTIVE JUROR:  No.

22         THE COURT:  This case involves various individuals

23   including Mr. Mackey who had strong political preferences

24   during the 2016 presidential election campaign including

25   individuals who supported President Donald Trump and

1  individuals who supported presidential candidate Hillary

2  Clinton.

3           Do you have strong feelings or opinions related to

4  the 2016 presidential election campaign or to the two

5  candidates in that campaign such that it would overcome your

6  duty to judge this case fairly and impartially?

7           THE PROSPECTIVE JUROR:  I have opinions.  I can't

8  say that those opinions would enable, like, make me not make

9  a decision.  I think I could be impartial, I would like to

10  say that.  But, of course, I can't say for sure.

11           THE COURT:  We don't ask jurors not to have

12  opinions, they're entitled to them.  They're entitled to

13  their feelings.  But what we do ask is that they not permit

14  those feelings to guide their decision, dictate their

15  decision.  Jurors have to be confined to the facts, the

16  evidence that's presented in court, and the instructions on

17  the law.  Apply the law to the facts that the jury finds and

18  render a verdict not taking into account their opinions or

19  their beliefs that they developed outside the courtroom.

20           Can you do that?  Can you confine yourself to the

21  evidence presented in court and the law as instructed by

22  Judge Garaufis.

23           THE PROSPECTIVE JUROR:  Maybe.

24           THE COURT:  Ms. Ruiz, we need jurors who are

25  confident that they can separate their personal beliefs and

1    opinions from their duty as jurors, and if you're not

2    certain that you can do that, then I don't think you're the

3    right juror for this case so I'm going to excuse you.

4              THE PROSPECTIVE JUROR:  Thank you.  Okay.  All

5    right.

6              THE COURT:  Thank you.  You can go to the central

7    jury room and they'll give you further instructions.

8              THE PROSPECTIVE JUROR:  Thank you.

9              (The prospective juror was excused by the Court.)

10             THE COURT:  Juror No. 54, Floyd Gordon.  Question

11   17.

12             (Prospective Juror No. 54 enters the courtroom.)

13             THE COURT:  Good morning, Mr. Gordon.

14             THE PROSPECTIVE JUROR:  Good morning.

15             THE COURT:  Mr. Gordon, during your time in the

16   Central Jury Room or in the Ceremonial Courtroom or at

17   lunch, did you overhear any of your fellow jurors discussing

18   this case, the facts, the indictment, or anything about the

19   case?

20             THE PROSPECTIVE JUROR:  No.

21             THE COURT:  The case has received some degree of

22   media attention.  Have you read, heard, or seen anything in

23   the media, on the internet, or on social media before today

24   about this case or about the defendant Douglas Mackey,

25   otherwise known as Ricky Vaughn.

*Jury Selection* 488

1    THE PROSPECTIVE JUROR:  No.

2    THE COURT:  This case involves various individuals

3  including the defendant Douglas Mackey who had strong

4  preliminary preferences during the 2016 presidential

5  election campaign including individuals who supported

6  presidential candidate Donald Trump and presidential

7  candidate Hillary Clinton.

8    Do you have strong feelings or opinions related to

9  the 2016 presidential election campaign or to the two

10  candidates in that campaign such that it would overcome your

11  duty to judge this case fairly and impartially?

12    THE PROSPECTIVE JUROR:  No.

13    THE COURT:  Do you have any experience with what

14  you perceived to be deliberately false or misleading

15  information on the internet or on social media?

16    THE PROSPECTIVE JUROR:  I'm trying to remember.  I

17  don't think so.

18    THE COURT:  Okay.  At trial, you may hear some

19  language that you find to be offensive.  You shouldn't

20  assess the evidence you hear based on whether you find it to

21  be offensive or not but rather on whether that evidence

22  tends to prove or disprove the elements of the crime.

23    If you found some evidence to be offensive, would

24  you be able to set aside your feelings about its

25  offensiveness and objectively hear and consider that

1   evidence and follow the Court's instructions on the law.

2                THE PROSPECTIVE JUROR:  Yes.

3                THE COURT:  You indicated that either you or a

4   close friend or relative who are lawyers or work for lawyers

5   or worked for a judge or in a courthouse.

6                Can you tell me about that?

7                THE PROSPECTIVE JUROR:  A cousin of mine, she's a

8   lawyer.  I think she does corporate law.  I'm not a hundred

9   percent sure.

10               THE COURT:  Have you learned anything about the

11  law from her?

12               THE PROSPECTIVE JUROR:  No.

13               THE COURT:  Okay.  Will her being a lawyer affect

14  your ability to be fair and impartial in this case?

15               THE PROSPECTIVE JUROR:  No.

16               THE COURT:  The trial is going to start on

17  March 20th and last until March 31st at the latest.  Is

18  there any reason this would cause you a genuine hardship if

19  you were selected to serve on this jury?

20               THE PROSPECTIVE JUROR:  Yes.

21               THE COURT:  Tell me about that, what?

22               THE PROSPECTIVE JUROR:  My wife works overnights

23  and we have a seven-month old baby and he's up every two to

24  three hours to be fed and I'm taking care of him during that

25  time.

*Jury Selection*                                    490

1              THE COURT:  Okay.

2              THE PROSPECTIVE JUROR:  So some days I'm tired,

3    some days I'm okay.

4              THE COURT:  Okay.  So during the day, she's home?

5              THE PROSPECTIVE JUROR:  Yes.

6              THE COURT:  Taking care of the baby?

7              THE PROSPECTIVE JUROR:  Yes.

8              THE COURT:  And you work?

9              THE PROSPECTIVE JUROR:  That's correct, I work.

10             THE COURT:  What do you for a living?

11             THE PROSPECTIVE JUROR:  I'm a IT specialist for

12   radiology.

13             THE COURT:  So, at night, she's working and you're

14   getting up every two to three hours to feed the baby?

15             THE PROSPECTIVE JUROR:  That's correct.

16             THE COURT:  Been there.  Okay, I hear you.  Let me

17   continue with the questions.

18             Have you, a family member or close friend ever

19   been involved in the criminal justice system, meaning, ever

20   been charged with a crime, convicted of a crime, been the

21   subject of a criminal investigation, been a witness to a

22   crime, a witness in a grand jury investigation, or

23   questioned by law enforcement officers or the victim of a

24   crime?

25             THE PROSPECTIVE JUROR:  No.

1                THE COURT:  Have you, a family member, or close

2       friend ever been a party to a legal action against, or had a

3       dispute with, the United States of America or any of its

4       agencies or employees?

5                THE PROSPECTIVE JUROR:  No.

6                THE COURT:  You live in Cambria Heights?

7                THE PROSPECTIVE JUROR:  Yes.

8                THE COURT:  How long have you lived there?

9                THE PROSPECTIVE JUROR:  Since 2012, like, ten

10      years.

11               THE COURT:  Do you own or do you rent?

12               THE PROSPECTIVE JUROR:  I own.

13               THE COURT:  And you live with your wife and your

14      child?

15               THE PROSPECTIVE JUROR:  Yes.

16               THE COURT:  You told us you work in IT and I'm

17      sorry if you told us what your wife does for a living but I

18      know she works at night.

19               THE PROSPECTIVE JUROR:  She's a nurse

20      practitioner.

21               THE COURT:  What is your highest level of

22      education you completed?

23               THE PROSPECTIVE JUROR:  Associate's degree.

24               THE COURT:  Have you ever served in the military?

25               THE PROSPECTIVE JUROR:  No.

*Jury Selection*                              492

1          THE COURT:  And from where do you get your news?

2     Newspapers, radio, TV, internet, social media, podcasts.

3          THE PROSPECTIVE JUROR:  All of the above.

4          THE COURT:  Are there any particular platforms or

5     purveyors of the news that come to mind that you get your

6     news from.

7          THE PROSPECTIVE JUROR:  No.

8          THE COURT:  Like on TV.  Is there a particular

9     network that you watch to get your news?

10          THE PROSPECTIVE JUROR:  Like, CNN, Channel 7.

11          THE COURT:  Okay.  Do you use the internet and

12     social media?

13          THE PROSPECTIVE JUROR:  Yes.

14          THE COURT:  What social media platforms do you

15     use?

16          THE PROSPECTIVE JUROR:  Facebook, Instagram.

17          THE COURT:  Are you concerned at all about the

18     reliability of information that you find on the internet and

19     social media?

20          THE PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Will that concern affect your ability

22     to be fair and impartial in this case?

23          THE PROSPECTIVE JUROR:  Yes.

24          THE COURT:  In what way?

25          THE PROSPECTIVE JUROR:  Because you don't know

*Jury Selection*                                                493

 1    what's false and what's accurate?

 2              THE COURT:  The evidence in this case will come in

 3    at the trial and you will, if you're selected to serve, have

 4    the ability to assess it.  And in assessing the evidence,

 5    would you be guided by your concern about the reliability of

 6    social media or would you limit yourself to the what's

 7    presented in court?

 8              THE PROSPECTIVE JUROR:  Only limit myself to the

 9    evidence that's provided in court.

10              THE COURT:  Have you ever been involved in voter

11    education, voter registration, or any get out the vote

12    efforts?

13              THE PROSPECTIVE JUROR:  No.

14              THE COURT:  Do you have any hobbies or ways you

15    spend your free time if you have it.

16              THE PROSPECTIVE JUROR:  Play sports, hang out with

17    friend.

18              THE COURT:  Are there any television shows or

19    radio programs that you regularly watch or listen to?

20              THE PROSPECTIVE JUROR:  Yeah, I like "Family Guy,"

21    "Two and a Half Men," stuff like that, comedies.

22              THE COURT:  Is there any reason why you cannot be

23    fair and impartial in this case?

24              THE PROSPECTIVE JUROR:  No.

25              THE COURT:  Is there anything about this case that

1     would cause you to favor one side over the other?

2               THE PROSPECTIVE JUROR:  No.

3               THE COURT:  Will you be able to set aside any

4     sympathies or biases you may have for any of the parties in

5     this case and render an impartial verdict based solely on

6     the evidence presented and the law as given to you by Judge

7     Garaufis?

8               THE PROSPECTIVE JUROR:  Yes.

9               THE COURT:  Okay.  Any follow-up questions for

10    Mr. Gordon?

11              MR. BUFORD:  No.  No, your Honor.

12              MR. FRISCH:  I have one, your Honor.  Can we

13    approach?

14              THE COURT:  Yes.

15              (Continued on the next page.)

16              (Sidebar held outside the presence of the

17    potential juror.)

18              MR. FRISCH:  When we were in the

19    Ceremonial Courtroom when we started, the first thing I

20    wrote down in my notes, which I could show you if we're

21    ex parte, was:  "Sleeping and yawning.  Second job?"  He was

22    in the second row, he was to the far left I think on the

23    aisle and it was noticeable to me that he was nodding off

24    and he was going like this (indicating) and that's one

25    concern.

*Jury Selection*                                         495

1          My concern is that he's going to not just be --
2    he's going to want to get back to his wife and kid, so I
3    challenge him for that reason.
4          MR. BUFORD:  Your Honor, I think that the trial
5    would take the place during his regular working hours where
6    he's currently employed and able to function by every
7    indication.  So if it becomes an issue during the trial,
8    I've seen judges address it if it becomes a concern.  But I
9    don't know that that's a reason to strike him for cause.
10          Again, I think the trial 9:30 to 5:00 schedule
11    just takes the place of his current employment where he's a
12    functioning employee.
13          THE COURT:  I agree.  I'm not going to predict
14    whether he's going to be sufficiently awake to hear the
15    evidence and consider it.  And Judge Garaufis will be very
16    good at waking him up if he fall as sleep.  So, yes.
17          (Sidebar discussion concludes.)
18          (In open court.)
19          THE COURT:  Okay.  Mr. Gordon they're going in
20    escort you in into the next courtroom and we will continue
21    the process and they will get back to you shortly.  Thank
22    you.
23          (The prospective juror exits from the courtroom.)
24          MR. FRISCH:  Can I place one thing on the record?
25          THE COURT:  Yes.

*Jury Selection* 496

1       MR. FRISCH:  When your Honor dismissed Mr. Gordon

2   from the room, he kind of looked at us on this side of the

3   room and kind of rolled his eyes.  I'm sure it wasn't in any

4   way disrespectful but he plainly doesn't want to be here.

5   So just to tie it together, so I renew my challenge.

6       THE COURT:  We'll keep Mr. Gordon on the panel.

7       COURTROOM DEPUTY:  55.

8       THE COURT:  55, Amal Das.

9       (Prospective Juror No. 55 enters the courtroom.)

10      THE COURT:  Good morning, Mr. Das.

11      THE PROSPECTIVE JUROR:  Good morning.

12      THE COURT:  Mr. Das, when you were in the Central

13  Jury Room or the Ceremonial Courtroom or during lunch, did

14  you overhear any of the jurors discussing this case and the

15  facts?

16      THE PROSPECTIVE JUROR:  Yes, sir.

17      THE COURT:  You did.

18      THE PROSPECTIVE JUROR:  Yes.

19      THE COURT:  What did you hear?

20      THE PROSPECTIVE JUROR:  It was the duty, yes, and

21  this is my civic responsibility.  That's why I coming here.

22      THE COURT:  No.  I'm asking you, Mr. Das, if you

23  overheard any discussions about the case from the other

24  jurors while you were waiting to be called in.

25      THE PROSPECTIVE JUROR:  No.

*Jury Selection*                                    497

1          THE COURT:  Mr. Das, how long have you been in the

2   United States?

3          THE PROSPECTIVE JUROR:  Sorry, sir.

4          THE COURT:  Okay.  How long have you been in the

5   United States?

6          THE PROSPECTIVE JUROR:  15 years.

7          THE COURT:  And what do you do for a living?  What

8   is your job.

9          THE PROSPECTIVE JUROR:  I am pharmaceutical

10  company and machine operator.

11         THE COURT:  You work for a pharmaceutical company?

12         THE PROSPECTIVE JUROR:  Machine operator.

13         THE COURT:  A mission operator?

14         What is the highest level of education you

15  completed.

16         THE PROSPECTIVE JUROR:  Highest level of

17  education, Bangladesh, a bachelors degree.

18         THE COURT:  Mr. Das, do you believe your English

19  language skills are sufficient for you to serve on this

20  jury?

21         THE PROSPECTIVE JUROR:  So-so.

22         THE COURT:  So-so, did you say?

23         THE PROSPECTIVE JUROR:  Huh.

24         THE COURT:  Okay.  Mr. Das, I'm going to excuse

25  you from serving on this jury.  You can go to the Central

*Jury Selection* 498

1  Jury Room they'll give you further instructions, okay?

2  Thanks.

3  (The prospective juror was excused by the Court.)

4  THE COURT:  Kathleen Thomas, Juror No. 57.

5  MR. BUFORD:  I'm sorry, your Honor, I thought we

6  were on 56.  Is 56 not here.

7  MR. GULLOTTA:  He was excused for a work trip.

8  (Prospective Juror No. 57 enters the courtroom.)

9  THE COURT:  Kathleen Thomas, Juror No. 57.  Good

10  morning.

11  THE PROSPECTIVE JUROR:  Good morning.

12  THE COURT:  Ms. Thomas, you indicated in the first

13  day that there's something about the nature of this case

14  that would cause you to favor one side over the other.

15  Can you tell me about that?

16  THE PROSPECTIVE JUROR:  Possibly.  Based on what

17  you said, I believe.  Apparently, it's something to do with

18  jury, not jury, voter tampering or voting misguiding.

19  Granted, whichever side is the side, I guess, the

20  prosecution side, that side, has to prove that that

21  particular person did that particular thing.  I get that,

22  did that happen in general in the 2016 election, my belief

23  is yes.

24  THE COURT:  Okay.  Thank you.  In this case, in

25  every case, every criminal case, the evidence is presented

1    during the trial in the courtroom.  And the case is decided

2    on that evidence, not on what someone else may have done in

3    another situation or what happened generally even, it's very

4    specific to what are the facts in this case and whether

5    those facts were proved beyond a reasonable doubt and

6    whether that is a crime or not.

7              THE PROSPECTIVE JUROR:  Okay.

8              THE COURT:  So would you be able to put the

9    Government to its burden of proof, have them introduce

10   evidence that convinced you beyond a reasonable doubt that

11   Mr. Mackey is guilty and not rely on whatever else may have

12   happened.

13             THE PROSPECTIVE JUROR:  That's why I said before

14   that particular individual did.  You brought up another

15   question that whatever is, is a crime.  Whatever there's a

16   definition, I'm sure you guys all have.

17             THE COURT:  Yes.  Judge Garaufis will give you

18   that that definition at the end of the case and you will

19   have to listen to the evidence before then and then

20   deliberate with your fellow jurors to figure out whether

21   that evidence convinces you beyond a reasonable doubt that a

22   crime was committed according to what Judge Garaufis tells

23   you a crime is and that Mr. Mackey did it.

24             And if the Government doesn't do that, doesn't

25   submit to you enough evidence to prove beyond a reasonable

1   doubt that a crime was committed by Mr. Mackey, you would be

2   duty bound to find him not guilty and exclude from that

3   consideration everything else that happened in society or

4   anything like that.

5            THE PROSPECTIVE JUROR:  Somebody else can go.

6            THE COURT:  So could you do that?

7            THE PROSPECTIVE JUROR:  Yes.

8            THE COURT:  And conversely, if the Government

9   would submit evidence that convinced you beyond a reasonable

10  doubt that Mr. Mackey committed this crime, could you return

11  a verdict of guilty excluding everything else that happened

12  out in society?

13           THE PROSPECTIVE JUROR:  Yes.

14           THE COURT:  So you would be guided by the evidence

15  and the instructions on the law and you would not favor one

16  side or the other, yes or no.

17           THE PROSPECTIVE JUROR:  Yes.

18           THE COURT:  When you were waiting to be called in

19  here, whether you were sitting in the Central Jury Room or

20  the --

21           THE PROSPECTIVE JUROR:  Whatever, here.

22           THE COURT:  The Ceremonial Courtroom or at lunch,

23  did you overhear any of your fellow jurors discussing this

24  case, discussing the substance of the case, the indictment?

25           THE PROSPECTIVE JUROR:  Not the case, case.  Just

*Jury Selection*                                          501

1   the presuppositions that it's something political which is

2   why you have a thousand people here.  And so, you get -- I

3   guess going for an equal balance of whatever, or whatever

4   you guys are deciding.  General procedure not the specifics

5   of the case.

6               THE COURT:  And that it -- and that it was

7   political in some respects?

8               THE PROSPECTIVE JUROR:  Because you're saying

9   voter and 2016, that automatically says that there is a

10  political component to it.

11              THE COURT:  Okay.

12              THE PROSPECTIVE JUROR:  I mean, we all know left

13  and rights are screaming and yelling.

14              THE COURT:  Okay.

15              THE PROSPECTIVE JUROR:  Can't deny that.

16              THE COURT:  Are you able to put aside anything you

17  overheard about this case and judge --

18              THE PROSPECTIVE JUROR:  Nothing relevant.

19              THE COURT:  It's nothing relevant?

20              THE PROSPECTIVE JUROR:  Nothing relevant.  Just

21  only relevant to my getting here.  Why they're picking so

22  many people, blah, blah, blah, blah.

23              THE COURT:  Okay.  Fair enough.

24              Now, the case has received some degree he media

25  attention.  Have you read, heard, or seen anything in the

*Jury Selection*                                              502

1  media on the internet or on social media before today about

2  this case or about the defendant Douglas Mackey, otherwise

3  another known as Ricky Vaughn?

4          THE PROSPECTIVE JUROR:  The name is not ringing

5  bells but I do watch Rachel Maddow so that's been there.

6          THE COURT:  You don't recall seeing anything on

7  Rachel Maddow about the case?

8          THE PROSPECTIVE JUROR:  No.

9          THE COURT:  You recall seeing anything else in the

10  media, social media, on the internet about this case?

11          THE PROSPECTIVE JUROR:  Not that I can place it to

12  this particular person.

13          THE COURT:  Okay.  Just in general about alleged

14  disinformation in the 2016 election?

15          THE PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Are you able to put aside all of that

17  and any ideas, opinions, or conclusions you drew from that

18  other stuff and judge this case solely based on the evidence

19  presented in court and the law as given to you by Judge

20  Garaufis?

21          THE PROSPECTIVE JUROR:  I am fairly sure I could.

22          THE COURT:  Okay.  Now, this is sort of going

23  along this line.  This case involves various individuals

24  including Mr. Mackey who had strong political preferences

25  during the 2016 presidential election campaign including

1   individuals who supported Donald Trump and individuals who

2   supported Hillary Clinton.

3            Do you have strong feelings or opinions related to

4   the 2016 presidential election campaign or to the two

5   candidates in that campaign such that it would overcome your

6   duty to judge this case fairly and impartially?

7            THE PROSPECTIVE JUROR:  No.

8            THE COURT:  Do you have any experience with what

9   you perceived to be deliberately false or misleading

10  information on the internet or on social media?

11           THE PROSPECTIVE JUROR:  Define experience.  What

12  do you mean?  Have I seen a lot of it, yes.

13           THE COURT:  Okay.  Would your experiences seeing a

14  lot of it affect your ability to be fair and impartial in

15  this case, meaning, can you put aside what you've seen that

16  you think was deliberately misleading or false elsewhere and

17  judge this case fairly and impartially based on the evidence

18  presented in court and the law as given to you by Judge

19  Garaufis.

20           THE PROSPECTIVE JUROR:  I believe so.

21           THE COURT:  At trial, you may hear some language

22  that you find to be offensive and you shouldn't assess that

23  evidence based on whether you find it to be offensive or

24  not, but rather whether that evidence tends to prove or

25  disprove the elements of the crime.

*Jury Selection*                                                504

1          If you found some of the evidence to be offensive,

2   would you be able to set aside your feelings about its

3   offensiveness, objectively hear that evidence, and consider

4   it fairly and impartially?

5          THE PROSPECTIVE JUROR:  I would consider it part

6   of the person's character that was saying it.  I work in a

7   high school, I tell my kids to present themselves in a

8   certain manner or people will be judging you as your

9   character.  I'm under oath here so I have to be straight up.

10          THE COURT:  Let me move on.

11          The trial is going to start on March 20th and go

12   until March 31st, is there any reason if you were selected

13   as a juror that that would cause you a genuine hardship?

14          THE PROSPECTIVE JUROR:  No.

15          THE COURT:  Have you, a family member or close

16   friend ever been involved in the criminal justice system,

17   meaning, been the victim of a crime, accused of committing a

18   crime, convicted of a crime, subject to a criminal

19   investigation.

20          THE PROSPECTIVE JUROR:  My brother-in-law was

21   murdered if that covers it.

22          THE COURT:  I was going to get -- that covers as

23   victim of a crime.  We'll get to that in a minute.  Other

24   than that, has anyone else been involved in the criminal

25   justice system?

1          THE PROSPECTIVE JUROR:  I've had a bunch of

2    students murdered.

3          THE COURT:  Okay.  The murder of your

4    brother-in-law and your students, clearly, they're victims.

5    Would that affect your ability to be fair and impartial in

6    this case?

7          THE PROSPECTIVE JUROR:  I don't think so.

8          THE COURT:  Have you, a family member, or close

9    friend ever been a party to a legal action against, or had a

10   dispute with, the United States of America or any of its

11   agencies or employees?

12         THE PROSPECTIVE JUROR:  I haven't been sued or

13   anything like that if that's what you're asking or brought

14   to trial.

15         THE COURT:  But specifically against the

16   United States of America.

17         THE PROSPECTIVE JUROR:  No.

18         THE COURT:  Can I speak with the lawyers at

19   sidebar, please.

20         (Sidebar held outside the presence of the

21   potential juror.)

22         THE COURT:  So?

23         MR. BUFORD:  No objection.

24         THE COURT:  We got to get into her personal

25   pedigree information.

*Jury Selection*                                      506

1           MR. FRISCH:  I have no objection to excusing her.

2           THE COURT:  Isn't this a subject of a motion in

3    limine?

4           MR. BUFORD:  Which is?

5           THE COURT:  The offensive nature of some of the

6    information.

7           MR. FRISCH:  Yes.

8           MR. BUFORD:  Some of it's pending.  It's unclear

9    how much, if any, will come in and some of it may be

10   conditional rulings depending on how the trial plays out.

11   Some language may be shown, some may not, it's sort of in

12   flux.

13          MR. FRISCH:  I would add to that, and I don't

14   think Mr. Buford will disagree, there's just levels of

15   offensiveness.  There's different degrees of offensiveness.

16   There's a lot of offensive stuff that's just coming in

17   because that's the way they talk on these Twitters, in the

18   Twitter-sphere in this particular world and there's a worse

19   level which is subject to, say, what Judge Garaufis worse

20   stuff which is very, very bad.

21          But even if the most mild stuff comes in, I use

22   the word "mild" in a very relative way, a lot of very

23   offensive range.  So, at the very least, we might risk she

24   should be excused and we should move on.  At the very last,

25   I would explore that with her.  That plus the unfortunate

1    circumstances of the people she's lost through crime.

2              THE COURT:  All right.

3              (Sidebar discussion concludes.)

4              (In open court.)

5              THE COURT:  Ms. Thomas.

6              THE PROSPECTIVE JUROR:  Mm-hmm.

7              THE COURT:  I want to follow-up on the offensive

8    evidence question that I posed to you.

9              You said that you would consider that evidence as

10   going to the speaker, let's say, whoever said to, going to

11   their character.

12             THE PROSPECTIVE JUROR:  Mm-hmm.

13             THE COURT:  Would you let -- assuming you found

14   someone who spoke words that were offensive and had because

15   of that bad character, would that overcome your duty to look

16   at the evidence as a whole and to determine whether it

17   satisfies the Government's burden of proof beyond a

18   reasonable doubt that a crime was committed.

19             THE PROSPECTIVE JUROR:  I would be taking it into

20   account in that evidence as I would if he was -- he, she,

21   whatever, was, you know, lies once and then, you know, what

22   else was a lie that may be they got away with.  As I said,

23   it speaks to character.

24             THE COURT:  All right.  Ms. Thomas, I'm going to

25   excuse you from serving on this jury.  You can go to the

*Jury Selection*                                    508

1    Central Jury Room where they'll give you further

2    instructions, okay?

3              THE PROSPECTIVE JUROR:  Okay.  Thank you.

4              (The prospective juror was excused by the Court.)

5              THE COURT:  Complicating matters, Mr. Gilreath,

6    Juror 46, has informed us that he is receiving an award at

7    an awards dinner this evening at 6:30 and he has requested

8    to leave by 4:00 o'clock.  So I seriously doubt we will be

9    done.  Maybe we'll be done before then and able to exercise

10   your peremptories.  But if we're not, we got to figure out

11   what to do.  I don't want to make him miss receiving his

12   award.

13             Let's bring in Jianming Zhao.

14             (Prospective Juror No. 58 enters the courtroom.)

15             THE COURT:  Good morning, Mr. Zhao.

16             THE PROSPECTIVE JUROR:  Good morning, sir.

17             THE COURT:  If you could move the microphone

18   closer to you, please.

19             THE PROSPECTIVE JUROR:  Okay.

20             THE COURT:  Thank you.

21             Mr. Zhao, when you were in the jury room earlier

22   today, yesterday, Monday, did you overhear any of the other

23   jurors discussing this case and the facts about it.

24             THE PROSPECTIVE JUROR:  No, I didn't.

25             THE COURT:  Okay.  This case has received, excuse

*Jury Selection*                                              509

1    me, this case has received some degree of media attention.

2    Have you read, heard, or seen anything in the media on the

3    internet or on social media about this case or about the

4    defendant Douglas Mackey otherwise known as Ricky Vaughn?

5              THE PROSPECTIVE JUROR:  No.

6              THE COURT:  This case involves various individuals

7    including the defendant Douglas Mackey who had strong

8    political preferences during the 2016 presidential election

9    campaign including individuals who supported presidential

10   Donald Trump and individuals who supported presidential

11   candidate Hillary Clinton.

12             Do you have strong feelings or opinions related to

13   the 2016 presidential election campaign or to those two

14   candidates such that it would overcome your duty to judge

15   this case fairly and impartially.

16             THE PROSPECTIVE JUROR:  Sorry, I didn't get it.

17             THE COURT:  Do you have strong feelings or

18   opinions about the 2016 presidential election campaign or

19   President Donald Trump or Hillary Clinton such that it would

20   overcome your duty to be fair and impartial in this case?

21             THE PROSPECTIVE JUROR:  No, I haven't.

22             THE COURT:  Do you have any experience with what

23   you perceived to be deliberately false or misleading

24   information on the internet or social media?

25             THE PROSPECTIVE JUROR:  No.

*Jury Selection*                                510

1          THE COURT:  At trial, you may hear some language

2     that you find to be offensive.  You should not assess that

3     evidence based on whether you believe it to be offensive or

4     not, but whether that evidence tends to prove or disprove

5     the elements of the crime.

6          If you found some of the evidence to be offensive,

7     would you be able to put aside your feelings about its

8     offensiveness and objectively consider it and render a fair

9     and impartial verdict.

10         THE PROSPECTIVE JUROR:  I don't understand.

11         THE COURT:  You don't understand?

12         THE PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Okay.  How long have you been in the

14    United States, Mr. Zhao?

15         THE PROSPECTIVE JUROR:  Since 2016.

16         THE COURT:  What do you do for a living?

17         THE PROSPECTIVE JUROR:  I'm a truck driver.

18         THE COURT:  Are you married, sir?

19         THE PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Okay.  Do you believe that your

21    English language skills are sufficient to serve on this

22    jury?

23         THE PROSPECTIVE JUROR:  Sometimes.

24         THE COURT:  Sometimes?

25         THE PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Mr. Zhao, I'm going to excuse you from

2     serving on the jury.  You can go to the Central Jury Room

3     they'll give you further instructions, okay?

4          THE PROSPECTIVE JUROR:  Okay.

5          THE COURT:  Thank you.

6          (The prospective juror was excused by the Court.)

7          THE COURT:  We're going to go to 12:30 and break

8     for lunch.

9          COURTROOM DEPUTY:  Juror 59.

10          (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (continuing.)

2            THE COURT:  Good morning, Mr. Najowitz.

3            THE PROSPECTIVE JUROR:  Good morning.

4            THE COURT:  Ira Najowitz, Juror Number 59.

5            Mr. Najowitz, when you were in the central jury

6   room, or the ceremonial courtroom, or during lunch break,

7   did you over hear any discussions that you fellow jurors

8   were having about this case, about the facts or anything

9   related to it?

10            THE PROSPECTIVE JUROR:  No, did I not.

11            THE COURT:  Okay.  This case has received some

12   degree of media attention.

13            Have you read, heard, or seen anything in the

14   media, on the internet, or on social media before today

15   about this case or about the defendant, Douglass Mackey,

16   otherwise known as Ricky Vaughn?

17            THE PROSPECTIVE JUROR:  No, I have not.

18            THE COURT:  This case involves various

19   individuals, including the defendant, Douglass Mackey, who

20   had strong political preferences during the 2016

21   presidential election campaign, including individuals who

22   supported President Donald Trump, and individuals who

23   supported presidential candidate Hillary Clinton.

24            Do you have strong feelings or opinions about the

25   2016 presidential election campaign or those two candidates

1   such that it would overcome your duty to judge this case

2   fairly and impartially?

3             THE PROSPECTIVE JUROR:  No, it would not.

4             THE COURT:  Do you have any experience with what

5   you perceived to be deliberately false or misleading

6   information on the internet or social media?

7             THE PROSPECTIVE JUROR:  No, I have not.

8             THE COURT:  At trial, you may hear some language

9   that you may find to be offensive.  You should not assess

10  that evidence based on whether you find it to be offensive

11  or not, but, rather, whether that evidence tends to prove or

12  disprove the elements of crime.

13            THE PROSPECTIVE JUROR:  I can keep an open mind

14  and stay impartial.

15            THE COURT:  All right.  If you found evidence to

16  be offensive, you wouldn't -- you would be able to set aside

17  your feelings about its offensiveness and judge it fairly

18  and impartially?

19            THE PROSPECTIVE JUROR:  I would.

20            THE COURT:  You indicated that you've been on a

21  jury before.

22            THE PROSPECTIVE JUROR:  Yes, I have.

23            THE COURT:  Tell me about that.

24            THE PROSPECTIVE JUROR:  Three times over the

25  years, I've served in State Supreme Court.  It's two

1   criminal cases and one civil case.

2          THE COURT:  Do you remember the nature of those

3   criminal cases?

4          THE PROSPECTIVE JUROR:  I think one was grand

5   larceny, I think attempted theft auto.  The other one was

6   attempted burglary or a burglary.

7          THE COURT:  And in each of those cases, did you

8   render a verdict -- the criminal and civil case?

9          THE PROSPECTIVE JUROR:  Yes, I did.

10         THE COURT:  And this was in Queens Supreme,

11  correct?

12         THE PROSPECTIVE JUROR:  I lived many years --

13  before Queens, I lived in the Bronx.  One case was in Bronx

14  County Supreme Court.  The other two were in Queens.

15         THE COURT:  The trial is going to start on Monday,

16  the 20th, and last, at the latest, until March 31st.

17         Is there any reason this would cause you a genuine

18  hardship if you were selected to serve on the jury?

19         THE PROSPECTIVE JUROR:  No it would not.

20         THE COURT:  Have you, a family member, or a close

21  friend ever been part of the criminal justice system?  By

22  that I mean, charged with a crime, convicted, subject to a

23  criminal investigation, witness, victim, witness in a grand

24  jury investigation, anything like that.

25         THE PROSPECTIVE JUROR:  No, I have not.

1          THE COURT:  Have you, a family member, or close

2   friend ever been a party to a legal action against or had a

3   dispute with the United States or any of its agencies or

4   employees?

5          THE PROSPECTIVE JUROR:  No, I have not.

6          THE COURT:  You live in Oakland Gardens, correct?

7          THE PROSPECTIVE JUROR:  Correct.

8          THE COURT:  How long have you lived there?

9          THE PROSPECTIVE JUROR:  I lived there since 1988.

10  So, yeah, 34 years plus.

11         THE COURT:  Do you own or do you rent your home?

12         THE PROSPECTIVE JUROR:  It's a co-op.  I'm a

13  shareholder.

14         THE COURT:  Do you live with anyone?

15         THE PROSPECTIVE JUROR:  No.  By myself.

16         THE COURT:  Have you ever been married, or do you

17  have any children?

18         THE PROSPECTIVE JUROR:  No.  I'm single.

19         THE COURT:  Are you working?

20         THE PROSPECTIVE JUROR:  No.  I'm retired.

21         THE COURT:  From what?

22         THE PROSPECTIVE JUROR:  I worked for many years

23  for a public policy database.  We would write summaries of

24  short article -- on articles and books dealing with US

25  public policy, social policy, political affairs, foreign

1   policy, and also same topics from other countries around the

2   world.

3               THE COURT:  What is the highest level of education

4   you've completed?

5               THE PROSPECTIVE JUROR:  I have a master's degree.

6               THE COURT:  In what?

7               THE PROSPECTIVE JUROR:  Science.

8               THE COURT:  Ever served in the military?

9               THE PROSPECTIVE JUROR:  No, I have not.

10              THE COURT:  Where do you get your news from?

11  Newspapers, radio, TV, internet, social media, podcasts,

12  what?

13              THE PROSPECTIVE JUROR:  I get my news from TV;

14  CNN, MSNBC.  And also I'll read articles online on the

15  internet.

16              THE COURT:  Any particular purveyor of those

17  articles, or just various?

18              THE PROSPECTIVE JUROR:  I'll read things, you

19  know, various from political viewpoints.

20              THE COURT:  Other than what you've already

21  mentioned, do you use the internet or social media?  And, if

22  so, what platforms?  How do you use them?  And how

23  frequently?

24              THE PROSPECTIVE JUROR:  I'm not really into

25  Facebook on social media per say.  It's basically, you know,

1    I'm reading articles online, streaming video, watching

2    attending podcasts, things like that.

3              THE COURT:  Are you concerned at all about the

4    reliability of information that you find on the internet and

5    social media?

6              THE PROSPECTIVE JUROR:  Oh, yes.  One has to use

7    one's head when one is reading material and take things with

8    a grain of salt, if necessary.

9              THE COURT:  Will any concerns that you have about

10   such reliability affect your ability to be fair and

11   impartial in this case?

12             THE PROSPECTIVE JUROR:  No, it wouldn't.

13             THE COURT:  Have you ever been involved in voter

14   education, voter registration, or any get-out-the-vote

15   efforts?

16             THE PROSPECTIVE JUROR:  No, I haven't.

17             THE COURT:  What are you hobbies?  How do you

18   spend your leisure time?

19             THE PROSPECTIVE JUROR:  I go to the gym regularly.

20   I enjoy walking, reading.

21             THE COURT:  Are there any television shows or

22   radio programs that you regularly watch or listen to?

23             THE PROSPECTIVE JUROR:  Not really, no.

24             THE COURT:  Can you be fair and impartial in this

25   case?

1             THE PROSPECTIVE JUROR:  Yes, I can.

2             THE COURT:  Is there anything about this case that

3    would cause you to favor one side over the other?

4             THE PROSPECTIVE JUROR:  No, it would not.

5             THE COURT:  Will you be able to set aside any

6    sympathies or biases you may have for any of the parties in

7    this case and render an impartial verdict based solely on

8    the evidence presented in court and the instructions on the

9    law from Judge Garaufis?

10            THE PROSPECTIVE JUROR:  Yes.  I can follow the

11   instructions and be objective, yes.

12            THE COURT:  Any follow-up for Mr. Najowitz?

13            MR. BUFORD:  No.  Thank you, Your Honor.

14            MR. FRISCH:  Nothing else.

15            THE COURT:  Thank you, Mr. Najowitz.  They are

16   going to escort you into the next courtroom and we will

17   continue the process with your colleagues and hopefully,

18   before too long, we will have the requisite number of folks

19   and we can do our peremptories.

20            THE PROSPECTIVE JUROR:  Thank you, your Honor.

21            (The prospective juror exits.)

22            (The prospective juror enters.)

23            THE COURT:  Leonard Shostak, Juror Number 60, good

24   morning.

25            THE PROSPECTIVE JUROR:  Good morning.

1          THE COURT:  Mr. Shostak, you answered -- or you

2   held your number up to a few questions that I asked the full

3   panel on the first day.

4          THE PROSPECTIVE JUROR:  Yes.

5          THE COURT:  And we can get into them in detail, if

6   necessary.

7          I want to, I want to cut to the quick, as they

8   say, and ask you, sort of, the ultimate question, and

9   perhaps the most important question.

10          Can you be fair and impartial in this case?

11          THE PROSPECTIVE JUROR:  Not in this case, no.

12          THE COURT:  Okay.  Why don't you tell me why not.

13          THE PROSPECTIVE JUROR:  Because I've heard a bunch

14   about the case from people here, and because of my job

15   working with law enforcement, teaching them improv.

16          THE COURT:  Teaching them improv?

17          THE PROSPECTIVE JUROR:  Yes.  I did a community

18   outreach program where we teach NYPD officers improv to

19   teach them compassion.

20          THE COURT:  And based on that --

21          THE PROSPECTIVE JUROR:  Based on the information

22   that I got working with officers, and over the years working

23   two doors down, and working for the court clerks union, I

24   have had too many interactions with the system that I don't

25   think I can -- I don't think I can give a fair and

1  impartial, and my beliefs of a lot of other things about

2  minorities and classes.

3            THE COURT:  Tell me about your what you heard the

4  other jurors talking about.

5            THE PROSPECTIVE JUROR:  I heard it was a person

6  that was preventing minorities from voting, using electronic

7  means to persuade them otherwise.

8            THE COURT:  Do you remember when you heard this?

9            THE PROSPECTIVE JUROR:  I heard this yesterday

10 afternoon.  Right after lunch.

11           THE COURT:  Was it from 1, 2, 3, 10?

12           THE PROSPECTIVE JUROR:  It was a table full of

13 people talking about it.

14           THE COURT:  Was it upstairs in the cafeteria?

15           THE PROSPECTIVE JUROR:  No.

16           THE COURT:  It was here?

17           THE PROSPECTIVE JUROR:  And there was somebody in

18 the room using a laptop to do research in the case.  That's

19 where they were getting their information from.

20           THE COURT:  Someone had a laptop in that room?

21           THE PROSPECTIVE JUROR:  Yes.  There were multiple

22 laptops in that room yesterday.

23           THE COURT:  Do you -- did you see any of the

24 laptops?  Not just the laptops, but what was on the screen?

25           THE PROSPECTIVE JUROR:  I saw the screen, the

1  person sitting by the window looking something up.  I don't

2  know that they were specifically looking that up, but that's

3  what they were talking about while they were on the screen.

4         THE COURT:  Do you remember which juror it was

5  that was on that laptop?

6         THE PROSPECTIVE JUROR:  I can probably pick the

7  person out.

8         THE COURT:  We're not going to do a lineup.

9         THE PROSPECTIVE JUROR:  I mean, I can't tell you

10 specifically.  Like, by memory which one it was.  I didn't

11 see their number, no.  I can maybe describe them to you.

12        THE COURT:  But you saw multiple laptops?

13        THE PROSPECTIVE JUROR:  I saw at least two

14 different laptops out yesterday.

15        THE COURT:  And on one of them you saw --

16        THE PROSPECTIVE JUROR:  It was sitting by the

17 window.

18        THE COURT:  You saw a screen that had --

19        THE PROSPECTIVE JUROR:  A search engine results on

20 that.

21        THE COURT:  The other laptop, did you see that

22 screen?

23        THE PROSPECTIVE JUROR:  I just saw it out, no.

24        THE COURT:  Mr. Shostak, I want to thank you for

25 that information and for your time.  I'm going to excuse you

1   because I don't think you're well suited to sit on this

2   case.

3              THE PROSPECTIVE JUROR:  All right.

4              THE COURT:  I appreciate your candor.

5              THE PROSPECTIVE JUROR:  Do I still come back

6   tomorrow for something else?

7              THE COURT:  No, you don't.  Unless you want to.

8              THE PROSPECTIVE JUROR:  I get to sleep when I'm

9   here, so I'm fine coming.

10             THE COURT:  You can go to the central jury room,

11  they will give you further instructions.

12             THE PROSPECTIVE JUROR:  All right.

13             THE COURT:  Thank you.

14             THE PROSPECTIVE JUROR:  Thank you.

15             (The prospective juror exits.)

16             THE COURT:  I think the only way to deal with this

17  is to, in addition to asking each juror whether they heard

18  discussions is whether they saw any computer devices or cell

19  phones or anything else that had any information about this

20  case on it.  I have no idea how a juror gets a laptop into

21  the court.

22             MR. FRISCH:  I found something out to me this

23  morning which was news to me.  I brought this laptop into

24  the court house this morning and I had an order from Judge

25  Garaufis to permit it.  And the officers downstairs told me

1   anyone can bring in a laptop, anyone, which was news to me.

2   I didn't know the rules had changed.

3           THE COURT:  That's not my understanding of our

4   protocols.

5           MR. FRISCH:  It was news to me.

6           THE COURT:  Ms. Granberg, did you bring a laptop?

7           MR. FRISCH:  But we have an order for two laptops.

8   This is the first time I brought one in and the court

9   officer at the, whatever you call that machine, said anyone

10  can bring in a laptop.

11          THE COURT:  Well, I can't do anything about that

12  now.  I think we have to press on with our selection and

13  just try to fare it out, any problems with individual

14  jurors.  So, and just so you know, I cut to the quick with

15  Mr. Shostak because he held up his number for six or so

16  questions.  And they all were, the questions going towards

17  basis law enforcement, things like that, and I just figured

18  he would not make it through.  So let's get it done quick.

19          Let's bring in Mr. Robert Gondek, number 61.  The

20  next three didn't raise their cards for anything, so maybe

21  we can get three out of it and be closer to the end.

22          (The prospective juror enters.)

23          THE COURT:  Good afternoon, Mr. Grondek.

24          THE PROSPECTIVE JUROR:  How are you doing.

25          THE COURT:  Did I pronounce that correctly?

Jury Selection                    524

1    THE PROSPECTIVE JUROR:  Yeah.

2    THE COURT:  Mr. Grondek, when you were in the

3  central jury room or in the ceremonial courtroom on Monday

4  or at lunch, did you overhear any of your fellow perspective

5  jurors talking about this case?

6    THE PROSPECTIVE JUROR:  I heard like a couple

7  people talking about it, but I didn't really hear what they

8  were saying.  I was like away from every one.

9    THE COURT:  Did you see anyone in the central jury

10  room yesterday with a laptop or other computer device that

11  had open a search for this case, like, a search with

12  results?

13    THE PROSPECTIVE JUROR:  No.

14    THE COURT:  Now, this case has received some

15  degree of media attention.  Have you read, heard, or seen

16  anything in the media, on the internet, or on social media

17  before today about this case, or the defendant, Douglass

18  Mackey, otherwise known as Ricky Vaughn?

19    THE PROSPECTIVE JUROR:  No.

20    THE COURT:  This case involves various individuals

21  including the defendant, Mr. Mackey, who had strong

22  political preferences during the 2016 presidential election

23  campaign, including individuals who supported President

24  Donald Trump and individuals who supported presidential

25  candidate Hillary Clinton.

1          Do you have strong feelings or opinions related to

2     the 2016 presidential election campaign or to those two

3     candidates, such that it would overcome your duty to judge

4     this case fairly and impartially?.

5               THE PROSPECTIVE JUROR:  No.

6               THE COURT:  Do you have any experience with what

7     your perceive to be deliberately false or misleading

8     information on the internet or social media?

9               THE PROSPECTIVE JUROR:  No.

10              THE COURT:  You should not assess that evidence

11    based on whether you find the language used to be offensive

12    or not.  But, rather, whether that evidence tends to prove

13    or disprove the elements of the crime.

14              If you found some of the evidence offensive, would

15    you be able to set aside your feelings about its

16    offensiveness and objectively consider it in a fair and

17    impartial manner?

18              THE PROSPECTIVE JUROR:  Yes.

19              THE COURT:  The trial is going to start on Monday,

20    the 20th and end, at the very latest on March 31st.  Would

21    serving on the jury during that period of time cause you a

22    genuine hardship?

23              THE PROSPECTIVE JUROR:  The only concern I have, I

24    have a newborn.  I'm just worried about my wife taking care

25    of them alone.

1            THE COURT:  Do you work during the day normally?

2            THE PROSPECTIVE JUROR:  Yeah.  My off days are

3    Sunday, Monday, so ideally Monday I would like to be home to

4    take care of the baby.

5            THE COURT:  Have you, a family member, or close

6    friend ever been involved in the criminal justice system?

7    By that I mean, charged with a crime, convicted of a crime,

8    been the subject of a criminal investigation, been a witness

9    to a crime, victim of a crime, been a witness in a grand

10   jury investigation, anything like that?

11           THE PROSPECTIVE JUROR:  You said family member?

12           THE COURT:  You, a family member, or a close

13   friend.

14           THE PROSPECTIVE JUROR:  That was involved in a

15   crime?

16           THE COURT:  In any way.  Either accused of the

17   crime, or a victim of the crime, a witness.

18           THE PROSPECTIVE JUROR:  Yes.

19           THE COURT:  Tell me about that.

20           THE PROSPECTIVE JUROR:  My wife's father, he was

21   charged with something.

22           THE COURT:  Was he ultimately convicted?

23           THE PROSPECTIVE JUROR:  No.  He was found

24   innocent.

25           THE COURT:  Is there anything about that

Jury Selection                               527

1    experience that would cause you to be -- cause you, affect

2    your ability to be fair and impartial?

3              THE PROSPECTIVE JUROR:  No, no.  I don't think so.

4              THE COURT:  Have you, a family member, or close

5    friend ever been a party to a legal action against, or had a

6    dispute with the United States, or any of its agencies or

7    employees?

8              THE PROSPECTIVE JUROR:  No.

9              THE COURT:  You live in Massapequa Park?

10             THE PROSPECTIVE JUROR:  Yes.

11             THE COURT:  How long have you lived there?

12             THE PROSPECTIVE JUROR:  Ten years.

13             THE COURT:  Do you own or do you rent your home?

14             THE PROSPECTIVE JUROR:  Own?

15             THE COURT:  You live with your wife and your baby.

16             THE PROSPECTIVE JUROR:  Yes.

17             THE COURT:  First child?

18             THE PROSPECTIVE JUROR:  Yes.

19             THE COURT:  How old?

20             THE PROSPECTIVE JUROR:  Three months.

21             THE COURT:  What does your wife do for a living?

22             THE PROSPECTIVE JUROR:  She's, she reads

23   investment bonds.

24             THE COURT:  What do you do for a living?

25             THE PROSPECTIVE JUROR:  Electrician.

1          THE COURT:  What is the highest level of education

2   you've completed?

3          THE PROSPECTIVE JUROR:  High school.

4          THE COURT:  Have you ever served in the military?

5          THE PROSPECTIVE JUROR:  No.

6          THE COURT:  Where do you get your news from?

7   Newspaper, radio, television, internet, social media,

8   podcasts, other sources?

9          THE PROSPECTIVE JUROR:  Just like word of mouth.

10  I'm like a hermit, I guess.  I don't have a social media or

11  anything like that.

12         THE COURT:  Your not on social media?

13         THE PROSPECTIVE JUROR:  No.

14         THE COURT:  No Facebook?

15         THE PROSPECTIVE JUROR:  No.

16         THE COURT:  Twitter.

17         THE PROSPECTIVE JUROR:  No, nothing.

18         THE COURT:  TikTok?

19         THE PROSPECTIVE JUROR:  No.

20         THE COURT:  What about the internet?  Do you use

21  the internet?

22         THE PROSPECTIVE JUROR:  Yeah, but I don't look up

23  news or anything like that.  I just do my thing and that's

24  it.

25         THE COURT:  Are you concerned about the

1   reliability of information that you find on the internet or

2   social media?

3           THE PROSPECTIVE JUROR:  I would say so.  Can't

4   trust everything.

5           THE COURT:  Will that concern affect your ability

6   to be fair and impartial in this case?

7           THE PROSPECTIVE JUROR:  I don't think so.

8           THE COURT:  Have you ever been involved in voter

9   education, voter registration, or any get out the vote

10  efforts?

11          THE PROSPECTIVE JUROR:  No.

12          THE COURT:  Do you have any hobbies?  How do you

13  spend your free time, assuming you have free time.

14          THE PROSPECTIVE JUROR:  I play sports and I work

15  on cars.

16          THE COURT:  Are there any television shows or

17  radio programs that you regularly watch or listen to?

18          THE PROSPECTIVE JUROR:  Not really.  Whatever my

19  wife is watching.

20          THE COURT:  Can you be fair and impartial in this

21  case?

22          THE PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Is there anything about this case that

24  would caution you to favor one side over the other?

25          THE PROSPECTIVE JUROR:  No.

1              THE COURT:  Would you be able to set aside any

2    sympathies or biases you may have for any of the parties in

3    this case and render an impartial verdict based solely on

4    the evidence presented in court and the law as given to you

5    by Judge Garaufis?

6              THE PROSPECTIVE JUROR:  Yes.

7              THE COURT:  Any follow-up questions for

8    Mr. Grondek?

9              MR.  BUFORD:  No thank you, your Honor.

10             DEFENSE ATTORNEY:  No thank you, your Honor.

11             THE COURT:  Okay, Mr. Grondek.  I'm going to ask

12   you to go to the other court room, they'll escort you there,

13   and we'll get back to you later in the day.

14             (The prospective juror exits.)

15             THE COURTROOM DEPUTY:  Ready for 62?

16             THE COURT:  Number 62.  Samuel Shipman.

17             (The prospective juror enters.)

18             THE COURT:  Good afternoon, Mr. Shipman.

19             THE PROSPECTIVE JUROR:  Good afternoon.

20             THE COURT:  Mr. Shipman, as you were in either the

21   ceremonial courtroom on Monday or the central jury room

22   yesterday or at lunch, did you hear any of your fellow

23   perspective jurors discussing this case?

24             THE PROSPECTIVE JUROR:  No.

25             THE COURT:  Did you observe anyone with a laptop

Jury Selection                   531

1   or other internet capable device with a search engine on

2   that with results of a search on this case?

3            THE PROSPECTIVE JUROR:  No.

4            THE COURT:  Now, this case has received some

5   degree of media attention.  Have you read, heard, or seen

6   anything in the media or on the internet or on social media

7   before today about this case or about the defendant,

8   Douglass Mackey, otherwise known as Ricky Vaughn?

9            THE PROSPECTIVE JUROR:  I don't, I have a

10  subscription to the New York Times, so I don't remember

11  details, but it's possible that I -- it sounds like vaguely

12  familiar.  Because I know that I've read articles that

13  involve elections and deception, but I don't remember if it

14  was this specific case to be honest.

15           THE COURT:  Based on your vague recollection of

16  reading things like that, have you formed any ideas or

17  opinions or conclusions about the facts of this case or

18  about Mr. Mackey?

19           THE PROSPECTIVE JUROR:  No.

20           THE COURT:  This case involves various

21  individuals, including the defendant, Mr. Mackey, who had

22  strong political preferences during the 2016 presidential

23  election campaign, including individuals who supported

24  President Donald Trump and individuals who supported

25  presidential candidate Hillary Clinton.

1          Do you have strong feelings or opinions related to

2     the 2016 presidential election campaign or to the two

3     candidates in that campaign such that it would overcome your

4     duty to judge this case fairly and impartially?

5          THE PROSPECTIVE JUROR:  Possibly, yes.

6          THE COURT:  How so?

7          THE PROSPECTIVE JUROR:  I feel like there was a

8     lot of misinformation during that time and how it ended up

9     turning out made me very emotional, and I still feel a

10    little emotional about it.  I mean, I would do my best to be

11    impartial, but I can't help but feel emotional any time that

12    election and that time period and things that happened are

13    brought up.

14         THE COURT:  It's not impermissible for us or for

15    jurors to have emotions about a lot of things, even the case

16    they're called upon to adjudicate.  The question is, and

17    what is impermissible is if jurors allow their emotions to

18    overcome their duty to look objectively at evidence, assess

19    it, and render a verdict based on the law that's given by

20    the judge without allowing their emotions to interfere with

21    that.

22         THE PROSPECTIVE JUROR:  I think I can do that.  I

23    think I can be objective.

24         THE COURT:  Do you have any experience with what

25    you perceive to be deliberately false or misleading

Jury Selection                                    533

1   information on the internet or on social media?  Any
2   personal experience?
3              THE PROSPECTIVE JUROR:  No.
4              THE COURT:  I think you alluded to that you read
5   something in the New York Times, maybe, about it and in
6   relation to elections.
7              THE PROSPECTIVE JUROR:  Is that what you meant if
8   I read about?
9              THE COURT:  No, I was asking if you had
10  experience.
11             THE PROSPECTIVE JUROR:  Like, if I have given
12  misinformation?
13             THE COURT:  Yes.  Have you come across anything on
14  social media or the internet that your like geez, that's
15  deliberately false or misleading.  Personal experience in
16  that regard and I think you said no.
17             THE PROSPECTIVE JUROR:  Well, I have a friend from
18  Hong Kong who is on Facebook all of the time and I have a
19  recollection of her telling me something and sharing a
20  Facebook story with me.  I don't remember the details of it,
21  but I remember at the time going and trying to research
22  other sources and finding the information that she gave me
23  was incorrect and sending her those other sources.  I do
24  have that memory.
25             THE COURT:  Will you be able to set aside any

1    experiences that you had with false information, misleading

2    information on the internet, or on social media, set those

3    aside, and judge this case based solely on the evidence

4    presented in court and the laws given to you by Judge

5    Garaufis and do that in an impartial and fair manner?

6                THE PROSPECTIVE JUROR:  Yes.

7                THE COURT:  At trial, you may hear some language

8    that you may find to be offensive.  You should not assess

9    that evidence based on whether you find the language used to

10   be offensive or not.  But, rather, whether that evidence

11   tends to prove or disprove the elements of the crime.

12               If you found some of the evidence offensive, would

13   you be able to set aside your feelings about its

14   offensiveness and objectively hear the evidence and render

15   an impartial and fair verdict?

16               THE PROSPECTIVE JUROR:  Yes.

17               THE COURT:  The trial is going to start on the

18   20th of March and go until the 31st, at the very latest.  Is

19   there any reason why this would cause you a genuine hardship

20   if you were selected to serve on the jury?

21               THE PROSPECTIVE JUROR:  No.

22               THE COURT:  Have you, a family member, or close

23   friend ever been charged with a crime, convicted of a crime,

24   or been the subject of a criminal investigation, witness to

25   a crime, witness in a grand jury investigation?

1          THE PROSPECTIVE JUROR:  No.

2          THE COURT:  Victim of a crime?  No?

3          THE PROSPECTIVE JUROR:  No.

4          THE COURT:  You, a family member, or close friend

5     ever been a party to a legal action against or had a dispute

6     with the United States of America any of its agencies or

7     employees?

8          THE PROSPECTIVE JUROR:  No.

9          THE COURT:  You live in Brooklyn?

10          THE PROSPECTIVE JUROR:  Yes.

11          THE COURT:  How long have you lived in Brooklyn?

12          THE PROSPECTIVE JUROR:  About 15 years now.

13          THE COURT:  Do you own or do you rent your home?

14          THE PROSPECTIVE JUROR:  I rent.

15          THE COURT:  Do you live with anyone?

16          THE PROSPECTIVE JUROR:  My boyfriend.

17          THE COURT:  What does he do for a living?

18          THE PROSPECTIVE JUROR:  He's an accountant.

19          THE COURT:  What do you do for a living?

20          THE PROSPECTIVE JUROR:  I'm a flight attendant.

21          THE COURT:  I won't ask you who you work for.

22          What's your highest level of education?

23          THE PROSPECTIVE JUROR:  College.

24          THE COURT:  You graduated --

25          THE PROSPECTIVE JUROR:  A four-year degree.

1          THE COURT:  A Bachelor's degree?

2          THE PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Ever served in the military?

4          THE PROSPECTIVE JUROR:  No.

5          THE COURT:  Where do you get your news from?

6   Newspapers radio television, internet, social media

7   podcasts, what?

8          THE PROSPECTIVE JUROR:  Everything but -- like I

9   said, I have a subscription to the New York Times, so I read

10  that the most.

11         THE COURT:  But other things as well?

12         THE PROSPECTIVE JUROR:  Sometimes I listen to,

13  like, to podcasts and watch the news on TV.

14         THE COURT:  When you watch the news on TV, is

15  there any particular station that you watch?

16         THE PROSPECTIVE JUROR:  Often CNN.

17         THE COURT:  And you use the internet and social

18  media?

19         THE PROSPECTIVE JUROR:  Not as much as others, but

20  yeah.  I'm not on Facebook, I haven't been on Facebook for a

21  highly.

22         THE COURT:  What about Twitter or Instagram?

23         THE PROSPECTIVE JUROR:  Very little.  But I'm, but

24  yeah.

25         THE COURT:  You have both of those?

1          THE PROSPECTIVE JUROR:  I have accounts, yes.

2          THE COURT:  How frequently are you, do you use

3     them?  Weekly, monthly, daily, what?

4          THE PROSPECTIVE JUROR:  Just like once a month, I

5     would say.

6          THE COURT:  Are you concerned at all about the

7     reliability of the information that you find on the internet

8     and social media?

9          THE PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Will that concern affect your ability

11    to be fair and impartial in this case?

12         THE PROSPECTIVE JUROR:  No.

13         THE COURT:  Have you ever been involved in voter

14    education, voter registration, or any get out the vote

15    efforts?

16         THE PROSPECTIVE JUROR:  No.

17         THE COURT:  Do you have any hobbies?  How do you

18    spend your free time?

19         THE PROSPECTIVE JUROR:  Yoga, running, city biking

20    around.

21         THE COURT:  Okay.

22         And are there any television shows or regular

23    programs that you regularly watch or listen to?

24         THE PROSPECTIVE JUROR:  I like Law and Order a

25    lot.  Law and Order SVU.

1          THE COURT:  It's not like that in real life, you

2   know.

3          THE PROSPECTIVE JUROR:  I know.

4          THE COURT:  Can you be fair and impartial in this

5   case?

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Is there anything about this case that

8   would cause you to favor one side over the other?

9          THE PROSPECTIVE JUROR:  No.

10         THE COURT:  Will you be able to set aside any

11   sympathies or biases you may have for any of the parties you

12   have in this case and render an impartial verdict based

13   solely on the evidence presented in court and the law as

14   given to you by Judge Garaufis?

15         THE PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Any follow up for Mr. Shipman?

17         MR. BUFORD:  Not from the Government, thank you.

18         MR. FRISCH:  No, thank you.

19         THE COURT:  Thank you, Mr. Shipman.  They're going

20   to escort you into the next courtroom and we're going to

21   continue this process.  We're probably going to break for

22   lunch.  Actually, you know what?  Let's break for lunch now

23   and then --

24         THE COURTROOM DEPUTY:  You have one more waiting

25   outside.

Jury Selection                                         539

1          THE COURT:  Okay, we'll do that one more.  We'll

2     do Mr. Matthews and then we'll break at 12:35, hopefully.

3     But please escort Mr. Shipman outside.

4               (The prospective juror exits.)

5               (The prospective juror enters.)

6          THE COURT:  Good afternoon, Mr. Matthews.

7          THE PROSPECTIVE JUROR:  Good afternoon.

8          THE COURT:  Leighton Matthews, Juror Number 63.

9          Mr. Matthews, while you were waiting in the

10    central jury room yesterday, today, yesterday at lunch, or

11    Monday when we were in the ceremonial courtroom, did you

12    overhear any of your fellow jurors talking about this case,

13    the facts, anything like that related to the case?

14         THE PROSPECTIVE JUROR:  No, not really.  Just

15    general, but nothing specific and I wasn't involved in the

16    conversation.

17         THE COURT:  Did you see any laptops, or internet

18    access devices, cell phones or anything that had on their

19    screens anything related to the case?

20         THE PROSPECTIVE JUROR:  No.

21         THE COURT:  Now this case has received some degree

22    of media attention.  Have you read, heard, on seen anything

23    on the media on the internet or on social media before today

24    about this case, or about the defendant, Douglass Mackey,

25    otherwise known as Ricky Vaughn?

1          THE PROSPECTIVE JUROR:  No.

2          THE COURT:  This case involves various individuals

3    including the defendant, Douglass Mackey, who had strong

4    political preferences during the 2016 presidential election

5    campaign, including individuals who supported President

6    Donald Trump and individuals who supported presidential

7    candidate Hillary Clinton.

8          Do you have strong feelings or opinions related to

9    the 2016 presidential election campaign or to candidates in

10   that campaign such that it would overcome your duty to judge

11   this case fairly and impartially?

12         THE PROSPECTIVE JUROR:  Maybe.

13         THE COURT:  How so?  Tell me.  Before you answer,

14   let me just -- and you give me whatever answer you want to

15   give me.  This is you and your feelings and everything.  But

16   we ask jurors to, and they're sworn, to decide cases fairly

17   and impartially based solely on the evidence presented in

18   court and the law that's given to you by the judge.  We

19   require them to exclude their personal feelings and not let

20   those feelings overcome their verdict.  If they can't do

21   that, if they would be guided by their personal feelings and

22   not the evidence, we want to know that.  But we require them

23   to make sure that they can keep their feelings out of it.

24   So why don't you answer the question.

25         THE PROSPECTIVE JUROR:  Okay, I think I can do

1    that.  But I'm very biased to a specific party.  Plus, there

2    was stuff that went on in 2016 that would make me think

3    twice.  Even if I listen to the case, maybe I would have a

4    preference, I think so.

5              THE COURT:  Let me ask you this question.  If you

6    were selected as a juror and you heard the Government's

7    evidence.  And the Government has the burden to prove beyond

8    a reasonable doubt that Mr. Mackey is guilty.  And if you

9    heard the Government's evidence and you concluded that they

10   failed to meet their burden of proof, they didn't prove

11   beyond a reasonable doubt that Mr. Mackey committed the

12   crime they claim, would you have, despite your feelings one

13   party or the other, whatever, I don't know which party.

14   Would you have any hesitance to find Mr. Mackey not guilty?

15             THE PROSPECTIVE JUROR:  No, I would never find

16   somebody guilty based on something other than the evidence.

17             THE COURT:  On the other hand, if the Government

18   would submit evidence to you and you found that evidence did

19   prove beyond a reasonable doubt that the defendant is

20   guilty, could you return a guilty verdict?

21             THE PROSPECTIVE JUROR:  Yes.

22             THE COURT:  In viewing the evidence, do you

23   believe that you would be, and whether it rose to the level

24   of proof beyond a reasonable doubt, do you believe that your

25   personal feelings would color the way you looked at that

1   evidence?

2            THE PROSPECTIVE JUROR:  If it's close.  It could

3   be.  If they don't -- if they don't prove it 100 percent or

4   the other side didn't disprove it, maybe I could.  I would

5   have to use my own judgment and I would maybe lean to the

6   other side based on that.

7            THE COURT:  Mr. Matthews, I'm going to, unless

8   there's any objection, I'm going to excuse you from serving

9   on this jury.

10           MR.  BUFORD:  No objection.

11           MR. FRISCH:  No objections.

12           THE COURT:  You can report to the central jury

13  room and they will give you further instructions.

14           THE PROSPECTIVE JUROR:  Okay, thank you.

15           THE COURT:  Okay.

16           Do we have 30?

17           MR.  BUFORD:  Yes.

18           THE COURT:  So that means we need ten.

19           MR.  BUFORD:  Or six.

20           THE COURT:  Or six.  Judge Garaufis wants six

21  alternates, so we're going to try to do that.

22           THE COURTROOM DEPUTY:  Judge, can they go to lunch

23  or?

24           THE COURT:  I want to give them some more warnings

25  before they go.

1          MR. FRISCH:  While you go, can we head out for

2     lunch?

3          THE COURT:  Absolutely.

4          MR.  BUFORD:  Your Honor, just in terms of the

5     count, I think you said you wanted to talk and review who

6     was collected already to make sure about the --

7          THE COURT:  I will talk about the -- that's true.

8     That's true.  We can only that at 2 o'clock.

9          MR.  BUFORD:  I understand.  I just want to be

10    optimistic about the numbers.

11         THE COURT:  Yes.  I would like to, if at all

12    possible, we still have the outstanding challenge from Juror

13    Number 1 that I said I would hold in abeyance, if we can get

14    11 more, then we can let her go.  But I'd like to do that --

15    I really want to get done by like 3:30.  So we can let,

16    also, Mr. I forget his name, Juror Number 46, go to his

17    award ceremony.  But I will inquire about him.

18         THE COURTROOM DEPUTY:  So judge, you are going to

19    the jury room.  Do you want this to be on the record or off

20    the record?  I'm just asking so that the court reporter can

21    go before you.

22         THE COURT:  Yes, why don't you go?

23         THE COURTROOM DEPUTY:  What time should everyone

24    be back?

25         THE COURT:  Everybody should be back here ready to

1    go at 1:30.  The people in there can be back there at

2    2 o'clock.

3              (Continued on the next page.)

1    (continuing.)

2              (The following took place in the central jury room.)

3              THE COURT:  Okay, folks, good news.  Good news, not

4    great news.  Good news.

5              So we're going to break for lunch.  Be back here at

6    1:30.  We need 11 more people to be qualified.  My goal is to

7    have that done -- I hope we can do it.  I can't guarantee it,

8    but my goal is to have it done by 3:30.  Once we hit that

9    number that we need, unless there's any quirks, everyone else

10   will be released from further service and we'll pick our jury

11   from the folks that we've qualified.

12             Please, do not talk about the case.  Do not do any

13   research.  No Google searches.  Nothing.  Don't talk to each

14   other, and if you are approached by any of the parties in the

15   lunch break, let me know.

16             So 1:30, be back here.

17             (Lunch recess taken.)

18             (Continued on the following page.)

19

20

21

22

23

24

25

1                  **A F T E R N O O N   S E S S I O N**

2              (In open court; prospective jurors not present.)

3              THE COURT:  Okay.  Ready to continue?  Julia Weiss,

4    Juror Number 64, answered affirmatively to questions 10, 17,

5    18, 19, and 21, if I'm not mistaken.

6              (The prospective juror approaches.)

7              THE COURT:  Good afternoon, Ms. Weiss.

8              THE PROSPECTIVE JUROR:  Good afternoon.

9              THE COURT:  You indicated in the ceremonial

10   courtroom on the first day that you have prepaid vacation

11   plans or confirmed medical appointments over the next two

12   weeks that cannot be moved; is that correct?

13             THE PROSPECTIVE JUROR:  Yes.  I have a trip to Paris

14   from the 26th to the 31st of this month.  It cannot be moved,

15   unfortunately.

16             THE COURT:  Okay.  Goodbye.  You are excused.

17             THE PROSPECTIVE JUROR:  Wow, that was easy.  Thank

18   you.

19             THE COURT:  Thank you.

20             (The prospective juror exits.)

21             THE LAW CLERK:  Ready for 65?

22             THE COURT:  Yep.  Janine Murphy.  Affirmatively

23   answered questions 12 and 17.

24             (The prospective juror approaches.)

25             THE COURT:  Good afternoon, Ms. Murphy.

1          THE PROSPECTIVE JUROR:   Hello.

2          THE COURT:   Ms. Murphy, during the -- when you were

3    in the central jury room or in the ceremonial courtroom on

4    Monday or during the lunch breaks, did you overhear any of

5    your fellow prospective jurors talking about the case?

6          THE PROSPECTIVE JUROR:   No, sir.

7          THE COURT:   Did you observe anyone with a laptop or

8    a tablet with information about the case up on a search?

9          THE PROSPECTIVE JUROR:   No, sir.

10          THE COURT:   Okay.   This case has received some

11   degree of media attention.

12          Have you read, heard, or seen anything in the media,

13   on the internet, or on social media before today about the

14   case or about the defendant, Douglass Mackey, otherwise known

15   as Ricky Vaughn?

16          THE PROSPECTIVE JUROR:   No, sir.

17          THE COURT:   This case involves various individuals,

18   including the defendant, Douglass Mackey, who had strong

19   political preferences during the 2016 Presidential election

20   campaign, including individuals who supported President Donald

21   Trump and individuals who supported Presidential candidate

22   Hillary Clinton.

23          Do you have strong feelings or opinions related to

24   the 2016 Presidential election campaign or to the two

25   candidates during that campaign, such that it would overcome

1    your duty to judge this case fairly and impartially?

2                THE PROSPECTIVE JUROR:  I do have my opinion, but I

3    don't think so.

4                THE COURT:  Do you have any experience with what you

5    perceived to be deliberately false or misleading information

6    on the internet or on social media?

7                THE PROSPECTIVE JUROR:  I'm not sure I understand

8    your question.

9                THE COURT:  Do you use the internet and social

10   media?

11               THE PROSPECTIVE JUROR:  I do.

12               THE COURT:  Okay.  During your use of the internet

13   or social media, did you ever perceive that there was

14   deliberately false or misleading information on whatever it

15   was you saw, whether it was the internet or social media?

16               THE PROSPECTIVE JUROR:  I guess so.

17               THE COURT:  Would your experiences with such

18   information affect your ability to be fair and impartial in

19   this case?  In other words --

20               THE PROSPECTIVE JUROR:  Well, you would have to -- I

21   guess you have to try to figure out what the truth is.

22               THE COURT:  All right.  Which is what we ask jurors

23   to do.  They decide the facts, what happened.

24               And in doing that, they are to be guided by the

25   evidence that's submitted in the case; not their experiences

1    outside the courtroom that happened whenever they happened.

2    That is not relevant to the determination of what happened in

3    this case.  You have to judge this case based on the evidence

4    that's submitted.

5            And this case involves allegedly false and

6    misleading information on the internet or on social media.

7            So I'm asking you, is -- would you be able to set

8    aside whatever feelings you had about what you saw elsewhere

9    that may be misleading and judge this case on the facts that

10   are presented in the courtroom as opposed to anything else?

11           THE PROSPECTIVE JUROR:  I do, but can I just ask a

12   question, or make a statement?

13           THE COURT:  Sure.

14           THE PROSPECTIVE JUROR:  I do have trouble coming

15   here because I live very far distance, and for me to come here

16   for two weeks would be very stressful and difficult for me, so

17   I'm wondering if that would be, you know, helpful to you?

18           THE COURT:  There's a question that deals with that,

19   and we'll get to that.

20           THE PROSPECTIVE JUROR:  Sorry.

21           THE COURT:  That's okay.  That's fine.

22           At trial, you may hear some language that you find

23   to be offensive.  You should not assess that evidence based on

24   whether you believe it to be offensive or not, but, rather,

25   whether that evidence tends to prove or disprove the elements

1   of the crime.  If you found some evidence to be offensive,

2   would be able to set aside your feelings about its

3   offensiveness and objectively consider that evidence and be

4   fair and impartial in rendering your verdict?

5                THE PROSPECTIVE JUROR:  I -- I believe so.

6                THE COURT:  You indicated that you served on a jury

7   before, correct?

8                THE PROSPECTIVE JUROR:  Yes.

9                THE COURT:  When was that?  What type of case?

10  Which court was it in?

11               THE PROSPECTIVE JUROR:  I served three times on jury

12  duty.  I've had -- 2018 or '19, it was a drug case in Suffolk

13  County.  Also, I was on a jury for a negligence case, and also

14  a murder trial.

15               THE COURT:  And was that murder trial also in

16  Suffolk County?

17               THE PROSPECTIVE JUROR:  All of them were in Suffolk

18  County.

19               THE COURT:  All of them in Suffolk.

20               And in each of the cases, did you reach a verdict?

21  Don't tell me what the verdicts were, just if you reached

22  verdicts or not.

23               THE PROSPECTIVE JUROR:  I don't -- I was an

24  alternate on the last one, so I don't know what the verdict

25  actually was.  They did reach a verdict, though.

1          And the negligent case settled out of court.

2          And a few days after questioning, I was released

3     from the murder trial.

4          THE COURT:  You also indicated that you have close

5     friends or relatives who are lawyers or work for lawyers, or

6     work for a judge or in a courthouse.  Tell me about that,

7     please.

8          THE PROSPECTIVE JUROR:  I have a nephew who is a

9     attorney for corporate law.

10          THE COURT:  Okay.  In this case, you are going to

11     have to decide the verdict based on the law that Judge

12     Garaufis tells you applies.  There's not going to be any

13     corporate law involved, but to the extent you may have learned

14     something from your nephew about the area of law, can you put

15     what you learned aside and take the law from Judge Garaufis

16     and use that in rendering your verdict?

17          THE PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Anything about your relationship with

19     your nephew who is a corporate lawyer who -- that would affect

20     your ability to be fair and impartial in this case?

21          THE PROSPECTIVE JUROR:  No.

22          THE COURT:  So the difficulty in serving on this

23     jury from March 20th to March 31st, for you, is because of the

24     travel and the distance that you live from the court -- from

25     this courthouse, as opposed to the Central Islip courthouse.

1    I mean, you probably live far away from Central Islip

2    courthouse, too?

3              THE PROSPECTIVE JUROR:  It's about a half an hour.

4              THE COURT:  That's better.

5              Are there any other issues in relation to the length

6    of the trial that would cause you a genuine hardship?

7              THE PROSPECTIVE JUROR:  I have a husband who just

8    recently had back surgery, so he -- I do need to help him from

9    time to time.  He can't bend, he can't lift, he can't twist or

10   anything.  He had the spinal surgery.

11             THE COURT:  When did he have the surgery?

12             THE PROSPECTIVE JUROR:  February 2nd.

13             THE COURT:  Was it a fusion or --

14             THE PROSPECTIVE JUROR:  Yes.

15             THE COURT:  What levels?

16             THE PROSPECTIVE JUROR:  Lower -- I don't know, S1/5,

17   something like that.

18             THE COURT:  All right.  Have you, a family member,

19   or close friend ever been involved in the criminal justice

20   system, meaning charged with a crime, convicted of a crime,

21   subject of a criminal investigation, witness, victim, witness

22   in a grand jury investigation, anything like that?

23             THE PROSPECTIVE JUROR:  I was -- I was a bank

24   manager, and I was involved in a bank robbery.

25             THE COURT:  Is there anything about that experience

1   that would affect your ability to be fair and impartial in

2   this case?

3            THE PROSPECTIVE JUROR:  No.

4            THE COURT:  Have you, a family member, or close

5   friend ever been a party to a legal action against, or had a

6   dispute with, the United States of America or any of its

7   agencies or employees?

8            THE PROSPECTIVE JUROR:  No.

9            THE COURT:  You live in Selden?  How long?

10           THE PROSPECTIVE JUROR:  How long have I lived there?

11           THE COURT:  Yes.

12           THE PROSPECTIVE JUROR:  Thirty years.

13           THE COURT:  Do you own or do you rent your home?

14           THE PROSPECTIVE JUROR:  I own.

15           THE COURT:  And you live with your husband?

16           THE PROSPECTIVE JUROR:  I do.

17           THE COURT:  What is -- is your husband -- I know

18   he's recovering from his surgery now, but does he work?

19           THE PROSPECTIVE JUROR:  He's a general foreman for

20   The Town of Huntington.

21           THE COURT:  And do you have any children?

22           THE PROSPECTIVE JUROR:  I do not.

23           THE COURT:  Are you employed?

24           THE PROSPECTIVE JUROR:  I am recently retired.

25           THE COURT:  What did you do?

1              THE PROSPECTIVE JUROR:  I was a bank manager.

2              THE COURT:  You told me that.  I'm sorry.

3              What's the highest level of education you've

4    completed?

5              THE PROSPECTIVE JUROR:  Two years of college.

6              THE COURT:  Have you ever served in the military?

7              THE PROSPECTIVE JUROR:  No.

8              THE COURT:  Where do you get your news from?

9    Newspapers, radio, television, internet, social --

10             THE PROSPECTIVE JUROR:  Television.

11             THE COURT:  Television?

12             THE PROSPECTIVE JUROR:  (No verbal response.)

13             THE COURT:  What channels do you watch that you get

14   your news from?

15             THE PROSPECTIVE JUROR:  Channel 2, Channel 12.

16             THE COURT:  Do you use the internet, and are you on

17   social media?

18             THE PROSPECTIVE JUROR:  I am.

19             THE COURT:  What social media platforms do you use?

20             THE PROSPECTIVE JUROR:  Facebook and Instagram.

21             THE COURT:  And what about the internet?  How do you

22   use it?

23             THE PROSPECTIVE JUROR:  I Google search.  That's it.

24             THE COURT:  Are you concerned -- what's the

25   frequency with which you use Facebook and Instagram?

1           THE PROSPECTIVE JUROR:  I use them every day.

2           THE COURT:  Are you concerned at all about the

3    reliability of the information you find on the internet and

4    social media?

5           THE PROSPECTIVE JUROR:  Not overly concerned, no.

6           THE COURT:  Have you ever been involved in voter

7    education or voter registration, or any get-out-the-vote

8    efforts?

9           THE PROSPECTIVE JUROR:  No.

10          THE COURT:  What television shows or radio programs,

11   if any, do you regularly watch or listen to?

12          THE PROSPECTIVE JUROR:  I don't know.

13          THE COURT:  Anything in particular?

14          THE PROSPECTIVE JUROR:  Yellowstone, the Chicago PD

15   and the Chicago fire department show.  I stream things, you

16   know, on the -- on TV, I don't know.

17          THE COURT:  Netflix and stuff like that?

18          THE PROSPECTIVE JUROR:  Netflix, movies, yes.

19          THE COURT:  All right.

20          THE PROSPECTIVE JUROR:  Hallmark.

21          THE COURT:  Do you have any hobbies?  How do you

22   spend your free time?

23          THE PROSPECTIVE JUROR:  I have a dog.  I spend a lot

24   of time with my dog.  And I actually do have a little like

25   part-time job with a dog breeder, helping out.

1          THE COURT:  Is there any reason why you cannot be

2     fair and impartial in this case?

3          THE PROSPECTIVE JUROR:  No.

4          THE COURT:  Is there anything about this case that

5     would cause you to favor one side over the other?

6          THE PROSPECTIVE JUROR:  No.

7          THE COURT:  Will you be able to set aside any

8     sympathies or biases you may have for any of the parties in

9     this case and render an impartial verdict based solely on the

10    evidence presented and the law as given to you by Judge

11    Garaufis?

12         THE PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Any follow-up questions for Ms. Murphy?

14         MR. BUFORD:  No, thank you, Your Honor.

15         MR. FRISCH:  Can I ask a question from here without

16    going to the sidebar?

17         THE COURT:  Sure.

18         MR. FRISCH:  Just to inquire more about the

19    prospective juror's -- the needs of the prospective juror's

20    husband and the commute and just make sure we're all okay with

21    that.

22         THE COURT:  Is your husband able to ambulate?

23         THE PROSPECTIVE JUROR:  Yes.

24         THE COURT:  Able to dress himself?

25         THE PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Able to toilet on his own?

2          THE PROSPECTIVE JUROR:  Mm-hmm.

3          THE COURT:  Can he -- not asking if he's a good cook

4    for not, but can he prepare his own meals?

5          THE PROSPECTIVE JUROR:  Yes, he can.

6          THE COURT:  Okay.  Having been someone who has had

7    similar surgery, I can appreciate the recovery, but -- and I

8    do appreciate how our district is spread out and how we have

9    people from the Island coming into Brooklyn, and folks from

10   Staten Island going out to CI --

11         THE PROSPECTIVE JUROR:  It's really too far.  It's

12   six hours a day in the car, sir.

13         THE COURT:  I know that, but that is our jury pool.

14   That is the district that we -- that has been created.  You

15   could argue that it should be two districts because we have 8

16   million people in this district --

17         THE PROSPECTIVE JUROR:  I know, but I heard other

18   jurors say that they got called to Central Islip and because

19   they lived here, they were able to come here, so why is that

20   not fair for me since I don't live close by?

21         THE COURT:  Because the -- because our jury --

22         THE PROSPECTIVE JUROR:  It's stressful for me.

23         THE COURT:  I understand that, I do.  And it's

24   stressful for every juror who is asked to cross the district

25   to serve on jury duty, but that is our jury pool and I don't

1  know who these folks are who said that they were released from

2  their jury service, but it's been my practice for 17 years and

3  the practice of all the judges in this court not to exclude

4  jurors solely based that reason.

5          So I'm going to ask you to bear with us and you are

6  a qualified juror to serve on this case and if you will go

7  with Chloe and Barbara, they will take you into the other room

8  and we'll do our -- at the end of the -- I hope before

9  three o'clock or 3:30, we'll do our -- exercise our peremptory

10 challenges and it may be that you get struck.  Actually, you

11 have a greater chance of being struck from the jury than being

12 picked to serve on the jury, that's the way the numbers work

13 out.  So I'm sorry, Ms. Murphy.

14         THE PROSPECTIVE JUROR:  I'm finished?

15         THE COURT:  Yes, thank you.

16         (The prospective juror exits.)

17         (The prospective juror approaches.)

18         THE COURT:  Good afternoon, Ms. Fernandez.

19         THE PROSPECTIVE JUROR:  Good afternoon.

20         THE COURT:  Elsa Fernandez, Juror Number 66.

21         THE PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Ms. Fernandez, in either Monday,

23 Tuesday, or earlier today, when you were in the central jury

24 room, or when you were in the ceremonial courtroom, did you

25 overhear any of the other jurors talking about the case?

1          THE PROSPECTIVE JUROR:  No.  No, sir.

2          THE COURT:  Did you observe any of the other jurors

3     with a laptop computer or a tablet that had a search up that

4     had information about the case on it?

5          THE PROSPECTIVE JUROR:  No, sir.

6          THE COURT:  Okay.  This case has received media

7     attention.

8          Have you read, heard, or seen anything in the media,

9     on the internet, or on social media before today about this

10    case or about the defendant, Douglass Mackey, otherwise known

11    as Ricky Vaughn?

12         THE PROSPECTIVE JUROR:  No, sir.

13         THE COURT:  This case involves individuals,

14    including the defendant, Douglass Mackey, who had strong

15    feelings -- excuse me -- strong political preferences during

16    the 2016, Presidential election campaign, including

17    individuals who supported President Donald Trump and

18    individuals who supported Presidential candidate Hillary

19    Clinton.

20         Do you have strong feelings or opinions related to

21    the 2016 Presidential election campaign, or to the two

22    candidates, such that it would overcome your duty to be fair

23    and impartial in this case?

24         THE PROSPECTIVE JUROR:  No, sir.

25         THE COURT:  Do you have any experience with what you

1    perceive to be deliberately false or misleading information on

2    the internet or on social media?

3              THE PROSPECTIVE JUROR:  No, sir.

4              THE COURT:  At trial, you may hear some language

5    that you may find to be offensive.  You should not assess that

6    evidence based on whether you find it to be offensive or not,

7    but, rather, based on whether that evidence tends to prove or

8    disprove the elements of the crime charged.  If --

9              THE PROSPECTIVE JUROR:  I don't think so.

10             THE COURT:  Hold on.

11             If you find some evidence offensive, would you be

12   able to set aside your feelings about its offensiveness and

13   look at the evidence objectively and decide this case fairly

14   and impartially?

15             THE PROSPECTIVE JUROR:  Well, I believe the -- if I

16   found some evidence that pointed to guilty verdict, I will.

17             THE COURT:  Okay.  So, in other words, if you found

18   some evidence to be offensive to you, you could put aside your

19   feelings about it and decide whether that evidence proved or

20   disproved the case, yes?

21             THE PROSPECTIVE JUROR:  Well, depend on those

22   evidence are.

23             THE COURT:  Okay.  It depends on the evidence,

24   right?

25             THE PROSPECTIVE JUROR:  Yeah.

1              THE COURT:  You've served on a jury before, yes?

2              THE PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Can you tell me when that was, what kind

4    of case it was, which court it was in, and whether you ended

5    up rendering a verdict?

6              THE PROSPECTIVE JUROR:  No, sir.

7              THE COURT:  You don't remember when it was, where it

8    was?

9              THE PROSPECTIVE JUROR:  No.

10             THE COURT:  Was it here in Brooklyn where you served

11   on a jury?

12             THE PROSPECTIVE JUROR:  I don't know.

13             THE COURT:  You don't remember, okay.

14             Any objection if we allow Ms. Fernandez to be

15   excused?

16             MR. BUFORD:  No, Your Honor.

17             MR. FRISCH:  No.

18             THE COURT:  Ms. Fernandez, I will excuse you from

19   serving on the jury.  You can go to the central jury room and

20   they will give you further instructions, okay?

21             THE PROSPECTIVE JUROR:  Okay.  Thank you.

22             (The prospective juror exits.)

23             THE LAW CLERK:  Sixty-seven?

24             THE COURT:  Yes, 67 is Christopher Cadieux.

25   Answered affirmatively to questions 12, 15, 17, and 18.

1           (The prospective juror approaches.)

2           THE LAW CLERK:  Mr. Cadieux.

3           THE COURT:  Good afternoon, Mr. Cadieux.

4           THE PROSPECTIVE JUROR:  Good afternoon.

5           THE COURT:  Mr. Cadieux, when you were in the

6    central jury room or in the ceremonial courtroom on Monday or

7    during lunch, did you overhear any of your fellow prospective

8    jurors discussing this case?

9           THE PROSPECTIVE JUROR:  Not in those situations, but

10   actually when we were leaving on Monday, coming out of the

11   court building, there was some discussions, a bunch of --

12   there was a crowd of folks that were walking toward the

13   subway.

14          THE COURT:  Okay.  Did you hear clearly what they

15   were saying?

16          THE PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Would what they were saying affect in

18   any way your ability to be fair and impartial in this case and

19   to judge this case solely on the evidence presented in court

20   and the instructions on the law given to you by Judge

21   Garaufis?

22          THE PROSPECTIVE JUROR:  What they said was nothing

23   too much more than what was presented clearly when we first

24   started the trial.  I don't think that would affect me, but I

25   do have -- I'm struggling with the subject matter of this

 1    case.  I guess simply because, to me, it touches the root

 2    of -- of our freedoms, basically.  If I could take a step

 3    backwards, I help out a lot with veterans.  I volunteer my

 4    time.  My dad is in the American Legion and we do a lot of

 5    collections, things like that, going out to the vets hospitals

 6    and distributing goods and whatnot.  And what these folks have

 7    sacrificed for me to have my freedom to be able to choose the

 8    government that I want and the direction I want this country

 9    to go, I'm struggling with that, my belief, and what I know

10    this case to be, as far as I know right now.

11              THE COURT:  Your struggles with your firm

12    well-founded beliefs and what you think this case is about,

13    would that affect -- would it overcome your ability to

14    objectively listen to the evidence that's presented in court,

15    to put the government to its burden of proof to prove beyond a

16    reasonable doubt that Mr. Mackey is guilty, and to listen to

17    the law as given to you by Judge Garaufis?

18              THE PROSPECTIVE JUROR:  I would like to believe that

19    I'm an objective person, and, you know, truth -- truth told

20    here, really, I'm not sure if it would or wouldn't, I would be

21    honest.  You know, I would like to think I could be objective

22    and listen and weigh that, but, again, because of my

23    experiences and seeing sacrifices a lot of these men and women

24    have made, loss of limb and whatnot, that weighs heavily on

25    me, too.  I'm just being honest.

1            THE COURT:  We need jurors to be sure that they can

2    be fair and impartial and not let their feelings, however

3    well-founded, interfere with the process of objective

4    evaluation and impartial adjudication.  And if you are not

5    sure, this is not the case for you, and that's fine, that's

6    fine.

7            Unless there's any objection, I will excuse Mr.

8    Cadieux, is it pronounced?

9            THE PROSPECTIVE JUROR:  "Cadieux."

10           THE COURT:  Mr. Cadieux from serving on this jury.

11           MR. BUFORD:  No objection, Your Honor.

12           MR. FRISCH:  No objection.

13           THE COURT:  Thank you, Mr. Cadieux.

14           THE PROSPECTIVE JUROR:  Thank you.

15           (The prospective juror is excused.)

16           THE LAW CLERK:  Ready for 68?

17           THE COURT:  Graziella Giambalvo, Juror Number 68,

18   has served on a jury before, number 12.

19           (The prospective juror enters.)

20           THE COURT:  Good afternoon, Ms. Giambalvo.

21           THE PROSPECTIVE JUROR:  Good afternoon, Your Honor.

22           THE COURT:  Ms. Giambalvo, during the time that you

23   were in the jury room or the ceremonial courtroom or over

24   lunch or after the day when you were leaving, did you overhear

25   any of your fellow prospective jurors talking about the case?

1           THE PROSPECTIVE JUROR:  I may have heard --

2           THE COURT:  If you can just move the mic a little

3    closer.

4           THE PROSPECTIVE JUROR:  I may have heard, but I

5    don't know to what extent, because everybody was like talking

6    all together, but not in proximity.

7           THE COURT:  Okay.  Would anything you heard affect

8    your ability to be a fair and impartial juror in this case?

9           THE PROSPECTIVE JUROR:  I would be fair.

10          THE COURT:  Okay.  During that same period of time,

11   did you see any of your fellow jurors with a computer -- a

12   laptop computer, a tablet computer -- that had information

13   about the case on it?

14          THE PROSPECTIVE JUROR:  I saw a laptop, one, but I

15   don't know what type of information it had.

16          THE COURT:  Okay.  This case has received -- let me

17   start over.

18          This case has received some degree of media

19   attention.  Before today, have you read, heard, or seen

20   anything in the media, on the internet, or on social media

21   about this case or about the Defendant, Douglass Mackey, who

22   is otherwise known as Ricky Vaughn?

23          THE PROSPECTIVE JUROR:  I remember -- see, I don't

24   know to what extent.  I mean, I've seen a lot of election

25   tampering.  I saw that on TV, but I don't know if it's all

1    related.

2          THE COURT:  Okay.  Will you be able to set aside

3    anything you may have seen or heard before about election

4    tampering or particularly -- or specifically about this case,

5    and be able to judge this case based solely on the evidence

6    presented in court, and on the instructions on the law that

7    you get from Judge Garaufis?

8          THE PROSPECTIVE JUROR:  Yes, I would.

9          THE COURT:  This case involves various individuals,

10   including Mr. Mackey, who had strong political preferences

11   during the 2016 Presidential election campaign, including

12   individuals who supported President Donald Trump, and

13   individuals who supported Presidential candidate Hillary

14   Clinton.

15         Do you have strong feelings or opinions about the

16   2016 Presidential election campaign or the two candidates in

17   that campaign, such that it would overcome your duty to judge

18   this case fairly and impartially?

19         THE PROSPECTIVE JUROR:  I'm not sure that I would or

20   wouldn't.  I'm not sure.  I'm just not sure if I would.

21         THE COURT:  Ms. Giambalvo, we need people on this

22   jury who are sure that they can put aside any of their

23   personal feelings, political beliefs, or anything like that,

24   and judge the case based only on the evidence presented in

25   court, and the laws given to the jury by Judge Garaufis.  If

1    you can't be sure that you can do that, then you may not be

2    the right juror to sit on this case.

3              THE PROSPECTIVE JUROR:  I'm not sure.  I think all

4    election is fair, but I'm not sure about that one.

5              THE COURT:  Okay.

6              Any objection to excusing Ms. Giambalvo from sitting

7    on this case?

8              MR. BUFORD:  No objection, Your Honor.

9              MR. FRISCH:  No.

10             THE COURT:  Okay, Ms. Giambalvo, I'm going to excuse

11   you.  You can go to the central jury room, and they will give

12   you further instructions.

13             THE PROSPECTIVE JUROR:  Okay.  Thank you.

14             THE COURT:  Thank you.

15             (The prospective juror is excused.)

16             THE COURT:  Next juror is John Magri, number 69,

17   answered affirmatively to questions 12, 15, 16, 18, 19,

18   and 20.

19             THE LAW CLERK:  Are you ready for him?

20             THE COURT:  Yes.

21             (The prospective juror enters.)

22             THE COURT:  Good afternoon, Mr. Magri.

23             THE PROSPECTIVE JUROR:  Good afternoon.

24             THE COURT:  I've got a number of questions I want to

25   ask you, but I want to start with a couple things.

1          You answered affirmatively to a number of questions

2    that are sort of interrelated, if you will.

3          Do you have a background or taken courses in the

4    law, worked for an attorney, law firm, judge or in a

5    courthouse; family members, yourself, close friends, working

6    for law enforcement; family members, yourself, or close

7    friends having relationships or close friendships with people

8    in the law enforcement; or, anyone who has been employed by

9    the US Attorney's Office.

10          With respect to all of those things, is there

11   anything about them -- about your answers to those

12   questions -- that would affect -- that you think would affect

13   your ability to be fair and impartial in this case?  We will

14   get to the substance of that in a moment, but I just want to

15   cut to the quick, if you think that because of some

16   relationship you have with someone in law enforcement or in

17   the US Attorney's Office or your experience in the law or

18   something like that, you can't be fair and impartial in this

19   case, I want to know that before we go too far.

20          THE PROSPECTIVE JUROR:  I can be fair and impartial,

21   but, I don't know what you might think when you get to details

22   of my time at the FBI, et cetera.

23          (Continued on the following page.)

24

25

*Jury Selection*                                          569

1           THE COURT:  Okay.  You can be fair and impartial.

2           THE PROSPECTIVE JUROR:  I can.

3           THE COURT:  Okay.  All right.  Before we go there,

4    we've heard that there may have been discussions about this

5    case amongst the jurors, the prospective jurors, either in

6    the Central Jury Room, outside of the courthouse when

7    leaving one day in the ceremonial courtroom.

8           Did you overhear any of those discussions?

9           THE PROSPECTIVE JUROR:  Nothing about the

10   substance of the case.  There have been a lot of questions

11   about how quickly the process is going.  Questions about,

12   like, some folks were fearful of the types of questions they

13   would be asked in this room.  Some believing there would be

14   some sort of legal questions but absolutely nothing

15   regarding, like, the defendant or any of the substance of

16   the case.

17          THE COURT:  Okay.  During your time in the Central

18   Jury Room, have you seen anyone with a laptop computer,

19   tablet or other device that had any am information about the

20   case on it.

21          THE PROSPECTIVE JUROR:  I believe there was

22   someone the first day who had a laptop or computer.  I have

23   no idea what was on it.

24          THE COURT:  Okay.  This case has received some

25   degree of media attention.  Before today, have you read,

1   heard, or seen anything in the media, on the internet, on

2   social media about this case or anything about the defendant

3   Douglas Mackey a/k/a Ricky Vaughn?

4           THE PROSPECTIVE JUROR:  Not that I recall, no.

5           THE COURT:  This case involves various individuals

6   including the defendant Mr. Mackey who had strong political

7   preferences during the 2016 presidential election campaign

8   including individuals who supported President Donald Trump

9   and individuals who supported presidential candidate Hillary

10  Clinton.

11          Do you have strong feelings or opinions related to

12  the 2016 presidential election campaign or the two

13  candidates such that it would overcome your duty to be fair

14  and impartial in this case.

15          THE PROSPECTIVE JUROR:  No.

16          THE COURT:  You have any experience with what you

17  perceive to be deliberately false or misleading information

18  on the internet or on social media?

19          THE PROSPECTIVE JUROR:  Widespread and consistent.

20  Are you talking about specifically this case?

21          THE COURT:  No, just in general.

22          THE PROSPECTIVE JUROR:  Yes, widespread and

23  consistent.  Consistently misleading or incomplete.

24          THE COURT:  All right.  Would your experiences in

25  viewing such information affect your ability to be fair and

*Jury Selection*                                    571

1    impartial in this case?

2              THE PROSPECTIVE JUROR:  No.

3              THE COURT:  At trial, you may hear some language

4    that you find to be offensive, you should not assess that

5    evidence based on whether you find it to be offensive or

6    not, but rather, whether that evidence tends to prove or

7    disprove the elements of the crime.

8              If you found some of the evidence to be offensive,

9    would you be able to set aside your feelings about its

10   offensiveness and objectively consider it and render a fair

11   and impartial verdict?

12             THE PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Will sitting on this jury from

14   March 20th through March 31st pose a genuine hardship for

15   you.

16             THE PROSPECTIVE JUROR:  If I may answer this way.

17   I care for my mother who is now 90.  She has the beginnings

18   of dementia and does sometimes require some attention.  And

19   that may occur in unexpected ways and at unexpected times.

20   I do tend to go over to her home periodically, make sure she

21   is taking her medication and there is nothing awry.  Service

22   on this jury, assuming like the time you described, should

23   not present an insurmountable burden.  However, if my mother

24   calls me when she has once and says she is hemorrhaging, I

25   am going to go and I am going to take her to the hospital

1  because it might not occur to her to call 911, she would

2  call me.

3          THE COURT:  Does she lives alone?

4          THE PROSPECTIVE JUROR:  She lives alone,

5  approximately, one mile from my house.  She vigorously

6  defends her independence and I struggle to allow her as much

7  independence as I can.

8          THE COURT:  Okay.  Does she have any homecare,

9  anything like that?

10          THE PROSPECTIVE JUROR:  She would not tolerate

11  anyone in her home and barely tolerates me in her home when

12  I ask her about her medications.

13          THE COURT:  Okay.  All right.  I want to get back

14  to the other questions that I asked in the big room.

15          You've served on a jury before, correct?

16          THE PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Tell me when, where, what, did you

18  reach a verdict?

19          THE PROSPECTIVE JUROR:  The last time I served, I

20  was the -- it was a state court case, it was a homicide

21  case.  12 jurors, two alternates, and they brought in a

22  folding chair to make me the third alternate.  It was my

23  impression after the trial that a young prosecutor, they

24  wanted me on there because they wanted a young prosecutor,

25  wanted feedback on his performance in the homicide trial and

1   he wanted feedback regarding his presentation, the manner of

2   presentation, speed of presentation, and such.  I was

3   excused immediately before they went to deliberations.

4           THE COURT:  Okay.  And you said the last time,

5   there were other times you served on a jury?

6           THE PROSPECTIVE JUROR:  No.

7           THE COURT:  Okay.  You have a background in the

8   law?

9           THE PROSPECTIVE JUROR:  Yes.

10          THE COURT:  What is that background?

11          THE PROSPECTIVE JUROR:  Juris Doctor from NYU,

12  '91.

13          THE COURT:  You worked as an attorney?

14          THE PROSPECTIVE JUROR:  For five years at Cahill,

15  Gordon & Reindel.

16          THE COURT:  Heard of it.  What did you do after

17  that?

18          THE PROSPECTIVE JUROR:  I came to the bureau.  I

19  went to work as a special agent at the FBI.

20          THE COURT:  And you're still work as an FBI

21  special agent?

22          THE PROSPECTIVE JUROR:  No, I retired in March of

23  2018.

24          THE COURT:  And did you have a particular

25  specialty as a special agent in the FBI?

1          THE PROSPECTIVE JUROR:  So I began working, well,

2     I went to the initial orientation phase.  I spent the first

3     14 and a half years, plus or minus, working crimes, violent

4     crimes.  I was injured during an arrest that went bad.

5     Herniated discs in my back banged up my knee, so I then

6     decided to become a supervisor because I couldn't, forgive

7     me, "run and gun" anymore.  And after that, I went to the

8     national security world, intelligence division and criminal

9     division.  The last few months, I spent six months at

10    headquarters back in the criminal division and I retired

11    after that.

12          THE COURT:  Okay.  I read you this litany of

13    questions that you put your number up for.

14          Is there anything else in those questions that you

15    need to tell me?  And it seems like a lot of it was because

16    you were a former agent and lawyer and all of that.

17          THE PROSPECTIVE JUROR:  There is one other thing

18    that I think might be of interest which is I left the FBI as

19    a whistleblower regarding a litany of wrongdoing.  And, at

20    the end, I was, quite honestly, forced out under threat of

21    my job and my pension.  That said, it's my belief regarding

22    the agency as a whole:  I believe the leadership of the

23    agency is deeply troubled.  But it's the same objection I

24    had regarding the agency that I say is pretty positive with

25    about myself, that is, I judge individuals as individuals.

1    I listen to individual information as just that.  I do not

2    judge based people on a group to which they may belong.  But

3    I thought I should mention that in an effort for full

4    candor.

5           THE COURT:  In light of your -- the manner in

6    which you departed the FBI, will you hold that against the

7    Government in this case.

8           THE PROSPECTIVE JUROR:  I will not hold it against

9    the -- in terms of determinations of fact, I cannot and I

10   will not hold it against any of the individuals who testify.

11   I have a healthy suspicion of everyone who will testify.

12          THE COURT:  So when you hear the agents testifying

13   in this case, I don't know what they're going to testify to,

14   you will view that testimony with a healthy suspicion?

15          THE PROSPECTIVE JUROR:  On both sides.

16          THE COURT:  As you would any other witness?

17          THE PROSPECTIVE JUROR:  I'm suspicious of all

18   testimony both by the Government and by the defense.  Each

19   of them has may have different reasons for shaping the truth

20   in one way or another.

21          THE COURT:  Okay.  Other than your experience as a

22   FBI agent, have you a family member, or close friend have

23   any involvement in the criminal justice system, meaning,

24   being charged with a crime, victim of a crime, subject of a

25   criminal investigation, witness to a crime, witness in a

1    grand jury investigation, or victim of a crime.

2          THE PROSPECTIVE JUROR:  Victim of a crime.  My mom

3    has been assaulted when she was younger and she was a little

4    bit more mobile she was assaulted twice on the street,

5    street crime.  My sister was assaulted once, again, same

6    kind of thing surrounded by five guys.  I believe my nephew

7    has done something like he rolled a car during a snowstorm

8    and the road was closed and he received a summons at a

9    bedside.  I think that's about the limit.

10         THE COURT:  Anything about those experiences that

11   would affect your ability to be fair and impartial in this

12   case?

13         THE PROSPECTIVE JUROR:  No.

14         THE COURT:  Have you, a family member, or close

15   friend ever been a party to a legal action against, or had a

16   dispute with, the United States of America any of its

17   agencies or employees?

18         THE PROSPECTIVE JUROR:  Not that I know of, no.

19         THE COURT:  Your leaving the FBI the way you

20   describe was not -- there was no related formal proceedings

21   or anything like that, was there?

22         THE PROSPECTIVE JUROR:  I related the information

23   that I had to appropriate governmental authorities.  That

24   was the limit of it.  There was no suit filed.

25         THE COURT:  Okay.  And then you ended up retiring.

*Jury Selection*                                    577

1           THE PROSPECTIVE JUROR:  I retired and then I
2    brought that information to them.
3           THE COURT:  I see.  I see.  Okay.  You live in
4    Forest Hills, correct?
5           THE PROSPECTIVE JUROR:  I do.
6           THE COURT:  How long?
7           THE PROSPECTIVE JUROR:  57 years.
8           THE COURT:  Do you own or do you rent.
9           THE PROSPECTIVE JUROR:  Own.
10          THE COURT:  Do you live with anyone?
11          THE PROSPECTIVE JUROR:  No.
12          THE COURT:  Ever been married or have any kids?
13          THE PROSPECTIVE JUROR:  No.
14          THE COURT:  And you're currently retired, you told
15   us about that.
16          Are you working again?
17          THE PROSPECTIVE JUROR:  No.
18          THE COURT:  Your highest level of education is a
19   J.D.?
20          THE PROSPECTIVE JUROR:  Yes.
21          THE COURT:  Ever serve in the military?
22          THE PROSPECTIVE JUROR:  No.
23          THE COURT:  How did you get your news, newspapers,
24   radio, television, internet, social media, podcasts.
25          THE PROSPECTIVE JUROR:  Television, internet.  I

1  prefer primary documents, so sometimes I might, like, order

2  something like an inspector general's report to read the

3  unredacted versions of certain reports, or I should say the

4  redacted version, not the unredacted version that would

5  be...

6              THE COURT:  Do you use the internet or social

7  media?

8              THE PROSPECTIVE JUROR:  Social media, no.  The

9  internet, yes.

10             THE COURT:  How do you use the internet?

11             THE PROSPECTIVE JUROR:  YouTube oftentimes.

12  Sometimes for research, to respond to a summons to appear

13  here.  I also play an online game, so that may also bring up

14  the internet.

15             THE COURT:  Are you concerned at all about the

16  reliability of information that you find on the internet or

17  social media?

18             THE PROSPECTIVE JUROR:  I find that most

19  information you receive nowadays is incomplete and at least

20  partially inaccurate and that's why I prefer primary sources

21  so I can come to my own conclusions.

22             THE COURT:  Will your concerns about the

23  reliability of information that you find on internet and

24  social media affect your ability to be fair and impartial in

25  this case?

1          THE PROSPECTIVE JUROR:  No.

2          THE COURT:  Have you ever been involved in voter

3    education, voter registration, or any get out the vote

4    efforts?

5          THE PROSPECTIVE JUROR:  No.

6          THE COURT:  Do you have any hobbies?  How do you

7    spend your leisure time other than online gaming?

8          THE PROSPECTIVE JUROR:  I tried to take up golf,

9    that was a failure.

10          THE COURT:  It is for just about everyone.

11          THE PROSPECTIVE JUROR:  Sometimes I shoot.  Now, I

12    shoot with a friend up in Pennsylvania.  I read a lot, and

13    watch some TV and I spend some days going out with friends

14    for lunch on Fridays and kind of do some exploring.

15          THE COURT:  Do you have any TV shows or radio

16    programs that you regularly watch or listen to?

17          THE PROSPECTIVE JUROR:  There are -- I subscribe

18    to certain, like, YouTube channels and I will often peruse

19    those channels to see if there is something of interest.

20          A lot of times, if they have a certain guest I

21    might be interested in or I tend to read and try to keep

22    abreast of a lot of the geopolitical stuff, like, what's

23    happening in the South China Sea or Ukraine, that kind of

24    thing.

25          THE COURT:  Can you be fair and impartial in this

*Jury Selection*                                            580

1   case?

2            THE PROSPECTIVE JUROR:  Yes.

3            THE COURT:  Is there anything about this case that

4   would cause you to favor one side over the other?

5            THE PROSPECTIVE JUROR:  No.

6            THE COURT:  Would you be able to set aside any

7   sympathies, biases or prejudices, excuse me, sympathies or

8   biases you may have for any of the parties in this case and

9   render an impartial verdict based solely on evidence

10  presented and the law as given to you by Judge Garaufis?

11           THE PROSPECTIVE JUROR:  Yes.

12           THE COURT:  All right.  Any follow up for

13  Mr. Magri?

14           MR. BUFORD:  No, your Honor.  Thank you.

15           MR. FRISCH:  I have one.  Can we approach?

16           THE COURT:  Sure.

17           (Sidebar held outside the presence of the jury.)

18           MR. FRISCH:  If I remember correctly, earlier

19  today the Government was concerned about the possibility

20  that a witness worked in the same law office as the husband

21  of the FBI agent sitting at the table.  The degrees of

22  separation here are a lot less remote than that.  This

23  gentleman brings a degree of specific knowledge about

24  federal investigation of alleged crime.  Understanding how

25  the FBI works, there are three or four FBI agents whose

1   names are on the witness list and there are about seven or

2   eight FBI agents who have at lowest whose names that I know

3   of who have worked on this case.  I haven't gotten to his

4   mother yet who may bring -- who may cause a problem during

5   the course of the trial.  I don't think we should have on

6   this jury someone with substantial federal investigative

7   experience judging a case which was investigated by the FBI

8   given all the circumstances about which he spoke, he's

9   simply not the right juror for this case.

10          MR. BUFORD:  Your Honor, the list of agents that

11  are going to testify was read publicly.  He didn't recognize

12  any of the names.  He hasn't worked in any of the units that

13  investigate the case.  And I think this is essentially an

14  argument that anyone who is a former agent cannot serve in a

15  federal criminal trial.  If he'd expressed reservations or

16  ambivalence about whether he could be fair and impartial, I

17  think that would be worth exploring.  But he was categorical

18  in his statements that he could be fair and impartial and

19  his relationship to the bureau is somewhat mixed given the

20  circumstances under which he left.

21          I don't know that there is a detectable bias one

22  way or the other on that.  And as with the mother, your

23  Honor, I think there may be slightly more acute than usual.

24  But anyone with an elderly relative can always have a

25  medical emergency room.  I don't know if it's worth excusing

*Jury Selection*                                                    582

1   this particular juror given that there is no reason to think

2   that anything is imminent there?

3           MR. FRISCH:  I mean, if he were to say, if he were

4   to say that as an FBI agent he'd be able to put out of his

5   mind his 14 and a half years of experience and training if

6   it's more than 14 and a half years about how much the FBI

7   conducts its investigations, how they corroborate or don't

8   corroborate.

9           There's another issue here that one of the

10  cooperating witnesses, I'm sorry, the cooperating witness

11  who will testify at this trial anonymously on the

12  Government's application is currently working for the FBI.

13          One of the circumstances that the Government has

14  brought to the attention of Judge Garaufis in favor of this

15  cooperating witness's anonymity at trial is that it would

16  compromise ongoing investigations of the FBI.  I don't know

17  any of this, and the unusual nature of this case, is going

18  to play in the mind of this man who appears to have very

19  definite ideas about things.  I don't know whether it cuts

20  for or against Mr. Mackey.  The Government's position at the

21  sidebar me some reason to think it cuts in their favor one

22  way or the other.  I don't want to find out.

23          THE COURT:  What offices were -- the investigation

24  into this case, what offices was it run out of or did it

25  involve?

*Jury Selection*                                               583

1          MR. BUFORD:  It was the New York Field Office.

2          MR. PAULSEN:  It's always the New York Field

3    Office?

4          MR. GULLOTTA:  Public corruption.

5          MR. PAULSEN:  It's C4, one of the two public

6    corruption squads.

7          THE COURT:  C4.

8          MR. PAULSEN:  C4.

9          THE COURT:  Nothing out of D.C.?

10          MR. PAULSEN:  I think there may have been maybe a

11    referral in the beginning but it would have been -- it was

12    always investigated here because of Mr. Mackey's prior

13    residence here.

14          THE COURT:  All right.  I'm going ask him a couple

15    questions but, I mean, I hear what you're saying Mr. Frisch,

16    but it would it's almost tantamount to anyone in -- formerly

17    in a particular law enforcement agency can't sit on a case

18    that was investigated by that law enforcement agency.

19          MR. FRISCH:  Well, this is not cops and robbers

20    and this is not drugs and guns, this is an unusual case that

21    the FBI is involved in here.  And I'm just struck by the

22    incongruity of the Government's position now compared to the

23    Government's position on this McGovern earlier today because

24    there was the possibility that she worked in the same law

25    division as the husband of the case agent.  I don't think it

1   flies.

2          The other thing, I'm sorry, just one more point.

3   This is a lawyer as well.  I honestly don't know which way

4   this cuts I'm just really uncomfortable with it.  What I was

5   going -- I interrupted my own train of thought which is

6   probably a good thing sometimes.  This is somebody who can't

7   help himself no matter what he says from having a point of

8   view.  He's been a whistleblower.  He gets redacted or

9   unredacted versions of things.  He may say, and I don't

10  doubt him, I take what your Honor said to me earlier today

11  about people tell the truth.  I take that seriously.  I

12  agree with you.  I believe he believes he can be fair and

13  impartial, I don't.  I don't think he's lying, it's just too

14  much baggage, too much in his head, and he's a man with a

15  lot of ideas that I think makes him just a wrong choice.

16         THE COURT:  He'd be number either 32 or 30.  If we

17  let two people off then I'm thinking maybe we let off so he

18  at best would be an alternate.

19         MR. GULLOTTA:  It sounds like circumstances for a

20  peremptory, not challenge for cause.

21         MR. BUFORD:  Your Honor, to be clear with respect

22  to the earlier juror who worked in the law department.

23         THE COURT:  She's on the panel, I'm not concerned.

24  You can make whatever arguments you want to make I unless I

25  act on them.

1           MR. BUFORD:  Understood.

2           MR. PAULSEN:  In the interest of us moving very

3    quickly.  If we have an objection to a witness about like

4    who he is and what his job is, should we that that earlier

5    because we obviously talked to him for 15 minutes.

6           THE COURT:  If you have any objection, flag it

7    early.

8           MR. PAULSEN:  This is not about his answers, it's

9    about who he is.

10          MR. FRISCH:  It's about both.  It's about both.

11          THE COURT:  Let's say if you have any objection

12   that is a strong objection, important point, raise it

13   earlier rather than later.

14          MR. PAULSEN:  Okay.

15          THE COURT:  Okay.  I'll ask him a couple

16   questions.

17          (Sidebar discussion concludes.)

18          (In open court.)

19          THE COURT:  Mr. Magri, did you ever work -- you

20   worked in the New York Field Office.

21          THE PROSPECTIVE JUROR:  So for the first 14 and a

22   half years, most of my work was in the Brooklyn-Queens RA.

23   After that, then headquarters for a bit in D.C., then when I

24   came back, back to the B-Q RA and then to Manhattan in

25   various offices in Manhattan.

*Jury Selection*                                                586

1           THE COURT:  When you were in Manhattan, what years

2    was that?

3           THE PROSPECTIVE JUROR:  So in 2010 through 2012, I

4    was in an office on the west side of Manhattan but not the

5    main field office.

6           THE COURT:  Okay.  You ever, in your tenure, work

7    with folks in the Public Corruption Unit, C4?

8           THE PROSPECTIVE JUROR:  Not that I recall, no.

9           THE COURT:  Okay.  I read a list of names in the

10   beginning of the case, a number of FBI agents.  You don't

11   know any of those folks?

12          THE PROSPECTIVE JUROR:  I don't recognize the name

13   of any of those folks.  I was in the New York office for

14   almost 22 and a half years, it's possible that, like, one of

15   these people might possible pop up and I might recognize a

16   face.  But I had no direct dealing with them, and if I

17   recognize them, it maybe only I passed them in a hallway.  I

18   never worked with them.  I didn't recognize any of the names

19   you listed.

20          THE COURT:  Okay.  Mr. Magri, you can go with

21   Chloe.  She's going to take you into the other courtroom.

22   We're going to continue this process.  We need, I believe,

23   five more people, maybe six and then we'll exercise our

24   peremptories and pick a jury.  I can't guarantee you're

25   going to be on or off, I don't know it's up to them.

1          THE PROSPECTIVE JUROR:  Thank you.

2          THE COURT:  Thanks.

3          (Continued on the next page.)

Jury Selection                           588

1   (continued.)

2            THE COURT:  Next juror is Isabell Parra.  She

3   answered affirmatively to question 17.

4            (The prospective juror enters.)

5            THE COURT:  Good afternoon, Ms. Parra.

6            THE PROSPECTIVE JUROR:  Hi there.

7            THE COURT:  Ms. Parra, during your time in the

8   central jury room or the ceremonial courtroom that we

9   started in on Monday, or at lunch, or leaving the court,

10  coming to court, did you ever overhear any of your fellow

11  jurors discussing the case?

12           THE PROSPECTIVE JUROR:  No.

13           THE COURT:  Over in the central jury room, did you

14  see anyone with a laptop computer that had on its screen

15  information about the case?

16           THE PROSPECTIVE JUROR:  No.

17           THE COURT:  This case has received some degree of

18  media attention.  Before today, have you read, heard, or

19  seen anything in the media, on the internet, or on social

20  media about this case or about the defendant, Douglass

21  Mackey, who is otherwise known as Ricky Vaughn?

22           THE PROSPECTIVE JUROR:  I've heard but no -- I

23  mean, I know that I've heard the name, but I don't know

24  anything, details or anything.

25           THE COURT:  Have you formed any ideas, opinions,

1   or conclusions about the facts of this case or about the

2   defendant, Douglass Mackey, based on what you've heard?

3            THE PROSPECTIVE JUROR:  No.

4            THE COURT:  This case involves various

5   individuals, including the defendant, Douglass Mackey, who

6   had strong political preferences during the 2016

7   presidential election campaign, including individuals who

8   supported President Donald Trump and individuals who

9   supported Presidential candidate Hillary Clinton.

10           Do you have strong feelings or opinions related to

11  the 2016 Presidential election campaign or to the two

12  candidates in that campaign such that it would overcome your

13  ability to judge this case fairly and impartially?

14           THE PROSPECTIVE JUROR:  Most likely.

15           THE COURT:  Yes?

16           THE PROSPECTIVE JUROR:  Yes.

17           THE COURT:  Cases are decided -- we ask jurors to

18  decide cases based on the evidence presented in court, the

19  applicable law that's given by the judge.  And putting aside

20  their suspicions, their sympathies, their biases, their

21  political or personal feelings, you don't think you would be

22  able to do that?

23           THE PROSPECTIVE JUROR:  I mean, I think that I

24  could be literal about it.  And, I mean, I believe in facts

25  so, I mean, if something is factual, then it's factual.

1          THE COURT:  So if the Government, who has the

2     burden in this case, would fail to produce evidence that

3     convinced you beyond a reasonable doubt that Mr. Mackey was

4     guilty, would you have any hesitance in rendering a verdict

5     of not guilty?

6          THE PROSPECTIVE JUROR:  No.

7          THE COURT:  Conversely, if the Government produced

8     evidence such that you were convinced beyond a reasonable

9     doubt that Mr. Mackey is guilty, would you have any

10    hesitance in rendering a guilty verdict?

11         THE PROSPECTIVE JUROR:  No.  I mean, I want the

12    truth to be the truth.  I don't have any -- anything for

13    myself in it.

14         THE COURT:  So despite the feelings you have about

15    the 2016 campaign, you could look at the evidence if it's

16    sufficient beyond a reasonable doubt and it complies with

17    the law, you can render a guilty verdict, or, if it isn't,

18    you could render a not guilty --

19         THE PROSPECTIVE JUROR:  Yeah, I can be a team

20    player and be, yeah, open minded.

21         THE COURT:  Do you have any experience with what

22    you perceive to be deliberately false or misleading

23    information on the internet or social media?

24         THE PROSPECTIVE JUROR:  No.

25         THE COURT:  At trial you may hear some language

1    that you may find to be offensive.  You should not assess

2    the evidence you hear based on whether you find it to be

3    offensive or not, but, rather, whether it tends to prove or

4    disprove the elements of the crime.

5             If you did find some evidence to be offensive,

6    would you be able to put aside your feelings about its

7    offensiveness and objectively hear the evidence and render

8    an impartial verdict?

9             THE PROSPECTIVE JUROR:  Yes.

10            THE COURT:  You have close friends or relatives

11   who are lawyers, or work for lawyers, or work for a judge,

12   or in a courthouse, yes?

13            THE PROSPECTIVE JUROR:  Yes.

14            THE COURT:  Tell me about that, please.

15            THE PROSPECTIVE JUROR:  I just have a girlfriend

16   who works for the Biden administration in the labor

17   division.  She's a lawyer.

18            THE COURT:  For the Department of Labor?

19            THE PROSPECTIVE JUROR:  Yes.

20            THE COURT:  Is there anything about your

21   relationship with her that would affect your ability to be

22   fair and impartial in this case?

23            THE PROSPECTIVE JUROR:  No.

24            THE COURT:  I don't believe this case involves any

25   labor law, so whatever she may have told you about the law

1   is not relevant.  And, more importantly, you will get the

2   law from Judge Garaufis; he will tell you what the law is.

3           You can apply the law that he gives to you?

4           THE PROSPECTIVE JUROR:  Yes.

5           THE COURT:  Trial is going to start March 20th and

6   last until March 31st.  Is there any reason why this would

7   cause you a genuine hardship if you were selected to serve

8   on this jury?

9           THE PROSPECTIVE JUROR:  Yes, I have a holiday plan

10  that starts on the 28th to the 5th with my husband.

11          THE COURT:  Where are you going?

12          THE PROSPECTIVE JUROR:  Puerto Rico.

13          THE COURT:  And you have tickets already and all

14  of that?

15          THE PROSPECTIVE JUROR:  Yeah.  Accommodations and

16  airfare and rental car.

17          THE COURT:  Okay.  It's too close, right?

18          MR.  BUFORD:  Right on the edge, Judge.

19          THE COURT:  Okay, Ms. Parra, the trial could

20  possibly end before the 28th.  But it's too close.  It's

21  possible that it could end on the 28th or even after, so I'm

22  going to excuse you from serving on this jury and you can

23  report to the central jury room and they will give you

24  further instructions.

25          THE PROSPECTIVE JUROR:  Okay.  Thank you.

1              (The prospective juror exits.)

2              (The prospective juror enters.)

3              THE COURT:  Banti Nath, Juror Number 71.

4              Mr. Nath, during your jury service, have you

5     overheard any of the other jurors talking about this case?

6              THE PROSPECTIVE JUROR:  About this one?

7              THE COURT:  Yes.  About the facts of the case.

8              THE PROSPECTIVE JUROR:  No.

9              THE COURT:  Have you observed anyone in the jury

10    room -- the central jury room with a laptop computer or

11    internet access device, a tablet, that had, on its screen,

12    any information about the case?

13             THE PROSPECTIVE JUROR:  Here?

14             THE COURT:  Yes.

15             THE PROSPECTIVE JUROR:  No.

16             THE COURT:  This case has received some degree of

17    media attention.  Before today, have you read, heard, or

18    seen anything in the media, on the internet, or on social

19    media about this case or about the defendant, Douglass

20    Mackey, who is otherwise known as Ricky Vaughn?

21             THE PROSPECTIVE JUROR:  Sorry, can I -- I'm sorry.

22             THE COURT:  Okay.

23             Before today, have you read, heard, or seen

24    anything in the media, on the internet, or on social media

25    about this case, or about this defendant, Douglass Mackey?

1           THE PROSPECTIVE JUROR:  No.

2           THE COURT:  Mr. Nath, how long have you been in

3    the United States?

4           THE PROSPECTIVE JUROR:  Here?

5           THE COURT:  Yes, in the United States.

6           THE PROSPECTIVE JUROR:  Twenty-two years.

7           THE COURT:  What do you do for a living?

8           THE PROSPECTIVE JUROR:  Gas station.

9           THE COURT:  You work at a gas station?

10          THE PROSPECTIVE JUROR:  Yes.

11          THE COURT:  You indicated in -- I believe you did

12   -- that you have close friends or relatives who are lawyers

13   or who work for lawyers, yes?

14          THE PROSPECTIVE JUROR:  In the company I work.  In

15   the company I work, there is a lawyer.

16          THE COURT:  Oh, okay.

17          Where do you live?

18          THE PROSPECTIVE JUROR:  Long Island.

19          THE COURT:  In what town?

20          THE PROSPECTIVE JUROR:  Hicksville.

21          THE COURT:  How long have you lived there?

22          THE PROSPECTIVE JUROR:  Nine years, ten years.

23          THE COURT:  Do you live with anyone?

24          THE PROSPECTIVE JUROR:  My wife.

25          THE COURT:  What does your wife do for a living?

1          THE PROSPECTIVE JUROR:  She works in a -- what is

2    that?  Nursing home.

3          THE COURT:  Okay.  Anyone else live with you?

4          THE PROSPECTIVE JUROR:  Two daughters.

5          THE COURT:  How old are they?

6          THE PROSPECTIVE JUROR:  Eleven years old.  Twins.

7          THE COURT:  Any objection to excusing Mr. Nath?

8          MR.  BUFORD:  No, your Honor.

9          MR. FRISCH:  No, your Honor.

10         THE COURT:  Okay.  Mr. Nath I'm going to excuse

11   you from serving on this jury.  You can report to the

12   central jury room.  They will give you further instructions.

13   You're excused.

14         THE PROSPECTIVE JUROR:  I can go?

15         THE COURT:  Yes.  Go to the room you started off

16   in this morning and let them know you've been excused.

17         THE PROSPECTIVE JUROR:  Okay, thank you.

18         (The prospective juror is excused.)

19         (The prospective juror enters.)

20         THE COURT:  Yes, Karin Molfetto, Juror Number 72.

21         Good afternoon, Ms. Molfetto.

22         THE PROSPECTIVE JUROR:  Hi.

23         THE COURT:  Ms. Molfetto, before -- well, during

24   the jury service, have you overheard any of your colleagues

25   talking about the facts of this case?

1          THE PROSPECTIVE JUROR:  I have not.  I personally

2     have not.  The only thing I heard is everybody guessing how

3     many people were already picked.  So that's what I heard.

4          THE COURT:  All right.  You observed anyone with a

5     laptop computer or tablet with --

6          THE PROSPECTIVE JUROR:  I did see actually a

7     couple of people with what I thought was a laptop, but I --

8          THE COURT:  Did you observe what was on the screen

9     with them?

10          THE PROSPECTIVE JUROR:  Somebody looked like they

11     were just kind of doodling or something, but I didn't really

12     see what they were doing, no.

13          THE COURT:  You don't recall seeing any

14     information about this case.

15          THE PROSPECTIVE JUROR:  No, no.

16          THE COURT:  This case has received some degree of

17     media attention.  Before today, have you read, heard, or

18     seen anything in the media, on the internet, or on social

19     media about the case or about the defendant, Douglass

20     Mackey, otherwise known as Ricky Vaughn?

21          THE PROSPECTIVE JUROR:  No.

22          THE COURT:  This case involves various

23     individuals, including the defendant, Douglass Mackey, who

24     had strong political preferences during the 2016

25     Presidential election campaign, including individuals who

Jury Selection                              597

1   supported President Trump and individuals who supported

2   Presidential candidate Hillary Clinton.

3           Do you have strong feelings or opinions related to

4   the 2016 Presidential election campaign or to the two

5   candidates in that campaign such that it would overcome your

6   duty to judge this case fairly and impartially?

7           THE PROSPECTIVE JUROR:  I have to answer honestly

8   that it might.  It might.

9           THE COURT:  In what way?

10          THE PROSPECTIVE JUROR:  Because I feel strongly

11  about certain events regarding politics on one side, so...

12          THE COURT:  Putting aside politics, generally, or

13  politics toward one side, and focusing particularly on that

14  election, the 2016 election, do your feelings relate to that

15  or things that happen subsequent to that?

16          THE PROSPECTIVE JUROR:  It -- probably not to

17  that.  It's probably subsequent to that.

18          THE COURT:  Do those feelings and opinions, are

19  they so strong that they would overcome your duty as a juror

20  to limit yourself to the facts presented in court and the

21  law as given to you by the trial judge?

22          THE PROSPECTIVE JUROR:  I think I might have --

23          THE COURT:  So, in other words --

24          THE PROSPECTIVE JUROR:  I think I would have kind

25  of a hard time, to be honest with you, give in light of what

Jury Selection                              598

1   happened in what happened in the 2020 election and
2   everything that happened with that.  I think I might have
3   some trouble.
4            THE COURT:  Okay.  All right Ms. Molfetto -- any
5   objection to excusing Ms. Molfetto?
6            MR.  BUFORD:  No, your Honor.
7            MR. FRISCH:  No, your Honor.
8            THE COURT:  Okay.  Ms. Molfetto, I'll excuse you
9   from serving on this jury.  You can go to the central jury
10  room and they will give you further instructions.
11           (The prospective juror exits.)
12           THE COURT:  The next juror is Renu Sharma, Juror
13  Number 73.  Did not respond to any of the questions.
14           (The prospective juror enters.)
15           THE COURT:  Good afternoon, Ms. Sharma.
16           Ms. Sharma, during your time as a juror here, have
17  you overheard any of the other jurors talking about the
18  case?
19           THE PROSPECTIVE JUROR:  No, sir.
20           THE COURT:  Have you observed any of the other
21  jurors with a laptop computer or tablet that had information
22  about the case on it?
23           THE PROSPECTIVE JUROR:  No, sir.
24           THE COURT:  This case has received some degree of
25  media attention.  Before today, have you read, heard, or

1   seen anything in the media, on the internet, or on social

2   media about this case or about the defendant, Douglass

3   Mackey?

4            THE PROSPECTIVE JUROR:  No, sir.

5            THE COURT:  This case involves various

6   individuals, including the defendant, Douglass Mackey, who

7   had strong political preferences during the 2016

8   Presidential election campaign, including individuals who

9   supported President Donald Trump and individuals who

10  supported Presidential candidate Hillary Clinton.

11           Do you have strong feelings or opinions related to

12  the 2016 Presidential election campaign or to the two

13  candidates in that campaign such that it would overcome your

14  duty to judge this case fairly and impartially?

15           THE PROSPECTIVE JUROR:  No, sir.  I'm impartial,

16  I'm neutral.

17           THE COURT:  Do you have any experience with what

18  your perceived to be deliberately false and misleading

19  information on the internet or on social media?

20           THE PROSPECTIVE JUROR:  No.

21           THE COURT:  At trial, you may hear some language

22  that you may find to be offensive.  You should not assess

23  that evidence based on whether you find it to be offensive

24  or not.  But rather, whether that evidence tends to prove or

25  disprove the elements of the crime.

1          THE PROSPECTIVE JUROR:  It depend, sir.

2          THE COURT:  If you found some of the evidence to

3    be offensive, would you be able to put aside your feelings

4    about it and objectively consider it and render an impartial

5    and fair verdict?

6          THE PROSPECTIVE JUROR:  I stay impartial.

7          THE COURT:  You'll stay impartial, okay.

8          The trial is going to start on the 20th of March,

9    that's next Monday, and it will go no later than March 31st.

10          Is there any reason this would cause you a genuine

11   hardship if you would selected to serve on the jury?

12          THE PROSPECTIVE JUROR:  Yes, sir.  Because I'm by

13   myself and I have family, two small kids to take care of,

14   and I have nobody else to take care of them.

15          THE COURT:  How old are your kids?

16          THE PROSPECTIVE JUROR:  They're 15.  And I'm a

17   single parent and I'm the only one who works and I have

18   bills to pay and if I'm stuck with this case, I don't know

19   because my work doesn't pay.

20          THE COURT:  Okay.

21          THE PROSPECTIVE JUROR:  It doesn't pay for this

22   process.

23          THE COURT:  Are you kids in high school?

24          THE PROSPECTIVE JUROR:  Sorry?

25          THE COURT:  What year are your kids in school?

1           THE PROSPECTIVE JUROR:  Right now they're not

2    here, they're in school, but they're not here right now.

3           THE COURT:  They're in school.  Are they in high

4    school?

5           THE PROSPECTIVE JUROR:  Yes.

6           THE COURT:  Okay.

7           Have you, a family member, or close friend ever

8    been charged with a crime, convicted of a crime, or been the

9    subject of a criminal investigation, been a witness to a

10   crime, been a --

11          THE PROSPECTIVE JUROR:  No, sir.

12          THE COURT:  No?  Nothing?  Not involved in the

13   criminal justice system?

14          THE PROSPECTIVE JUROR:  No, sir.

15          THE COURT:  What do you do for a living?  What's

16   your job?

17          THE PROSPECTIVE JUROR:  I'm a receptionist, sir.

18          THE COURT:  For who?  A receptionist for what?

19          THE PROSPECTIVE JUROR:  Security company.

20          THE COURT:  What are you work hours, usually?

21          THE PROSPECTIVE JUROR:  It's different every day,

22   sir.

23          THE COURT:  It's different every day?

24          THE PROSPECTIVE JUROR:  Yes, sir.

25          THE COURT:  What's -- how often do you go into

1    work?

2              THE PROSPECTIVE JUROR:  Five days, sir.

3              THE COURT:  Five days during the week or any days

4    during the weekend?

5              THE PROSPECTIVE JUROR:  Weekend, too.

6              THE COURT:  Okay.

7              Have you, a family member, other close friend ever

8    been a party to a legal action or had a dispute with the

9    United States any of its agencies or employees?

10             THE PROSPECTIVE JUROR:  No, sir.

11             THE COURT:  You live in Brooklyn?

12             THE PROSPECTIVE JUROR:  Yes, sir.

13             THE COURT:  How long have you lived in Brooklyn?

14             THE PROSPECTIVE JUROR:  It's 22 years, sir.

15             THE COURT:  Do you own or do you rent your home?

16             THE PROSPECTIVE JUROR:  I rent my apartment.

17             THE COURT:  And you live with your two children?

18             THE PROSPECTIVE JUROR:  Yes, sir.

19             THE COURT:  Anyone else?

20             THE PROSPECTIVE JUROR:  No.

21             THE COURT:  You work for a security company as a

22   receptionist.

23             THE PROSPECTIVE JUROR:  Yes, sir.

24             THE COURT:  What is the highest level of education

25   you received or you completed?

1              THE PROSPECTIVE JUROR:  I have my post graduation

2    in psychology.

3              THE COURT:  Post graduate degree is psychology?

4              THE PROSPECTIVE JUROR:  Yes.

5              THE COURT:  Have you ever served in the military?

6              THE PROSPECTIVE JUROR:  No, sir.

7              THE COURT:  Where do you get your news from?

8    Newspaper, radio, television, internet, social media,

9    podcast, what?

10             THE PROSPECTIVE JUROR:  Mostly newspapers.

11             THE COURT:  What newspapers do you read?

12             THE PROSPECTIVE JUROR:  Daily News.

13             THE COURT:  Do you use the internet or social

14   media?

15             THE PROSPECTIVE JUROR:  Yes, sir.  Not social

16   media, just internet.

17             THE COURT:  And what do you use the internet for?

18             THE PROSPECTIVE JUROR:  For my work.  Not that

19   social media.

20             THE COURT:  Have you ever been involved in voter

21   education, voter register, or any get out the vote efforts?

22             THE PROSPECTIVE JUROR:  No, sir.

23             THE COURT:  Do you have any hobbies?  How do you

24   spend your free time?

25             THE PROSPECTIVE JUROR:  I love to read, sir.  I

1    love to read, that's all.  That's my, yes.

2         THE COURT:  Do you have any TV shows or radio

3    programs that you regularly watch or listen to?

4         THE PROSPECTIVE JUROR:  Only news, sir.

5         THE COURT:  And what news shows do you see on TV?

6    Do you watch on TV any particular channels?

7         THE PROSPECTIVE JUROR:  I watch all of the news.

8    Fox 5, ABC, PIX11.  All of the news channels.

9         THE COURT:  Can you be fair and impartial in this

10   case?

11        THE PROSPECTIVE JUROR:  I didn't understand.

12        THE COURT:  Can you be fair and impartial in this

13   case.

14        THE PROSPECTIVE JUROR:  Yes, sir.

15        THE COURT:  Is there anything in that case that

16   would cause you to favor one side over the other?

17        THE PROSPECTIVE JUROR:  No, sir.  Not at all.

18        THE COURT:  Will you be able to set aside any

19   sympathies or biases you may have for any of the parties in

20   this case and render an impartial verdict based solely on

21   the evidence presented and the law as given to you by Judge

22   Garaufis?

23        THE PROSPECTIVE JUROR:  No, sir.

24        THE COURT:  Let me ask that again.

25        Would you be able to set aside any sympathies or

1   biases you may have for any of the parties in this case, and

2   render an impartial verdict based solely on the evidence

3   presented in court and the law as given to you by Judge

4   Garaufis?

5           THE PROSPECTIVE JUROR:  No, sir.

6           THE COURT:  You can't be impartial?  You told me

7   before you can be impartial.

8           THE PROSPECTIVE JUROR:  No, sir.  I stay neutral

9   and it depends on the evidence.

10          THE COURT:  That's what I'm saying in this

11  question.  I don't think you're hearing the question

12  correctly.

13          THE PROSPECTIVE JUROR:  I'm sorry.

14          THE COURT:  You can render an impartial verdict in

15  this case based solely on the evidence presented in court

16  and by the laws given to you by Judge Garaufis, yes?

17          THE PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Any follow up for Ms. Sharma?

19          MR.  BUFORD:  No, your Honor.  Thank you.

20          MR. FRISCH:  No, your Honor.

21          THE COURT:  Thank you, Ms. Sharma.  They're going

22  to escort you into the next room and we'll get back to you

23  shortly.  Thank you.

24          THE PROSPECTIVE JUROR:  Thank you.

25          (The prospective juror exits.)

Jury Selection                          606

1          THE COURT:  33, is that right?  Next juror is

2     number 74, Laura Maier.

3          THE COURTROOM DEPUTY:  The next one we have is 75,

4     Judge.

5          THE COURT:  Okay.  Kuo Min Tsai.  Ms. Maier is not

6     there?

7          THE COURTROOM DEPUTY:  She called yesterday and

8     said she wouldn't be able to come because of a personal

9     commitment.

10          THE COURT:  All right.

11          (The prospective juror enters.)

12          THE COURT:  Good afternoon, Mr. Tsai.

13          Mr. Tsai, when you were with the other jurors in

14     the room and in the ceremonial courtroom or at lunch or

15     leaving the courthouse, did you overhear any of them talk

16     about the case, the facts of the case, or anything like

17     that?

18          THE PROSPECTIVE JUROR:  No.

19          THE COURT:  Have you seen any of the other jurors

20     with a laptop computer or tablet with information about the

21     case on it?

22          THE PROSPECTIVE JUROR:  No.

23          THE COURT:  This case has received some degree of

24     media attention.  Before today, have you ever read, heard,

25     or sign anything in the media, on the internet, or on social

Jury Selection                            607

1   media about this case or about the defendant, Douglass

2   Mackey?

3              THE PROSPECTIVE JUROR:  No.

4              THE COURT:  This case involves various

5   individuals, including the defendant, Douglass Mackey, who

6   had strong political preferences during the 2016

7   Presidential election campaign, including individuals who

8   supported President Donald Trump and individuals who

9   supported Presidential candidate Hillary Clinton.

10              Do you have strong feelings or opinions related to

11   the 2016 Presidential election campaign or to the two

12   candidates in that campaign such that it would overcome your

13   duty to judge this case fairly and impartially?

14              THE PROSPECTIVE JUROR:  No.

15              THE COURT:  Do you have any experience with what

16   you perceived to be deliberately false or misleading

17   information on the internet or on social media?

18              THE PROSPECTIVE JUROR:  No.

19              THE COURT:  At trial, you may hear some language

20   that you may find to be offensive.  You should not assess

21   the evidence you hear based on whether you find it to be

22   offensive or not.  But rather, whether that evidence tends

23   to prove or disprove the elements of the crime.

24              If you found some of the evidence offensive, would

25   you be able to set aside your feelings about its

1    offensiveness and objectively consider it and render a fair

2    and impartial verdict?

3             THE PROSPECTIVE JUROR:  I will do my best, but

4    I've never been testing so I cannot guarantee.

5             THE COURT:  You will do your best to set aside

6    your feelings and be objective and fair and impartial?

7             THE PROSPECTIVE JUROR:  Yes.

8             THE COURT:  Do you believe you can do that?  There

9    are no guarantees in life, but, except death and taxes, and

10   maybe not even taxes.  But you can do your best and be fair

11   and impartial and objectively consider the evidence?

12            THE PROSPECTIVE JUROR:  Yes.

13            THE COURT:  The trial in this case is going to be

14   from March 20th through March 31st, at the latest.  Is there

15   any reason this would cause you a genuine hardship if you

16   were selected to serve on the jury?

17            THE PROSPECTIVE JUROR:  No.

18            THE COURT:  Have you, a family member, or close

19   friend ever been part of the criminal justice system?

20   Meaning, have you or a family member ever been charged with

21   a crime, been convicted of a crime, been the subject of a

22   criminal investigation, been a witness to a crime, been a

23   witness in a grand jury investigation or questioned in any

24   matter by law enforcement officers, or been the victim of a

25   crime?

1           THE PROSPECTIVE JUROR:  No.  To the best of my

2      memory, I don't recall it.

3                (Continued on the next page.)

1   (continuing.)

2          THE COURT:  Have you, a family member or close

3   friend ever been a party to a legal action against or had a

4   dispute with the United States or any of its agencies or

5   employees?

6          THE PROSPECTIVE JUROR:  No.

7          THE COURT:  Mr. Tsai, you live in Fresh Meadows;

8   correct?

9          THE PROSPECTIVE JUROR:  Yes.

10         THE COURT:  How long have you lived in Fresh

11  Meadows?

12         THE PROSPECTIVE JUROR:  Almost 40 years.  Start a

13  family '86.

14         THE COURT:  Do you own or rent your home?

15         THE PROSPECTIVE JUROR:  I own a house, a townhouse.

16         THE COURT:  And do you live with anyone?

17         THE PROSPECTIVE JUROR:  Yes.  My wife and my

18  daughter who has already move out after marriage about --

19         THE COURT:  So your daughter has moved out already?

20         THE PROSPECTIVE JUROR:  Yeah, move out almost seven

21  or eight years.

22         THE COURT:  What does your wife do for a living?

23         THE PROSPECTIVE JUROR:  She's the sales lady in a

24  jewelry store.

25         THE COURT:  And what do you do for a living?

1          THE PROSPECTIVE JUROR:  I'm IT guy and I working for

2    private insurance company for 12 years and then I working for

3    the City of New York for 20 years.

4          THE COURT:  What is the highest level of education

5    you completed?

6          THE PROSPECTIVE JUROR:  I graduate from Queens

7    College, computer science master's degree.

8          THE COURT:  From Queens College?

9          THE PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Have you ever served in the military?

11         THE PROSPECTIVE JUROR:  I'm a -- I come from Taiwan,

12   and 20 years old, you must join the army.  So I served about

13   two years in the army in Taiwan, but not over here.

14         THE COURT:  Okay.

15         Where do you get your news from?  Newspapers, radio,

16   television, internet, social media, podcasts, where?

17         THE PROSPECTIVE JUROR:  I must say the family

18   Chinese -- the Chinese newspaper called *Xinhua* and my wife

19   like to read every day, so I read it every day.  And on top of

20   it, you know, the internet and -- I subscribe to ABC News, NBC

21   News, so they were sending me the alert and the -- so I read

22   it, and sometimes I go to the website to read the news.

23         THE COURT:  Those same news; ABC, NBC, and others?

24         THE PROSPECTIVE JUROR:  Even Fox.

25         THE COURT:  Even Fox, okay.

1          Do you ever get your news from TV?

2          THE PROSPECTIVE JUROR:  Ten years ago, yes, but not

3    right now, because I -- we don't subscribe to TV anymore.  We

4    just got from the iPhone, from the iPad, so I don't need the

5    TV program anymore, no.

6          THE COURT:  Do you use the internet and social

7    media?

8          THE PROSPECTIVE JUROR:  I have Facebook and

9    Instagram, but I only read, I don't post it because, you know,

10   every day you work on the computer environment.  I don't want

11   to spend my time after work still working on the -- on the

12   computer -- in the IT -- on the computer or laptop.  I just

13   read it.  I don't want to pause it.  I hardly text message.  I

14   put -- call my wife, call my daughter, call everybody instead

15   of text them.

16         THE COURT:  All right.  Are you concerned at all

17   about the reliability of information that you find on the

18   internet or social media?

19         THE PROSPECTIVE JUROR:  Can you say again, please?

20         THE COURT:  Sure.

21         Are you concerned at all about the reliability of

22   information that you find on the internet or social media?

23         THE PROSPECTIVE JUROR:  Yes, because we heard a lot

24   of news which is the -- can I say it -- is the false message

25   and I will make my own judgment to decide if it's correct or

1   not.  But sometimes I'm wrong.

2           THE COURT:  Okay.  You're concern is about the

3   reliability of information on the internet and social media.

4   Will that affect your ability to be fair and impartial in this

5   case and judge this case based on the evidence you see in

6   court and the instructions on the law that you are given by

7   the judge?

8           THE PROSPECTIVE JUROR:  I don't know how to say it,

9   but I will do by best to do -- make my own judgment.  But

10  sometimes I do not realize that the information I got from the

11  other source.

12          THE COURT:  Okay.

13          Have you ever been involved in voter education or

14  voter registration, or any get-out-the-vote efforts?

15          THE PROSPECTIVE JUROR:  Oh, yes, I was in -- you

16  know -- Chinese working over here, they don't know how to

17  speak Chinese -- English, so I be the interpreter for almost

18  four years.

19          THE COURT:  At the polling place itself?

20          THE PROSPECTIVE JUROR:  Yes, in Queens, yes.

21          THE COURT:  Okay.  Do you have any hobbies?  How do

22  you spend your free time?

23          THE PROSPECTIVE JUROR:  My wife say I'm very boring.

24          THE COURT:  What did you say?

25          THE PROSPECTIVE JUROR:  I don't have too many -- I

1   like play the ping-pong, play badminton, and I play the

2   tennis.  But I hardly, didn't know how the pay the music or

3   painting, or -- so I do not have too many hobbies in the

4   house.

5              THE COURT:  Okay.  Do you have any TV shows or radio

6   programs that you regularly watch or listen to?

7              THE PROSPECTIVE JUROR:  Not really.  Only on the

8   1010 WINS when I drive in, I heard the news from 1010 WINS.

9              THE COURT:  1010 WINS?

10             THE PROSPECTIVE JUROR:  Right now, I hardly watch

11  the TV anymore.

12             THE COURT:  Can you be fair and impartial in this

13  case?

14             THE PROSPECTIVE JUROR:  I would say I would do my

15  best.

16             THE COURT:  Is there anything about this case that

17  would cause you favor one side over the other?

18             THE PROSPECTIVE JUROR:  No.

19             THE COURT:  Will you be able to put aside any

20  sympathies or bias you may have for any of the parties in this

21  case and render an impartial verdict based solely on the

22  evidence presented in court and on the law as given to you by

23  Judge Garaufis?

24             THE PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Any follow-up questions for Mr. Tsai?

*Jury Selection*                                                                 615

1            MR. BUFORD:  No, Your Honor.

2            MR. FRISCH:  No, thank you.

3            THE COURT:  Okay, Mr. Tsai, they will take you into

4    the next room and we will get to you shortly.

5            THE PROSPECTIVE JUROR:  All right.  Thank you.

6            (The prospective juror exits.)

7            THE COURT:  Yes, we need four -- actually, we need

8    two, right?  Four would be ideal.

9            (The prospective juror enters.)

10           THE COURT:  Good afternoon, Ms. Costanza.

11           THE PROSPECTIVE JUROR:  Good afternoon.

12           THE COURT:  Marie Costanza, Juror Number 76,

13   answered affirmatively to questions 12, 17, and 19.

14           Don't worry about that, Ms. Costanza.

15           When you were with your other -- the other jurors in

16   the jury room, the ceremonial courtroom, at lunch, leaving the

17   courthouse, did you overhear any of the other jurors talking

18   about the case?

19           THE PROSPECTIVE JUROR:  No.

20           THE COURT:  Did you observe anyone with a laptop

21   computer or tablet that had information about the case on its

22   screen?

23           THE PROSPECTIVE JUROR:  No.

24           THE COURT:  This case has received some degree of

25   media attention.

1          Before today, have you read, heard or seen anything

2    in the media, on the internet or on social media about this

3    case or about the defendant, Douglass Mackey?

4          THE PROSPECTIVE JUROR:  No.

5          THE COURT:  This case involves various individuals,

6    including the defendant, Douglass Mackey, who had strong

7    political preferences during the 2016 Presidential election

8    campaign, including individuals who supported President Donald

9    Trump, and individuals who supported Presidential candidate

10   Hillary Clinton.

11         Do you have strong feelings or opinions related to

12   the 2016 Presidential election campaign or to the two

13   candidates in that campaign, such that it would overcome your

14   duty to judge this case fairly and impartially?

15         THE PROSPECTIVE JUROR:  No.

16         THE COURT:  Do you have any experience with what you

17   perceive to be deliberately false or misleading information on

18   the internet or on social media?

19         THE PROSPECTIVE JUROR:  No.

20         THE COURT:  At trial, you may hear some language

21   that you find to be offensive.  You should not assess that

22   evidence based on whether you find it to be offensive or not,

23   but rather whether that evidence tends to prove or disprove

24   the elements of the crime.

25         If you found some of the evidence to be offensive,

1   would you be able to put aside your feelings about its

2   offensiveness and objectively hear it and impartially render a

3   verdict?

4          THE PROSPECTIVE JUROR:  Yes.

5          THE COURT:  You indicated that served on a jury

6   before?

7          THE PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Can you tell me when that was, what

9   court, what type of case, and whether or not you rendered a

10  verdict?

11         THE PROSPECTIVE JUROR:  It was on the other -- Jay

12  Street, I believe.  It was a long time ago, maybe around 2009

13  and it was an accident case and they settled out of court.

14         THE COURT:  Okay.  That was the only time you served

15  on a jury?

16         THE PROSPECTIVE JUROR:  Yes.  That's it, yes.

17         THE COURT:  You also indicated that have close

18  friends or relatives who are lawyers, work for lawyers, worked

19  for a judge in a courthouse, and you have relationships,

20  family members with law enforcement officers.

21         THE PROSPECTIVE JUROR:  Well, actually FBI agent is

22  my husband's cousin.

23         THE COURT:  Your husband's cousin was an FBI agent?

24         THE PROSPECTIVE JUROR:  Yes.  He's retired.

25         THE COURT:  Was he also a lawyer?

1            THE PROSPECTIVE JUROR:  No.

2            THE COURT:  So there are two different things.

3       When did your husband's cousin retire?

4            THE PROSPECTIVE JUROR:  Maybe a few years back.  I'm

5  not sure.  Maybe about five years, six years.

6            THE COURT:  Would your husband -- the relationship

7  with your husband's cousin affect in any way your ability to

8  be fair and impartial in this case?

9            THE PROSPECTIVE JUROR:  It would not affect my

10  ability, no.

11            THE COURT:  You indicated that you have close

12  friends or relatives who are lawyers or work for lawyers.

13            THE PROSPECTIVE JUROR:  Yes.  My sister-in-law

14  worked for a law firm all her life.

15            THE COURT:  Do you know what law firm?

16            THE PROSPECTIVE JUROR:  Yes.  She worked for a law

17  firm.

18            THE COURT:  Do you know which law firm it was?

19            THE PROSPECTIVE JUROR:  Oh, Chase and Weinstein.

20  Chase down on Court Street.

21            THE COURT:  That's not going to affect your ability

22  to be fair and impartial, would it?

23            THE PROSPECTIVE JUROR:  No.

24            THE COURT:  Okay.

25            And you may have learned something about the law

1  from your husband's cousin or from your girlfriend, but the

2  law in this case is going to come from Judge Garaufis.

3             THE PROSPECTIVE JUROR:  Okay.

4             THE COURT:  He will tell you what the law is.  You

5  can apply that law and you must apply it whether you've

6  learned something different somewhere along the lines.

7             THE PROSPECTIVE JUROR:  Right.

8             THE COURT:  Can you do that?

9             THE PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Okay.  The trial in this case is going

11  to start on the 20th and go until the 31st.  Is there any

12  reason why this would cause you a genuine hardship if you were

13  selected to serve?

14             THE PROSPECTIVE JUROR:  No.

15             THE COURT:  Have you, a family member, or close

16  friend ever been involved in the criminal justice system,

17  meaning ever been charged with a crime, convicted, subject of

18  a criminal investigation, witness to a crime, victim, involved

19  in a grand jury investigation, anything?

20             THE PROSPECTIVE JUROR:  Well, some family members

21  have been incarcerated.

22             THE COURT:  Okay.

23             THE PROSPECTIVE JUROR:  They're all deceased.

24             THE COURT:  Would that affect your ability to be

25  fair and impartial in this case?

1          THE PROSPECTIVE JUROR:  No, it wouldn't affect, no.

2          THE COURT:  Have you, a family member, or close

3   friend ever been a party to a legal action against the United

4   States or had a dispute with the United States or any of its

5   agencies or employees?

6          THE PROSPECTIVE JUROR:  No.

7          THE COURT:  You live, Ms. Costanza in Brooklyn?

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  How long?

10          THE PROSPECTIVE JUROR:  All my life.

11          THE COURT:  Do you own or do you rent your home?

12          THE PROSPECTIVE JUROR:  Own.

13          THE COURT:  And you live with your husband?

14          THE PROSPECTIVE JUROR:  Yes.

15          THE COURT:  What does your husband -- what did he

16   do, or what does he do?

17          THE PROSPECTIVE JUROR:  Court clerk.  360 Adams

18   Street.

19          THE COURT:  He was a court clerk?

20          THE PROSPECTIVE JUROR:  Yes.

21          THE COURT:  In the clerk's office?

22          THE PROSPECTIVE JUROR:  Yes.  Clerk's office, yes.

23          THE COURT:  You have kids?

24          THE PROSPECTIVE JUROR:  I have one child.

25          THE COURT:  Grown?

1            THE PROSPECTIVE JUROR:  Yes.

2            THE COURT:  What does he or she do for a living?

3            THE PROSPECTIVE JUROR:  She's unemployed right now.

4    She's 35.

5            THE COURT:  What is the highest level of education

6    you received?

7            THE PROSPECTIVE JUROR:  High school.

8            THE COURT:  What do you do for a living?

9            THE PROSPECTIVE JUROR:  I'm home.  I take care -- I

10   take care of my sister-in-law who has COPD now, and I'm

11   basically a homemaker, caretaker.

12           THE COURT:  Have you ever served in the military?

13           THE PROSPECTIVE JUROR:  No.

14           THE COURT:  Where do you get your news from;

15   newspapers, radio, TV, internet, social media, podcast --

16           THE PROSPECTIVE JUROR:  I like the radio.

17           THE COURT:  What?

18           THE PROSPECTIVE JUROR:  I listen to 1010.

19           THE COURT:  1010 WINS?

20           THE PROSPECTIVE JUROR:  Yes.  That's what I

21   basically listen to.

22           THE COURT:  Do you use the internet or social media?

23           THE PROSPECTIVE JUROR:  Yes.

24           THE COURT:  What social media platforms do you use?

25           THE PROSPECTIVE JUROR:  Just Facebook.

1          THE COURT:  And what about the internet?  What

2     internet sources or platforms do you use?

3          THE PROSPECTIVE JUROR:  I don't really -- I just go

4     on Facebook really.  I don't have the time to go on the

5     internet.

6          THE COURT:  Are you concerned at all about the

7     reliability of information that you find on the internet or on

8     social media?

9          THE PROSPECTIVE JUROR:  It doesn't affect me one

10    way, you know.

11         THE COURT:  All right.  Have you ever been involved

12    in voter education, or voter registration, or any

13    get-out-the-vote efforts?

14         THE PROSPECTIVE JUROR:  No.

15         THE COURT:  Do you have any hobbies?

16         THE PROSPECTIVE JUROR:  Yes.

17         THE COURT:  How do you spend your leisure time?

18    What are your hobbies?

19         THE PROSPECTIVE JUROR:  I knit, I crochet, I craft.

20    I use a lot with my hands.  Sew -- a lot of good old knitting

21    and --

22         THE COURT:  Okay.

23         THE PROSPECTIVE JUROR:  Yeah, that's what I like to

24    do.

25         THE COURT:  Are there any TV shows or radio programs

1   that you regularly watch or listen to other than 1010 WINS?

2           THE PROSPECTIVE JUROR:  I like the ID channel, I

3   like that.

4           THE COURT:  The ID channel?

5           THE PROSPECTIVE JUROR:  Yes, the ID channel with all

6   the shows.

7           THE COURT:  Can you be fair and impartial in this

8   case?

9           THE PROSPECTIVE JUROR:  Yes.

10           THE COURT:  Is there anything about this case that

11   would cause you to favor one side over the other?

12           THE PROSPECTIVE JUROR:  No.

13           THE COURT:  Will you be able to set aside any

14   sympathies or biases you may have for any of the parties in

15   this case and render an impartial verdict based solely on the

16   evidence presented in court and the law as given to you by

17   Judge Garaufis?

18           THE PROSPECTIVE JUROR:  Yes.

19           THE COURT:  Do we have any follow-up questions for

20   Ms. Costanza?

21           MR. BUFORD:  No, Your Honor.

22           MR. FRISCH:  No, Your Honor.

23           THE COURT:  Thank you, Ms. Costanza.  They are going

24   to take you into the next room and we will be with you

25   shortly?

1          THE PROSPECTIVE JUROR:  Okay.  Thank you.

2          (The prospective juror exits.)

3          (The prospective juror enters.)

4          THE COURT:  Good afternoon, Ms. Rivera?

5          THE PROSPECTIVE JUROR:  Good afternoon.

6          THE COURT:  Ms. Rivera, from Monday through today

7    when you were in the central jury room or the ceremonial

8    courtroom, or at lunch, or outside with your fellow jurors,

9    did you ever hear anyone talk about the facts of this case?

10         THE PROSPECTIVE JUROR:  No.

11         THE COURT:  Did you ever see any of the other jurors

12   with a laptop computer or a tablet device with information

13   about this case or reports about this case on the screen?

14         THE PROSPECTIVE JUROR:  No.

15         THE COURT:  This case has received some degree of

16   media attention.

17         Before today, have you read, heard, or seen anything

18   in the media, on the internet, or on social media about this

19   case or about the defendant, Douglass Mackey?

20         THE PROSPECTIVE JUROR:  No.

21         THE COURT:  This case involves various individuals,

22   including the defendant, Douglass Mackey, who had strong

23   political preferences during the 2016 Presidential election

24   campaign, including individuals who supported President Donald

25   Trump, and individuals who supported Presidential candidate

1    Hillary Clinton.

2              Do you have strong feelings or opinions related to

3    the 2016 Presidential election campaign, or to the two

4    candidates in that campaign, such that it would overcome your

5    duty to judge this case fairly and impartially?

6              THE PROSPECTIVE JUROR:  Honestly speaking, I really

7    don't get into politics.  It's been -- the last time I voted

8    was with Obama.  I -- at this present moment, sorry to say, I

9    mean, I have a lot going on that I could care less.

10             THE COURT:  Okay.  That's fine.

11             THE PROSPECTIVE JUROR:  Yeah.

12             THE COURT:  That's your right as an American

13   citizen --

14             THE PROSPECTIVE JUROR:  Yes.

15             THE COURT:  -- to not care less.

16             THE PROSPECTIVE JUROR:  I could care less what's

17   going on.

18             THE COURT:  All right.  That's fine.

19             Do you have any experience with what you perceive to

20   be deliberately false or misleading information on the

21   internet or on social media?

22             THE PROSPECTIVE JUROR:  Repeat that question.

23             THE COURT:  I will.

24             Do you have any experience with what you perceived

25   to be deliberately false or misleading information on the

1    internet or on social media?

2            THE PROSPECTIVE JUROR:  Social media, I mean, you

3    know, everything is a facade.  I would say they only show you

4    what you want you to see.  You don't know what goes on behind

5    closed doors.

6            THE COURT:  Would your experiences with anything you

7    may have perceived to be false or misleading on social media

8    affect your ability to be fair and impartial in this case and

9    judge this case solely on the evidence presented in court and

10   on the law as given to you by Judge Garaufis?

11           In other words, can you judge this case fairly and

12   impartially based on what happens in court and the evidence

13   that's received in court, not something you thought was false

14   or misleading on the internet or on social media outside of

15   the Court, just what happens in court?

16           THE PROSPECTIVE JUROR:  Only what happens in court?

17   I mean, they only going to tell you what they want you to

18   know, right?

19           THE COURT:  No.  The Government has the burden in

20   this case to prove it beyond a reasonable doubt.  They have to

21   give you the evidence that satisfies you beyond a reasonable

22   doubt that Mr. Mackey is guilty.  And if they don't, then you

23   can return a verdict of not guilty because the Government

24   didn't satisfy its burden of proof.

25           But if the Government gives you evidence that

1   satisfies you beyond a reasonable doubt that Mr. Mackey is

2   guilty, based on the law that Judge Garaufis tells you, you're

3   duty-bound to render a guilty verdict.

4           So the question is:  Can you satisfy that obligation

5   as a juror and look at the evidence presented in court by the

6   Government, hold them to their burden of proof, to prove

7   beyond a reasonable doubt, that Mr. Mackey is guilty of this

8   crime?  And if they satisfy that burden of proof, can you

9   render a guilty verdict?  And if they fail to satisfy that

10  burden of proof, can you render a not guilty verdict?

11          THE PROSPECTIVE JUROR:  At this present moment, no,

12  I can't -- my mind is elsewhere.  I have -- like I said, I

13  have a lot going on.

14          THE COURT:  Any objection to excusing Ms. Rivera?

15          MR. BUFORD:  No, Your Honor.

16          MR. FRISCH:  No, Your Honor.

17          THE COURT:  Okay.  Ms. Rivera, we will excuse you

18  from serving on this jury.

19          THE PROSPECTIVE JUROR:  Excuse me.  I'm in mourning.

20  I lost my sister-in-law.  It makes two years I lost my

21  grandson in a driving accident.  You know, I get a text from

22  my son that he's going through a lot, so, you know, I am the

23  mother, I am the head of household and I have -- there's

24  things that I need to take care of.

25          THE COURT:  I'm sorry to hear that, Ms. Rivera, but

1    we are excusing you from serving on this jury, so you can go

2    to the central jury room and you can go take care of your

3    family.

4                THE PROSPECTIVE JUROR:  Thank you.

5                (The prospective juror is excused.)

6                THE COURT:  Juror Number 78, Nicole Butterfield,

7    answered affirmatively to questions 15 and 17.

8                (The prospective juror enters.)

9                THE COURT:  Good afternoon, Ms. Butterfield.

10                THE PROSPECTIVE JUROR:  Good afternoon.

11                THE COURT:  Ms. Butterfield, during your service

12    thus far, in your interactions with your fellow jurors,

13    whether they were in the various courtrooms, cafeteria,

14    outside of court, what have you, have you ever heard any of

15    them discussing this case, the facts of this case?

16                THE PROSPECTIVE JUROR:  No, I have not.

17                THE COURT:  Have you ever seen any of them with a

18    laptop computer, or a tablet, or some sort of internet device

19    with information about the case, articles about the case on

20    the screen?

21                THE PROSPECTIVE JUROR:  No.  No, I haven't.

22                THE COURT:  Now, this case has received some degree

23    of media attention.  Before today, have you read, heard, or

24    seen anything in the media, on the internet, or on social

25    media about this case or about the defendant, Douglass Mackey?

1          THE PROSPECTIVE JUROR:  No, I haven't.

2          THE COURT:  This case involves various individuals,

3    including the defendant, Douglass Mackey, who had strong

4    political preferences during the 2016 Presidential election

5    campaign, including individuals who supported President Donald

6    Trump and individuals who supported Presidential candidate

7    Hillary Clinton.

8          Do you have strong feelings or opinions related to

9    the 2016 Presidential election campaign or to the two

10   candidates in that campaign such that it would overcome your

11   duty to judge this case fairly and impartially?

12         THE PROSPECTIVE JUROR:  I don't think so.

13         THE COURT:  Do you have any experience with what you

14   perceived to be deliberately false or misleading information

15   on the internet or on social media?

16         THE PROSPECTIVE JUROR:  Have I had any experience

17   with it?

18         THE COURT:  Have you seen anything that you thought

19   to yourself:  That's deliberately false and misleading.

20         Whether it's on the internets or social media,

21   anything that comes to mind.

22         THE PROSPECTIVE JUROR:  I've certainly come across

23   misinformation online, yeah.

24         THE COURT:  Okay.  Would your experiences with such

25   information affect your ability to be a fair and impartial

1    juror in this case knowing that you can only judge this case

2    based on the evidence that's presented in court and the law as

3    given to you by Judge Garaufis?

4              THE PROSPECTIVE JUROR:  Right.  I don't think so.

5              THE COURT:  At trial, you may hear some language

6    that you may find to be offensive.  You should not assess that

7    evidence based on whether or not you find it offensive, but,

8    rather, based on whether the evidence tends to prove or

9    disprove the elements of the crime.  If you found some of the

10   evidence offensive, would you be able to set aside your

11   feelings about its offensiveness and objectively consider it

12   and render an impartial and fair verdict?

13             THE PROSPECTIVE JUROR:  I think so.

14             THE COURT:  You indicated on Monday in the

15   ceremonial courtroom, if I'm correct, you have a background

16   in, or taken courses in the law, and that you have close

17   friends or relatives who are lawyers, or work for lawyers, or

18   work for a judge, or in the courthouse.

19             Can you tell me about both of those things?

20             THE PROSPECTIVE JUROR:  Sure.

21             So during my PhD, I took some courses on feminist

22   law and -- or feminist legal theory and comparative

23   constitutional law.  I have my PhD in Hungary, so it was

24   comparative across nations and so on, obviously.

25             And then in terms of close friends, one of my

1    childhood friends is a tax attorney, so...

2           THE COURT:  I'm sure this case will not involve

3    feminist legal theory, comparative constitutional law, or tax

4    law -- fairly confident about that.

5           Nevertheless, should you have learned -- if you

6    learned anything about the law that may conflict with what

7    Judge Garaufis instructs you the law is for this case, as a

8    juror, you have to put aside what you learned, and the law is

9    what Judge Garaufis says it is, and you have to apply that.

10          Can you do that?

11          THE PROSPECTIVE JUROR:  Yeah, I think so.  I mean,

12   there's a difference between advocating and learning about

13   different ways of, you know -- advocating for law and changes

14   and so on, and then what the law is and, you know, carrying it

15   out.

16          THE COURT:  So the trial is going to start on Monday

17   the 20th and go to March 31st, at the very latest.

18          Is there any reason why serving on this jury for

19   that period of time would cause you a genuine hardship?

20          THE PROSPECTIVE JUROR:  I don't think so.

21          THE COURT:  Have you, a family member, or close

22   friend, ever been involved in the criminal justice system?

23   And by that I mean been accused of committing a crime, charged

24   with a crime, convicted, been the subject of a criminal

25   investigation, witness to a crime, victim of a crime, or

1    involved in grand jury investigation in any way?

2              THE PROSPECTIVE JUROR:  I don't think so.

3              THE COURT:  Have you, a family member, or close

4    friend ever been a party to a legal action against, or had a

5    dispute with, the United States of America or any of its

6    agencies or employees?

7              THE PROSPECTIVE JUROR:  No.

8              (Continued on the followin

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Jury Selection*                                                633

1              (Continued.)

2              THE COURT:  You live in Astoria.

3              THE PROSPECTIVE JUROR:  That's right.

4              THE COURT:  How long have you lived there?

5              THE PROSPECTIVE JUROR:  More than thee years now.

6              THE COURT:  Do you own or do you rent?

7              THE PROSPECTIVE JUROR:  Rent.

8              THE COURT:  And do you live with anyone?

9              THE PROSPECTIVE JUROR:  My wife.

10             THE COURT:  What does your wife do for a living?

11             THE PROSPECTIVE JUROR:  She's a graduate student

12    in the New School.

13             THE COURT:  Do you have any children?

14             THE PROSPECTIVE JUROR:  No.

15             THE COURT:  What do you do for a living?

16             THE PROSPECTIVE JUROR:  I'm an editor for the

17    O'Reilly Media.  It's a technical publisher.

18             THE COURT:  And you referenced studying for your

19    Ph.D.  Did you complete that?

20             THE PROSPECTIVE JUROR:  Yes, I did.

21             THE COURT:  Okay.  So that's your highest level

22    not that there's --

23             THE PROSPECTIVE JUROR:  That's right.

24             THE COURT:  -- much higher than that.

25             THE PROSPECTIVE JUROR:  I have my Ph.D.

1            THE COURT:  Have you ever served in the military?

2            THE PROSPECTIVE JUROR:  I have not.

3            THE COURT:  Where do you get your news from?

4    Newspapers, radio, TV, internet, social media, podcasts, you

5    tell me.

6            THE PROSPECTIVE JUROR:  All of that.  Newspapers

7    on a pretty daily basis, some podcasts.

8            THE COURT:  What newspapers?

9            THE PROSPECTIVE JUROR:  The Washington Post, New

10   York Times, and then I have recently -- there's a new app

11   that I'm using that's giving me all kinds of different news,

12   credible -- I think -- news sources.

13           THE COURT:  And that's on your phone?

14           THE PROSPECTIVE JUROR:  Yeah, that's right.

15           THE COURT:  Podcasts.  Any ones in particular?

16           THE PROSPECTIVE JUROR:  Occasionally,

17   Pod Save America and, you know, the Brian Lehrer Show and

18   some I don't know random technical related AI-related,

19   artificial -- machine-learning-related podcasts, that's what

20   my work is related to.

21           THE COURT:  You use the internet and social media?

22           THE PROSPECTIVE JUROR:  I do.

23           THE COURT:  What social media platforms do you

24   use?

25           THE PROSPECTIVE JUROR:  Facebook less and less,

1  Instagram, and, yeah, I guess that's pretty much it.

2  Twitter, I use it less and less.  I use Twitter.

3          THE COURT:  Okay.  Are you concerned at all about

4  the reliability of information that you find on the internet

5  and social media?

6          THE PROSPECTIVE JUROR:  I am sometimes.  I mean,

7  I'm researcher in my background, so I check my sources and

8  it is an issue, yeah.

9          THE COURT:  Would that concern affect your ability

10 to be fair and impartial in this case understanding that the

11 evidence in this case that you have to draw your conclusion

12 from is presented in court.  It's not something you perceive

13 to be fake or misleading, it's something you saw previously.

14          Can you be fair and impartial notwithstanding the

15 fact that you have some concerns about the reliability of

16 what you see on the internet and social media.

17          THE PROSPECTIVE JUROR:  I would say I think so,

18 yeah.

19          THE COURT:  Have you ever been involved in voter

20 education, voter registration or any get out the vote

21 efforts?

22          THE PROSPECTIVE JUROR:  I have been involved in

23 getting out the vote.

24          THE COURT:  In what way.

25          THE PROSPECTIVE JUROR:  Through a campaign.

1           THE COURT:  You've worked on campaigns for

2    individual candidates and things?

3           THE PROSPECTIVE JUROR:  Right.  Here in New York,

4    in Astoria, for Alexandra Ocascio-Cortez.  I worked for her

5    campaign.

6           THE COURT:  Other than that, anything?

7           THE PROSPECTIVE JUROR:  No, that's pretty much it.

8           THE COURT:  Do you have any hobbies?  How do you

9    spend your free time?

10          THE PROSPECTIVE JUROR:  I walk my dog, I was

11   running until recently.  I go swimming, do yoga, I travel

12   when I can.  I like to travel.

13          THE COURT:  Are there any television shows or

14   radio programs that you are regularly watching or listening

15   to?

16          THE PROSPECTIVE JUROR:  I mean, these days,

17   because it changes with what's on.  What am I watching?

18   "Abbott Elementary," "The Last of Us."  I don't know, just,

19   yeah, whatever is recent.  It changes over time, so those

20   are a few that come to mind.

21          THE COURT:  Can you be fair and impartial in this

22   case?

23          THE PROSPECTIVE JUROR:  I think so.

24          THE COURT:  Is there anything about this case that

25   would cause you to favor one side over the other?

1              THE PROSPECTIVE JUROR:  You could argue with

2    certain experience, certain political views that I could,

3    but I also like to believe that I would listen to the

4    evidence and make a decision based on the evidence itself,

5    so...

6              THE COURT:  Will you be able to set aside any

7    sympathies or biases you may have for any of the parties in

8    this case and render an impartial verdict based solely on

9    the evidence presented in court and the law as given to you

10   by Judge Garaufis?

11             THE PROSPECTIVE JUROR:  I would do my best to,

12   yes.

13             THE COURT:  Any follow-up for Ms. Butterfield?

14             MR. BUFORD:  No, Your Honor.

15             MR. FRISCH:  No, Judge.  Thank you.

16             THE COURT:  Ms. Butterfield, Chloe is going to

17   escort you into courtroom 2F and we will be with you

18   momentarily.

19             (The prospective juror exits from the courtroom.)

20             THE COURT:  That's 36.

21             MR. BUFORD:  We got 36, too, your Honor.

22             THE COURT:  Bare minimum.

23             MR. PAULSEN:  I think you said you wanted to talk

24   to the people who were cleared earlier.

25             THE COURT:  I will talk to them, that's fine.  I

*Jury Selection*                                                638

1   don't want to do it individually, though, because that will

2   take too much time.  I will do it collectively and those who

3   have already heard this will just have to hear it again.

4        My question is:  Are you prepared to exercise your

5   peremptories?  You probably need a little time to think it

6   through, but are you prepared to do it now or do you want to

7   get more people?

8        MR. FRISCH:  My thinking is with at least one

9   juror having to go, your Honor having to speak to them, we

10  should just get everyone one.  At least 38 of the 40 and

11  then just do it.  That would be a preference.

12       My thinking is that we should just, we should get

13  through this process and get it done because it's time

14  consuming and get the peremptories.  How much many you're

15  going to go through whether you're going to go to 38 or 40

16  we should just get that done.

17       THE COURT:  We could.  Do we have 36 now and that

18  would be enough and that would get us 12 and 4 alternates.

19  But we would have jurors, juror number one and I forget the

20  other juror I forget her name, miss -- yes, Ms. Murphy,

21  No. 65, or we if and try to get two more and then we can

22  excuse them and then we'd have 36 and we can do our

23  peremptories then.

24       LAW CLERK:  It would be 38.

25       THE COURT:  It would be 36, we get rid of 1 and

1    65.   Look, neither of them want to be on this jury and that

2    would mean you would -- if you don't want them on this jury,

3    you would have to use your peremptories on them and I don't

4    like forcing people's hand, so you tell me what you want to

5    do.

6              MR. PAULSEN:  Your Honor, my only question was

7    whether you thought that as a result of reinterviewing the

8    people who may have heard others talking about it whether

9    that's going to change our numbers in any way.

10             THE COURT:  I don't think it will but I will do

11   that.  If it doesn't, I don't want to have to then come back

12   here and then question more jurors to replace those two.

13             MR. BUFORD:  Your Honor, we have to get two more

14   jurors to qualify two more to get to 38.

15             MR. FRISCH:  I agree with that.

16             THE COURT:  All right.  Bring the next one in.

17   Ms. Rebecca Benghiat, Juror No. 79.

18             (Prospective Juror No. 79 enters the courtroom.)

19             THE COURT:  Chloe, could you come here, please.

20             (A brief pause in the proceedings was held.)

21             THE COURT:  How do you pronounce your name?

22             THE PROSPECTIVE JUROR:  Benghiat.

23             THE COURT:  I was very close.

24             Ms. Benghiat, during your service as a juror in

25   whatever room you were in with your other jurors or outside

1   the courthouse or whatever, did you ever hear any of them

2   discussing this case the facts of this case.

3           THE PROSPECTIVE JUROR:  I did not.

4           THE COURT:  You seen any of your colleagues with a

5   laptop computer or a tablet with information or articles

6   about the case on the screen?

7           THE PROSPECTIVE JUROR:  I have not.

8           THE COURT:  I have a number of questions that I

9   want to ask you, but your responses to some of the questions

10  makes me want to bring them up front.

11          You indicated that you heard or read something

12  about this case before jury selection?

13          THE PROSPECTIVE JUROR:  Correct.

14          THE COURT:  Can you tell me about that, please.

15          THE PROSPECTIVE JUROR:  I believe I remembered the

16  indictment about a year ago.

17          THE COURT:  Do you remember where you saw that?

18          THE PROSPECTIVE JUROR:  I don't remember where I

19  saw it.  It could have been related to work in some sort of

20  circulated news announcement.

21          THE COURT:  Okay.  What is your work?

22          THE PROSPECTIVE JUROR:  So I'm an attorney but I

23  also am the president of a suicide prevention nonprofit.

24          THE COURT:  Okay.  Other than that time, was there

25  any other time that you saw anything about this case or

*Jury Selection*                                                    641

1    Mr. Mackey, the defendant, on the internet, media, social

2    media?

3              THE PROSPECTIVE JUROR:  No.

4              THE COURT:  Did you draw any conclusions from

5    seeing that the indictment had been issued from reading that

6    article about whether Mr. Mackey is guilty or not guilty of

7    these charges?

8              THE PROSPECTIVE JUROR:  No.

9              THE COURT:  You also indicated -- I read a list of

10   names and you indicated that some of them, or one of them,

11   or whatever were familiar to you.

12             Was it the name Ricky Vaughn?

13             THE PROSPECTIVE JUROR:  Yes, it was.

14             THE COURT:  From which you --

15             THE PROSPECTIVE JUROR:  From the indictment.

16             THE COURT:  From the indictment, okay.  No one

17   else?

18             THE PROSPECTIVE JUROR:  Correct.

19             THE COURT:  This case involves various individuals

20   including the defendant Douglas Mackey who had strong

21   political preferences during the 2016 presidential election

22   campaign including individuals who supported President

23   Donald Trump and individuals who supported presidential

24   candidate Hillary Clinton.

25             Do you have strong feelings or opinions related to

*Jury Selection* 642

1    the 2016 presidential election campaign or to the two

2    candidates in that campaign such that it would overcome your

3    duty to judge this case fairly and impartially?

4              THE PROSPECTIVE JUROR:  No.

5              THE COURT:  Do you have any experience with what

6    you perceived to be deliberately false or misleading

7    information on the internet or on social media?

8              THE PROSPECTIVE JUROR:  So a portion of the work

9    that I oversee at our nonprofit is related to cyber bullying

10   so there's some relationship there.  There is a vertical of

11   work that we do that's associated.

12             THE COURT:  Would your experiences through your

13   work or experiences seeing what you perceive to be false or

14   misleading information on the internet, affect your ability

15   to be fair and impartial in this case?

16             In other words, can you judge this case based on

17   the evidence presented in court and the law as given to you

18   by Judge Garaufis?

19             THE PROSPECTIVE JUROR:  Yes.

20             THE COURT:  At trial, you may hear some evidence

21   or some language that you find to be offensive.  You

22   shouldn't assess the evidence you hear based on whether you

23   find it to be offensive or not, but rather whether that

24   evidence tends to prove or disprove the elements of crime.

25             If you find some of the evidence to be offensive,

*Jury Selection*                                                  643

1   would you be able to set aside those feelings and

2   objectively listen to the evidence and fairly and

3   impartially render a verdict?

4           THE PROSPECTIVE JUROR:  Yes.

5           THE COURT:  The trial is going to start on Monday

6   the 20th and go to the 31st of March at the latest.  It's

7   probably going to end sooner that that, but is there any

8   reason why serving on the jury would cause you a genuine

9   hardship?

10          THE PROSPECTIVE JUROR:  No.

11          THE COURT:  Have you, a family member, or close

12  friend ever been involved in the criminal justice system?

13          And by that, I mean charged with a crime,

14  convicted of a crime, been the subject of a criminal

15  investigation, witness to a crime, witness in a grand jury

16  investigation, questioned by law enforcement, or victim of a

17  crime?

18          THE PROSPECTIVE JUROR:  Once questioned by the FBI

19  after an incident on an international flight but that's it.

20          THE COURT:  Okay.  Is there anything about that

21  experience that would affect your ability to be fair and

22  impartial?

23          THE PROSPECTIVE JUROR:  No.

24          THE COURT:  Have you, a family member, or close

25  friend ever been party to a legal action or dispute against

1    the United States or any of its agencies or employees?

2              THE PROSPECTIVE JUROR:  No.

3              THE COURT:  You live in Brooklyn?

4              THE PROSPECTIVE JUROR:  Correct.

5              THE COURT:  How long have you lived in Brooklyn?

6              THE PROSPECTIVE JUROR:  I lived in Brooklyn since

7    2013.

8              THE COURT:  Do you own or do you rent your home?

9              THE PROSPECTIVE JUROR:  I own.

10             THE COURT:  Do you live with anyone?

11             THE PROSPECTIVE JUROR:  I live two people.

12             THE COURT:  What are their occupations?

13             THE PROSPECTIVE JUROR:  My husband is an

14   artist-designer and I also live with our daughter, teenager.

15             THE COURT:  And tell me what you do for a living?

16             THE PROSPECTIVE JUROR:  So I'm the president of

17   the Jed Foundation which is a national youth suicide

18   prevention organization.  We focus on suicide prevention,

19   mental health, cyber bullying, and school systems.

20             THE COURT:  And you're the executive director?

21             THE PROSPECTIVE JUROR:  Yeah, it's a -- yes.

22             THE COURT:  And you have a J.D.?

23             THE PROSPECTIVE JUROR:  Correct.

24             THE COURT:  Did you work as a -- does your work

25   that you do now involve, I'm sure it involves the law, but

1   you being a lawyer?

2          THE PROSPECTIVE JUROR:  No.  I maintain my

3   license, but no.

4          THE COURT:  Did you ever practice law at a firm or

5   anything like that?

6          THE PROSPECTIVE JUROR:  No, not after graduation.

7          THE COURT:  Okay.  Ever serve in the military?

8          THE PROSPECTIVE JUROR:  No.

9          THE COURT:  Where do you get your news from?

10  Newspapers, radio, TV, internet, social media, podcasts,

11  other sources?

12         THE PROSPECTIVE JUROR:  Not social media,

13  typically; not podcasts, typically.  Generally, radio,

14  online, and newspaper.

15         THE COURT.  What newspapers.

16         THE PROSPECTIVE JUROR:  Generally the New York

17  Times, sometimes the Washington Post.

18         THE COURT:  What podcasts?

19         THE PROSPECTIVE JUROR:  No podcasts.

20         THE COURT:  You said no podcasts, I'm sorry.

21         What radio?

22         THE PROSPECTIVE JUROR:  NPR.

23         THE COURT:  On the internet, any particular

24  internet sources?

25         THE PROSPECTIVE JUROR:  CNN.  Typically, New York

1    Times.  Sometimes Apple News.

2              THE COURT:  And do you use the social media at

3    all?

4              THE PROSPECTIVE JUROR:  I have public personas

5    through my work but I don't use it personally.

6              THE COURT:  Are you concerned about the

7    reliability of information that you find on the internet and

8    social media?

9              THE PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Will that concern affect your ability

11   to be fair and impartial in this case, again, knowing that

12   you have to judge this case based on the evidence presented

13   in court and not on anything else?

14             THE PROSPECTIVE JUROR:  No, it wouldn't affect my

15   ability.

16             THE COURT:  Have you ever been involved in voter

17   education, voter registration, or any get out the vote

18   efforts?

19             THE PROSPECTIVE JUROR:  Voter registration and get

20   out the vote.

21             THE COURT:  Tell me about that, please.

22             THE PROSPECTIVE JUROR:  Voter registration, pretty

23   much every voting cycle in Brooklyn, so I help canvass.  And

24   voter get out the vote, in the last three or four

25   presidential elections, I've done phone banking.

*Jury Selection*                                              647

1        THE COURT:  Do you have any hobbies?  How do you

2    spend your free time?

3        THE PROSPECTIVE JUROR:  I work 80-plus hours a

4    week, I have very little extra free time.

5        THE COURT:  Can you be fair and impartial in this

6    case?

7        THE PROSPECTIVE JUROR:  Yes.

8        THE COURT:  Is there anything about this case that

9    would cause you to favor one side over the other?

10       THE PROSPECTIVE JUROR:  I spend a lot of time

11   professionally understanding and staying abreast of social

12   media and impacts on mental health, influences on youth,

13   attitudes, behaviors, and emerging technologies.  So I have,

14   I would say, a stronger knowledge base than typical.

15       THE COURT:  And would that cause you to favor the

16   Government over Mr. Mackey, or Mr. Mackey over the

17   Government, or not?

18       THE PROSPECTIVE JUROR:  No.

19       THE COURT:  Are you able to set aside any

20   sympathies or biases you may have for any of the parties in

21   this case and render an impartial verdict based solely on

22   the evidence presented in court and on the law as given to

23   you by Judge Garaufis?

24       THE PROSPECTIVE JUROR:  Yes.

25       THE COURT:  I just want to be sure that I followed

1    up on all of the questions that you raised your number to.

2              Do you have a background or taken courses in the

3    law?

4              Worked for an attorney or law firm or judge in a

5    courthouse?

6              Close friends or relatives who are lawyers, work

7    for lawyers, worked for a judge or in a courthouse?

8              Is there anything along those lines that you

9    didn't tell me about?

10             THE PROSPECTIVE JUROR:  No.

11             THE COURT:  Okay.  Any follow-up questions?

12             MR. FRISCH:  Your Honor, I have one question, I

13   don't think it's controversial.

14             Can I pose it in open court?

15             THE COURT:  Sure.

16             MR. FRISCH:  If you can ask the prospective juror,

17   given the scope of knowledge she has about social media and

18   cyber bullying and things of that nature, if she can put

19   that knowledge aside if she's on the jury and focus and

20   decide the evidence based on the everyday that she sees at

21   the trial.

22             THE COURT:  And the law as given to you by Judge

23   Garaufis?

24             MR. FRISCH:  Yes.

25             THE PROSPECTIVE JUROR:  Yes.

*Jury Selection*                                                     649

1              THE COURT:  Okay.

2              MR. FRISCH:  Thank you, Judge.

3              THE COURT:  Thank you.

4              Ms. Benghiat, I believe Chloe will take you into

5       the next room.  We have hopefully one more person to get

6       through and then I'll take a little break and then we'll

7       exercise our peremptory challenges and the jury will be

8       picked so I'm hoping by 4:30.

9              THE PROSPECTIVE JUROR:  Thank you.

10             (The prospective juror exits from the courtroom.)

11             (Prospective Juror No. 80 enters the courtroom.)

12             THE COURT:  Good afternoon Alon Hillel-Tuch.

13             THE PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Juror No. 80.  How are you doing?

15             THE PROSPECTIVE JUROR:  Good.  How about you guys?

16             THE COURT:  We're okay.  At least I'm okay.  I

17      won't speak for anyone else.

18             Mr. Hillel-Tuch, during your service as a

19      prospective juror, in any of the rooms into you were in,

20      lunch breaks, or leaving the courthouse, did you overhear

21      any of the other jurors discussing the facts of this case?

22             THE PROSPECTIVE JUROR:  Not the facts of the case,

23      but some jurors indicated they might have bias one way or

24      another.  So nothing about what was divulged, just that they

25      might already have opinions.

1          THE COURT:  Okay.  Did you hear what their

2     opinions were?

3          THE PROSPECTIVE JUROR:  No, I wasn't part of the

4     conversation.  I tried to stay out of it.

5          THE COURT:  What did you hear?  Does it affect

6     your ability to be fair and impartial in this case?

7          THE PROSPECTIVE JUROR:  No.

8          THE COURT:  Have you made any -- come to any

9     conclusions about anything based on what you've heard,

10    whether from me or from your other jurors about this case?

11         THE PROSPECTIVE JUROR:  No.

12         THE COURT:  Have you seen any of the other jurors

13    with laptop computers or computer tablets with information

14    about the case or articles about the case on them?

15         THE PROSPECTIVE JUROR:  No.  I only know of two

16    people who had a tablet and they were in the room there.

17         THE COURT:  This case received some degree of

18    media attention.  Before today, have you read, heard, or

19    seen anything in the media, on the internet, or on social

20    media about this case or about the defendant Douglas Mackey,

21    otherwise known as Ricky Vaughn.

22         THE PROSPECTIVE JUROR:  No.

23         THE COURT:  This case involves various individuals

24    who, including the defendant, Douglas Mackey, who had strong

25    preliminary preferences during the 2016 presidential

1   election campaign including individuals who supported

2   President Donald Trump and individuals who supported

3   presidential candidate Hillary Clinton.

4           Do you have strong feelings or opinions related to

5   the 2016 presidential election campaign or to the two

6   candidates in that campaign such that it would overcome your

7   duty to judge this case fairly and impartially?

8           THE PROSPECTIVE JUROR:  No.  I mean I made a

9   voting decision but that doesn't affect my opinion on the

10  case.

11          (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Continued.)

2              THE COURT:  Do you have any experience with what

3    you perceived to be deliberately false or misleading

4    information on the internet or on social media?

5              THE PROSPECTIVE JUROR:  In what context?

6              THE COURT:  Did you ever coma come across anything

7    on the internet or social media that you thought to yourself

8    was deliberately false or misleading?

9              THE PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Knowing that this case is to be judged

11   by the evidence presented in court and not on anything else

12   that happens outside of the courtroom, would your

13   experiences with such information that you found that you

14   thought was false or misleading, deliberately so, would that

15   affect your ability to be fair and impartial in this case?

16             THE PROSPECTIVE JUROR:  No.  And with context,

17   academically my first masters was in conflict resolution,

18   focusing on information, dissemination, and things of that

19   nature.  And right now I'm completing a second masters in

20   cyber security, which might be relevant.

21             THE COURT:  Okay.

22             You will be asked as a juror to deliberate on a

23   verdict, and in doing so, assess the evidence presented by

24   the Government, and should Mr. Mackey put on a case, his

25   evidence as well.  He's not required to put on a case, as I

1   told you in the beginning.  You have to assess that evidence

2   and that evidence alone and apply the facts as you find them

3   to be to the law as given to you by Judge Garaufis.  I don't

4   know if you've -- I know you've answered some of these

5   questions that you do have some experience in law.

6           THE PROSPECTIVE JUROR:  I answered yes because I

7   was paid but, 20 years ago I worked at Kirkland and Ellis

8   over the summer as a kid at minimum wage, but I was paid.

9   So that should count for something.

10          THE COURT:  I don't know if your education to date

11  has any legal components to it or anything that would be

12  covered by this case.

13          THE PROSPECTIVE JUROR:  It's an emerging field.  I

14  have exposure to mediation, but not in the context of court.

15          THE COURT:  Okay, we'll put that aside for now.

16          At trial, you may hear some language that you may

17  find to be offensive.  You should not assess that evidence

18  based on whether you find it to be offensive or not.  But

19  rather, based on whether it tends to prove or disprove the

20  elements of the crime charged.

21          If you found some of the evidence offensive, would

22  you be able to put aside your feelings about it's

23  offensiveness and objectively render an impartial verdict?

24          THE PROSPECTIVE JUROR:  Yes.

25          THE COURT:  You said 16, 17, and 18 you worked for

1   an attorney or law firm which was Kirkland and Ellis when

2   you were a kid.  Minimum wage, really?

3           THE PROSPECTIVE JUROR:  Look they used to try to

4   say do it for credit, but luckily people stopped them from

5   going to town.

6           THE COURT:  Do you have any close friends or

7   relatives who are lawyers, or work for lawyers, or work for

8   a judge in a court house?

9           THE PROSPECTIVE JUROR:  I have friends that are

10  lawyers.  The last -- nobody is actively working for the

11  Government in any capacity.

12          THE COURT:  And you have family members or

13  friends, close friends, who work for law enforcement?

14          THE PROSPECTIVE JUROR:  My cousin married an

15  Albany officer at the University of Albany.

16          THE COURT:  He's a campus officer?

17          THE PROSPECTIVE JUROR:  Yes, but it's police

18  there.

19          THE COURT:  Yes, no.  I'm not diminishing it.

20          THE PROSPECTIVE JUROR:  I don't see them often,

21  but they live up in Albany so we try to see them once in a

22  while.

23          THE COURT:  And 19.  Do you, a family member, or

24  close friend have any relationships, close relationships,

25  with a federal or local law enforcement officer?  That's

Jury Selection                           655

1    your same thing?

2            THE PROSPECTIVE JUROR:  Yeah.  I might have

3    misunderstood the question.

4            THE COURT:  Okay.  So about that; two things.

5    You're going to get the law from Judge Garaufis.  He's going

6    to tell you what the law is for this case and you have to

7    apply that law to the facts as you find, whether you agree

8    with it or not, or whether you learned anything from the

9    folks at Kirkland and Ellis, or your relatives about the

10   law.  You can do that?

11           THE PROSPECTIVE JUROR:  Yes.

12           THE COURT:  Anything in these experiences that are

13   going to affect your ability the be fair and impartial in

14   this case?

15           THE PROSPECTIVE JUROR:  No.

16           THE COURT:  I don't know enough about your

17   educational background to understand whether there's

18   anything in this that may conflict with what this case is

19   about --

20           THE PROSPECTIVE JUROR:  No.  I mean, the conflict

21   resolution side, I was a fellow at the institute, but I

22   specialized in mass killings and genocide's.  I don't

23   believe that pertains to this case.  And the work I do in

24   cyber security, where I'm also a course assistant

25   instructor, it's predominantly like how to hack into various

1   hardware devices, you know, stuff like that.

2          THE COURT:  Okay.  So the trial is going to be

3   from March 20th to the 31st.  Is there any reason why this

4   would cause you a genuine hardship if you were selected to

5   serve on the jury?

6          THE PROSPECTIVE JUROR:  No, it's actually ideal

7   timing.

8          THE COURT:  Have you, a family member, or close

9   friend, ever been involved in the criminal justice system?

10  That means; charged with a crime, convicted of a crime, been

11  the subject of a criminal investigation, been a witness to a

12  crime, grand jury investigation, or victim of a crime?

13         THE PROSPECTIVE JUROR:  No.

14         THE COURT:  Ever been a party to a legal action

15  against or dispute with the United States of America or any

16  of its agencies or employees?

17         THE PROSPECTIVE JUROR:  No.

18         THE COURT:  You live in Brooklyn?

19         THE PROSPECTIVE JUROR:  Yeah.

20         THE COURT:  How long have you lived in Brooklyn?

21         THE PROSPECTIVE JUROR:  My wife and I moved to

22  Brooklyn in 2010.  And before that I was in Midtown East and

23  before that, like, Upstate.

24         THE COURT:  Do you own or do you rent your home?

25         THE PROSPECTIVE JUROR:  We own.

1          THE COURT:  And other than your wife, do you live

2   with anyone?

3          THE PROSPECTIVE JUROR:  No.

4          THE COURT:  What does your wife do for a living?

5          THE PROSPECTIVE JUROR:  She's a neuropsychologist

6   at NYU.

7          THE COURT:  Do you have kids?

8          THE PROSPECTIVE JUROR:  No.

9          THE COURT:  And are you full-time student or are

10  you working also?

11         THE PROSPECTIVE JUROR:  I'm a part time student, I

12  work both at NYU and I work on the side also in the

13  investment space.

14         THE COURT:  What do you do at NYU?

15         THE PROSPECTIVE JUROR:  Teach on cyber security.

16         THE COURT:  And your highest level of education is

17  currently is masters?

18         THE PROSPECTIVE JUROR:  Yes.

19         THE COURT:  And you're on your second masters?

20         THE PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Served in the military?

22         THE PROSPECTIVE JUROR:  No.

23         THE COURT:  Where do you get your news from?

24  Newspapers, radio, TV, internet, social media, what?

25         THE PROSPECTIVE JUROR:  Predominantly newspaper,

Jury Selection                          658

1    and news abroad.  I was originally born in the Netherlands,

2    so I also read the Dutch newspapers.

3            THE COURT:  What papers do you read here?

4            THE PROSPECTIVE JUROR:  The Economists, New York

5    Times, also *The Wall Street Journal*, Financial Times.  New

6    Yorker.  And then I can tell you the Dutch papers, but I

7    don't know if that matters or not.

8            THE COURT:  This case wasn't carried on the Dutch

9    papers, was it?

10           THE PROSPECTIVE JUROR:  I wouldn't know.  If it

11   did, I would have told you.

12           THE COURT:  Do you use the internet or social

13   media, and if so, what platforms how do you use them and how

14   frequently?

15           THE PROSPECTIVE JUROR:  I do use the internet.  I

16   do have accounts at various social media platforms, I do not

17   use them.  My wife included, we don't even use our social

18   media accounts.  She doesn't have them anymore.  I have an

19   account with Meta, so I have Facebook, I have a Linkedin

20   account with Microsoft, and I do have a Twitter account, but

21   I do not use it.

22           THE COURT:  Are you concerned at all about the

23   reliability of the information that you find on the internet

24   and social media?

25           THE PROSPECTIVE JUROR:  I, no.  I don't read it as

Jury Selection                          659

1    truth without source, so...

2           THE COURT:  Have you ever been involved in voter

3    education, voter registration, or any get out the vote

4    efforts?

5           THE PROSPECTIVE JUROR:  No.

6           THE COURT:  Do you have any hobbies?  How do you

7    spend your free time?

8           THE PROSPECTIVE JUROR:  Teaching is a hobby

9    because they don't pay you enough otherwise.  Besides that;

10   piano, we swim, we walk, do things of that nature.  Vacation

11   when we can.  Various musical instruments.  Chess, math,

12   stuff like that.  Reading, you know.

13          THE COURT:  What television shows or radio

14   programs do you regularly watch or listen to?

15          THE PROSPECTIVE JUROR:  We do not do non-scripted

16   television because my brain goes to mush.  We do not

17   subscribe to cable television.  We have a screen in the

18   house, but we only have access to streaming.  Predominantly

19   during the week, light comedy because everybody is busy.

20   Otherwise, we don't watch legal proceedings, legal drama,

21   anything of that nature.  It's purely light comedy, I would

22   say.

23          THE COURT:  And radio?  Nothing in particular?

24          THE PROSPECTIVE JUROR:  No.  Too many commercials.

25   It's not for me.

1          THE COURT:  Can you be fair and impartial in this

2     case?

3          THE PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Anything about this case that would

5     cause you to favor one side over the other?

6          THE PROSPECTIVE JUROR:  Not at this point, no.

7          THE COURT:  Will you be able to set aside any

8     sympathies or biases you may have for any of the parties in

9     this case and render an impartial verdict based solely on

10    the evidence presented and the law as given to you by Judge

11    Garaufis?

12         THE PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Is there any follow up for Mr.

14    Hillel-tuch?

15         MR.  BUFORD:  No thank you, your Honor.

16         MR. FRISCH:  No thank you, Judge.

17         THE COURT:  Okay.  Mr. Hillel-tuch, Chloe is going

18    to escort you into the ceremonial courtroom where the other

19    panelists are.  We've now got, have enough from which the

20    jury can be picked and we're going to come in and exercise

21    our preemptories in ten minutes.

22         Can you -- is that enough time for you to figure

23    it out or do you need more?  Why don't you take Mr.

24    Hillel-tuch inside?

25         The problem is that Mr. Gilreath, he's got his

Jury Selection                           661

1    award ceremony at 6:30 and he needs to leave by 4:30.  He

2    said 4:00, he pushed it to 4:30 and he will be really pissed

3    if he doesn't get to make it.  I think we can probably push

4    him an extra 15 minutes, but -- Do you want to come in as

5    I'm questioning them about whether they have heard anything?

6             MR. FRISCH:  I think the short answer is I don't

7    need ten minutes, I'm ready now.  But my question is:  Are

8    you going to deal with the jurors Ms. Murphy and Ms. Marcus?

9             THE COURT:  I was going to dismiss them, yes.

10            MR. FRISCH:  I see.

11            THE COURT:  Dismiss them first and then talk to

12   the other jurors about whether they overheard anybody or saw

13   any tablets or computers or anything.

14            MR. FRISCH:  Do you want us to wait here or do you

15   want us to come with you?

16            THE COURT:  It's up to you.

17            MR. FRISCH:  Well, are we going to strike here or

18   are we going to strike there?

19            THE COURT:  I think we strike there because

20   they're all set up already.

21            MR. FRISCH:  Got it.  So we can walk in with you.

22            THE COURT:  Okay.

23            MR.  BUFORD:  We need a few minutes to chat

24   amongst ourselves unfortunately, is that possible?

25            THE COURT:  That's possible, but -- yes, it's

Jury Selection                                        662

1   possible.  Don't take too long.

2          MR.  BUFORD:  Maybe we'll stay here for a few

3   minutes while you guys go over there.

4          THE COURT:  Do you need to listen to me talk to

5   the other jurors about whether or not they heard anything

6   before today?

7          MR.  BUFORD:  I don't think so.  Unless somebody

8   says yes, I think we're okay.

9          (The following took place in the ceremonial

10  courtroom.)

11         THE COURT:  Ladies and gentlemen, in a few

12  minutes, and Mr. Gilreath, I know you're anxious to get out.

13  A few more minutes.  In a few minutes, the Government is

14  going to come in and we're going to start our process of

15  exercising preemptory challenges.  But something came up

16  late yesterday and early today that some of you weren't

17  asked about.  Those of you who were picked today were asked

18  about this, but the others not.

19         So we were informed that at some point, there were

20  jurors speaking perhaps about the case in the central jury

21  room, here in the ceremonial courtroom, outside after the

22  proceedings in the cafeteria, we're not sure where it was.

23  But did any of you who were seated here hear any of your

24  jurors, the other jurors, talking about this case in any

25  way?

1              Okay.

2              THE PROSPECTIVE JUROR:  You asked me this morning.

3              THE COURT:  Okay, good.  If I asked you about it

4    already, you don't need to put your hands up.  Okay.

5              Did anyone see in the central jury room at any

6    point in time, someone, a juror or two, with a laptop

7    computer or a tablet that had information about the case on

8    the screen?  Anyone?  Okay, great.

9              That's it.  So now the Government is going to come

10   in.  We'll exercise the preemptory challenges and we will

11   get you going.  I'll give you some final instructions, those

12   that have been selected, and that will be the day.  So give

13   me another minute, I'm going to go bug them to get in.

14             (A recess was taken at this time.)

15             (Taken outside of the presence of the perspective

16   jurors.)

17             THE COURT:  So first round start with the

18   defendant.

19             MR. FRISCH:  Just so I understand how your Honor

20   does it.  So those other jurors are going to be dismissed?

21             THE COURT:  They have been dismissed.

22             MR. FRISCH:  And essentially we're using our

23   strikes for the first 28 that are seated?

24             THE COURT:  Correct.  You have ten and he has six

25   in the first 28.

1          MR. FRISCH:  If I wanted to strike,

2     hypothetically, number 28, I can do that first and then go

3     back and strike, hypothetically, number one?

4          THE COURT:  Sure.

5          MR. FRISCH:  I think I had one more question.  So

6     just out of, to show you that I'm a nice guy, I'm going to

7     strike Mr. Gilreath first to get him out of here.

8          THE COURT:  Let me make sure I've the numbers.

9          MR. FRISCH:  He's 46.

10          THE COURT:  I'm not going to --

11          MR. FRISCH:  Do I go first or does the Government?

12          THE COURT:  You go first.  And you have two this

13     round, so you have another one.

14          MR. FRISCH:  Okay, I get it.  45.

15          MR.  BUFORD:  I'll take 51 and 32.  For my next

16     round, I'll take 32.

17          THE COURT:  You have -- after these two I'm going

18     to dismiss them.  So Mr. Gilreath can go home.  I want to

19     dismiss them in groups.

20          MR. FRISCH:  So it's now my turn to go; is that

21     right?

22          THE COURT:  Yes.

23          MR. FRISCH:  And I do, I do two now?

24          THE COURT:  Yes.

25          MR. FRISCH:  Okay.  Number 47 and number 37.

1              THE COURT:  I'm going to start calling out some

2       names.  If you hear your name you are dismissed with my

3       thanks, the thanks of the Court and the parties, and you can

4       go to the central jury room and let them know.

5              So we'll start with Mr. Gilreath, you're

6       dismissed.

7              Ms. Pryor, you're dismissed.

8              Ms. McGovern-Walsh, you're dismissed.

9              Mr.  Mooney, you're dismissed.

10             Mr.  Krishnaswamy, you're dismissed.

11             And Ms. Lin, you're dismissed.

12             (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2          MR. FRISCH:  Am I right that the 28th juror was

3    Number 54, Mr. Gordon?

4          THE COURT:  Number 61, Mr. Gondek.  I will count

5    them up again.

6          Yes.

7          MR. FRISCH:  Okay.  So now I have two.  Number 28

8    and Number 54.

9          THE COURT:  You said 54?

10         MR. FRISCH:  Twenty-eight and 54.  Let me just see

11   the names.  Fifty-four --

12         THE COURT:  Klepadlo is 28.

13         MR. FRISCH:  Klepadlo 28; and 54, Gordon.

14         THE COURT:  Correct.

15         You have one more.

16         MR. PAULSEN:  Number 15.

17         THE COURT:  Fifteen.

18         MR. FRISCH:  So did he just strike two people in a

19   row?

20         THE COURT:  Yes, because he did his strike in round

21   three, which he went second, and he goes first in round four.

22         MR. FRISCH:  So the two are Number 8 and Number 15;

23   is that it?

24         THE COURT:  Correct.  Now you have two more in this

25   round.

*Sidebar*                                                          667

1            MR. FRISCH:  Can I have a moment just to, sort of,
2    gather my thoughts?
3            THE COURT:  Sure.
4            (In open court; prospective jurors present.)
5            THE COURT:  So, Dr. Block, you are excused.
6            Ms. Klepadlo, you're excused.
7            MR. FRISCH:  Can I interrupt you?
8            (Sidebar.)
9            MR. FRISCH:  One of the things I'm thinking of
10   doing, before you excuse these jurors, can you wait and call
11   these two back, please?
12           (In open court; prospective jurors present.)
13           THE COURT:  Ms. Klepadlo, could you come back,
14   please?
15           (The prospective juror enters.)
16           MR. FRISCH:  And Mr. Block.
17           THE COURT:  Can you go get Dr. Block and have him
18   come back, please.
19           Can you please take a seat?
20           THE COURT:  They're trying to get Dr. Block.
21           MR. FRISCH:  Thank you.
22           THE COURT:  Thank you, Dr. Block.
23           (The prospective juror enters.)
24           THE COURT:  Thank you, Dr. Block.
25           (Sidebar.)

1          MR. FRISCH:  So I want to raise a challenge to the

2    Government's strikes because the Government has now struck in

3    a row three white males, Mr. Williams, Mr. McDermott, and

4    Mr. Block, and so I challenge those challenges under reverse

5    Batson claim.

6          MR. PAULSEN:  Your Honor, how would you like to

7    handle it?  Would you like to do the argument here?

8          THE COURT:  Yes.

9          MR. PAULSEN:  Let me just get these in order.  The

10   first one --

11         THE COURT:  What number?  His Batson challenges are

12   white men.

13         MR. PAULSEN:  Yes, I understand.  I mean, I think --

14         THE COURT:  But if it's relevant, if you're striking

15   Ms. --

16         MR. PAULSEN:  I'm sorry, you're right.  I'm sorry.

17   That's why I'm trying to get this in order.

18         Our first strike was a white woman, obviously, so

19   that's -- not everybody we struck was a white male.  For each

20   of the individuals we struck, we have neutral reasons that

21   relate to the specific answers they gave.  The first one was

22   an individual, James Mooney, who was the first --

23         THE COURT:  Number 32.

24         MR. PAULSEN:  Yeah.  This is an individual we felt

25   he gave very vague answers about what sort of news programs he

*Sidebar*                                                        669

1  watched.  We did not feel like we had a clear sense of what

2  his inputs were in terms of how he followed the news.  He said

3  he lived alone.  We didn't have a feel for the person.  He

4  said he didn't use social media.  He said he attended the

5  funerals of police officers.  He seemed like he had strong

6  political opinions, but we didn't get a feel from where those

7  were coming from, and we struck him because of, frankly,

8  the -- we didn't feel like we got a clear vision of him.

9              THE COURT:  And the others?

10             MR. PAULSEN:  The next one was Number 8, Mr. Block.

11 He was a teacher.  He's a chiropractor.  He was the one who

12 talked at length extensively.  Every question Your Honor asked

13 him resulted in almost a long speech about how he could see on

14 both sides.  We, frankly, were confused by his answers and

15 sometimes felt that he was over explaining his answers.  We,

16 frankly, just didn't get a good feel about how -- where he

17 stood on things, and we felt that we were uncomfortable

18 thinking that we didn't get a clear sense of if he actually

19 did have opinions on the subjects in this case, whether we

20 were getting to the core of it.

21             The last one we chose was Number 15.  This was

22 Charles McDermott.  This was -- I think our answer, again, was

23 that he said he had no news whatsoever.  He -- this was an

24 individual who said he has many small kids, he works at home.

25 He said he pays attention to sports but does not pay attention

1   to news at all.  He works in the financial world doing

2   accounting for hedge funds.  It, frankly, didn't seem

3   plausible that he didn't have any notion of what's going on in

4   the world.  His answers suggested that he didn't have any

5   clear opinions on anything.  Again, we were uncomfortable

6   because we didn't feel like he was being transparent about

7   what his inputs were in terms of what he watched.

8           MR. FRISCH:  May I be heard?

9           THE COURT:  Sure.

10          MR. FRISCH:  So I didn't -- in my challenge, I

11  didn't raise Number 1, who was a white woman, because I

12  understand what they said at the sidebar about her attenuated

13  connection to the husband of the special agent.

14          However, with regard to the next three, starting in

15  reverse order, Mr. McDermott struck me as clear and honest and

16  transparent as he could.  There's nothing about him that, in

17  my view, is even arguably vague or confusing.  I can't

18  remember the word that Mr. Paulsen used.  He's a guy with kids

19  who doesn't pay attention to a lot of things that are the

20  subject of this case, which, to me, made him a good juror for

21  both sides.

22          I didn't get any sense of confusion or ambiguity

23  from Mr. Mooney or Dr. Block.  And if we were talking about

24  just one of them, you know, it's not a pattern, it's not a

25  series, now we have three white males in a row, none of whom

1   frankly, seem objectionable and all of whom seem, to me, to be

2   giving the Court clear, honest, and direct answers, and so I

3   stand by my challenge.

4          THE COURT:  Last word?

5          MR. PAULSEN:  No, Your Honor.  We're comfortable

6   with much of the veneer.  Frankly, we felt like we got clear

7   insight into many of these people.

8          And for certain other people, we found their answers

9   about their lack of interest in the news, more or less,

10  credible.  And so, in this situation, when there were certain

11  individuals who seemed, we believed, likely did have inputs

12  and just weren't disclosing them, we struck those individuals.

13         The first individual, of course, was not white man.

14  She was a woman whose husband listens to the show that has

15  been saying negative things about this case.  She turned it

16  off quickly, but we were concerned that in a situation if

17  one's spouse was watching the show, it would cause some

18  tension at home, and that was why we struck her.

19         THE COURT:  The Government has articulated non --

20  reasons why it leveled its strikes -- challenges against these

21  three individuals.  They seem, to me, to be legitimate

22  reasons.  You can question whether they should have these

23  concerns, but they don't seem to be farfetched.

24         Clearly, it's not race-based, and it's just a

25  coincidence that they happen to be all white.  I could see

1   them giving these reasons for any person regardless of their

2   color, so I'm going to deny the Batson challenge.

3               MR. FRISCH:  So now we're up to -- I have how many

4   in a row next?

5               THE COURT:  You have two -- three.

6               MR. FRISCH:  So I now make three challenges.

7               THE COURT:  Yes.

8               MR. FRISCH:  If I can speak to my client and tell

9   him where we are.

10               THE COURT:  I'm not going to dismiss anybody else

11   just in case this comes up again, all right?

12               MR. FRISCH:  Say that again.

13               THE COURT:  I'm not going to dismiss anyone else yet

14   in case this comes up.  I don't want Chloe to have to run down

15   the hall and get someone.

16               MR. FRISCH:  I understand.

17               (Pause.)

18               MR. PAULSEN:  Your Honor, my colleagues have asked

19   if you could call out the number when you strike somebody,

20   too.

21               THE COURT:  Call out the number?

22               MR. PAULSEN:  Yes.  When you say the name and the

23   number.

24               THE COURT:  Oh, I see.

25               MR. PAULSEN:  We're trying to keep track.

1          THE COURT:  But -- they're trying to keep track --

2          MR. PAULSEN:  Yes.  They heard the names.

3          THE COURT:  I don't want to do that because -- if we

4    get another challenge, somebody thinks they're gone --

5          MR. PAULSEN:  Understood.

6          THE COURT:  All right.  So you've got three.

7          MR. FRISCH:  Number 34, Number 39, and Number 42.

8          MR. PAULSEN:  We are going to strike 13 and 26.

9          MR. FRISCH:  I will renew my challenge to Number 26.

10         Again, a white male.  If I remember correctly, whose

11   answers were clear and direct and seemed to have no problems.

12         MR. PAULSEN:  Your Honor, I had in my notes that

13   this person avoids news and -- this individual avoided news,

14   was very jaded, and was very concerned about the reliability

15   on social media.  He said he would spend most of his time

16   looking at sports, but, again, we were concerned that there

17   was something that had him turn away from news and is quite

18   jaded.  We didn't get a clear read on what that was, and so

19   the uncertainty led us to use him as our last strike.

20   Frankly, most people, at this point, we would be fine with.

21         MR. FRISCH:  Before you rule, can I have a second to

22   look at my notes?

23         THE COURT:  Yes.

24         (Pause.)

25         MR. PAULSEN:  For the record, Your Honor --

1          THE COURT:  Wait.

2          MR. FRISCH:  Again, as with the other three white

3     males, these are based on claims of uncertainty and comfort.

4     There's no specific -- in my view, the explanations for all

5     four were just unspecific, claims of uncertainty that simply

6     don't rebut the *prima facie* case of a Batson challenge against

7     these four white males.

8          THE COURT:  I disagree.  I think they are specific.

9     I don't necessarily agree with them -- not reasons why I would

10    use to strike those jurors -- but they're not a -- they are

11    specific, and I don't find them to be something that the

12    Government is using to hide behind to strike white males from

13    this jury.  There are still a number of white males on this

14    jury.  Guidetti.

15         MR. PAULSEN:  Your Honor, for the record, there are

16    several white men here we were absolutely fine with that we

17    felt we had a clear read on.  We didn't move to strike any of

18    these individuals for cause.  I think we have been clear that

19    one of our biggest concerns is that coverage of this case has

20    been in the news, and our concern is that some of that

21    coverage, which has almost entirely been negative, we are

22    concerned that if individuals don't realize that they have

23    been exposed to it, or weren't quite clear about what their

24    sources were, that that is a concern for us.

25         Obviously, in between, we struck a Latino woman who

1  had concerns with law enforcement, and we struck for those

2  reasons.

3          THE COURT:  I'm going to overrule the challenge.

4          MR. FRISCH:  So I have one more --

5          THE COURT:  On the main panel.

6          MR. FRISCH:  -- on the main panel.

7          If I can just talk to Mr. Mackey, first.

8          THE COURT:  Sure.

9          (Pause.)

10         MR. FRISCH:  I'm ready.  Number 48, Leder,

11 L-E-D-E-R.

12         THE COURT:  Okay.  So that means our main panel is

13 number 3 -- go along on your list, please.  Number 3, 5, 9,

14 14, 22, 23, 24, 30, 36, 38, 59, and 61.

15         MR. PAULSEN:  That's right, Your Honor.

16         MR. FRISCH:  That's what I have.

17         THE COURT:  Okay.  Do you want -- okay.  Let's just

18 finish the alternates.

19         So now the alternate challenges will be from Jurors

20 62 through 80, and we'll start with the defendant.

21         You get two each -- two strikes.

22         MR. FRISCH:  It can be anywhere within the eight?

23         THE COURT:  Yes.

24         MR. FRISCH:  Got it.

25         MR. PAULSEN:  Excuse me one second, Your Honor.

1             (Pause.)

2             MR. FRISCH:  So there's -- I get four strikes --

3             THE COURT:  No, you get two strikes on the eight --

4             MR. FRISCH:  I get a total of two on the eight?

5             THE COURT:  Yes, because there are four alternates,

6    and you each get two strikes on four alternates, so that's why

7    we have eight.

8             MR. FRISCH:  Okay.  Let me just have one second.

9             (Pause.)

10            THE COURT:  You're up.

11            MR. FRISCH:  Number 69, Mr. Magri, M-A-G-R-I.

12            THE COURT:  I figured that.

13            MR. PAULSEN:  Number 72, Ms. Sharma.

14            THE COURT:  Seventy-two?

15            MR. FRISCH:  Seventy-three.

16            THE COURT:  Seventy-three.

17            MR. PAULSEN:  Sorry.

18            MR. FRISCH:  And then I will do --

19            THE COURT:  No.  They --

20            MR. FRISCH:  They go next?

21            THE COURT:  Actually, yes, they go next.

22            MR. FRISCH:  Okay.

23            MR. PAULSEN:  I think -- right here, 75.

24            THE COURT:  Mr. Tsai.

25            MR. PAULSEN:  Yes.

1          MR. FRISCH:  I need to regroup.

2          THE COURT:  Sure.

3          (Pause.)

4          MR. FRISCH:  Erik?

5          MR. PAULSEN:  Yes.

6          MR. FRISCH:  Ms. Butterfield, 78.

7          THE COURT:  I figured that was coming.

8          Okay.  So our alternates will be:  Mr. Shipman is

9  Alternate 1; Ms. Costanza is Alternate 2; Ms. Behghiat is

10 Alternate 3; and Mr. Hillel-Tuch Alternate 4.

11         MR. FRISCH:  Yes, that's right.

12         MR. PAULSEN:  Yes, that's right.

13         THE COURT:  Is that jury acceptable to the

14 Government?

15         MR. PAULSEN:  It is, Your Honor.

16         THE COURT:  Is that jury acceptable to the

17 defendant?

18         MR. FRISCH:  Yes.

19         THE COURT:  Okay.

20         All right.  Thank you, gentlemen.

21         (Sidebar ends.)

22         (In open court; prospective jurors present.)

23         THE COURT:  Ladies and gentlemen, I'm going to read

24 a list of names.  Those who are called will be our jury.  If

25 you do not hear your name, that means you are excused with my

1   thanks and thanks of the Court and the parties.

2           Our jury will consist of Juror Number 3,

3   Mr. Guidetti; Juror Number 5, Mr. Wan; Juror Number 9,

4   Ms. Santana; Juror Number 14, Ms. Gopal; Juror Number 22,

5   Ms. Rodolico; Juror Number 23, Mr. Kopitz; Juror Number 24,

6   Mr. Rebinin; Juror Number 30, Ms. Tran; Juror Number 36,

7   Ms. Mojescik -- I'm sorry if I mispronounce your name -- Juror

8   Number 38, Ms. Webb; Juror Number 59, Mr. Najowitz; and Juror

9   Number 61, Mr. Gondek.

10          (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Continued.)

2           THE COURT:  Our alternate jurors will be Juror

3    No. 62, Mr. Shipman.  Juror No. 65, no, excuse me Juror

4    No. 76, Ms. Costanza.  Juror No. 79, Ms. Benghiat.  And

5    Juror No. 80 Mr. Hillel-Tuch.  Those of you whose names were

6    not called can get up, go to the Central Jury Room.  You are

7    excused.  Thank you so much.  I am very sorry this took so

8    long.

9           Those whose names were called, please stay seated.

10          I want to make sure no one snuck out.

11          (A brief pause in the proceedings was held.)

12          THE COURT:  We're good.  Ladies and gentlemen, you

13   know already that the trial is starting Monday.  I think --

14   where's Miriam?  She's not here.

15          So trial starts Monday.  I believe Judge Garaufis

16   starts the trial at -- his trial days start at 9:00 a.m. if

17   I'm not mistaken but you'll get information from his deputy

18   shortly.  You're going to get your telephone numbers and

19   everything so they know how to reach you in case anything

20   changes.

21          The same admonitions that I gave you before apply

22   until and, actually, through the trial.  Don't talk about

23   the case amongst yourselves or with anyone else.  If anyone

24   asks you what's going on you say I was picked it serve on a

25   jury in a criminal case.

1              No internet research.  Don't do a Google search or

2    anything like that.  The evidence is going to be presented

3    to you in court and nowhere else, and it's limited to what

4    is presented in court.  You can't do your own research.

5              If anyone approaches you about the case, let Judge

6    Garaufis know about that immediately.  If you see the

7    parties in the hall, which you likely will during the trial,

8    smile politely and go along your way.  They will do the

9    same.  They won't talk to you.  It's not because they're

10   rude, it's because they're not supposed to have any contact

11   with you outside the courtroom.

12             You have my thanks, the thanks of the Court.  This

13   is a very important thing that you're doing.  It's part of

14   your obligation as a citizen in this country to serve on

15   juries and we appreciate that greatly.  Our system of

16   government is fabulous.

17             One of the things that makes it different and

18   better than the systems of government throughout the world

19   is that we have jury trials.  We have juries of our peers

20   who decide guilt or innocence, decide civil liability.  It

21   separates from us from just about every country or most

22   countries anyway in the world and it's enshrined in our

23   constitution.  You are fulfilling your constitutional duty

24   as a citizen of this country to serve on this jury and we

25   appreciate that.

1            I know you're going to enjoy your experience.  I

2    have yet to meet someone who served on a jury who did not

3    enjoy the experience.  Who didn't find it interesting and

4    fulfilling.  Thank you.

5            THE JURY: (Collectively) Thank you.

6            THE COURT:  So Joe Reccoppa is Judge Garaufis's

7    Miriam and he's going to come meet you and give you some

8    more information.

9            Anything else?

10           MR. FRISCH:  Thank you, Judge.

11           MR. PAULSEN:  Thank you.

12           THE COURT:  Good luck.  Thanks.

13           (WHEREUPON, this matter was adjourned to March 20,

14   2023, at 9:00 a.m.)

15

16

17

18

19

20

21

22

23

24

25